**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 10-1413

---

SIERRA CLUB,
Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and
LISA P. JACKSON, Administrator,
Respondents.

---

Petition for Review of Final Administrative Action
of the United States Environmental Protection Agency

---

# PROOF OPENING BRIEF OF SIERRA CLUB

---


David S. Baron
Seth L. Johnson
Emma C. Cheuse
Earthjustice
1625 Massachusetts Ave., NW Suite 702
Washington, DC 20036
Phone: (202) 667-4500
Fax: (202) 667-2356
dbaron@earthjustice.org
sjohnson@earthjustice.org
echeuse@earthjustice.org

*Counsel for Sierra Club*


Dated: November 14, 2011

**<u>ORAL ARGUMENT NOT YET SCHEDULED</u>**

**UNITED STATES COURT OF APPEALS**
**DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| SIERRA CLUB,<br><br>Petitioner,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY and LISA P. JACKSON, Administrator,<br><br>Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 10-1413 |

**SIERRA CLUB'S CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

In accordance with D.C. Circuit Rule 28(a)(1), petitioner Sierra Club hereby certifies as follows:

**(A) Parties and Amici**

**(i) Parties, Intervenors, and Amici Who Appeared in the District Court**

This case is a petition for review of final agency action, not an appeal from the ruling of a district court.

**(ii) Parties to This Case**

<u>Petitioner:</u>

Sierra Club.

<u>Respondents:</u>

The respondents are the United States Environmental Protection Agency and Lisa P. Jackson, Administrator (collectively, “EPA”).

Intervenor:

The Utility Air Regulatory Group is an intervenor for respondent EPA.

**(iii) *Amici* in This Case**

As yet, there are no *amici curiae*.

**(iv) Circuit Rule 26.1 Disclosures for Petitioner**

See disclosure form that follows.

**(B) Ruling Under Review**

Petitioner seeks review of the final action (including the promulgation of regulations) taken by EPA in establishing “significant impact levels” and a “significant monitoring concentration” for fine particulate matter (“$PM_{2.5}$”) air pollution, to be codified in 40 C.F.R. §§ 51.165, 51.166, and 52.21. EPA took this action at 75 Fed. Reg. 64,864 (Oct. 20, 2010), JA__, titled “Prevention of Significant Deterioration (PSD) for Particulate Matter Less Than 2.5 Micrometers ($PM_{2.5}$)—Increments, Significant Impact Levels (SILs) and Significant Monitoring Concentration (SMC).”

**(C) Related Cases**

Petitioner is aware of the following challenge in this Court to portions of the same rule, filed on the following date by the following parties:

- State of Texas and Texas Commission on Environmental Quality, Dec. 20, 2010, No. 10-1415.

That case is being held in abeyance.

DATED: November 14, 2011

Respectfully submitted,

/s/David S. Baron
David S. Baron
Seth L. Johnson
Emma C. Cheuse
Earthjustice
1625 Massachusetts Ave., NW
Suite 702
Washington, DC 20036
(202) 667-4500
dbaron@earthjustice.org
sjohnson@earthjustice.org
echeuse@earthjustice.org

*Counsel for Sierra Club*

**ORAL ARGUMENT NOT YET SCHEDULED**

**UNITED STATES COURT OF APPEALS**
**DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| SIERRA CLUB, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 10-1413 |
| U.S. ENVIRONMENTAL | ) | |
| PROTECTION AGENCY and LISA P. | ) | |
| JACKSON, Administrator, | ) | |
| | ) | |
| Respondents. | ) | |

**SIERRA CLUB'S RULE 26.1 DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1 and 28(a)(1) and D.C. Circuit Rule 26.1, petitioner Sierra Club makes the following disclosures:

The following are parent companies, subsidiaries, or affiliates of Sierra Club that have issued shares or debt securities to the public: None.

Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment.

DATED: November 14, 2011

Respectfully submitted,

/s/David S. Baron
David S. Baron
Seth L. Johnson
Emma C. Cheuse
Earthjustice
1625 Massachusetts Ave., NW
Suite 702
Washington, DC 20036
(202) 667-4500
dbaron@earthjustice.org
sjohnson@earthjustice.org
echeuse@earthjustice.org

*Counsel for Sierra Club*

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT…. ....................................................................1

STATUTES AND REGULATIONS…...................................................................1

STATEMENT OF ISSUES PRESENTED….........................................................1

STATEMENT OF FACTS…. ..........................................................................2

I. Background...........................................................................................2

II. EPA's Waiver of the Statutory Requirements.................................................7

A. EPA's Establishment of Significant Impact Levels to Short-Circuit Compliance Determinations. ..........................................................................8

B. EPA's Establishment of the Significant Monitoring Concentration to Allow Sources to Avoid Providing Preconstruction Monitoring Data for Review. ..........................................................................................11

STANDARD OF REVIEW…. ........................................................................12

SUMMARY OF ARGUMENT…. ....................................................................13

STANDING…. ..........................................................................................16

ARGUMENT…. ........................................................................................19

I. EPA's Adoption of Significant Impact Levels to Waive Compliance with Clean Air Standards and Increments Is Unlawful and Arbitrary. ......................20

A. The Act Unambiguously Requires Compliance with Clean Air Standards and Increments...........................................................................20

1. The Act's Extraordinarily Rigid Language Forecloses *De Minimis* Exemptions from the Requirement for Showing Compliance with Clean Air Standards and Increments. ...............................................................20

2. Adoption of Significant Impact Levels Eviscerates, Rather Than Implements, the Legislative Design. ........................................................29

B. There Is No Showing That Air Quality Impacts at the Levels of the Significant Impact Levels Are "Trivial," Nor Can There Be. ........................32

1. EPA's Claim of Trivial Benefits Flouts the Act. ................................32

2. EPA's Claim of Trivial Benefits Is Arbitrary and Irrational. .............37

II. EPA's "*De Minimis*" Waiver of the Pre-Application Monitoring Mandated by the Act Is Unlawful and Arbitrary. ..............................................................39

A. The Clean Air Act Unambiguously Requires Pre-Construction Air Quality Monitoring. ..........................................................................................40

1. The Act Is Extraordinarily Rigid.......................................................40

2. Adoption of the Significant Monitoring Concentration Thwarts, Rather Than Implements, the Legislative Design. ...................................45

B. EPA Did Not and Cannot Show That Monitoring Benefits Are "Trivial." ...................................................................................................47

1. EPA's Claim of Trivial Benefits Is Contrary to the Act .....................47

2. EPA Does Not and Cannot Provide a Rational Basis for Finding Monitoring to Be of Trivial Value. .........................................................50

CONCLUSION… ..........................................................................................54

STATUTORY AND REGULATORY ADDENDUM

DECLARATIONS

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**


* *Alabama Power Co. v. EPA*,
636 F.2d 323 (D.C. Cir. 1979)…………………………………………………......
………………………..5, 6, 19, 24, 26-32, 34, 37, 38, 41-43, 45, 47, 48, 51, 53

*Alaska Dep't of Envtl. Conserv. v. EPA*,
540 U.S. 461 (2004)..........................................................................6, 28, 29, 30

*Am. Farm Bureau Fed'n v. EPA*,
559 F.3d 512 (D.C. Cir. 2009)..........................................................................33

*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002)........................................................................................26

*Catawba County v. EPA*,
571 F.3d 20 (D.C. Cir. 2009)............................................................................13

*Chevron U.S.A. Inc. v. NRDC*,
467 U.S. 837 (1984).................................................................................12, 13

*Consumer Electronics Ass'n v. FCC*,
347 F.3d 291 (D.C. Cir. 2003)..........................................................................21

*Engine Mfrs. Ass'n v. EPA*,
88 F.3d 1075 (D.C. Cir. 1996)..........................................................25, 28, 45, 47

*Envtl. Def. Fund v. Admin'r* ("*EDF II*"),
898 F.2d 183 (D.C. Cir. 1990)............................................................................4

*Envtl. Def. Fund v. EPA* ("*EDF I*"),
636 F.2d 1267 (D.C. Cir. 1980)...............................................................35, 39, 49

*Envtl. Def. Fund v. EPA* ("*EDF III*"),
82 F.3d 451, *amended by* 92 F.3d 1209 (D.C. Cir. 1996)….……..19, 24, 35, 36

*Gen. Instrument Corp. v. FCC*,
213 F.3d 724 (D.C. Cir. 2000)..........................................................................50

*Int'l Alliance of Theatrical & Stage Employees v. NLRB*,
334 F.3d 27 (D.C. Cir. 2003)......................................................................35, 49


* Authorities upon which we chiefly rely are marked with an asterisk.

*Kokechik Fishermen's Ass'n v. Sec'y of Commerce*,
839 F.2d 795 (D.C. Cir. 1988)....................23

*Massachusetts v. DOT*,
93 F.3d 890 (D.C. Cir. 1996)....................13, 32

*Massachusetts v. EPA*,
549 U.S. 497 (2007)....................21, 37, 38

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................13, 37, 52

*Nat'l Parks Conserv. Ass'n v. Manson*,
414 F.3d 1 (D.C. Cir. 2005)....................18

*New York v. EPA*,
443 F.3d 880 (D.C. Cir. 2006)....................23, 26

*North Carolina v. EPA*,
531 F.3d 896 (D.C. Cir. 2008)....................26

*NRDC v. EPA*,
489 F.3d 1364 (D.C. Cir. 2007)....................23

* *Public Citizen v. Fed. Motor Carrier Safety Admin.*,
374 F.3d 1209 (D.C. Cir. 2004)....................52, 53

*Public Citizen v. FTC*,
869 F.2d 1541 (D.C. Cir. 1989)....................24, 35, 47, 48, 50

* *Public Citizen v. Young*,
831 F.2d 1108 (D.C. Cir. 1987)....................19-21, 28, 29, 31, 35, 45

* *Shays v. Fed. Election Comm'n*,
414 F.3d 76 (D.C. Cir. 2005).................... 18, 19, 34, 35, 37, 38, 43, 46, 49, 53

*Shays v. Fed. Election Comm'n*,
528 F.3d 914 (D.C. Cir. 2008)....................18

*Sierra Club v. EPA*,
129 F.3d 137 (D.C. Cir. 1997)....................18

*Sierra Club v. EPA*,
294 F.3d 155 (D.C. Cir. 2002)....................................................................23, 43

*Train v. Natural Resources Defense Council*,
421 U.S. 60 (1975)..............................................................................................29

*Transactive Corp. v. United States*,
91 F.3d 232 (D.C. Cir. 1996)...............................................................................13

*U.S. Telecom Ass'n v. FCC*,
359 F.3d 554 (D.C. Cir. 2004)............................................................................54

*Union Electric Co. v. EPA*,
427 U.S. 246 (1976)........................................................................................3, 29

*United States v. Clintwood Elkhorn Mining Co.*,
553 U.S. 1 (2008)................................................................................................21

*Vill. of Barrington, Ill. v. Surface Transp. Bd.*,
636 F.3d 650 (D.C. Cir. 2011)....................................................................13, 32

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001)............................................................................................32

**STATUTES**

42 U.S.C. § 7407(a) .................................................................................................3

42 U.S.C. § 7407(d)(1)..............................................................................................4

42 U.S.C. § 7407(d)(4)(A)(v) ...................................................................................25

42 U.S.C. § 7409........................................................................................................3

42 U.S.C. § 7409(b) ..................................................................................................3

42 U.S.C. § 7409(b)(1)..............................................................................................32

42 U.S.C. § 7410(a)(1)-(2).........................................................................................3

42 U.S.C. § 7410(a)(2)(C) .........................................................................................6

42 U.S.C. § 7410(a)(2)(D)(i) ..............................................................................9, 25

42 U.S.C. § 7410(a)(2)(J) ....................6
42 U.S.C. § 7410(c)(1) ....................6
42 U.S.C. § 7410(*l*) ....................3
42 U.S.C. § 7411(a)(4) ....................5
42 U.S.C. § 7426 ....................25
42 U.S.C. § 7470-7479 ....................3
42 U.S.C. § 7470(1) ....................5
42 U.S.C. § 7470(5) ....................17, 48
42 U.S.C. § 7471 ....................1, 4, 6, 29
42 U.S.C. § 7472 ....................4
42 U.S.C. § 7473 ....................4
42 U.S.C. § 7473(a) ....................30
42 U.S.C. § 7473(c) ....................23
42 U.S.C. § 7474 ....................4
42 U.S.C. § 7475(a) ....................1, 5, 24
42 U.S.C. § 7475(a)(2) ....................17
42 U.S.C. § 7475(a)(3) ....................5, 6, 25, 39
42 U.S.C. § 7475(a)(3)(A) ....................22
42 U.S.C. § 7475(a)(3)(A)-(B) ....................21
42 U.S.C. § 7475(a)(3)(B) ....................40
42 U.S.C. § 7475(a)(7) ....................42
42 U.S.C. § 7475(b) ....................22
42 U.S.C. § 7475(d)(2)(C)(iii)-(iv) ....................22

42 U.S.C. § 7475(d)(2)(D) ....... 22

42 U.S.C. § 7475(e)(2) ....... 6, 39, 41-43, 45, 46, 47

42 U.S.C. § 7475(e)(3) ....... 45

42 U.S.C. § 7475(e)(3)(C) ....... 17

42 U.S.C. § 7475(e)(3)(D) ....... 45

42 U.S.C. § 7476 ....... 1, 4

42 U.S.C. § 7476(a) ....... 7

42 U.S.C. § 7476(a)-(b) ....... 7

42 U.S.C. § 7476(c) ....... 17

42 U.S.C. § 7476(d) ....... 30

42 U.S.C. § 7479(1) ....... 5, 24

42 U.S.C. § 7479(2)(c) ....... 5

42 U.S.C. § 7479(4) ....... 51

42 U.S.C. § 7502(c)(5) ....... 31

42 U.S.C. § 7503(a)(1) ....... 31

42 U.S.C. § 7511a(c)(2)(A) ....... 45

42 U.S.C. § 7607(b)(1) ....... 1

42 U.S.C. § 7607(d)(1)(J) ....... 12

42 U.S.C. § 7607(d)(9) ....... 12

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. Pt. 50, App.L § 2.1-2.2 ....... 39

40 C.F.R. Pt. 50, App.N, § 1(c) ....... 34

40 C.F.R. Pt. 50, App.N, § 4.3 ....... 34

40 C.F.R. Pt. 50, App.N, § 4.3(a) ....................................................................34

40 C.F.R. Pt. 50, App.N, § 4.3(b) ....................................................................34

40 C.F.R. Pt. 50, App.N, § 4.5(1) tbl. 1 ...........................................................34

40 C.F.R. Pt. 50, App.N, § 4.5(a)-(b) ...............................................................34

40 C.F.R. Pt. 51, App.W, § 8.2.1.b ...................................................................44

40 C.F.R. § 50.13(a)......................................................................................3, 7

40 C.F.R. § 51.161 ............................................................................................17

40 C.F.R. § 51.165(b)(1)......................................................................................9

40 C.F.R. § 51.166(a)(7)(ii)-(iii).........................................................................27

40 C.F.R. § 51.166(a)(7)(iv)(*a*) ........................................................................27

40 C.F.R. § 51.166(b)(2)(i) ................................................................................27

40 C.F.R. § 51.166(b)(3).....................................................................................27

40 C.F.R. § 51.166(b)(23)...................................................................................27

40 C.F.R. § 51.166(b)(39)...................................................................................27

40 C.F.R. § 51.166(i)(5)......................................................................................11

40 C.F.R. § 51.166(i)(5)(ii).................................................................................11

40 C.F.R. § 51.166(q) .........................................................................................17

40 C.F.R. § 52.21(a)(2)(ii)-(iii)...........................................................................27

40 C.F.R. § 52.21(a)(2)(iv)(*a*) ..........................................................................27

40 C.F.R. § 52.21(b)(2)(i) ..................................................................................27

40 C.F.R. § 52.21(b)(3).......................................................................................27

40 C.F.R. § 52.21(b)(23).....................................................................................27

40 C.F.R. § 52.21(b)(40).....................................................................................27

40 C.F.R. § 52.21(i)(5) ........ 11

40 C.F.R. § 52.21(i)(5)(ii) ........ 11, 53

40 C.F.R. § 52.21(q) ........ 17

**FEDERAL REGISTER**

62 Fed. Reg. 38,652 (July 18, 1997) ........ 7

68 Fed. Reg. 26,690 (May 16, 2003) ........ 2

71 Fed. Reg. 61,144 (Oct. 17, 2006) ........ 7

72 Fed. Reg. 20,586 (Apr. 25, 2007) ........ 2, 3

72 Fed. Reg. 54,112 (Sept. 21, 2007) ........ 2, 7-9, 11, 16, 51

75 Fed. Reg. 64,864 (Oct. 20, 2010) ........ 1-3, 7-12, 26, 30, 35, 37, 39, 40, 51

**LEGISLATIVE MATERIAL**

H.R. Rep. No. 95-294 (1977) ........ 6, 30

S. Rep. No. 95-127 (1977) ........ 30

**OTHER SOURCES**

Daniel A. Farber et al., *Cases and Materials on Environmental Law* 534 (7th ed. 2006) ........ 31

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| CAA, the Act | Clean Air Act |
| the Club | Sierra Club |
| EPA, the agency | Environmental Protection Agency |
| JA | Joint Appendix |
| NAAQS | National Ambient Air Quality Standards |
| $PM_{2.5}$ | Fine particulate matter (particulate matter 2.5 micrometers and smaller in diameter) |
| $PM_{10}$ | Coarse particles (particulate matter 10 micrometers and smaller in diameter) |
| PSD | Prevention of significant deterioration |
| SILs | Significant impact levels |
| SMC | Significant monitoring concentration |
| $\mu g/m^3$ | Micrograms per cubic meter |

## JURISDICTIONAL STATEMENT

**(A) Agency.** Respondents U.S. Environmental Protection Agency and Lisa P. Jackson, Administrator, (collectively, "EPA" or "the agency") have authority to establish maximum allowable increases ("increments") in levels of fine particulate matter ("$PM_{2.5}$") pollution and to promulgate rules to prevent significant deterioration of air quality from $PM_{2.5}$ pollution pursuant to Clean Air Act (also called "the Act" or "CAA") §§ 161, 165(a), 166, 42 U.S.C. §§ 7471, 7475(a), 7476.

**(B) Court of Appeals.** Pursuant to 42 U.S.C. § 7607(b)(1), this Court has jurisdiction to review the final EPA actions, taken at 75 Fed. Reg. 64,864 (Oct. 20, 2010) ("the $PM_{2.5}$ increments rule"), challenged in this proceeding.

**(C) Timeliness.** The petition for review was timely filed within the 60-day window of CAA § 307(b)(1), 42 U.S.C. § 7607(b)(1), on December 17, 2010.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in an addendum to this brief.

## STATEMENT OF ISSUES PRESENTED

1. Whether EPA illegally and arbitrarily abrogated the Clean Air Act's express mandate that proposed new major sources of air pollution must show, before receiving a permit, that they will not cause or contribute to a violation of any increment or national ambient air quality standard.

2. Whether EPA illegally and arbitrarily abrogated the Clean Air Act's mandatory monitoring requirements for proposed new major sources of air pollution.

## STATEMENT OF FACTS

### I. BACKGROUND.

Fine particulate matter pollution "is causally linked" to a wide range of serious health impacts, including asthma attacks, hospitalization and emergency room visits for cardiopulmonary diseases, chronic respiratory disease, reduction in lung function, cancer, and premature death. 72 Fed. Reg. 54,112, 54,127/3-28/2 (Sept. 21, 2007), JA__-__. Metals in $PM_{2.5}$ pollution can bioaccumulate and cause a variety of health problems, including harm to the kidneys and central nervous system. EPA-HQ-OAR-2006-0605-0005 at 2-11 tbl.2-2, JA__; 68 Fed. Reg. 26,690, 26,693-94 (May 16, 2003), JA__-__. $PM_{2.5}$ pollution also seriously impairs visibility and causes a multitude of ecological harms, including damage to plants and acidification and eutrophication of waterbodies. 72 Fed. Reg. at 54,129/1-30/1, 54,131/1-32/3, JA__-__, __-__.

A product of combustion, 75 Fed. Reg. at 64,880/3, JA__, $PM_{2.5}$ pollution is emitted in large quantities by such sources as power plants, refineries, and large factories, *id.* at 64,865, JA__; 72 Fed. Reg. 20,586, 20,594/1, /3, 20,596/1 (Apr. 25, 2007), JA__, __. $PM_{2.5}$ pollution can be transported in the atmosphere for

hundreds of miles from such emission points to downwind communities. 75 Fed. Reg. at 64,880/3, JA__. As well as being emitted directly by sources, $PM_{2.5}$ pollution also results from atmospheric reactions involving precursor gases, including sulfur dioxide and oxides of nitrogen. *E.g.*, 72 Fed. Reg. at 20,589/2, JA__.

The Clean Air Act requires EPA to set National Ambient Air Quality Standards ("NAAQS") for various harmful air pollutants, including particulate matter, at levels requisite to protect public health and welfare.[1] 42 U.S.C. § 7409. These standards limit the concentration of each pollutant allowable in the ambient air people breathe. Every state must develop for EPA approval an "implementation plan" ("state implementation plan") to ensure that the standards are "achieved and maintained" in all areas of each state. *Id.* § 7407(a); *see also id.* §§ 7410(a)(1)-(2), (*l*), 7475(a)(3). Attainment and maintenance of attainment of the NAAQS is "central" to the Act's regulatory scheme. *Union Electric Co. v. EPA*, 427 U.S. 246, 258 (1976).

To ensure that clean air is maintained in areas currently meeting the NAAQS, Congress established special "PSD" provisions aimed at prevention of

[1] The primary NAAQS is set at a level to protect public health; the secondary NAAQS at a level to protect the public welfare. 42 U.S.C. § 7409(b). Because EPA has set both NAAQS at the same level, 40 C.F.R. § 50.13(a), Petitioner uses NAAQS to refer to either or both unless otherwise noted.

significant deterioration of air quality in these areas. 42 U.S.C. §§ 7470-7479; *Envtl. Def. Fund v. Admin'r* ("*EDF II*"), 898 F.2d 183, 184 (D.C. Cir. 1990) (Congress established PSD program "to protect the air quality in national parks and similar areas of special scenic or recreational value, and in areas where pollution was within the national ambient standards"). Among other things, the PSD provisions provide for statutory or regulatory "increments" (limits on pollution increases) for these "attainment" areas.[2] *See* 42 U.S.C. §§ 7473, 7476. Increments' stringency varies for different areas based on a statutory classification scheme. The most stringent increments apply to "Class I" areas—mainly, large national parks and wilderness areas. The next level of increment protection is given to "Class II" areas, presumptively comprising all other attainment areas. *See EDF II*, 898 F.2d at 185; *see also* 42 U.S.C. §§ 7472, 7474 (also allowing establishment of Class III areas, though none has ever been created).

The statutory PSD provisions require that persons proposing to build new and modified major air pollution sources (such as large power plants and factories)

---

[2] The Act requires EPA to identify ("designate") regions of each state as either violating the NAAQS ("nonattainment" areas) or meeting the NAAQS ("attainment" areas). 42 U.S.C. § 7407(d)(1). Where information is insufficient to determine whether an area meets the NAAQS, EPA designates the area as "unclassifiable." *Id.* Because unclassifiable areas are treated the same as attainment areas for regulatory purposes, *e.g.*, *id.* § 7471, references herein to attainment areas encompass unclassifiable areas as well.

in attainment areas must first obtain preconstruction ("PSD") permits from the state or EPA. 42 U.S.C. § 7475(a); *Alabama Power Co. v. EPA*, 636 F.2d 323, 362 (D.C. Cir. 1979). The Act applies the permitting requirements to new sources that emit[3] 250 tons per year (or 100 tons per year for some source categories) of any air pollutant, as well as to modified major emitting facilities (*i.e.*, those undergoing changes that increase pollutant emissions). 42 U.S.C. §§ 7475(a), 7479(1), (2)(C), 7411(a)(4); *Alabama Power*, 636 F.2d at 352-53. Congress created the PSD permit requirement "to protect public health and welfare from *any* actual or potential adverse effect which in the Administrator's judgment may reasonably be anticipate[d] to occur from air pollution or from exposures to pollutants in other media, which pollutants originate as emissions to the ambient air . . . , notwithstanding attainment and maintenance of all national ambient air quality standards." 42 U.S.C. § 7470(1) (emphasis added).

Key to obtaining a PSD permit, the applicant must show that emissions from the facility "will not cause, or contribute to," any exceedance of any increment for any pollutant in any attainment area more than once a year or to any exceedance of any NAAQS for any pollutant in any area ever. *Id.* § 7475(a)(3). Congress

[3] The permitting requirement also extends to sources that "have the potential to emit" these amounts. 42 U.S.C. § 7479(1). For brevity, the terms "emit" or "emissions" are used herein as shorthand for "emit, or have the potential to emit," unless the context indicates otherwise.

intended to make absolutely sure that pollution increases would not degrade air quality to the point of violating standards or increments. *Alabama Power*, 636 F.2d at 362; *see also* H.R. Rep. No. 95-294, at 9 (1977) ("The purpose of the permit is to assure that the allowable increments and allowable ceilings will not be exceeded as a result of emissions from any new or modified stationary source.").

To provide assurance that these demonstrations would be accurate and credible, Congress expressly required, with limited exception, that the applicant provide at least one year's worth of air quality monitoring data, collected before the date of the permit application to provide a real-world picture of air quality in the affected area. 42 U.S.C. § 7475(e)(2). If that monitoring data shows, for example, that ambient pollution levels are already on the verge of violating standards or increments, the permit applicant must show how it could add new pollution without pushing the area into violation. *See id.* § 7475(a)(3).

Congress required the PSD program to be carried out through state implementation plans (or, absent an adequate state plan, a federal implementation plan) that comply with the Act and EPA regulations. *See id.* §§ 7471, 7410(a)(2)(C), (a)(2)(J), (c)(1); *see also Alaska Dep't of Envtl. Conserv. v. EPA*, 540 U.S. 461, 470-71 (2004) (describing statutory scheme). When a state carries out the PSD program through its state implementation plan, its plan must comply with the requirements EPA established at 40 C.F.R. § 51.166. In states where EPA

carries out the program, the governing rule is 40 C.F.R. § 52.21. When EPA adopts new or revised NAAQS, the Act requires EPA to adopt PSD rules for such NAAQS within two years, and the states must then update their implementation plans. 42 U.S.C. § 7476(a)-(b).

## II. EPA'S WAIVER OF THE STATUTORY REQUIREMENTS.

EPA adopted NAAQS for $PM_{2.5}$ in 1997 and revised them in 2006 to their current levels of 15 micrograms per cubic meter ($\mu g/m^3$) measured as an annual average and 35 $\mu g/m^3$ measured as a 24-hour average. 40 C.F.R. § 50.13(a); 62 Fed. Reg. 38,652 (July 18, 1997); 71 Fed. Reg. 61,144 (Oct. 17, 2006). Pursuant to § 166(a) of the Act, the agency was therefore obligated to adopt PSD rules to implement the $PM_{2.5}$ NAAQS. 42 U.S.C. § 7476(a); *see also* 75 Fed. Reg. at 64,870/3-71/1 (relying on 42 U.S.C. § 7476(a)). In 2010, EPA issued a final rule adopting $PM_{2.5}$ increments for Class I, II, and III areas. 75 Fed. Reg. at 64,903-04 (to be codified at 40 C.F.R. § 51.166(c)(1)), JA__-__; *id.* at 64,905-06 (to be codified at 40 C.F.R. § 52.21(c)), JA__-__. As part of the same rulemaking, however, EPA provided for waivers of the Act's key requirement that PSD permit applicants show that their projects will not cause or contribute to NAAQS or increment violations. *Id.* at 64,866, JA__; *see also* 72 Fed. Reg. at 54,115, JA__. EPA also provided for waiver of the statutory mandate that permit applicants provide at least one year's worth of air monitoring data collected prior to the date

of the permit application. 75 Fed. Reg. at 64,866/1, JA__; *see also* 72 Fed. Reg. at 54,115/1, JA__. Sierra Club filed this case to challenge those waivers.

### A. EPA's Establishment of Significant Impact Levels to Short-Circuit Compliance Determinations.

EPA waived the statutorily mandated showing of compliance with standards and increments if the source predicts that its emissions will not cause ambient $PM_{2.5}$ pollution levels to increase by more than fixed amounts (set forth in the rule) called "significant impact levels" (also "SILs"). *See* 75 Fed. Reg. at 64,891/1-2, JA__; *see also* 72 Fed. Reg. at 54,139/2-3, JA__. As a result, when an area is within a significant impact level's worth of exceeding the NAAQS, or when less than a significant impact level's worth of the increment remains, significant impact levels allow a proposed source to cause a violation of the NAAQS or increment. *See* 75 Fed. Reg. at 64,891/1 ("a source that demonstrates that the projected ambient impact of its proposed emissions increase does not exceed the SIL for that pollutant at a location where a NAAQS or increment violation occurs is not considered to cause or contribute to that violation."), JA__. EPA deems an impact below the significant impact level to be trivial even where the "emissions increase . . . alone would cause . . . air quality impacts" that, when added to existing levels of ambient air pollution, exceed the increment or NAAQS. *Id.* at 64,904/3, 64,906/3 (to be codified at 40 C.F.R. §§ 51.166(k)(2), 52.21(k)(2)), JA__, __. A

major new factory or power plant can thus obtain a PSD permit even though it will in fact cause or contribute to NAAQS or increment violations.

EPA authorized significant impact levels for states and made them mandatory for the federal PSD program. *See id.* at 64,904/3 (to be codified at 40 C.F.R. § 51.166(k)(2)), JA__; *id.* at 64,906/3 (to be codified at 40 C.F.R. § 52.21(k)(2)), JA__. This marked the first promulgation of significant impact levels for any pollutant in the PSD regulations. 72 Fed. Reg. at 54,138/3, JA__. The rule also provided that a proposed PSD source whose emissions are predicted to travel into an area already violating standards would be deemed not to contribute to the existing violation as long as its impact fell below the Class II significant impact level. *See* 75 Fed. Reg. at 64,902 (to be codified at 40 C.F.R. § 51.165(b)(2)), JA__; *see also* 40 C.F.R. § 51.165(b)(1) (requiring states to include plans to satisfy Clean Air Act § 110(a)(2)(D)(i), 42 U.S.C. § 7410(a)(2)(D)(i)). Thus, a source proposing to locate in an attainment area can still receive a PSD permit even if its emissions will increase the level of $PM_{2.5}$ pollution in a nonattainment area and worsen an existing violation of standards there.

Over commenters' objections, EPA asserted a single legal rationale for establishing significant impact levels: "the *de minimis* principles described by the court in *Alabama Power* at 323, 360." 75 Fed. Reg. at 64,891/2-3, JA__; *see also* 72 Fed. Reg. at 54,139/2, JA__. Commenters provided several examples of

permits that actually issued based on significant impact levels for other pollutants, despite the fact that modeling predicted that emissions would contribute to violations of the relevant increment. EPA-HQ-OAR-2006-0605-0040 at 17, JA__. Yet the agency did not explain how an approach that allows violations of standards and increments to occur could be deemed consistent with a *de minimis* exemption. Indeed, EPA conceded that when ambient air levels of $PM_{2.5}$ pollution are near an increment or the NAAQS, "the use of a SIL may not be appropriate," but nevertheless authorized the use of significant impact levels in those (and all other) situations. 75 Fed. Reg. at 64,894/1, JA__; *see also id.* at 64,892/1, JA__. The agency also "acknowledge[d] that [it] did not conduct any new modeling or other types of analyses of the proposed SILs in order to explicitly show that the final $PM_{2.5}$ SILs values in this final rule are *de minimis*."[4] *Id.* at 64,893/2-3, JA__.

[4] EPA derived its significant impact level values by scaling down significant impact levels it had previously proposed (but never adopted) for the "coarse" particle ("$PM_{10}$") NAAQS. EPA did this by multiplying "the $PM_{10}$ SILs . . . by . . . the ratio of the $PM_{2.5}$ NAAQS to the $PM_{10}$ NAAQS." 75 Fed. Reg. at 64,890/3, JA__. EPA did not explain why the numbers produced by this approach reflected trivial levels of $PM_{2.5}$ increases, nor did it explain why the previously proposed $PM_{10}$ SILs it used for the calculation were themselves in fact trivial. *See id.* at 64,893/3, JA__.

**B. EPA's Establishment of the Significant Monitoring Concentration to Allow Sources to Avoid Providing Preconstruction Monitoring Data for Review.**

EPA also waived the Act's requirement for a year's worth of preconstruction air quality monitoring for sources that predict the increase they will cause in an area's $PM_{2.5}$ levels will fall below a "significant monitoring concentration" (also "SMC") specified in the rule.[5] 75 Fed. Reg. at 64,897/1, JA__; 72 Fed. Reg. at 54,141/1, JA__. It authorized states to use the significant monitoring concentration and made it a required part of the federal PSD program. 75 Fed. Reg. at 64,904/2 (to be codified at 40 C.F.R. § 51.166(i)(5)(i)(*c*)), JA__; *id.* at 64,906/1 (to be codified at 40 C.F.R. § 52.21(i)(5)(i)), JA__; *see also* 40 C.F.R. §§ 51.166(i)(5), 52.21(i)(5).

As with the significant impact levels, and again over commenters' objections, EPA-HQ-OAR-2006-0605-0040 at 18-19, JA__-__, EPA relied on the *de minimis* principle from *Alabama Power* as its source of legal authority. 75 Fed. Reg. at 64,896/1, JA__; *see also* 72 Fed. Reg. at 54,141/2, JA__. The agency set the significant monitoring concentration at two times the lowest concentration of

---

[5] EPA also allows a source to avoid undertaking monitoring if existing ambient air levels of the pollutant are below the significant monitoring concentration. 40 C.F.R. §§ 51.166(i)(5)(ii), 52.21(i)(5)(ii); 75 Fed. Reg. at 64,867/1, JA__.

$PM_{2.5}$ that monitors could allegedly detect,[6] 75 Fed. Reg. at 64,897/1, JA__, but did not explain how the significant monitoring concentration bore any connection to compliance with the NAAQS or increment, or how monitoring data would never provide any regulatory benefits, *see* EPA-HQ-OAR-2006-0605-0040 at 18-19, JA__-__. In fact, the agency conceded that monitoring would be useful even where the significant monitoring concentration was not exceeded, stating that when "representative ambient concentration data are not available from other sources and the ambient air quality is at levels near the $PM_{2.5}$ NAAQS, we do not encourage the continued use of the SMC." EPA-HQ-OAR-2006-0605-0059 at 92 [hereinafter EPA, *RTC*], JA__. But the final rule nonetheless expressly allows waiver of monitoring in just such a situation, and in any other situation where monitoring would in fact be useful. *Id.*, JA__.

**STANDARD OF REVIEW**

At issue is whether EPA's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9); *see also id.* § 7607(d)(1)(J). For matters of statutory interpretation, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*

[6] The agency is reconsidering this multiplication factor.

*U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984). If the statute is ambiguous, under *Chevron* step two, the agency's interpretation must be rejected if, among other things, "the agency has [not] offered a reasoned explanation for why it chose that interpretation," *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011), or the interpretation "diverges from any realistic meaning of the statute," *Massachusetts v. DOT*, 93 F.3d 890, 893 (D.C. Cir. 1996). Unless otherwise expressly indicated, references in this brief to "unlawful" agency action address both violation of congressional intent under *Chevron* step one and unreasonable agency interpretation under step two. The agency's action is arbitrary and capricious if, for example, the agency "entirely failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), or failed to "identif[y] and explain[] the reasoned basis for its decision," *Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996). *See also, e.g.*, *Catawba County v. EPA*, 571 F.3d 20, 41 (D.C. Cir. 2009) (arbitrary and capricious review under Clean Air Act is same as under Administrative Procedure Act).

## SUMMARY OF ARGUMENT

EPA violated the express terms of the Act in waiving the statutory directive that proposed new sources prove their increased pollution will not cause or contribute to violation of any clean air standards or increments. The Act's

mandate for this showing is extraordinarily rigid, foreclosing "*de minimis*" waivers of the sort EPA authorized through the significant impact levels it adopted here. These waivers flout the Act's most central purposes—attainment and protection of the national clean air standards—and this Court's precedents preclude *de minimis* exemptions that thwart implementation of such core requirements of the legislative design.

EPA also did not and cannot meet its burden of showing that pollution increases allowed by its significant impact levels are truly "trivial" as required by the *de minimis* test. By law, the national clean air standards must be set exactly at the level requisite to protect public health, leaving no room for claims that pollution increases over those standards are trivial. Moreover, EPA concedes, as it must, that pollution increases lower than the significant impact levels can still cause a violation of standards or increments where, for example, pollution levels are already right at, or very close to, the levels of the standards and increments. And because EPA's rule allows an unlimited number of sources to pollute right up to the level of the significant impact levels, the violations of increments and standards that the rule allows are unlimited, too. EPA cannot lawfully or rationally claim that prevention of such violations is "trivial," "pointless," or of "no value."

EPA also illegally waived the Act's explicit mandate for a year's worth of air quality monitoring data before a permit to increase pollution can be granted.

The statute is again extremely rigid in requiring this monitoring so the permitting agency and the public can know, based on real-world data, whether the air is already too dirty to allow additional pollution from new sources. Congress specified only a single exception to the requirement for a full year's worth of monitoring, and then only to allow a shorter monitoring period under limited circumstances, thus foreclosing the kind of complete waiver EPA has authorized here. Moreover, EPA cannot lawfully claim that monitoring is "pointless" or of "trivial" value for purposes of determining compliance with standards and increments when Congress explicitly stated that it was essential for that very purpose. EPA simply disagrees with Congress's clear command.

EPA also does not and cannot show any rational relationship between its significant monitoring concentration, which is a measure of the predicted increase that a proposed source will cause in $PM_{2.5}$ levels, and its claim that information on monitored, existing pollution levels would be of trivial value. EPA itself concedes that such monitoring "can be useful," even when the predicted pollution increase is below the significant monitoring concentration, where pre-existing pollution levels in affected areas are already right at (or over) standards or increments and the increase would tip the area into violation. Yet EPA's rule allows waiver of monitoring in precisely such situations where—far from being pointless and trivial—monitoring information would be crucial. Further, the statute requires that

pre-application monitoring information be provided to the public, and there is no lawful or rational basis for EPA to deem the public's right to that information "trivial" on any grounds.

## STANDING

Petitioner Sierra Club ("the Club") is a national nonprofit organization whose purposes include the protection and enjoyment of the environment, including protection of air quality. *See* attached declaration of Bruce Nilles. The Club has standing to bring this action on behalf of itself and its many members who have well-founded concerns about threats to their health and welfare from $PM_{2.5}$ air pollution in places where they live, work, and enjoy recreation. *See* attached declarations. EPA has found that exposure to such pollution is linked to asthma attacks, hospitalization, and emergency room visits for cardiopulmonary diseases, development of chronic respiratory disease, reduction in lung function, lower quality of life, premature death, impaired visibility in both urban areas and parklands, and damage to plants and forests. *E.g.*, 72 Fed. Reg. at 54,127/3-32/3, JA__-__. The rules challenged herein allow increased emissions from new and modified power plants and factories to cause or worsen violations of clean air standards and increments for $PM_{2.5}$ in places where Club members live, work, and recreate, thereby endangering their health and welfare. *See* attached declarations.

The challenged rules further injure the interests of Sierra Club and its members by waiving requirements for permit applications to include information to which the Club and its members are entitled,[7] including pre-application monitored air quality data for $PM_{2.5}$ for impacted areas, and analyses of whether the source's emissions (combined with emissions from other sources) will cause or contribute to $PM_{2.5}$ NAAQS and increment violations in places where Club members live, work, and recreate. *Id.* The rules thereby also impair the ability of Sierra Club's members (and the Club on their behalf) to provide informed advocacy in PSD permitting proceedings, and in subsequent challenges to permit decisions, including through a project that it has created for that purpose. *Id.*; Nilles Declaration. The Club further anticipates the rule's waiver of the above-referenced information submission requirements will require it to incur additional financial expenditures or staff time to make up for the lack of the above-referenced information, thereby harming the Club's financial interests. *Id.* Sierra Club and its members are also harmed by EPA's waiver of the procedural requirement for a permitting agency to review the section 165(a)(3) and (e)(2) informational

[7] *See* 42 U.S.C. § 7470(5) (stating purpose "to assure that any decision to permit increased air pollution. . . is made only . . . after adequate procedural opportunities for informed public participation in the decisionmaking process"); *id.* § 7476(c) (incorporating § 7470); *id.* § 7475(a)(2), (e)(2), (e)(3)(C) (public hearing); 40 C.F.R. §§ 51.161, 51.166(q), 52.21(q) (public participation).

submissions before deciding whether to issue a permit, a requirement designed to protect the health and welfare interests of the Club's members. Further support for Sierra Club's standing appears in the materials cited in this brief and in the appended declarations.

For all the foregoing reasons, Sierra Club has standing to bring this action. *See, e.g.*, *Shays v. Fed. Election Comm'n*, 528 F.3d 914, 923 (D.C. Cir. 2008) (plaintiff has standing to challenge rule that impairs plaintiff's ability to access information that statute requires to be publicly disclosed); *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 85, 95 (D.C. Cir. 2005) ("when agencies adopt procedures inconsistent with statutory guarantees, parties who appear regularly before the agency" have standing to object); *Nat'l Parks Conserv. Ass'n v. Manson*, 414 F.3d 1, 4-7 (D.C. Cir. 2005) (conservation groups with members in affected area have standing to challenge federal action that alters legal regime governing a state permit decision under Clean Air Act); *Sierra Club v. EPA*, 129 F.3d 137, 139 (D.C. Cir. 1997) (environmental group with members in affected areas has standing to challenge EPA suspension of Clean Air Act review requirements in such areas).

## ARGUMENT

Under this Circuit's precedent, the authority to create a *de minimis* exemption is "narrow in reach and tightly bounded by the need to show that the situation is genuinely de minimis." *Alabama Power*, 636 F.2d at 361. A *de minimis* exemption is not allowed at all where a statute is "extraordinarily rigid." *Id.* at 360; *Shays*, 414 F.3d at 114. An agency cannot lawfully create a *de minimis* exemption to a statutory command unless that exemption actually serves to "implement[] the legislative design." *Alabama Power*, 636 F.2d at 360; *accord Public Citizen v. Young*, 831 F.2d 1108, 1116 (D.C. Cir. 1987) ("the test for application of the *de minimis* doctrine [is:] would the doctrine 'implement[] the legislative design'?" (citation omitted; second alteration in original)). Further, *de minimis* exemptions "must cover only situations where 'the burdens of regulation yield a gain of trivial or no value.'" *Shays*, 414 F.3d at 114 (quoting *Envtl. Def. Fund v. EPA* ("*EDF III*"), 82 F.3d 451, 466, *amended by* 92 F.3d 1209 (D.C. Cir. 1996)). The analysis requires "the assessment of particular circumstances," and the agency bears the burden of showing that "matters are truly *de minimis*." *Alabama Power*, 636 F.2d at 360; *see also Shays*, 414 F.3d at 115.

The Clean Air Act forecloses application of the *de minimis* exemption to either § 165(a)(3) or § 165(e)(2). Even if it did not, EPA cannot and did not carry

its burden to justify the significant impact levels or significant monitoring concentration as valid *de minimis* exemptions.

# I. EPA'S ADOPTION OF SIGNIFICANT IMPACT LEVELS TO WAIVE COMPLIANCE WITH CLEAN AIR STANDARDS AND INCREMENTS IS UNLAWFUL AND ARBITRARY.

## A. The Act Unambiguously Requires Compliance with Clean Air Standards and Increments.[8]

### 1. The Act's Extraordinarily Rigid Language Forecloses *De Minimis* Exemptions from the Requirement for Showing Compliance with Clean Air Standards and Increments.

The portion of the Act that governs here is precisely the type of "extraordinarily rigid" provisions that bar *de minimis* exemptions. *See, e.g.*, *Public Citizen v. Young*, 831 F.2d at 1113. The Act explicitly provides that "*[n]o* major emitting facility . . . may be constructed in *any* area to which [the PSD program] applies unless," among other requirements, the proposed source demonstrates that its emissions

> *will not* cause, or contribute to, air pollution in excess of *any* (A) maximum allowable increase or maximum allowable concentration for *any* pollutant in *any* area to which this part applies more than one time per year, [or] (B) national ambient air quality standard in *any* air quality control region.

[8] This part of the brief addresses the significant impact levels EPA's rule added to 40 C.F.R. §§ 51.166(k) and 52.21(k).

42 U.S.C. § 7475(a)(3)(A)-(B) (emphasis added). Thus, the Act mandates in unambiguous, sweeping, and rigid terms that no new major sources can be allowed without the required showing of compliance with the NAAQS and increments. It is clear—"no" means no, *see United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 7 (2008)—and, as shown by the repeated use of "any," the statutory mandate must be given broad, sweeping effect, *see Consumer Electronics Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003) ("the Supreme Court has consistently instructed that statutes written in broad, sweeping language should be given broad, sweeping application."); *see also Clintwood Elkhorn Mining*, 553 U.S. at 7 ("Five 'any's' in one sentence and it begins to seem that Congress meant the statute to have expansive reach."); *Massachusetts v. EPA*, 549 U.S. 497, 528-29 (2007) ("repeated use of the word 'any'" demonstrated that statutory language was "sweeping" in its protective reach). This is the very sort of "rigid" language that forecloses *de minimis* exemptions. *See Public Citizen v. Young*, 831 F.2d at 1111-13 (quoting statutory language whose "natural—almost inescapable—reading" requires certain action and finding that language is rigid).

That Congress did not allow EPA any leeway to invent any *de minimis* exemptions to the explicit mandates in § 165(a)(3) is further shown by the fact that Congress expressly set out in intricate detail the very narrow situations in which exceptions *would* be allowed. Specifically:

- Congress expressly allowed in § 165(a)(3)(A) itself for an exceedance of increments and maximum allowable concentrations no more than "*one time* per year." 42 U.S.C. § 7475(a)(3)(A) (emphasis added). In contrast, EPA's significant impact levels allow unlimited violations.
- Congress waived the requirement for a showing of compliance with increments for a narrow set of sources located in Class II areas that, among other things, will emit no more than 50 tons per year after applying best available pollution controls and prove that their particulate matter and sulfur oxides emissions will not cause or contribute to a violation of the secondary NAAQS for either pollutant. *Id.* § 7475(b). In contrast, EPA's significant impact levels waive compliance with increments for any PSD sources, regardless of size of emission levels or compliance with the NAAQS.
- Congress set up a narrowly limned variance process whereby a state may issue a PSD permit to a facility that will cause or contribute to a violation of increments in a Class I area if the relevant Federal Land Manager certifies that emissions "will have no adverse impact on the air quality-related values of such lands," and other requirements are met. *Id.* § 7475(d)(2)(C)(iii)-(iv), (D). Congress also expressly specified narrow circumstances in which certain increases in

> emissions could be excluded in determining consumption of increments. *Id.* § 7473(c). In contrast, EPA's significant impact levels waive compliance with any increment for any sources, in any circumstance, without requiring a case-by-case finding of "no adverse impact" on Class I areas or any other safeguards.

The meticulous and intricate fashion in which Congress specified allowable exemptions shows an extraordinarily rigid approach in which additional exemptions simply have no place. *See Sierra Club v. EPA*, 294 F.3d 155, 160 (D.C. Cir. 2002) ("We cannot but infer from the presence of these specific exemptions that the absence of any other exemption for the transport of ozone was deliberate, and that the Agency's attempt to grant such a dispensation is contrary to the intent of the Congress."). It is well-established that "'[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of a contrary legislative intent.'" *NRDC v. EPA*, 489 F.3d 1364, 1374 (D.C. Cir. 2007) (citation omitted); *New York v. EPA*, 443 F.3d 880, 887 (D.C. Cir. 2006). This principle applies with full force to bar *de minimis* exemptions in situations where Congress has explicitly set out in the statute itself the only exceptions it meant to allow. *See Kokechik Fishermen's Ass'n v. Sec'y of Commerce*, 839 F.2d 795, 801-02 (D.C. Cir. 1988) (statute that established "moratorium" but allowed two narrow exceptions "does not provide for

a 'negligible impact' exception to its permitting requirements"); *see also EDF III*, 82 F.3d at 466 (citing *Kokechik* as a *de minimis* case).

Moreover, Congress has already exercised its judgment as to which sources have sufficient impact to be subjected to the permitting scheme, including the core PSD permitting requirement that the proposed source not cause or contribute to violation of a NAAQS or increment. Only a "major emitting facility," defined as, for certain listed types of sources, one that emits or has the potential to emit at least 100 tons per year "of any air pollutant" or, in general, "any other source with the potential to emit two hundred and fifty tons per year or more of any air pollutant," must obtain a PSD permit and make the required showing.[9] 42 U.S.C. §§ 7475(a), 7479(1). By contrast, Congress did not subject minor sources to preconstruction permitting. *See Alabama Power*, 636 F.2d at 362. Even in its definition of "major emitting facility," Congress allowed for states to provide one specific exemption, for "nonprofit health or education institutions." 42 U.S.C. § 7479(1). Thus, the very terms of the Act specify Congress's judgment of what sources are not worth putting through PSD permitting. The *de minimis* concept does not authorize EPA to disturb the balance Congress struck. *Public Citizen v. FTC*, 869 F.2d 1541, 1557 (D.C. Cir. 1989) ("agencies surely do not have inherent authority to second-

[9] As discussed below at p.27, the permitting requirement applies to new sources and certain modifications of existing sources. *Alabama Power*, 636 F.2d at 399.

guess Congress' calculations."); *see also Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir. 1996) (under *Chevron*, an agency may not "avoid the Congressional intent clearly expressed in the text simply by asserting that its preferred approach would be better policy").

The rigidity of the statutory mandate is further shown by the fact that Congress did not limit the showing required by § 165(a)(3) to "significant" violations of the NAAQS or increments. Aside from allowing the once per year exceedance referenced above, § 165(a)(3) explicitly mandates a showing that emissions "will not cause, or contribute to, air pollution in excess of any" NAAQS or increment. 42 U.S.C. § 7475(a)(3). Congress did not insert the word "significantly" either before the phrase "in excess of" or around "cause or contribute," and that omission is telling. Where Congress has meant to target only "significant" contributions to NAAQS violations, as opposed to any contributions, it has said so explicitly. *E.g.*, 42 U.S.C. § 7410(a)(2)(D)(i) (requiring state implementation plans to prohibit emissions "in amounts which will . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]"); *id.* § 7426 (requiring notice to nearby states of emissions increases that "may significantly contribute to levels of air pollution in excess of" the NAAQS in any area outside the state); *see also, e.g., id.* § 7407(d)(4)(A)(v) (when sources in part of area otherwise designated as badly out

of attainment for ozone or carbon monoxide "do not contribute significantly to violation of the [NAAQS]," part must be excluded from nonattainment area). Congress's omission of "significantly" from § 165(a)(3) was thus purposeful. *See, e.g.*, *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452-53 (2002). EPA cannot rewrite the statute to include "significantly" here or render its use superfluous where Congress chose to include it. *See North Carolina v. EPA*, 531 F.3d 896, 911-12 (D.C. Cir. 2008); *New York*, 443 F.3d at 887 (rejecting interpretation of statute that would render word "insignificant if not superfluous" (internal quotation marks omitted)).

Contrary to EPA's assertions, 75 Fed. Reg. at 64,891/2-3, JA__, *Alabama Power* does not support application of the *de minimis* principle here.[10] Although the Court there offered dictum outlining principles governing the *de minimis* exemption, 636 F.2d at 360-61, nowhere did the Court uphold a specific EPA application of that principle to the PSD program, *see id.* at 400, 405 (rejecting EPA attempts to create non-*de minimis* exemptions). The Court did at points suggest that EPA might be able to apply the *de minimis* principle to avoid triggering the requirement to obtain a PSD permit or provide best available control technology for certain modifications where projected emissions increases of the relevant

[10] EPA did not invoke "administrative necessity" as a basis for the exemptions it adopted here. *See Alabama Power*, 636 F.2d at 357-60.

pollutant(s) fall below thresholds that are reasonably shown to be trivial. *Id.* EPA subsequently did in fact adopt such thresholds for emission increases that are "significant" enough to trigger PSD permitting for modifications.[11] But the Court did not hold, and has never held that once a source is required to obtain a PSD permit, the statute nonetheless allows for a *de minimis* exemption from the central mandate for showing compliance with NAAQS and increments. Assuming *arguendo* that the Court allowed a *de minimis* exemption from the requirement to obtain a PSD permit for modifications whose predicted emissions fall below a level justified as trivial, any modifications predicted to emit *above* that level plainly *must* obtain a PSD permit, and are therefore subject to the rigid and central requirements of § 165(a)(3). Yet EPA's significant impact level exemption waives § 165(a)(3) in just such situations, where a source already must obtain a PSD permit because its projected emissions are above any statutory or *de minimis* tonnage thresholds.

EPA asserts "that it is reasonable to allow new or modified sources that contribute only minimally . . . to a modeled violation of a NAAQS or increment to

---

[11] 40 C.F.R. §§ 51.166(a)(7)(ii)-(iii), (iv)(*a*); 52.21(a)(2)(ii)-(iii), (iv)(*a*); *see also id.* §§ 51.166(b)(2)(i) (defining "major modification"); 52.21(b)(2)(i) (same); 51.166(b)(3) (defining "net emissions increase"); 52.21(b)(3) (same); 51.166(b)(23); 52.21(b)(23) (same); 51.166(b)(39) (defining "significant emissions increase"); 52.21(b)(40) (same). These significance thresholds are not at issue in this case.

receive their construction permits." *See* EPA, *RTC*, at 62, JA__ . But EPA cannot substitute its view of reasonableness for the path mandated by Congress. Under the Act, "a PSD permit may issue *only if* a source 'will not cause, or contribute to, air pollution in excess of any . . . maximum allowable increase or maximum allowable concentration for any pollutant' or any NAAQS." *Alaska Dep't of Envtl. Conserv.*, 540 U.S. at 473 (quoting 42 U.S.C. § 7475(a)(3)) (emphasis added; alteration in original); *accord id.* at 484; *Alabama Power*, 636 F.2d at 350. "The theory of the statutory PSD program," the *Alabama Power* Court held, "is that concentration on preconstruction review of major emitting facilities in clean air areas will preserve air quality in those areas. . . ." *Alabama Power*, 636 F.2d at 378. The agency may not "avoid the Congressional intent clearly expressed in the text simply by asserting that its preferred approach would be better policy." *Engine Mfrs. Ass'n*, 88 F.3d at 1089.

For all the foregoing reasons, Congress has commanded in "extraordinarily rigid" terms the situations in which sources do and do not have to make the mandatory PSD permitting program showing of compliance with standards and increments. *E.g.*, *Public Citizen v. Young*, 831 F.2d at 1113. The text of the Act itself is plain, sweeping, and rigid, foreclosing the invention of additional exemptions via the *de minimis* principle. *Id.* at 1113, 1122.

### 2. Adoption of Significant Impact Levels Eviscerates, Rather Than Implements, the Legislative Design.

*De minimis* exemptions are allowed only where they "implement[] the legislative design." *Alabama Power*, 636 F.2d at 360; *accord Public Citizen v. Young*, 831 F.2d at 1116. Far from implementing Congress's design here, EPA's significant impact levels severely undermine it by waiving the Act's *most central* mandate—attainment and maintenance of the NAAQS. *See supra* pp.9-10. Timely achievement and protection of the NAAQS has been described by the Supreme Court and this Court as the "heart" of the Act, *Train v. Natural Resources Defense Council*, 421 U.S. 60, 66-67 (1975); *Alabama Power*, 636 F.2d at 346, and as "central" to its regulatory scheme. *Union Electric Co.*, 427 U.S. at 258. *A fortiori*, attainment (and maintaining attainment) of the NAAQS lies at the Act's core. *See, e.g., Alaska Dep't of Envtl. Conserv.*, 540 U.S. at 469 ("The [1970 Clean Air Act] amendments aimed to guarantee the prompt attainment and maintenance of specified air quality standards." (quotation marks omitted)). By allowing new and modified major pollution sources to cause or contribute to violations of the $PM_{2.5}$ NAAQS, the significant impact levels do violence to the centerpiece of Congress's legislative design.

In addition, the significant impact levels vitiate the PSD provisions' core purposes of protection of the increments and NAAQS. As is plain from the Act, 42 U.S.C. § 7471, preventing significant deterioration of air quality is central to the

PSD program. *Alaska Dep't of Envtl. Conserv.*, 540 U.S. at 470 ("The PSD requirements, enacted as part of 1977 amendments to the Act, are designed to ensure that the air quality in attainment areas or areas that are already 'clean' will not degrade." (citations and quotation marks omitted)). This Court has stated that "*the emphatic goal* of the PSD provisions is to prevent those thresholds [*i.e.*, the increments] from being exceeded." *Alabama Power*, 636 F.2d at 362 (emphasis added); *see also* H.R. Rep. No. 95-294, at 9; S. Rep. No. 95-127, at 11, 32 (1977) (deterioration of air quality may never exceed NAAQS, and PSD permit must protect increment). "[A]n increment defines 'significant deterioration.'" 75 Fed. Reg. at 64,875/2, JA__; *see also id.* at 64,885/3 ("the PSD regulations insure that any such deterioration does not lead to air pollution levels that exceed the levels defined by the NAAQS"), JA__. Further showing the centrality of protecting the increments and NAAQS is § 163(a)'s requirement that implementation plans "*shall* contain measures *assuring* that maximum allowable increases over baseline concentrations of, and maximum allowable concentrations of, such pollutant *shall not be exceeded*." 42 U.S.C. § 7473(a) (emphasis added); *see also id.* § 7476(d) (PSD regulations issued under § 166(a) "shall provide specific measures at least as effective as the increments established in [§ 163]"). Because EPA's *de minimis* exemptions to § 165(a)(3) allow violations of the increments and the NAAQS—contrary to the Act's most central objectives—they thwart rather than implement

the legislative design, and are therefore plainly impermissible under this Court's case law. *E.g.*, *Public Citizen v. Young*, 831 F.2d at 1116.

EPA's approach further flouts the legislative design to *prevent* significant deterioration. *Alabama Power*, 636 F.2d at 361 ("The PSD part of the statute, by its title and by its terms, is designed to prevent significant deterioration of air quality in the nation's 'clean air areas' . . . ."). The agency acknowledges that significant impact levels could well lead to violations of NAAQS and increments. EPA, *RTC*, at 62, JA__. But rather than rejecting the SILs on this ground, EPA suggests that the state can "address the violations by requiring . . . a reduction of emissions from existing sources." *Id.*, JA__. In other words, EPA's scheme facilitates the breaking of increments and NAAQS by new sources, after which states are left to repair the damage that the waiver has allowed. Such a Rube Goldberg-esque process runs counter to the Act's design of preventing deterioration and of regulating new and modified sources more strictly than existing sources, *see, e.g.*, Daniel A. Farber et al., *Cases and Materials on Environmental Law* 534 (7th ed. 2006); *see also* 42 U.S.C. §§ 7502(c)(5), 7503(a)(1) (requiring new and modified major sources in nonattainment areas to offset their new emissions by obtaining emission reductions from other sources in area even though NAAQS violation already exists). Moreover, because the rule sets no deadlines for corrective action by the states after violations due to SILs are

allowed, EPA's approach allows such violations to continue indefinitely. This cannot be squared with the PSD program's plain emphasis on prevention, *Alabama Power*, 636 F.2d at 362 ("emphatic goal of the PSD provisions is to prevent" violations of NAAQS or increment), and is thus unlawful, *see also, e.g.*, *Vill. of Barrington*, 636 F.3d at 660 (if agency has "exceeded the statute's clear boundaries," interpretation is unlawful under *Chevron* step one); *Massachusetts v. DOT*, 93 F.3d at 893 (same, under *Chevron* step two).

## B. There Is No Showing That Air Quality Impacts at the Levels of the Significant Impact Levels Are "Trivial," Nor Can There Be.

### 1. EPA's Claim of Trivial Benefits Flouts the Act.[12]

EPA has not met its burden of showing that pollution increases at or below the levels of its significant impact levels are truly "trivial," nor can it. At the outset, the notion that EPA can authorize any violation of the NAAQS is contrary to the Act's directive that EPA set the NAAQS at a level that is "requisite to protect the public health," with "an adequate margin of safety." 42 U.S.C. § 7409(b)(1). The Supreme Court has construed this mandate as requiring NAAQS to be set at levels "*not lower or higher than is necessary*—to protect the public health with an adequate margin of safety." *Whitman v. Am. Trucking*

[12] This part of the brief addresses the significant impact levels EPA's rule added to 40 C.F.R. §§ 51.166(k) and 52.21(k).

*Ass'ns*, 531 U.S. 457, 476 (2001) (emphasis added). Because by law the NAAQS must *already* reflect the absolute pollution limit requisite to protect health, EPA cannot specify that pollution levels *higher* than the NAAQS are permissible. But that is precisely what EPA has done with its significant impact levels, which allow pollution levels to increase to levels "higher" than the absolute maximum the agency has previously determined to be requisite to protect public health and welfare.[13] *See* EPA, *RTC* at 62 ("we believe that it is reasonable to allow new or modified sources that contribute only minimally . . . to a modeled violation of a NAAQS . . . to receive their construction permits. . . ."), JA__.

Further, there is no room for the agency to claim that violations that have made it through the multiple screens that are already part of the NAAQS itself are still "trivial." The form of the $PM_{2.5}$ NAAQS itself *already* specifies in great detail precisely how compliance is to be determined, including provisions that average out transitory or isolated exceedances, and provisions that address levels that are slightly above or below the standard level. Compliance with the annual and 24-hour standards is determined by averaging monitored (or predicted) levels over a

[13] If anything, the $PM_{2.5}$ NAAQS are *already* higher (*i.e.*, weaker) than necessary to protect health and welfare. *See Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 519 (D.C. Cir. 2009) (per curiam) (remanding 2006 $PM_{2.5}$ NAAQS to EPA because agency failed to explain adequately why $PM_{2.5}$ NAAQS are sufficiently protective).

three-year period. *See* 40 C.F.R. Pt. 50, App.N, § 1(c) (defining "design values"). For the 24-hour standard, only the 98th percentile values—the eighth highest values, if the monitor has a valid sample for every day of the year, *id.* § 4.5(1) tbl.1—are used from each year for this averaging. *Id.* § 4.5(a)-(b). The values derived from this process are then subject to rounding to the nearest 0.1 μg/m$^3$ for the annual standard, and nearest 1 μg/m$^3$ for the 24-hour. *Id.* § 4.3. For example, if the calculated annual average is 15.04 μg/m$^3$, it is rounded down to 15.0 μg/m$^3$, and the standard of 15 μg/m$^3$ is met. *See id.* § 4.3(a). If the average is 15.05 μg/m$^3$, it is rounded up to 15.1 μg/m$^3$, and the standard is violated. *See id.* For the 24-hour standard, if the 3-year average is 35.4 μg/m$^3$, it is rounded down to 35 μg/m$^3$, and the standard of 35 μg/m$^3$ is met. *See id.* § 4.3(b). If the monitored value is 35.5 μg/m$^3$, it is rounded up to 36 μg/m$^3$, and the standard is violated. *See id.* Thus, as part of the NAAQS-setting process, EPA has already built into the standards provisions that define in detail the leeway deemed requisite: There is no room for the agency to claim that violations that have already escaped these multiple screens are somehow "trivial."

In addition, it is impossible for EPA to carry its burden of showing that no source with impacts below any significant impact levels will exceed the increment or NAAQS. *See Alabama Power*, 636 F.2d at 360; *Shays*, 414 F.3d at 114. Exceeding these thresholds depends not just on the impacts of the source seeking a

PSD permit, but also on the existing levels of pollution and any pollution increases that are being allowed from other new sources. Because under its approach, EPA cannot "find the concentration at which there are only trivial benefits to be derived from regulation," *Envtl. Def. Fund v. EPA* ("*EDF I*"), 636 F.2d 1267, 1284 n.46 (D.C. Cir. 1980), EPA's significant impact levels are unlawful, *see Shays*, 414 F.3d at 114 (quoting *Public Citizen v. FTC* and *EDF III*); *see also Int'l Alliance of Theatrical & Stage Employees v. NLRB*, 334 F.3d 27, 35 (D.C. Cir. 2003) (rejecting interpretation under *Chevron* step two because "reading . . . leads to irrational results in practice").

Moreover, EPA concedes, as it must, that pollution increases within the significant impact levels can still cause an area that is meeting the $PM_{2.5}$ NAAQS and increments to violate them. *See* 75 Fed. Reg. at 64,892/1-2, 64,894/2, JA__, __; EPA, *RTC* at 62, JA__. If, for example, the proposed source will emit $PM_{2.5}$ pollution that has an ambient impact of 1 $\mu g/m^3$ (24-hour average) and is thus below the Class II significant impact level (1.2 $\mu g/m^3$ (24-hour average)), 75 Fed. Reg. at 64,866, JA__, but is located in an area that already has an ambient concentration of 35 $\mu g/m^3$, it will tip the area into nonattainment. *See* EPA-HQ-OAR-2006-0605-0051 at 2 (warning of similar situation existing in Mississippi),

JA__.[14] Where the area is already violating the standards or increments, *any* increase will compound the violation and make it harder to cure.[15] In addition, because EPA's rules allow *unlimited* numbers of sources to claim significant impact level exemptions, violations can also be triggered—even in areas well below the standards and increments—by allowing multiple new sources in the same area (or upwind of the area) each to increase $PM_{2.5}$ levels up to the significant impact level. Sierra Club also offered comments, unrefuted by EPA, that impacts below a significant impact level for other pollutants can and do cause or contribute to violations of increments for those pollutants, contrary to the Act's requirements. *See* EPA-HQ-OAR-2006-0605-0040 at 17, JA__.

[14] Although the Court in *EDF III* upheld a *de minimis* exemption, there the Court found that the exempted activities "would produce either no or a trivial level of emissions," and therefore "could not threaten a state's attainment of the goals in its [state implementation plan]." 82 F.3d at 467. Here, EPA concedes that emissions from even a single source qualifying for a significant impact level exemption can be enough to cause or worsen a NAAQS or increment violation. Moreover, the provision at issue in *EDF III* did not contain the indicia of rigidity found here.

[15] Although PSD permits are required only for sources proposing to construct in attainment areas, such sources can worsen an existing violation in several ways. For example, the source's location can be such that its emissions are likely to drift or blow into an area that is already violating standards. Or, the area where the source is locating may have fallen into violation of standards after its initial designation at "attainment," but EPA has not yet redesignated the area as "nonattainment." The latter can and does happen because there is no statutory deadline for EPA to redesignate attainment areas to nonattainment.

EPA thus has failed to carry its burden of demonstrating that the significant impact levels are actually *de minimis*. *E.g.*, *Alabama Power*, 636 F.2d at 360; *see also Shays*, 414 F.3d at 114-15. The impacts allowed by EPA's significant impact levels plainly are not limited to "*only* situations where 'the burdens of regulation yield a gain of trivial or no value.'" *Shays*, 414 F.3d at 114 (emphasis added, citation omitted).[16]

**2. EPA's Claim of Trivial Benefits Is Arbitrary and Irrational.[17]**

EPA's adoption of significant impact levels is arbitrary and capricious for the same reasons stated above. The agency has failed to rationally justify the significant impact levels as "trivial," when pollution increases below those levels can in fact cause or contribute to violations of NAAQS and increments. *See State Farm*, 463 U.S. at 43.

Indeed, EPA's stated ground for the waivers is based less on a claim of truly *de minimis* benefits, and more on a policy argument that a proposed new source should not "bear the burden of addressing its small contribution to a problem caused primarily by other sources." 75 Fed. Reg. at 64,892/1, JA__. EPA

[16] EPA's failure to tether its significant impact levels to the statute also renders them arbitrary and capricious. *See Massachusetts v. EPA*, 549 U.S. at 535 ("EPA must ground its reasons for action or inaction in the statute.").

[17] This part of the brief addresses the significant impact levels EPA's rule added to 40 C.F.R. §§ 51.165(b)(2), 51.166(k), and 52.21(k).

"believe[s] that it is reasonable to allow new or modified sources that contribute only minimally . . . to a modeled violation of a NAAQS or increment to receive their construction permits" because requiring additional reductions from the proposed source "would not produce the levels of air quality improvement that could come from the control of older, existing sources." EPA, *RTC* at 62, JA__. But Congress has already directed that proposed new sources "*cannot commence construction* if their emissions would cause or contribute to a violation" of increments. *Alabama Power*, 636 F.2d at 350 (emphasis added). Congress made the choice that new sources would indeed bear the burden of reducing pollution once pollution has already reached the level of NAAQS and increments. EPA cannot use the *de minimis* exemption to substitute its policy preference for the one Congress chose. *Massachusetts v. EPA*, 549 U.S. at 535 ("EPA must ground its reasons for action or inaction in the statute."); *Shays*, 414 F.3d at 114 (*de minimis* exemption not allowable where it "reflects impermissible 'second-guess[ing] [of] Congress's calculations'") (citations omitted; alterations in original).

In addition, EPA has offered no evidence that sources cause or contribute only trivially to violations of the NAAQS or increment when their emissions have impacts below the promulgated significant impact level values—or below *any* significant impact level values. Indeed, EPA expressly "acknowledge[s] that" it conducted no new analyses "to explicitly show that the final $PM_{2.5}$ SILs values in

this final rule are *de minimis*." 75 Fed. Reg. at 64,893/2-3, JA__. But, "to justify a regulatory cutoff under the de minimis principle, EPA must find the concentration at which there are only trivial benefits to be derived from regulation." *EDF I*, 636 F.2d at 1284 n.46. The agency has utterly failed to do so here.

## II. EPA'S "*DE MINIMIS*" WAIVER OF THE PRE-APPLICATION MONITORING MANDATED BY THE ACT IS UNLAWFUL AND ARBITRARY.

The Act requires each applicant for a PSD permit to supply at least one year's worth of pre-application "air quality monitoring data gathered for purposes of determining whether" the facility's emissions will cause or contribute to violation of increments or NAAQS. 42 U.S.C. § 7475(e)(2). Air quality monitors collect samples of the air and measure the concentrations of pollutants in those samples. *See, e.g.*, 40 C.F.R. Pt. 50, App.L §§ 2.1-2.2. Such monitoring determines the actual level of existing air pollution in the ambient air at a given location. To demonstrate that a proposed facility will not cause a violation, the applicant must show the increased emissions from the facility—when added to existing monitored pollution levels and predicted pollution increases from other new sources—will not cause pollution levels to rise above the NAAQS or violate an increment. *See* 42 U.S.C. § 7475(a)(3), (e)(2). For example, if existing monitored levels of $PM_{2.5}$ are already right at the level of the NAAQS, then any additional emissions that are predicted to increase those $PM_{2.5}$ levels to

concentrations exceeding the standard will cause a violation, and must be prohibited. *See id.* § 7475(a)(3)(B).

EPA's rule illegally and arbitrarily waives the first part of the above process—the requirement for a year's worth of air quality monitoring—whenever the permit applicant predicts (through air quality computer modeling[18]) that its emissions will cause an increase in ambient $PM_{2.5}$ levels of less than a set amount, 4 $\mu g/m^3$ (24-hour average). 75 Fed. Reg. at 64,896/1-2, JA__. This waiver applies regardless of how badly polluted the air already might be. In fact, thanks to the waiver, neither the permitting agency nor the public will have any way of knowing based on real-world data whether existing air pollution already exceeds (or is close to exceeding) standards and increments, such that the new source would cause or worsen a violation. As further detailed below, EPA's attempt to justify this waiver on *de minimis* grounds flouts the rigid terms and express purpose of the statute and is irrational.

## A. The Clean Air Act Unambiguously Requires Pre-Construction Air Quality Monitoring.

### 1. The Act Is Extraordinarily Rigid.

Each PSD permit applicant must provide an air quality analysis that

[18] Air quality modeling uses computer simulations to predict the impact of emissions on ambient air quality.

> shall include continuous air quality monitoring data gathered for purposes of determining whether emissions from such facility will exceed the maximum allowable increases or the maximum allowable concentration permitted under this part. Such data shall be gathered over a period of one calendar year preceding the date of application for a permit under this part unless the State, in accordance with regulations promulgated by the Administrator, determines that a complete and adequate analysis for such purposes may be accomplished in a shorter period.

42 U.S.C. § 7475(e)(2). As this Court has held, "This is a plain requirement for inclusion of monitoring data, for purposes of the determination whether emissions will exceed allowable increments." *Alabama Power*, 636 F.2d at 372.

The explicit requirement for a year's worth of monitoring is again the sort of rigid statutory command that forecloses a *de minimis* exemption. Indeed, this Court has already read the monitoring mandate in § 165(e)(2) as being particularly inflexible. In *Alabama Power*, EPA argued that it need not require monitoring to determine whether a proposed PSD source will cause or contribute to violations of allowable increments. *Id.* The agency asserted that monitoring for actual air quality concentrations was technologically infeasible for all but a small number of pollutants and that monitoring techniques were at best of questionable accuracy. *Id.* The Court flatly rejected the argument, holding that section 165(e)(2)'s language is "dispositive." *Id.* While EPA could require methods like modeling in addition to monitoring "to ensure that allowable increments and NAAQS are not violated," the Court held, "it does not have authority to dispense with monitoring

as at least one element of the overall enforcement effort where Congress has mandated the use of that technique." *Id.* Although the Court was not addressing a *de minimis* claim by EPA on this issue,[19] the holding makes clear that the mandate of section 165(e)(2) is an extraordinarily rigid one.

The Court's strict reading is strongly supported by the statutory language. Not only is the monitoring requirement phrased in unambiguous and mandatory terms, but Congress itself specified only a single allowable exception: where the State "determines that a complete and adequate analysis for such purposes may be accomplished in a shorter period." 42 U.S.C. § 7475(e)(2). Allowing an applicant to provide monitoring data for a "shorter period" than a year is vastly different from allowing an applicant to provide no monitoring data at all. Had Congress intended to allow a complete waiver of the requirement, it would have said so. *Compare id.* § 7475(a)(7) (providing for "such [post-construction] monitoring *as may be necessary* to determine the effect which emissions from any such facility may have, or is having, on air quality") (emphasis added), *with id.* § 7475(e)(2) (requiring that pre-construction analysis "*shall* include continuous air quality monitoring data" that "*shall* be gathered over a period of one calendar year")

[19] Dictum in *Alabama Power* suggests the more general analytical requirements in § 165(e)(1) might be subject to a *de minimis* exemption. 636 F.2d at 371. Even if entitled to weight, however, that dictum does not address the highly prescriptive and inflexible monitoring requirement in subsection (e)(2).

(emphasis added). Thus, Congress plainly thought about possible exceptions and specified only one, thereby showing that the monitoring requirement must otherwise rigidly apply. *E.g.*, *Sierra Club*, 294 F.3d at 160.

Further, a *de minimis* exemption to the monitoring requirement flouts the very purpose of that requirement as stated in the statute itself. Congress required pre-application monitoring specifically "*for purposes of determining whether emissions from [the proposed] facility will exceed*" the increment or NAAQS. 42 U.S.C. § 7475(e)(2) (emphasis added). This explicit language simply leaves no room for EPA to claim that monitoring can be waived as having *de minimis* value for purposes of determining whether NAAQS or increments will be exceeded. Congress could not have been clearer that it determined monitoring was not merely helpful, *but essential* for that very purpose. *See, e.g.*, *Alabama Power*, 636 F.2d at 376 & n.17 (monitoring is "essential" to determining the baseline against which increment consumption is measured). Congress plainly did not view monitoring as something that could be dispensed with as being "pointless" or of "trivial" value. *Shays*, 414 F.3d at 114.

Monitoring serves the purposes specified by Congress by, among other things, providing real-world information about existing concentrations of air pollutants in the affected area that will be the foundation for determining what additional pollution (if any) can be allowed without violating standards or

increments. *See* EPA-HQ-OAR-2006-0605-0040 at 19-20 (citing EPA's New Source Review Workshop Manual and 40 C.F.R. Pt. 51, App.W, § 8.2.1.b), JA__-__. If that monitoring shows actual pollution levels in the area are already right at the level of the standard (or if monitoring shows all the increment has been consumed), then *any* pollution increase that tips these levels into violation must be prohibited. This statutorily prescribed function of monitoring is totally defeated if EPA waives—under the artifice of a *de minimis* exemption—collection of the very data that Congress has decided is essential to gauging compliance with the NAAQS and increments.

Under EPA's significant monitoring concentration rule, for example, if a proposed new major source predicts that it will add 3 $\mu g/m^3$ to $PM_{2.5}$ levels in an area, the source can avoid providing any pre-application monitoring data showing existing $PM_{2.5}$ concentrations in the area. Thus, there will be no actual monitoring data to inform what the additional 3 $\mu g/m^3$ in pollution will mean when added to existing $PM_{2.5}$ concentrations. If the pre-construction daily $PM_{2.5}$ concentration is in fact 33 $\mu g/m^3$ or higher, the additional pollution from the new source will put the area into violation of the NAAQS (or worsen an existing violation, if the pre-construction level is higher than 35 $\mu g/m^3$). But the significant monitoring concentration allows the source to get a permit without anyone even being aware that actual $PM_{2.5}$ levels presage this violation. And EPA's rule allows this to

happen repeatedly for an unlimited number of times as subsequent new sources locate or expand in the very same area.

This is not a situation where Congress left open the possibility that EPA or the states could substitute air quality modeling for the monitoring explicitly mandated by section 165(e)(2). Congress was well aware that modeling could sometimes be useful in implementing the Act's requirements, and provided for modeling in some circumstances. *See* 42 U.S.C. §§ 7475(e)(3), (e)(3)(D), 7511a(c)(2)(A). Yet in § 165(e)(2), Congress specified that pre-application monitoring was required for a specified period, at an absolute minimum. *Id.* § 7475(e)(2). EPA must adhere to the policy choice Congress made. *Alabama Power*, 636 F.2d at 372; *see Engine Mfrs. Ass'n*, 88 F.3d at 1089.

### 2. Adoption of the Significant Monitoring Concentration Thwarts, Rather Than Implements, the Legislative Design.

For all the foregoing reasons, EPA's significant monitoring concentration waiver not only conflicts with the rigid statutory command, but also runs afoul of the principle that *de minimis* exemptions must not be allowed if they thwart, rather than implement, the legislative design. *Public Citizen v. Young*, 831 F.2d at 1113, 1116. By allowing waiver of pre-application monitoring whenever a source's predicted impact is less than 4 $\mu g/m^3$, EPA authorizes the very thing Congress meant to prevent through such monitoring—violation of NAAQS and increments.

It thereby flouts Congress' expressly stated purpose in requiring that monitoring. 42 U.S.C. § 7475(e)(2) (mandating a year's worth of monitoring data "for purposes of determining whether emissions from such facility will exceed" increments or NAAQS). Moreover, the monitoring exemption itself does not in any way advance any part of the legislative design. *See supra* pp.29-32. To the contrary, the lack of monitoring data undermines the ability of permitting agencies to determine whether a proposed new source will comply with the Act's central goals and mandates.

Indeed, EPA's stated rationale shows a deliberate effort to depart from the legislative design. The agency claimed that it could lawfully set the significant monitoring concentration at *any* value for purposes of increment analysis. *See* EPA, *RTC* at 92 (asserting "preconstruction monitoring data generally are not useful for increment analyses for *any* sources, including"—but not limited to—"sources with impacts below the SMC" (emphasis added)), JA__. By saying that *any* significant monitoring concentration—no matter how high—would represent a level of emissions for which monitoring "would yield a gain of trivial or no value," *id.* at 91 (quoting *Alabama Power*, 636 F.2d at 361), JA__, the agency reveals that it deems its preferred approach—optional or no monitoring—better policy than the one Congress selected. Such second-guessing of Congress' choices is not a valid ground for invoking a *de minimis* exemption. *Shays*, 414 F.3d at 114.

### B. EPA Did Not and Cannot Show That Monitoring Benefits Are "Trivial."

As further set forth below, EPA did not and cannot meet its burden of showing that monitoring yields trivial or no benefits when the significant monitoring concentration is met—a prerequisite to invoking the *de minimis* principle. *Alabama Power*, 636 F.2d at 360-61.

#### 1. EPA's Claim of Trivial Benefits Is Contrary to the Act

EPA cannot show that the benefits of monitoring are "trivial" because, as shown above, Congress itself has decreed otherwise. Because Congress has mandated monitoring as a necessary and mandatory tool for the purpose of determining compliance with NAAQS and increments, the agency cannot lawfully declare monitoring of trivial value for that very purpose.

EPA also cannot lawfully declare monitoring information to be of trivial value because Congress has explicitly mandated that such information be provided to the public. 42 U.S.C. § 7475(e)(2) ("The results of such analysis shall be available at the time of the public hearing on the application for such permit."). EPA cannot by fiat declare the public's statutory right to this information to be trivial. *See Engine Mfrs. Ass'n*, 88 F.3d at 1089; *see also Public Citizen v. FTC*, 869 F.2d at 1548 n.13 ("persons seeking to vindicate a statutory right to information have standing even if they know or should know that the untruthful

information they receive is false . . . and even if the information is available to them through other channels." (citations omitted)). Indeed, one of Congress' stated purposes in adopting the PSD program was "to assure that any decision to permit increased air pollution in any area to which [the PSD program] applies is made only . . . after adequate procedural opportunities for *informed public participation in the decisionmaking process*." 42 U.S.C. § 7470(5) (emphasis added). Congress has already decided that the public is entitled to the monitoring information mandated by § 165(e)(2), and EPA has no "authority to second-guess" that decision by substituting its own preferences as to what data the public should have. *Public Citizen v. FTC*, 869 F.2d at 1557.

EPA's action in setting a significant monitoring concentration was also unlawful and arbitrary because EPA cannot show any connection between the level of predicted increase that a proposed source will cause in $PM_{2.5}$ levels (the level that is compared to the significant monitoring concentration) and its claim that information on pre-application ambient pollution levels would be of trivial value. *See Alabama Power*, 636 F.2d at 360-61 (EPA has "burden of making the required showing" that "matters are truly de minimis" such that regulation in those circumstances results in "gain of trivial or no value"). Information on *existing* (pre-application) pollution levels in the impacted areas is plainly important and valuable regardless of the level of pollution *increase* that a source is predicted to

cause above that level. The fact that a source is predicted to cause a just under 4 μg/$m^3$ increase in $PM_{2.5}$ levels hardly renders monitoring of pre-existing $PM_{2.5}$ levels of trivial benefit, particularly where that monitoring could reveal that the impacted area is within 4 μg/$m^3$ of violating the NAAQS or increments or is already violating the NAAQS or increments. EPA's claim to the contrary is rather like saying that a doctor can rationally give a patient more of a dangerous drug without knowing how much of the drug the person is already taking.

Because EPA cannot show that monitoring data for sources with ambient impacts below the significant monitoring concentration would always be of trivial or no value, its action is unlawful. *See EDF I*, 636 F.2d at 1284 n.46 ("in order to justify a regulatory cutoff, under the *de minimis* principle, EPA must find the concentration at which there are only trivial benefits to be derived from regulation."); *Int'l Alliance of Theatrical & Stage Employees*, 334 F.3d at 35 (rejecting under *Chevron* step two interpretation that "leads to irrational results in practice"); *see also Shays*, 414 F.3d at 115 (assuming that statute permits *de minimis* exemptions, "the record here presents no coherent justification for the specific exemption [EPA] chose").

### 2. EPA Does Not and Cannot Provide a Rational Basis for Finding Monitoring to Be of Trivial Value.[20]

Far from showing that monitoring is of trivial value, EPA itself concedes that "preconstruction monitoring *can be useful* in determining the background concentration for purposes of a NAAQS analysis," even when a source predicts its impact will fall below the significant monitoring concentration. EPA, *RTC* at 92 (emphasis added), JA__. "Accordingly," the agency continues, "where representative ambient concentration data are not available from other sources and the ambient air quality is at levels near the $PM_{2.5}$ NAAQS, *we do not encourage the continued use of the SMC* to exempt sources from collecting preconstruction monitoring data." *Id.* (emphasis added), JA__. But the rule itself still authorizes the "*de minimis*" monitoring waiver in these and other situations where monitoring would in fact be useful. *Id.*, JA__. It is plain that when EPA admits that monitoring provides a benefit, it cannot authorize a *de minimis* exemption from such monitoring. *See Public Citizen v. FTC*, 869 F.2d at 1557.[21]

---

[20] Petitioner's arguments as to why the significant monitoring concentration is unlawful apply here as well. *See Gen. Instrument Corp. v. FCC*, 213 F.3d 724, 732 (D.C. Cir. 2000) ("we have recognized that an arbitrary and capricious claim and a *Chevron* step two argument overlap, and because of that we have not been sticky as to whether an argument in the area of overlap is characterized as a *Chevron* step two claim or as an arbitrary and capricious challenge.").

[21] In addition to being useful in determining whether NAAQS and increments will be exceeded, monitoring is also important in establishing the "baseline" pollution

footnote continued on next page...

EPA's setting of the significant monitoring concentration at twice (or any multiple of) the monitoring detection level for $PM_{2.5}$ also has no rational relationship to a finding of *de minimis* value for pre-application monitoring. The significant monitoring concentration is a measure of the expected *increase* in ambient concentrations due to the added emissions from the new source, an increase that is predicted through computer modeling, not monitoring.[22] 72 Fed. Reg. at 54,141/2, JA__. That this amount of modeled increase might be predicted to occur below levels that could be accurately measured says nothing about the value of requiring pre-application monitoring to find out how bad existing pollution levels already are. Indeed, elsewhere in the rulemaking EPA agreed that "[m]onitoring accuracy is not a relevant concern in predicting with air quality dispersion models the concentrations of a pollutant that a source will cause if its construction and operation are allowed to occur." 75 Fed. Reg. at 64,891/3, JA__.

---

...footnote continued

concentrations for measuring consumption of increments. That baseline is established on the date of the first application for a permit in an area subject to the PSD program. 42 U.S.C. § 7479(4). The "starting point for determining the baseline . . . is the existing ambient pollution level in that area" at that time, "based on air quality data," including monitoring data. *Alabama Power*, 636 F.2d at 374. Thus, data on existing air quality is essential to establishing the baseline concentration, regardless of how low existing pollution levels might be.

[22] Sierra Club discusses below the separate problem with applying a significant monitoring concentration to ambient $PM_{2.5}$ levels. *See infra* pp.53-54.

For the same reason, there is no rational connection between monitoring accuracy and the significant monitoring concentration at issue here. *State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious where there is no "rational connection between the facts found and the choice made" (quotation marks omitted)).

The irrationality of EPA's claim of triviality is further shown by the fact that EPA's chosen significant monitoring concentration, 4 $\mu g/m^3$, is double the 24-hour Class I increment. *See* 75 Fed. Reg. at 64,865, JA__. The agency cannot rationally claim that expected pollution increases are "trivial" for the purpose of determining whether to require monitoring, when those increases exceed the increments themselves. EPA contends that "the level of the increments is not material to the level of the SMC that we are setting in this final rule," EPA, *RTC* at 92, JA__. But given that section 165(e)(2) explicitly requires monitoring for purposes of determining compliance with the increments, EPA cannot rationally make such a claim. *State Farm*, 463 U.S. at 43; *see Public Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004).

Also arbitrary and legally defective are claims by EPA that monitoring for purposes of determining compliance with increments is of trivial value because "increment analyses typically are based solely on modeling . . . without the use of monitoring data" and that "preconstruction monitoring data generally are not useful for increment analyses for any sources, including sources with impacts

below the SMC." EPA, *RTC* at 92, JA__. As noted above, this Court has already rejected such arguments in *Alabama Power*. There EPA argued that it should be allowed to waive monitoring for purposes of determining compliance with increments because, the agency claimed, such an approach was technologically infeasible. 636 F.2d at 372. The Court rejected the argument, citing the express statutory mandate, and found that Congress meant to force development of adequate techniques to use monitoring for this purpose. *Id.* It is arbitrary for EPA to ignore both the statutory language itself and this Court's binding interpretation. *Cf. Public Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d at 1216 (failure to consider statutory factor renders decision arbitrary and capricious).

EPA's rationale here is particularly outlandish because the agency claims monitoring is of *de minimis* value for purposes of increment analysis even at significant monitoring concentrations *above* the one it chose. *See* EPA, *RTC* at 92, JA__. A *de minimis* claim is arbitrary where the supporting rationale "would apply equally [to other values] Congress could hardly have deemed trivial." *Shays*, 414 F.3d at 114-15.

Finally, it is also arbitrary and capricious for EPA to waive pre-application monitoring for $PM_{2.5}$ where the applicant estimates that the existing ambient concentration of $PM_{2.5}$ in the affected area is below the significant monitoring concentration. EPA, *RTC* at 92, JA__; *see also, e.g.*, 40 C.F.R. § 52.21(i)(5)(ii)

(allowing exemption from monitoring requirement when "concentrations of the pollutant in the area that the source or modification would affect are less than the [significant monitoring concentration]"). EPA asserts that "there is little benefit to be gained from preconstruction monitoring of ambient concentrations that are below the SMC," EPA, *RTC* at 92, JA__, but nowhere explains how existing ambient concentrations can be known with the accuracy Congress intended without the benefit of monitoring. It is arbitrary to dispense with monitoring based solely on a prejudgment of what the monitoring will show. *See U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 577 (D.C. Cir. 2004) (rejecting "circular" agency reasoning).

## CONCLUSION

For the reasons given above, Petitioners respectfully request that this Court vacate the portions of the $PM_{2.5}$ increments rule that establish significant impact levels and a significant monitoring concentration.

DATED: November 14, 2011

Respectfully submitted,

/s/David S. Baron

David S. Baron
Seth L. Johnson
Emma C. Cheuse
Earthjustice
1625 Massachusetts Ave., NW
Suite 702

Washington, DC 20036
(202) 667-4500
dbaron@earthjustice.org
sjohnson@earthjustice.org
echeuse@earthjustice.org

*Counsel for Sierra Club*

## CERTIFICATE REGARDING WORD LIMITATION

Counsel hereby certifies that, in accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), the foregoing Proof Opening Brief of Sierra Club contains 12,839 words, as counted by counsel's word processing system.

DATED: November 14, 2011

/s/David S. Baron
David S. Baron

# STATUTORY AND REGULATORY ADDENDUM

**Statutes**

42 U.S.C. § 7407

42 U.S.C. § 7409

42 U.S.C. § 7410

42 U.S.C. § 7411

42 U.S.C. § 7426

42 U.S.C. § 7470

42 U.S.C. § 7471

42 U.S.C. § 7472

42 U.S.C. § 7473

42 U.S.C. § 7474

42 U.S.C. § 7475

42 U.S.C. § 7476

42 U.S.C. § 7477

42 U.S.C. § 7478

42 U.S.C. § 7479

42 U.S.C. § 7502

42 U.S.C. § 7503

42 U.S.C. § 7511a

42 U.S.C. § 7607

**Regulations**

40 C.F.R. Pt. 50, App. L

40 C.F.R. Pt. 50, App. N

40 C.F.R. Pt. 51, App. W

40 C.F.R. § 50.13

40 C.F.R. § 51.161

40 C.F.R. § 51.165

40 C.F.R. § 51.166

40 C.F.R. § 52.21

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7407

§ 7407. Air quality control regions

Effective: January 23, 2004

Currentness

**(a) Responsibility of each State for air quality; submission of implementation plan**

Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State.

**(b) Designated regions**

For purposes of developing and carrying out implementation plans under section 7410 of this title--

**(1)** an air quality control region designated under this section before December 31, 1970, or a region designated after such date under subsection (c) of this section, shall be an air quality control region; and

**(2)** the portion of such State which is not part of any such designated region shall be an air quality control region, but such portion may be subdivided by the State into two or more air quality control regions with the approval of the Administrator.

**(c) Authority of Administrator to designate regions; notification of Governors of affected States**

The Administrator shall, within 90 days after December 31, 1970, after consultation with appropriate State and local authorities, designate as an air quality control region any interstate area or major intrastate area which he deems necessary or appropriate for the attainment and maintenance of ambient air quality standards. The Administrator shall immediately notify the Governors of the affected States of any designation made under this subsection.

**(d) Designations**

**(1) Designations generally**

**(A) Submission by Governors of initial designations following promulgation of new or revised standards**

By such date as the Administrator may reasonably require, but not later than 1 year after promulgation of a new or revised national ambient air quality standard for any pollutant under section 7409 of this title, the Governor of each State shall (and at any other time the Governor of a State deems appropriate the Governor may) submit to the Administrator a list of all areas (or portions thereof) in the State, designating as--

**(i)** nonattainment, any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant,

**(ii)** attainment, any area (other than an area identified in clause (i)) that meets the national primary or secondary ambient air quality standard for the pollutant, or

**(iii)** unclassifiable, any area that cannot be classified on the basis of available information as meeting or not meeting the national primary or secondary ambient air quality standard for the pollutant.

The Administrator may not require the Governor to submit the required list sooner than 120 days after promulgating a new or revised national ambient air quality standard.

**(B) Promulgation by EPA of designations**

**(i)** Upon promulgation or revision of a national ambient air quality standard, the Administrator shall promulgate the designations of all areas (or portions thereof) submitted under subparagraph (A) as expeditiously as practicable, but in no case later than 2 years from the date of promulgation of the new or revised national ambient air quality standard. Such period may be extended for up to one year in the event the Administrator has insufficient information to promulgate the designations.

**(ii)** In making the promulgations required under clause (i), the Administrator may make such modifications as the Administrator deems necessary to the designations of the areas (or portions thereof) submitted under subparagraph (A) (including to the boundaries of such areas or portions thereof). Whenever the Administrator intends to make a modification, the Administrator shall notify the State and provide such State with an opportunity to demonstrate why any proposed modification is inappropriate. The Administrator shall give such notification no later than 120 days before the date the Administrator promulgates the designation, including any modification thereto. If the Governor fails to submit the list in whole or in part, as required under subparagraph (A), the Administrator shall promulgate the designation that the Administrator deems appropriate for any area (or portion thereof) not designated by the State.

**(iii)** If the Governor of any State, on the Governor's own motion, under subparagraph (A), submits a list of areas (or portions thereof) in the State designated as nonattainment, attainment, or unclassifiable, the Administrator shall act on such designations in accordance with the procedures under paragraph (3) (relating to redesignation).

**(iv)** A designation for an area (or portion thereof) made pursuant to this subsection shall remain in effect until the area (or portion thereof) is redesignated pursuant to paragraph (3) or (4).

**(C) Designations by operation of law**

**(i)** Any area designated with respect to any air pollutant under the provisions of paragraph (1)(A), (B), or (C) of this subsection (as in effect immediately before November 15, 1990) is designated, by operation of law, as a nonattainment area for such pollutant within the meaning of subparagraph (A)(i).

**(ii)** Any area designated with respect to any air pollutant under the provisions of paragraph (1)(E) (as in effect immediately before November 15, 1990) is designated by operation of law, as an attainment area for such pollutant within the meaning of subparagraph (A)(ii).

**(iii)** Any area designated with respect to any air pollutant under the provisions of paragraph (1)(D) (as in effect immediately before November 15, 1990) is designated, by operation of law, as an unclassifiable area for such pollutant within the meaning of subparagraph (A)(iii).

**(2) Publication of designations and redesignations**

**(A)** The Administrator shall publish a notice in the Federal Register promulgating any designation under paragraph (1) or (5), or announcing any designation under paragraph (4), or promulgating any redesignation under paragraph (3).

**(B)** Promulgation or announcement of a designation under paragraph (1), (4) or (5) shall not be subject to the provisions of sections 553 through 557 of Title 5 (relating to notice and comment), except nothing herein shall be construed as precluding such public notice and comment whenever possible.

**(3) Redesignation**

**(A)** Subject to the requirements of subparagraph (E), and on the basis of air quality data, planning and control considerations, or any other air quality-related considerations the Administrator deems appropriate, the Administrator may at any time notify the Governor of any State that available information indicates that the designation of any area or portion of an area within the State or interstate area should be revised. In issuing such notification, which shall be public, to the Governor, the Administrator shall provide such information as the Administrator may have available explaining the basis for the notice.

**(B)** No later than 120 days after receiving a notification under subparagraph (A), the Governor shall submit to the Administrator such redesignation, if any, of the appropriate area (or areas) or portion thereof within the State or interstate area, as the Governor considers appropriate.

**(C)** No later than 120 days after the date described in subparagraph (B) (or paragraph (1)(B)(iii)), the Administrator shall promulgate the redesignation, if any, of the area or portion thereof, submitted by the Governor in accordance with subparagraph (B), making such modifications as the Administrator may deem necessary, in the same manner and under the same procedure as is applicable under clause (ii) of paragraph (1)(B), except that the phrase "60 days" shall be substituted for the phrase "120 days" in that clause. If the Governor does not submit, in accordance with subparagraph (B), a redesignation for an area (or portion thereof) identified by the Administrator under subparagraph (A), the Administrator shall promulgate such redesignation, if any, that the Administrator deems appropriate.

**(D)** The Governor of any State may, on the Governor's own motion, submit to the Administrator a revised designation of any area or portion thereof within the State. Within 18 months of receipt of a complete State redesignation submittal, the Administrator shall approve or deny such redesignation. The submission of a redesignation by a Governor shall not affect the effectiveness or enforceability of the applicable implementation plan for the State.

**(E)** The Administrator may not promulgate a redesignation of a nonattainment area (or portion thereof) to attainment unless--

**(i)** the Administrator determines that the area has attained the national ambient air quality standard;

**(ii)** the Administrator has fully approved the applicable implementation plan for the area under section 7410(k) of this title;

**(iii)** the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions;

**(iv)** the Administrator has fully approved a maintenance plan for the area as meeting the requirements of section 7505a of this title; and

**(v)** the State containing such area has met all requirements applicable to the area under section 7410 of this title and part D of this subchapter.

**(F)** The Administrator shall not promulgate any redesignation of any area (or portion thereof) from nonattainment to unclassifiable.

**(4) Nonattainment designations for ozone, carbon monoxide and particulate matter (PM-10)**

**(A) Ozone and carbon monoxide**

**(i)** Within 120 days after November 15, 1990, each Governor of each State shall submit to the Administrator a list that designates, affirms or reaffirms the designation of, or redesignates (as the case may be), all areas (or portions thereof) of the Governor's State as attainment, nonattainment, or unclassifiable with respect to the national ambient air quality standards for ozone and carbon monoxide.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

**(ii)** No later than 120 days after the date the Governor is required to submit the list of areas (or portions thereof) required under clause (i) of this subparagraph, the Administrator shall promulgate such designations, making such modifications as the Administrator may deem necessary, in the same manner, and under the same procedure, as is applicable under clause (ii) of paragraph (1)(B), except that the phrase "60 days" shall be substituted for the phrase "120 days" in that clause. If the Governor does not submit, in accordance with clause (i) of this subparagraph, a designation for an area (or portion thereof), the Administrator shall promulgate the designation that the Administrator deems appropriate.

**(iii)** No nonattainment area may be redesignated as an attainment area under this subparagraph.

**(iv)** Notwithstanding paragraph (1)(C)(ii) of this subsection, if an ozone or carbon monoxide nonattainment area located within a metropolitan statistical area or consolidated metropolitan statistical area (as established by the Bureau of the Census) is classified under part D of this subchapter as a Serious, Severe, or Extreme Area, the boundaries of such area are hereby revised (on the date 45 days after such classification) by operation of law to include the entire metropolitan statistical area or consolidated metropolitan statistical area, as the case may be, unless within such 45-day period the Governor (in consultation with State and local air pollution control agencies) notifies the Administrator that additional time is necessary to evaluate the application of clause (v). Whenever a Governor has submitted such a notice to the Administrator, such boundary revision shall occur on the later of the date 8 months after such classification or 14 months after November 15, 1990, unless the Governor makes the finding referred to in clause (v), and the Administrator concurs in such finding, within such period. Except as otherwise provided in this paragraph, a boundary revision under this clause or clause (v) shall apply for purposes of any State implementation plan revision required to be submitted after November 15, 1990.

**(v)** Whenever the Governor of a State has submitted a notice under clause (iv), the Governor, in consultation with State and local air pollution control agencies, shall undertake a study to evaluate whether the entire metropolitan statistical area or consolidated metropolitan statistical area should be included within the nonattainment area. Whenever a Governor finds and demonstrates to the satisfaction of the Administrator, and the Administrator concurs in such finding, that with respect to a portion of a metropolitan statistical area or consolidated metropolitan statistical area, sources in the portion do not contribute significantly to violation of the national ambient air quality standard, the Administrator shall approve the Governor's request to exclude such portion from the nonattainment area. In making such finding, the Governor and the Administrator shall consider factors such as population density, traffic congestion, commercial development, industrial development, meteorological conditions, and pollution transport.

**(B) PM-10 designations**

By operation of law, until redesignation by the Administrator pursuant to paragraph (3)--

**(i)** each area identified in 52 Federal Register 29383 (Aug. 7, 1987) as a Group I area (except to the extent that such identification was modified by the Administrator before November 15, 1990) is designated nonattainment for PM-10;

**(ii)** any area containing a site for which air quality monitoring data show a violation of the national ambient air quality standard for PM-10 before January 1, 1989 (as determined under part 50, appendix K of title 40 of the Code of Federal Regulations) is hereby designated nonattainment for PM-10; and

**(iii)** each area not described in clause (i) or (ii) is hereby designated unclassifiable for PM-10.

Any designation for particulate matter (measured in terms of total suspended particulates) that the Administrator promulgated pursuant to this subsection (as in effect immediately before November 15, 1990) shall remain in effect for purposes of implementing the maximum allowable increases in concentrations of particulate matter (measured in terms of total suspended particulates) pursuant to section 7473(b) of this title, until the Administrator determines that such designation is no longer necessary for that purpose.

**(5) Designations for lead**

The Administrator may, in the Administrator's discretion at any time the Administrator deems appropriate, require a State to designate areas (or portions thereof) with respect to the national ambient air quality standard for lead in effect as of

November 15, 1990, in accordance with the procedures under subparagraphs (A) and (B) of paragraph (1), except that in applying subparagraph (B)(i) of paragraph (1) the phrase "2 years from the date of promulgation of the new or revised national ambient air quality standard" shall be replaced by the phrase "1 year from the date the Administrator notifies the State of the requirement to designate areas with respect to the standard for lead".

**(6) Designations**

**(A) Submission**

Notwithstanding any other provision of law, not later than February 15, 2004, the Governor of each State shall submit designations referred to in paragraph (1) for the July 1997 $PM_{2.5}$ national ambient air quality standards for each area within the State, based on air quality monitoring data collected in accordance with any applicable Federal reference methods for the relevant areas.

**(B) Promulgation**

Notwithstanding any other provision of law, not later than December 31, 2004, the Administrator shall, consistent with paragraph (1), promulgate the designations referred to in subparagraph (A) for each area of each State for the July 1997 $PM_{2.5}$ national ambient air quality standards.

**(7) Implementation plan for regional haze**

**(A) In general**

Notwithstanding any other provision of law, not later than 3 years after the date on which the Administrator promulgates the designations referred to in paragraph (6)(B) for a State, the State shall submit, for the entire State, the State implementation plan revisions to meet the requirements promulgated by the Administrator under section 7492(e)(1) of this title (referred to in this paragraph as "regional haze requirements").

**(B) No preclusion of other provisions**

Nothing in this paragraph precludes the implementation of the agreements and recommendations stemming from the Grand Canyon Visibility Transport Commission Report dated June 1996, including the submission of State implementation plan revisions by the States of Arizona, California, Colorado, Idaho, Nevada, New Mexico, Oregon, Utah, or Wyoming by December 31, 2003, for implementation of regional haze requirements applicable to those States.

**(e) Redesignation of air quality control regions**

**(1)** Except as otherwise provided in paragraph (2), the Governor of each State is authorized, with the approval of the Administrator, to redesignate from time to time the air quality control regions within such State for purposes of efficient and effective air quality management. Upon such redesignation, the list under subsection (d) of this section shall be modified accordingly.

**(2)** In the case of an air quality control region in a State, or part of such region, which the Administrator finds may significantly affect air pollution concentrations in another State, the Governor of the State in which such region, or part of a region, is located may redesignate from time to time the boundaries of so much of such air quality control region as is located within such State only with the approval of the Administrator and with the consent of all Governors of all States which the Administrator determines may be significantly affected.

**(3)** No compliance date extension granted under section 7413(d)(5) of this title (relating to coal conversion) shall cease to be effective by reason of the regional limitation provided in section 7413(d)(5) of this title if the violation of such limitation is due solely to a redesignation of a region under this subsection.

**Credits**

(July 14, 1955, c. 360, Title I, § 107, as added Dec. 31, 1970, Pub.L. 91-604, § 4(a), 84 Stat. 1678; amended Aug. 7, 1977, Pub.L. 95-95, Title I, § 103, 91 Stat. 687; Nov. 15, 1990, Pub.L. 101-549, Title I, § 101(a), 104 Stat. 2399; Jan. 23, 2004, Pub.L. 108-199, Div. G, Title IV, § 425(a), 118 Stat. 417.)

Notes of Decisions (38)

Current through P.L. 112-39 approved 10-12-11

**End of Document** © 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7409

§ 7409. National primary and secondary ambient air quality standards

Currentness

**(a) Promulgation**

**(1)** The Administrator--

**(A)** within 30 days after December 31, 1970, shall publish proposed regulations prescribing a national primary ambient air quality standard and a national secondary ambient air quality standard for each air pollutant for which air quality criteria have been issued prior to such date; and

**(B)** after a reasonable time for interested persons to submit written comments thereon (but no later than 90 days after the initial publication of such proposed standards) shall by regulation promulgate such proposed national primary and secondary ambient air quality standards with such modifications as he deems appropriate.

**(2)** With respect to any air pollutant for which air quality criteria are issued after December 31, 1970, the Administrator shall publish, simultaneously with the issuance of such criteria and information, proposed national primary and secondary ambient air quality standards for any such pollutant. The procedure provided for in paragraph (1)(B) of this subsection shall apply to the promulgation of such standards.

**(b) Protection of public health and welfare**

**(1)** National primary ambient air quality standards, prescribed under subsection (a) of this section shall be ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health. Such primary standards may be revised in the same manner as promulgated.

**(2)** Any national secondary ambient air quality standard prescribed under subsection (a) of this section shall specify a level of air quality the attainment and maintenance of which in the judgment of the Administrator, based on such criteria, is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air. Such secondary standards may be revised in the same manner as promulgated.

**(c) National primary ambient air quality standard for nitrogen dioxide**

The Administrator shall, not later than one year after August 7, 1977, promulgate a national primary ambient air quality standard for $NO_2$ concentrations over a period of not more than 3 hours unless, based on the criteria issued under section 7408(c) of this title, he finds that there is no significant evidence that such a standard for such a period is requisite to protect public health.

**(d) Review and revision of criteria and standards; independent scientific review committee; appointment; advisory functions**

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

**(1)** Not later than December 31, 1980, and at five-year intervals thereafter, the Administrator shall complete a thorough review of the criteria published under section 7408 of this title and the national ambient air quality standards promulgated under this section and shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate in accordance with section 7408 of this title and subsection (b) of this section. The Administrator may review and revise criteria or promulgate new standards earlier or more frequently than required under this paragraph.

**(2)(A)** The Administrator shall appoint an independent scientific review committee composed of seven members including at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies.

**(B)** Not later than January 1, 1980, and at five-year intervals thereafter, the committee referred to in subparagraph (A) shall complete a review of the criteria published under section 7408 of this title and the national primary and secondary ambient air quality standards promulgated under this section and shall recommend to the Administrator any new national ambient air quality standards and revisions of existing criteria and standards as may be appropriate under section 7408 of this title and subsection (b) of this section.

**(C)** Such committee shall also (i) advise the Administrator of areas in which additional knowledge is required to appraise the adequacy and basis of existing, new, or revised national ambient air quality standards, (ii) describe the research efforts necessary to provide the required information, (iii) advise the Administrator on the relative contribution to air pollution concentrations of natural as well as anthropogenic activity, and (iv) advise the Administrator of any adverse public health, welfare, social, economic, or energy effects which may result from various strategies for attainment and maintenance of such national ambient air quality standards.

**Credits**

(July 14, 1955, c. 360, Title I, § 109, as added Dec. 31, 1970, Pub.L. 91-604, § 4(a), 84 Stat. 1679; amended Aug. 7, 1977, Pub.L. 95-95, Title I, § 106, 91 Stat. 691.)

Notes of Decisions (62)

Current through P.L. 112-39 approved 10-12-11

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7410

# § 7410. State implementation plans for national primary and secondary ambient air quality standards

Currentness

**(a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems**

**(1)** Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

**(2)** Each implementation plan submitted by a State under this chapter shall be adopted by the State after reasonable notice and public hearing. Each such plan shall--

**(A)** include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter;

**(B)** provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to--

**(i)** monitor, compile, and analyze data on ambient air quality, and

**(ii)** upon request, make such data available to the Administrator;

**(C)** include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D of this subchapter;

**(D)** contain adequate provisions--

**(i)** prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will--

**(I)** contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or

**(II)** interfere with measures required to be included in the applicable implementation plan for any other State under part C of this subchapter to prevent significant deterioration of air quality or to protect visibility,

**(ii)** insuring compliance with the applicable requirements of sections 7426 and 7415 of this title (relating to interstate and international pollution abatement);

**(E)** provide (i) necessary assurances that the State (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional agency designated by the State or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof), (ii) requirements that the State comply with the requirements respecting State boards under section 7428 of this title, and (iii) necessary assurances that, where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the State has responsibility for ensuring adequate implementation of such plan provision;

**(F)** require, as may be prescribed by the Administrator--

**(i)** the installation, maintenance, and replacement of equipment, and the implementation of other necessary steps, by owners or operators of stationary sources to monitor emissions from such sources,

**(ii)** periodic reports on the nature and amounts of emissions and emissions-related data from such sources, and

**(iii)** correlation of such reports by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection;

**(G)** provide for authority comparable to that in section 7603 of this title and adequate contingency plans to implement such authority;

**(H)** provide for revision of such plan--

**(i)** from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of attaining such standard, and

**(ii)** except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to the Administrator that the plan is substantially inadequate to attain the national ambient air quality standard which it implements or to otherwise comply with any additional requirements established under this chapter;

**(I)** in the case of a plan or plan revision for an area designated as a nonattainment area, meet the applicable requirements of part D of this subchapter (relating to nonattainment areas);

**(J)** meet the applicable requirements of section 7421 of this title (relating to consultation), section 7427 of this title (relating to public notification), and part C of this subchapter (relating to prevention of significant deterioration of air quality and visibility protection);

**(K)** provide for--

**(i)** the performance of such air quality modeling as the Administrator may prescribe for the purpose of predicting the effect on ambient air quality of any emissions of any air pollutant for which the Administrator has established a national ambient air quality standard, and

**(ii)** the submission, upon request, of data related to such air quality modeling to the Administrator;

**(L)** require the owner or operator of each major stationary source to pay to the permitting authority, as a condition of any permit required under this chapter, a fee sufficient to cover--

**(i)** the reasonable costs of reviewing and acting upon any application for such a permit, and

**(ii)** if the owner or operator receives a permit for such source, the reasonable costs of implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action),

until such fee requirement is superseded with respect to such sources by the Administrator's approval of a fee program under subchapter V of this chapter; and

**(M)** provide for consultation and participation by local political subdivisions affected by the plan.

**(3)(A)** Repealed. Pub.L. 101-549, Title I, § 101(d)(1), Nov. 15, 1990, 104 Stat. 2409

**(B)** As soon as practicable, the Administrator shall, consistent with the purposes of this chapter and the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C.A. § 791 et seq.], review each State's applicable implementation plans and report to the State on whether such plans can be revised in relation to fuel burning stationary sources (or persons supplying fuel to such sources) without interfering with the attainment and maintenance of any national ambient air quality standard within the period permitted in this section. If the Administrator determines that any such plan can be revised, he shall notify the State that a plan revision may be submitted by the State. Any plan revision which is submitted by the State shall, after public notice and opportunity for public hearing, be approved by the Administrator if the revision relates only to fuel burning stationary sources (or persons supplying fuel to such sources), and the plan as revised complies with paragraph (2) of this subsection. The Administrator shall approve or disapprove any revision no later than three months after its submission.

**(C)** Neither the State, in the case of a plan (or portion thereof) approved under this subsection, nor the Administrator, in the case of a plan (or portion thereof) promulgated under subsection (c) of this section, shall be required to revise an applicable implementation plan because one or more exemptions under section 7418 of this title (relating to Federal facilities), enforcement orders under section 7413(d) of this title, suspensions under subsection (f) or (g) of this section (relating to temporary energy or economic authority), orders under section 7419 of this title (relating to primary nonferrous smelters), or extensions of compliance in decrees entered under section 7413(e) of this title (relating to iron- and steel-producing operations) have been granted, if such plan would have met the requirements of this section if no such exemptions, orders, or extensions had been granted.

**(4)** Repealed. Pub.L. 101-549, Title I, § 101(d)(2), Nov. 15, 1990, 104 Stat. 2409

**(5)(A)(i)** Any State may include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program. The Administrator may approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.

**(ii)** Except as provided in subparagraph (B), no plan promulgated by the Administrator shall include any indirect source review program for any air quality control region, or portion thereof.

**(iii)** Any State may revise an applicable implementation plan approved under this subsection to suspend or revoke any such program included in such plan, provided that such plan meets the requirements of this section.

**(B)** The Administrator shall have the authority to promulgate, implement and enforce regulations under subsection (c) of this section respecting indirect source review programs which apply only to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources.

**(C)** For purposes of this paragraph, the term "indirect source" means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply (within the meaning of subsection (c)(2)(D)(ii) of this section), including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph.

**(D)** For purposes of this paragraph the term "indirect source review program" means the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations--

**(i)** exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or

**(ii)** preventing maintenance of any such standard after such date.

**(E)** For purposes of this paragraph and paragraph (2)(B), the term "transportation control measure" does not include any measure which is an "indirect source review program".

**(6)** No State plan shall be treated as meeting the requirements of this section unless such plan provides that in the case of any source which uses a supplemental, or intermittent control system for purposes of meeting the requirements of an order under section 7413(d) of this title or section 7419 of this title (relating to primary nonferrous smelter orders), the owner or operator of such source may not temporarily reduce the pay of any employee by reason of the use of such supplemental or intermittent or other dispersion dependent control system.

**(b) Extension of period for submission of plans**

The Administrator may, wherever he determines necessary, extend the period for submission of any plan or portion thereof which implements a national secondary ambient air quality standard for a period not to exceed 18 months from the date otherwise required for submission of such plan.

**(c) Preparation and publication by Administrator of proposed regulations setting forth implementation plan; transportation regulations study and report; parking surcharge; suspension authority; plan implementation**

**(1)** The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator--

**(A)** finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A) of this section, or

**(B)** disapproves a State implementation plan submission in whole or in part,

unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

**(2)(A)** Repealed. Pub.L. 101-549, Title I, § 101(d)(3)(A), Nov. 15, 1990, 104 Stat. 2409

**(B)** No parking surcharge regulation may be required by the Administrator under paragraph (1) of this subsection as a part of an applicable implementation plan. All parking surcharge regulations previously required by the Administrator shall be void upon June 22, 1974. This subparagraph shall not prevent the Administrator from approving parking surcharges if they are adopted and submitted by a State as part of an applicable implementation plan. The Administrator may not condition approval of any implementation plan submitted by a State on such plan's including a parking surcharge regulation.

**(C)** Repealed. Pub.L. 101-549, Title I, § 101(d)(3)(B), Nov. 15, 1990, 104 Stat. 2409

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

**(D)** For purposes of this paragraph--

**(i)** The term "parking surcharge regulation" means a regulation imposing or requiring the imposition of any tax, surcharge, fee, or other charge on parking spaces, or any other area used for the temporary storage of motor vehicles.

**(ii)** The term "management of parking supply" shall include any requirement providing that any new facility containing a given number of parking spaces shall receive a permit or other prior approval, issuance of which is to be conditioned on air quality considerations.

**(iii)** The term "preferential bus/carpool lane" shall include any requirement for the setting aside of one or more lanes of a street or highway on a permanent or temporary basis for the exclusive use of buses or carpools, or both.

**(E)** No standard, plan, or requirement, relating to management of parking supply or preferential bus/carpool lanes shall be promulgated after June 22, 1974, by the Administrator pursuant to this section, unless such promulgation has been subjected to at least one public hearing which has been held in the area affected and for which reasonable notice has been given in such area. If substantial changes are made following public hearings, one or more additional hearings shall be held in such area after such notice.

**(3)** Upon application of the chief executive officer of any general purpose unit of local government, if the Administrator determines that such unit has adequate authority under State or local law, the Administrator may delegate to such unit the authority to implement and enforce within the jurisdiction of such unit any part of a plan promulgated under this subsection. Nothing in this paragraph shall prevent the Administrator from implementing or enforcing any applicable provision of a plan promulgated under this subsection.

**(4)** Repealed. Pub.L. 101-549, Title I, § 101(d)(3)(C), Nov. 15, 1990, 104 Stat. 2409

**(5)(A)** Any measure in an applicable implementation plan which requires a toll or other charge for the use of a bridge located entirely within one city shall be eliminated from such plan by the Administrator upon application by the Governor of the State, which application shall include a certification by the Governor that he will revise such plan in accordance with subparagraph (B).

**(B)** In the case of any applicable implementation plan with respect to which a measure has been eliminated under subparagraph (A), such plan shall, not later than one year after August 7, 1977, be revised to include comprehensive measures to:

**(i)** establish, expand, or improve public transportation measures to meet basic transportation needs, as expeditiously as is practicable; and

**(ii)** implement transportation control measures necessary to attain and maintain national ambient air quality standards,

and such revised plan shall, for the purpose of implementing such comprehensive public transportation measures, include requirements to use (insofar as is necessary) Federal grants, State or local funds, or any combination of such grants and funds as may be consistent with the terms of the legislation providing such grants and funds. Such measures shall, as a substitute for the tolls or charges eliminated under subparagraph (A), provide for emissions reductions equivalent to the reductions which may reasonably be expected to be achieved through the use of the tolls or charges eliminated.

**(C)** Any revision of an implementation plan for purposes of meeting the requirements of subparagraph (B) shall be submitted in coordination with any plan revision required under part D of this subchapter.

**(d), (e) Repealed. Pub.L. 101-549, Title I, § 101(d)(4), (5), Nov. 15, 1990, 104 Stat. 2409**

**(f) National or regional energy emergencies; determination by President**

**(1)** Upon application by the owner or operator of a fuel burning stationary source, and after notice and opportunity for public hearing, the Governor of the State in which such source is located may petition the President to determine that a national or regional energy emergency exists of such severity that--

**(A)** a temporary suspension of any part of the applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) may be necessary, and

**(B)** other means of responding to the energy emergency may be inadequate.
Such determination shall not be delegable by the President to any other person. If the President determines that a national or regional energy emergency of such severity exists, a temporary emergency suspension of any part of an applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) adopted by the State may be issued by the Governor of any State covered by the President's determination under the condition specified in paragraph (2) and may take effect immediately.

**(2)** A temporary emergency suspension under this subsection shall be issued to a source only if the Governor of such State finds that--

**(A)** there exists in the vicinity of such source a temporary energy emergency involving high levels of unemployment or loss of necessary energy supplies for residential dwellings; and

**(B)** such unemployment or loss can be totally or partially alleviated by such emergency suspension.
Not more than one such suspension may be issued for any source on the basis of the same set of circumstances or on the basis of the same emergency.

**(3)** A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator, if any. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of paragraph (2).

**(4)** This subsection shall not apply in the case of a plan provision or requirement promulgated by the Administrator under subsection (c) of this section, but in any such case the President may grant a temporary emergency suspension for a four month period of any such provision or requirement if he makes the determinations and findings specified in paragraphs (1) and (2).

**(5)** The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c-10 of this title, as in effect before August 7, 1977, or section 7413(d) of this title, upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(g) Governor's authority to issue temporary emergency suspensions**

**(1)** In the case of any State which has adopted and submitted to the Administrator a proposed plan revision which the State determines--

**(A)** meets the requirements of this section, and

**(B)** is necessary (i) to prevent the closing for one year or more of any source of air pollution, and (ii) to prevent substantial increases in unemployment which would result from such closing, and
which the Administrator has not approved or disapproved under this section within 12 months of submission of the proposed plan revision, the Governor may issue a temporary emergency suspension of the part of the applicable implementation plan for such State which is proposed to be revised with respect to such source. The determination under subparagraph (B) may not be made with respect to a source which would close without regard to whether or not the proposed plan revision is approved.

 © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

**(2)** A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of this subsection.

**(3)** The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c-10 of this title as in effect before August 7, 1977, or under section 7413(d) of this title upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(h) Publication of comprehensive document for each State setting forth requirements of applicable implementation plan**

**(1)** Not later than 5 years after November 15, 1990, and every 3 years thereafter, the Administrator shall assemble and publish a comprehensive document for each State setting forth all requirements of the applicable implementation plan for such State and shall publish notice in the Federal Register of the availability of such documents.

**(2)** The Administrator may promulgate such regulations as may be reasonably necessary to carry out the purpose of this subsection.

**(i) Modification of requirements prohibited**

Except for a primary nonferrous smelter order under section 7419 of this title, a suspension under subsection (f) or (g) of this section (relating to emergency suspensions), an exemption under section 7418 of this title (relating to certain Federal facilities), an order under section 7413(d) of this title (relating to compliance orders), a plan promulgation under subsection (c) of this section, or a plan revision under subsection (a)(3) of this section, no order, suspension, plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator.

**(j) Technological systems of continuous emission reduction on new or modified stationary sources; compliance with performance standards**

As a condition for issuance of any permit required under this subchapter, the owner or operator of each new or modified stationary source which is required to obtain such a permit must show to the satisfaction of the permitting authority that the technological system of continuous emission reduction which is to be used will enable such source to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter.

**(k) Environmental Protection Agency action on plan submissions**

**(1) Completeness of plan submissions**

**(A) Completeness criteria**

Within 9 months after November 15, 1990, the Administrator shall promulgate minimum criteria that any plan submission must meet before the Administrator is required to act on such submission under this subsection. The criteria shall be limited to the information necessary to enable the Administrator to determine whether the plan submission complies with the provisions of this chapter.

**(B) Completeness finding**

Within 60 days of the Administrator's receipt of a plan or plan revision, but no later than 6 months after the date, if any, by which a State is required to submit the plan or revision, the Administrator shall determine whether the minimum criteria established pursuant to subparagraph (A) have been met. Any plan or plan revision that a State submits to the Administrator, and that has not been determined by the Administrator (by the date 6 months after receipt of the submission) to have failed

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

to meet the minimum criteria established pursuant to subparagraph (A), shall on that date be deemed by operation of law to meet such minimum criteria.

**(C) Effect of finding of incompleteness**

Where the Administrator determines that a plan submission (or part thereof) does not meet the minimum criteria established pursuant to subparagraph (A), the State shall be treated as not having made the submission (or, in the Administrator's discretion, part thereof).

**(2) Deadline for action**

Within 12 months of a determination by the Administrator (or a determination deemed by operation of law) under paragraph (1) that a State has submitted a plan or plan revision (or, in the Administrator's discretion, part thereof) that meets the minimum criteria established pursuant to paragraph (1), if applicable (or, if those criteria are not applicable, within 12 months of submission of the plan or revision), the Administrator shall act on the submission in accordance with paragraph (3).

**(3) Full and partial approval and disapproval**

In the case of any submittal on which the Administrator is required to act under paragraph (2), the Administrator shall approve such submittal as a whole if it meets all of the applicable requirements of this chapter. If a portion of the plan revision meets all the applicable requirements of this chapter, the Administrator may approve the plan revision in part and disapprove the plan revision in part. The plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan revision as complying with the applicable requirements of this chapter.

**(4) Conditional approval**

The Administrator may approve a plan revision based on a commitment of the State to adopt specific enforceable measures by a date certain, but not later than 1 year after the date of approval of the plan revision. Any such conditional approval shall be treated as a disapproval if the State fails to comply with such commitment.

**(5) Calls for plan revisions**

Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard, to mitigate adequately the interstate pollutant transport described in section 7506a of this title or section 7511c of this title, or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies. The Administrator shall notify the State of the inadequacies, and may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions. Such findings and notice shall be public. Any finding under this paragraph shall, to the extent the Administrator deems appropriate, subject the State to the requirements of this chapter to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate (except that the Administrator may not adjust any attainment date prescribed under part D of this subchapter, unless such date has elapsed).

**(6) Corrections**

Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), area designation, redesignation, classification, or reclassification was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

**(l) Plan revisions**

Each revision to an implementation plan submitted by a State under this chapter shall be adopted by such State after reasonable notice and public hearing. The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.

**(m) Sanctions**

The Administrator may apply any of the sanctions listed in section 7509(b) of this title at any time (or at any time after) the Administrator makes a finding, disapproval, or determination under paragraphs (1) through (4), respectively, of section 7509(a) of this title in relation to any plan or plan item (as that term is defined by the Administrator) required under this chapter, with respect to any portion of the State the Administrator determines reasonable and appropriate, for the purpose of ensuring that the requirements of this chapter relating to such plan or plan item are met. The Administrator shall, by rule, establish criteria for exercising his authority under the previous sentence with respect to any deficiency referred to in section 7509(a) of this title to ensure that, during the 24-month period following the finding, disapproval, or determination referred to in section 7509(a) of this title, such sanctions are not applied on a statewide basis where one or more political subdivisions covered by the applicable implementation plan are principally responsible for such deficiency.

**(n) Savings clauses**

**(1) Existing plan provisions**

Any provision of any applicable implementation plan that was approved or promulgated by the Administrator pursuant to this section as in effect before November 15, 1990, shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this chapter.

**(2) Attainment dates**

For any area not designated nonattainment, any plan or plan revision submitted or required to be submitted by a State--

**(A)** in response to the promulgation or revision of a national primary ambient air quality standard in effect on November 15, 1990, or

**(B)** in response to a finding of substantial inadequacy under subsection (a)(2) of this section (as in effect immediately before November 15, 1990),

shall provide for attainment of the national primary ambient air quality standards within 3 years of November 15, 1990, or within 5 years of issuance of such finding of substantial inadequacy, whichever is later.

**(3) Retention of construction moratorium in certain areas**

In the case of an area to which, immediately before November 15, 1990, the prohibition on construction or modification of major stationary sources prescribed in subsection (a)(2)(I) of this section (as in effect immediately before November 15, 1990) applied by virtue of a finding of the Administrator that the State containing such area had not submitted an implementation plan meeting the requirements of section 7502(b)(6) of this title (relating to establishment of a permit program) (as in effect immediately before November 15, 1990) or 7502(a)(1) of this title (to the extent such requirements relate to provision for attainment of the primary national ambient air quality standard for sulfur oxides by December 31, 1982) as in effect immediately before November 15, 1990, no major stationary source of the relevant air pollutant or pollutants shall be constructed or modified in such area until the Administrator finds that the plan for such area meets the applicable requirements of section 7502(c)(5) of this title (relating to permit programs) or subpart 5 of part D of this subchapter (relating to attainment of the primary national ambient air quality standard for sulfur dioxide), respectively.

**(o) Indian tribes**

If an Indian tribe submits an implementation plan to the Administrator pursuant to section 7601(d) of this title, the plan shall be reviewed in accordance with the provisions for review set forth in this section for State plans, except as otherwise provided by regulation promulgated pursuant to section 7601(d)(2) of this title. When such plan becomes effective in accordance with the regulations promulgated under section 7601(d) of this title, the plan shall become applicable to all areas (except as expressly provided otherwise in the plan) located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation.

**(p) Reports**

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

Any State shall submit, according to such schedule as the Administrator may prescribe, such reports as the Administrator may require relating to emission reductions, vehicle miles traveled, congestion levels, and any other information the Administrator may deem necessary to assess the development effectiveness, need for revision, or implementation of any plan or plan revision required under this chapter.

**Credits**

(July 14, 1955, c. 360, Title I, § 110, as added Dec. 31, 1970, Pub.L. 91-604, § 4(a), 84 Stat. 1680; amended June 22, 1974, Pub.L. 93-319, § 4, 88 Stat. 256; S.Res. 4, Feb. 4, 1977; Aug. 7, 1977, Pub.L. 95-95, Title I, §§ 107, 108, 91 Stat. 691, 693; Nov. 16, 1977, Pub.L. 95-190, § 14(a)(1)-(6), 91 Stat. 1399; July 17, 1981, Pub.L. 97-23, § 3, 95 Stat. 142; Nov. 15, 1990, Pub.L. 101-549, Title I, §§ 101(b)-(d), 102(h), 107(c), 108(d), Title IV, § 412, 104 Stat. 2404-2408, 2422, 2464, 2466, 2634.)

Notes of Decisions (309)

Current through P.L. 112-39 approved 10-12-11

**End of Document** © 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7411

§ 7411. Standards of performance for new stationary sources

Currentness

**(a) Definitions**
For purposes of this section:

**(1)** The term "standard of performance" means a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.

**(2)** The term "new source" means any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.

**(3)** The term "stationary source" means any building, structure, facility, or installation which emits or may emit any air pollutant. Nothing in subchapter II of this chapter relating to nonroad engines shall be construed to apply to stationary internal combustion engines.

**(4)** The term "modification" means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.

**(5)** The term "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source.

**(6)** The term "existing source" means any stationary source other than a new source.

**(7)** The term "technological system of continuous emission reduction" means--

**(A)** a technological process for production or operation by any source which is inherently low-polluting or nonpolluting, or

**(B)** a technological system for continuous reduction of the pollution generated by a source before such pollution is emitted into the ambient air, including precombustion cleaning or treatment of fuels.

**(8)** A conversion to coal (A) by reason of an order under section 2(a) of the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C.A. § 792(a) ] or any amendment thereto, or any subsequent enactment which supersedes such Act [15 U.S.C.A. § 791 et seq.], or (B) which qualifies under section 7413(d)(5)(A)(ii) of this title, shall not be deemed to be a modification for purposes of paragraphs (2) and (4) of this subsection.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

**(b) List of categories of stationary sources; standards of performance; information on pollution control techniques; sources owned or operated by United States; particular systems; revised standards**

**(1)(A)** The Administrator shall, within 90 days after December 31, 1970, publish (and from time to time thereafter shall revise) a list of categories of stationary sources. He shall include a category of sources in such list if in his judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.

**(B)** Within one year after the inclusion of a category of stationary sources in a list under subparagraph (A), the Administrator shall publish proposed regulations, establishing Federal standards of performance for new sources within such category. The Administrator shall afford interested persons an opportunity for written comment on such proposed regulations. After considering such comments, he shall promulgate, within one year after such publication, such standards with such modifications as he deems appropriate. The Administrator shall, at least every 8 years, review and, if appropriate, revise such standards following the procedure required by this subsection for promulgation of such standards. Notwithstanding the requirements of the previous sentence, the Administrator need not review any such standard if the Administrator determines that such review is not appropriate in light of readily available information on the efficacy of such standard. Standards of performance or revisions thereof shall become effective upon promulgation. When implementation and enforcement of any requirement of this chapter indicate that emission limitations and percent reductions beyond those required by the standards promulgated under this section are achieved in practice, the Administrator shall, when revising standards promulgated under this section, consider the emission limitations and percent reductions achieved in practice.

**(2)** The Administrator may distinguish among classes, types, and sizes within categories of new sources for the purpose of establishing such standards.

**(3)** The Administrator shall, from time to time, issue information on pollution control techniques for categories of new sources and air pollutants subject to the provisions of this section.

**(4)** The provisions of this section shall apply to any new source owned or operated by the United States.

**(5)** Except as otherwise authorized under subsection (h) of this section, nothing in this section shall be construed to require, or to authorize the Administrator to require, any new or modified source to install and operate any particular technological system of continuous emission reduction to comply with any new source standard of performance.

**(6)** The revised standards of performance required by enactment of subsection (a)(1)(A)(i) and (ii) of this section shall be promulgated not later than one year after August 7, 1977. Any new or modified fossil fuel fired stationary source which commences construction prior to the date of publication of the proposed revised standards shall not be required to comply with such revised standards.

**(c) State implementation and enforcement of standards of performance**

**(1)** Each State may develop and submit to the Administrator a procedure for implementing and enforcing standards of performance for new sources located in such State. If the Administrator finds the State procedure is adequate, he shall delegate to such State any authority he has under this chapter to implement and enforce such standards.

**(2)** Nothing in this subsection shall prohibit the Administrator from enforcing any applicable standard of performance under this section.

**(d) Standards of performance for existing sources; remaining useful life of source**

**(1)** The Administrator shall prescribe regulations which shall establish a procedure similar to that provided by section 7410 of this title under which each State shall submit to the Administrator a plan which (A) establishes standards of performance for any existing source for any air pollutant (i) for which air quality criteria have not been issued or which is not included on a list published under section 7408(a) of this title or emitted from a source category which is regulated under section 7412 of this title

but (ii) to which a standard of performance under this section would apply if such existing source were a new source, and (B) provides for the implementation and enforcement of such standards of performance. Regulations of the Administrator under this paragraph shall permit the State in applying a standard of performance to any particular source under a plan submitted under this paragraph to take into consideration, among other factors, the remaining useful life of the existing source to which such standard applies.

**(2)** The Administrator shall have the same authority--

**(A)** to prescribe a plan for a State in cases where the State fails to submit a satisfactory plan as he would have under section 7410(c) of this title in the case of failure to submit an implementation plan, and

**(B)** to enforce the provisions of such plan in cases where the State fails to enforce them as he would have under sections 7413 and 7414 of this title with respect to an implementation plan.

In promulgating a standard of performance under a plan prescribed under this paragraph, the Administrator shall take into consideration, among other factors, remaining useful lives of the sources in the category of sources to which such standard applies.

**(e) Prohibited acts**

After the effective date of standards of performance promulgated under this section, it shall be unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source.

**(f) New source standards of performance**

**(1)** For those categories of major stationary sources that the Administrator listed under subsection (b)(1)(A) of this section before November 15, 1990, and for which regulations had not been proposed by the Administrator by November 15, 1990, the Administrator shall--

**(A)** propose regulations establishing standards of performance for at least 25 percent of such categories of sources within 2 years after November 15, 1990;

**(B)** propose regulations establishing standards of performance for at least 50 percent of such categories of sources within 4 years after November 15, 1990; and

**(C)** propose regulations for the remaining categories of sources within 6 years after November 15, 1990.

**(2)** In determining priorities for promulgating standards for categories of major stationary sources for the purpose of paragraph (1), the Administrator shall consider--

**(A)** the quantity of air pollutant emissions which each such category will emit, or will be designed to emit;

**(B)** the extent to which each such pollutant may reasonably be anticipated to endanger public health or welfare; and

**(C)** the mobility and competitive nature of each such category of sources and the consequent need for nationally applicable new source standards of performance.

**(3)** Before promulgating any regulations under this subsection or listing any category of major stationary sources as required under this subsection, the Administrator shall consult with appropriate representatives of the Governors and of State air pollution control agencies.

**(g) Revision of regulations**

**(1)** Upon application by the Governor of a State showing that the Administrator has failed to specify in regulations under subsection (f)(1) of this section any category of major stationary sources required to be specified under such regulations, the Administrator shall revise such regulations to specify any such category.

**(2)** Upon application of the Governor of a State, showing that any category of stationary sources which is not included in the list under subsection (b)(1)(A) of this section contributes significantly to air pollution which may reasonably be anticipated to endanger public health or welfare (notwithstanding that such category is not a category of major stationary sources), the Administrator shall revise such regulations to specify such category of stationary sources.

**(3)** Upon application of the Governor of a State showing that the Administrator has failed to apply properly the criteria required to be considered under subsection (f)(2) of this section, the Administrator shall revise the list under subsection (b)(1)(A) of this section to apply properly such criteria.

**(4)** Upon application of the Governor of a State showing that--

**(A)** a new, innovative, or improved technology or process which achieves greater continuous emission reduction has been adequately demonstrated for any category of stationary sources, and

**(B)** as a result of such technology or process, the new source standard of performance in effect under this section for such category no longer reflects the greatest degree of emission limitation achievable through application of the best technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impact and energy requirements) has been adequately demonstrated,

the Administrator shall revise such standard of performance for such category accordingly.

**(5)** Unless later deadlines for action of the Administrator are otherwise prescribed under this section, the Administrator shall, not later than three months following the date of receipt of any application by a Governor of a State, either--

**(A)** find that such application does not contain the requisite showing and deny such application, or

**(B)** grant such application and take the action required under this subsection.

**(6)** Before taking any action required by subsection (f) of this section or by this subsection, the Administrator shall provide notice and opportunity for public hearing.

**(h) Design, equipment, work practice, or operational standard; alternative emission limitation**

**(1)** For purposes of this section, if in the judgment of the Administrator, it is not feasible to prescribe or enforce a standard of performance, he may instead promulgate a design, equipment, work practice, or operational standard, or combination thereof, which reflects the best technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated. In the event the Administrator promulgates a design or equipment standard under this subsection, he shall include as part of such standard such requirements as will assure the proper operation and maintenance of any such element of design or equipment.

**(2)** For the purpose of this subsection, the phrase “not feasible to prescribe or enforce a standard of performance” means any situation in which the Administrator determines that (A) a pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State, or local law, or (B) the application of measurement methodology to a particular class of sources is not practicable due to technological or economic limitations.

**(3)** If after notice and opportunity for public hearing, any person establishes to the satisfaction of the Administrator that an alternative means of emission limitation will achieve a reduction in emissions of any air pollutant at least equivalent to the reduction in emissions of such air pollutant achieved under the requirements of paragraph (1), the Administrator shall permit the use of such alternative by the source for purposes of compliance with this section with respect to such pollutant.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

**(4)** Any standard promulgated under paragraph (1) shall be promulgated in terms of standard of performance whenever it becomes feasible to promulgate and enforce such standard in such terms.

**(5)** Any design, equipment, work practice, or operational standard, or any combination thereof, described in this subsection shall be treated as a standard of performance for purposes of the provisions of this chapter (other than the provisions of subsection (a) of this section and this subsection).

**(i) Country elevators**

Any regulations promulgated by the Administrator under this section applicable to grain elevators shall not apply to country elevators (as defined by the Administrator) which have a storage capacity of less than two million five hundred thousand bushels.

**(j) Innovative technological systems of continuous emission reduction**

**(1)(A)** Any person proposing to own or operate a new source may request the Administrator for one or more waivers from the requirements of this section for such source or any portion thereof with respect to any air pollutant to encourage the use of an innovative technological system or systems of continuous emission reduction. The Administrator may, with the consent of the Governor of the State in which the source is to be located, grant a waiver under this paragraph, if the Administrator determines after notice and opportunity for public hearing, that--

**(i)** the proposed system or systems have not been adequately demonstrated,

**(ii)** the proposed system or systems will operate effectively and there is a substantial likelihood that such system or systems will achieve greater continuous emission reduction than that required to be achieved under the standards of performance which would otherwise apply, or achieve at least an equivalent reduction at lower cost in terms of energy, economic, or nonair quality environmental impact,

**(iii)** the owner or operator of the proposed source has demonstrated to the satisfaction of the Administrator that the proposed system will not cause or contribute to an unreasonable risk to public health, welfare, or safety in its operation, function, or malfunction, and

**(iv)** the granting of such waiver is consistent with the requirements of subparagraph (C).

In making any determination under clause (ii), the Administrator shall take into account any previous failure of such system or systems to operate effectively or to meet any requirement of the new source performance standards. In determining whether an unreasonable risk exists under clause (iii), the Administrator shall consider, among other factors, whether and to what extent the use of the proposed technological system will cause, increase, reduce, or eliminate emissions of any unregulated pollutants; available methods for reducing or eliminating any risk to public health, welfare, or safety which may be associated with the use of such system; and the availability of other technological systems which may be used to conform to standards under this section without causing or contributing to such unreasonable risk. The Administrator may conduct such tests and may require the owner or operator of the proposed source to conduct such tests and provide such information as is necessary to carry out clause (iii) of this subparagraph. Such requirements shall include a requirement for prompt reporting of the emission of any unregulated pollutant from a system if such pollutant was not emitted, or was emitted in significantly lesser amounts without use of such system.

**(B)** A waiver under this paragraph shall be granted on such terms and conditions as the Administrator determines to be necessary to assure--

**(i)** emissions from the source will not prevent attainment and maintenance of any national ambient air quality standards, and

**(ii)** proper functioning of the technological system or systems authorized.

Any such term or condition shall be treated as a standard of performance for the purposes of subsection (e) of this section and section 7413 of this title.

**(C)** The number of waivers granted under this paragraph with respect to a proposed technological system of continuous emission reduction shall not exceed such number as the Administrator finds necessary to ascertain whether or not such system will achieve the conditions specified in clauses (ii) and (iii) of subparagraph (A).

**(D)** A waiver under this paragraph shall extend to the sooner of--

**(i)** the date determined by the Administrator, after consultation with the owner or operator of the source, taking into consideration the design, installation, and capital cost of the technological system or systems being used, or

**(ii)** the date on which the Administrator determines that such system has failed to--

**(I)** achieve at least an equivalent continuous emission reduction to that required to be achieved under the standards of performance which would otherwise apply, or

**(II)** comply with the condition specified in paragraph (1)(A)(iii),
and that such failure cannot be corrected.

**(E)** In carrying out subparagraph (D)(i), the Administrator shall not permit any waiver for a source or portion thereof to extend beyond the date--

**(i)** seven years after the date on which any waiver is granted to such source or portion thereof, or

**(ii)** four years after the date on which such source or portion thereof commences operation,
whichever is earlier.

**(F)** No waiver under this subsection shall apply to any portion of a source other than the portion on which the innovative technological system or systems of continuous emission reduction is used.

**(2)(A)** If a waiver under paragraph (1) is terminated under clause (ii) of paragraph (1)(D), the Administrator shall grant an extension of the requirements of this section for such source for such minimum period as may be necessary to comply with the applicable standard of performance under this section. Such period shall not extend beyond the date three years from the time such waiver is terminated.

**(B)** An extension granted under this paragraph shall set forth emission limits and a compliance schedule containing increments of progress which require compliance with the applicable standards of performance as expeditiously as practicable and include such measures as are necessary and practicable in the interim to minimize emissions. Such schedule shall be treated as a standard of performance for purposes of subsection (e) of this section and section 7413 of this title.

**Credits**

(July 14, 1955, c. 360, Title I, § 111, as added Dec. 31, 1970, Pub.L. 91-604, § 4(a), 84 Stat. 1683; amended Nov. 18, 1971, Pub.L. 92-157, Title III, § 302(f), 85 Stat. 464; Aug. 7, 1977, Pub.L. 95-95, Title I, § 109(a)-(d)(1), (e), (f), Title IV, § 401(b), 91 Stat. 697 to 703, 791; Nov. 16, 1977, Pub.L. 95-190, § 14(a)(7) to (9), 91 Stat. 1399; Nov. 9, 1978, Pub.L. 95-623, § 13(a), 92 Stat. 3457; Nov. 15, 1990, Pub.L. 101-549, Title I, § 108(e) to (g), Title III, § 302(a), (b), Title IV, § 403(a), 104 Stat. 2467, 2574, 2631.)

Notes of Decisions (113)

Current through P.L. 112-39 approved 10-12-11

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7426

§ 7426. Interstate pollution abatement

Currentness

**(a) Written notice to all nearby States**
Each applicable implementation plan shall--

**(1)** require each major proposed new (or modified) source--

**(A)** subject to part C of this subchapter (relating to significant deterioration of air quality) or

**(B)** which may significantly contribute to levels of air pollution in excess of the national ambient air quality standards in any air quality control region outside the State in which such source intends to locate (or make such modification),
to provide written notice to all nearby States the air pollution levels of which may be affected by such source at least sixty days prior to the date on which commencement of construction is to be permitted by the State providing notice, and

**(2)** identify all major existing stationary sources which may have the impact described in paragraph (1) with respect to new or modified sources and provide notice to all nearby States of the identity of such sources not later than three months after August 7, 1977.

**(b) Petition for finding that major sources emit or would emit prohibited air pollutants**
Any State or political subdivision may petition the Administrator for a finding that any major source or group of stationary sources emits or would emit any air pollutant in violation of the prohibition of section 7410(a)(2)(D)(ii) of this title or this section. Within 60 days after receipt of any petition under this subsection and after public hearing, the Administrator shall make such a finding or deny the petition.

**(c) Violations; allowable continued operation**
Notwithstanding any permit which may have been granted by the State in which the source is located (or intends to locate), it shall be a violation of this section and the applicable implementation plan in such State--

**(1)** for any major proposed new (or modified) source with respect to which a finding has been made under subsection (b) of this section to be constructed or to operate in violation of the prohibition of section 7410(a)(2)(D)(ii) of this title or this section, or

**(2)** for any major existing source to operate more than three months after such finding has been made with respect to it.
The Administrator may permit the continued operation of a source referred to in paragraph (2) beyond the expiration of such three-month period if such source complies with such emission limitations and compliance schedules (containing increments of progress) as may be provided by the Administrator to bring about compliance with the requirements contained in section 7410(a)(2)(D)(ii) of this title or this section as expeditiously as practicable, but in no case later than three years after the date

of such finding. Nothing in the preceding sentence shall be construed to preclude any such source from being eligible for an enforcement order under section 7413(d) of this title after the expiration of such period during which the Administrator has permitted continuous operation.

**Credits**
(July 14, 1955, c. 360, Title I, § 126, as added Aug. 7, 1977, Pub.L. 95-95, Title I, § 123, 91 Stat. 724; amended Nov. 16, 1977, Pub.L. 95-190, § 14(a)(39), 91 Stat. 1401; Nov. 15, 1990, Pub.L. 101-549, Title I, § 109(a), 104 Stat. 2469.)

Notes of Decisions (13)

Current through P.L. 112-39 approved 10-12-11

**End of Document** © 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part C. Prevention of Significant Deterioration of Air Quality

Subpart I. Clean Air (Refs & Annos)

42 U.S.C.A. § 7470

§ 7470. Congressional declaration of purpose

Currentness

The purposes of this part are as follows:

**(1)** to protect public health and welfare from any actual or potential adverse effect which in the Administrator's judgment may reasonably be anticipate [1] to occur from air pollution or from exposures to pollutants in other media, which pollutants originate as emissions to the ambient air) [2], notwithstanding attainment and maintenance of all national ambient air quality standards;

**(2)** to preserve, protect, and enhance the air quality in national parks, national wilderness areas, national monuments, national seashores, and other areas of special national or regional natural, recreational, scenic, or historic value;

**(3)** to insure that economic growth will occur in a manner consistent with the preservation of existing clean air resources;

**(4)** to assure that emissions from any source in any State will not interfere with any portion of the applicable implementation plan to prevent significant deterioration of air quality for any other State; and

**(5)** to assure that any decision to permit increased air pollution in any area to which this section applies is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decisionmaking process.

**Credits**

(July 14, 1955, c. 360, Title I, § 160, as added Aug. 7, 1977, Pub.L. 95-95, Title I, § 127(a), 91 Stat. 731.)

Notes of Decisions (2)

Current through P.L. 112-39 approved 10-12-11

Footnotes

1 So in original. Probably should be “anticipated”.

2 So in original. Section was enacted without an opening parenthesis.

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part C. Prevention of Significant Deterioration of Air Quality

Subpart I. Clean Air (Refs & Annos)

42 U.S.C.A. § 7471

§ 7471. Plan requirements

Currentness

In accordance with the policy of section 7401(b)(1) of this title, each applicable implementation plan shall contain emission limitations and such other measures as may be necessary, as determined under regulations promulgated under this part, to prevent significant deterioration of air quality in each region (or portion thereof) designated pursuant to section 7407 of this title as attainment or unclassifiable.

**Credits**

(July 14, 1955, c. 360, Title I, § 161, as added Aug. 7, 1977, Pub.L. 95-95, Title I, § 127(a), 91 Stat. 731; amended Nov. 15, 1990, Pub.L. 101-549, Title I, § 110(1), 104 Stat. 2470.)

Notes of Decisions (2)

Current through P.L. 112-39 approved 10-12-11

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part C. Prevention of Significant Deterioration of Air Quality

Subpart I. Clean Air (Refs & Annos)

42 U.S.C.A. § 7472

§ 7472. Initial classifications

Currentness

**(a) Areas designated as class I**

Upon the enactment of this part, all--

**(1)** international parks,

**(2)** national wilderness areas which exceed 5,000 acres in size,

**(3)** national memorial parks which exceed 5,000 acres in size, and

**(4)** national parks which exceed six thousand acres in size,

and which are in existence on August 7, 1977, shall be class I areas and may not be redesignated. All areas which were redesignated as class I under regulations promulgated before August 7, 1977, shall be class I areas which may be redesignated as provided in this part. The extent of the areas designated as Class I under this section shall conform to any changes in the boundaries of such areas which have occurred subsequent to August 7, 1977, or which may occur subsequent to November 15, 1990.

**(b) Areas designated as class II**

All areas in such State designated pursuant to section 7407(d) of this title as attainment or unclassifiable which are not established as class I under subsection (a) of this section shall be class II areas unless redesignated under section 7474 of this title.

**Credits**

(July 14, 1955, c. 360, Title I, § 162, as added Aug. 7, 1977, Pub.L. 95-95, Title I, § 127(a), 91 Stat. 731; amended Nov. 16, 1977, Pub.L. 95-190, § 14(a)(40), 91 Stat. 1401; Nov. 15, 1990, Pub.L. 101-549, Title I, §§ 108(m), 110(2), 104 Stat. 2469, 2470.)

Current through P.L. 112-39 approved 10-12-11

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part C. Prevention of Significant Deterioration of Air Quality

Subpart I. Clean Air (Refs & Annos)

42 U.S.C.A. § 7473

§ 7473. Increments and ceilings

Currentness

**(a) Sulfur oxide and particulate matter; requirement that maximum allowable increases and maximum allowable concentrations not be exceeded**

In the case of sulfur oxide and particulate matter, each applicable implementation plan shall contain measures assuring that maximum allowable increases over baseline concentrations of, and maximum allowable concentrations of, such pollutant shall not be exceeded. In the case of any maximum allowable increase (except an allowable increase specified under section 7475(d)(2)(C)(iv) of this title) for a pollutant based on concentrations permitted under national ambient air quality standards for any period other than an annual period, such regulations shall permit such maximum allowable increase to be exceeded during one such period per year.

**(b) Maximum allowable increases in concentrations over baseline concentrations**

**(1)** For any class I area, the maximum allowable increase in concentrations of sulfur dioxide and particulate matter over the baseline concentration of such pollutants shall not exceed the following amounts:

| **Pollutant** | **Maximum allowable increase (in micrograms per cubic meter)** |
|---|---|
| Particulate matter: | |
| Annual geometric mean | 5 |
| Twenty-four-hour maximum | 10 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 2 |
| Twenty-four-hour maximum | 5 |
| Three-hour maximum | 25 |

**(2)** For any class II area, the maximum allowable increase in concentrations of sulfur dioxide and particulate matter over the baseline concentration of such pollutants shall not exceed the following amounts:

| **Pollutant** | **Maximum allowable increase (in micrograms per cubic meter)** |
|---|---|
| Particulate matter: | |
| Annual geometric mean | 19 |

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

| | |
|---|---|
| Twenty-four-hour maximum | 37.. |
| Sulfur dioxide: | |
| Annual arithmetic mean | 20.. |
| Twenty-four-hour maximum | 91.. |
| Three-hour maximum | 512 |

**(3)** For any class III area, the maximum allowable increase in concentrations of sulfur dioxide and particulate matter over the baseline concentration of such pollutants shall not exceed the following amounts:

| **Pollutant** | **Maximum allowable increase (in micrograms per cubic meter)** |
|---|---|
| Particulate matter: | |
| Annual geometric mean | 37.. |
| Twenty-four-hour maximum | 75.. |
| Sulfur dioxide: | |
| Annual arithmetic mean | 40.. |
| Twenty-four-hour maximum | 182 |
| Three-hour maximum | 700 |

**(4)** The maximum allowable concentration of any air pollutant in any area to which this part applies shall not exceed a concentration for such pollutant for each period of exposure equal to--

**(A)** the concentration permitted under the national secondary ambient air quality standard, or

**(B)** the concentration permitted under the national primary ambient air quality standard,
whichever concentration is lowest for such pollutant for such period of exposure.

**(c) Orders or rules for determining compliance with maximum allowable increases in ambient concentrations of air pollutants**

**(1)** In the case of any State which has a plan approved by the Administrator for purposes of carrying out this part, the Governor of such State may, after notice and opportunity for public hearing, issue orders or promulgate rules providing that for purposes of determining compliance with the maximum allowable increases in ambient concentrations of an air pollutant, the following concentrations of such pollutant shall not be taken into account:

**(A)** concentrations of such pollutant attributable to the increase in emissions from stationary sources which have converted from the use of petroleum products, or natural gas, or both, by reason of an order which is in effect under the provisions of sections 792(a) and (b) of Title 15 (or any subsequent legislation which supersedes such provisions) over the emissions from such sources before the effective date of such order. [1]

**(B)** the concentrations of such pollutant attributable to the increase in emissions from stationary sources which have converted from using natural gas by reason of a natural gas curtailment pursuant to a natural gas curtailment plan in effect pursuant to the Federal Power Act [16 U.S.C.A. § 791a et seq.] over the emissions from such sources before the effective date of such plan,

**(C)** concentrations of particulate matter attributable to the increase in emissions from construction or other temporary emission-related activities, and

**(D)** the increase in concentrations attributable to new sources outside the United States over the concentrations attributable to existing sources which are included in the baseline concentration determined in accordance with section 7479(4) of this title.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

**(2)** No action taken with respect to a source under paragraph (1)(A) or (1)(B) shall apply more than five years after the effective date of the order referred to in paragraph (1)(A) or the plan referred to in paragraph (1)(B), whichever is applicable. If both such order and plan are applicable, no such action shall apply more than five years after the later of such effective dates.

**(3)** No action under this subsection shall take effect unless the Governor submits the order or rule providing for such exclusion to the Administrator and the Administrator determines that such order or rule is in compliance with the provisions of this subsection.

**Credits**

(July 14, 1955, c. 360, Title I, § 163, as added Aug. 7, 1977, Pub.L. 95-95, Title I, § 127(a), 91 Stat. 732; amended Nov. 16, 1977, Pub.L. 95-190, § 14(a)(41), 91 Stat. 1401.)

Notes of Decisions (6)

Current through P.L. 112-39 approved 10-12-11

Footnotes

1 So in original. The period probably should be a comma.

**End of Document** © 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part C. Prevention of Significant Deterioration of Air Quality

Subpart I. Clean Air (Refs & Annos)

42 U.S.C.A. § 7474

§ 7474. Area redesignation

Currentness

**(a) Authority of States to redesignate areas**

Except as otherwise provided under subsection (c) of this section, a State may redesignate such areas as it deems appropriate as class I areas. The following areas may be redesignated only as class I or II:

**(1)** an area which exceeds ten thousand acres in size and is a national monument, a national primitive area, a national preserve, a national recreation area, a national wild and scenic river, a national wildlife refuge, a national lakeshore or seashore, and

**(2)** a national park or national wilderness area established after August 7, 1977, which exceeds ten thousand acres in size.

The extent of the areas referred to in paragraph[1] (1) and (2) shall conform to any changes in the boundaries of such areas which have occurred subsequent to August 7, 1977, or which may occur subsequent to November 15, 1990. Any area (other than an area referred to in paragraph (1) or (2) or an area established as class I under the first sentence of section 7472(a) of this title) may be redesignated by the State as class III if--

**(A)** such redesignation has been specifically approved by the Governor of the State, after consultation with the appropriate Committees of the legislature if it is in session or with the leadership of the legislature if it is not in session (unless State law provides that such redesignation must be specifically approved by State legislation) and if general purpose units of local government representing a majority of the residents of the area so redesignated enact legislation (including for such units of local government resolutions where appropriate) concurring in the State's redesignation;

**(B)** such redesignation will not cause, or contribute to, concentrations of any air pollutant which exceed any maximum allowable increase or maximum allowable concentration permitted under the classification of any other area; and

**(C)** such redesignation otherwise meets the requirements of this part.

Subparagraph (A) of this paragraph shall not apply to area redesignations by Indian tribes.

**(b) Notice and hearing; notice to Federal land manager; written comments and recommendations; regulations; disapproval of redesignation**

**(1)(A)** Prior to redesignation of any area under this part, notice shall be afforded and public hearings shall be conducted in areas proposed to be redesignated and in areas which may be affected by the proposed redesignation. Prior to any such public hearing a satisfactory description and analysis of the health, environmental, economic, social, and energy effects of the proposed redesignation shall be prepared and made available for public inspection and prior to any such redesignation, the description and analysis of such effects shall be reviewed and examined by the redesignating authorities.

**(B)** Prior to the issuance of notice under subparagraph (A) respecting the redesignation of any area under this subsection, if such area includes any Federal lands, the State shall provide written notice to the appropriate Federal land manager and afford adequate opportunity (but not in excess of 60 days) to confer with the State respecting the intended notice of redesignation and to submit written comments and recommendations with respect to such intended notice of redesignation. In redesignating any area under this section with respect to which any Federal land manager has submitted written comments and recommendations, the State shall publish a list of any inconsistency between such redesignation and such recommendations and an explanation of such inconsistency (together with the reasons for making such redesignation against the recommendation of the Federal land manager).

**(C)** The Administrator shall promulgate regulations not later than six months after August 7, 1977, to assure, insofar as practicable, that prior to any public hearing on redesignation of any area, there shall be available for public inspection any specific plans for any new or modified major emitting facility which may be permitted to be constructed and operated only if the area in question is designated or redesignated as class III.

**(2)** The Administrator may disapprove the redesignation of any area only if he finds, after notice and opportunity for public hearing, that such redesignation does not meet the procedural requirements of this section or is inconsistent with the requirements of section 7472(a) of this title or of subsection (a) of this section. If any such disapproval occurs, the classification of the area shall be that which was in effect prior to the redesignation which was disapproved.

**(c) Indian reservations**
Lands within the exterior boundaries of reservations of federally recognized Indian tribes may be redesignated only by the appropriate Indian governing body. Such Indian governing body shall be subject in all respect to the provisions of subsection (e) of this section.

**(d) Review of national monuments, primitive areas, and national preserves**
The Federal Land Manager shall review all national monuments, primitive areas, and national preserves, and shall recommend any appropriate areas for redesignation as class I where air quality related values are important attributes of the area. The Federal Land Manager shall report such recommendations, within [2] supporting analysis, to the Congress and the affected States within one year after August 7, 1977. The Federal Land Manager shall consult with the appropriate States before making such recommendations.

**(e) Resolution of disputes between State and Indian tribes**
If any State affected by the redesignation of an area by an Indian tribe or any Indian tribe affected by the redesignation of an area by a State disagrees with such redesignation of any area, or if a permit is proposed to be issued for any new major emitting facility proposed for construction in any State which the Governor of an affected State or governing body of an affected Indian tribe determines will cause or contribute to a cumulative change in air quality in excess of that allowed in this part within the affected State or tribal reservation, the Governor or Indian ruling body may request the Administrator to enter into negotiations with the parties involved to resolve such dispute. If requested by any State or Indian tribe involved, the Administrator shall make a recommendation to resolve the dispute and protect the air quality related values of the lands involved. If the parties involved do not reach agreement, the Administrator shall resolve the dispute and his determination, or the results of agreements reached through other means, shall become part of the applicable plan and shall be enforceable as part of such plan. In resolving such disputes relating to area redesignation, the Administrator shall consider the extent to which the lands involved are of sufficient size to allow effective air quality management or have air quality related values of such an area.

**Credits**
(July 14, 1955, c. 360, Title I, § 164, as added Aug. 7, 1977, Pub.L. 95-95, Title I, § 127(a), 91 Stat. 733; amended Nov. 16, 1977, Pub.L. 95-190, § 14(a)(42), (43), 91 Stat. 1402; Nov. 15, 1990, Pub.L. 101-549, Title I, § 108(n), 104 Stat. 2469.)

Notes of Decisions (5)

Current through P.L. 112-39 approved 10-12-11

Footnotes

1 So in original. Probably should be "paragraphs".

2 So in original. Probably should be "with".

End of Document © 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part C. Prevention of Significant Deterioration of Air Quality

Subpart I. Clean Air (Refs & Annos)

42 U.S.C.A. § 7475

§ 7475. Preconstruction requirements

Currentness

**(a) Major emitting facilities on which construction is commenced**

No major emitting facility on which construction is commenced after August 7, 1977, may be constructed in any area to which this part applies unless--

**(1)** a permit has been issued for such proposed facility in accordance with this part setting forth emission limitations for such facility which conform to the requirements of this part;

**(2)** the proposed permit has been subject to a review in accordance with this section, the required analysis has been conducted in accordance with regulations promulgated by the Administrator, and a public hearing has been held with opportunity for interested persons including representatives of the Administrator to appear and submit written or oral presentations on the air quality impact of such source, alternatives thereto, control technology requirements, and other appropriate considerations;

**(3)** the owner or operator of such facility demonstrates, as required pursuant to section 7410(j) of this title, that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of any (A) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which this part applies more than one time per year, (B) national ambient air quality standard in any air quality control region, or (C) any other applicable emission standard or standard of performance under this chapter;

**(4)** the proposed facility is subject to the best available control technology for each pollutant subject to regulation under this chapter emitted from, or which results from, such facility;

**(5)** the provisions of subsection (d) of this section with respect to protection of class I areas have been complied with for such facility;

**(6)** there has been an analysis of any air quality impacts projected for the area as a result of growth associated with such facility;

**(7)** the person who owns or operates, or proposes to own or operate, a major emitting facility for which a permit is required under this part agrees to conduct such monitoring as may be necessary to determine the effect which emissions from any such facility may have, or is having, on air quality in any area which may be affected by emissions from such source; and

**(8)** in the case of a source which proposes to construct in a class III area, emissions from which would cause or contribute to exceeding the maximum allowable increments applicable in a class II area and where no standard under section 7411 of

this title has been promulgated subsequent to August 7, 1977, for such source category, the Administrator has approved the determination of best available technology as set forth in the permit.

**(b) Exception**

The demonstration pertaining to maximum allowable increases required under subsection (a)(3) of this section shall not apply to maximum allowable increases for class II areas in the case of an expansion or modification of a major emitting facility which is in existence on August 7, 1977, whose allowable emissions of air pollutants, after compliance with subsection (a)(4) of this section, will be less than fifty tons per year and for which the owner or operator of such facility demonstrates that emissions of particulate matter and sulfur oxides will not cause or contribute to ambient air quality levels in excess of the national secondary ambient air quality standard for either of such pollutants.

**(c) Permit applications**

Any completed permit application under section 7410 of this title for a major emitting facility in any area to which this part applies shall be granted or denied not later than one year after the date of filing of such completed application.

**(d) Action taken on permit applications; notice; adverse impact on air quality related values; variance; emission limitations**

**(1)** Each State shall transmit to the Administrator a copy of each permit application relating to a major emitting facility received by such State and provide notice to the Administrator of every action related to the consideration of such permit.

**(2)(A)** The Administrator shall provide notice of the permit application to the Federal Land Manager and the Federal official charged with direct responsibility for management of any lands within a class I area which may be affected by emissions from the proposed facility.

**(B)** The Federal Land Manager and the Federal official charged with direct responsibility for management of such lands shall have an affirmative responsibility to protect the air quality related values (including visibility) of any such lands within a class I area and to consider, in consultation with the Administrator, whether a proposed major emitting facility will have an adverse impact on such values.

**(C)(i)** In any case where the Federal official charged with direct responsibility for management of any lands within a class I area or the Federal Land Manager of such lands, or the Administrator, or the Governor of an adjacent State containing such a class I area files a notice alleging that emissions from a proposed major emitting facility may cause or contribute to a change in the air quality in such area and identifying the potential adverse impact of such change, a permit shall not be issued unless the owner or operator of such facility demonstrates that emissions of particulate matter and sulfur dioxide will not cause or contribute to concentrations which exceed the maximum allowable increases for a class I area.

**(ii)** In any case where the Federal Land Manager demonstrates to the satisfaction of the State that the emissions from such facility will have an adverse impact on the air quality-related values (including visibility) of such lands, notwithstanding the fact that the change in air quality resulting from emissions from such facility will not cause or contribute to concentrations which exceed the maximum allowable increases for a class I area, a permit shall not be issued.

**(iii)** In any case where the owner or operator of such facility demonstrates to the satisfaction of the Federal Land Manager, and the Federal Land Manager so certifies, that the emissions from such facility will have no adverse impact on the air quality-related values of such lands (including visibility), notwithstanding the fact that the change in air quality resulting from emissions from such facility will cause or contribute to concentrations which exceed the maximum allowable increases for class I areas, the State may issue a permit.

**(iv)** In the case of a permit issued pursuant to clause (iii), such facility shall comply with such emission limitations under such permit as may be necessary to assure that emissions of sulfur oxides and particulates from such facility will not cause or contribute to concentrations of such pollutant which exceed the following maximum allowable increases over the baseline concentration for such pollutants:

| | Maximum allowable in crease (in micrograms per cubic meter) |
|---|---|
| Particulate matter: | |
| Annual geometric mean | 19.. |
| Twenty-four-hour maximum | 37.. |
| Sulfur dioxide: | |
| Annual arithmetic mean | 20.. |
| Twenty-four-hour maximum | 91.. |
| Three-hour maximum | 325 |

**(D)(i)** In any case where the owner or operator of a proposed major emitting facility who has been denied a certification under subparagraph (C)(iii) demonstrates to the satisfaction of the Governor, after notice and public hearing, and the Governor finds, that the facility cannot be constructed by reason of any maximum allowable increase for sulfur dioxide for periods of twenty-four hours or less applicable to any class I area and, in the case of Federal mandatory class I areas, that a variance under this clause will not adversely affect the air quality related values of the area (including visibility), the Governor, after consideration of the Federal Land Manager's recommendation (if any) and subject to his concurrence, may grant a variance from such maximum allowable increase. If such variance is granted, a permit may be issued to such source pursuant to the requirements of this subparagraph.

**(ii)** In any case in which the Governor recommends a variance under this subparagraph in which the Federal Land Manager does not concur, the recommendations of the Governor and the Federal Land Manager shall be transmitted to the President. The President may approve the Governor's recommendation if he finds that such variance is in the national interest. No Presidential finding shall be reviewable in any court. The variance shall take effect if the President approves the Governor's recommendations. The President shall approve or disapprove such recommendation within ninety days after his receipt of the recommendations of the Governor and the Federal Land Manager.

**(iii)** In the case of a permit issued pursuant to this subparagraph, such facility shall comply with such emission limitations under such permit as may be necessary to assure that emissions of sulfur oxides from such facility will not (during any day on which the otherwise applicable maximum allowable increases are exceeded) cause or contribute to concentrations which exceed the following maximum allowable increases for such areas over the baseline concentration for such pollutant and to assure that such emissions will not cause or contribute to concentrations which exceed the otherwise applicable maximum allowable increases for periods of exposure of 24 hours or less on more than 18 days during any annual period:

**MAXIMUM ALLOWABLE INCREASE**
**[In micrograms per cubic meter]**

| Period of exposure | Low terrain areas | High terrain areas |
|---|---|---|
| 24-hr maximum | 36 | 62 |
| 3-hr maximum | 130 | 221 |

**(iv)** For purposes of clause (iii), the term “high terrain area” means with respect to any facility, any area having an elevation of 900 feet or more above the base of the stack of such facility, and the term “low terrain area” means any area other than a high terrain area.

**(e) Analysis; continuous air quality monitoring data; regulations; model adjustments**

**(1)** The review provided for in subsection (a) of this section shall be preceded by an analysis in accordance with regulations of the Administrator, promulgated under this subsection, which may be conducted by the State (or any general purpose unit of local government) or by the major emitting facility applying for such permit, of the ambient air quality at the proposed site

and in areas which may be affected by emissions from such facility for each pollutant subject to regulation under this chapter which will be emitted from such facility.

**(2)** Effective one year after August 7, 1977, the analysis required by this subsection shall include continuous air quality monitoring data gathered for purposes of determining whether emissions from such facility will exceed the maximum allowable increases or the maximum allowable concentration permitted under this part. Such data shall be gathered over a period of one calendar year preceding the date of application for a permit under this part unless the State, in accordance with regulations promulgated by the Administrator, determines that a complete and adequate analysis for such purposes may be accomplished in a shorter period. The results of such analysis shall be available at the time of the public hearing on the application for such permit.

**(3)** The Administrator shall within six months after August 7, 1977, promulgate regulations respecting the analysis required under this subsection which regulations--

**(A)** shall not require the use of any automatic or uniform buffer zone or zones,

**(B)** shall require an analysis of the ambient air quality, climate and meteorology, terrain, soils and vegetation, and visibility at the site of the proposed major emitting facility and in the area potentially affected by the emissions from such facility for each pollutant regulated under this chapter which will be emitted from, or which results from the construction or operation of, such facility, the size and nature of the proposed facility, the degree of continuous emission reduction which could be achieved by such facility, and such other factors as may be relevant in determining the effect of emissions from a proposed facility on any air quality control region,

**(C)** shall require the results of such analysis shall be available at the time of the public hearing on the application for such permit, and

**(D)** shall specify with reasonable particularity each air quality model or models to be used under specified sets of conditions for purposes of this part.

Any model or models designated under such regulations may be adjusted upon a determination, after notice and opportunity for public hearing, by the Administrator that such adjustment is necessary to take into account unique terrain or meteorological characteristics of an area potentially affected by emissions from a source applying for a permit required under this part.

**Credits**

(July 14, 1955, c. 360, Title I, § 165, as added Aug. 7, 1977, Pub.L. 95-95, Title I, § 127(a), 91 Stat. 735; amended Nov. 16, 1977, Pub.L. 95-190, § 14(a)(44)-(51), 91 Stat. 1402.)

Notes of Decisions (32)

Current through P.L. 112-39 approved 10-12-11

**End of Document** © 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part C. Prevention of Significant Deterioration of Air Quality

Subpart I. Clean Air (Refs & Annos)

42 U.S.C.A. § 7476

§ 7476. Other pollutants

Currentness

**(a) Hydrocarbons, carbon monoxide, photochemical oxidants, and nitrogen oxides**
In the case of the pollutants hydrocarbons, carbon monoxide, photochemical oxidants, and nitrogen oxides, the Administrator shall conduct a study and not later than two years after August 7, 1977, promulgate regulations to prevent the significant deterioration of air quality which would result from the emissions of such pollutants. In the case of pollutants for which national ambient air quality standards are promulgated after August 7, 1977, he shall promulgate such regulations not more than 2 years after the date of promulgation of such standards.

**(b) Effective date of regulations**
Regulations referred to in subsection (a) of this section shall become effective one year after the date of promulgation. Within 21 months after such date of promulgation such plan revision shall be submitted to the Administrator who shall approve or disapprove the plan within 25 months after such date or promulgation in the same manner as required under section 7410 of this title.

**(c) Contents of regulations**
Such regulations shall provide specific numerical measures against which permit applications may be evaluated, a framework for stimulating improved control technology, protection of air quality values, and fulfill the goals and purposes set forth in section 7401 and section 7470 of this title.

**(d) Specific measures to fulfill goals and purposes**
The regulations of the Administrator under subsection (a) of this section shall provide specific measures at least as effective as the increments established in section 7473 of this title to fulfill such goals and purposes, and may contain air quality increments, emission density requirements, or other measures.

**(e) Area classification plan not required**
With respect to any air pollutant for which a national ambient air quality standard is established other than sulfur oxides or particulate matter, an area classification plan shall not be required under this section if the implementation plan adopted by the State and submitted for the Administrator's approval or promulgated by the Administrator under section 7410(c) of this title contains other provisions which when considered as a whole, the Administrator finds will carry out the purposes in section 7470 of this title at least as effectively as an area classification plan for such pollutant. Such other provisions referred to in the preceding sentence need not require the establishment of maximum allowable increases with respect to such pollutant for any area to which this section applies.

**(f) PM-10 increments**

The Administrator is authorized to substitute, for the maximum allowable increases in particulate matter specified in section 7473(b) of this title and section 7475(d)(2)(C)(iv) of this title, maximum allowable increases in particulate matter with an aerodynamic diameter smaller than or equal to 10 micrometers. Such substituted maximum allowable increases shall be of equal stringency in effect as those specified in the provisions for which they are substituted. Until the Administrator promulgates regulations under the authority of this subsection, the current maximum allowable increases in concentrations of particulate matter shall remain in effect.

**Credits**

(July 14, 1955, c. 360, Title I, § 166, as added Aug. 7, 1977, Pub.L. 95-95, Title I, § 127(a), 91 Stat. 739; amended Nov. 15, 1990, Pub.L. 101-549, Title I, § 105(b), 104 Stat. 2462.)

Notes of Decisions (5)

Current through P.L. 112-39 approved 10-12-11

**End of Document** © 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part C. Prevention of Significant Deterioration of Air Quality

Subpart I. Clean Air (Refs & Annos)

42 U.S.C.A. § 7477

§ 7477. Enforcement

Currentness

The Administrator shall, and a State may, take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction or modification of a major emitting facility which does not conform to the requirements of this part, or which is proposed to be constructed in any area designated pursuant to section 7407(d) of this title as attainment or unclassifiable and which is not subject to an implementation plan which meets the requirements of this part.

**Credits**

(July 14, 1955, c. 360, Title I, § 167, as added Aug. 7, 1977, Pub.L. 95-95, Title I, § 127(a), 91 Stat. 740; amended Nov. 15, 1990, Pub.L. 101-549, Title I, § 110(3), Title VII, § 708, 104 Stat. 2470, 2684.)

Notes of Decisions (22)

Current through P.L. 112-39 approved 10-12-11

**End of Document** © 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part C. Prevention of Significant Deterioration of Air Quality

Subpart I. Clean Air (Refs & Annos)

42 U.S.C.A. § 7478

# § 7478. Period before plan approval

Currentness

**(a) Existing regulations to remain in effect**

Until such time as an applicable implementation plan is in effect for any area, which plan meets the requirements of this part to prevent significant deterioration of air quality with respect to any air pollutant, applicable regulations under this chapter prior to August 7, 1977, shall remain in effect to prevent significant deterioration of air quality in any such area for any such pollutant except as otherwise provided in subsection (b) of this section.

**(b) Regulations deemed amended; construction commenced after June 1, 1975**

If any regulation in effect prior to August 7, 1977, to prevent significant deterioration of air quality would be inconsistent with the requirements of section 7472(a), section 7473(b) or section 7474(a) of this title, then such regulations shall be deemed amended so as to conform with such requirements. In the case of a facility on which construction was commenced (in accordance with the definition of "commenced" in section 7479(2) of this title) after June 1, 1975, and prior to August 7, 1977, the review and permitting of such facility shall be in accordance with the regulations for the prevention of significant deterioration in effect prior to August 7, 1977.

**Credits**

(July 14, 1955, c. 360, Title I, § 168, as added Aug. 7, 1977, Pub.L. 95-95, Title I, § 127(a), 91 Stat. 740; amended Nov. 16, 1977, Pub.L. 95-190, § 14(a)(52), 91 Stat. 1402.)

Notes of Decisions (1)

Current through P.L. 112-39 approved 10-12-11

**End of Document** © 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part C. Prevention of Significant Deterioration of Air Quality

Subpart I. Clean Air (Refs & Annos)

42 U.S.C.A. § 7479

§ 7479. Definitions

Currentness

For purposes of this part--

**(1)** The term "major emitting facility" means any of the following stationary sources of air pollutants which emit, or have the potential to emit, one hundred tons per year or more of any air pollutant from the following types of stationary sources: fossil-fuel fired steam electric plants of more than two hundred and fifty million British thermal units per hour heat input, coal cleaning plants (thermal dryers), kraft pulp mills, Portland Cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants, primary copper smelters, municipal incinerators capable of charging more than fifty tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production facilities, chemical process plants, fossil-fuel boilers of more than two hundred and fifty million British thermal units per hour heat input, petroleum storage and transfer facilities with a capacity exceeding three hundred thousand barrels, taconite ore processing facilities, glass fiber processing plants, charcoal production facilities. Such term also includes any other source with the potential to emit two hundred and fifty tons per year or more of any air pollutant. This term shall not include new or modified facilities which are nonprofit health or education institutions which have been exempted by the State.

**(2)(A)** The term "commenced" as applied to construction of a major emitting facility means that the owner or operator has obtained all necessary preconstruction approvals or permits required by Federal, State, or local air pollution emissions and air quality laws or regulations and either has (i) begun, or caused to begin, a continuous program of physical on-site construction of the facility or (ii) entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of construction of the facility to be completed within a reasonable time.

**(B)** The term "necessary preconstruction approvals or permits" means those permits or approvals, required by the permitting authority as a precondition to undertaking any activity under clauses (i) or (ii) of subparagraph (A) of this paragraph.

**(C)** The term "construction" when used in connection with any source or facility, includes the modification (as defined in section 7411(a) of this title) of any source or facility.

**(3)** The term "best available control technology" means an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility through application of production processes and available methods, systems, and techniques, including fuel cleaning, clean fuels, or treatment or innovative fuel combustion techniques for control of

each such pollutant. In no event shall application of "best available control technology" result in emissions of any pollutants which will exceed the emissions allowed by any applicable standard established pursuant to section 7411 or 7412 of this title. Emissions from any source utilizing clean fuels, or any other means, to comply with this paragraph shall not be allowed to increase above levels that would have been required under this paragraph as it existed prior to November 15, 1990.

**(4)** The term "baseline concentration" means, with respect to a pollutant, the ambient concentration levels which exist at the time of the first application for a permit in an area subject to this part, based on air quality data available in the Environmental Protection Agency or a State air pollution control agency and on such monitoring data as the permit applicant is required to submit. Such ambient concentration levels shall take into account all projected emissions in, or which may affect, such area from any major emitting facility on which construction commenced prior to January 6, 1975, but which has not begun operation by the date of the baseline air quality concentration determination. Emissions of sulfur oxides and particulate matter from any major emitting facility on which construction commenced after January 6, 1975, shall not be included in the baseline and shall be counted against the maximum allowable increases in pollutant concentrations established under this part.

**Credits**

(July 14, 1955, c. 360, Title I, § 169, as added Aug. 7, 1977, Pub.L. 95-95, Title I, § 127(a), 91 Stat. 740; amended Nov. 16, 1977, Pub.L. 95-190, § 14(a)(54), 91 Stat. 1402; Nov. 15, 1990, Pub.L. 101-549, Title III, § 305(b), Title IV, § 403(d), 104 Stat. 2583, 2631.)

Notes of Decisions (21)

Current through P.L. 112-39 approved 10-12-11

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part D. Plan Requirements for Nonattainment Areas

Subpart 1. Nonattainment Areas in General (Refs & Annos)

42 U.S.C.A. § 7502

# § 7502. Nonattainment plan provisions in general

Currentness

**(a) Classifications and attainment dates**

**(1) Classifications**

**(A)** On or after the date the Administrator promulgates the designation of an area as a nonattainment area pursuant to section 7407(d) of this title with respect to any national ambient air quality standard (or any revised standard, including a revision of any standard in effect on November 15, 1990), the Administrator may classify the area for the purpose of applying an attainment date pursuant to paragraph (2), and for other purposes. In determining the appropriate classification, if any, for a nonattainment area, the Administrator may consider such factors as the severity of nonattainment in such area and the availability and feasibility of the pollution control measures that the Administrator believes may be necessary to provide for attainment of such standard in such area.

**(B)** The Administrator shall publish a notice in the Federal Register announcing each classification under subparagraph (A), except the Administrator shall provide an opportunity for at least 30 days for written comment. Such classification shall not be subject to the provisions of sections 553 through 557 of Title 5 (concerning notice and comment) and shall not be subject to judicial review until the Administrator takes final action under subsection (k) or (l) of section 7410 of this title (concerning action on plan submissions) or section 7509 of this title (concerning sanctions) with respect to any plan submissions required by virtue of such classification.

**(C)** This paragraph shall not apply with respect to nonattainment areas for which classifications are specifically provided under other provisions of this part.

**(2) Attainment dates for nonattainment areas**

**(A)** The attainment date for an area designated nonattainment with respect to a national primary ambient air quality standard shall be the date by which attainment can be achieved as expeditiously as practicable, but no later than 5 years from the date such area was designated nonattainment under section 7407(d) of this title, except that the Administrator may extend the attainment date to the extent the Administrator determines appropriate, for a period no greater than 10 years from the date of designation as nonattainment, considering the severity of nonattainment and the availability and feasibility of pollution control measures.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

**(B)** The attainment date for an area designated nonattainment with respect to a secondary national ambient air quality standard shall be the date by which attainment can be achieved as expeditiously as practicable after the date such area was designated nonattainment under section 7407(d) of this title.

**(C)** Upon application by any State, the Administrator may extend for 1 additional year (hereinafter referred to as the "Extension Year") the attainment date determined by the Administrator under subparagraph (A) or (B) if--

**(i)** the State has complied with all requirements and commitments pertaining to the area in the applicable implementation plan, and

**(ii)** in accordance with guidance published by the Administrator, no more than a minimal number of exceedances of the relevant national ambient air quality standard has occurred in the area in the year preceding the Extension Year.

No more than 2 one-year extensions may be issued under this subparagraph for a single nonattainment area.

**(D)** This paragraph shall not apply with respect to nonattainment areas for which attainment dates are specifically provided under other provisions of this part.

**(b) Schedule for plan submissions**

At the time the Administrator promulgates the designation of an area as nonattainment with respect to a national ambient air quality standard under section 7407(d) of this title, the Administrator shall establish a schedule according to which the State containing such area shall submit a plan or plan revision (including the plan items) meeting the applicable requirements of subsection (c) of this section and section 7410(a)(2) of this title. Such schedule shall at a minimum, include a date or dates, extending no later than 3 years from the date of the nonattainment designation, for the submission of a plan or plan revision (including the plan items) meeting the applicable requirements of subsection (c) of this section and section 7410(a)(2) of this title.

**(c) Nonattainment plan provisions**

The plan provisions (including plan items) required to be submitted under this part shall comply with each of the following:

**(1) In general**

Such plan provisions shall provide for the implementation of all reasonably available control measures as expeditiously as practicable (including such reductions in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology) and shall provide for attainment of the national primary ambient air quality standards.

**(2) RFP**

Such plan provisions shall require reasonable further progress.

**(3) Inventory**

Such plan provisions shall include a comprehensive, accurate, current inventory of actual emissions from all sources of the relevant pollutant or pollutants in such area, including such periodic revisions as the Administrator may determine necessary to assure that the requirements of this part are met.

**(4) Identification and quantification**

Such plan provisions shall expressly identify and quantify the emissions, if any, of any such pollutant or pollutants which will be allowed, in accordance with section 7503(a)(1)(B) of this title, from the construction and operation of major new or modified stationary sources in each such area. The plan shall demonstrate to the satisfaction of the Administrator that the emissions quantified for this purpose will be consistent with the achievement of reasonable further progress and will not interfere with attainment of the applicable national ambient air quality standard by the applicable attainment date.

**(5) Permits for new and modified major stationary sources**

Such plan provisions shall require permits for the construction and operation of new or modified major stationary sources anywhere in the nonattainment area, in accordance with section 7503 of this title.

**(6) Other measures**

Such plan provisions shall include enforceable emission limitations, and such other control measures, means or techniques (including economic incentives such as fees, marketable permits, and auctions of emission rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to provide for attainment of such standard in such area by the applicable attainment date specified in this part.

**(7) Compliance with section 7410(a)(2)**

Such plan provisions shall also meet the applicable provisions of section 7410(a)(2) of this title.

**(8) Equivalent techniques**

Upon application by any State, the Administrator may allow the use of equivalent modeling, emission inventory, and planning procedures, unless the Administrator determines that the proposed techniques are, in the aggregate, less effective than the methods specified by the Administrator.

**(9) Contingency measures**

Such plan shall provide for the implementation of specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date applicable under this part. Such measures shall be included in the plan revision as contingency measures to take effect in any such case without further action by the State or the Administrator.

**(d) Plan revisions required in response to finding of plan inadequacy**

Any plan revision for a nonattainment area which is required to be submitted in response to a finding by the Administrator pursuant to section 7410(k)(5) of this title (relating to calls for plan revisions) must correct the plan deficiency (or deficiencies) specified by the Administrator and meet all other applicable plan requirements of section 7410 of this title and this part. The Administrator may reasonably adjust the dates otherwise applicable under such requirements to such revision (except for attainment dates that have not yet elapsed), to the extent necessary to achieve a consistent application of such requirements. In order to facilitate submittal by the States of adequate and approvable plans consistent with the applicable requirements of this chapter, the Administrator shall, as appropriate and from time to time, issue written guidelines, interpretations, and information to the States which shall be available to the public, taking into consideration any such guidelines, interpretations, or information provided before November 15, 1990.

**(e) Future modification of standard**

If the Administrator relaxes a national primary ambient air quality standard after November 15, 1990, the Administrator shall, within 12 months after the relaxation, promulgate requirements applicable to all areas which have not attained that standard as of the date of such relaxation. Such requirements shall provide for controls which are not less stringent than the controls applicable to areas designated nonattainment before such relaxation.

**Credits**

(July 14, 1955, c. 360, Title I, § 172, as added Aug. 7, 1977, Pub.L. 95-95, Title I, § 129(b), 91 Stat. 746; amended Nov. 16, 1977, Pub.L. 95-190, § 14(a)(55), (56), 91 Stat. 1402; Nov. 15, 1990, Pub.L. 101-549, Title I, § 102(b), 104 Stat. 2412.)

Notes of Decisions (41)

Current through P.L. 112-39 approved 10-12-11

**End of Document** © 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part D. Plan Requirements for Nonattainment Areas

Subpart 1. Nonattainment Areas in General (Refs & Annos)

42 U.S.C.A. § 7503

§ 7503. Permit requirements

Currentness

**(a) In general**

The permit program required by section 7502(b)(6) of this title shall provide that permits to construct and operate may be issued if--

**(1)** in accordance with regulations issued by the Administrator for the determination of baseline emissions in a manner consistent with the assumptions underlying the applicable implementation plan approved under section 7410 of this title and this part, the permitting agency determines that--

**(A)** by the time the source is to commence operation, sufficient offsetting emissions reductions have been obtained, such that total allowable emissions from existing sources in the region, from new or modified sources which are not major emitting facilities, and from the proposed source will be sufficiently less than total emissions from existing sources (as determined in accordance with the regulations under this paragraph) prior to the application for such permit to construct or modify so as to represent (when considered together with the plan provisions required under section 7502 of this title) reasonable further progress (as defined in section 7501 of this title); or

**(B)** in the case of a new or modified major stationary source which is located in a zone (within the nonattainment area) identified by the Administrator, in consultation with the Secretary of Housing and Urban Development, as a zone to which economic development should be targeted, that emissions of such pollutant resulting from the proposed new or modified major stationary source will not cause or contribute to emissions levels which exceed the allowance permitted for such pollutant for such area from new or modified major stationary sources under section 7502(c) of this title;

**(2)** the proposed source is required to comply with the lowest achievable emission rate;

**(3)** the owner or operator of the proposed new or modified source has demonstrated that all major stationary sources owned or operated by such person (or by any entity controlling, controlled by, or under common control with such person) in such State are subject to emission limitations and are in compliance, or on a schedule for compliance, with all applicable emission limitations and standards under this chapter; and [1]

**(4)** the Administrator has not determined that the applicable implementation plan is not being adequately implemented for the nonattainment area in which the proposed source is to be constructed or modified in accordance with the requirements of this part; and

**(5)** an analysis of alternative sites, sizes, production processes, and environmental control techniques for such proposed source demonstrates that benefits of the proposed source significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification.

Any emission reductions required as a precondition of the issuance of a permit under paragraph (1) shall be federally enforceable before such permit may be issued.

**(b) Prohibition on use of old growth allowances**

Any growth allowance included in an applicable implementation plan to meet the requirements of section 7502(b)(5) of this title (as in effect immediately before November 15, 1990) shall not be valid for use in any area that received or receives a notice under section 7410(a)(2)(H)(ii) of this title (as in effect immediately before November 15, 1990) or under section 7410(k)(1) of this title that its applicable implementation plan containing such allowance is substantially inadequate.

**(c) Offsets**

**(1)** The owner or operator of a new or modified major stationary source may comply with any offset requirement in effect under this part for increased emissions of any air pollutant only by obtaining emission reductions of such air pollutant from the same source or other sources in the same nonattainment area, except that the State may allow the owner or operator of a source to obtain such emission reductions in another nonattainment area if (A) the other area has an equal or higher nonattainment classification than the area in which the source is located and (B) emissions from such other area contribute to a violation of the national ambient air quality standard in the nonattainment area in which the source is located. Such emission reductions shall be, by the time a new or modified source commences operation, in effect and enforceable and shall assure that the total tonnage of increased emissions of the air pollutant from the new or modified source shall be offset by an equal or greater reduction, as applicable, in the actual emissions of such air pollutant from the same or other sources in the area.

**(2)** Emission reductions otherwise required by this chapter shall not be creditable as emissions reductions for purposes of any such offset requirement. Incidental emission reductions which are not otherwise required by this chapter shall be creditable as emission reductions for such purposes if such emission reductions meet the requirements of paragraph (1).

**(d) Control technology information**

The State shall provide that control technology information from permits issued under this section will be promptly submitted to the Administrator for purposes of making such information available through the RACT/BACT/LAER clearinghouse to other States and to the general public.

**(e) Rocket engines or motors**

The permitting authority of a State shall allow a source to offset by alternative or innovative means emission increases from rocket engine and motor firing, and cleaning related to such firing, at an existing or modified major source that tests rocket engines or motors under the following conditions:

**(1)** Any modification proposed is solely for the purpose of expanding the testing of rocket engines or motors at an existing source that is permitted to test such engines on November 15, 1990.

**(2)** The source demonstrates to the satisfaction of the permitting authority of the State that it has used all reasonable means to obtain and utilize offsets, as determined on an annual basis, for the emissions increases beyond allowable levels, that all available offsets are being used, and that sufficient offsets are not available to the source.

**(3)** The source has obtained a written finding from the Department of Defense, Department of Transportation, National Aeronautics and Space Administration or other appropriate Federal agency, that the testing of rocket motors or engines at the facility is required for a program essential to the national security.

**(4)** The source will comply with an alternative measure, imposed by the permitting authority, designed to offset any emission increases beyond permitted levels not directly offset by the source. In lieu of imposing any alternative offset measures, the

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

permitting authority may impose an emissions fee to be paid to such authority of a State which shall be an amount no greater than 1.5 times the average cost of stationary source control measures adopted in that area during the previous 3 years. The permitting authority shall utilize the fees in a manner that maximizes the emissions reductions in that area.

**Credits**

(July 14, 1955, c. 360, Title I, § 173, as added Aug. 7, 1977, Pub.L. 95-95, Title I, § 129(b), 91 Stat. 748; amended Nov. 16, 1977, Pub.L. 95-190, § 14(a)(57), (58), 91 Stat. 1403; Nov. 15, 1990, Pub.L. 101-549, Title I, § 102(c), 104 Stat. 2415.)

Notes of Decisions (14)

Current through P.L. 112-39 approved 10-12-11

Footnotes

1 So in original. The word "and" probably should not appear.

**End of Document** © 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter I. Programs and Activities

Part D. Plan Requirements for Nonattainment Areas

Subpart 2. Additional Provisions for Ozone Nonattainment Areas (Refs & Annos)

42 U.S.C.A. § 7511a

§ 7511a. Plan submissions and requirements

Currentness

**(a) Marginal Areas**

Each State in which all or part of a Marginal Area is located shall, with respect to the Marginal Area (or portion thereof, to the extent specified in this subsection), submit to the Administrator the State implementation plan revisions (including the plan items) described under this subsection except to the extent the State has made such submissions as of November 15, 1990.

**(1) Inventory**

Within 2 years after November 15, 1990, the State shall submit a comprehensive, accurate, current inventory of actual emissions from all sources, as described in section 7502(c)(3) of this title, in accordance with guidance provided by the Administrator.

**(2) Corrections to the State implementation plan**

Within the periods prescribed in this paragraph, the State shall submit a revision to the State implementation plan that meets the following requirements--

**(A) Reasonably available control technology corrections**

For any Marginal Area (or, within the Administrator's discretion, portion thereof) the State shall submit, within 6 months of the date of classification under section 7511(a) of this title, a revision that includes such provisions to correct requirements in (or add requirements to) the plan concerning reasonably available control technology as were required under section 7502(b) of this title (as in effect immediately before November 15, 1990), as interpreted in guidance issued by the Administrator under section 7408 of this title before November 15, 1990.

**(B) Savings clause for vehicle inspection and maintenance**

**(i)** For any Marginal Area (or, within the Administrator's discretion, portion thereof), the plan for which already includes, or was required by section 7502(b)(11)(B) of this title (as in effect immediately before November 15, 1990) to have included, a specific schedule for implementation of a vehicle emission control inspection and maintenance program, the State shall submit, immediately after November 15, 1990, a revision that includes any provisions necessary to provide for a vehicle inspection and maintenance program of no less stringency than that of either the program defined in House Report Numbered 95-294, 95th Congress, 1st Session, 281-291 (1977) as interpreted in guidance of the Administrator issued pursuant to section 7502(b)(11)(B) of this title (as in effect immediately before November 15, 1990) or the program already included in the plan, whichever is more stringent.

**(ii)** Within 12 months after November 15, 1990, the Administrator shall review, revise, update, and republish in the Federal Register the guidance for the States for motor vehicle inspection and maintenance programs required by this chapter, taking into consideration the Administrator's investigations and audits of such program. The guidance shall, at a minimum, cover the frequency of inspections, the types of vehicles to be inspected (which shall include leased vehicles that are registered in the nonattainment area), vehicle maintenance by owners and operators, audits by the State, the test method and measures, including whether centralized or decentralized, inspection methods and procedures, quality of inspection, components covered, assurance that a vehicle subject to a recall notice from a manufacturer has complied with that notice, and effective implementation and enforcement, including ensuring that any retesting of a vehicle after a failure shall include proof of corrective action and providing for denial of vehicle registration in the case of tampering or misfueling. The guidance which shall be incorporated in the applicable State implementation plans by the States shall provide the States with continued reasonable flexibility to fashion effective, reasonable, and fair programs for the affected consumer. No later than 2 years after the Administrator promulgates regulations under section 7521(m)(3) of this title (relating to emission control diagnostics), the State shall submit a revision to such program to meet any requirements that the Administrator may prescribe under that section.

**(C) Permit programs**

Within 2 years after November 15, 1990, the State shall submit a revision that includes each of the following:

**(i)** Provisions to require permits, in accordance with sections 7502(c)(5) and 7503 of this title, for the construction and operation of each new or modified major stationary source (with respect to ozone) to be located in the area.

**(ii)** Provisions to correct requirements in (or add requirements to) the plan concerning permit programs as were required under section 7502(b)(6) of this title (as in effect immediately before November 15, 1990), as interpreted in regulations of the Administrator promulgated as of November 15, 1990.

**(3) Periodic inventory**

**(A) General requirement**

No later than the end of each 3-year period after submission of the inventory under paragraph (1) until the area is redesignated to attainment, the State shall submit a revised inventory meeting the requirements of subsection (a)(1) of this section.

**(B) Emissions statements**

**(i)** Within 2 years after November 15, 1990, the State shall submit a revision to the State implementation plan to require that the owner or operator of each stationary source of oxides of nitrogen or volatile organic compounds provide the State with a statement, in such form as the Administrator may prescribe (or accept an equivalent alternative developed by the State), for classes or categories of sources, showing the actual emissions of oxides of nitrogen and volatile organic compounds from that source. The first such statement shall be submitted within 3 years after November 15, 1990. Subsequent statements shall be submitted at least every year thereafter. The statement shall contain a certification that the information contained in the statement is accurate to the best knowledge of the individual certifying the statement.

**(ii)** The State may waive the application of clause (i) to any class or category of stationary sources which emit less than 25 tons per year of volatile organic compounds or oxides of nitrogen if the State, in its submissions under subparagraphs [1] (1) or (3)(A), provides an inventory of emissions from such class or category of sources, based on the use of the emission factors established by the Administrator or other methods acceptable to the Administrator.

**(4) General offset requirement**

For purposes of satisfying the emission offset requirements of this part, the ratio of total emission reductions of volatile organic compounds to total increased emissions of such air pollutant shall be at least 1.1 to 1.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

The Administrator may, in the Administrator's discretion, require States to submit a schedule for submitting any of the revisions or other items required under this subsection. The requirements of this subsection shall apply in lieu of any requirement that the State submit a demonstration that the applicable implementation plan provides for attainment of the ozone standard by the applicable attainment date in any Marginal Area. Section 7502(c)(9) of this title (relating to contingency measures) shall not apply to Marginal Areas.

**(b) Moderate Areas**
Each State in which all or part of a Moderate Area is located shall, with respect to the Moderate Area, make the submissions described under subsection (a) of this section (relating to Marginal Areas), and shall also submit the revisions to the applicable implementation plan described under this subsection.

**(1) Plan provisions for reasonable further progress**

**(A) General rule**

**(i)** By no later than 3 years after November 15, 1990, the State shall submit a revision to the applicable implementation plan to provide for volatile organic compound emission reductions, within 6 years after November 15, 1990, of at least 15 percent from baseline emissions, accounting for any growth in emissions after 1990. Such plan shall provide for such specific annual reductions in emissions of volatile organic compounds and oxides of nitrogen as necessary to attain the national primary ambient air quality standard for ozone by the attainment date applicable under this chapter. This subparagraph shall not apply in the case of oxides of nitrogen for those areas for which the Administrator determines (when the Administrator approves the plan or plan revision) that additional reductions of oxides of nitrogen would not contribute to attainment.

**(ii)** A percentage less than 15 percent may be used for purposes of clause (i) in the case of any State which demonstrates to the satisfaction of the Administrator that--

**(I)** new source review provisions are applicable in the nonattainment areas in the same manner and to the same extent as required under subsection (e) of this section in the case of Extreme Areas (with the exception that, in applying such provisions, the terms “major source” and “major stationary source” shall include (in addition to the sources described in section 7602 of this title) any stationary source or group of sources located within a contiguous area and under common control that emits, or has the potential to emit, at least 5 tons per year of volatile organic compounds);

**(II)** reasonably available control technology is required for all existing major sources (as defined in subclause (I)); and

**(III)** the plan reflecting a lesser percentage than 15 percent includes all measures that can feasibly be implemented in the area, in light of technological achievability.

To qualify for a lesser percentage under this clause, a State must demonstrate to the satisfaction of the Administrator that the plan for the area includes the measures that are achieved in practice by sources in the same source category in nonattainment areas of the next higher category.

**(B) Baseline emissions**
For purposes of subparagraph (A), the term “baseline emissions” means the total amount of actual VOC or $NO_x$ emissions from all anthropogenic sources in the area during the calendar year 1990, excluding emissions that would be eliminated under the regulations described in clauses (i) and (ii) of subparagraph (D).

**(C) General rule for creditability of reductions**
Except as provided under subparagraph (D), emissions reductions are creditable toward the 15 percent required under subparagraph (A) to the extent they have actually occurred, as of 6 years after November 15, 1990, from the implementation of measures required under the applicable implementation plan, rules promulgated by the Administrator, or a permit under subchapter V of this chapter.

**(D) Limits on creditability of reductions**

Emission reductions from the following measures are not creditable toward the 15 percent reductions required under subparagraph (A):

**(i)** Any measure relating to motor vehicle exhaust or evaporative emissions promulgated by the Administrator by January 1, 1990.

**(ii)** Regulations concerning Reid Vapor Pressure promulgated by the Administrator by November 15, 1990, or required to be promulgated under section 7545(h) of this title.

**(iii)** Measures required under subsection (a)(2)(A) of this section (concerning corrections to implementation plans prescribed under guidance by the Administrator).

**(iv)** Measures required under subsection (a)(2)(B) of this section to be submitted immediately after November 15, 1990 (concerning corrections to motor vehicle inspection and maintenance programs).

**(2) Reasonably available control technology**

The State shall submit a revision to the applicable implementation plan to include provisions to require the implementation of reasonably available control technology under section 7502(c)(1) of this title with respect to each of the following:

**(A)** Each category of VOC sources in the area covered by a CTG document issued by the Administrator between November 15, 1990, and the date of attainment.

**(B)** All VOC sources in the area covered by any CTG issued before November 15, 1990.

**(C)** All other major stationary sources of VOCs that are located in the area.

Each revision described in subparagraph (A) shall be submitted within the period set forth by the Administrator in issuing the relevant CTG document. The revisions with respect to sources described in subparagraphs (B) and (C) shall be submitted by 2 years after November 15, 1990, and shall provide for the implementation of the required measures as expeditiously as practicable but no later than May 31, 1995.

**(3) Gasoline vapor recovery**

**(A) General rule**

Not later than 2 years after November 15, 1990, the State shall submit a revision to the applicable implementation plan to require all owners or operators of gasoline dispensing systems to install and operate, by the date prescribed under subparagraph (B), a system for gasoline vapor recovery of emissions from the fueling of motor vehicles. The Administrator shall issue guidance as appropriate as to the effectiveness of such system. This subparagraph shall apply only to facilities which sell more than 10,000 gallons of gasoline per month (50,000 gallons per month in the case of an independent small business marketer of gasoline as defined in section 7625-1 [2] of this title).

**(B) Effective date**

The date required under subparagraph (A) shall be--

**(i)** 6 months after the adoption date, in the case of gasoline dispensing facilities for which construction commenced after November 15, 1990;

**(ii)** one year after the adoption date, in the case of gasoline dispensing facilities which dispense at least 100,000 gallons of gasoline per month, based on average monthly sales for the 2-year period before the adoption date; or

**(iii)** 2 years after the adoption date, in the case of all other gasoline dispensing facilities.

Any gasoline dispensing facility described under both clause (i) and clause (ii) shall meet the requirements of clause (i).

**(C) Reference to terms**

For purposes of this paragraph, any reference to the term "adoption date" shall be considered a reference to the date of adoption by the State of requirements for the installation and operation of a system for gasoline vapor recovery of emissions from the fueling of motor vehicles.

**(4) Motor vehicle inspection and maintenance**

For all Moderate Areas, the State shall submit, immediately after November 15, 1990, a revision to the applicable implementation plan that includes provisions necessary to provide for a vehicle inspection and maintenance program as described in subsection (a)(2)(B) of this section (without regard to whether or not the area was required by section 7502(b)(11)(B) of this title (as in effect immediately before November 15, 1990) to have included a specific schedule for implementation of such a program).

**(5) General offset requirement**

For purposes of satisfying the emission offset requirements of this part, the ratio of total emission reductions of volatile organic compounds to total increase emissions of such air pollutant shall be at least 1.15 to 1.

**(c) Serious Areas**

Except as otherwise specified in paragraph (4), each State in which all or part of a Serious Area is located shall, with respect to the Serious Area (or portion thereof, to the extent specified in this subsection), make the submissions described under subsection (b) of this section (relating to Moderate Areas), and shall also submit the revisions to the applicable implementation plan (including the plan items) described under this subsection. For any Serious Area, the terms "major source" and "major stationary source" include (in addition to the sources described in section 7602 of this title) any stationary source or group of sources located within a contiguous area and under common control that emits, or has the potential to emit, at least 50 tons per year of volatile organic compounds.

**(1) Enhanced monitoring**

In order to obtain more comprehensive and representative data on ozone air pollution, not later than 18 months after November 15, 1990, the Administrator shall promulgate rules, after notice and public comment, for enhanced monitoring of ozone, oxides of nitrogen, and volatile organic compounds. The rules shall, among other things, cover the location and maintenance of monitors. Immediately following the promulgation of rules by the Administrator relating to enhanced monitoring, the State shall commence such actions as may be necessary to adopt and implement a program based on such rules, to improve monitoring for ambient concentrations of ozone, oxides of nitrogen and volatile organic compounds and to improve monitoring of emissions of oxides of nitrogen and volatile organic compounds. Each State implementation plan for the area shall contain measures to improve the ambient monitoring of such air pollutants.

**(2) Attainment and reasonable further progress demonstrations**

Within 4 years after November 15, 1990, the State shall submit a revision to the applicable implementation plan that includes each of the following:

**(A) Attainment demonstration**

A demonstration that the plan, as revised, will provide for attainment of the ozone national ambient air quality standard by the applicable attainment date. This attainment demonstration must be based on photochemical grid modeling or any other analytical method determined by the Administrator, in the Administrator's discretion, to be at least as effective.

**(B) Reasonable further progress demonstration**

A demonstration that the plan, as revised, will result in VOC emissions reductions from the baseline emissions described in subsection (b)(1)(B) of this section equal to the following amount averaged over each consecutive 3-year period beginning 6 years after November 15, 1990, until the attainment date:

**(i)** at least 3 percent of baseline emissions each year; or

**(ii)** an amount less than 3 percent of such baseline emissions each year, if the State demonstrates to the satisfaction of the Administrator that the plan reflecting such lesser amount includes all measures that can feasibly be implemented in the area, in light of technological achievability.

To lessen the 3 percent requirement under clause (ii), a State must demonstrate to the satisfaction of the Administrator that the plan for the area includes the measures that are achieved in practice by sources in the same source category in nonattainment areas of the next higher classification. Any determination to lessen the 3 percent requirement shall be reviewed at each milestone under subsection (g) of this section and revised to reflect such new measures (if any) achieved in practice by sources in the same category in any State, allowing a reasonable time to implement such measures. The emission reductions described in this subparagraph shall be calculated in accordance with subsection (b)(1)(C) and (D) of this section (concerning creditability of reductions). The reductions creditable for the period beginning 6 years after November 15, 1990, shall include reductions that occurred before such period, computed in accordance with subsection (b)(1) of this section, that exceed the 15-percent amount of reductions required under subsection (b)(1)(A) of this section.

**(C) $NO_x$ control**

The revision may contain, in lieu of the demonstration required under subparagraph (B), a demonstration to the satisfaction of the Administrator that the applicable implementation plan, as revised, provides for reductions of emissions of VOC's and oxides of nitrogen (calculated according to the creditability provisions of subsection (b)(1)(C) and (D) of this section), that would result in a reduction in ozone concentrations at least equivalent to that which would result from the amount of VOC emission reductions required under subparagraph (B). Within 1 year after November 15, 1990, the Administrator shall issue guidance concerning the conditions under which $NO_x$ control may be substituted for VOC control or may be combined with VOC control in order to maximize the reduction in ozone air pollution. In accord with such guidance, a lesser percentage of VOCs may be accepted as an adequate demonstration for purposes of this subsection.

**(3) Enhanced vehicle inspection and maintenance program**

**(A) Requirement for submission**

Within 2 years after November 15, 1990, the State shall submit a revision to the applicable implementation plan to provide for an enhanced program to reduce hydrocarbon emissions and $NO_x$ emissions from in-use motor vehicles registered in each urbanized area (in the nonattainment area), as defined by the Bureau of the Census, with a 1980 population of 200,000 or more.

**(B) Effective date of State programs; guidance**

The State program required under subparagraph (A) shall take effect no later than 2 years from November 15, 1990, and shall comply in all respects with guidance published in the Federal Register (and from time to time revised) by the Administrator for enhanced vehicle inspection and maintenance programs. Such guidance shall include--

**(i)** a performance standard achievable by a program combining emission testing, including on-road emission testing, with inspection to detect tampering with emission control devices and misfueling for all light-duty vehicles and all light-duty trucks subject to standards under section 7521 of this title; and

**(ii)** program administration features necessary to reasonably assure that adequate management resources, tools, and practices are in place to attain and maintain the performance standard.

Compliance with the performance standard under clause (i) shall be determined using a method to be established by the Administrator.

**(C) State program**

The State program required under subparagraph (A) shall include, at a minimum, each of the following elements--

**(i)** Computerized emission analyzers, including on-road testing devices.

**(ii)** No waivers for vehicles and parts covered by the emission control performance warranty as provided for in section 7541(b) of this title unless a warranty remedy has been denied in writing, or for tampering-related repairs.

**(iii)** In view of the air quality purpose of the program, if, for any vehicle, waivers are permitted for emissions-related repairs not covered by warranty, an expenditure to qualify for the waiver of an amount of $450 or more for such repairs (adjusted annually as determined by the Administrator on the basis of the Consumer Price Index in the same manner as provided in subchapter V of this chapter).

**(iv)** Enforcement through denial of vehicle registration (except for any program in operation before November 15, 1990, whose enforcement mechanism is demonstrated to the Administrator to be more effective than the applicable vehicle registration program in assuring that noncomplying vehicles are not operated on public roads).

**(v)** Annual emission testing and necessary adjustment, repair, and maintenance, unless the State demonstrates to the satisfaction of the Administrator that a biennial inspection, in combination with other features of the program which exceed the requirements of this chapter, will result in emission reductions which equal or exceed the reductions which can be obtained through such annual inspections.

**(vi)** Operation of the program on a centralized basis, unless the State demonstrates to the satisfaction of the Administrator that a decentralized program will be equally effective. An electronically connected testing system, a licensing system, or other measures (or any combination thereof) may be considered, in accordance with criteria established by the Administrator, as equally effective for such purposes.

**(vii)** Inspection of emission control diagnostic systems and the maintenance or repair of malfunctions or system deterioration identified by or affecting such diagnostics systems.

Each State shall biennially prepare a report to the Administrator which assesses the emission reductions achieved by the program required under this paragraph based on data collected during inspection and repair of vehicles. The methods used to assess the emission reductions shall be those established by the Administrator.

**(4) Clean-fuel vehicle programs**

**(A)** Except to the extent that substitute provisions have been approved by the Administrator under subparagraph (B), the State shall submit to the Administrator, within 42 months of November 15, 1990, a revision to the applicable implementation plan for each area described under part C of subchapter II of this chapter to include such measures as may be necessary to ensure the effectiveness of the applicable provisions of the clean-fuel vehicle program prescribed under part C of subchapter II of this chapter, including all measures necessary to make the use of clean alternative fuels in clean-fuel vehicles (as defined in part C of subchapter II of this chapter) economic from the standpoint of vehicle owners. Such a revision shall also be submitted for each area that opts into the clean fuel-vehicle program as provided in part C of subchapter II of this chapter.

**(B)** The Administrator shall approve, as a substitute for all or a portion of the clean-fuel vehicle program prescribed under part C of subchapter II of this chapter, any revision to the relevant applicable implementation plan that in the Administrator's judgment will achieve long-term reductions in ozone-producing and toxic air emissions equal to those achieved under part C of subchapter II of this chapter, or the percentage thereof attributable to the portion of the clean-fuel vehicle program for which the revision is to substitute. The Administrator may approve such revision only if it consists exclusively of provisions other than those required under this chapter for the area. Any State seeking approval of such revision must submit the revision to the Administrator within 24 months of November 15, 1990. The Administrator shall approve or disapprove any such revision within 30 months of November 15, 1990. The Administrator shall publish the revision submitted by a State in the Federal Register upon receipt. Such notice shall constitute a notice of proposed rulemaking on whether or not to approve such revision and shall be deemed to comply with the requirements concerning notices of proposed rulemaking contained in sections 553 through 557 of Title 5 (related to notice and comment). Where the Administrator approves such revision for

any area, the State need not submit the revision required by subparagraph (A) for the area with respect to the portions of the Federal clean-fuel vehicle program for which the Administrator has approved the revision as a substitute.

**(C)** If the Administrator determines, under section 7509 of this title, that the State has failed to submit any portion of the program required under subparagraph (A), then, in addition to any sanctions available under section 7509 of this title, the State may not receive credit, in any demonstration of attainment or reasonable further progress for the area, for any emission reductions from implementation of the corresponding aspects of the Federal clean-fuel vehicle requirements established in part C of subchapter II of this chapter.

**(5) Transportation control**

**(A)** [3] Beginning 6 years after November 15, 1990, and each third year thereafter, the State shall submit a demonstration as to whether current aggregate vehicle mileage, aggregate vehicle emissions, congestion levels, and other relevant parameters are consistent with those used for the area's demonstration of attainment. Where such parameters and emissions levels exceed the levels projected for purposes of the area's attainment demonstration, the State shall within 18 months develop and submit a revision of the applicable implementation plan that includes a transportation control measures program consisting of measures from, but not limited to, section 7408(f) of this title that will reduce emissions to levels that are consistent with emission levels projected in such demonstration. In considering such measures, the State should ensure adequate access to downtown, other commercial, and residential areas and should avoid measures that increase or relocate emissions and congestion rather than reduce them. Such revision shall be developed in accordance with guidance issued by the Administrator pursuant to section 7408(e) of this title and with the requirements of section 7504(b) of this title and shall include implementation and funding schedules that achieve expeditious emissions reductions in accordance with implementation plan projections.

**(6) De minimis rule**

The new source review provisions under this part shall ensure that increased emissions of volatile organic compounds resulting from any physical change in, or change in the method of operation of, a stationary source located in the area shall not be considered de minimis for purposes of determining the applicability of the permit requirements established by this chapter unless the increase in net emissions of such air pollutant from such source does not exceed 25 tons when aggregated with all other net increases in emissions from the source over any period of 5 consecutive calendar years which includes the calendar year in which such increase occurred.

**(7) Special rule for modifications of sources emitting less than 100 tons**

In the case of any major stationary source of volatile organic compounds located in the area (other than a source which emits or has the potential to emit 100 tons or more of volatile organic compounds per year), whenever any change (as described in section 7411(a)(4) of this title) at that source results in any increase (other than a de minimis increase) in emissions of volatile organic compounds from any discrete operation, unit, or other pollutant emitting activity at the source, such increase shall be considered a modification for purposes of section 7502(c)(5) of this title and section 7503(a) of this title, except that such increase shall not be considered a modification for such purposes if the owner or operator of the source elects to offset the increase by a greater reduction in emissions of volatile organic compounds concerned from other operations, units, or activities within the source at an internal offset ratio of at least 1.3 to 1. If the owner or operator does not make such election, such change shall be considered a modification for such purposes, but in applying section 7503(a)(2) of this title in the case of any such modification, the best available control technology (BACT), as defined in section 7479 of this title, shall be substituted for the lowest achievable emission rate (LAER). The Administrator shall establish and publish policies and procedures for implementing the provisions of this paragraph.

**(8) Special rule for modifications of sources emitting 100 tons or more**

In the case of any major stationary source of volatile organic compounds located in the area which emits or has the potential to emit 100 tons or more of volatile organic compounds per year, whenever any change (as described in section 7411(a)(4) of this title) at that source results in any increase (other than a de minimis increase) in emissions of volatile organic compounds from any discrete operation, unit, or other pollutant emitting activity at the source, such increase shall be considered a modification for purposes of section 7502(c)(5) of this title and section 7503(a) of this title, except that if the owner or operator of the

source elects to offset the increase by a greater reduction in emissions of volatile organic compounds from other operations, units, or activities within the source at an internal offset ratio of at least 1.3 to 1, the requirements of section 7503(a)(2) of this title (concerning the lowest achievable emission rate (LAER)) shall not apply.

**(9) Contingency provisions**

In addition to the contingency provisions required under section 7502(c)(9) of this title, the plan revision shall provide for the implementation of specific measures to be undertaken if the area fails to meet any applicable milestone. Such measures shall be included in the plan revision as contingency measures to take effect without further action by the State or the Administrator upon a failure by the State to meet the applicable milestone.

**(10) General offset requirement**

For purposes of satisfying the emission offset requirements of this part, the ratio of total emission reductions of volatile organic compounds to total increase emissions of such air pollutant shall be at least 1.2 to 1.

Any reference to "attainment date" in subsection (b) of this section, which is incorporated by reference into this subsection, shall refer to the attainment date for serious areas.

**(d) Severe Areas**

Each State in which all or part of a Severe Area is located shall, with respect to the Severe Area, make the submissions described under subsection (c) of this section (relating to Serious Areas), and shall also submit the revisions to the applicable implementation plan (including the plan items) described under this subsection. For any Severe Area, the terms "major source" and "major stationary source" include (in addition to the sources described in section 7602 of this title) any stationary source or group of sources located within a contiguous area and under common control that emits, or has the potential to emit, at least 25 tons per year of volatile organic compounds.

**(1) Vehicle miles traveled**

**(A)** Within 2 years after November 15, 1990, the State shall submit a revision that identifies and adopts specific enforceable transportation control strategies and transportation control measures to offset any growth in emissions from growth in vehicle miles traveled or numbers of vehicle trips in such area and to attain reduction in motor vehicle emissions as necessary, in combination with other emission reduction requirements of this subpart, to comply with the requirements of subsection [4] (b)(2)(B) and (c)(2)(B) of this section (pertaining to periodic emissions reduction requirements). The State shall consider measures specified in section 7408(f) of this title, and choose from among and implement such measures as necessary to demonstrate attainment with the national ambient air quality standards; in considering such measures, the State should ensure adequate access to downtown, other commercial, and residential areas and should avoid measures that increase or relocate emissions and congestion rather than reduce them.

**(B)** The State may also, in its discretion, submit a revision at any time requiring employers in such area to implement programs to reduce work-related vehicle trips and miles travelled by employees. Such revision shall be developed in accordance with guidance issued by the Administrator pursuant to section 7408(f) of this title and may require that employers in such area increase average passenger occupancy per vehicle in commuting trips between home and the workplace during peak travel periods. The guidance of the Administrator may specify average vehicle occupancy rates which vary for locations within a nonattainment area (suburban, center city, business district) or among nonattainment areas reflecting existing occupancy rates and the availability of high occupancy modes. Any State required to submit a revision under this subparagraph (as in effect before December 23, 1995) containing provisions requiring employers to reduce work-related vehicle trips and miles travelled by employees may, in accordance with State law, remove such provisions from the implementation plan, or withdraw its submission, if the State notifies the Administrator, in writing, that the State has undertaken, or will undertake, one or more alternative methods that will achieve emission reductions equivalent to those to be achieved by the removed or withdrawn provisions.

**(2) Offset requirement**

For purposes of satisfying the offset requirements pursuant to this part, the ratio of total emission reductions of VOCs to total increased emissions of such air pollutant shall be at least 1.3 to 1, except that if the State plan requires all existing major sources in the nonattainment area to use best available control technology (as defined in section 7479(3) of this title) for the control of volatile organic compounds, the ratio shall be at least 1.2 to 1.

**(3) Enforcement under section 7511d**

By December 31, 2000, the State shall submit a plan revision which includes the provisions required under section 7511d of this title.

Any reference to the term "attainment date" in subsection (b) or (c) of this section, which is incorporated by reference into this subsection (d), shall refer to the attainment date for Severe Areas.

**(e) Extreme Areas**

Each State in which all or part of an Extreme Area is located shall, with respect to the Extreme Area, make the submissions described under subsection (d) of this section (relating to Severe Areas), and shall also submit the revisions to the applicable implementation plan (including the plan items) described under this subsection. The provisions of clause (ii) of subsection (c)(2)(B) of this section (relating to reductions of less than 3 percent), the provisions of paragaphs [5] (6), (7) and (8) of subsection (c) of this section (relating to de minimus rule and modification of sources), and the provisions of clause (ii) of subsection (b)(1)(A) of this section (relating to reductions of less than 15 percent) shall not apply in the case of an Extreme Area. For any Extreme Area, the terms "major source" and "major stationary source" includes (in addition to the sources described in section 7602 of this title) any stationary source or group of sources located within a contiguous area and under common control that emits, or has the potential to emit, at least 10 tons per year of volatile organic compounds.

**(1) Offset requirement**

For purposes of satisfying the offset requirements pursuant to this part, the ratio of total emission reductions of VOCs to total increased emissions of such air pollutant shall be at least 1.5 to 1, except that if the State plan requires all existing major sources in the nonattainment area to use best available control technology (as defined in section 7479(3) of this title) for the control of volatile organic compounds, the ratio shall be at least 1.2 to 1.

**(2) Modifications**

Any change (as described in section 7411(a)(4) of this title) at a major stationary source which results in any increase in emissions from any discrete operation, unit, or other pollutant emitting activity at the source shall be considered a modification for purposes of section 7502(c)(5) of this title and section 7503(a) of this title, except that for purposes of complying with the offset requirement pursuant to section 7503(a)(1) of this title, any such increase shall not be considered a modification if the owner or operator of the source elects to offset the increase by a greater reduction in emissions of the air pollutant concerned from other discrete operations, units, or activities within the source at an internal offset ratio of at least 1.3 to 1. The offset requirements of this part shall not be applicable in Extreme Areas to a modification of an existing source if such modification consists of installation of equipment required to comply with the applicable implementation plan, permit, or this chapter.

**(3) Use of clean fuels or advanced control technology**

For Extreme Areas, a plan revision shall be submitted within 3 years after November 15, 1990, to require, effective 8 years after November 15, 1990, that each new, modified, and existing electric utility and industrial and commercial boiler which emits more than 25 tons per year of oxides of nitrogen--

**(A)** burn as its primary fuel natural gas, methanol, or ethanol (or a comparably low polluting fuel), or

**(B)** use advanced control technology (such as catalytic control technology or other comparably effective control methods) for reduction of emissions of oxides of nitrogen.

For purposes of this subsection, the term "primary fuel" means the fuel which is used 90 percent or more of the operating time. This paragraph shall not apply during any natural gas supply emergency (as defined in title III of the Natural Gas Policy Act of 1978 [15 U.S.C.A. § 3361 et seq.] ).

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

**(4) Traffic control measures during heavy traffic hours**

For Extreme Areas, each implementation plan revision under this subsection may contain provisions establishing traffic control measures applicable during heavy traffic hours to reduce the use of high polluting vehicles or heavy-duty vehicles, notwithstanding any other provision of law.

**(5) New technologies**

The Administrator may, in accordance with section 7410 of this title, approve provisions of an implementation plan for an Extreme Area which anticipate development of new control techniques or improvement of existing control technologies, and an attainment demonstration based on such provisions, if the State demonstrates to the satisfaction of the Administrator that--

**(A)** such provisions are not necessary to achieve the incremental emission reductions required during the first 10 years after November 15, 1990; and

**(B)** the State has submitted enforceable commitments to develop and adopt contingency measures to be implemented as set forth herein if the anticipated technologies do not achieve planned reductions.

Such contingency measures shall be submitted to the Administrator no later than 3 years before proposed implementation of the plan provisions and approved or disapproved by the Administrator in accordance with section 7410 of this title. The contingency measures shall be adequate to produce emission reductions sufficient, in conjunction with other approved plan provisions, to achieve the periodic emission reductions required by subsection (b)(1) or (c)(2) of this section and attainment by the applicable dates. If the Administrator determines that an Extreme Area has failed to achieve an emission reduction requirement set forth in subsection (b)(1) or (c)(2) of this section, and that such failure is due in whole or part to an inability to fully implement provisions approved pursuant to this subsection, the Administrator shall require the State to implement the contingency measures to the extent necessary to assure compliance with subsections (b)(1) and (c)(2) of this section.

Any reference to the term "attainment date" in subsection (b), (c), or (d) of this section which is incorporated by reference into this subsection, shall refer to the attainment date for Extreme Areas.

**(f) $NO_x$ requirements**

**(1)** The plan provisions required under this subpart for major stationary sources of volatile organic compounds shall also apply to major stationary sources (as defined in section 7602 of this title and subsections (c), (d), and (e) of this section) of oxides of nitrogen. This subsection shall not apply in the case of oxides of nitrogen for those sources for which the Administrator determines (when the Administrator approves a plan or plan revision) that net air quality benefits are greater in the absence of reductions of oxides of nitrogen from the sources concerned. This subsection shall also not apply in the case of oxides of nitrogen for--

**(A)** nonattainment areas not within an ozone transport region under section 7511c of this title, if the Administrator determines (when the Administrator approves a plan or plan revision) that additional reductions of oxides of nitrogen would not contribute to attainment of the national ambient air quality standard for ozone in the area, or

**(B)** nonattainment areas within such an ozone transport region if the Administrator determines (when the Administrator approves a plan or plan revision) that additional reductions of oxides of nitrogen would not produce net ozone air quality benefits in such region.

The Administrator shall, in the Administrator's determinations, consider the study required under section 7511f of this title.

**(2)(A)** If the Administrator determines that excess reductions in emissions of $NO_x$ would be achieved under paragraph (1), the Administrator may limit the application of paragraph (1) to the extent necessary to avoid achieving such excess reductions.

**(B)** For purposes of this paragraph, excess reductions in emissions of $NO_x$ are emission reductions for which the Administrator determines that net air quality benefits are greater in the absence of such reductions. Alternatively, for purposes of this paragraph, excess reductions in emissions of $NO_x$ are, for--

**(i)** nonattainment areas not within an ozone transport region under section 7511c of this title, emission reductions that the Administrator determines would not contribute to attainment of the national ambient air quality standard for ozone in the area, or

**(ii)** nonattainment areas within such ozone transport region, emission reductions that the Administrator determines would not produce net ozone air quality benefits in such region.

**(3)** At any time after the final report under section 7511f of this title is submitted to Congress, a person may petition the Administrator for a determination under paragraph (1) or (2) with respect to any nonattainment area or any ozone transport region under section 7511c of this title. The Administrator shall grant or deny such petition within 6 months after its filing with the Administrator.

**(g) Milestones**

**(1) Reductions in emissions**

6 years after November 15, 1990, and at intervals of every 3 years thereafter, the State shall determine whether each nonattainment area (other than an area classified as Marginal or Moderate) has achieved a reduction in emissions during the preceding intervals equivalent to the total emission reductions required to be achieved by the end of such interval pursuant to subsection (b)(1) of this section and the corresponding requirements of subsections (c)(2)(B) and (C), (d), and (e) of this section. Such reduction shall be referred to in this section as an applicable milestone.

**(2) Compliance demonstration**

For each nonattainment area referred to in paragraph (1), not later than 90 days after the date on which an applicable milestone occurs (not including an attainment date on which a milestone occurs in cases where the standard has been attained), each State in which all or part of such area is located shall submit to the Administrator a demonstration that the milestone has been met. A demonstration under this paragraph shall be submitted in such form and manner, and shall contain such information and analysis, as the Administrator shall require, by rule. The Administrator shall determine whether or not a State's demonstration is adequate within 90 days after the Administrator's receipt of a demonstration which contains the information and analysis required by the Administrator.

**(3) Serious and Severe Areas; State election**

If a State fails to submit a demonstration under paragraph (2) for any Serious or Severe Area within the required period or if the Administrator determines that the area has not met any applicable milestone, the State shall elect, within 90 days after such failure or determination--

**(A)** to have the area reclassified to the next higher classification,

**(B)** to implement specific additional measures adequate, as determined by the Administrator, to meet the next milestone as provided in the applicable contingency plan, or

**(C)** to adopt an economic incentive program as described in paragraph (4).

If the State makes an election under subparagraph (B), the Administrator shall, within 90 days after the election, review such plan and shall, if the Administrator finds the contingency plan inadequate, require further measures necessary to meet such milestone. Once the State makes an election, it shall be deemed accepted by the Administrator as meeting the election requirement. If the State fails to make an election required under this paragraph within the required 90-day period or within 6 months thereafter, the area shall be reclassified to the next higher classification by operation of law at the expiration of such 6-month period. Within 12 months after the date required for the State to make an election, the State shall submit a revision of the applicable implementation plan for the area that meets the requirements of this paragraph. The Administrator shall review such plan revision and approve or disapprove the revision within 9 months after the date of its submission.

**(4) Economic incentive program**

**(A)** An economic incentive program under this paragraph shall be consistent with rules published by the Administrator and sufficient, in combination with other elements of the State plan, to achieve the next milestone. The State program may include a nondiscriminatory system, consistent with applicable law regarding interstate commerce, of State established emissions fees or a system of marketable permits, or a system of State fees on sale or manufacture of products the use of which contributes to ozone formation, or any combination of the foregoing or other similar measures. The program may also include incentives and requirements to reduce vehicle emissions and vehicle miles traveled in the area, including any of the transportation control measures identified in section 7408(f) of this title.

**(B)** Within 2 years after November 15, 1990, the Administrator shall publish rules for the programs to be adopted pursuant to subparagraph (A). Such rules shall include model plan provisions which may be adopted for reducing emissions from permitted stationary sources, area sources, and mobile sources. The guidelines shall require that any revenues generated by the plan provisions adopted pursuant to subparagraph (A) shall be used by the State for any of the following:

**(i)** Providing incentives for achieving emission reductions.

**(ii)** Providing assistance for the development of innovative technologies for the control of ozone air pollution and for the development of lower-polluting solvents and surface coatings. Such assistance shall not provide for the payment of more than 75 percent of either the costs of any project to develop such a technology or the costs of development of a lower-polluting solvent or surface coating.

**(iii)** Funding the administrative costs of State programs under this chapter. Not more than 50 percent of such revenues may be used for purposes of this clause.

**(5) Extreme Areas**

If a State fails to submit a demonstration under paragraph (2) for any Extreme Area within the required period, or if the Administrator determines that the area has not met any applicable milestone, the State shall, within 9 months after such failure or determination, submit a plan revision to implement an economic incentive program which meets the requirements of paragraph (4). The Administrator shall review such plan revision and approve or disapprove the revision within 9 months after the date of its submission.

**(h) Rural transport areas**

**(1)** Notwithstanding any other provision of section 7511 of this title or this section, a State containing an ozone nonattainment area that does not include, and is not adjacent to, any part of a Metropolitan Statistical Area or, where one exists, a Consolidated Metropolitan Statistical Area (as defined by the United States Bureau of the Census), which area is treated by the Administrator, in the Administrator's discretion, as a rural transport area within the meaning of paragraph (2), shall be treated by operation of law as satisfying the requirements of this section if it makes the submissions required under subsection (a) of this section (relating to marginal areas).

**(2)** The Administrator may treat an ozone nonattainment area as a rural transport area if the Administrator finds that sources of VOC (and, where the Administrator determines relevant, $NO_X$) emissions within the area do not make a significant contribution to the ozone concentrations measured in the area or in other areas.

**(i) Reclassified areas**

Each State containing an ozone nonattainment area reclassified under section 7511(b)(2) of this title shall meet such requirements of subsections (b) through (d) of this section as may be applicable to the area as reclassified, according to the schedules prescribed in connection with such requirements, except that the Administrator may adjust any applicable deadlines (other than attainment dates) to the extent such adjustment is necessary or appropriate to assure consistency among the required submissions.

**(j) Multi-State ozone nonattainment areas**

**(1) Coordination among States**

Each State in which there is located a portion of a single ozone nonattainment area which covers more than one State (hereinafter in this section referred to as a "multi-State ozone nonattainment area") shall--

**(A)** take all reasonable steps to coordinate, substantively and procedurally, the revisions and implementation of State implementation plans applicable to the nonattainment area concerned; and

**(B)** use photochemical grid modeling or any other analytical method determined by the Administrator, in his discretion, to be at least as effective.

The Administrator may not approve any revision of a State implementation plan submitted under this part for a State in which part of a multi-State ozone nonattainment area is located if the plan revision for that State fails to comply with the requirements of this subsection.

**(2) Failure to demonstrate attainment**

If any State in which there is located a portion of a multi-State ozone nonattainment area fails to provide a demonstration of attainment of the national ambient air quality standard for ozone in that portion within the required period, the State may petition the Administrator to make a finding that the State would have been able to make such demonstration but for the failure of one or more other States in which other portions of the area are located to commit to the implementation of all measures required under this section (relating to plan submissions and requirements for ozone nonattainment areas). If the Administrator makes such finding, the provisions of section 7509 of this title (relating to sanctions) shall not apply, by reason of the failure to make such demonstration, in the portion of the multi-State ozone nonattainment area within the State submitting such petition.

Credits

(July 14, 1955, c. 360, Title I, § 182, as added Nov. 15, 1990, Pub.L. 101-549, Title I, § 103, 104 Stat. 2426; amended Dec. 23, 1995, Pub.L. 104-70, § 1, 109 Stat. 773.)

Notes of Decisions (22)

Current through P.L. 112-39 approved 10-12-11

Footnotes

1 So in original. Probably should be "subparagraph".
2 So in original. Probably should be section "7625".
3 So in original. No subpar. (B) has been enacted.
4 So in original. Probably should be "subsections".
5 So in original. Probably should be "paragraphs".

**End of Document** © 2011 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated

Title 42. The Public Health and Welfare

Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

Subchapter III. General Provisions

42 U.S.C.A. § 7607

§ 7607. Administrative proceedings and judicial review

Currentness

**(a) Administrative subpenas; confidentiality; witnesses**

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4) or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the [1] chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),, [2] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of Title 18, except that such paper, book, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subparagraph, the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

**(b) Judicial review**

**(1)** A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,, [2] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5) of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title,, [2] under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c-10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I of this chapter) which is locally or regionally applicable may be

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

**(2)** Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

**(c) Additional evidence**
In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to [3] the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

**(d) Rulemaking**

**(1)** This subsection applies to--

**(A)** the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

**(B)** the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

**(C)** the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F) of this title, or any regulation under section 7412(m) or (n) of this title,

**(D)** the promulgation of any requirement for solid waste combustion under section 7429 of this title,

**(E)** the promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title,

**(F)** the promulgation or revision of any aircraft emission standard under section 7571 of this title,

**(G)** the promulgation or revision of any regulation under subchapter IV-A of this chapter (relating to control of acid deposition),

**(H)** promulgation or revision of regulations pertaining to primary nonferrous smelter orders under section 7419 of this title (but not including the granting or denying of any such order),

**(I)** promulgation or revision of regulations under subchapter VI of this chapter (relating to stratosphere and ozone protection),

**(J)** promulgation or revision of regulations under part C of subchapter I of this chapter (relating to prevention of significant deterioration of air quality and protection of visibility),

**(K)** promulgation or revision of regulations under section 7521 of this title and test procedures for new motor vehicles or engines under section 7525 of this title, and the revision of a standard under section 7521(a)(3) of this title,

**(L)** promulgation or revision of regulations for noncompliance penalties under section 7420 of this title,

**(M)** promulgation or revision of any regulations promulgated under section 7541 of this title (relating to warranties and compliance by vehicles in actual use),

**(N)** action of the Administrator under section 7426 of this title (relating to interstate pollution abatement),

**(O)** the promulgation or revision of any regulation pertaining to consumer and commercial products under section 7511b(e) of this title,

**(P)** the promulgation or revision of any regulation pertaining to field citations under section 7413(d)(3) of this title,

**(Q)** the promulgation or revision of any regulation pertaining to urban buses or the clean-fuel vehicle, clean-fuel fleet, and clean fuel programs under part C of subchapter II of this chapter,

**(R)** the promulgation or revision of any regulation pertaining to nonroad engines or nonroad vehicles under section 7547 of this title,

**(S)** the promulgation or revision of any regulation relating to motor vehicle compliance program fees under section 7552 of this title,

**(T)** the promulgation or revision of any regulation under subchapter IV-A of this chapter (relating to acid deposition),

**(U)** the promulgation or revision of any regulation under section 7511b(f) of this title pertaining to marine vessels, and

**(V)** such other actions as the Administrator may determine.

The provisions of section 553 through 557 and section 706 of Title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies. This subsection shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of Title 5.

**(2)** Not later than the date of proposal of any action to which this subsection applies, the Administrator shall establish a rulemaking docket for such action (hereinafter in this subsection referred to as a "rule"). Whenever a rule applies only within a particular State, a second (identical) docket shall be simultaneously established in the appropriate regional office of the Environmental Protection Agency.

**(3)** In the case of any rule to which this subsection applies, notice of proposed rulemaking shall be published in the Federal Register, as provided under section 553(b) of Title 5, shall be accompanied by a statement of its basis and purpose and shall specify the period available for public comment (hereinafter referred to as the "comment period"). The notice of proposed rulemaking shall also state the docket number, the location or locations of the docket, and the times it will be open to public inspection. The statement of basis and purpose shall include a summary of--

**(A)** the factual data on which the proposed rule is based;

**(B)** the methodology used in obtaining the data and in analyzing the data; and

**(C)** the major legal interpretations and policy considerations underlying the proposed rule.

The statement shall also set forth or summarize and provide a reference to any pertinent findings, recommendations, and comments by the Scientific Review Committee established under section 7409(d) of this title and the National Academy of Sciences, and, if the proposal differs in any important respect from any of these recommendations, an explanation of the reasons

for such differences. All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule.

**(4)(A)** The rulemaking docket required under paragraph (2) shall be open for inspection by the public at reasonable times specified in the notice of proposed rulemaking. Any person may copy documents contained in the docket. The Administrator shall provide copying facilities which may be used at the expense of the person seeking copies, but the Administrator may waive or reduce such expenses in such instances as the public interest requires. Any person may request copies by mail if the person pays the expenses, including personnel costs to do the copying.

**(B)(i)** Promptly upon receipt by the agency, all written comments and documentary information on the proposed rule received from any person for inclusion in the docket during the comment period shall be placed in the docket. The transcript of public hearings, if any, on the proposed rule shall also be included in the docket promptly upon receipt from the person who transcribed such hearings. All documents which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability.

**(ii)** The drafts of proposed rules submitted by the Administrator to the Office of Management and Budget for any interagency review process prior to proposal of any such rule, all documents accompanying such drafts, and all written comments thereon by other agencies and all written responses to such written comments by the Administrator shall be placed in the docket no later than the date of proposal of the rule. The drafts of the final rule submitted for such review process prior to promulgation and all such written comments thereon, all documents accompanying such drafts, and written responses thereto shall be placed in the docket no later than the date of promulgation.

**(5)** In promulgating a rule to which this subsection applies (i) the Administrator shall allow any person to submit written comments, data, or documentary information; (ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions; (iii) a transcript shall be kept of any oral presentation; and (iv) the Administrator shall keep the record of such proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.

**(6)(A)** The promulgated rule shall be accompanied by (i) a statement of basis and purpose like that referred to in paragraph (3) with respect to a proposed rule and (ii) an explanation of the reasons for any major changes in the promulgated rule from the proposed rule.

**(B)** The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

**(C)** The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation.

**(7)(A)** The record for judicial review shall consist exclusively of the material referred to in paragraph (3), clause (i) of paragraph (4)(B), and subparagraphs (A) and (B) of paragraph (6).

**(B)** Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b) of this section). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

**(8)** The sole forum for challenging procedural determinations made by the Administrator under this subsection shall be in the United States court of appeals for the appropriate circuit (as provided in subsection (b) of this section) at the time of the substantive review of the rule. No interlocutory appeals shall be permitted with respect to such procedural determinations. In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.

**(9)** In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be--

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

**(D)** without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

**(10)** Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.

**(11)** The requirements of this subsection shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977.

**(e) Other methods of judicial review not authorized**
Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

**(f) Costs**
In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

**(g) Stay, injunction, or similar relief in proceedings relating to noncompliance penalties**
In any action respecting the promulgation of regulations under section 7420 of this title or the administration or enforcement of section 7420 of this title no court shall grant any stay, injunctive, or similar relief before final judgment by such court in such action.

**(h) Public participation**
It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of Title 5, the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure a reasonable period for public participation of at least 30 days, except as otherwise expressly provided in section [4] 7407(d), 7502(a), 7511(a) and (b), and 7512(a) and (b) of this title.

**Credits**
(July 14, 1955, c. 360, Title III, § 307, as added Dec. 31, 1970, Pub.L. 91-604, § 12(a), 84 Stat. 1707; amended Nov. 18, 1971, Pub.L. 92-157, Title III, § 302(a), 85 Stat. 464; June 22, 1974, Pub.L. 93-319, § 6(c), 88 Stat. 259; Aug. 7, 1977, Pub.L. 95-95, Title III, §§ 303(d), 305(a), (c), (f)-(h), 91 Stat. 772, 776, 777; Nov. 16, 1977, Pub.L. 95-190, § 14(a)(79), (80), 91 Stat. 1404; Nov. 15, 1990, Pub.L. 101-549, Title I, §§ 108(p), 110(5), Title III, § 302(g), (h), Title VII, §§ 702(c), 703, 706, 707(h), 710(b), 104 Stat. 2469, 2470, 2574, 2681-2684.)

Notes of Decisions (271)

Current through P.L. 112-39 approved 10-12-11

Footnotes

1 So in original. Probably should be "this".

2 So in original.

3 So in original. The word "to" probably should not appear.

4 So in original. Probably should be "sections".

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

40 C.F.R. Pt. 50, App. L

# Appendix L to Part 50--Reference Method for the Determination of Fine Particulate Matter as $PM_{2.5}$ in the Atmosphere

Effective: December 18, 2006
Currentness

1.0 Applicability.

1.1 This method provides for the measurement of the mass concentration of fine particulate matter having an aerodynamic diameter less than or equal to a nominal 2.5 micrometers ($PM_{2.5}$ ) in ambient air over a 24-hour period for purposes of determining whether the primary and secondary national ambient air quality standards for fine particulate matter specified in § 50.7 and § 50.13 of this part are met. The measurement process is considered to be nondestructive, and the $PM_{2.5}$ sample obtained can be subjected to subsequent physical or chemical analyses. Quality assessment procedures are provided in part 58, Appendix A of this chapter, and quality assurance guidance are provided in references 1, 2, and 3 in section 13.0 of this appendix.

1.2 This method will be considered a reference method for purposes of part 58 of this chapter only if:

(a) The associated sampler meets the requirements specified in this appendix and the applicable requirements in part 53 of this chapter, and

(b) The method and associated sampler have been designated as a reference method in accordance with part 53 of this chapter.

1.3 $PM_{2.5}$ samplers that meet nearly all specifications set forth in this method but have minor deviations and/or modifications of the reference method sampler will be designated as “Class I” equivalent methods for $PM_{2.5}$ in accordance with part 53 of this chapter.

2.0 Principle.

2.1 An electrically powered air sampler draws ambient air at a constant volumetric flow rate into a specially shaped inlet and through an inertial particle size separator (impactor) where the suspended particulate matter in the $PM_{2.5}$ size range is separated for collection on a polytetrafluoroethylene (PTFE) filter over the specified sampling period. The air sampler and other aspects of this reference method are specified either explicitly in this appendix or generally with reference to other applicable regulations or quality assurance guidance.

2.2 Each filter is weighed (after moisture and temperature conditioning) before and after sample collection to determine the net gain due to collected $PM_{2.5}$. The total volume of air sampled is determined by the sampler from the measured flow rate at actual ambient temperature and pressure and the sampling time. The mass concentration of $PM_{2.5}$ in the ambient air is computed as the total mass of collected particles in the $PM_{2.5}$ size range divided by the actual volume of air sampled, and is expressed in micrograms per cubic meter of air ($\mu g/m^3$).

3.0 $PM_{2.5}$ Measurement Range.

3.1 Lower concentration limit. The lower detection limit of the mass concentration measurement range is estimated to be approximately 2 µg/m$^3$, based on noted mass changes in field blanks in conjunction with the 24 m$^3$ nominal total air sample volume specified for the 24-hour sample.

3.2 Upper concentration limit. The upper limit of the mass concentration range is determined by the filter mass loading beyond which the sampler can no longer maintain the operating flow rate within specified limits due to increased pressure drop across the loaded filter. This upper limit cannot be specified precisely because it is a complex function of the ambient particle size distribution and type, humidity, the individual filter used, the capacity of the sampler flow rate control system, and perhaps other factors. Nevertheless, all samplers are estimated to be capable of measuring 24-hour $PM_{2.5}$ mass concentrations of at least 200 µg/m$^3$ while maintaining the operating flow rate within the specified limits.

3.3 Sample period. The required sample period for $PM_{2.5}$ concentration measurements by this method shall be 1,380 to 1500 minutes (23 to 25 hours). However, when a sample period is less than 1,380 minutes, the measured concentration (as determined by the collected $PM_{2.5}$ mass divided by the actual sampled air volume), multiplied by the actual number of minutes in the sample period and divided by 1,440, may be used as if it were a valid concentration measurement for the specific purpose of determining a violation of the NAAQS. This value assumes that the $PM_{2.5}$ concentration is zero for the remaining portion of the sample period and therefore represents the minimum concentration that could have been measured for the full 24-hour sample period. Accordingly, if the value thus calculated is high enough to be an exceedance, such an exceedance would be a valid exceedance for the sample period. When reported to AIRS, this data value should receive a special code to identify it as not to be commingled with normal concentration measurements or used for other purposes.

4.0 Accuracy.

4.1 Because the size and volatility of the particles making up ambient particulate matter vary over a wide range and the mass concentration of particles varies with particle size, it is difficult to define the accuracy of $PM_{2.5}$ measurements in an absolute sense. The accuracy of $PM_{2.5}$ measurements is therefore defined in a relative sense, referenced to measurements provided by this reference method. Accordingly, accuracy shall be defined as the degree of agreement between a subject field $PM_{2.5}$ sampler and a collocated $PM_{2.5}$ reference method audit sampler operating simultaneously at the monitoring site location of the subject sampler and includes both random (precision) and systematic (bias) errors. The requirements for this field sampler audit procedure are set forth in part 58, appendix A of this chapter.

4.2 Measurement system bias. Results of collocated measurements where the duplicate sampler is a reference method sampler are used to assess a portion of the measurement system bias according to the schedule and procedure specified in part 58, appendix A of this chapter.

4.3 Audits with reference method samplers to determine system accuracy and bias. According to the schedule and procedure specified in part 58, appendix A of this chapter, a reference method sampler is required to be located at each of selected $PM_{2.5}$ SLAMS sites as a duplicate sampler. The results from the primary sampler and the duplicate reference method sampler are used to calculate accuracy of the primary sampler on a quarterly basis, bias of the primary sampler on an annual basis, and bias of a single reporting organization on an annual basis. Reference 2 in section 13.0 of this appendix provides additional information and guidance on these reference method audits.

4.4 Flow rate accuracy and bias. Part 58, appendix A of this chapter requires that the flow rate accuracy and bias of individual $PM_{2.5}$ samplers used in SLAMS monitoring networks be assessed periodically via audits of each sampler's operational flow rate. In addition, part 58, appendix A of this chapter requires that flow rate bias for each reference and equivalent method operated by each reporting organization be assessed quarterly and annually. Reference 2 in section 13.0 of this appendix provides additional information and guidance on flow rate accuracy audits and calculations for accuracy and bias.

5.0 Precision. A data quality objective of 10 percent coefficient of variation or better has been established for the operational precision of $PM_{2.5}$ monitoring data.

5.1 Tests to establish initial operational precision for each reference method sampler are specified as a part of the requirements for designation as a reference method under § 53.58 of this chapter.

5.2 Measurement System Precision. Collocated sampler results, where the duplicate sampler is not a reference method sampler but is a sampler of the same designated method as the primary sampler, are used to assess measurement system precision according to the schedule and procedure specified in part 58, appendix A of this chapter. Part 58, appendix A of this chapter requires that these collocated sampler measurements be used to calculate quarterly and annual precision estimates for each primary sampler and for each designated method employed by each reporting organization. Reference 2 in section 13.0 of this appendix provides additional information and guidance on this requirement.

6.0 Filter for $PM_{2.5}$Sample Collection. Any filter manufacturer or vendor who sells or offers to sell filters specifically identified for use with this $PM_{2.5}$ reference method shall certify that the required number of filters from each lot of filters offered for sale as such have been tested as specified in this section 6.0 and meet all of the following design and performance specifications.

6.1 Size. Circular, 46.2 mm diameter ±0.25 mm.

6.2 Medium. Polytetrafluoroethylene (PTFE Teflon), with integral support ring.

6.3 Support ring. Polymethylpentene (PMP) or equivalent inert material, 0.38 ±0.04 mm thick, outer diameter 46.2 mm ±0.25 mm, and width of 3.68 mm ( ±0.00, -0.51 mm).

6.4 Pore size. 2 mum as measured by ASTM F 316-94.

6.5 Filter thickness. 30 to 50 mum.

6.6 Maximum pressure drop (clean filter). 30 cm $H_2O$ column @ 16.67 L/min clean air flow.

6.7 Maximum moisture pickup. Not more than 10 mg weight increase after 24-hour exposure to air of 40 percent relative humidity, relative to weight after 24-hour exposure to air of 35 percent relative humidity.

6.8 Collection efficiency. Greater than 99.7 percent, as measured by the DOP test (ASTM D 2986-91) with 0.3 mum particles at the sampler's operating face velocity.

6.9 Filter weight stability. Filter weight loss shall be less than 20 mug, as measured in each of the following two tests specified in sections 6.9.1 and 6.9.2 of this appendix. The following conditions apply to both of these tests: Filter weight loss shall be the average difference between the initial and the final filter weights of a random sample of test filters selected from each lot prior to sale. The number of filters tested shall be not less than 0.1 percent of the filters of each manufacturing lot, or 10 filters, whichever is greater. The filters shall be weighed under laboratory conditions and shall have had no air sample passed through them, i.e., filter blanks. Each test procedure must include initial conditioning and weighing, the test, and final conditioning and weighing. Conditioning and weighing shall be in accordance with sections 8.0 through 8.2 of this appendix and general guidance provided in reference 2 of section 13.0 of this appendix.

6.9.1 Test for loose, surface particle contamination. After the initial weighing, install each test filter, in turn, in a filter cassette (Figures L-27, L-28, and L-29 of this appendix) and drop the cassette from a height of 25 cm to a flat hard surface, such as a particle-free wood bench. Repeat two times, for a total of three drop tests for each test filter. Remove the test filter from the cassette and weigh the filter. The average change in weight must be less than 20 mg.

6.9.2 Test for temperature stability. After weighing each filter, place the test filters in a drying oven set at 40 degreesC ±2 degreesC for not less than 48 hours. Remove, condition, and reweigh each test filter. The average change in weight must be less than 20 mug.

6.10 Alkalinity. Less than 25 microequivalents/gram of filter, as measured by the guidance given in reference 2 in section 13.0 of this appendix.

6.11 Supplemental requirements. Although not required for determination of $PM_{2.5}$ mass concentration under this reference method, additional specifications for the filter must be developed by users who intend to subject $PM_{2.5}$ filter samples to subsequent chemical analysis. These supplemental specifications include background chemical contamination of the filter and any other filter parameters that may be required by the method of chemical analysis. All such supplemental filter specifications must be compatible with and secondary to the primary filter specifications given in this section 6.0 of this appendix.

7.0 $PM_{2.5}$ Sampler.

7.1 Configuration. The sampler shall consist of a sample air inlet, downtube, particle size separator (impactor), filter holder assembly, air pump and flow rate control system, flow rate measurement device, ambient and filter temperature monitoring system, barometric pressure measurement system, timer, outdoor environmental enclosure, and suitable mechanical, electrical, or electronic control capability to meet or exceed the design and functional performance as specified in this section 7.0 of this appendix. The performance specifications require that the sampler:

(a) Provide automatic control of sample volumetric flow rate and other operational parameters.

(b) Monitor these operational parameters as well as ambient temperature and pressure.

(c) Provide this information to the sampler operator at the end of each sample period in digital form, as specified in table L-1 of section 7.4.19 of this appendix.

7.2 Nature of specifications. The $PM_{2.5}$ sampler is specified by a combination of design and performance requirements. The sample inlet, downtube, particle size discriminator, filter cassette, and the internal configuration of the filter holder assembly are specified explicitly by design figures and associated mechanical dimensions, tolerances, materials, surface finishes, assembly instructions, and other necessary specifications. All other aspects of the sampler are specified by required operational function and performance, and the design of these other aspects (including the design of the lower portion of the filter holder assembly) is optional, subject to acceptable operational performance. Test procedures to demonstrate compliance with both the design and performance requirements are set forth in subpart E of part 53 of this chapter.

7.3 Design specifications. Except as indicated in this section 7.3 of this appendix, these components must be manufactured or reproduced exactly as specified, in an ISO 9001-registered facility, with registration initially approved and subsequently maintained during the period of manufacture. See § 53.1(t) of this chapter for the definition of an ISO-registered facility. Minor modifications or variances to one or more components that clearly would not affect the aerodynamic performance of the inlet, downtube, impactor, or filter cassette will be considered for specific approval. Any such proposed modifications shall be described and submitted to the EPA for specific individual acceptability either as part of a reference or equivalent method application under part 53 of this chapter or in writing in advance of such an intended application under part 53 of this chapter.

7.3.1 Sample inlet assembly. The sample inlet assembly, consisting of the inlet, downtube, and impactor shall be configured and assembled as indicated in Figure L-1 of this appendix and shall meet all associated requirements. A portion of this assembly shall also be subject to the maximum overall sampler leak rate specification under section 7.4.6 of this appendix.

7.3.2 Inlet. The sample inlet shall be fabricated as indicated in Figures L-2 through L-18 of this appendix and shall meet all associated requirements.

7.3.3 Downtube. The downtube shall be fabricated as indicated in Figure L-19 of this appendix and shall meet all associated requirements.

7.3.4 Particle size separator. The sampler shall be configured with either one of the two alternative particle size separators described in this section 7.3.4. One separator is an impactor-type separator (WINS impactor) described in sections 7.3.4.1, 7.3.4.2, and 7.3.4.3 of this appendix. The alternative separator is a cyclone-type separator (VSCC[30]) described in section 7.3.4.4 of this appendix.

7.3.4.1 The impactor (particle size separator) shall be fabricated as indicated in Figures L-20 through L-24 of this appendix and shall meet all associated requirements. Following the manufacture and finishing of each upper impactor housing (Figure L-21 of this appendix), the dimension of the impaction jet must be verified by the manufacturer using Class ZZ go/no-go plug gauges that are traceable to NIST.

7.3.4.2 Impactor filter specifications:

(a) Size. Circular, 35 to 37 mm diameter.

(b) Medium. Borosilicate glass fiber, without binder.

(c) Pore size. 1 to 1.5 micrometer, as measured by ASTM F 316-80.

(d) Thickness. 300 to 500 micrometers.

7.3.4.3 Impactor oil specifications:

(a) Composition. Dioctyl sebacate (DOS), single-compound diffusion oil.

(b) Vapor pressure. Maximum $2 \times 10^{-8}$ mm Hg at 25 °C.

(c) Viscosity. 36 to 40 centistokes at 25 °C.

(d) Density. 1.06 to 1.07 $g/cm^3$ at 25 °C.

(e) Quantity. 1 mL ±0.1 mL.

7.3.4.4 The cyclone-type separator is identified as a BGI VSCC[30] Very Sharp Cut Cyclone particle size separator specified as part of EPA-designated equivalent method EQPM-0202-142 (67 FR 15567, April 2, 2002) and as manufactured by BGI Incorporated, 58 Guinan Street, Waltham, Massachusetts 20451.

7.3.5 Filter holder assembly. The sampler shall have a sample filter holder assembly to adapt and seal to the down tube and to hold and seal the specified filter, under section 6.0 of this appendix, in the sample air stream in a horizontal position below the downtube such that the sample air passes downward through the filter at a uniform face velocity. The upper portion of this assembly shall be fabricated as indicated in Figures L-25 and L-26 of this appendix and shall accept and seal with the filter cassette, which shall be fabricated as indicated in Figures L-27 through L-29 of this appendix.

(a) The lower portion of the filter holder assembly shall be of a design and construction that:

(1) Mates with the upper portion of the assembly to complete the filter holder assembly,

(2) Completes both the external air seal and the internal filter cassette seal such that all seals are reliable over repeated filter changings, and

(3) Facilitates repeated changing of the filter cassette by the sampler operator.

(b) Leak-test performance requirements for the filter holder assembly are included in section 7.4.6 of this appendix.

(c) If additional or multiple filters are stored in the sampler as part of an automatic sequential sample capability, all such filters, unless they are currently and directly installed in a sampling channel or sampling configuration (either active or inactive), shall be covered or (preferably) sealed in such a way as to:

(1) Preclude significant exposure of the filter to possible contamination or accumulation of dust, insects, or other material that may be present in the ambient air, sampler, or sampler ventilation air during storage periods either before or after sampling; and

(2) To minimize loss of volatile or semi-volatile PM sample components during storage of the filter following the sample period.

7.3.6 Flow rate measurement adapter. A flow rate measurement adapter as specified in Figure L-30 of this appendix shall be furnished with each sampler.

7.3.7 Surface finish. All internal surfaces exposed to sample air prior to the filter shall be treated electrolytically in a sulfuric acid bath to produce a clear, uniform anodized surface finish of not less than 1000 mg/ft $^2$ (1.08 mg/cm $^2$) in accordance with military standard specification (mil. spec.) 8625F, Type II, Class 1 in reference 4 of section 13.0 of this appendix. This anodic surface coating shall not be dyed or pigmented. Following anodization, the surfaces shall be sealed by immersion in boiling deionized water for not less than 15 minutes. Section 53.51(d)(2) of this chapter should also be consulted.

7.3.8 Sampling height. The sampler shall be equipped with legs, a stand, or other means to maintain the sampler in a stable, upright position and such that the center of the sample air entrance to the inlet, during sample collection, is maintained in a horizontal plane and is 2.0 ±0.2 meters above the floor or other horizontal supporting surface. Suitable bolt holes, brackets, tie-downs, or other means should be provided to facilitate mechanically securing the sample to the supporting surface to prevent toppling of the sampler due to wind.

7.4 Performance specifications.

7.4.1 Sample flow rate. Proper operation of the impactor requires that specific air velocities be maintained through the device. Therefore, the design sample air flow rate through the inlet shall be 16.67 L/min (1.000 m $^3$ /hour) measured as actual volumetric flow rate at the temperature and pressure of the sample air entering the inlet.

7.4.2 Sample air flow rate control system. The sampler shall have a sample air flow rate control system which shall be capable of providing a sample air volumetric flow rate within the specified range, under section 7.4.1 of this appendix, for the specified filter, under section 6.0 of this appendix, at any atmospheric conditions specified, under section 7.4.7 of this appendix, at a filter pressure drop equal to that of a clean filter plus up to 75 cm water column (55 mm Hg), and over the specified range of supply line voltage, under section 7.4.15.1 of this appendix. This flow control system shall allow for operator adjustment of the operational flow rate of the sampler over a range of at least ±15 percent of the flow rate specified in section 7.4.1 of this appendix.

7.4.3 Sample flow rate regulation. The sample flow rate shall be regulated such that for the specified filter, under section 6.0 of this appendix, at any atmospheric conditions specified, under section 7.4.7 of this appendix, at a filter pressure drop equal to that of a clean filter plus up to 75 cm water column (55 mm Hg), and over the specified range of supply line voltage, under section 7.4.15.1 of this appendix, the flow rate is regulated as follows:

7.4.3.1 The volumetric flow rate, measured or averaged over intervals of not more than 5 minutes over a 24-hour period, shall not vary more than ±5 percent from the specified 16.67 L/min flow rate over the entire sample period.

7.4.3.2 The coefficient of variation (sample standard deviation divided by the mean) of the flow rate, measured over a 24-hour period, shall not be greater than 2 percent.

 © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

7.4.3.3 The amplitude of short-term flow rate pulsations, such as may originate from some types of vacuum pumps, shall be attenuated such that they do not cause significant flow measurement error or affect the collection of particles on the particle collection filter.

7.4.4 Flow rate cut off. The sampler's sample air flow rate control system shall terminate sample collection and stop all sample flow for the remainder of the sample period in the event that the sample flow rate deviates by more than 10 percent from the sampler design flow rate specified in section 7.4.1 of this appendix for more than 60 seconds. However, this sampler cut-off provision shall not apply during periods when the sampler is inoperative due to a temporary power interruption, and the elapsed time of the inoperative period shall not be included in the total sample time measured and reported by the sampler, under section 7.4.13 of this appendix.

7.4.5 Flow rate measurement.

7.4.5.1 The sampler shall provide a means to measure and indicate the instantaneous sample air flow rate, which shall be measured as volumetric flow rate at the temperature and pressure of the sample air entering the inlet, with an accuracy of ±2 percent. The measured flow rate shall be available for display to the sampler operator at any time in either sampling or standby modes, and the measurement shall be updated at least every 30 seconds. The sampler shall also provide a simple means by which the sampler operator can manually start the sample flow temporarily during non-sampling modes of operation, for the purpose of checking the sample flow rate or the flow rate measurement system.

7.4.5.2 During each sample period, the sampler's flow rate measurement system shall automatically monitor the sample volumetric flow rate, obtaining flow rate measurements at intervals of not greater than 30 seconds.

(a) Using these interval flow rate measurements, the sampler shall determine or calculate the following flow-related parameters, scaled in the specified engineering units:

(1) The instantaneous or interval-average flow rate, in L/min.

(2) The value of the average sample flow rate for the sample period, in L/min.

(3) The value of the coefficient of variation (sample standard deviation divided by the average) of the sample flow rate for the sample period, in percent.

(4) The occurrence of any time interval during the sample period in which the measured sample flow rate exceeds a range of ±5 percent of the average flow rate for the sample period for more than 5 minutes, in which case a warning flag indicator shall be set.

(5) The value of the integrated total sample volume for the sample period, in $m^3$.

(b) Determination or calculation of these values shall properly exclude periods when the sampler is inoperative due to temporary interruption of electrical power, under section 7.4.13 of this appendix, or flow rate cut off, under section 7.4.4 of this appendix.

(c) These parameters shall be accessible to the sampler operator as specified in table L-1 of section 7.4.19 of this appendix. In addition, it is strongly encouraged that the flow rate for each 5-minute interval during the sample period be available to the operator following the end of the sample period.

7.4.6 Leak test capability.

7.4.6.1 External leakage. The sampler shall include an external air leak-test capability consisting of components, accessory hardware, operator interface controls, a written procedure in the associated Operation/Instruction Manual, under section 7.4.18 of this appendix, and all other necessary functional capability to permit and facilitate the sampler operator to conveniently carry out a leak test of the sampler at a field monitoring site without additional equipment. The sampler components to be subjected

to this leak test include all components and their interconnections in which external air leakage would or could cause an error in the sampler's measurement of the total volume of sample air that passes through the sample filter.

(a) The suggested technique for the operator to use for this leak test is as follows:

(1) Remove the sampler inlet and installs the flow rate measurement adapter supplied with the sampler, under section 7.3.6 of this appendix.

(2) Close the valve on the flow rate measurement adapter and use the sampler air pump to draw a partial vacuum in the sampler, including (at least) the impactor, filter holder assembly (filter in place), flow measurement device, and interconnections between these devices, of at least 55 mm Hg (75 cm water column), measured at a location downstream of the filter holder assembly.

(3) Plug the flow system downstream of these components to isolate the components under vacuum from the pump, such as with a built-in valve.

(4) Stop the pump.

(5) Measure the trapped vacuum in the sampler with a built-in pressure measuring device.

(6)(i) Measure the vacuum in the sampler with the built-in pressure measuring device again at a later time at least 10 minutes after the first pressure measurement.

(ii) Caution: Following completion of the test, the adaptor valve should be opened slowly to limit the flow rate of air into the sampler. Excessive air flow rate may blow oil out of the impactor.

(7) Upon completion of the test, open the adaptor valve, remove the adaptor and plugs, and restore the sampler to the normal operating configuration.

(b) The associated leak test procedure shall require that for successful passage of this test, the difference between the two pressure measurements shall not be greater than the number of mm of Hg specified for the sampler by the manufacturer, based on the actual internal volume of the sampler, that indicates a leak of less than 80 mL/min.

(c) Variations of the suggested technique or an alternative external leak test technique may be required for samplers whose design or configuration would make the suggested technique impossible or impractical. The specific proposed external leak test procedure, or particularly an alternative leak test technique, proposed for a particular candidate sampler may be described and submitted to the EPA for specific individual acceptability either as part of a reference or equivalent method application under part 53 of this chapter or in writing in advance of such an intended application under part 53 of this chapter.

7.4.6.2 Internal, filter bypass leakage. The sampler shall include an internal, filter bypass leak-check capability consisting of components, accessory hardware, operator interface controls, a written procedure in the Operation/Instruction Manual, and all other necessary functional capability to permit and facilitate the sampler operator to conveniently carry out a test for internal filter bypass leakage in the sampler at a field monitoring site without additional equipment. The purpose of the test is to determine that any portion of the sample flow rate that leaks past the sample filter without passing through the filter is insignificant relative to the design flow rate for the sampler.

(a) The suggested technique for the operator to use for this leak test is as follows:

(1) Carry out an external leak test as provided under section 7.4.6.1 of this appendix which indicates successful passage of the prescribed external leak test.

(2) Install a flow-impervious membrane material in the filter cassette, either with or without a filter, as appropriate, which effectively prevents air flow through the filter.

(3) Use the sampler air pump to draw a partial vacuum in the sampler, downstream of the filter holder assembly, of at least 55 mm Hg (75 cm water column).

(4) Plug the flow system downstream of the filter holder to isolate the components under vacuum from the pump, such as with a built-in valve.

(5) Stop the pump.

(6) Measure the trapped vacuum in the sampler with a built-in pressure measuring device.

(7) Measure the vacuum in the sampler with the built-in pressure measuring device again at a later time at least 10 minutes after the first pressure measurement.

(8) Remove the flow plug and membrane and restore the sampler to the normal operating configuration.

(b) The associated leak test procedure shall require that for successful passage of this test, the difference between the two pressure measurements shall not be greater than the number of mm of Hg specified for the sampler by the manufacturer, based on the actual internal volume of the portion of the sampler under vacuum, that indicates a leak of less than 80 mL/min.

(c) Variations of the suggested technique or an alternative internal, filter bypass leak test technique may be required for samplers whose design or configuration would make the suggested technique impossible or impractical. The specific proposed internal leak test procedure, or particularly an alternative internal leak test technique proposed for a particular candidate sampler may be described and submitted to the EPA for specific individual acceptability either as part of a reference or equivalent method application under part 53 of this chapter or in writing in advance of such intended application under part 53 of this chapter.

7.4.7 Range of operational conditions. The sampler is required to operate properly and meet all requirements specified in this appendix over the following operational ranges.

7.4.7.1 Ambient temperature. -30 to =45 °C (Note: Although for practical reasons, the temperature range over which samplers are required to be tested under part 53 of this chapter is -20 to =40 °C, the sampler shall be designed to operate properly over this wider temperature range.).

7.4.7.2 Ambient relative humidity. 0 to 100 percent.

7.4.7.3 Barometric pressure range. 600 to 800 mm Hg.

7.4.8 Ambient temperature sensor. The sampler shall have capability to measure the temperature of the ambient air surrounding the sampler over the range of -30 to =45 °C, with a resolution of 0.1 °C and accuracy of ±2.0 °C, referenced as described in reference 3 in section 13.0 of this appendix, with and without maximum solar insolation.

7.4.8.1 The ambient temperature sensor shall be mounted external to the sampler enclosure and shall have a passive, naturally ventilated sun shield. The sensor shall be located such that the entire sun shield is at least 5 cm above the horizontal plane of the sampler case or enclosure (disregarding the inlet and downtube) and external to the vertical plane of the nearest side or protuberance of the sampler case or enclosure. The maximum temperature measurement error of the ambient temperature measurement system shall be less than 1.6 °C at 1 m/s wind speed and 1000 W/m2 solar radiation intensity.

7.4.8.2 The ambient temperature sensor shall be of such a design and mounted in such a way as to facilitate its convenient dismounting and immersion in a liquid for calibration and comparison to the filter temperature sensor, under section 7.4.11 of this appendix.

7.4.8.3 This ambient temperature measurement shall be updated at least every 30 seconds during both sampling and standby (non-sampling) modes of operation. A visual indication of the current (most recent) value of the ambient temperature

measurement, updated at least every 30 seconds, shall be available to the sampler operator during both sampling and standby (non-sampling) modes of operation, as specified in table L-1 of section 7.4.19 of this appendix.

7.4.8.4 This ambient temperature measurement shall be used for the purpose of monitoring filter temperature deviation from ambient temperature, as required by section 7.4.11 of this appendix, and may be used for purposes of effecting filter temperature control, under section 7.4.10 of this appendix, or computation of volumetric flow rate, under sections 7.4.1 to 7.4.5 of this appendix, if appropriate.

7.4.8.5 Following the end of each sample period, the sampler shall report the maximum, minimum, and average temperature for the sample period, as specified in table L-1 of section 7.4.19 of this appendix.

7.4.9 Ambient barometric sensor. The sampler shall have capability to measure the barometric pressure of the air surrounding the sampler over a range of 600 to 800 mm Hg referenced as described in reference 3 in section 13.0 of this appendix; also see part 53, subpart E of this chapter. This barometric pressure measurement shall have a resolution of 5 mm Hg and an accuracy of ±10 mm Hg and shall be updated at least every 30 seconds. A visual indication of the value of the current (most recent) barometric pressure measurement, updated at least every 30 seconds, shall be available to the sampler operator during both sampling and standby (non-sampling) modes of operation, as specified in table L-1 of section 7.4.19 of this appendix. This barometric pressure measurement may be used for purposes of computation of volumetric flow rate, under sections 7.4.1 to 7.4.5 of this appendix, if appropriate. Following the end of a sample period, the sampler shall report the maximum, minimum, and mean barometric pressures for the sample period, as specified in table L-1 of section 7.4.19 of this appendix.

7.4.10 Filter temperature control (sampling and post-sampling). The sampler shall provide a means to limit the temperature rise of the sample filter (all sample filters for sequential samplers), from insolation and other sources, to no more 5 degreesC above the temperature of the ambient air surrounding the sampler, during both sampling and post-sampling periods of operation. The post-sampling period is the non-sampling period between the end of the active sampling period and the time of retrieval of the sample filter by the sampler operator.

7.4.11 Filter temperature sensor(s).

7.4.11.1 The sampler shall have the capability to monitor the temperature of the sample filter (all sample filters for sequential samplers) over the range of -30 to =45 °C during both sampling and non-sampling periods. While the exact location of this temperature sensor is not explicitly specified, the filter temperature measurement system must demonstrate agreement, within 1 degreesC, with a test temperature sensor located within 1 cm of the center of the filter downstream of the filter during both sampling and non-sampling modes, as specified in the filter temperature measurement test described in part 53, subpart E of this chapter. This filter temperature measurement shall have a resolution of 0.1 degreesC and accuracy of ±1.0 °C, referenced as described in reference 3 in section 13.0 of this appendix. This temperature sensor shall be of such a design and mounted in such a way as to facilitate its reasonably convenient dismounting and immersion in a liquid for calibration and comparison to the ambient temperature sensor under section 7.4.8 of this appendix.

7.4.11.2 The filter temperature measurement shall be updated at least every 30 seconds during both sampling and standby (non-sampling) modes of operation. A visual indication of the current (most recent) value of the filter temperature measurement, updated at least every 30 seconds, shall be available to the sampler operator during both sampling and standby (non-sampling) modes of operation, as specified in table L-1 of section 7.4.19 of this appendix.

7.4.11.3 For sequential samplers, the temperature of each filter shall be measured individually unless it can be shown, as specified in the filter temperature measurement test described in § 53.57 of this chapter, that the temperature of each filter can be represented by fewer temperature sensors.

7.4.11.4 The sampler shall also provide a warning flag indicator following any occurrence in which the filter temperature (any filter temperature for sequential samplers) exceeds the ambient temperature by more than 5 degreesC for more than 30 consecutive minutes during either the sampling or post-sampling periods of operation, as specified in table L-1 of section 7.4.19 of this appendix, under section 10.12 of this appendix, regarding sample validity when a warning flag occurs. It is further

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

recommended (not required) that the sampler be capable of recording the maximum differential between the measured filter temperature and the ambient temperature and its time and date of occurrence during both sampling and post-sampling (non-sampling) modes of operation and providing for those data to be accessible to the sampler operator following the end of the sample period, as suggested in table L-1 of section 7.4.19 of this appendix.

7.4.12 Clock/timer system.

(a) The sampler shall have a programmable real-time clock timing/control system that:

(1) Is capable of maintaining local time and date, including year, month, day-of-month, hour, minute, and second to an accuracy of ±1.0 minute per month.

(2) Provides a visual indication of the current system time, including year, month, day-of-month, hour, and minute, updated at least each minute, for operator verification.

(3) Provides appropriate operator controls for setting the correct local time and date.

(4) Is capable of starting the sample collection period and sample air flow at a specific, operator-settable time and date, and stopping the sample air flow and terminating the sampler collection period 24 hours (1440 minutes) later, or at a specific, operator-settable time and date.

(b) These start and stop times shall be readily settable by the sampler operator to within ±1.0 minute. The system shall provide a visual indication of the current start and stop time settings, readable to ±1.0 minute, for verification by the operator, and the start and stop times shall also be available via the data output port, as specified in table L-1 of section 7.4.19 of this appendix. Upon execution of a programmed sample period start, the sampler shall automatically reset all sample period information and warning flag indications pertaining to a previous sample period. Refer also to section 7.4.15.4 of this appendix regarding retention of current date and time and programmed start and stop times during a temporary electrical power interruption.

7.4.13 Sample time determination. The sampler shall be capable of determining the elapsed sample collection time for each $PM_{2.5}$ sample, accurate to within ±1.0 minute, measured as the time between the start of the sampling period, under section 7.4.12 of this appendix and the termination of the sample period, under section 7.4.12 of this appendix or section 7.4.4 of this appendix. This elapsed sample time shall not include periods when the sampler is inoperative due to a temporary interruption of electrical power, under section 7.4.15.4 of this appendix. In the event that the elapsed sample time determined for the sample period is not within the range specified for the required sample period in section 3.3 of this appendix, the sampler shall set a warning flag indicator. The date and time of the start of the sample period, the value of the elapsed sample time for the sample period, and the flag indicator status shall be available to the sampler operator following the end of the sample period, as specified in table L-1 of section 7.4.19 of this appendix.

7.4.14 Outdoor environmental enclosure. The sampler shall have an outdoor enclosure (or enclosures) suitable to protect the filter and other non-weatherproof components of the sampler from precipitation, wind, dust, extremes of temperature and humidity; to help maintain temperature control of the filter (or filters, for sequential samplers); and to provide reasonable security for sampler components and settings.

7.4.15 Electrical power supply.

7.4.15.1 The sampler shall be operable and function as specified herein when operated on an electrical power supply voltage of 105 to 125 volts AC (RMS) at a frequency of 59 to 61 Hz. Optional operation as specified at additional power supply voltages and/or frequencies shall not be precluded by this requirement.

7.4.15.2 The design and construction of the sampler shall comply with all applicable National Electrical Code and Underwriters Laboratories electrical safety requirements.

7.4.15.3 The design of all electrical and electronic controls shall be such as to provide reasonable resistance to interference or malfunction from ordinary or typical levels of stray electromagnetic fields (EMF) as may be found at various monitoring sites and from typical levels of electrical transients or electronic noise as may often or occasionally be present on various electrical power lines.

7.4.15.4 In the event of temporary loss of electrical supply power to the sampler, the sampler shall not be required to sample or provide other specified functions during such loss of power, except that the internal clock/timer system shall maintain its local time and date setting within ±1 minute per week, and the sampler shall retain all other time and programmable settings and all data required to be available to the sampler operator following each sample period for at least 7 days without electrical supply power. When electrical power is absent at the operator-set time for starting a sample period or is interrupted during a sample period, the sampler shall automatically start or resume sampling when electrical power is restored, if such restoration of power occurs before the operator-set stop time for the sample period.

7.4.15.5 The sampler shall have the capability to record and retain a record of the year, month, day-of-month, hour, and minute of the start of each power interruption of more than 1 minute duration, up to 10 such power interruptions per sample period. (More than 10 such power interruptions shall invalidate the sample, except where an exceedance is measured, under section 3.3 of this appendix.) The sampler shall provide for these power interruption data to be available to the sampler operator following the end of the sample period, as specified in table L-1 of section 7.4.19 of this appendix.

7.4.16 Control devices and operator interface. The sampler shall have mechanical, electrical, or electronic controls, control devices, electrical or electronic circuits as necessary to provide the timing, flow rate measurement and control, temperature control, data storage and computation, operator interface, and other functions specified. Operator-accessible controls, data displays, and interface devices shall be designed to be simple, straightforward, reliable, and easy to learn, read, and operate under field conditions. The sampler shall have provision for operator input and storage of up to 64 characters of numeric (or alphanumeric) data for purposes of site, sampler, and sample identification. This information shall be available to the sampler operator for verification and change and for output via the data output port along with other data following the end of a sample period, as specified in table L-1 of section 7.4.19 of this appendix. All data required to be available to the operator following a sample collection period or obtained during standby mode in a post-sampling period shall be retained by the sampler until reset, either manually by the operator or automatically by the sampler upon initiation of a new sample collection period.

7.4.17 Data output port requirement. The sampler shall have a standard RS-232C data output connection through which digital data may be exported to an external data storage or transmission device. All information which is required to be available at the end of each sample period shall be accessible through this data output connection. The information that shall be accessible though this output port is summarized in table L-1 of section 7.4.19 of this appendix. Since no specific format for the output data is provided, the sampler manufacturer or vendor shall make available to sampler purchasers appropriate computer software capable of receiving exported sampler data and correctly translating the data into a standard spreadsheet format and optionally any other formats as may be useful to sampler users. This requirement shall not preclude the sampler from offering other types of output connections in addition to the required RS-232C port.

7.4.18 Operation/instruction manual. The sampler shall include an associated comprehensive operation or instruction manual, as required by part 53 of this chapter, which includes detailed operating instructions on the setup, operation, calibration, and maintenance of the sampler. This manual shall provide complete and detailed descriptions of the operational and calibration procedures prescribed for field use of the sampler and all instruments utilized as part of this reference method. The manual shall include adequate warning of potential safety hazards that may result from normal use or malfunction of the method and a description of necessary safety precautions. The manual shall also include a clear description of all procedures pertaining to installation, operation, periodic and corrective maintenance, and troubleshooting, and shall include parts identification diagrams.

7.4.19 Data reporting requirements. The various information that the sampler is required to provide and how it is to be provided is summarized in the following Table L-1.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

**Table L-1 to Appendix L of Part 50.--Summary of Information To Be Provided by the Sampler**

| Information to be provided | Appendix L section reference | Availability | | | | Format | |
|---|---|---|---|---|---|---|---|
| | | Anytime [1] | End of period [2] | Visual display [3] | Data output [4] | Digital reading [5] | Units |
| Flow rate, 30-second maximum interval............... | 7.4.5.1................ | # | .................. | # | * | XX.X................. | L/min |
| Flow rate, average for the sample period..... | 7.4.5.2................ | * | # | * | # | XX.X................. | L/min |
| Flow rate, CV, for sample period | 7.4.5.2................ | * | # | * | # | XX.X................. | % |
| Flow rate, 5-min. average out of spec. (FLAG [6])... | 7.4.5.2................ | # | # | # | ## | On/Off............... | ........................... |
| Sample volume, total.................... | 7.4.5.2................ | * | # | # | # | XX.X................. | $m^3$ |
| Temperature, ambient, 30-second interval.... | 7.4.8................... | # | .................. | # | ............... | XX.X................. | °C |
| Temperature, ambient, min., max., average for the sample period................. | 7.4.8................... | * | # | # | {# | XX.X................. | °C |
| Baro. pressure, ambient, 30-second interval.... | 7.4.9................... | # | .................. | # | ............... | XXX.................. | mm Hg |
| Baro. pressure, ambient, min., max., average for the sample period................. | 7.4.9................... | * | # | # | ## | XXX.................. | mm Hg |
| Filter temperature, 30-second interval.... | 7.4.11................. | # | .................. | # | ............... | XX.X................. | °C |
| Filter temp. differential, 30-second interval, out of spec. (FLAG [6])........... | 7.4.11................. | * | # | # | ## | On/Off............... | ........................... |
| Filter temp., maximum differential from ambient, date, time of occurrence.......... | 7.4.11................. | * | * | * | * | X.X, YY/MM/DD HH.mm........ | °C, Yr/Mon/Day Hrs. min |
| Date and Time.... | 7.4.12................. | # | .................. | # | ............... | YY/MM/DD HH.mm.............. | Yr/Mon/Day Hrs. min |
| Sample start and stop time settings | 7.4.12................. | # | # | # | # | YY/MM/DD HH.mm.............. | Yr/Mon/Day Hrs. min |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Sample period start time............ | 7.4.12................. | ......... | # | # | # | YY/MM/DD HH.mm.............. | Yr/Mon/Day Hrs. min |
| Elapsed sample time.................... | 7.4.13................. | * | # | # | # | HH.mm. ............ | Hrs. min |
| Elapsed sample time, out of spec. (FLAG [6])........... | 7.4.13................. | ......... | # | # | ## | On/Off............... | ........................... |
| Power interruptions #1 min., start time of first 10........... | 7.4.15.5.............. | * | # | * | # | 1HH.mm, 2HH.mm, etc...... | Hrs. min |
| User-entered information, such as sampler and site identification | 7.4.16................. | # | # | # | ## | As entered. | |

1 Information is required to be available to the operator at any time the sampler is operating, whether sampling or not.

2 Information relates to the entire sampler period and must be provided following the end of the sample period until reset manually by the operator or automatically by the sampler upon the start of a new sample period.

3 Information shall be available to the operator visually.

4 Information is to be available as digital data at the sampler's data output port specified in section 7.4.16 of this appendix following the end of the sample period until reset manually by the operator or automatically by the sampler upon the start of a new sample period.

5 Digital readings, both visual and data output, shall have not less than the number of significant digits and resolution specified.

6 Flag warnings may be displayed to the operator by a single flag indicator or each flag may be displayed individually. Only a set (on) flag warning must be indicated; an off (unset) flag may be indicated by the absence of a flag warning. Sampler users should refer to section 10.12 of this appendix regarding the validity of samples for which the sampler provided an associated flag warning.

8.0 Filter Weighing. See reference 2 in section 13.0 of this appendix, for additional, more detailed guidance.

8.1 Analytical balance. The analytical balance used to weigh filters must be suitable for weighing the type and size of filters specified, under section 6.0 of this appendix, and have a readability of ±1 mug. The balance shall be calibrated as specified by the manufacturer at installation and recalibrated immediately prior to each weighing session. See reference 2 in section 13.0 of this appendix for additional guidance.

8.2 Filter conditioning. All sample filters used shall be conditioned immediately before both the pre- and post-sampling weighings as specified below. See reference 2 in section 13.0 of this appendix for additional guidance.

8.2.1 Mean temperature. 20 - 23 degreesC.

8.2.2 Temperature control. ±2 degreesC over 24 hours.

8.2.3 Mean humidity. Generally, 30-40 percent relative humidity; however, where it can be shown that the mean ambient relative humidity during sampling is less than 30 percent, conditioning is permissible at a mean relative humidity within ±5 relative humidity percent of the mean ambient relative humidity during sampling, but not less than 20 percent.

8.2.4 Humidity control. ±5 relative humidity percent over 24 hours.

8.2.5 Conditioning time. Not less than 24 hours.

8.3 Weighing procedure.

8.3.1 New filters should be placed in the conditioning environment immediately upon arrival and stored there until the pre-sampling weighing. See reference 2 in section 13.0 of this appendix for additional guidance.

8.3.2 The analytical balance shall be located in the same controlled environment in which the filters are conditioned. The filters shall be weighed immediately following the conditioning period without intermediate or transient exposure to other conditions or environments.

8.3.3 Filters must be conditioned at the same conditions (humidity within ±5 relative humidity percent) before both the pre- and post-sampling weighings.

8.3.4 Both the pre- and post-sampling weighings should be carried out on the same analytical balance, using an effective technique to neutralize static charges on the filter, under reference 2 in section 13.0 of this appendix. If possible, both weighings should be carried out by the same analyst.

8.3.5 The pre-sampling (tare) weighing shall be within 30 days of the sampling period.

8.3.6 The post-sampling conditioning and weighing shall be completed within 240 hours (10 days) after the end of the sample period, unless the filter sample is maintained at temperatures below the average ambient temperature during sampling (or 4 °C or below for average sampling temperatures less than 4 °C) during the time between retrieval from the sampler and the start of the conditioning, in which case the period shall not exceed 30 days. Reference 2 in section 13.0 of this appendix has additional guidance on transport of cooled filters.

8.3.7 Filter blanks.

8.3.7.1 New field blank filters shall be weighed along with the pre-sampling (tare) weighing of each lot of $PM_{2.5}$ filters. These blank filters shall be transported to the sampling site, installed in the sampler, retrieved from the sampler without sampling, and reweighed as a quality control check.

8.3.7.2 New laboratory blank filters shall be weighed along with the pre-sampling (tare) weighing of each set of $PM_{2.5}$ filters. These laboratory blank filters should remain in the laboratory in protective containers during the field sampling and should be reweighed as a quality control check.

8.3.8 Additional guidance for proper filter weighing and related quality assurance activities is provided in reference 2 in section 13.0 of this appendix.

9.0 Calibration. Reference 2 in section 13.0 of this appendix contains additional guidance.

9.1 General requirements.

9.1.1 Multipoint calibration and single-point verification of the sampler's flow rate measurement device must be performed periodically to establish and maintain traceability of subsequent flow measurements to a flow rate standard.

9.1.2 An authoritative flow rate standard shall be used for calibrating or verifying the sampler's flow rate measurement device with an accuracy of ±2 percent. The flow rate standard shall be a separate, stand-alone device designed to connect to the flow rate measurement adapter, Figure L-30 of this appendix. This flow rate standard must have its own certification and be traceable to a National Institute of Standards and Technology (NIST) primary standard for volume or flow rate. If adjustments to the sampler's flow rate measurement system calibration are to be made in conjunction with an audit of the sampler's flow measurement system, such adjustments shall be made following the audit. Reference 2 in section 13.0 of this appendix contains additional guidance.

9.1.3 The sampler's flow rate measurement device shall be re-calibrated after electromechanical maintenance or transport of the sampler.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

9.2 Flow rate calibration/verification procedure.

9.2.1 $PM_{2.5}$ samplers may employ various types of flow control and flow measurement devices. The specific procedure used for calibration or verification of the flow rate measurement device will vary depending on the type of flow rate controller and flow rate measurement employed. Calibration shall be in terms of actual ambient volumetric flow rates ($Q^{a}$), measured at the sampler's inlet downtube. The generic procedure given here serves to illustrate the general steps involved in the calibration of a $PM_{2.5}$ sampler. The sampler operation/instruction manual required under section 7.4.18 of this appendix and the Quality Assurance Handbook in reference 2 in section 13.0 of this appendix provide more specific and detailed guidance for calibration.

9.2.2 The flow rate standard used for flow rate calibration shall have its own certification and be traceable to a NIST primary standard for volume or flow rate. A calibration relationship for the flow rate standard, e.g., an equation, curve, or family of curves relating actual flow rate ($Q_a$) to the flow rate indicator reading, shall be established that is accurate to within 2 percent over the expected range of ambient temperatures and pressures at which the flow rate standard may be used. The flow rate standard must be re-calibrated or re-verified at least annually.

9.2.3 The sampler flow rate measurement device shall be calibrated or verified by removing the sampler inlet and connecting the flow rate standard to the sampler's downtube in accordance with the operation/instruction manual, such that the flow rate standard accurately measures the sampler's flow rate. The sampler operator shall first carry out a sampler leak check and confirm that the sampler passes the leak test and then verify that no leaks exist between the flow rate standard and the sampler.

9.2.4 The calibration relationship between the flow rate (in actual L/min) indicated by the flow rate standard and by the sampler's flow rate measurement device shall be established or verified in accordance with the sampler operation/instruction manual. Temperature and pressure corrections to the flow rate indicated by the flow rate standard may be required for certain types of flow rate standards. Calibration of the sampler's flow rate measurement device shall consist of at least three separate flow rate measurements (multipoint calibration) evenly spaced within the range of -10 percent to =10 percent of the sampler's operational flow rate, section 7.4.1 of this appendix. Verification of the sampler's flow rate shall consist of one flow rate measurement at the sampler's operational flow rate. The sampler operation/instruction manual and reference 2 in section 13.0 of this appendix provide additional guidance.

9.2.5 If during a flow rate verification the reading of the sampler's flow rate indicator or measurement device differs by ±4 percent or more from the flow rate measured by the flow rate standard, a new multipoint calibration shall be performed and the flow rate verification must then be repeated.

9.2.6 Following the calibration or verification, the flow rate standard shall be removed from the sampler and the sampler inlet shall be reinstalled. Then the sampler's normal operating flow rate (in L/min) shall be determined with a clean filter in place. If the flow rate indicated by the sampler differs by ±2 percent or more from the required sampler flow rate, the sampler flow rate must be adjusted to the required flow rate, under section 7.4.1 of this appendix.

9.3 Periodic calibration or verification of the calibration of the sampler's ambient temperature, filter temperature, and barometric pressure measurement systems is also required. Reference 3 of section 13.0 of this appendix contains additional guidance.

10.0 $PM_{2.5}$ Measurement Procedure. The detailed procedure for obtaining valid $PM_{2.5}$ measurements with each specific sampler designated as part of a reference method for $PM_{2.5}$ under part 53 of this chapter shall be provided in the sampler-specific operation or instruction manual required by section 7.4.18 of this appendix. Supplemental guidance is provided in section 2.12 of the Quality Assurance Handbook listed in reference 2 in section 13.0 of this appendix. The generic procedure given here serves to illustrate the general steps involved in the $PM_{2.5}$ sample collection and measurement, using a $PM_{2.5}$ reference method sampler.

10.1 The sampler shall be set up, calibrated, and operated in accordance with the specific, detailed guidance provided in the specific sampler's operation or instruction manual and in accordance with a specific quality assurance program developed and established by the user, based on applicable supplementary guidance provided in reference 2 in section 13.0 of this appendix.

10.2 Each new sample filter shall be inspected for correct type and size and for pinholes, particles, and other imperfections. Unacceptable filters should be discarded. A unique identification number shall be assigned to each filter, and an information record shall be established for each filter. If the filter identification number is not or cannot be marked directly on the filter, alternative means, such as a number-identified storage container, must be established to maintain positive filter identification.

10.3 Each filter shall be conditioned in the conditioning environment in accordance with the requirements specified in section 8.2 of this appendix.

10.4 Following conditioning, each filter shall be weighed in accordance with the requirements specified in section 8.0 of this appendix and the presampling weight recorded with the filter identification number.

10.5 A numbered and preweighed filter shall be installed in the sampler following the instructions provided in the sampler operation or instruction manual.

10.6 The sampler shall be checked and prepared for sample collection in accordance with instructions provided in the sampler operation or instruction manual and with the specific quality assurance program established for the sampler by the user.

10.7 The sampler's timer shall be set to start the sample collection at the beginning of the desired sample period and stop the sample collection 24 hours later.

10.8 Information related to the sample collection (site location or identification number, sample date, filter identification number, and sampler model and serial number) shall be recorded and, if appropriate, entered into the sampler.

10.9 The sampler shall be allowed to collect the $PM_{2.5}$ sample during the set 24-hour time period.

10.10 Within 177 hours (7 days, 9 hours) of the end of the sample collection period, the filter, while still contained in the filter cassette, shall be carefully removed from the sampler, following the procedure provided in the sampler operation or instruction manual and the quality assurance program, and placed in a protective container. The protective container shall contain no loose material that could be transferred to the filter. The protective container shall hold the filter cassette securely such that the cover shall not come in contact with the filter's surfaces. Reference 2 in section 13.0 of this appendix contains additional information.

10.11 The total sample volume in actual $m^3$ for the sampling period and the elapsed sample time shall be obtained from the sampler and recorded in accordance with the instructions provided in the sampler operation or instruction manual. All sampler warning flag indications and other information required by the local quality assurance program shall also be recorded.

10.12 All factors related to the validity or representativeness of the sample, such as sampler tampering or malfunctions, unusual meteorological conditions, construction activity, fires or dust storms, etc. shall be recorded as required by the local quality assurance program. The occurrence of a flag warning during a sample period shall not necessarily indicate an invalid sample but rather shall indicate the need for specific review of the QC data by a quality assurance officer to determine sample validity.

10.13 After retrieval from the sampler, the exposed filter containing the $PM_{2.5}$ sample should be transported to the filter conditioning environment as soon as possible, ideally to arrive at the conditioning environment within 24 hours for conditioning and subsequent weighing. During the period between filter retrieval from the sampler and the start of the conditioning, the filter shall be maintained as cool as practical and continuously protected from exposure to temperatures over 25 °C to protect the integrity of the sample and minimize loss of volatile components during transport and storage. See section 8.3.6 of this appendix regarding time limits for completing the post-sampling weighing. See reference 2 in section 13.0 of this appendix for additional guidance on transporting filter samplers to the conditioning and weighing laboratory.

10.14. The exposed filter containing the $PM_{2.5}$ sample shall be re-conditioned in the conditioning environment in accordance with the requirements specified in section 8.2 of this appendix.

10.15. The filter shall be reweighed immediately after conditioning in accordance with the requirements specified in section 8.0 of this appendix, and the postsampling weight shall be recorded with the filter identification number.

10.16 The $PM_{2.5}$ concentration shall be calculated as specified in section 12.0 of this appendix.

11.0 Sampler Maintenance

The sampler shall be maintained as described by the sampler's manufacturer in the sampler-specific operation or instruction manual required under section 7.4.18 of this appendix and in accordance with the specific quality assurance program developed and established by the user based on applicable supplementary guidance provided in reference 2 in section 13.0 of this appendix.

12.0 Calculations

12.1 (a) The $PM_{2.5}$ concentration is calculated as:

$$PM_{2.5} = (W_f - W_i)/V_a$$

where:

$PM_{2.5}$ = mass concentration of $PM_{2.5}$, $\mu g/m^3$;

$W_f$, $W_i$ = final and initial weights, respectively, of the filter used to collect the $PM_{2.5}$ particle sample, mug;

$V_a$ = total air volume sampled in actual volume units, as provided by the sampler, $m^3$.

(b) Note: Total sample time must be between 1,380 and 1,500 minutes (23 and 25 hrs) for a fully valid $PM_{2.5}$ sample; however, see also section 3.3 of this appendix.

13.0 References.

1. Quality Assurance Handbook for Air Pollution Measurement Systems, Volume I, Principles. EPA/600/R-94/038a, April 1994. Available from CERI, ORD Publications, U.S. Environmental Protection Agency, 26 West Martin Luther King Drive, Cincinnati, Ohio 45268.

2. Quality Assurance Guidance Document 2.12. Monitoring $PM_{2.5}$ in Ambient Air Using Designated Reference or Class I Equivalent Methods. U.S. EPA, National Exposure Research Laboratory. Research Triangle Park, NC, November 1988 or later edition. Currently available at: http://www.epa.gov/ttn/amtic/pmqainf.html.

3. Quality Assurance Handbook for Air Pollution Measurement Systems, Volume IV: Meteorological Measurements, (Revised Edition) EPA/600/R-94/038d, March, 1995. Available from CERI, ORD Publications, U.S. Environmental Protection Agency, 26 West Martin Luther King Drive, Cincinnati, Ohio 45268.

4. Military standard specification (mil. spec.) 8625F, Type II, Class 1 as listed in Department of Defense Index of Specifications and Standards (DODISS), available from DODSSP-Customer Service, Standardization Documents Order Desk, 700 Robbins Avenue, Building 4D, Philadelphia, PA 1911-5094.

14.0 Figures L-1 through L-30 to Appendix L.

Credits

[62 FR 38714, July 18, 1997; 63 FR 7710, Feb. 17, 1998; 64 FR 19719, April 22, 1999; 71 FR 61226, Oct. 17, 2006]

SOURCE: 36 FR 22384, Nov. 25, 1971; 50 FR 25544, June 19, 1985; 63 FR 7274, Feb. 12, 1998 unless otherwise noted., unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401, et seq.

Current through November 3, 2011; 76 FR 68118.

Footnotes

# Provision of this information is required.

* Provision of this information is optional. If information related to the entire sample period is optionally provided prior to the end of the sample period, the value provided should be the value calculated for the portion of the sampler period completed up to the time the information is provided.

# Indicates that this information is also required to be provided to the Air Quality System (AQS) data bank; see § 58.16 of this chapter. For ambient temperature and barometric pressure, only the average for the sample period must be reported.

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter C. Air Programs
Part 50. National Primary and Secondary Ambient Air Quality Standards (Refs & Annos)

40 C.F.R. Pt. 50, App. N

# Appendix N to Part 50--Interpretation of the National Ambient Air Quality Standards for $PM_{2.5}$

Effective: April 8, 2008

Currentness

## 1. General

(a) This appendix explains the data handling conventions and computations necessary for determining when the annual and 24-hour primary and secondary national ambient air quality standards (NAAQS) for $PM_{2.5}$ specified in § 50.7 and § 50.13 of this part are met. $PM_{2.5}$, defined as particles with an aerodynamic diameter less than or equal to a nominal 2.5 micrometers, is measured in the ambient air by a Federal reference method (FRM) based on appendix L of this part, as applicable, and designated in accordance with part 53 of this chapter, or by a Federal equivalent method (FEM) designated in accordance with part 53 of this chapter, or by an Approved Regional Method (ARM) designated in accordance with part 58 of this chapter. Data handling and computation procedures to be used in making comparisons between reported $PM_{2.5}$ concentrations and the levels of the $PM_{2.5}$ NAAQS are specified in the following sections.

(b) Data resulting from exceptional events, for example structural fires or high winds, may be given special consideration. In some cases, it may be appropriate to exclude these data in whole or part because they could result in inappropriate values to compare with the levels of the $PM_{2.5}$ NAAQS. In other cases, it may be more appropriate to retain the data for comparison with the levels of the $PM_{2.5}$ NAAQS and then for EPA to formulate the appropriate regulatory response.

(c) The terms used in this appendix are defined as follows:

Annual mean refers to a weighted arithmetic mean, based on quarterly means, as defined in section 4.4 of this appendix.

Creditable samples are samples that are given credit for data completeness. They include valid samples collected on required sampling days and valid “make-up” samples taken for missed or invalidated samples on required sampling days.

Daily values for $PM_{2.5}$ refers to the 24-hour average concentrations of $PM_{2.5}$ calculated (averaged from hourly measurements) or measured from midnight to midnight (local standard time) that are used in NAAQS computations.

Designated monitors are those monitoring sites designated in a State or local agency PM Monitoring Network Description in accordance with part 58 of this chapter.

Design values are the metrics (i.e., statistics) that are compared to the NAAQS levels to determine compliance, calculated as shown in section 4 of this appendix:

(1) The 3-year average of annual means for a single monitoring site or a group of monitoring sites (referred to as the “annual standard design value”). If spatial averaging has been approved by EPA for a group of sites which meet the criteria specified in section 2(b) of this appendix and section 4.7.5 of appendix D of 40 CFR part 58, then 3 years of spatially averaged annual means will be averaged to derive the annual standard design value for that group of sites (further referred to as the “spatially averaged

annual standard design value”). Otherwise, the annual standard design value will represent the 3-year average of annual means for a single site (further referred to as the “single site annual standard design value”).

(2) The 3-year average of annual 98th percentile 24-hour average values recorded at each monitoring site (referred to as the “24-hour standard design value”).

Extra samples are non-creditable samples. They are daily values that do not occur on scheduled sampling days and that can not be used as make-ups for missed or invalidated scheduled samples. Extra samples are used in mean calculations and are subject to selection as a 98th percentile.

Make-up samples are samples taken to supplant missed or invalidated required scheduled samples. Make-ups can be made by either the primary or the collocated instruments. Make-up samples are either taken before the next required sampling day or exactly one week after the missed (or voided) sampling day. Also, to be considered a valid make-up, the sampling must be administered according to EPA guidance.

98th percentile is the daily value out of a year of $PM_{2.5}$ monitoring data below which 98 percent of all daily values fall.

Year refers to a calendar year.

2.0 Monitoring Considerations.

(a) Section 58.30 of this chapter specifies which monitoring locations are eligible for making comparisons with the $PM_{2.5}$ standards.

(b) To qualify for spatial averaging, monitoring sites must meet the criterion specified in section 4.7.5 of appendix D of 40 CFR part 58 as well as the following requirements:

(1) The annual mean concentration at each site shall be within 10 percent of the spatially averaged annual mean.

(2) The daily values for each site pair among the 3-year period shall yield a correlation coefficient of at least 0.9 for each calendar quarter.

(3) All of the monitoring sites should principally be affected by the same major emission sources of $PM_{2.5}$. For example, this could be demonstrated by site-specific chemical speciation profiles confirming all major component concentration averages to be within 10 percent for each calendar quarter.

(4) The requirements in paragraphs (b)(1) through (3) of this section shall be met for 3 consecutive years in order to produce a valid spatially averaged annual standard design value. Otherwise, the individual (single) site annual standard design values shall be compared directly to the level of the annual NAAQS.

(c) Section 58.12 of this chapter specifies the required minimum frequency of sampling for $PM_{2.5}$. Exceptions to the specified sampling frequencies, such as a reduced frequency during a season of expected low concentrations (i.e., “seasonal sampling”), are subject to the approval of EPA. Annual 98th percentile values are to be calculated according to equation 5 in section 4.5 of this appendix when a site operates on a “seasonal sampling” schedule.

3.0 Requirements for Data Used for Comparisons With the $PM_{2.5}$ NAAQS and Data Reporting Considerations.

(a) Except as otherwise provided in this appendix, only valid FRM/FEM/ARM $PM_{2.5}$ data required to be submitted to EPA's Air Quality System (AQS) shall be used in the design value calculations.

(b) $PM_{2.5}$ measurement data (typically hourly for continuous instruments and daily for filter-based instruments) shall be reported to AQS in micrograms per cubic meter ($\mu g/m^3$) to one decimal place, with additional digits to the right being truncated.

(c) Block 24-hour averages shall be computed from available hourly $PM_{2.5}$ concentration data for each corresponding day of the year and the result shall be stored in the first, or start, hour (i.e., midnight, hour ‘0’) of the 24-hour period. A 24-hour average shall be considered valid if at least 75 percent (i.e., 18) of the hourly averages for the 24-hour period are available. In the event that less than all 24 hourly averages are available (i.e., less than 24, but at least 18), the 24-hour average shall be computed on the basis of the hours available using the number of available hours as the divisor (e.g., 19). 24-hour periods with seven or more missing hours shall be considered valid if, after substituting zero for all missing hourly concentrations, the 24-hour average concentration is greater than the level of the standard. The computed 24-hour average $PM_{2.5}$ concentrations shall be reported to one decimal place (the additional digits to the right of the first decimal place are truncated, consistent with the data handling procedures for the reported data).

(d) Except for calculation of spatially averaged annual means and spatially averaged annual standard design values, all other calculations shown in this appendix shall be implemented on a site-level basis. Site level data shall be processed as follows:

(1) The default dataset for a site shall consist of the measured concentrations recorded from the designated primary FRM/FEM/ARM monitor. The primary monitor shall be designated in the appropriate State or local agency PM Monitoring Network Description. All daily values produced by the primary sampler are considered part of the site record (i.e., that site's daily value); this includes all creditable samples and all extra samples.

(2) Data for the primary monitor shall be augmented as much as possible with data from collocated FRM/FEM/ARM monitors. If a valid 24-hour measurement is not produced from the primary monitor for a particular day (scheduled or otherwise), but a valid sample is generated by a collocated FRM/FEM/ARM instrument (and recorded in AQS), then that collocated value shall be considered part of the site data record (i.e., that site's daily value). If more than one valid collocated FRM/FEM/ARM value is available, the average of those valid collocated values shall be used as the daily value.

(e) All daily values in the composite site record are used in annual mean and 98th percentile calculations, however, not all daily values are give credit towards data completeness requirements. Only “creditable” samples are given credit for data completeness. Creditable samples include valid samples on scheduled sampling days and valid make-up samples. All other types of daily values are referred to as “extra” samples.

4.0 Comparisons With the $PM_{2.5}$ NAAQS.

4.1 Annual $PM_{2.5}$ NAAQS.

(a) The annual $PM_{2.5}$ NAAQS is met when the annual standard design value is less than or equal to 15.0 micrograms per cubic meter ($\mu g/m^3$).

(b) For single site comparisons, 3 years of valid annual means are required to produce a valid annual standard design value. In the case of spatial averaging, 3 years of valid spatially averaged annual means are required to produce a valid annual standard design value. Designated sites with less than 3 years of data shall be included in annual spatial averages for those years that data completeness requirements are met. A year meets data completeness requirements when at least 75 percent of the scheduled sampling days for each quarter have valid data. [Quarterly data capture rates (expressed as a percentage) are specifically calculated as the number of creditable samples for the quarter divided by the number of scheduled samples for the quarter, the result then multiplied by 100 and rounded to the nearest integer.] However, years with at least 11 samples in each quarter shall be considered valid, notwithstanding quarters with less than complete data, if the resulting annual mean, spatially averaged annual mean concentration, or resulting annual standard design value concentration (rounded according to the conventions of section 4.3 of this appendix) is greater than the level of the standard. Furthermore, where the explicit 11 sample per quarter requirement is not met, the site annual mean shall still be considered valid if, by substituting a low value (described below) for the missing data in the deficient quarters (substituting enough to meet the 11 sample minimum), the computation still yields a recalculated annual mean, spatially averaged annual mean concentration, or annual standard design value concentration over the level of the standard. The low value used for this substitution test shall be the lowest reported daily value in the site data

record for that calendar quarter over the most recent 3-year period. If an annual mean is deemed complete using this test, the original annual mean (without substituted low values) shall be considered the official mean value for this site, not the result of the recalculated test using the low values.

(c) The use of less than complete data is subject to the approval of EPA, which may consider factors such as monitoring site closures/moves, monitoring diligence, and nearby concentrations in determining whether to use such data.

(d) The equations for calculating the annual standard design values are given in section 4.4 of this appendix.

4.2 24-Hour $PM_{2.5}$ NAAQS.

(a) The 24-hour $PM_{2.5}$ NAAQS is met when the 24-hour standard design value at each monitoring site is less than or equal to 35 $\mu g/m^3$. This comparison shall be based on 3 consecutive, complete years of air quality data. A year meets data completeness requirements when at least 75 percent of the scheduled sampling days for each quarter have valid data. However, years shall be considered valid, notwithstanding quarters with less than complete data (even quarters with less than 11 samples), if the resulting annual 98th percentile value or resulting 24-hour standard design value (rounded according to the conventions of section 4.3 of this appendix) is greater than the level of the standard.

(b) The use of less than complete data is subject to the approval of EPA which may consider factors such as monitoring site closures/moves, monitoring diligence, and nearby concentrations in determining whether to use such data for comparisons to the NAAQS.

(c) The procedures and equations for calculating the 24-hour standard design values are given in section 4.5 of this appendix.

4.3 Rounding Conventions. For the purposes of comparing calculated values to the applicable level of the standard, it is necessary to round the final results of the calculations described in sections 4.4 and 4.5 of this appendix. Results for all intermediate calculations shall not be rounded.

(a) Annual $PM_{2.5}$ standard design values shall be rounded to the nearest 0.1 $\mu g/m^3$ (decimals 0.05 and greater are rounded up to the next 0.1, and any decimal lower than 0.05 is rounded down to the nearest 0.1).

(b) 24-hour $PM_{2.5}$ standard design values shall be rounded to the nearest 1 $\mu g/m^3$ (decimals 0.5 and greater are rounded up to the nearest whole number, and any decimal lower than 0.5 is rounded down to the nearest whole number).

4.4 Equations for the Annual $PM_{2.5}$ NAAQS.

(a) An annual mean value for $PM_{2.5}$ is determined by first averaging the daily values of a calendar quarter using equation 1 of this appendix:

Where:

$X(?sym?)_{q,y,s}$ = the mean for quarter q of the year y for site s;

$n_q$ = the number of daily values in the quarter; and

$x_{i\ q,y,s}$ = the $i^{th}$ value in quarter q for year y for site s.

(b) Equation 2 of this appendix is then used to calculate the site annual mean:

Where:

$X(?sym?)_{y,s}$ = the annual mean concentration for year y (y = 1, 2, or 3) and for site s; and

$X(?sym?)_{q,y,s}$ = the mean for quarter q of year y for site s.

(c) If spatial averaging is utilized, the site-based annual means will then be averaged together to derive the spatially averaged annual mean using equation 3 of this appendix. Otherwise (i.e., for single site comparisons), skip to equation 4.B of this appendix.

Where:

$x(?sym?)_{y}$ = the spatially averaged mean for year y,

$x(?sym?)_{y,s}$ = the annual mean for year y and site s for sites designated to be averaged that meet completeness criteria, and

$n_s$ = the number of sites designated to be averaged that meet completeness criteria.

(d) The annual standard design value is calculated using equation 4A of this appendix when spatial averaging and equation 4B of this appendix when not spatial averaging:

Where:

x(?sym?) = the annual standard design value (the spatially averaged annual standard design value for equation 4A of this appendix and the single site annual standard design value for equation 4B of this appendix); and

$x(?sym?)_{y}$ = the spatially averaged annual mean for year y (result of equation 3 of this appendix) when spatial averaging is used, or

$x(?sym?)_{y,s}$ the annual mean for year y and site s (result of equation 2 of this appendix) when spatial averaging is not used.

(e) The annual standard design value is rounded according to the conventions in section 4.3 of this appendix before a comparison with the standard is made.

4.5 Procedures and Equations for the 24-Hour $PM_{2.5}$ NAAQS

(a) When the data for a particular site and year meet the data completeness requirements in section 4.2 of this appendix, calculation of the 98th percentile is accomplished by the steps provided in this subsection. Table 1 of this appendix shall be used to identify annual 98th percentile values, except that where a site operates on an approved seasonal sampling schedule, equation 5 of this appendix shall be used instead.

(1) Regular procedure for identifying annual 98th percentile values. Identification of annual 98th percentile values using the regular procedure (table 1) will be based on the creditable number of samples (as described below), rather than on the actual number of samples. Credit will not be granted for extra (non-creditable) samples. Extra samples, however, are candidates for selection as the annual 98th percentile. [The creditable number of samples will determine how deep to go into the data distribution, but all samples (creditable and extra) will be considered when making the percentile assignment.] The annual creditable number of samples is the sum of the four quarterly creditable number of samples.

Procedure: Sort all the daily values from a particular site and year by descending value. (For example: (x[1], x[2], x[3], * * *, x[n] ). In this case, x[1] is the largest number and x[n] is the smallest value.) The 98th percentile is determined from this sorted series of daily values which is ordered from the highest to the lowest number. Using the left column of table 1, determine the

appropriate range (i.e., row) for the annual creditable number of samples for year y ($cn_y$). The corresponding "n" value in the right column identifies the rank of the annual 98th percentile value in the descending sorted list of daily site values for year y. Thus, $P_{0.98, y}$ = the nth largest value.

**Table 1**

| **Annual creditable number of samples for year "y" ($cn_y$)** | **$P_{0.98, y}$ is the nth maximum value of the year, where n is the listed number** |
|---|---|
| 1-50 | 1 |
| 51-100 | 2 |
| 101-150 | 3 |
| 151-200 | 4 |
| 201-250 | 5 |
| 251-300 | 6 |
| 301-350 | 7 |
| 351-366 | 8 |

(2) Formula for computing annual 98th percentile values when sampling frequencies are seasonal.

Procedure: Calculate the annual 98th percentiles by determining the smallest measured concentration, x, that makes W(x) greater than 0.98 using equation 5 of this appendix:

Where:

$d_{High}$ = number of calendar days in the "High" season;

$d_{Low}$ = number of calendar days in the "Low" season;

$d_{High} + d_{Low}$ = days in a year; and

Such that "a" can be either "High" or "Low"; "x" is the measured concentration; and "$d_{High}/(d_{High} + d_{Low})$ and $d_{Low}/(d_{High} + d_{Low})$" are constant and are called seasonal "weights."

(b) The 24-hour standard design value is then calculated by averaging the annual 98th percentiles using equation 6 of this appendix:

(c) The 24-hour standard design value (3-year average 98th percentile) is rounded according to the conventions in section 4.3 of this appendix before a comparison with the standard is made.

Credits
[62 FR 38755, July 18, 1997; 69 FR 45595, July 30, 2004; 71 FR 61227, Oct. 17, 2006; 73 FR 1502, Jan. 9, 2008]
SOURCE: 36 FR 22384, Nov. 25, 1971; 50 FR 25544, June 19, 1985; 63 FR 7274, Feb. 12, 1998 unless otherwise noted., unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401, et seq.

Current through November 3, 2011; 76 FR 68118.

**End of Document** © 2011 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter C. Air Programs
Part 51. Requirements for Preparation, Adoption, and Submittal of Implementation Plans (Refs & Annos)

40 C.F.R. Pt. 51, App. W

Appendix W to Part 51--Guideline on Air Quality Models

Effective: December 9, 2005
Currentness

Preface

a. Industry and control agencies have long expressed a need for consistency in the application of air quality models for regulatory purposes. In the 1977 Clean Air Act, Congress mandated such consistency and encouraged the standardization of model applications. The Guideline on Air Quality Models (hereafter, Guideline) was first published in April 1978 to satisfy these requirements by specifying models and providing guidance for their use. The Guideline provides a common basis for estimating the air quality concentrations of criteria pollutants used in assessing control strategies and developing emission limits.

b. The continuing development of new air quality models in response to regulatory requirements and the expanded requirements for models to cover even more complex problems have emphasized the need for periodic review and update of guidance on these techniques. Historically, three primary activities have provided direct input to revisions of the Guideline. The first is a series of annual EPA workshops conducted for the purpose of ensuring consistency and providing clarification in the application of models. The second activity was the solicitation and review of new models from the technical and user community. In the March 27, 1980 Federal Register, a procedure was outlined for the submittal to EPA of privately developed models. After extensive evaluation and scientific review, these models, as well as those made available by EPA, have been considered for recognition in the Guideline. The third activity is the extensive on-going research efforts by EPA and others in air quality and meteorological modeling.

c. Based primarily on these three activities, new sections and topics have been included as needed. EPA does not make changes to the guidance on a predetermined schedule, but rather on an as-needed basis. EPA believes that revisions of the Guideline should be timely and responsive to user needs and should involve public participation to the greatest possible extent. All future changes to the guidance will be proposed and finalized in the Federal Register. Information on the current status of modeling guidance can always be obtained from EPA's Regional Offices.

Table of Contents

List of Tables

1.0 Introduction

2.0 Overview of Model Use

2.1 Suitability of Models

2.2 Levels of Sophistication of Models

2.3 Availability of Models

3.0 Recommended Air Quality Models

3.1 Preferred Modeling Techniques

3.1.1 Discussion

3.1.2 Recommendations

3.2 Use of Alternative Models

3.2.1 Discussion

3.2.2 Recommendations

3.3 Availability of Supplementary Modeling Guidance

4.0 Stationary–Source Models

4.1 Discussion

4.2 Recommendations

4.2.1 Screening Techniques

4.2.1.1 Simple Terrain

4.2.1.2 Complex Terrain

4.2.2 Refined Analytical Techniques

5.0 Models for Ozone, Particulate Matter, Carbon Monoxide, Nitrogen Dioxide, and Lead

5.1 Discussion

5.2 Recommendations

5.2.1 Models for Ozone

5.2.2 Models for Particulate Matter

5.2.2.1 PM–2.5

5.2.2.2 PM–10

5.2.3 Models for Carbon Monoxide

5.2.4 Models for Nitrogen Dioxide (Annual Average)

5.2.5 Models for Lead

6.0 Other Model Requirements

6.1 Discussion

6.2 Recommendations

6.2.1 Visibility

6.2.2 Good Engineering Practice Stack Height

6.2.3 Long Range Transport (LRT) (i.e., beyond 50 km)

6.2.4 Modeling Guidance for Other Governmental Programs

7.0 General Modeling Considerations

7.1 Discussion

7.2 Recommendations

7.2.1 Design Concentrations

7.2.2 Critical Receptor Sites

7.2.3 Dispersion Coefficients

7.2.4 Stability Categories

7.2.5 Plume Rise

7.2.6 Chemical Transformation

7.2.7 Gravitational Settling and Deposition

7.2.8 Complex Winds

7.2.9 Calibration of Models

8.0 Model Input Data

8.1 Source Data

8.1.1 Discussion

8.1.2 Recommendations

8.2 Background Concentrations

8.2.1 Discussion

8.2.2 Recommendations (Isolated Single Source)

8.2.3 Recommendations (Multi–Source Areas)

8.3 Meteorological Input Data

8.3.1 Length of Record of Meteorological Data

8.3.2 National Weather Service Data

8.3.3 Site Specific Data

8.3.4 Treatment of Near-calms and Calms

9.0 Accuracy and Uncertainty of Models

9.1 Discussion

9.1.1 Overview of Model Uncertainty

9.1.2 Studies of Model Accuracy

9.1.3 Use of Uncertainty in Decision–Making

9.1.4 Evaluation of Models

9.2 Recommendations

10.0 Regulatory Application of Models

10.1 Discussion

10.2 Recommendations

10.2.1 Analysis Requirements

10.2.2 Use of Measured Data in Lieu of Model Estimates

10.2.3 Emission Limits

11.0 Bibliography

12.0 References

Appendix A to Appendix W of 40 CFR Part 51--Summaries of Preferred Air Quality Models

**List of Tables**


| Table No. | Title |
|---|---|
| 4-1a...................................................... | Neutral/Stable Meteorological Matrix for CTSCREEN. |
| 4-1b...................................................... | Unstable/Convective Meteorological Matrix for CTSCREEN. |
| 8-1........................................................ | Model Emission Input Data for Point Sources. |
| 8-2........................................................ | Point Source Model Emission Input Data for NAAQS Compliance in PSD Demonstrations. |
| 8-3........................................................ | Averaging Times for Site Specific Wind and Turbulence Measurements. |


## 1.0 Introduction

a. The Guideline recommends air quality modeling techniques that should be applied to State Implementation Plan (SIP) revisions for existing sources and to new source reviews (NSR), including prevention of significant deterioration (PSD). [1 2 3] Applicable only to criteria air pollutants, it is intended for use by EPA Regional Offices in judging the adequacy of modeling analyses performed by EPA, State and local agencies and by industry. The guidance is appropriate for use by other Federal agencies and by State agencies with air quality and land management responsibilities. The Guideline serves to identify, for all interested parties, those techniques and data bases EPA considers acceptable. The Guideline is not intended to be a compendium of modeling techniques. Rather, it should serve as a common measure of acceptable technical analysis when supported by sound scientific judgment.

b. Due to limitations in the spatial and temporal coverage of air quality measurements, monitoring data normally are not sufficient as the sole basis for demonstrating the adequacy of emission limits for existing sources. Also, the impacts of new

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

sources that do not yet exist can only be determined through modeling. Thus, models, while uniquely filling one program need, have become a primary analytical tool in most air quality assessments. Air quality measurements can be used in a complementary manner to dispersion models, with due regard for the strengths and weaknesses of both analysis techniques. Measurements are particularly useful in assessing the accuracy of model estimates. The use of air quality measurements alone however could be preferable, as detailed in a later section of this document, when models are found to be unacceptable and monitoring data with sufficient spatial and temporal coverage are available.

c. It would be advantageous to categorize the various regulatory programs and to apply a designated model to each proposed source needing analysis under a given program. However, the diversity of the nation's topography and climate, and variations in source configurations and operating characteristics dictate against a strict modeling “cookbook”. There is no one model capable of properly addressing all conceivable situations even within a broad category such as point sources. Meteorological phenomena associated with threats to air quality standards are rarely amenable to a single mathematical treatment; thus, case-by-case analysis and judgment are frequently required. As modeling efforts become more complex, it is increasingly important that they be directed by highly competent individuals with a broad range of experience and knowledge in air quality meteorology. Further, they should be coordinated closely with specialists in emissions characteristics, air monitoring and data processing. The judgment of experienced meteorologists and analysts is essential.

d. The model that most accurately estimates concentrations in the area of interest is always sought. However, it is clear from the needs expressed by the States and EPA Regional Offices, by many industries and trade associations, and also by the deliberations of Congress, that consistency in the selection and application of models and data bases should also be sought, even in case-by-case analyses. Consistency ensures that air quality control agencies and the general public have a common basis for estimating pollutant concentrations, assessing control strategies and specifying emission limits. Such consistency is not, however, promoted at the expense of model and data base accuracy. The Guideline provides a consistent basis for selection of the most accurate models and data bases for use in air quality assessments.

e. Recommendations are made in the Guideline concerning air quality models, data bases, requirements for concentration estimates, the use of measured data in lieu of model estimates, and model evaluation procedures. Models are identified for some specific applications. The guidance provided here should be followed in air quality analyses relative to State Implementation Plans and in supporting analyses required by EPA, State and local agency air programs. EPA may approve the use of another technique that can be demonstrated to be more appropriate than those recommended in this guide. This is discussed at greater length in Section 3. In all cases, the model applied to a given situation should be the one that provides the most accurate representation of atmospheric transport, dispersion, and chemical transformations in the area of interest. However, to ensure consistency, deviations from this guide should be carefully documented and fully supported.

f. From time to time situations arise requiring clarification of the intent of the guidance on a specific topic. Periodic workshops are held with the headquarters, Regional Office, State, and local agency modeling representatives to ensure consistency in modeling guidance and to promote the use of more accurate air quality models and data bases. The workshops serve to provide further explanations of Guideline requirements to the Regional Offices and workshop reports are issued with this clarifying information. In addition, findings from ongoing research programs, new model development, or results from model evaluations and applications are continuously evaluated. Based on this information changes in the guidance may be indicated.

g. All changes to the Guideline must follow rulemaking requirements since the Guideline is codified in Appendix W of Part 51. EPA will promulgate proposed and final rules in the Federal Register to amend this Appendix. Ample opportunity for public comment will be provided for each proposed change and public hearings scheduled if requested.

h. A wide range of topics on modeling and data bases are discussed in the Guideline. Section 2 gives an overview of models and their appropriate use. Section 3 provides specific guidance on the use of “preferred” air quality models and on the selection of alternative techniques. Sections 4 through 7 provide recommendations on modeling techniques for application to simple-terrain stationary source problems, complex terrain problems, and mobile source problems. Specific modeling requirements for selected regulatory issues are also addressed. Section 8 discusses issues common to many modeling analyses, including acceptable model components. Section 9 makes recommendations for data inputs to models including source, meteorological

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

and background air quality data. Section 10 covers the uncertainty in model estimates and how that information can be useful to the regulatory decision-maker. The last chapter summarizes how estimates and measurements of air quality are used in assessing source impact and in evaluating control strategies.

i. Appendix W to 40 CFR Part 51 itself contains an appendix: Appendix A. Thus, when reference is made to “Appendix A” in this document, it refers to Appendix A to Appendix W to 40 CFR Part 51. Appendix A contains summaries of refined air quality models that are “preferred” for specific applications; both EPA models and models developed by others are included.

2.0 Overview of Model Use

a. Before attempting to implement the guidance contained in this document, the reader should be aware of certain general information concerning air quality models and their use. Such information is provided in this section.

2.1 Suitability of Models

a. The extent to which a specific air quality model is suitable for the evaluation of source impact depends upon several factors. These include: (1) The meteorological and topographic complexities of the area; (2) the level of detail and accuracy needed for the analysis; (3) the technical competence of those undertaking such simulation modeling; (4) the resources available; and (5) the detail and accuracy of the data base, i.e., emissions inventory, meteorological data, and air quality data. Appropriate data should be available before any attempt is made to apply a model. A model that requires detailed, precise, input data should not be used when such data are unavailable. However, assuming the data are adequate, the greater the detail with which a model considers the spatial and temporal variations in emissions and meteorological conditions, the greater the ability to evaluate the source impact and to distinguish the effects of various control strategies.

b. Air quality models have been applied with the most accuracy, or the least degree of uncertainty, to simulations of long term averages in areas with relatively simple topography. Areas subject to major topographic influences experience meteorological complexities that are extremely difficult to simulate. Although models are available for such circumstances, they are frequently site specific and resource intensive. In the absence of a model capable of simulating such complexities, only a preliminary approximation may be feasible until such time as better models and data bases become available.

c. Models are highly specialized tools. Competent and experienced personnel are an essential prerequisite to the successful application of simulation models. The need for specialists is critical when the more sophisticated models are used or the area being investigated has complicated meteorological or topographic features. A model applied improperly, or with inappropriate data, can lead to serious misjudgements regarding the source impact or the effectiveness of a control strategy.

d. The resource demands generated by use of air quality models vary widely depending on the specific application. The resources required depend on the nature of the model and its complexity, the detail of the data base, the difficulty of the application, and the amount and level of expertise required. The costs of manpower and computational facilities may also be important factors in the selection and use of a model for a specific analysis. However, it should be recognized that under some sets of physical circumstances and accuracy requirements, no present model may be appropriate. Thus, consideration of these factors should lead to selection of an appropriate model.

2.2 Levels of Sophistication of Models

a. There are two levels of sophistication of models. The first level consists of relatively simple estimation techniques that generally use preset, worst-case meteorological conditions to provide conservative estimates of the air quality impact of a specific source, or source category. These are called screening techniques or screening models. The purpose of such techniques is to eliminate the need of more detailed modeling for those sources that clearly will not cause or contribute to ambient concentrations in excess of either the National Ambient Air Quality Standards (NAAQS)[4] or the allowable prevention of significant deterioration (PSD) concentration increments.[2 3] If a screening technique indicates that the concentration

contributed by the source exceeds the PSD increment or the increment remaining to just meet the NAAQS, then the second level of more sophisticated models should be applied.

b. The second level consists of those analytical techniques that provide more detailed treatment of physical and chemical atmospheric processes, require more detailed and precise input data, and provide more specialized concentration estimates. As a result they provide a more refined and, at least theoretically, a more accurate estimate of source impact and the effectiveness of control strategies. These are referred to as refined models.

c. The use of screening techniques followed, as appropriate, by a more refined analysis is always desirable. However there are situations where the screening techniques are practically and technically the only viable option for estimating source impact. In such cases, an attempt should be made to acquire or improve the necessary data bases and to develop appropriate analytical techniques.

2.3 Availability of Models

a. For most of the screening and refined models discussed in the Guideline, codes, associated documentation and other useful information are available for download from EPA's Support Center for Regulatory Air Modeling (SCRAM) Internet Web site at http://www.epa.gov/scram001. A list of alternate models that can be used with case-by-case justification (subsection 3.2) and an example air quality analysis checklist are also posted on this Web site. This is a site with which modelers should become familiar.

3.0 Recommended Air Quality Models

a. This section recommends the approach to be taken in determining refined modeling techniques for use in regulatory air quality programs. The status of models developed by EPA, as well as those submitted to EPA for review and possible inclusion in this guidance, is discussed. The section also addresses the selection of models for individual cases and provides recommendations for situations where the preferred models are not applicable. Two additional sources of modeling guidance are the Model Clearinghouse[5] and periodic Regional/State/Local Modelers workshops.

b. In this guidance, when approval is required for a particular modeling technique or analytical procedure, we often refer to the “appropriate reviewing authority”. In some EPA regions, authority for NSR and PSD permitting and related activities has been delegated to State and even local agencies. In these cases, such agencies are “representatives” of the respective regions. Even in these circumstances, the Regional Office retains the ultimate authority in decisions and approvals. Therefore, as discussed above and depending on the circumstances, the appropriate reviewing authority may be the Regional Office, Federal Land Manager(s), State agency(ies), or perhaps local agency(ies). In cases where review and approval comes solely from the Regional Office (sometimes stated as “Regional Administrator”), this will be stipulated. If there is any question as to the appropriate reviewing authority, you should contact the Regional modeling contact (http://www.epa.gov/scram001/tt28.htm#regionalmodelingcontacts) in the appropriate EPA Regional Office, whose jurisdiction generally includes the physical location of the source in question and its expected impacts.

c. In all regulatory analyses, especially if other-than-preferred models are selected for use, early discussions among Regional Office staff, State and local control agencies, industry representatives, and where appropriate, the Federal Land Manager, are invaluable and are encouraged. Agreement on the data base(s) to be used, modeling techniques to be applied and the overall technical approach, prior to the actual analyses, helps avoid misunderstandings concerning the final results and may reduce the later need for additional analyses. The use of an air quality analysis checklist, such as is posted on EPA's Internet SCRAM Web site (subsection 2.3), and the preparation of a written protocol help to keep misunderstandings at a minimum.

d. It should not be construed that the preferred models identified here are to be permanently used to the exclusion of all others or that they are the only models available for relating emissions to air quality. The model that most accurately estimates concentrations in the area of interest is always sought. However, designation of specific models is needed to promote consistency in model selection and application.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

e. The 1980 solicitation of new or different models from the technical community [6] and the program whereby these models were evaluated, established a means by which new models are identified, reviewed and made available in the Guideline. There is a pressing need for the development of models for a wide range of regulatory applications. Refined models that more realistically simulate the physical and chemical process in the atmosphere and that more reliably estimate pollutant concentrations are needed.

### 3.1 Preferred Modeling Techniques

#### 3.1.1 Discussion

a. EPA has developed models suitable for regulatory application. Other models have been submitted by private developers for possible inclusion in the Guideline. Refined models which are preferred and recommended by EPA have undergone evaluation exercises [7] [8] [9] [10] that include statistical measures of model performance in comparison with measured air quality data as suggested by the American Meteorological Society [11] and, where possible, peer scientific reviews. [12] [13] [14]

b. When a single model is found to perform better than others, it is recommended for application as a preferred model and listed in Appendix A. If no one model is found to clearly perform better through the evaluation exercise, then the preferred model listed in Appendix A may be selected on the basis of other factors such as past use, public familiarity, cost or resource requirements, and availability. Accordingly, dispersion models listed in Appendix A meet these conditions:

i. The model must be written in a common programming language, and the executable(s) must run on a common computer platform.

ii. The model must be documented in a user's guide which identifies the mathematics of the model, data requirements and program operating characteristics at a level of detail comparable to that available for other recommended models in Appendix A.

iii. The model must be accompanied by a complete test data set including input parameters and output results. The test data must be packaged with the model in computer-readable form.

iv. The model must be useful to typical users, e.g., State air pollution control agencies, for specific air quality control problems. Such users should be able to operate the computer program(s) from available documentation.

v. The model documentation must include a comparison with air quality data (and/or tracer measurements) or with other well-established analytical techniques.

vi. The developer must be willing to make the model and source code available to users at reasonable cost or make them available for public access through the Internet or National Technical Information Service: The model and its code cannot be proprietary.

c. The evaluation process includes a determination of technical merit, in accordance with the above six items including the practicality of the model for use in ongoing regulatory programs. Each model will also be subjected to a performance evaluation for an appropriate data base and to a peer scientific review. Models for wide use (not just an isolated case) that are found to perform better will be proposed for inclusion as preferred models in future Guideline revisions.

d. No further evaluation of a preferred model is required for a particular application if the EPA recommendations for regulatory use specified for the model in the Guideline are followed. Alternative models to those listed in Appendix A should generally be compared with measured air quality data when they are used for regulatory applications consistent with recommendations in subsection 3.2.

#### 3.1.2 Recommendations

a. Appendix A identifies refined models that are preferred for use in regulatory applications. If a model is required for a particular application, the user should select a model from that appendix. These models may be used without a formal demonstration of

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

applicability as long as they are used as indicated in each model summary of Appendix A. Further recommendations for the application of these models to specific source problems are found in subsequent sections of the Guideline.

b. If changes are made to a preferred model without affecting the concentration estimates, the preferred status of the model is unchanged. Examples of modifications that do not affect concentrations are those made to enable use of a different computer platform or those that affect only the format or averaging time of the model results. However, when any changes are made, the Regional Administrator should require a test case example to demonstrate that the concentration estimates are not affected.

c. A preferred model should be operated with the options listed in Appendix A as "Recommendations for Regulatory Use." If other options are exercised, the model is no longer "preferred." Any other modification to a preferred model that would result in a change in the concentration estimates likewise alters its status as a preferred model. Use of the model must then be justified on a case-by-case basis.

3.2 Use of Alternative Models

3.2.1 Discussion

a. Selection of the best techniques for each individual air quality analysis is always encouraged, but the selection should be done in a consistent manner. A simple listing of models in this Guideline cannot alone achieve that consistency nor can it necessarily provide the best model for all possible situations. An EPA reference [15] provides a statistical technique for evaluating model performance for predicting peak concentration values, as might be observed at individual monitoring locations. This protocol is available to assist in developing a consistent approach when justifying the use of other-than-preferred modeling techniques recommended in the Guideline. The procedures in this protocol provide a general framework for objective decision-making on the acceptability of an alternative model for a given regulatory application. These objective procedures may be used for conducting both the technical evaluation of the model and the field test or performance evaluation. An ASTM reference [16] provides a general philosophy for developing and implementing advanced statistical evaluations of atmospheric dispersion models, and provides an example statistical technique to illustrate the application of this philosophy.

b. This section discusses the use of alternate modeling techniques and defines three situations when alternative models may be used.

3.2.2 Recommendations

a. Determination of acceptability of a model is a Regional Office responsibility. Where the Regional Administrator finds that an alternative model is more appropriate than a preferred model, that model may be used subject to the recommendations of this subsection. This finding will normally result from a determination that (1) a preferred air quality model is not appropriate for the particular application; or (2) a more appropriate model or analytical procedure is available and applicable.

b. An alternative model should be evaluated from both a theoretical and a performance perspective before it is selected for use. There are three separate conditions under which such a model may normally be approved for use: (1) If a demonstration can be made that the model produces concentration estimates equivalent to the estimates obtained using a preferred model; (2) if a statistical performance evaluation has been conducted using measured air quality data and the results of that evaluation indicate the alternative model performs better for the given application than a comparable model in Appendix A; or (3) if the preferred model is less appropriate for the specific application, or there is no preferred model. Any one of these three separate conditions may make use of an alternative model acceptable. Some known alternative models that are applicable for selected situations are listed on EPA's SCRAM Internet Web site (subsection 2.3). However, inclusion there does not confer any unique status relative to other alternative models that are being or will be developed in the future.

c. Equivalency, condition (1) in paragraph (b) of this subsection, is established by demonstrating that the maximum or highest, second highest concentrations are within 2 percent of the estimates obtained from the preferred model. The option to show equivalency is intended as a simple demonstration of acceptability for an alternative model that is so nearly identical (or contains

options that can make it identical) to a preferred model that it can be treated for practical purposes as the preferred model. Two percent was selected as the basis for equivalency since it is a rough approximation of the fraction that PSD Class I increments are of the NAAQS for $SO_2$, i.e., the difference in concentrations that is judged to be significant. However, notwithstanding this demonstration, models that are not equivalent may be used when one of the two other conditions described in paragraphs (d) and (e) of this subsection are satisfied.

d. For condition (2) in paragraph (b) of this subsection, established procedures and techniques [15] [16] for determining the acceptability of a model for an individual case based on superior performance should be followed, as appropriate. Preparation and implementation of an evaluation protocol which is acceptable to both control agencies and regulated industry is an important element in such an evaluation.

e. Finally, for condition (3) in paragraph (b) of this subsection, an alternative refined model may be used provided that:

i. The model has received a scientific peer review;

ii. The model can be demonstrated to be applicable to the problem on a theoretical basis;

iii. The data bases which are necessary to perform the analysis are available and adequate;

iv. Appropriate performance evaluations of the model have shown that the model is not biased toward underestimates; and

v. A protocol on methods and procedures to be followed has been established.

3.3 Availability of Supplementary Modeling Guidance

a. The Regional Administrator has the authority to select models that are appropriate for use in a given situation. However, there is a need for assistance and guidance in the selection process so that fairness and consistency in modeling decisions is fostered among the various Regional Offices and the States. To satisfy that need, EPA established the Model Clearinghouse [5] and also holds periodic workshops with headquarters, Regional Office, State, and local agency modeling representatives.

b. The Regional Office should always be consulted for information and guidance concerning modeling methods and interpretations of modeling guidance, and to ensure that the air quality model user has available the latest most up-to-date policy and procedures. As appropriate, the Regional Office may request assistance from the Model Clearinghouse after an initial evaluation and decision has been reached concerning the application of a model, analytical technique or data base in a particular regulatory action.

4.0 Traditional Stationary Source Models

4.1 Discussion

a. Guidance in this section applies to modeling analyses for which the predominant meteorological conditions that control the design concentration are steady state and for which the transport distances are nominally 50km or less. The models recommended in this section are generally used in the air quality impact analysis of stationary sources for most criteria pollutants. The averaging time of the concentration estimates produced by these models ranges from 1 hour to an annual average.

b. Simple terrain, as used here, is considered to be an area where terrain features are all lower in elevation than the top of the stack of the source(s) in question. Complex terrain is defined as terrain exceeding the height of the stack being modeled.

c. In the early 1980s, model evaluation exercises were conducted to determine the “best, most appropriate point source model” for use in simple terrain. [12] No one model was found to be clearly superior and, based on past use, public familiarity, and availability, ISC (predecessor to ISC3 [17]) became the recommended model for a wide range of regulatory applications. Other refined models which also employed the same basic Gaussian kernel as in ISC, i.e., BLP, CALINE3 and OCD, were developed

for specialized applications (Appendix A). Performance evaluations were also made for these models, which are identified below.

d. Encouraged by the development of pragmatic methods for better characterization of plume dispersion [18] [19] [20] [21] the AMS/EPA Regulatory Model Improvement Committee (AERMIC) developed AERMOD. [22] AERMOD employs best state-of-practice parameterizations for characterizing the meteorological influences and dispersion. The model utilizes a probability density function (pdf) and the superposition of several Gaussian plumes to characterize the distinctly non–Gaussian nature of the vertical pollutant distribution for elevated plumes during convective conditions; otherwise the distribution is Gaussian. Also, nighttime urban boundary layers (and plumes within them) have the turbulence enhanced by AERMOD to simulate the influence of the urban heat island. AERMOD has been evaluated using a variety of data sets and has been found to perform better than ISC3 for many applications, and as well or better than CTDMPLUS for several complex terrain data sets (Section A.1; subsection n). The current version of AERMOD has been modified to include an algorithm for dry and wet deposition for both gases and particles. Note that when deposition is invoked, mass in the plume is depleted. Availability of this version is described in Section A.1, and is subject to applicable guidance published in the Guideline.

e. A new building downwash algorithm [23] was developed and tested within AERMOD. The PRIME algorithm has been evaluated using a variety of data sets and has been found to perform better than the downwash algorithm that is in ISC3, and has been shown to perform acceptably in tests within AERMOD (Section A.1; subsection n).

4.2 Recommendations

4.2.1 Screening Techniques

4.2.1.1 Simple Terrain

a. Where a preliminary or conservative estimate is desired, point source screening techniques are an acceptable approach to air quality analyses. EPA has published guidance for screening procedures. [24] [25]

b. All screening procedures should be adjusted to the site and problem at hand. Close attention should be paid to whether the area should be classified urban or rural in accordance with Section 7.2.3. The climatology of the area should be studied to help define the worst-case meteorological conditions. Agreement should be reached between the model user and the appropriate reviewing authority on the choice of the screening model for each analysis, and on the input data as well as the ultimate use of the results.

4.2.1.2 Complex Terrain

a. CTSCREEN [26] can be used to obtain conservative, yet realistic, worst-case estimates for receptors located on terrain above stack height. CTSCREEN accounts for the three-dimensional nature of plume and terrain interaction and requires detailed terrain data representative of the modeling domain. The model description and user's instructions are contained in the user's guide. [26] The terrain data must be digitized in the same manner as for CTDMPLUS and a terrain processor is available. [27] A discussion of the model's performance characteristics is provided in a technical paper. [28] CTSCREEN is designed to execute a fixed matrix of meteorological values for wind speed (u), standard deviation of horizontal and vertical wind speeds ($\#_v$, $\#_w$), vertical potential temperature gradient (dtheta/dz), friction velocity ($u_*$), Monin–Obukhov length (L), mixing height ($z_i$) as a function of terrain height, and wind directions for both neutral/stable conditions and unstable convective conditions. Table 4–1 contains the matrix of meteorological variables that is used for each CTSCREEN analysis. There are 96 combinations, including exceptions, for each wind direction for the neutral/stable case, and 108 combinations for the unstable case. The specification of wind direction, however, is handled internally, based on the source and terrain geometry. Although CTSCREEN is designed to address a single source scenario, there are a number of options that can be selected on a case-by-case basis to address multi-source situations. However, the appropriate reviewing authority should be consulted, and concurrence obtained, on the protocol for modeling multiple sources with CTSCREEN to ensure that the worst case is identified and assessed. The maximum concentration output from CTSCREEN represents a worst-case 1–hour concentration. Time-scaling factors of 0.7 for 3–hour, 0.15 for 24–hour and

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

0.03 for annual concentration averages are applied internally by CTSCREEN to the highest 1–hour concentration calculated by the model.

b. Placement of receptors requires very careful attention when modeling in complex terrain. Often the highest concentrations are predicted to occur under very stable conditions, when the plume is near, or impinges on, the terrain. The plume under such conditions may be quite narrow in the vertical, so that even relatively small changes in a receptor's location may substantially affect the predicted concentration. Receptors within about a kilometer of the source may be even more sensitive to location. Thus, a dense array of receptors may be required in some cases. In order to avoid excessively large computer runs due to such a large array of receptors, it is often desirable to model the area twice. The first model run would use a moderate number of receptors carefully located over the area of interest. The second model run would use a more dense array of receptors in areas showing potential for high concentrations, as indicated by the results of the first model run.

c. As mentioned above, digitized contour data must be preprocessed [27] to provide hill shape parameters in suitable input format. The user then supplies receptors either through an interactive program that is part of the model or directly, by using a text editor; using both methods to select receptors will generally be necessary to assure that the maximum concentrations are estimated by either model. In cases where a terrain feature may “appear to the plume” as smaller, multiple hills, it may be necessary to model the terrain both as a single feature and as multiple hills to determine design concentrations.

d. Other screening techniques [17] [25] [29] may be acceptable for complex terrain cases where established procedures are used. The user is encouraged to confer with the appropriate reviewing authority if any unresolvable problems are encountered, e.g., applicability, meteorological data, receptor siting, or terrain contour processing issues.

### 4.2.2 Refined Analytical Techniques

a. A brief description of each preferred model for refined applications is found in Appendix A. Also listed in that appendix are availability, the model input requirements, the standard options that should be selected when running the program, and output options.

b. For a wide range of regulatory applications in all types of terrain, the recommended model is AERMOD. This recommendation is based on extensive developmental and performance evaluation (Section A.1; subsection n). Differentiation of simple versus complex terrain is unnecessary with AERMOD. In complex terrain, AERMOD employs the well-known dividing-streamline concept in a simplified simulation of the effects of plume-terrain interactions.

c. If aerodynamic building downwash is important for the modeling analysis, e.g., paragraph 6.2.2(b), then the recommended model is AERMOD. The state-of-the-science for modeling atmospheric deposition is evolving and the best techniques are currently being assessed and their results are being compared with observations. Consequently, while deposition treatment is available in AERMOD, the approach taken for any purpose should be coordinated with the appropriate reviewing authority. Line sources can be simulated with AERMOD if point or volume sources are appropriately combined. If buoyant plume rise from line sources is important for the modeling analysis, the recommended model is BLP. For other special modeling applications, CALINE3 (or CAL3QHCR on a case-by-case basis), OCD, and EDMS are available as described in Sections 5 and 6.

d. If the modeling application involves a well defined hill or ridge and a detailed dispersion analysis of the spatial pattern of plume impacts is of interest, CTDMPLUS, listed in Appendix A, is available. CDTMPLUS provides greater resolution of concentrations about the contour of the hill feature than does AERMOD through a different plume-terrain interaction algorithm.

**Table 4-1a.--Neutral/Stable Meteorological Matrix for CTSCREEN**

| Variable | Specific values | | | | |
|---|---|---|---|---|---|
| U (m/s)........................................................................ | 1.0 | 2.0 | 3.0 | 4.0 | 5.0 |
| $\#_v$ (m/s)...................................................................... | 0.3 | 0.75 | | | |
| $\#_w$ (m/s)...................................................................... | 0.08 | 0.15 | 0.30 | 0.75 | |
| Deltatheta/Deltaz (K/m)........................................................ | 0.01 | 0.02 | 0.035 | | |

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

| | |
|---|---|
| WD........................................................................... | (Wind direction is optimized internally for each meteorological combination.) |

Exceptions:

(1) If U # 2 m/s and $\#_v$ # 0.3 m/s, then include $\#_w$ = 0.04 m/s.

(2) If $\#_w$ = 0.75 m/s and U # 3.0 m/s, then Deltatheta/Deltaz is limited to # 0.01 K/m.

(3) If U # 4 m/s, then $\#_w$ # 0.15 m/s.

(4) $\#_w$ # $\#_v$

**Table 4-1b.--Unstable/Convective Meteorological Matrix for CTSCREEN**

| Variable | Specific values | | | | |
|---|---|---|---|---|---|
| U (m/s)................................................................... | 1.0 | 2.0 | 3.0 | 4.0 | 5.0 |
| U* (m/s)................................................................. | 0.1 | 0.3 | 0.5 | | |
| L (m)..................................................................... | -10 | -50 | -90 | | |
| Deltatheta/Deltaz (K/m).................................................. | 0.030 | (potential temperature gradient above $Z_i$) | | | |
| $Z_i$ (m).................................................................. | 0.5h | 1.0h | 1.5h | | (h = terrain height) |

5.0 Models for Ozone, Particulate Matter, Carbon Monoxide, Nitrogen Dioxide, and Lead

5.1 Discussion

a. This section identifies modeling approaches or models appropriate for addressing ozone ($O_3$)[a], carbon monoxide (CO), nitrogen dioxide ($NO_2$), particulates (PM–2.5[a] and PM–10), and lead. These pollutants are often associated with emissions from numerous sources. Generally, mobile sources contribute significantly to emissions of these pollutants or their precursors. For cases where it is of interest to estimate concentrations of CO or $NO_2$ near a single or small group of stationary sources, refer to Section 4. (Modeling approaches for $SO_2$ are discussed in Section 4.)

a Modeling for attainment demonstrations for $O_3$ and PM–2.5 should be conducted in time to meet required SIP submission dates as provided for in the respective implementation rules. Information on implementation of the 8–hr $O_3$ and PM–2.5 standards is available at: http://www.epa.gov/ttn/naags/.

b. Several of the pollutants mentioned in the preceding paragraph are closely related to each other in that they share common sources of emissions and/or are subject to chemical transformations of similar precursors.[30] [31] For example, strategies designed to reduce ozone could have an effect on the secondary component of PM–2.5 and vice versa. Thus, it makes sense to use models which take into account the chemical coupling between $O_3$ and PM–2.5, when feasible. This should promote consistency among methods used to evaluate strategies for reducing different pollutants as well as consistency among the strategies themselves. Regulatory requirements for the different pollutants are likely to be due at different times. Thus, the following paragraphs identify appropriate modeling approaches for pollutants individually.

c. The NAAQS for ozone was revised on July 18, 1997 and is now based on an 8–hour averaging period. Models for ozone are needed primarily to guide choice of strategies to correct an observed ozone problem in an area not attaining the NAAQS for ozone. Use of photochemical grid models is the recommended means for identifying strategies needed to correct high ozone concentrations in such areas. Such models need to consider emissions of volatile organic compounds (VOC), nitrogen oxides ($NO_X$) and carbon monoxide (CO), as well as means for generating meteorological data governing transport and dispersion of ozone and its precursors. Other approaches, such as Lagrangian or observational models may be used to guide choice of appropriate strategies to consider with a photochemical grid model. These other approaches may be sufficient to address ozone

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

in an area where observed concentrations are near the NAAQS or only slightly above it. Such a decision needs to be made on a case-by-case basis in concert with the Regional Office.

d. A control agency with jurisdiction over one or more areas with significant ozone problems should review available ambient air quality data to assess whether the problem is likely to be significantly impacted by regional transport. [32] Choice of a modeling approach depends on the outcome of this review. In cases where transport is considered significant, use of a nested regional model may be the preferred approach. If the observed problem is believed to be primarily of local origin, use of a model with a single horizontal grid resolution and geographical coverage that is less than that of a regional model may suffice.

e. The fine particulate matter NAAQS, promulgated on July 18, 1997, includes particles with an aerodynamic diameter nominally less than or equal to 2.5 micrometers (PM–2.5). Models for PM–2.5 are needed to assess adequacy of a proposed strategy for meeting annual and/or 24–hour NAAQS for PM–2.5. PM–2.5 is a mixture consisting of several diverse components. Because chemical/physical properties and origins of each component differ, it may be appropriate to use either a single model capable of addressing several of the important components or to model primary and secondary components using different models. Effects of a control strategy on PM–2.5 is estimated from the sum of the effects on the components composing PM–2.5. Model users may refer to guidance [33] for further details concerning appropriate modeling approaches.

f. A control agency with jurisdiction over one or more areas with PM–2.5 problems should review available ambient air quality data to assess which components of PM–2.5 are likely to be major contributors to the problem. If it is determined that regional transport of secondary particulates, such as sulfates or nitrates, is likely to contribute significantly to the problem, use of a regional model may be the preferred approach. Otherwise, coverage may be limited to a domain that is urban scale or less. Special care should be taken to select appropriate geographical coverage for a modeling application. [33]

g. The NAAQS for PM–10 was promulgated in July 1987 (40 CFR 50.6). A SIP development guide [34] is available to assist in PM–10 analyses and control strategy development. EPA promulgated regulations for PSD increments measured as PM–10 in a notice published on June 3, 1993 (40 CFR 51.166(c)). As an aid to assessing the impact on ambient air quality of particulate matter generated from prescribed burning activities, a reference [35] is available.

h. Models for assessing the impacts of particulate matter may involve dispersion models or receptor models, or a combination (depending on the circumstances). Receptor models focus on the behavior of the ambient environment at the point of impact as opposed to source-oriented dispersion models, which focus on the transport, diffusion, and transformation that begin at the source and continue to the receptor site. Receptor models attempt to identify and apportion sources by relating known sample compositions at receptors to measured or inferred compositions of source emissions. When complete and accurate emission inventories or meteorological characterization are unavailable, or unknown pollutant sources exist, receptor modeling may be necessary.

i. Models for assessing the impact of CO emissions are needed for a number of different purposes. Examples include evaluating effects of point sources, congested intersections and highways, as well as the cumulative effect of numerous sources of CO in an urban area.

j. Models for assessing the impact of sources on ambient $NO_2$ concentrations are primarily needed to meet new source review requirements, such as addressing the effect of a proposed source on PSD increments for annual concentrations of $NO_2$. Impact of an individual source on ambient $NO_2$ depends, in part, on the chemical environment into which the source's plume is to be emitted. There are several approaches for estimating effects of an individual source on ambient $NO_2$. One approach is through use of a plume-in-grid algorithm imbedded within a photochemical grid model. However, because of the rigor and complexity involved, and because this approach may not be capable of defining sub-grid concentration gradients, the plume-in-grid approach may be impractical for estimating effects on an annual PSD increment. A second approach which does not have this limitation and accommodates distance-dependent conversion ratios--the Plume Volume Molar Ratio Method (PVMRM) [36] --is currently being tested to determine suitability as a refined method. A third (screening) approach is to develop

site specific (domain-wide) conversion factors based on measurements. If it is not possible to develop site specific conversion factors and use of the plume-in-grid algorithm is also not feasible, other screening procedures may be considered.

k. In January 1999 (40 CFR Part 58, Appendix D), EPA gave notice that concern about ambient lead impacts was being shifted away from roadways and toward a focus on stationary point sources. EPA has also issued guidance on siting ambient monitors in the vicinity of such sources. [37] For lead, the SIP should contain an air quality analysis to determine the maximum quarterly lead concentration resulting from major lead point sources, such as smelters, gasoline additive plants, etc. General guidance for lead SIP development is also available. [38]

5.2 Recommendations

5.2.1 Models for Ozone

a. Choice of Models for Multi-source Applications. Simulation of ozone formation and transport is a highly complex and resource intensive exercise. Control agencies with jurisdiction over areas with ozone problems are encouraged to use photochemical grid models, such as the Models–3/Community Multi-scale Air Quality (CMAQ) modeling system, [39] to evaluate the relationship between precursor species and ozone. Judgement on the suitability of a model for a given application should consider factors that include use of the model in an attainment test, development of emissions and meteorological inputs to the model and choice of episodes to model. [32] Similar models for the 8–hour NAAQS and for the 1–hour NAAQS are appropriate.

b. Choice of Models to Complement Photochemical Grid Models. As previously noted, observational models, Lagrangian models, or the refined version of the Ozone Isopleth Plotting Program (OZIPR) [40] may be used to help guide choice of strategies to simulate with a photochemical grid model and to corroborate results obtained with a grid model. Receptor models have also been used to apportion sources of ozone precursors (e.g., VOC) in urban domains. EPA has issued guidance [32] in selecting appropriate techniques.

c. Estimating the Impact of Individual Sources. Choice of methods used to assess the impact of an individual source depends on the nature of the source and its emissions. Thus, model users should consult with the Regional Office to determine the most suitable approach on a case-by-case basis (subsection 3.2.2).

5.2.2 Models for Particulate Matter

5.2.2.1 PM–2.5

a. Choice of Models for Multi-source Applications. Simulation of phenomena resulting in high ambient PM–2.5 can be a multi-faceted and complex problem resulting from PM–2.5's existence as an aerosol mixture. Treating secondary components of PM–2.5, such as sulfates and nitrates, can be a highly complex and resource-intensive exercise. Control agencies with jurisdiction over areas with secondary PM–2.5 problems are encouraged to use models which integrate chemical and physical processes important in the formation, decay and transport of these species (e.g., Models–3/CMAQ [38] or REMSAD [41] ). Primary components can be simulated using less resource-intensive techniques. Suitability of a modeling approach or mix of modeling approaches for a given application requires technical judgement, [33] as well as professional experience in choice of models, use of the model(s) in an attainment test, development of emissions and meteorological inputs to the model and selection of days to model.

b. Choice of Analysis Techniques to Complement Air Quality Simulation Models. Receptor models may be used to corroborate predictions obtained with one or more air quality simulation models. They may also be potentially useful in helping to define specific source categories contributing to major components of PM–2.5. [33]

c. Estimating the Impact of Individual Sources. Choice of methods used to assess the impact of an individual source depends on the nature of the source and its emissions. Thus, model users should consult with the Regional Office to determine the most suitable approach on a case-by-case basis (subsection 3.2.2).

5.2.2.2 PM–10

a. Screening techniques like those identified in subsection 4.2.1 are applicable to PM–10. Conservative assumptions which do not allow removal or transformation are suggested for screening. Thus, it is recommended that subjectively determined values for "half-life" or pollutant decay not be used as a surrogate for particle removal. Proportional models (rollback/forward) may not be applied for screening analysis, unless such techniques are used in conjunction with receptor modeling. [34]

b. Refined models such as those discussed in subsection 4.2.2 are recommended for PM–10. However, where possible, particle size, gas-to-particle formation, and their effect on ambient concentrations may be considered. For point sources of small particles and for source-specific analyses of complicated sources, use the appropriate recommended steady-state plume dispersion model (subsection 4.2.2).

c. Receptor models have proven useful for helping validate emission inventories and for corroborating source-specific impacts estimated by dispersion models. The Chemical Mass Balance (CMB) model is useful for apportioning impacts from localized sources. [42] [43] [44] Other receptor models, e.g., the Positive Matrix Factorization (PMF) model [45] and Unmix, [46] which don't share some of CMB's constraints, have also been applied. In regulatory applications, dispersion models have been used in conjunction with receptor models to attribute source (or source category) contributions. Guidance is available for PM–10 sampling and analysis applicable to receptor modeling. [47]

d. Under certain conditions, recommended dispersion models may not be reliable. In such circumstances, the modeling approach should be approved by the Regional Office on a case-by-case basis. Analyses involving model calculations for stagnation conditions should also be justified on a case-by-case basis (subsection 7.2.8).

e. Fugitive dust usually refers to dust put into the atmosphere by the wind blowing over plowed fields, dirt roads or desert or sandy areas with little or no vegetation. Reentrained dust is that which is put into the air by reason of vehicles driving over dirt roads (or dirty roads) and dusty areas. Such sources can be characterized as line, area or volume sources. Emission rates may be based on site specific data or values from the general literature. Fugitive emissions include the emissions resulting from the industrial process that are not captured and vented through a stack but may be released from various locations within the complex. In some unique cases a model developed specifically for the situation may be needed. Due to the difficult nature of characterizing and modeling fugitive dust and fugitive emissions, it is recommended that the proposed procedure be cleared by the Regional Office for each specific situation before the modeling exercise is begun.

5.2.3 Models for Carbon Monoxide

a. Guidance is available for analyzing CO impacts at roadway intersections. [48] The recommended screening model for such analyses is CAL3QHC. [49] [50] This model combines CALINE3 (listed in Appendix A) with a traffic model to calculate delays and queues that occur at signalized intersections. The screening approach is described in reference 48; a refined approach may be considered on a case-by-case basis with CAL3QHCR. [51] The latest version of the MOBILE (mobile source emission factor) model should be used for emissions input to intersection models.

b. For analyses of highways characterized by uninterrupted traffic flows, CALINE3 is recommended, with emissions input from the latest version of the MOBILE model. A scientific review article for line source models is available. [52]

c. For urban area wide analyses of CO, an Eulerian grid model should be used. Information on SIP development and requirements for using such models can be found in several references. [48] [53] [54] [55]

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

d. Where point sources of CO are of concern, they should be treated using the screening and refined techniques described in Section 4.

5.2.4 Models for Nitrogen Dioxide (Annual Average)

a. A tiered screening approach is recommended to obtain annual average estimates of $NO_2$ from point sources for New Source Review analysis, including PSD, and for SIP planning purposes. This multi-tiered approach is conceptually shown in Figure 5–1 and described in paragraphs b through d of this subsection:

Figure 5–1

Multi-tiered screening approach for Estimating Annual $NO_2$ Concentrations from Point Sources




b. For Tier 1 (the initial screen), use an appropriate model in subsection 4.2.2 to estimate the maximum annual average concentration and assume a total conversion of NO to $NO_2$. If the concentration exceeds the NAAQS and/or PSD increments for $NO_2$, proceed to the 2nd level screen.

c. For Tier 2 (2nd level) screening analysis, multiply the Tier 1 estimate(s) by an empirically derived $NO_2/NO_X$ value of 0.75 (annual national default). [56] The reviewing agency may establish an alternative default $NO_2/NO_X$ ratio based on ambient annual average $NO_2$ and annual average $NO_X$ data representative of area wide quasi-equilibrium conditions. Alternative default $NO_2/NO_X$ ratios should be based on data satisfying quality assurance procedures that ensure data accuracy for both $NO_2$ and $NO_X$ within the typical range of measured values. In areas with relatively low $NO_X$ concentrations, the quality assurance procedures used to determine compliance with the $NO_2$ national ambient air quality standard may not be adequate. In addition, default $NO_2/NO_X$ ratios, including the 0.75 national default value, can underestimate long range $NO_2$ impacts and should be used with caution in long range transport scenarios.

d. For Tier 3 (3rd level) analysis, a detailed screening method may be selected on a case-by-case basis. For point source modeling, detailed screening techniques such as the Ozone Limiting Method [57] may also be considered. Also, a site specific $NO_2/NO_X$ ratio may be used as a detailed screening method if it meets the same restrictions as described for alternative default $NO_2/NO_X$ ratios. Ambient $NO_X$ monitors used to develop a site specific ratio should be sited to obtain the $NO_2$ and $NO_X$ concentrations under quasi-equilibrium conditions. Data obtained from monitors sited at the maximum $NO_X$ impact site, as may be required in a PSD pre-construction monitoring program, likely reflect transitional $NO_X$ conditions. Therefore, $NO_X$ data from maximum impact sites may not be suitable for determining a site specific $NO_2/NO_X$ ratio that is applicable for the

entire modeling analysis. A site specific ratio derived from maximum impact data can only be used to estimate $NO_2$ impacts at receptors located within the same distance of the source as the source-to-monitor distance.

e. In urban areas (subsection 7.2.3), a proportional model may be used as a preliminary assessment to evaluate control strategies to meet the NAAQS for multiple minor sources, i.e., minor point, area and mobile sources of $NO_X$; concentrations resulting from major point sources should be estimated separately as discussed above, then added to the impact of the minor sources. An acceptable screening technique for urban complexes is to assume that all $NO_X$ is emitted in the form of $NO_2$ and to use a model from Appendix A for nonreactive pollutants to estimate $NO_2$ concentrations. A more accurate estimate can be obtained by: (1) Calculating the annual average concentrations of $NO_X$ with an urban model, and (2) converting these estimates to $NO_2$ concentrations using an empirically derived annual $NO_2/NO_X$ ratio. A value of 0.75 is recommended for this ratio. However, a spatially averaged alternative default annual $NO_2/NO_X$ ratio may be determined from an existing air quality monitoring network and used in lieu of the 0.75 value if it is determined to be representative of prevailing ratios in the urban area by the reviewing agency. To ensure use of appropriate locally derived annual average $NO_2/NO_X$ ratios, monitoring data under consideration should be limited to those collected at monitors meeting siting criteria defined in 40 CFR Part 58, Appendix D as representative of “neighborhood”, “urban”, or “regional” scales. Furthermore, the highest annual spatially averaged $NO_2/NO_X$ ratio from the most recent 3 years of complete data should be used to foster conservatism in estimated impacts.

f. To demonstrate compliance with $NO_2$ PSD increments in urban areas, emissions from major and minor sources should be included in the modeling analysis. Point and area source emissions should be modeled as discussed above. If mobile source emissions do not contribute to localized areas of high ambient $NO_2$ concentrations, they should be modeled as area sources. When modeled as area sources, mobile source emissions should be assumed uniform over the entire highway link and allocated to each area source grid square based on the portion of highway link within each grid square. If localized areas of high concentrations are likely, then mobile sources should be modeled as line sources using an appropriate steady-state plume dispersion model (e.g., CAL3QHCR; subsection 5.2.3).

g. More refined techniques to handle special circumstances may be considered on a case-by-case basis and agreement with the appropriate reviewing authority (paragraph 3.0(b)) should be obtained. Such techniques should consider individual quantities of NO and $NO_2$ emissions, atmospheric transport and dispersion, and atmospheric transformation of NO to $NO_2$. Where they are available, site specific data on the conversion of NO to $NO_2$ may be used. Photochemical dispersion models, if used for other pollutants in the area, may also be applied to the $NO_X$ problem.

### 5.2.5 Models for Lead

a. For major lead point sources, such as smelters, which contribute fugitive emissions and for which deposition is important, professional judgement should be used, and there should be coordination with the appropriate reviewing authority (paragraph 3.0(b)). To model an entire major urban area or to model areas without significant sources of lead emissions, as a minimum a proportional (rollback) model may be used for air quality analysis. The rollback philosophy assumes that measured pollutant concentrations are proportional to emissions. However, urban or other dispersion models are encouraged in these circumstances where the use of such models is feasible.

b. In modeling the effect of traditional line sources (such as a specific roadway or highway) on lead air quality, dispersion models applied for other pollutants can be used. Dispersion models such as CALINE3 and CAL3QHCR have been used for modeling carbon monoxide emissions from highways and intersections (subsection 5.2.3). Where there is a point source in the middle of a substantial road network, the lead concentrations that result from the road network should be treated as background (subsection 8.2); the point source and any nearby major roadways should be modeled separately using the appropriate recommended steady-state plume dispersion model (subsection 4.2.2).

## 6.0 Other Model Requirements

### 6.1 Discussion

a. This section covers those cases where specific techniques have been developed for special regulatory programs. Most of the programs have, or will have when fully developed, separate guidance documents that cover the program and a discussion of the tools that are needed. The following paragraphs reference those guidance documents, when they are available. No attempt has been made to provide a comprehensive discussion of each topic since the reference documents were designed to do that. This section will undergo periodic revision as new programs are added and new techniques are developed.

b. Other Federal agencies have also developed specific modeling approaches for their own regulatory or other requirements. [58] Although such regulatory requirements and manuals may have come about because of EPA rules or standards, the implementation of such regulations and the use of the modeling techniques is under the jurisdiction of the agency issuing the manual or directive.

c. The need to estimate impacts at distances greater than 50km (the nominal distance to which EPA considers most steady-state Gaussian plume models are applicable) is an important one especially when considering the effects from secondary pollutants. Unfortunately, models originally available to EPA had not undergone sufficient field evaluation to be recommended for general use. Data bases from field studies at mesoscale and long range transport distances were limited in detail. This limitation was a result of the expense to perform the field studies required to verify and improve mesoscale and long range transport models. Meteorological data adequate for generating three-dimensional wind fields were particularly sparse. Application of models to complicated terrain compounds the difficulty of making good assessments of long range transport impacts. EPA completed limited evaluation of several long range transport (LRT) models against two sets of field data and evaluated results. [59] Based on the results, EPA concluded that long range and mesoscale transport models were limited for regulatory use to a case-by-case basis. However a more recent series of comparisons has been completed for a new model, CALPUFF (Section A.3). Several of these field studies involved three-to-four hour releases of tracer gas sampled along arcs of receptors at distances greater than 50km downwind. In some cases, short-term concentration sampling was available, such that the transport of the tracer puff as it passed the arc could be monitored. Differences on the order of 10 to 20 degrees were found between the location of the simulated and observed center of mass of the tracer puff. Most of the simulated centerline concentration maxima along each arc were within a factor of two of those observed. It was concluded from these case studies that the CALPUFF dispersion model had performed in a reasonable manner, and had no apparent bias toward over or under prediction, so long as the transport distance was limited to less than 300km. [60]

## 6.2 Recommendations

### 6.2.1 Visibility

a. Visibility in important natural areas (e.g., Federal Class I areas) is protected under a number of provisions of the Clean Air Act, including Sections 169A and 169B (addressing impacts primarily from existing sources) and Section 165 (new source review). Visibility impairment is caused by light scattering and light absorption associated with particles and gases in the atmosphere. In most areas of the country, light scattering by PM–2.5 is the most significant component of visibility impairment. The key components of PM–2.5 contributing to visibility impairment include sulfates, nitrates, organic carbon, elemental carbon, and crustal material.

b. The visibility regulations as promulgated in December 1980 (40 CFR 51.300–307) require States to mitigate visibility impairment, in any of the 156 mandatory Federal Class I areas, that is found to be "reasonably attributable" to a single source or a small group of sources. In 1985, EPA promulgated Federal Implementation Plans (FIPs) for several States without approved visibility provisions in their SIPs. The IMPROVE (Interagency Monitoring for Protected Visual Environments) monitoring network, a cooperative effort between EPA, the States, and Federal land management agencies, was established to implement the monitoring requirements in these FIPs. Data has been collected by the IMPROVE network since 1988.

c. In 1999, EPA issued revisions to the 1980 regulations to address visibility impairment in the form of regional haze, which is caused by numerous, diverse sources (e.g., stationary, mobile, and area sources) located across a broad region (40 CFR 51.308–309). The state of relevant scientific knowledge has expanded significantly since the Clean Air Act Amendments of

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

1977. A number of studies and reports [61] [62] have concluded that long range transport (e.g., up to hundreds of kilometers) of fine particulate matter plays a significant role in visibility impairment across the country. Section 169A of the Act requires states to develop SIPs containing long-term strategies for remedying existing and preventing future visibility impairment in 156 mandatory Class I federal areas. In order to develop long-term strategies to address regional haze, many States will need to conduct regional-scale modeling of fine particulate concentrations and associated visibility impairment (e.g., light extinction and deciview metrics).

d. To calculate the potential impact of a plume of specified emissions for specific transport and dispersion conditions ("plume blight"), a screening model, VISCREEN, and guidance are available. [63] If a more comprehensive analysis is required, a refined model should be selected. The model selection (VISCREEN vs. PLUVUE II or some other refined model), procedures, and analyses should be determined in consultation with the appropriate reviewing authority (paragraph 3.0(b)) and the affected Federal Land Manager (FLM). FLMs are responsible for determining whether there is an adverse effect by a plume on a Class I area.

e. CALPUFF (Section A.3) may be applied when assessment is needed of reasonably attributable haze impairment or atmospheric deposition due to one or a small group of sources. This situation may involve more sources and larger modeling domains than that to which VISCREEN ideally may be applied. The procedures and analyses should be determined in consultation with the appropriate reviewing authority (paragraph 3.0(b)) and the affected FLM(s).

f. Regional scale models are used by EPA to develop and evaluate national policy and assist State and local control agencies. Two such models which can be used to assess visibility impacts from source emissions are Models–3/CMAQ [38] and REMSAD. [41] Model users should consult with the appropriate reviewing authority (paragraph 3.0(b)), which in this instance would include FLMs.

6.2.2 Good Engineering Practice Stack Height

a. The use of stack height credit in excess of Good Engineering Practice (GEP) stack height or credit resulting from any other dispersion technique is prohibited in the development of emission limitations by 40 CFR 51.118 and 40 CFR 51.164. The definitions of GEP stack height and dispersion technique are contained in 40 CFR 51.100. Methods and procedures for making the appropriate stack height calculations, determining stack height credits and an example of applying those techniques are found in several references [64] [65] [66] [67], which provide a great deal of additional information for evaluating and describing building cavity and wake effects.

b. If stacks for new or existing major sources are found to be less than the height defined by EPA's refined formula for determining GEP height, then air quality impacts associated with cavity or wake effects due to the nearby building structures should be determined. The EPA refined formula height is defined as H + 1.5L (see reference 66). Detailed downwash screening procedures [24] for both the cavity and wake regions should be followed. If more refined concentration estimates are required, the recommended steady-state plume dispersion model in subsection 4.2.2 contains algorithms for building wake calculations and should be used.

6.2.3 Long Range Transport (LRT) (i.e., Beyond 50km)

a. Section 165(d) of the Clean Air Act requires that suspected adverse impacts on PSD Class I areas be determined. However, 50km is the useful distance to which most steady-state Gaussian plume models are considered accurate for setting emission limits. Since in many cases PSD analyses show that Class I areas may be threatened at distances greater than 50km from new sources, some procedure is needed to (1) determine if an adverse impact will occur, and (2) identify the model to be used in setting an emission limit if the Class I increments are threatened. In addition to the situations just described, there are certain applications containing a mixture of both long range and short range source-receptor relationships in a large modeled domain (e.g., several industrialized areas located along a river or valley). Historically, these applications have presented considerable difficulty to an analyst if impacts from sources having transport distances greater than 50km significantly contributed to the

design concentrations. To properly analyze applications of this type, a modeling approach is needed which has the capability of combining, in a consistent manner, impacts involving both short and long range transport. The CALPUFF modeling system, listed in Appendix A, has been designed to accommodate both the Class I area LRT situation and the large modeling domain situation. Given the judgement and refinement involved, conducting a LRT modeling assessment will require significant consultation with the appropriate reviewing authority (paragraph 3.0(b)) and the affected FLM(s). The FLM has an affirmative responsibility to protect air quality related values (AQRVs) that may be affected, and to provide the appropriate procedures and analysis techniques. Where there is no increment violation, the ultimate decision on whether a Class I area is adversely affected is the responsibility of the appropriate reviewing authority (Section 165(d)(2)(C)(ii) of the Clean Air Act), taking into consideration any information on the impacts on AQRVs provided by the FLM. According to Section 165(d)(2)(C)(iii) of the Clean Air Act, if there is a Class I increment violation, the source must demonstrate to the satisfaction of the FLM that the emissions from the source will have no adverse impact on the AQRVs.

b. If LRT is determined to be important, then refined estimates utilizing the CALPUFF modeling system should be obtained. A screening approach [60] [68] is also available for use on a case-by-case basis that generally provides concentrations that are higher than those obtained using refined characterizations of the meteorological conditions. The meteorological input data requirements for developing the time and space varying three-dimensional winds and dispersion meteorology for refined analyses are discussed in paragraph 8.3.1.2(d). Additional information on applying this model is contained in Appendix A. To facilitate use of complex air quality and meteorological modeling systems, a written protocol approved by the appropriate reviewing authority (paragraph 3.0(b)) and the affected FLM(s) may be considered for developing consensus in the methods and procedures to be followed.

6.2.4 Modeling Guidance for Other Governmental Programs

a. When using the models recommended or discussed in the Guideline in support of programmatic requirements not specifically covered by EPA regulations, the model user should consult the appropriate Federal or State agency to ensure the proper application and use of the models. For modeling associated with PSD permit applications that involve a Class I area, the appropriate Federal Land Manager should be consulted on all modeling questions.

b. The Offshore and Coastal Dispersion (OCD) model, described in Appendix A, was developed by the Minerals Management Service and is recommended for estimating air quality impact from offshore sources on onshore, flat terrain areas. The OCD model is not recommended for use in air quality impact assessments for onshore sources. Sources located on or just inland of a shoreline where fumigation is expected should be treated in accordance with subsection 7.2.8.

c. The latest version of the Emissions and Dispersion Modeling System (EDMS), was developed and is supported by the Federal Aviation Administration (FAA), and is appropriate for air quality assessment of primary pollutant impacts at airports or air bases. EDMS has adopted AERMOD for treating dispersion. Application of EDMS is intended for estimating the collective impact of changes in aircraft operations, point source, and mobile source emissions on pollutant concentrations. It is not intended for PSD, SIP, or other regulatory air quality analyses of point or mobile sources at or peripheral to airport property that are unrelated to airport operations. If changes in other than aircraft operations are associated with analyses, a model recommended in Chapter 4 or 5 should be used. The latest version of EDMS may be obtained from FAA at its Web site: http://www.aee.faa.gov/emissions/edms/edmshome.htm.

7.0 General Modeling Considerations

7.1 Discussion

a. This section contains recommendations concerning a number of different issues not explicitly covered in other sections of this guide. The topics covered here are not specific to any one program or modeling area but are common to nearly all modeling analyses for criteria pollutants.

7.2 Recommendations

7.2.1 Design Concentrations (See Also Subsection 10.2.3.1)

7.2.1.1 Design Concentrations for $SO_2$, PM–10, CO, Pb, and $NO_2$

a. An air quality analysis for $SO_2$, PM–10, CO, Pb, and $NO_2$ is required to determine if the source will (1) cause a violation of the NAAQS, or (2) cause or contribute to air quality deterioration greater than the specified allowable PSD increment. For the former, background concentration (subsection 8.2) should be added to the estimated impact of the source to determine the design concentration. For the latter, the design concentration includes impact from all increment consuming sources.

b. If the air quality analyses are conducted using the period of meteorological input data recommended in subsection 8.3.1.2 (e.g., 5 years of National Weather Service (NWS) data or at least 1 year of site specific data; subsection 8.3.3), then the design concentration based on the highest, second-highest short term concentration over the entire receptor network for each year modeled or the highest long term average (whichever is controlling) should be used to determine emission limitations to assess compliance with the NAAQS and PSD increments. For the 24–hour PM–10 NAAQS (which is a probabilistic standard)--when multiple years are modeled, they collectively represent a single period. Thus, if 5 years of NWS data are modeled, then the highest sixth highest concentration for the whole period becomes the design value. And in general, when n years are modeled, the (n+1)th highest concentration over the n-year period is the design value, since this represents an average or expected exceedance rate of one per year.

c. When sufficient and representative data exist for less than a 5–year period from a nearby NWS site, or when site specific data have been collected for less than a full continuous year, or when it has been determined that the site specific data may not be temporally representative (subsection 8.3.3), then the highest concentration estimate should be considered the design value. This is because the length of the data record may be too short to assure that the conditions producing worst-case estimates have been adequately sampled. The highest value is then a surrogate for the concentration that is not to be exceeded more than once per year (the wording of the deterministic standards). Also, the highest concentration should be used whenever selected worst-case conditions are input to a screening technique, as described in EPA guidance. [24]

d. If the controlling concentration is an annual average value and multiple years of data (site specific or NWS) are used, then the design value is the highest of the annual averages calculated for the individual years. If the controlling concentration is a quarterly average and multiple years are used, then the highest individual quarterly average should be considered the design value.

e. As long a period of record as possible should be used in making estimates to determine design values and PSD increments. If more than 1 year of site specific data is available, it should be used.

7.2.1.2 Design Concentrations for $O_3$ and PM–2.5

a. Guidance and specific instructions for the determination of the 1–hr and 8–hr design concentrations for ozone are provided in Appendix H and I (respectively) of reference 4. Appendix H explains how to determine when the expected number of days per calendar year with maximum hourly concentrations above the NAAQS is equal to or less than 1. Appendix I explains the data handling conventions and computations necessary for determining whether the 8–hour primary and secondary NAAQS are met at an ambient monitoring site. For PM–2.5, Appendix N of reference 4, and supplementary guidance, [69] explain the data handling conventions and computations necessary for determining when the annual and 24–hour primary and secondary NAAQS are met. For all SIP revisions the user should check with the Regional Office to obtain the most recent guidance documents and policy memoranda concerning the pollutant in question. There are currently no PSD increments for $O_3$ and PM–2.5.

7.2.2 Critical Receptor Sites

a. Receptor sites for refined modeling should be utilized in sufficient detail to estimate the highest concentrations and possible violations of a NAAQS or a PSD increment. In designing a receptor network, the emphasis should be placed on receptor resolution and location, not total number of receptors. The selection of receptor sites should be a case-by-case determination taking into consideration the topography, the climatology, monitor sites, and the results of the initial screening procedure.

7.2.3 Dispersion Coefficients

a. Steady-state Gaussian plume models used in most applications should employ dispersion coefficients consistent with those contained in the preferred models in Appendix A. Factors such as averaging time, urban/rural surroundings (see paragraphs (b)--(f) of this subsection), and type of source (point vs. line) may dictate the selection of specific coefficients. Coefficients used in some Appendix A models are identical to, or at least based on, Pasquill–Gifford coefficients [70] in rural areas and McElroy–Pooler [71] coefficients in urban areas. A key feature of AERMOD's formulation is the use of directly observed variables of the boundary layer to parameterize dispersion. [22]

b. The selection of either rural or urban dispersion coefficients in a specific application should follow one of the procedures suggested by Irwin [72] and briefly described in paragraphs (c)--(f) of this subsection. These include a land use classification procedure or a population based procedure to determine whether the character of an area is primarily urban or rural.

c. Land Use Procedure: (1) Classify the land use within the total area, $A_o$, circumscribed by a 3km radius circle about the source using the meteorological land use typing scheme proposed by Auer [73]; (2) if land use types I1, I2, C1, R2, and R3 account for 50 percent or more of $A_o$, use urban dispersion coefficients; otherwise, use appropriate rural dispersion coefficients.

d. Population Density Procedure: (1) Compute the average population density, p(?sym?) per square kilometer with $A_o$ as defined above; (2) If p(?sym?) is greater than 750 people/$km_2$, use urban dispersion coefficients; otherwise use appropriate rural dispersion coefficients.

e. Of the two methods, the land use procedure is considered more definitive. Population density should be used with caution and should not be applied to highly industrialized areas where the population density may be low and thus a rural classification would be indicated, but the area is sufficiently built-up so that the urban land use criteria would be satisfied. In this case, the classification should already be “urban” and urban dispersion parameters should be used.

f. Sources located in an area defined as urban should be modeled using urban dispersion parameters. Sources located in areas defined as rural should be modeled using the rural dispersion parameters. For analyses of whole urban complexes, the entire area should be modeled as an urban region if most of the sources are located in areas classified as urban.

g. Buoyancy-induced dispersion (BID), as identified by Pasquill [74], is included in the preferred models and should be used where buoyant sources, e.g., those involving fuel combustion, are involved.

7.2.4 Stability Categories

a. The Pasquill approach to classifying stability is commonly used in preferred models (Appendix A). The Pasquill method, as modified by Turner [75], was developed for use with commonly observed meteorological data from the National Weather Service and is based on cloud cover, insolation and wind speed.

b. Procedures to determine Pasquill stability categories from other than NWS data are found in subsection 8.3. Any other method to determine Pasquill stability categories must be justified on a case-by-case basis.

c. For a given model application where stability categories are the basis for selecting dispersion coefficients, both $\#_y$ and $\#_z$ should be determined from the same stability category. “Split sigmas” in that instance are not recommended. Sector averaging, which eliminates the $\#_y$ term, is commonly acceptable in complex terrain screening methods.

d. AERMOD, also a preferred model in Appendix A, uses a planetary boundary layer scaling parameter to characterize stability.[22] This approach represents a departure from the discrete, hourly stability categories estimated under the Pasquill–Gifford–Turner scheme.

7.2.5 Plume Rise

a. The plume rise methods of Briggs[76 77] are incorporated in many of the preferred models and are recommended for use in many modeling applications. In AERMOD,[22] for the stable boundary layer, plume rise is estimated using an iterative approach, similar to that in the CTDMPLUS model. In the convective boundary layer, plume rise is superposed on the displacements by random convective velocities.[78] In AERMOD, plume rise is computed using the methods of Briggs excepting cases involving building downwash, in which a numerical solution of the mass, energy, and momentum conservation laws is performed.[23] No explicit provisions in these models are made for multistack plume rise enhancement or the handling of such special plumes as flares; these problems should be considered on a case-by-case basis.

b. Gradual plume rise is generally recommended where its use is appropriate: (1) In AERMOD; (2) in complex terrain screening procedures to determine close-in impacts and (3) when calculating the effects of building wakes. The building wake algorithm in AERMOD incorporates and exercises the thermodynamically based gradual plume rise calculations as described in (a) above. If the building wake is calculated to affect the plume for any hour, gradual plume rise is also used in downwind dispersion calculations to the distance of final plume rise, after which final plume rise is used. Plumes captured by the near wake are re-emitted to the far wake as a ground-level volume source.

c. Stack tip downwash generally occurs with poorly constructed stacks and when the ratio of the stack exit velocity to wind speed is small. An algorithm developed by Briggs[77] is the recommended technique for this situation and is used in preferred models for point sources.

7.2.6 Chemical Transformation

a. The chemical transformation of $SO_2$ emitted from point sources or single industrial plants in rural areas is generally assumed to be relatively unimportant to the estimation of maximum concentrations when travel time is limited to a few hours. However, in urban areas, where synergistic effects among pollutants are of considerable consequence, chemical transformation rates may be of concern. In urban area applications, a half-life of 4 hours[75] may be applied to the analysis of $SO_2$ emissions. Calculations of transformation coefficients from site specific studies can be used to define a “half-life” to be used in a steady-state Gaussian plume model with any travel time, or in any application, if appropriate documentation is provided. Such conversion factors for pollutant half-life should not be used with screening analyses.

b. Use of models incorporating complex chemical mechanisms should be considered only on a case-by-case basis with proper demonstration of applicability. These are generally regional models not designed for the evaluation of individual sources but used primarily for region-wide evaluations. Visibility models also incorporate chemical transformation mechanisms which are an integral part of the visibility model itself and should be used in visibility assessments.

7.2.7 Gravitational Settling and Deposition

a. An “infinite half-life” should be used for estimates of particle concentrations when steady-state Gaussian plume models containing only exponential decay terms for treating settling and deposition are used.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

b. Gravitational settling and deposition may be directly included in a model if either is a significant factor. When particulate matter sources can be quantified and settling and dry deposition are problems, professional judgement should be used, and there should be coordination with the appropriate reviewing authority (paragraph 3.0(b)).

7.2.8 Complex Winds

a. Inhomogeneous Local Winds. In many parts of the United States, the ground is neither flat nor is the ground cover (or land use) uniform. These geographical variations can generate local winds and circulations, and modify the prevailing ambient winds and circulations. Geographic effects are most apparent when the ambient winds are light or calm. [79] In general these geographically induced wind circulation effects are named after the source location of the winds, e.g., lake and sea breezes, and mountain and valley winds. In very rugged hilly or mountainous terrain, along coastlines, or near large land use variations, the characterization of the winds is a balance of various forces, such that the assumptions of steady-state straight-line transport both in time and space are inappropriate. In the special cases described, the CALPUFF modeling system (described in Appendix A) may be applied on a case-by-case basis for air quality estimates in such complex non-steady-state meteorological conditions. The purpose of choosing a modeling system like CALPUFF is to fully treat the time and space variations of meteorology effects on transport and dispersion. The setup and application of the model should be determined in consultation with the appropriate reviewing authority (paragraph 3.0(b)) consistent with limitations of paragraph 3.2.2(e). The meteorological input data requirements for developing the time and space varying three-dimensional winds and dispersion meteorology for these situations are discussed in paragraphs 8.3.1.2(d) and 8.3.1.2(f). Examples of inhomogeneous winds include, but aren't limited to, situations described in the following paragraphs (i)--(iii):

i. Inversion Breakup Fumigation. Inversion breakup fumigation occurs when a plume (or multiple plumes) is emitted into a stable layer of air and that layer is subsequently mixed to the ground through convective transfer of heat from the surface or because of advection to less stable surroundings. Fumigation may cause excessively high concentrations but is usually rather short-lived at a given receptor. There are no recommended refined techniques to model this phenomenon. There are, however, screening procedures [24] that may be used to approximate the concentrations. Considerable care should be exercised in using the results obtained from the screening techniques.

ii. Shoreline Fumigation. Fumigation can be an important phenomenon on and near the shoreline of bodies of water. This can affect both individual plumes and area-wide emissions. When fumigation conditions are expected to occur from a source or sources with tall stacks located on or just inland of a shoreline, this should be addressed in the air quality modeling analysis. The Shoreline Dispersion Model (SDM) listed on EPA's Internet SCRAM Web site (subsection 2.3) may be applied on a case-by-case basis when air quality estimates under shoreline fumigation conditions are needed. [80] Information on the results of EPA's evaluation of this model together with other coastal fumigation models is available. [81] Selection of the appropriate model for applications where shoreline fumigation is of concern should be determined in consultation with the appropriate reviewing authority (paragraph 3.0(b)).

iii. Stagnation. Stagnation conditions are characterized by calm or very low wind speeds, and variable wind directions. These stagnant meteorological conditions may persist for several hours to several days. During stagnation conditions, the dispersion of air pollutants, especially those from low-level emissions sources, tends to be minimized, potentially leading to relatively high ground-level concentrations. If point sources are of interest, users should note the guidance provided for CALPUFF in paragraph (a) of this subsection. Selection of the appropriate model for applications where stagnation is of concern should be determined in consultation with the appropriate reviewing authority (paragraph 3.0(b)).

7.2.9 Calibration of Models

a. Calibration of models is not common practice and is subject to much error and misunderstanding. There have been attempts by some to compare model estimates and measurements on an event-by-event basis and then to calibrate a model with results of that comparison. This approach is severely limited by uncertainties in both source and meteorological data and therefore it

is difficult to precisely estimate the concentration at an exact location for a specific increment of time. Such uncertainties make calibration of models of questionable benefit. Therefore, model calibration is unacceptable.

8.0 Model Input Data

a. Data bases and related procedures for estimating input parameters are an integral part of the modeling procedure. The most appropriate data available should always be selected for use in modeling analyses. Concentrations can vary widely depending on the source data or meteorological data used. Input data are a major source of uncertainties in any modeling analysis. This section attempts to minimize the uncertainty associated with data base selection and use by identifying requirements for data used in modeling. A checklist of input data requirements for modeling analyses is posted on EPA's Internet SCRAM Web site (subsection 2.3). More specific data requirements and the format required for the individual models are described in detail in the users' guide for each model.

8.1 Source Data

8.1.1 Discussion

a. Sources of pollutants can be classified as point, line and area/volume sources. Point sources are defined in terms of size and may vary between regulatory programs. The line sources most frequently considered are roadways and streets along which there are well-defined movements of motor vehicles, but they may be lines of roof vents or stacks such as in aluminum refineries. Area and volume sources are often collections of a multitude of minor sources with individually small emissions that are impractical to consider as separate point or line sources. Large area sources are typically treated as a grid network of square areas, with pollutant emissions distributed uniformly within each grid square.

b. Emission factors are compiled in an EPA publication commonly known as AP–42 [82]; an indication of the quality and amount of data on which many of the factors are based is also provided. Other information concerning emissions is available in EPA publications relating to specific source categories. The appropriate reviewing authority (paragraph 3.0(b)) should be consulted to determine appropriate source definitions and for guidance concerning the determination of emissions from and techniques for modeling the various source types.

8.1.2 Recommendations

a. For point source applications the load or operating condition that causes maximum ground-level concentrations should be established. As a minimum, the source should be modeled using the design capacity (100 percent load). If a source operates at greater than design capacity for periods that could result in violations of the standards or PSD increments, this load) [a] should be modeled. Where the source operates at substantially less than design capacity, and the changes in the stack parameters associated with the operating conditions could lead to higher ground level concentrations, loads such as 50 percent and 75 percent of capacity should also be modeled. A range of operating conditions should be considered in screening analyses; the load causing the highest concentration, in addition to the design load, should be included in refined modeling. For a steam power plant, the following (b-h) is typical of the kind of data on source characteristics and operating conditions that may be needed. Generally, input data requirements for air quality models necessitate the use of metric units; where English units are common for engineering usage, a conversion to metric is required.

a Malfunctions which may result in excess emissions are not considered to be a normal operating condition. They generally should not be considered in determining allowable emissions. However, if the excess emissions are the result of poor maintenance, careless operation, or other preventable conditions, it may be necessary to consider them in determining source impact.

b. Plant layout. The connection scheme between boilers and stacks, and the distance and direction between stacks, building parameters (length, width, height, location and orientation relative to stacks) for plant structures which house boilers, control equipment, and surrounding buildings within a distance of approximately five stack heights.

c. Stack parameters. For all stacks, the stack height and inside diameter (meters), and the temperature (K) and volume flow rate (actual cubic meters per second) or exit gas velocity (meters per second) for operation at 100 percent, 75 percent and 50 percent load.

d. Boiler size. For all boilers, the associated megawatts, $10^6$ BTU/hr, and pounds of steam per hour, and the design and/or actual fuel consumption rate for 100 percent load for coal (tons/hour), oil (barrels/hour), and natural gas (thousand cubic feet/hour).

e. Boiler parameters. For all boilers, the percent excess air used, the boiler type (e.g., wet bottom, cyclone, etc.), and the type of firing (e.g., pulverized coal, front firing, etc.).

f. Operating conditions. For all boilers, the type, amount and pollutant contents of fuel, the total hours of boiler operation and the boiler capacity factor during the year, and the percent load for peak conditions.

g. Pollution control equipment parameters. For each boiler served and each pollutant affected, the type of emission control equipment, the year of its installation, its design efficiency and mass emission rate, the date of the last test and the tested efficiency, the number of hours of operation during the latest year, and the best engineering estimate of its projected efficiency if used in conjunction with coal combustion; data for any anticipated modifications or additions.

h. Data for new boilers or stacks. For all new boilers and stacks under construction and for all planned modifications to existing boilers or stacks, the scheduled date of completion, and the data or best estimates available for items (b) through (g) of this subsection following completion of construction or modification.

i. In stationary point source applications for compliance with short term ambient standards, SIP control strategies should be tested using the emission input shown on Table 8–1. When using a refined model, sources should be modeled sequentially with these loads for every hour of the year. To evaluate SIPs for compliance with quarterly and annual standards, emission input data shown in Table 8–1 should again be used. Emissions from area sources should generally be based on annual average conditions. The source input information in each model user's guide should be carefully consulted and the checklist (paragraph 8.0(a)) should also be consulted for other possible emission data that could be helpful. NAAQS compliance demonstrations in a PSD analysis should follow the emission input data shown in Table 8–2. For purposes of emissions trading, new source review and demonstrations, refer to current EPA policy and guidance to establish input data.

j. Line source modeling of streets and highways requires data on the width of the roadway and the median strip, the types and amounts of pollutant emissions, the number of lanes, the emissions from each lane and the height of emissions. The location of the ends of the straight roadway segments should be specified by appropriate grid coordinates. Detailed information and data requirements for modeling mobile sources of pollution are provided in the user's manuals for each of the models applicable to mobile sources.

k. The impact of growth on emissions should be considered in all modeling analyses covering existing sources. Increases in emissions due to planned expansion or planned fuel switches should be identified. Increases in emissions at individual sources that may be associated with a general industrial/commercial/residential expansion in multi-source urban areas should also be treated. For new sources the impact of growth on emissions should generally be considered for the period prior to the start-up date for the source. Such changes in emissions should treat increased area source emissions, changes in existing point source emissions which were not subject to preconstruction review, and emissions due to sources with permits to construct that have not yet started operation.

**Table 8-1.--Model Emission Input Data for Point Sources [1]**

| Averaging time | Emission limit (#/MMBtu) [2] | x | Operating Level (MMBtu/hr) [2] | x | Operating factor (e.g., hr/yr, hr/day) |
|---|---|---|---|---|---|
| Stationary Point Source(s) Subject to SIP Emission Limit(s) Evaluation for Compliance with Ambient Standards (Including Areawide Demonstrations) | | | | | |

| | | | |
|---|---|---|---|
| Annual & quarterly............ | Maximum allowable emission limit or federally enforceable permit limit. | Actual or design capacity (whichever is greater), or federally enforceable permit condition. | Actual operating factor averaged over most recent 2 years. [3] |
| Short term........................... | Maximum allowable emission limit or federally enforceable permit limit. | Actual or design capacity (whichever is greater), or federally enforceable permit condition. [4] | Continuous operation, i.e., all hours of each time period under consideration (for all hours of the meteorological data base). [5] |
| Nearby Source(s) [6 7] Same input requirements as for stationary point source(s) above. | | | |
| Other Source(s) [7] If modeled (subsection 8.2.3), input data requirements are defined below. | | | |
| Annual & quarterly............ | Maximum allowable emission limit or federally enforceable permit limit. [6] | Annual level when actually operating, averaged over the most recent 2 years. [3] | Actual operating factor averaged over the most recent 2 years. [3] |
| Short term........................... | Maximum allowable emission limit or federally enforceable permit limit. [6] | Annual level when actually operating, averaged over the most recent 2 years. [3] | Continuous operation, i.e., all hours of each time period under consideration (for all hours of the meteorological data base). [5] |

1 The model input data requirements shown on this table apply to stationary source control strategies for STATE IMPLEMENTATION PLANS. For purposes of emissions trading, new source review, or prevention of significant deterioration, other model input criteria may apply. Refer to the policy and guidance for these programs to establish the input data.

2 Terminology applicable to fuel burning sources; analogous terminology (e.g., #/throughput) may be used for other types of sources.

3 Unless it is determined that this period is not representative.

4 Operating levels such as 50 percent and 75 percent of capacity should also be modeled to determine the load causing the highest concentration.

5 If operation does not occur for all hours of the time period of consideration (e.g., 3 or 24 hours) and the source operation is constrained by a federally enforceable permit condition, an appropriate adjustment to the modeled emission rate may be made (e.g., if operation is only 8 a.m. to 4 p.m. each day, only these hours will be modeled with emissions from the source. Modeled emissions should not be averaged across non-operating time periods.)

6 See paragraph 8.2.3(c).

7 See paragraph 8.2.3(d).

**TABLE 8-2.--Point Source Model Emission Input Data for NAAQS Compliance in PSD Demonstrations**

| Averaging time | Emission limit (#/MMBtu) [1] | x | Operating level(MMBtu/hr) [1] | x | Operating factor (e.g., hr/yr, hr/day) |
|---|---|---|---|---|---|
| Proposed Major New or Modified Source | | | | | |
| Annual & quarterly............. | Maximum allowable emission limit or federally enforceable permit limit. | | Design capacity or federally enforceable permit condition. | | Continuous operation (i.e., 8760 hours). [2] |

| | | | |
|---|---|---|---|
| Short term (# 24 hours)........ | Maximum allowable emission limit or federally enforceable permit limit. | Design capacity or federally enforceable permit condition. [3] | Continuous operation, i.e., all hours of each time period under consideration (for all hours of the meteorological data base). [2] |
| Nearby Source(s) [4 6] | | | |
| Annual & quarterly............. | Maximum allowable emission limit or federally enforceable permit limit. [5] | Actual or design capacity (whichever is greater), or federally enforceable permit condition. | Actual operating factor averaged over the most recent 2 years. [7 8] |
| Short term (# 24 hours)........ | Maximum allowable emission limit or federally enforceable permit limit. [5] | Actual or design capacity (whichever is greater), or federally enforceable permit condition. [3] | Continuous operation, i.e., all hours of each time period under consideration (for all hours of the meteorological data base). [2] |
| Other Source(s) [6 9] | | | |
| Annual & quarterly............. | Maximum allowable emission limit or federally enforceable permit limit. [5] | Annual level when actually operating, averaged over the most recent 2 years. [7] | Actual operating factor averaged over the most recent 2 years. [7 8] |
| Short term (# 24 hours)........ | Maximum allowable emission limit or federally enforceable permit limit. [5] | Annual level when actually operating, averaged over the most recent 2 years. [7] | Continuous operation, i.e., all hours of each time period under consideration (for all hours of the meteorological data base). [2] |

8 For those permitted sources not in operation or that have not established an appropriate factor, continuous operation (i.e., 8760) should be used.

9 Generally, the ambient impacts from non-nearby (background) sources can be represented by air quality data unless adequate data do not exist.

## 8.2 Background Concentrations

### 8.2.1 Discussion

a. Background concentrations are an essential part of the total air quality concentration to be considered in determining source impacts. Background air quality includes pollutant concentrations due to: (1) Natural sources; (2) nearby sources other than the one(s) currently under consideration; and (3) unidentified sources.

b. Typically, air quality data should be used to establish background concentrations in the vicinity of the source(s) under consideration. The monitoring network used for background determinations should conform to the same quality assurance and other requirements as those networks established for PSD purposes.[83] An appropriate data validation procedure should be applied to the data prior to use.

c. If the source is not isolated, it may be necessary to use a multi-source model to establish the impact of nearby sources. Since sources don't typically operate at their maximum allowable capacity (which may include the use of “dirtier” fuels), modeling is necessary to express the potential contribution of background sources, and this impact would not be captured via monitoring. Background concentrations should be determined for each critical (concentration) averaging time.

### 8.2.2 Recommendations (Isolated Single Source)

a. Two options (paragraph (b) or (c) of this section) are available to determine the background concentration near isolated sources.

b. Use air quality data collected in the vicinity of the source to determine the background concentration for the averaging times of concern. Determine the mean background concentration at each monitor by excluding values when the source in question is impacting the monitor. The mean annual background is the average of the annual concentrations so determined at each monitor. For shorter averaging periods, the meteorological conditions accompanying the concentrations of concern should be identified. Concentrations for meteorological conditions of concern, at monitors not impacted by the source in question, should be averaged for each separate averaging time to determine the average background value. Monitoring sites inside a 90° sector downwind of the source may be used to determine the area of impact. One hour concentrations may be added and averaged to determine longer averaging periods.

c. If there are no monitors located in the vicinity of the source, a “regional site” may be used to determine background. A “regional site” is one that is located away from the area of interest but is impacted by similar natural and distant man-made sources.

8.2.3 Recommendations (Multi–Source Areas)

a. In multi-source areas, two components of background should be determined: contributions from nearby sources and contributions from other sources.

b. Nearby Sources: All sources expected to cause a significant concentration gradient in the vicinity of the source or sources under consideration for emission limit(s) should be explicitly modeled. The number of such sources is expected to be small except in unusual situations. Owing to both the uniqueness of each modeling situation and the large number of variables involved in identifying nearby sources, no attempt is made here to comprehensively define this term. Rather, identification of nearby sources calls for the exercise of professional judgement by the appropriate reviewing authority (paragraph 3.0(b)). This guidance is not intended to alter the exercise of that judgement or to comprehensively define which sources are nearby sources.

c. For compliance with the short-term and annual ambient standards, the nearby sources as well as the primary source(s) should be evaluated using an appropriate Appendix A model with the emission input data shown in Table 8–1 or 8–2. When modeling a nearby source that does not have a permit and the emission limit contained in the SIP for a particular source category is greater than the emissions possible given the source's maximum physical capacity to emit, the “maximum allowable emission limit” for such a nearby source may be calculated as the emission rate representative of the nearby source's maximum physical capacity to emit, considering its design specifications and allowable fuels and process materials. However, the burden is on the permit applicant to sufficiently document what the maximum physical capacity to emit is for such a nearby source.

d. It is appropriate to model nearby sources only during those times when they, by their nature, operate at the same time as the primary source(s) being modeled. Where a primary source believes that a nearby source does not, by its nature, operate at the same time as the primary source being modeled, the burden is on the primary source to demonstrate to the satisfaction of the appropriate reviewing authority (paragraph 3.0(b)) that this is, in fact, the case. Whether or not the primary source has adequately demonstrated that fact is a matter of professional judgement left to the discretion of the appropriate reviewing authority. The following examples illustrate two cases in which a nearby source may be shown not to operate at the same time as the primary source(s) being modeled. Some sources are only used during certain seasons of the year. Those sources would not be modeled as nearby sources during times in which they do not operate. Similarly, emergency backup generators that never operate simultaneously with the sources that they back up would not be modeled as nearby sources. To reiterate, in these examples and other appropriate cases, the burden is on the primary source being modeled to make the appropriate demonstration to the satisfaction of the appropriate reviewing authority.

e. The impact of the nearby sources should be examined at locations where interactions between the plume of the point source under consideration and those of nearby sources (plus natural background) can occur. Significant locations include: (1) the area of maximum impact of the point source; (2) the area of maximum impact of nearby sources; and (3) the area where all sources combine to cause maximum impact. These locations may be identified through trial and error analyses.

f. Other Sources: That portion of the background attributable to all other sources (e.g., natural sources, minor sources and distant major sources) should be determined by the procedures found in subsection 89.2.2 or by application of a model using Table 8–1 or 8–2.

8.3 Meteorological Input Data

a. The meteorological data used as input to a dispersion model should be selected on the basis of spatial and climatological (temporal) representativeness as well as the ability of the individual parameters selected to characterize the transport and dispersion conditions in the area of concern. The representativeness of the data is dependent on: (1) The proximity of the meteorological monitoring site to the area under consideration; (2) the complexity of the terrain; (3) the exposure of the meteorological monitoring site; and (4) the period of time during which data are collected. The spatial representativeness of the data can be adversely affected by large distances between the source and receptors of interest and the complex topographic characteristics of the area. Temporal representativeness is a function of the year-to-year variations in weather conditions. Where appropriate, data representativeness should be viewed in terms of the appropriateness of the data for constructing realistic boundary layer profiles and three dimensional meteorological fields, as described in paragraphs (c) and (d) below.

b. Model input data are normally obtained either from the National Weather Service or as part of a site specific measurement program. Local universities, Federal Aviation Administration (FAA), military stations, industry and pollution control agencies may also be sources of such data. Some recommendations for the use of each type of data are included in this subsection.

c. Regulatory application of AERMOD requires careful consideration of minimum data for input to AERMET. Data representativeness, in the case of AERMOD, means utilizing data of an appropriate type for constructing realistic boundary layer profiles. Of paramount importance is the requirement that all meteorological data used as input to AERMOD must be both laterally and vertically representative of the transport and dispersion within the analysis domain. Where surface conditions vary significantly over the analysis domain, the emphasis in assessing representativeness should be given to adequate characterization of transport and dispersion between the source(s) of concern and areas where maximum design concentrations are anticipated to occur. The representativeness of data that were collected off-site should be judged, in part, by comparing the surface characteristics in the vicinity of the meteorological monitoring site with the surface characteristics that generally describe the analysis domain. The surface characteristics input to AERMET should be based on the topographic conditions in the vicinity of the meteorological tower. Furthermore, since the spatial scope of each variable could be different, representativeness should be judged for each variable separately. For example, for a variable such as wind direction, the data may need to be collected very near plume height to be adequately representative, whereas, for a variable such as temperature, data from a station several kilometers away from the source may in some cases be considered to be adequately representative.

d. For long range transport modeling assessments (subsection 6.2.3) or for assessments where the transport winds are complex and the application involves a non-steady-state dispersion model (subsection 7.2.8), use of output from prognostic mesoscale meteorological models is encouraged.[84 85 86] Some diagnostic meteorological processors are designed to appropriately blend available NWS comparable meteorological observations, local site specific meteorological observations, and prognostic mesoscale meteorological data, using empirical relationships, to diagnostically adjust the wind field for mesoscale and local-scale effects. These diagnostic adjustments can sometimes be improved through the use of strategically placed site specific meteorological observations. The placement of these special meteorological observations (often more than one location is needed) involves expert judgement, and is specific to the terrain and land use of the modeling domain. Acceptance for use of output from prognostic mesoscale meteorological models is contingent on concurrence by the appropriate reviewing authorities (paragraph 3.0(b)) that the data are of acceptable quality, which can be demonstrated through statistical comparisons with observations of winds aloft and at the surface at several appropriate locations.

8.3.1 Length of Record of Meteorological Data

8.3.1.1 Discussion

a. The model user should acquire enough meteorological data to ensure that worst-case meteorological conditions are adequately represented in the model results. The trend toward statistically based standards suggests a need for all meteorological conditions to be adequately represented in the data set selected for model input. The number of years of record needed to obtain a stable distribution of conditions depends on the variable being measured and has been estimated by Landsberg and Jacobs [87] for various parameters. Although that study indicates in excess of 10 years may be required to achieve stability in the frequency distributions of some meteorological variables, such long periods are not reasonable for model input data. This is due in part to the fact that hourly data in model input format are frequently not available for such periods and that hourly calculations of concentration for long periods may be prohibitively expensive. Another study [88] compared various periods from a 17–year data set to determine the minimum number of years of data needed to approximate the concentrations modeled with a 17–year period of meteorological data from one station. This study indicated that the variability of model estimates due to the meteorological data input was adequately reduced if a 5–year period of record of meteorological input was used.

8.3.1.2 Recommendations

a. Five years of representative meteorological data should be used when estimating concentrations with an air quality model. Consecutive years from the most recent, readily available 5–year period are preferred. The meteorological data should be adequately representative, and may be site specific or from a nearby NWS station. Where professional judgment indicates NWS–collected ASOS (automated surface observing stations) data are inadequate {for cloud cover observations}, the most recent 5 years of NWS data that are observer-based may be considered for use.

b. The use of 5 years of NWS meteorological data or at least l year of site specific data is required. If one year or more (including partial years), up to five years, of site specific data is available, these data are preferred for use in air quality analyses. Such data should have been subjected to quality assurance procedures as described in subsection 8.3.3.2.

c. For permitted sources whose emission limitations are based on a specific year of meteorological data, that year should be added to any longer period being used (e.g., 5 years of NWS data) when modeling the facility at a later time.

d. For LRT situations (subsection 6.2.3) and for complex wind situations (paragraph 7.2.8(a)), if only NWS or comparable standard meteorological observations are employed, five years of meteorological data (within and near the modeling domain) should be used. Consecutive years from the most recent, readily available 5–year period are preferred. Less than five, but at least three, years of meteorological data (need not be consecutive) may be used if mesoscale meteorological fields are available, as discussed in paragraph 8.3(d). These mesoscale meteorological fields should be used in conjunction with available standard NWS or comparable meteorological observations within and near the modeling domain.

e. For solely LRT applications (subsection 6.2.3), if site specific meteorological data are available, these data may be helpful when used in conjunction with available standard NWS or comparable observations and mesoscale meteorological fields as described in paragraph 8.3.1.2(d).

f. For complex wind situations (paragraph 7.2.8(a)) where site specific meteorological data are being relied upon as the basis for characterizing the meteorological conditions, a data base of at least 1 full-year of meteorological data is required. If more data are available, they should be used. Site specific meteorological data may have to be collected at multiple locations. Such data should have been subjected to quality assurance procedures as described in paragraph 8.3.3.2(a), and should be reviewed for spatial and temporal representativeness.

8.3.2 National Weather Service Data

8.3.2.1 Discussion

a. The NWS meteorological data are routinely available and familiar to most model users. Although the NWS does not provide direct measurements of all the needed dispersion model input variables, methods have been developed and successfully used to translate the basic NWS data to the needed model input. Site specific measurements of model input parameters have been made

for many modeling studies, and those methods and techniques are becoming more widely applied, especially in situations such as complex terrain applications, where available NWS data are not adequately representative. However, there are many model applications where NWS data are adequately representative, and the applications still rely heavily on the NWS data.

b. Many models use the standard hourly weather observations available from the National Climatic Data Center (NCDC). These observations are then preprocessed before they can be used in the models.

8.3.2.2 Recommendations

a. The preferred models listed in Appendix A all accept as input the NWS meteorological data preprocessed into model compatible form. If NWS data are judged to be adequately representative for a particular modeling application, they may be used. NCDC makes available surface [89] [90] and upper air [91] meteorological data in CD–ROM format.

b. Although most NWS measurements are made at a standard height of 10 meters, the actual anemometer height should be used as input to the preferred model. Note that AERMOD at a minimum requires wind observations at a height above ground between seven times the local surface roughness height and 100 meters.

c. Wind directions observed by the National Weather Service are reported to the nearest 10 degrees. A specific set of randomly generated numbers has been developed for use with the preferred EPA models and should be used with NWS data to ensure a lack of bias in wind direction assignments within the models.

d. Data from universities, FAA, military stations, industry and pollution control agencies may be used if such data are equivalent in accuracy and detail to the NWS data, and they are judged to be adequately representative for the particular application.

8.3.3 Site Specific Data

8.3.3.1 Discussion

a. Spatial or geographical representativeness is best achieved by collection of all of the needed model input data in close proximity to the actual site of the source(s). Site specific measured data are therefore preferred as model input, provided that appropriate instrumentation and quality assurance procedures are followed and that the data collected are adequately representative (free from inappropriate local or microscale influences) and compatible with the input requirements of the model to be used. It should be noted that, while site specific measurements are frequently made “on-property” (i.e., on the source's premises), acquisition of adequately representative site specific data does not preclude collection of data from a location off property. Conversely, collection of meteorological data on a source's property does not of itself guarantee adequate representativeness. For help in determining representativeness of site specific measurements, technical guidance [92] is available. Site specific data should always be reviewed for representativeness and consistency by a qualified meteorologist.

8.3.3.2 Recommendations

a. EPA guidance [92] provides recommendations on the collection and use of site specific meteorological data. Recommendations on characteristics, siting, and exposure of meteorological instruments and on data recording, processing, completeness requirements, reporting, and archiving are also included. This publication should be used as a supplement to other limited guidance on these subjects. [83] [93] [94] Detailed information on quality assurance is also available. [95] As a minimum, site specific measurements of ambient air temperature, transport wind speed and direction, and the variables necessary to estimate atmospheric dispersion should be available in meteorological data sets to be used in modeling. Care should be taken to ensure that meteorological instruments are located to provide representative characterization of pollutant transport between sources and receptors of interest. The appropriate reviewing authority (paragraph 3.0(b)) is available to help determine the appropriateness of the measurement locations.

b. All site specific data should be reduced to hourly averages. Table 8–3 lists the wind related parameters and the averaging time requirements.

c. Missing Data Substitution. After valid data retrieval requirements have been met [92], hours in the record having missing data should be treated according to an established data substitution protocol provided that data from an adequately representative alternative site are available. Such protocols are usually part of the approved monitoring program plan. Data substitution guidance is provided in Section 5.3 of reference 92. If no representative alternative data are available for substitution, the absent data should be coded as missing using missing data codes appropriate to the applicable meteorological pre-processor. Appropriate model options for treating missing data, if available in the model, should be employed.

d. Solar Radiation Measurements. Total solar radiation or net radiation should be measured with a reliable pyranometer or net radiometer, sited and operated in accordance with established site specific meteorological guidance. [92] [95]

e. Temperature Measurements. Temperature measurements should be made at standard shelter height (2m) in accordance with established site specific meteorological guidance. [92]

f. Temperature Difference Measurements. Temperature difference (DeltaT) measurements should be obtained using matched thermometers or a reliable thermocouple system to achieve adequate accuracy. Siting, probe placement, and operation of DeltaT systems should be based on guidance found in Chapter 3 of reference 92, and such guidance should be followed when obtaining vertical temperature gradient data. AERMET employs the Bulk Richardson scheme which requires measurements of temperature difference. To ensure correct application and acceptance, AERMOD users should consult with the appropriate Reviewing Authority before using the Bulk Richardson scheme for their analysis.

g. Winds Aloft. For simulation of plume rise and dispersion of a plume emitted from a stack, characterization of the wind profile up through the layer in which the plume disperses is required. This is especially important in complex terrain and/or complex wind situations where wind measurements at heights up to hundreds of meters above stack base may be required in some circumstances. For tall stacks when site specific data are needed, these winds have been obtained traditionally using meteorological sensors mounted on tall towers. A feasible alternative to tall towers is the use of meteorological remote sensing instruments (e.g., acoustic sounders or radar wind profilers) to provide winds aloft, coupled with 10–meter towers to provide the near-surface winds. (For specific requirements for AERMOD and CTDMPLUS, see Appendix A.) Specifications for wind measuring instruments and systems are contained in reference 92.

h. Turbulence. There are several dispersion models that are capable of using direct measurements of turbulence (wind fluctuations) in the characterization of the vertical and lateral dispersion (e.g., CTDMPLUS, AERMOD, and CALPUFF). For specific requirements for CTDMPLUS, AERMOD, and CALPUFF, see Appendix A. For technical guidance on measurement and processing of turbulence parameters, see reference 92. When turbulence data are used in this manner to directly characterize the vertical and lateral dispersion, the averaging time for the turbulence measurements should be one hour (Table 8–3). There are other dispersion models (e.g., BLP, and CALINE3) that employ P–G stability categories for the characterization of the vertical and lateral dispersion. Methods for using site specific turbulence data for the characterization of P–G stability categories are discussed in reference 92. When turbulence data are used in this manner to determine the P–G stability category, the averaging time for the turbulence measurements should be 15 minutes.

i. Stability Categories. For dispersion models that employ P–G stability categories for the characterization of the vertical and lateral dispersion, the P–G stability categories, as originally defined, couple near-surface measurements of wind speed with subjectively determined insolation assessments based on hourly cloud cover and ceiling height observations. The wind speed measurements are made at or near 10m. The insolation rate is typically assessed using observations of cloud cover and ceiling height based on criteria outlined by Turner. [70] It is recommended that the P–G stability category be estimated using the Turner method with site specific wind speed measured at or near 10m and representative cloud cover and ceiling height. Implementation of the Turner method, as well as considerations in determining representativeness of cloud cover and ceiling height in cases for which site specific cloud observations are unavailable, may be found in Section 6 of reference 92. In the absence of requisite data to implement the Turner method, the SRDT method or wind fluctuation statistics (i.e., the $\#_E$ and $\#_A$ methods) may be used.

j. The SRDT method, described in Section 6.4.4.2 of reference 92, is modified slightly from that published from earlier work [96] and has been evaluated with three site specific data bases. [97] The two methods of stability classification which use wind fluctuation statistics, the $\#_E$ and $\#_A$ methods, are also described in detail in Section 6.4.4 of reference 92 (note applicable tables in Section 6). For additional information on the wind fluctuation methods, several references are available. [98] [99] [100] [101]

k. Meteorological Data Preprocessors. The following meteorological preprocessors are recommended by EPA: AERMET, [102] PCRAMMET, [103] MPRM, [104] METPRO, [105] and CALMET [106] AERMET, which is patterned after MPRM, should be used to preprocess all data for use with AERMOD. Except for applications that employ AERMOD, PCRAMMET is the recommended meteorological preprocessor for use in applications employing hourly NWS data. MPRM is a general purpose meteorological data preprocessor which supports regulatory models requiring PCRAMMET formatted (NWS) data. MPRM is available for use in applications employing site specific meteorological data. The latest version (MPRM 1.3) has been configured to implement the SRDT method for estimating P–G stability categories. METPRO is the required meteorological data preprocessor for use with CTDMPLUS. CALMET is available for use with applications of CALPUFF. All of the above mentioned data preprocessors are available for downloading from EPA's Internet SCRAM Web site (subsection 2.3).

**Table 8-3.--Averaging Times for Site Specific Wind and Turbulence Measurements**

| Parameter | Averaging time (hour) |
|---|---|
| Surface wind speed (for use in stability determinations)......... | 1 |
| Transport direction................................................................ | 1 |
| Dilution wind speed.............................................................. | 1 |
| Turbulence measurements ($\#_E$ and $\#_A$) for use in stability determinations......................................................................... | 1 [1] |
| Turbulence measurements for direct input to dispersion models..................................................................................... | 1 |

$$\sigma_{1\,hr} = \sqrt{\frac{\sigma_{15}^2 + \sigma_{15}^2 + \sigma_{15}^2 + \sigma_{15}^2}{4}}$$

8.3.4 Treatment of Near–Calms and Calms

8.3.4.1 Discussion

a. Treatment of calm or light and variable wind poses a special problem in model applications since steady-state Gaussian plume models assume that concentration is inversely proportional to wind speed. Furthermore, concentrations may become unrealistically large when wind speeds less than 1 m/s are input to the model. Procedures have been developed to prevent the occurrence of overly conservative concentration estimates during periods of calms. These procedures acknowledge that a steady-state Gaussian plume model does not apply during calm conditions, and that our knowledge of wind patterns and plume behavior during these conditions does not, at present, permit the development of a better technique. Therefore, the procedures disregard hours which are identified as calm. The hour is treated as missing and a convention for handling missing hours is recommended.

b. AERMOD, while fundamentally a steady-state Gaussian plume model, contains algorithms for dealing with low wind speed (near calm) conditions. As a result, AERMOD can produce model estimates for conditions when the wind speed may be less than 1 m/s, but still greater than the instrument threshold. Required input to AERMET, the meteorological processor for AERMOD, includes a threshold wind speed and a reference wind speed. The threshold wind speed is typically the threshold of the instrument used to collect the wind speed data. The reference wind speed is selected by the model as the lowest level of non-missing wind speed and direction data where the speed is greater than the wind speed threshold, and the height of the measurement is between seven times the local surface roughness and 100 meters. If the only valid observation of the reference wind speed between these heights is less than the threshold, the hour is considered calm, and no concentration is calculated. None of the

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

observed wind speeds in a measured wind profile that are less than the threshold speed are used in construction of the modeled wind speed profile in AERMOD.

8.3.4.2 Recommendations

a. Hourly concentrations calculated with steady-state Gaussian plume models using calms should not be considered valid; the wind and concentration estimates for these hours should be disregarded and considered to be missing. Critical concentrations for 3–, 8–, and 24–hour averages should be calculated by dividing the sum of the hourly concentrations for the period by the number of valid or non-missing hours. If the total number of valid hours is less than 18 for 24–hour averages, less than 6 for 8–hour averages or less than 3 for 3–hour averages, the total concentration should be divided by 18 for the 24–hour average, 6 for the 8–hour average and 3 for the 3–hour average. For annual averages, the sum of all valid hourly concentrations is divided by the number of non-calm hours during the year. AERMOD has been coded to implement these instructions. For models listed in Appendix A, a post-processor computer program, CALMPRO [107] has been prepared, is available on the SCRAM Internet Web site (subsection 2.3), and should be used.

b. Stagnant conditions that include extended periods of calms often produce high concentrations over wide areas for relatively long averaging periods. The standard steady-state Gaussian plume models are often not applicable to such situations. When stagnation conditions are of concern, other modeling techniques should be considered on a case-by-case basis (see also subsection 7.2.8).

c. When used in steady-state Gaussian plume models, measured site specific wind speeds of less than 1 m/s but higher than the response threshold of the instrument should be input as 1 m/s; the corresponding wind direction should also be input. Wind observations below the response threshold of the instrument should be set to zero, with the input file in ASCII format. For input to AERMOD, no adjustment should be made to the site specific wind data. In all cases involving steady-state Gaussian plume models, calm hours should be treated as missing, and concentrations should be calculated as in paragraph (a) of this subsection.

9.0 Accuracy and Uncertainty of Models

9.1 Discussion

a. Increasing reliance has been placed on concentration estimates from models as the primary basis for regulatory decisions concerning source permits and emission control requirements. In many situations, such as review of a proposed source, no practical alternative exists. Therefore, there is an obvious need to know how accurate models really are and how any uncertainty in the estimates affects regulatory decisions. During the 1980's, attempts were made to encourage development of standardized evaluation methods. [11] [108] EPA recognized the need for incorporating such information and has sponsored workshops [109] on model accuracy, the possible ways to quantify accuracy, and on considerations in the incorporation of model accuracy and uncertainty in the regulatory process. The Second (EPA) Conference on Air Quality Modeling, August 1982 [110], was devoted to that subject.

b. To better deduce the statistical significance of differences seen in model performance in the face of unaccounted for uncertainties and variations, investigators have more recently explored the use of bootstrap techniques. [111] [112] Work is underway to develop a new generation of evaluation metrics [16] that takes into account the statistical differences (in error distributions) between model predictions and observations. [113] Even though the procedures and measures are still evolving to describe performance of models that characterize atmospheric fate, transport and diffusion [114] [115] [116], there has been general acceptance of a need to address the uncertainties inherent in atmospheric processes.

9.1.1 Overview of Model Uncertainty

a. Dispersion models generally attempt to estimate concentrations at specific sites that really represent an ensemble average of numerous repetitions of the same event. [16] The event is characterized by measured or “known” conditions that are input to

the models, e.g., wind speed, mixed layer height, surface heat flux, emission characteristics, etc. However, in addition to the known conditions, there are unmeasured or unknown variations in the conditions of this event, e.g., unresolved details of the atmospheric flow such as the turbulent velocity field. These unknown conditions, may vary among repetitions of the event. As a result, deviations in observed concentrations from their ensemble average, and from the concentrations estimated by the model, are likely to occur even though the known conditions are fixed. Even with a perfect model that predicts the correct ensemble average, there are likely to be deviations from the observed concentrations in individual repetitions of the event, due to variations in the unknown conditions. The statistics of these concentration residuals are termed “inherent” uncertainty. Available evidence suggests that this source of uncertainty alone may be responsible for a typical range of variation in concentrations of as much as ±50 percent. [117]

b. Moreover, there is “reducible” uncertainty [108] associated with the model and its input conditions; neither models nor data bases are perfect. Reducible uncertainties are caused by: (1) Uncertainties in the input values of the known conditions (i.e., emission characteristics and meteorological data); (2) errors in the measured concentrations which are used to compute the concentration residuals; and (3) inadequate model physics and formulation. The “reducible” uncertainties can be minimized through better (more accurate and more representative) measurements and better model physics.

c. To use the terminology correctly, reference to model accuracy should be limited to that portion of reducible uncertainty which deals with the physics and the formulation of the model. The accuracy of the model is normally determined by an evaluation procedure which involves the comparison of model concentration estimates with measured air quality data. [118] The statement of accuracy is based on statistical tests or performance measures such as bias, noise, correlation, etc. [11] However, information that allows a distinction between contributions of the various elements of inherent and reducible uncertainty is only now beginning to emerge. [16] As a result most discussions of the accuracy of models make no quantitative distinction between (1) limitations of the model versus (2) limitations of the data base and of knowledge concerning atmospheric variability. The reader should be aware that statements on model accuracy and uncertainty may imply the need for improvements in model performance that even the “perfect” model could not satisfy.

9.1.2 Studies of Model Accuracy

a. A number of studies [119] [120] have been conducted to examine model accuracy, particularly with respect to the reliability of short-term concentrations required for ambient standard and increment evaluations. The results of these studies are not surprising. Basically, they confirm what expert atmospheric scientists have said for some time: (1) Models are more reliable for estimating longer time-averaged concentrations than for estimating short-term concentrations at specific locations; and (2) the models are reasonably reliable in estimating the magnitude of highest concentrations occurring sometime, somewhere within an area. For example, errors in highest estimated concentrations of ± 10 to 40 percent are found to be typical [121] [122], i.e., certainly well within the often quoted factor-of-two accuracy that has long been recognized for these models. However, estimates of concentrations that occur at a specific time and site, are poorly correlated with actually observed concentrations and are much less reliable.

b. As noted above, poor correlations between paired concentrations at fixed stations may be due to “reducible” uncertainties in knowledge of the precise plume location and to unquantified inherent uncertainties. For example, Pasquill [123] estimates that, apart from data input errors, maximum ground-level concentrations at a given hour for a point source in flat terrain could be in error by 50 percent due to these uncertainties. Uncertainty of five to 10 degrees in the measured wind direction, which transports the plume, can result in concentration errors of 20 to 70 percent for a particular time and location, depending on stability and station location. Such uncertainties do not indicate that an estimated concentration does not occur, only that the precise time and locations are in doubt.

9.1.3 Use of Uncertainty in Decision–Making

a. The accuracy of model estimates varies with the model used, the type of application, and site specific characteristics. Thus, it is desirable to quantify the accuracy or uncertainty associated with concentration estimates used in decision-making. Communications between modelers and decision-makers must be fostered and further developed. Communications concerning concentration estimates currently exist in most cases, but the communications dealing with the accuracy of models and its meaning to the decision-maker are limited by the lack of a technical basis for quantifying and directly including uncertainty in decisions. Procedures for quantifying and interpreting uncertainty in the practical application of such concepts are only beginning to evolve; much study is still required. [108] [109] [110] [124] [125]

b. In all applications of models an effort is encouraged to identify the reliability of the model estimates for that particular area and to determine the magnitude and sources of error associated with the use of the model. The analyst is responsible for recognizing and quantifying limitations in the accuracy, precision and sensitivity of the procedure. Information that might be useful to the decision-maker in recognizing the seriousness of potential air quality violations includes such model accuracy estimates as accuracy of peak predictions, bias, noise, correlation, frequency distribution, spatial extent of high concentration, etc. Both space/time pairing of estimates and measurements and unpaired comparisons are recommended. Emphasis should be on the highest concentrations and the averaging times of the standards or increments of concern. Where possible, confidence intervals about the statistical values should be provided. However, while such information can be provided by the modeler to the decision-maker, it is unclear how this information should be used to make an air pollution control decision. Given a range of possible outcomes, it is easiest and tends to ensure consistency if the decision-maker confines his judgement to use of the "best estimate" provided by the modeler (i.e., the design concentration estimated by a model recommended in the Guideline or an alternate model of known accuracy). This is an indication of the practical limitations imposed by current abilities of the technical community.

c. To improve the basis for decision-making, EPA has developed and is continuing to study procedures for determining the accuracy of models, quantifying the uncertainty, and expressing confidence levels in decisions that are made concerning emissions controls. [126] [127] However, work in this area involves "breaking new ground" with slow and sporadic progress likely. As a result, it may be necessary to continue using the "best estimate" until sufficient technical progress has been made to meaningfully implement such concepts dealing with uncertainty.

9.1.4 Evaluation of Models

a. A number of actions have been taken to ensure that the best model is used correctly for each regulatory application and that a model is not arbitrarily imposed. First, the Guideline clearly recommends the most appropriate model be used in each case. Preferred models, based on a number of factors, are identified for many uses. General guidance on using alternatives to the preferred models is also provided. Second, the models have been subjected to a systematic performance evaluation and a peer scientific review. Statistical performance measures, including measures of difference (or residuals) such as bias, variance of difference and gross variability of the difference, and measures of correlation such as time, space, and time and space combined as recommended by the AMS Woods Hole Workshop [11], were generally followed. Third, more specific information has been provided for justifying the site specific use of alternative models in previously cited EPA guidance [15], and new models are under consideration and review. [16] Together these documents provide methods that allow a judgement to be made as to what models are most appropriate for a specific application. For the present, performance and the theoretical evaluation of models are being used as an indirect means to quantify one element of uncertainty in air pollution regulatory decisions.

b. EPA has participated in a series of conferences entitled, "Harmonisation within Atmospheric Dispersion Modelling for Regulatory Purposes." [128] for the purpose of promoting the development of improved methods for the characterization of model performance. There is a consensus developing on what should be considered in the evaluation of air quality models [129], namely quality assurance planning, documentation and scrutiny should be consistent with the intended use, and should include:

• Scientific peer review;

• Supportive analyses (diagnostic evaluations, code verification, sensitivity and uncertainty analyses);

• Diagnostic and performance evaluations with data obtained in trial locations, and

• Statistical performance evaluations in the circumstances of the intended applications.

Performance evaluations and diagnostic evaluations assess different qualities of how well a model is performing, and both are needed to establish credibility within the client and scientific community. Performance evaluations allow us to decide how well the model simulates the average temporal and spatial patterns seen in the observations, and employ large spatial/temporal scale data sets (e.g., national data sets). Performance evaluations also allow determination of relative performance of a model in comparison with alternative modeling systems. Diagnostic evaluations allow determination of a model capability to simulate individual processes that affect the results, and usually employ smaller spatial/temporal scale date sets (e.g., field studies). Diagnostic evaluations allow us to decide if we get the right answer for the right reason. The objective comparison of modeled concentrations with observed field data provides only a partial means for assessing model performance. Due to the limited supply of evaluation data sets, there are severe practical limits in assessing model performance. For this reason, the conclusions reached in the science peer reviews and the supportive analyses have particular relevance in deciding whether a model will be useful for its intended purposes.

c. To extend information from diagnostic and performance evaluations, sensitivity and uncertainty analyses are encouraged since they can provide additional information on the effect of inaccuracies in the data bases and on the uncertainty in model estimates. Sensitivity analyses can aid in determining the effect of inaccuracies of variations or uncertainties in the data bases on the range of likely concentrations. Uncertainty analyses can aid in determining the range of likely concentration values, resulting from uncertainties in the model inputs, the model formulations, and parameterizations. Such information may be used to determine source impact and to evaluate control strategies. Where possible, information from such sensitivity analyses should be made available to the decision-maker with an appropriate interpretation of the effect on the critical concentrations.

9.2 Recommendations

a. No specific guidance on the quantification of model uncertainty for use in decision-making is being given at this time. As procedures for considering uncertainty develop and become implementable, this guidance will be changed and expanded. For the present, continued use of the "best estimate" is acceptable; however, in specific circumstances for $O_3$, PM–2.5 and regional haze, additional information and/or procedures may be appropriate. [32] [33]

10.0 Regulatory Application of Models

10.1 Discussion

a. Procedures with respect to the review and analysis of air quality modeling and data analyses in support of SIP revisions, PSD permitting or other regulatory requirements need a certain amount of standardization to ensure consistency in the depth and comprehensiveness of both the review and the analysis itself. This section recommends procedures that permit some degree of standardization while at the same time allowing the flexibility needed to assure the technically best analysis for each regulatory application.

b. Dispersion model estimates, especially with the support of measured air quality data, are the preferred basis for air quality demonstrations. Nevertheless, there are instances where the performance of recommended dispersion modeling techniques, by comparison with observed air quality data, may be shown to be less than acceptable. Also, there may be no recommended modeling procedure suitable for the situation. In these instances, emission limitations may be established solely on the basis of observed air quality data as would be applied to a modeling analysis. The same care should be given to the analyses of the air quality data as would be applied to a modeling analysis.

c. The current NAAQS for $SO_2$ and CO are both stated in terms of a concentration not to be exceeded more than once a year. There is only an annual standard for $NO_2$ and a quarterly standard for Pb. Standards for fine particulate matter (PM–2.5) are expressed in terms of both long-term (annual) and short-term (daily) averages. The long-term standard is calculated using the three year average of the annual averages while the short-term standard is calculated using the three year average of the 98th percentile of the daily average concentration. For PM–10, the convention is to compare the arithmetic mean, averaged over 3 consecutive years, with the concentration specified in the NAAQS (50 $\mu g/m^3$). The 24–hour NAAQS (150 $\mu g/m^3$) is met if, over a 3–year period, there is (on average) no more than one exceedance per year. As noted in subsection 7.2.1.1, the modeled compliance for this NAAQS is based on the highest 6th highest concentration over 5 years. For ozone the short term 1–hour standard is expressed in terms of an expected exceedance limit while the short term 8–hour standard is expressed in terms of a three year average of the annual fourth highest daily maximum 8–hour value. The NAAQS are subjected to extensive review and possible revision every 5 years.

d. This section discusses general requirements for concentration estimates and identifies the relationship to emission limits. The following recommendations apply to: (1) Revisions of State Implementation Plans and (2) the review of new sources and the prevention of significant deterioration (PSD).

## 10.2 Recommendations

### 10.2.1 Analysis Requirements

a. Every effort should be made by the Regional Office to meet with all parties involved in either a SIP revision or a PSD permit application prior to the start of any work on such a project. During this meeting, a protocol should be established between the preparing and reviewing parties to define the procedures to be followed, the data to be collected, the model to be used, and the analysis of the source and concentration data. An example of requirements for such an effort is contained in the Air Quality Analysis Checklist posted on EPA's Internet SCRAM Web site (subsection 2.3). This checklist suggests the level of detail required to assess the air quality resulting from the proposed action. Special cases may require additional data collection or analysis and this should be determined and agreed upon at this preapplication meeting. The protocol should be written and agreed upon by the parties concerned, although a formal legal document is not intended. Changes in such a protocol are often required as the data collection and analysis progresses. However, the protocol establishes a common understanding of the requirements.

b. An air quality analysis should begin with a screening model to determine the potential of the proposed source or control strategy to violate the PSD increment or NAAQS. For traditional stationary sources, EPA guidance [24] should be followed. Guidance is also available for mobile sources. [48]

c. If the concentration estimates from screening techniques indicate a significant impact or that the PSD increment or NAAQS may be approached or exceeded, then a more refined modeling analysis is appropriate and the model user should select a model according to recommendations in Sections 4–8. In some instances, no refined technique may be specified in this guide for the situation. The model user is then encouraged to submit a model developed specifically for the case at hand. If that is not possible, a screening technique may supply the needed results.

d. Regional Offices should require permit applicants to incorporate the pollutant contributions of all sources into their analysis. Where necessary this may include emissions associated with growth in the area of impact of the new or modified source. PSD air quality assessments should consider the amount of the allowable air quality increment that has already been consumed by other sources. Therefore, the most recent source applicant should model the existing or permitted sources in addition to the one currently under consideration. This would permit the use of newly acquired data or improved modeling techniques if such have become available since the last source was permitted. When remodeling, the worst case used in the previous modeling analysis should be one set of conditions modeled in the new analysis. All sources should be modeled for each set of meteorological conditions selected.

### 10.2.2 Use of Measured Data in Lieu of Model Estimates

a. Modeling is the preferred method for determining emission limitations for both new and existing sources. When a preferred model is available, model results alone (including background) are sufficient. Monitoring will normally not be accepted as the sole basis for emission limitation. In some instances when the modeling technique available is only a screening technique, the addition of air quality data to the analysis may lend credence to model results.

b. There are circumstances where there is no applicable model, and measured data may need to be used. However, only in the case of a NAAQS assessment for an existing source should monitoring data alone be a basis for emission limits. In addition, the following items (i-vi) should be considered prior to the acceptance of the measured data:

i. Does a monitoring network exist for the pollutants and averaging times of concern?

ii. Has the monitoring network been designed to locate points of maximum concentration?

iii. Do the monitoring network and the data reduction and storage procedures meet EPA monitoring and quality assurance requirements?

iv. Do the data set and the analysis allow impact of the most important individual sources to be identified if more than one source or emission point is involved?

v. Is at least one full year of valid ambient data available?

vi. Can it be demonstrated through the comparison of monitored data with model results that available models are not applicable?

c. The number of monitors required is a function of the problem being considered. The source configuration, terrain configuration, and meteorological variations all have an impact on number and placement of monitors. Decisions can only be made on a case-by-case basis. Guidance is available for establishing criteria for demonstrating that a model is not applicable?

d. Sources should obtain approval from the appropriate reviewing authority (paragraph 3.0(b)) for the monitoring network prior to the start of monitoring. A monitoring protocol agreed to by all concerned parties is highly desirable. The design of the network, the number, type and location of the monitors, the sampling period, averaging time as well as the need for meteorological monitoring or the use of mobile sampling or plume tracking techniques, should all be specified in the protocol and agreed upon prior to start-up of the network.

10.2.3 Emission Limits

10.2.3.1 Design Concentrations

a. Emission limits should be based on concentration estimates for the averaging time that results in the most stringent control requirements. The concentration used in specifying emission limits is called the design value or design concentration and is a sum of the concentration contributed by the primary source, other applicable sources, and--for NAAQS assessments--the background concentration.

b. To determine the averaging time for the design value, the most restrictive NAAQS or PSD increment, as applicable, should be identified. For a NAAQS assessment, the averaging time for the design value is determined by calculating, for each averaging time, the ratio of the difference between the applicable NAAQS (S) and the background concentration (B) to the (model) predicted concentration (P) (i.e., (S–B)/P). For a PSD increment assessment, the averaging time for the design value is determined by calculating, for each averaging time, the ratio of the applicable PSD increment (I) and the model-predicted concentration (P) (i.e., I/P). The averaging time with the lowest ratio identifies the most restrictive standard or increment. If the annual average is the most restrictive, the highest estimated annual average concentration from one or a number of years of data is the design value. When short term standards are most restrictive, it may be necessary to consider a broader range of concentrations than the highest value. For example, for pollutants such as $SO_2$, the highest, second-highest concentration is the design value. For pollutants with statistically based NAAQS, the design value is found by determining the more restrictive of:

(1) The short-term concentration over the period specified in the standard, or (2) the long-term concentration that is not expected to exceed the long-term NAAQS. Determination of design values for PM–10 is presented in more detail in EPA guidance. [34]

10.2.3.2 NAAQS Analyses for New or Modified Sources

a. For new or modified sources predicted to have a significant ambient impact [83] and to be located in areas designated attainment or unclassifiable for the $SO_2$, Pb, $NO_2$, or CO NAAQS, the demonstration as to whether the source will cause or contribute to an air quality violation should be based on: (1) The highest estimated annual average concentration determined from annual averages of individual years; or (2) the highest, second-highest estimated concentration for averaging times of 24–hours or less; and (3) the significance of the spatial and temporal contribution to any modeled violation. For Pb, the highest estimated concentration based on an individual calendar quarter averaging period should be used. Background concentrations should be added to the estimated impact of the source. The most restrictive standard should be used in all cases to assess the threat of an air quality violation. For new or modified sources predicted to have a significant ambient impact [83] in areas designated attainment or unclassifiable for the PM–10 NAAQS, the demonstration of whether or not the source will cause or contribute to an air quality violation should be based on sufficient data to show whether: (1) The projected 24–hour average concentrations will exceed the 24–hour NAAQS more than once per year, on average; (2) the expected (i.e., average) annual mean concentration will exceed the annual NAAQS; and (3) the source contributes significantly, in a temporal and spatial sense, to any modeled violation.

10.2.3.3 PSD Air Quality Increments and Impacts

a. The allowable PSD increments for criteria pollutants are established by regulation and cited in 40 CFR 51.166. These maximum allowable increases in pollutant concentrations may be exceeded once per year at each site, except for the annual increment that may not be exceeded. The highest, second-highest increase in estimated concentrations for the short term averages as determined by a model should be less than or equal to the permitted increment. The modeled annual averages should not exceed the increment.

b. Screening techniques defined in subsection 4.2.1 can sometimes be used to estimate short term incremental concentrations for the first new source that triggers the baseline in a given area. However, when multiple increment-consuming sources are involved in the calculation, the use of a refined model with at least 1 year of site specific or 5 years of (off-site) NWS data is normally required (subsection 8.3.1.2). In such cases, sequential modeling must demonstrate that the allowable increments are not exceeded temporally and spatially, i.e., for all receptors for each time period throughout the year(s) (time period means the appropriate PSD averaging time, e.g., 3–hour, 24–hour, etc.).

c. The PSD regulations require an estimation of the $SO_2$, particulate matter (PM–10), and $NO_2$ impact on any Class I area. Normally, steady-state Gaussian plume models should not be applied at distances greater than can be accommodated by the steady state assumptions inherent in such models. The maximum distance for refined steady-state Gaussian plume model application for regulatory purposes is generally considered to be 50km. Beyond the 50km range, screening techniques may be used to determine if more refined modeling is needed. If refined models are needed, long range transport models should be considered in accordance with subsection 6.2.3. As previously noted in Sections 3 and 7, the need to involve the Federal Land Manager in decisions on potential air quality impacts, particularly in relation to PSD Class I areas, cannot be overemphasized.

## 11.0 Bibliography [a]

a The documents listed here are major sources of supplemental information on the theory and application of mathematical air quality models.

American Meteorological Society. Symposia on Turbulence, Diffusion, and Air Pollution (1st–10th); 1971–1992. Symposia on Boundary Layers & Turb. 11th–12th; 1995–1997. Boston, MA.

American Meteorological Society, 1977–1998. Joint Conferences on Applications of Air Pollution Meteorology (1st–10th). Sponsored by the American Meteorological Society and the Air & Waste Management Association. Boston, MA.

American Meteorological Society, 1978. Accuracy of Dispersion Models. Bulletin of the American Meteorological Society, 59(8): 1025–1026.

American Meteorological Society, 1981. Air Quality Modeling and the Clean Air Act: Recommendations to EPA on Dispersion Modeling for Regulatory Applications. Boston, MA.

Briggs, G.A., 1969. Plume Rise. U.S. Atomic Energy Commission Critical Review Series, Oak Ridge National Laboratory, Oak Ridge, TN.

Drake, R.L. and S.M. Barrager, 1979. Mathematical Models for Atmospheric Pollutants. EPRI EA–1131. Electric Power Research Institute, Palo Alto, CA.

Environmental Protection Agency, 1978. Workbook for Comparison of Air Quality Models. Publication No. EPA–450/2–78–028a and b. Office of Air Quality Planning & Standards, Research Triangle Park, NC.

Erisman J.W., Van Pul A. and Wyers P. (1994) Parameterization of surface resistance for the quantification of atmospheric deposition of acidifying pollutants and ozone. Atmos. Environ., 28: 2595–2607.

Fox, D.G., and J.E. Fairobent, 1981. NCAQ Panel Examines Uses and Limitations of Air Quality Models. Bulletin of the American Meteorological Society, 62(2): 218–221.

Gifford, F.A., 1976. Turbulent Diffusion Typing Schemes: A Review. Nuclear Safety, 17(1): 68–86.

Gudiksen, P.H., and M.H. Dickerson, Eds., Executive Summary: Atmospheric Studies in Complex Terrain Technical Progress Report FY–1979 Through FY–1983. Lawrence Livermore National Laboratory, Livermore, CA. (Docket Reference No. II–I–103).

Hanna, S.R., G.A. Briggs, J. Deardorff, B.A. Egan, G.A. Gifford and F. Pasquill, 1977. AMS Workshop on Stability Classification Schemes And Sigma Curves--Summary of Recommendations. Bulletin of the American Meteorological Society, 58(12): 1305–1309.

Hanna, S.R., G.A. Briggs and R.P. Hosker, Jr., 1982. Handbook on Atmospheric Diffusion. Technical Information Center, U.S. Department of Energy, Washington, D.C.

Haugen, D.A., Workshop Coordinator, 1975. Lectures on Air Pollution and Environmental Impact Analyses. Sponsored by the American Meteorological Society, Boston, MA.

Hoffnagle, G.F., M.E. Smith, T.V. Crawford and T.J. Lockhart, 1981. On-site Meteorological Instrumentation Requirements to Characterize Diffusion from Point Sources--A Workshop, 15–17 January 1980, Raleigh, NC. Bulletin of the American Meteorological Society, 62(2): 255–261.

Hunt, J.C.R., R.G. Holroyd, D.J. Carruthers, A.G. Robins, D.D. Apsley, F.B. Smith and D.J. Thompson, 1990. Developments in Modeling Air Pollution for Regulatory Uses. In Proceedings of the 18th NATO/CCMS International Technical Meeting on Air Pollution Modeling and its Application, Vancouver, Canada. Also In Air Pollution Modeling and its Application VIII (1991). H. van Dop and D.G. Steyn, eds. Plenum Press, New York, NY. pp. 17–59.

Pasquill, F. and F.B. Smith, 1983. Atmospheric Diffusion, 3rd Edition. Ellis Horwood Limited, Chichester, West Sussex, England, 438pp.

Randerson, D., Ed., 1984. Atmospheric Science and Power Production. DOE/TIC 2760l. Office of Scientific and Technical Information, U.S. Department of Energy, Oak Ridge, TN.

Scire, J.S. and L.L. Schulman, 1980: Modeling plume rise from low-level buoyant line and point sources. AMS/APCA Second Joint Conference on Applications of Air Pollution Meteorology, March 24–27, New Orleans, LA.

Smith, M.E., Ed., 1973. Recommended Guide for the Prediction of the Dispersion of Airborne Effluents. The American Society of Mechanical Engineers, New York, NY.

Stern, A.C., Ed., 1976. Air Pollution, Third Edition, Volume I: Air Pollutants, Their Transformation and Transport. Academic Press, New York, NY.

Turner, D.B., 1979. Atmospheric Dispersion Modeling: A Critical Review. Journal of the Air Pollution Control Association, 29(5): 502–519.

Venkatram, A. and J.C. Wyngaard, Editors, 1988. Lectures on Air Pollution Modeling. American Meteorological Society, Boston, MA. 390pp.

## 12.0 References

1 Code of Federal Regulations; Title 40 (Protection of Environment). Sections 51.112, 51.117, 51.150, 51.160.

2 Environmental Protection Agency, 1990. New Source Review Workshop Manual: Prevention of Significant Deterioration and Nonattainment Area Permitting (Draft). Office of Air Quality Planning & Standards, Research Triangle Park, NC. (Available at: http://www.epa.gov/ttn/nsr/)

3 Code of Federal Regulations; Title 40 (Protection of Environment). Sections 51.166 and 52.21.

4 Code of Federal Regulations (Title 40, Part 50): Protection of the Environment; National Primary and Secondary Ambient Air Quality Standards.

5 Environmental Protection Agency, 1988. Model Clearinghouse: Operational Plan (Revised). Staff Report. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (Docket No. A–88–04, II–J–1)

6 Environmental Protection Agency, 1980. Guidelines on Air Quality Models. Federal Register, 45(61): 20157–20158.

7 Scire, J.S. and L.L. Schulman, 1981. Evaluation of the BLP and ISC Models with SF6 Tracer Data and $SO_2$ Measurements at Aluminum Reduction Plants. APCA Specialty Conference on Dispersion Modeling for Complex Sources, St. Louis, MO.

8 Environmental Protection Agency, 1986. Evaluation of Mobile Source Air Quality Simulation Models. Publication No. EPA–450/4–86–002. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 86–167293)

9 Strimaitis, D.G., J.S. Scire and J.C. Chang. 1998. Evaluation of the CALPUFF Dispersion Model with Two Power Plant Data Sets. Tenth Joint Conference on the Application of Air Pollution Meteorology, Phoenix, Arizona. American Meteorological Society, Boston, MA. January 11–16, 1998.

10 Environmental Protection Agency, 2003. AERMOD: Latest Features and Evaluation Results. Publication No. EPA–454/R–03–003. U.S. Environmental Protection Agency, Research Triangle Park, NC. (Available at http://www.epa.gov/scram001/)

11 Fox, D.G., 1981. Judging Air Quality Model Performance. Bulletin of the American Meteorological Society, 62(5): 599–609.

12 American Meteorological Society, 1983. Synthesis of the Rural Model Reviews. Publication No. EPA–600/3–83–108. Office of Research & Development, Research Triangle Park, NC. (NTIS No. PB 84–121037)

13 Allwine, K.J., W.F. Dabberdt and L.L. Simmons. 1998. Peer Review of the CALMET/CALPUFF Modeling System. Prepared by the KEVRIC Company, Inc. under EPA Contract No. 68–D–98–092 for Environmental Protection Agency, Research Triangle Park, NC. (Docket No. A–99–05, II–A–8)

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

14 Hanna, S., M. Garrison and B. Turner, 1998. AERMOD Peer Review report. Prepared by SAI, Inc. under EPA Contract No. 68–D6–0064/1–14 for Environmental Protection Agency, Research Triangle Park, NC. 12pp. & appendices (Docket No. A–99–05, II–A–6)

15 Environmental Protection Agency, 1992. Protocol for Determining the Best Performing Model. Publication No. EPA–454/R–92–025. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 93–226082)

16 ASTM D6589: Standard Guide for Statistical Evaluation of Atmospheric Dispersion Model Performance. (2000)

17 Environmental Protection Agency, 1995. User's Guide for the Industrial Source Complex (ISC3) Dispersion Models, Volumes 1 and 2. Publication Nos. EPA–454/B–95–003a & b. U.S. Environmental Protection Agency, Research Triangle Park, NC. (NTIS Nos. PB 95–222741 and PB 95–222758, respectively)

18 Hanna, S.R. and R.J. Paine, 1989. Hybrid Plume Dispersion Model (HPDM) Development and Evaluation. J. Appl. Meteorol., 28: 206–224.

19 Hanna, S.R. and J.C. Chang, 1992. Boundary layer parameterizations for applied dispersion modeling over urban areas. Bound. Lay. Meteorol., 58, 229–259.

20 Hanna, S.R. and J.C. Chang, 1993. Hybrid Plume Dispersion Model (HPDM) Improvements and Testing at Three Field Sites. Atmos. Environ., 27A: 1491–1508.

21 American Meteorological Society, 1984. Workshop on Updating Applied Diffusion Models. 24–27 January 1984. Clearwater, Florida. J. Climate and Appl. Met., 24(11): 1111--1207.

22 Environmental Protection Agency, 2002. AERMOD: Description of Model Formulation. Research Triangle Park, NC. EPA Report No. EPA–454/R–02–002d; April 2002; AND Cimorelli, A. et al., 2005. AERMOD: A Dispersion Model for Industrial Source Applications. Part I: General Model Formulation and Boundary Layer Characterization. Journal of Applied Meteorology, 44(5): 682–693.

23 L.L. Schulman, D.G. Strimaitis and J.S. Scire, 2002. Development and evaluation of the PRIME plume rise and building downwash model. Journal of the Air & Waste Management Association, 50: 378–390.

24 Environmental Protection Agency, 1992. Screening Procedures for Estimating the Air Quality Impact of Stationary Sources, Revised. Publication No. EPA–454/R–92–019. U.S. Environmental Protection Agency, Research Triangle Park, NC. (NTIS No. PB 93–219095)

25 Environmental Protection Agency, 1995. SCREEN3 User's Guide. Publication No. EPA–454/B–95–004. U.S. Environmental Protection Agency, Research Triangle Park, NC. (NTIS No. PB 95–222766)

26 Perry, S.G., D.J. Burns and A.J. Cimorelli, 1990. User's Guide to CTDMPLUS: Volume 2. The Screening Mode (CTSCREEN). Publication No. EPA–600/8–90–087. U.S. Environmental Protection Agency, Research Triangle Park, NC. (NTIS No. PB 91–136564)

27 Mills, M.T., R.J. Paine, E.A. Insley and B.A. Egan, 1987. The Complex Terrain Dispersion Model Terrain Preprocessor System--User's Guide and Program Description. Publication No. EPA–600/8–88–003. U.S. Environmental Protection Agency, Research Triangle Park, NC. (NTIS No. PB 88–162094)

28 Burns, D.J., S.G. Perry and A.J. Cimorelli, 1991. An Advanced Screening Model for Complex Terrain Applications. Paper presented at the 7th Joint Conference on Applications of Air Pollution Meteorology (cosponsored by the American Meteorological Society and the Air & Waste Management Association), January 13–18, 1991, New Orleans, LA.

29 Environmental Research and Technology, 1987. User's Guide to the Rough Terrain Diffusion Model (RTDM), Rev. 3.20. ERT Document No. P–D535–585. Environmental Research and Technology, Inc., Concord, MA. (NTIS No. PB 88–171467)

30 Meng, Z.D. Dabdub and J.H. Seinfeld, 1997. Chemical Coupling between Atmospheric Ozone and Particulate Matter. Science, 277: 116–119.

31 Hidy, G.M, P.M. Roth, J.M. Hales and R.D. Scheffe, 1998. Fine Particles and Oxidant Pollution: Developing an Agenda for Cooperative Research. JAWMA, 50: 613–632.

32 Environmental Protection Agency, 2005. Guidance on the Use of Models and Other Analyses in Attainment Demonstrations for the 8–hr Ozone NAAQS (Draft Final). Office of Air Quality Planning & Standards, Research Triangle Park, NC. (Latest version available on SCRAM Web site as draft-final–O3.pdf; see subsection 2.3)

33 Environmental Protection Agency, 2005. Guidance on the Use of Models and Other Analyses in Attainment Demonstrations for the PM–2.5 NAAQS and Regional Haze Goals. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (As of May 2005, this document has not been finalized; latest version available on SCRAM Web site as draft-pm.pdf; see subsection 2.3)

34 Environmental Protection Agency, 1987. PM–10 SIP Development Guideline. Publication No. EPA–450/2–86–001. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 87–206488)

35 U.S. Forest Service, 1996. User Assessment of Smoke–Dispersion Models for Wildland Biomass Burning. USDA, Pacific Northwest Research Station, Portland, OR. General Technical Report PNW–GTR–379. 30pp. (NTIS No. PB 97–163380)

36 Hanrahan, P.L., 1999. The Polar Volume Polar Ratio Method for Determining $NO_2/NO_X$ Ratios in Modeling--Part I: Methodology. J. Air & Waste Manage. Assoc., 49: 1324–1331.

37 Environmental Protection Agency, 1997. Guidance for Siting Ambient Air Monitors around Stationary Lead Sources. Publication No. EPA–454/R–92–009R. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 97–208094)

38 Environmental Protection Agency, 1993. Lead Guideline Document. Publication No. EPA–452/R–93–009. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 94–111846)

39 Environmental Protection Agency, 1998. EPA Third–Generation Air Quality Modeling System. Models–3, Volume 9b: User Manual. Publication No. EPA–600/R–98/069(b). Office of Research and Development, Washington, D.C.

40 Gery, M.W. and R.R. Crouse, 1991. User's Guide for Executing OZIPR. Publication No. EPA–600/8–90–069. Office of Research & Development, Research Triangle Park, NC. (NTIS No. PB 91–175877)

41 Environmental Protection Agency, 2002. User's Guide to the Regulatory Modeling System for Aerosols and Deposition (REMSAD) Version 7. Prepared for Environmental Protection Agency under Contract No. GS–10F–0124J by ICF Consulting, July 2002. (Available at http://www.epa.gov/scram001/)

42 Environmental Protection Agency, 2004. EPA–CMB8.2 Users Manual. Publication No. EPA–452/R–04–011. Office of Air Quality Planning & Standards, Research Triangle Park, NC; December 2004. (Available at http://www.ega.gov/scram001/)

43 Environmental Protection Agency, 2004. Protocol for Applying and Validating the CMB Model for $PM_{2.5}$ and VOC. Publication No. EPA–451/R–04–001. Office of Air Quality Planning & Standards, Research Triangle Park, NC; December 2004. (Available at http://www.ega.gov/scram001/)

44 Environmental Protection Agency, 1988. Chemical Mass Balance Model Diagnostics. Publication No. EPA–450/4–88–005. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 88–208319)

45 Paatero, P. and U. Tapper, 1994. Positive Matrix Factorization: A Non-negative Factor Model with Optimal Utilization of Error Estimates of Data Values. Environmetrics, 5: 111–126. (Other documents related to PMF may be accessed via FTP at ftp://rock.helsinki.fi/pub/misc/pmf.)

46 Lewis, C.W., G.A. Norris, R.C. Henry and T.L. Conner, 2003. Source Apportionment of Phoenix PM–2.5 Aerosol with the Unmix Receptor Model. Journal of the Air & Waste Management Association, 53(3): 325–338.

47 Environmental Protection Agency, 1994. Guidelines for PM10 Sampling and Analysis Applicable to Receptor Modeling. Publication No. EPA–452/R–94–009. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 94–177441)

48 Environmental Protection Agency, 1992. Guideline for Modeling Carbon Monoxide from Roadway Intersections. Publication No. EPA–454/R–92–005. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 93–210391)

49 Environmental Protection Agency, 1992. User's Guide for CAL3QHC Version 2: A Modeling Methodology for Predicting Pollutant Concentrations near Roadway Intersections. Publication No. EPA–454/R–92–006. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 93–210250)

50 Environmental Protection Agency, 1992. Evaluation of CO Intersection Modeling techniques Using a New York City Database. Publication No. EPA–454/R–92–004. Office of Air Quality Planning & Standards, RTP, NC 27711. (NTIS No. PB 93–105559)

51 Environmental Protection Agency, 1995. Addendum to the User's Guide to CAL3QHC Version 2.0. Staff Report. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (Available at http://www.epa.gov/scram001/)

52 Shannon, J.D., 1987. Mobile Source Modeling Review. A report prepared under a cooperative agreement with the Environmental Protection Agency. 5pp. (Docket No. A–88–04, II–J–2)

53 Environmental Protection Agency, 1991. Emission Inventory Requirements for Carbon Monoxide State Implementation Plans. Publication No. EPA–450/4–91–011. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 92–112150)

54 Environmental Protection Agency, 1992. Guideline for Regulatory Application of the Urban Airshed Model for Areawide Carbon Monoxide. Publication No. EPA–450/4–92–011a and b. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS Nos. PB 92–213222 and PB 92–213230)

55 Environmental Protection Agency, 1992. Technical Support Document to Aid States with the Development of Carbon Monoxide State Implementation Plans. Publication No. EPA–452/R–92–003. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 92–233055)

56 Chu, S.H. and E.L. Meyer, 1991. Use of Ambient Ratios to Estimate Impact of $NO_X$ Sources on Annual $NO_2$ Concentrations. Proceedings, 84th Annual Meeting & Exhibition of the Air & Waste Management Association, Vancouver, B.C.; 16–21 June 1991. (16pp.) (Docket No. A–92–65, II–A–9)

57 Cole, H.S. and J.E. Summerhays, 1979. A Review of Techniques Available for Estimation of Short–Term $NO_2$ Concentrations. Journal of the Air Pollution Control Association, 29(8): 812–817.

58 U.S. Department of Housing and Urban Development, 1980. Air Quality Considerations in Residential Planning. U.S. Superintendent of Documents, Washington, DC. (GPO Order Nos. 023–000–00577–8, 023–000–00576–0, 023–000–00575–1)

59 Environmental Protection Agency, 1986. Evaluation of Short–Term Long–Range Transport Models, Volumes I and II. Publication Nos. EPA–450/4–86–016a and b. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS Nos. PB 87–142337 and PB 87–142345)

60 Environmental Protection Agency, 1998. Interagency Workgroup on Air Quality Modeling (IWAQM) Phase 2 Summary Report and Recommendations for Modeling Long–Range Transport Impacts. Publication No. EPA–454/R–98–019. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 99–121089)

61 National Acid Precipitation Assessment Program (NAPAP), 1991. Acid Deposition: State of Science and Technology. Volume III Terrestrial, Materials, Health and Visibility Effects. Report 24, Visibility: Existing and Historical Conditions--Causes and Effects Edited by Patricia M. Irving. Washington, DC 129pp.

62 National Research Council, 1993. Protecting Visibility in National Parks and Wilderness Areas. National Academy Press, Washington, DC 446pp.

63 Environmental Protection Agency, 1992. Workbook for Plume Visual Impact Screening and Analysis (Revised). Publication No. EPA–454/R–92–023. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 93–223592)

64 Environmental Protection Agency, 1981. Guideline for Use of Fluid Modeling to Determine Good Engineering Practice (GEP) Stack Height. Publication No. EPA–450/4–81–003. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 82–145327)

65 Lawson, Jr., R.E. and W.H. Snyder, 1983. Determination of Good Engineering Practice Stack Height: A Demonstration Study for a Power Plant. Publication No. EPA–600/3–83–024. Office of Research & Development, Research Triangle Park, NC. (NTIS No. PB 83–207407)

66 Environmental Protection Agency, 1985. Guideline for Determination of Good Engineering Practice Stack Height (Technical Support Document for the Stack Height Regulations), Revised. Publication No. EPA–450/4–80–023R. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 85–225241)

67 Snyder, W.H. and R.E. Lawson, Jr., 1985. Fluid Modeling Demonstration of Good Engineering–Practice Stack Height in Complex Terrain. Publication No. EPA–600/3–85–022. Office of Research & Development, Research Triangle Park, NC. (NTIS No. PB 85–203107)

68 Bennett, M.J, M.E. Yansura, I.G. Hornyik, J.M. Nall, D.G. Caniparoli and C.G. Ashmore, 2002. Evaluation of the CALPUFF Long-range Transport Screening Technique by Comparison to Refined CALPUFF Results for Several Power Plants in Both the Eastern and Western United States. Proceedings of the Air & Waste Management Association's 95th Annual Conference, June 23–27, 2002; Baltimore, MD. Paper #43454.

69 Environmental Protection Agency, 1999. Guideline of Data Handling Conventions for the PM NAAQS. Publication No. EPA–454/R–99–008. Office of Air Quality Planning & Standards, Research Triangle Park. (NTIS PB 99–149023)

70 Turner, D.B., 1969. Workbook of Atmospheric Dispersion Estimates. PHS Publication No. 999–AP–26. U.S. Department of Health, Education and Welfare, Public Health Service, Cincinnati, OH. (NTIS No. PB–191482)

71 McElroy, J.L. and F. Pooler, Jr., 1968. St. Louis Dispersion Study, Volume II--Analysis. National Air Pollution Control Administration Publication No. AP–53, U.S. Department of Health, Education and Welfare, Public Health Service, Arlington, VA. (NTIS No. PB–190255)

72 Irwin, J.S., 1978. Proposed Criteria for Selection of Urban Versus Rural Dispersion Coefficients. (Draft Staff Report). Meteorology and Assessment Division, U.S. Environmental Protection Agency, Research Triangle Park, NC. (Docket No. A–80–46, II–B–8)

73 Auer, Jr., A.H., 1978. Correlation of Land Use and Cover with Meteorological Anomalies. Journal of Applied Meteorology, 17(5): 636–643.

74 Pasquill, F., 1976. Atmospheric Dispersion Parameters in Gaussian Plume Modeling, Part II. Possible Requirements for Change in the Turner Workbook Values. Publication No. EPA–600/4–76–030b. Office of Research & Development, Research Triangle Park, NC. (NTIS No. PB–258036/3BA)

75 Turner, D.B., 1964. A Diffusion Model for an Urban Area. Journal of Applied Meteorology, 3(1): 83–91.

76 Briggs, G.A., 1975. Plume Rise Predictions. Chapter 3 in Lectures on Air Pollution and Environmental Impact Analyses. American Meteorological Society, Boston, MA; pp. 59–111.

77 Hanna, S.R., G.A. Briggs and R.P. Hosker, Jr., 1982. Plume Rise. Chapter 2 in Handbook on Atmospheric Diffusion. Technical Information Center, U.S. Department of Energy, Washington, DC; pp. 11–24. DOE/TIC–11223 (DE 82002045)

78 Weil, J.C., L.A. Corio and R.P. Brower, 1997. A PDF dispersion model for buoyant plumes in the convective boundary layer. Journal of Applied Meteorology, 36: 982–1003.

79 Stull, R.B., 1988. An Introduction to Boundary Layer Meteorology. Kluwer Academic Publishers, Boston, MA. 666pp.

80 Environmental Protection Agency, 1988. User's Guide to SDM--A Shoreline Dispersion Model. Publication No. EPA–450/4–88–017. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 89–164305)

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

81 Environmental Protection Agency, 1987. Analysis and Evaluation of Statistical Coastal Fumigation Models. Publication No. EPA–450/4–87–002. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 87–175519)

82 Environmental Protection Agency, 1995. Compilation of Air Pollutant Emission Factors, Volume I: Stationary Point and Area Sources (Fifth Edition, AP–42: GPO Stock No. 055–000–00500–1), and Supplements A–D; Volume II: Mobile Sources (Fifth Edition). Office of Air Quality Planning & Standards, Research Triangle Park, NC. Volume I can be downloaded from EPA's Internet Web site at http://www.epa.gov/ttn/chief/ap42.html; Volume II can be downloaded from http://www.epa.gov/omswww/ap42.htm

83 Environmental Protection Agency, 1987. Ambient Air Monitoring Guidelines for Prevention of Significant Deterioration (PSD). Publication No. EPA–450/4–87–007. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 90–168030)

84 Stauffer, D.R. and Seaman, N.L., 1990. Use of four-dimensional data assimilation in a limited-area mesoscale model. Part I: Experiments with synoptic-scale data. Monthly Weather Review, 118: 1250–1277.

85 Stauffer, D.R., N.L. Seaman and F.S. Binkowski, 1991. Use of four-dimensional data assimilation in a limited-area mesoscale model. Part II: Effect of data assimilation within the planetary boundary layer. Monthly Weather Review, 119: 734–754.

86 Grell, G.A., J. Dudhia, and D.R. Stauffer, 1994. A Description of the Fifth–Generation Penn State/NCAR Mesoscale Model (MM5). NCAR Technical Note, NCAR/TN–398+STR, National Center for Atmospheric Research, Boulder, CO; 138pp. http://www.mmm.ucar.edu/mm5/mm5–home.html

87 Landsberg, H.E. and W.C. Jacobs, 1951. Compendium of Meteorology. American Meteorological Society, Boston, MA; pp. 976–992.

88 Burton, C.S., T.E. Stoeckenius and J.P. Nordin, 1983. The Temporal Representativeness of Short–Term Meteorological Data Sets: Implications for Air Quality Impact Assessments. Systems Applications, Inc., San Rafael, CA. (Docket No. A–80–46, II–G–11)

89 Solar and Meteorological Surface Observation Network, 1961–1990; 3–volume CD–ROM. Version 1.0, September 1993. Produced jointly by National Climatic Data Center and National Renewable Energy Laboratory. Can be ordered from NOAA National Data Center's Internet Web site at http://www.NNDC.NOAA.GOV/.

90 Hourly United States Weather Observations, 1990–1995 (CD–ROM). October 1997. Produced jointly by National Climatic Data Center and Environmental Protection Agency. Can be ordered from NOAA National Data Center's Internet Web site at http://lwf.ncdc.noaa.gov/oa/ncdc.html

91 Radiosonde Data of North America, 1946–1996; 4–volume CD–ROM. August 1996. Produced jointly by Forecast Systems laboratory and National Climatic Data Center. Can be ordered from NOAA National Data Center's Internet Web site at http://lwf.ncdc.noaa.gov/oa/ncdc.html

92 Environmental Protection Agency, 2000. Meteorological Monitoring Guidance for Regulatory Modeling Applications. Publication No. EPA–454/R–99–005. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (PB 2001–103606) (Available at http://www.epa.gov/scram001/)

93 ASTM D5527: Standard Practice for Measuring Surface Winds and Temperature by Acoustic Means. (1994)

94 ASTM D5741: Standard Practice for Characterizing Surface Wind Using Wind Vane and Rotating Anemometer. (1996)

95 Environmental Protection Agency, 1995. Quality Assurance for Air Pollution Measurement Systems, Volume IV--Meteorological Measurements. Publication No. EPA600/R–94/038d. Office of Air Quality Planning & Standards, Research Triangle Park, NC. Note: for copies of this handbook, you may make inquiry to ORD Publications, 26 West Martin Luther King Dr., Cincinatti, OH 45268. Phone (513) 569–7562 or (800) 490–9198 (automated request line)

96 Bowen, B.M., J.M. Dewart and A.I. Chen, 1983. Stability Class Determination: A Comparison for One Site. Proceedings, Sixth Symposium on Turbulence and Diffusion. American Meteorological Society, Boston, MA; pp. 211–214. (Docket No. A–92–65, II–A–7)

97 Environmental Protection Agency, 1993. An Evaluation of a Solar Radiation/Delta–T (SRDT) Method for Estimating Pasquill–Gifford (P–G) Stability Categories. Publication No. EPA–454/R–93–055. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 94–113958)

98 Irwin, J.S., 1980. Dispersion Estimate Suggestion #8: Estimation of Pasquill Stability Categories. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (Docket No. A–80–46, II–B–10)

99 Mitchell, Jr., A.E. and K.O. Timbre, 1979. Atmospheric Stability Class from Horizontal Wind Fluctuation. Presented at 72nd Annual Meeting of Air Pollution Control Association, Cincinnati, OH; June 24–29, 1979. (Docket No. A–80–46, II–P–9)

100 Smedman--Hogstrom, A. and V. Hogstrom, 1978. A Practical Method for Determining Wind Frequency Distributions for the Lowest 200m from Routine Meteorological Data. J. of Applied Meteorology, 17(7): 942–954.

101 Smith, T.B. and S.M. Howard, 1972. Methodology for Treating Diffusivity. MRI 72 FR–1030. Meteorology Research, Inc., Altadena, CA. (Docket No. A–80–46, II–P–8)

102 Environmental Protection Agency, 2004. User's Guide for the AERMOD Meteorological Preprocessor (AERMET). Publication No. EPA–454/B–03–002. U.S. Environmental Protection Agency, Research Triangle Park, NC. (Available at http://www.epa.gov/scram001/)

103 Environmental Protection Agency, 1993. PCRAMMET User's Guide. Publication No. EPA–454/R–96–001. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 97–147912)

104 Environmental Protection Agency, 1996. Meteorological Processor for Regulatory Models (MPRM) User's Guide. Publication No. EPA–454/B–96–002. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 96–180518)

105 Paine, R.J., 1987. User's Guide to the CTDM Meteorological Preprocessor Program. Publication No. EPA–600/8–88–004. Office of Research & Development, Research Triangle Park, NC. (NTIS No. PB 88–162102)

106 Scire, J.S., F.R. Francoise, M.E. Fernau and R.J. Yamartino, 1998. A User's Guide for the CALMET Meteorological Model (Version 5.0). Earth Tech, Inc., Concord, MA. (http://www.src.com/calpuff/calpuff1.htm)

107 Environmental Protection Agency, 1984. Calms Processor (CALMPRO) User's Guide. Publication No. EPA–901/9–84–001. Office of Air Quality Planning & Standards, Region I, Boston, MA. (NTIS No. PB 84–229467)

108 Fox, D.G., 1984. Uncertainty in air quality modeling. Bulletin of the American Meteorological Society, 65(1): 27–36.

109 Burton, C.S., 1981. The Role of Atmospheric Models in Regulatory Decision–Making: Summary Report. Systems Applications, Inc., San Rafael, CA. Prepared under contract No. 68–01–5845 for U.S. Environmental Protection Agency, Research Triangle Park, NC. (Docket No. A–80–46, II–M–6)

110 Environmental Protection Agency, 1981. Proceedings of the Second Conference on Air Quality Modeling, Washington, DC. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (Docket No. A–80–46, II–M–16)

111 Hanna, S.R., 1989. Confidence limits for air quality model evaluations, as estimated by bootstrap and jackknife resampling methods. Atmospheric Environment, 23(6): 1385–1398.

112 Cox, W.M. and J.A. Tikvart, 1990. A statistical procedure for determining the best performing air quality simulation model. Atmos. Environ., 24A(9): 2387–2395.

113 Oreskes, N.K., K. Shrader–Frechette and K. Beliz, 1994. Verification, validation and confirmation of numerical models in the earth sciences. Science, 263: 641–646.

114 Dekker, C.M., A. Groenendijk, C.J. Sliggers and G.K. Verboom, 1990. Quality Criteria for Models to Calculate Air Pollution. Lucht (Air) 90, Ministry of Housing, Physical Planning and Environment, Postbus 450, 2260 MB Leidschendam, The Netherlands; 52pp.

115 Weil, J.C., R.I. Sykes and A. Venkatram, 1992. Evaluating air-quality models: review and outlook. Journal of Applied Meteorology, 31: 1121–1145.

116 Cole, S.T. and P.J. Wicks, Editors (1995): Model Evaluation Group: Report of the Second Open Meeting. EUR 15990 EN, European Commission, Directorate–General XII, Environmental Research Programme, L–2920 Luxembourg; 77pp.

117 Hanna, S.R., 1982. Natural Variability of Observed Hourly $SO_2$ and CO Concentrations in St. Louis. Atmospheric Environment, 16(6): 1435–1440.

118 Bowne, N.E., 1981. Validation and Performance Criteria for Air Quality Models. Appendix F in Air Quality Modeling and the Clean Air Act: Recommendations to EPA on Dispersion Modeling for Regulatory Applications. American Meteorological Society, Boston, MA; pp. 159–171. (Docket No. A–80–46, II–A–106)

119 Bowne, N.E. and R.J. Londergan, 1983. Overview, Results, and Conclusions for the EPRI Plume Model Validation and Development Project: Plains Site. EPRI EA–3074. Electric Power Research Institute, Palo Alto, CA.

120 Moore, G.E., T.E. Stoeckenius and D.A. Stewart, 1982. A Survey of Statistical Measures of Model Performance and Accuracy for Several Air Quality Models. Publication No. EPA–450/4–83–001. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 83–260810)

121 Rhoads, R.G., 1981. Accuracy of Air Quality Models. Staff Report. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (Docket No. A–80–46, II–G–6)

122 Hanna, S.R., 1993. Uncertainties in air quality model predictions. Boundary–Layer Meteorology, 62: 3–20.

123 Pasquill, F., 1974. Atmospheric Diffusion, 2nd Edition. John Wiley and Sons, New York, NY; 479pp.

124 Morgan, M.G. and M. Henrion, 1990. Uncertainty, A Guide to Dealing With Uncertainty in Quantitative Risk and Policy Analysis. Cambridge University Press. New York, NY; 332pp.

125 Irwin, J.S., K. Steinberg, C. Hakkarinen and H. Feldman, 2001. Uncertainty in Air Quality Modeling for Risk Calculations. (CD–ROM) Proceedings of Guideline on Air Quality Models: A New Beginning. April 4–6, 2001, Newport, RI, Air & Waste Management Association. Pittsburgh, PA; 17pp.

126 Austin, B.S., T.E. Stoeckenius, M.C. Dudik and T.S. Stocking, 1988. User's Guide to the Expected Exceedances System. Systems Applications, Inc., San Rafael, CA. Prepared under Contract No. 68–02–4352 Option I for the U.S. Environmental Protection Agency, Research Triangle Park, NC. (Docket No. A–88–04, II–I–3)

127 Thrall, A.D., T.E. Stoeckenius and C.S. Burton, 1985. A Method for Calculating Dispersion Modeling Uncertainty Applied to the Regulation of an Emission Source. Systems Applications, Inc., San Rafael, CA. Prepared for the U.S. Environmental Protection Agency, Research Triangle Park, NC. (Docket No. A–80–46, IV–G–1)

128 “Ten years of Harmonisation activities: Past, present and future” at http://www.dmu.dk/AtmosphericEnvironment /Harmoni/Conferences/Belgirate/BelgiratePapers.asp.

129 “A platform for model evaluation” at http://www.dmu.dk/AtmosphericEnvironment /Harmoni/Conferences/Belgirate/BelgiratePapers.asp.

## APPENDIX A TO APPENDIX W OF PART 51--SUMMARIES OF PREFERRED AIR QUALITY MODELS

Table of Contents

A.0 Introduction and Availability

A.1 Aermod

A.2 Buoyant Line and Point Source Dispersion Model (BLP)

A.3 CALINE3

A.4 CALPUFF

A.5 Complex Terrain Dispersion Model Plus Algorithms for Unstable Situations (CTDMPLUS)

A.6 Offshore and Coastal Dispersion Model (OCD)

A.REF References

## A.0 Introduction and Availability

(1) This appendix summarizes key features of refined air quality models preferred for specific regulatory applications. For each model, information is provided on availability, approximate cost (where applicable), regulatory use, data input, output format and options, simulation of atmospheric physics, and accuracy. These models may be used without a formal demonstration of applicability provided they satisfy the recommendations for regulatory use; not all options in the models are necessarily recommended for regulatory use.

(2) Many of these models have been subjected to a performance evaluation using comparisons with observed air quality data. Where possible, several of the models contained herein have been subjected to evaluation exercises, including (1) statistical performance tests recommended by the American Meteorological Society and (2) peer scientific reviews. The models in this appendix have been selected on the basis of the results of the model evaluations, experience with previous use, familiarity of the model to various air quality programs, and the costs and resource requirements for use.

(3) Codes and documentation for all models listed in this appendix are available from EPA's Support Center for Regulatory Air Models (SCRAM) Web site at http://www.epa.gov/scram001. Documentation is also available from the National Technical Information Service (NTIS), http://www.ntis.gov or U.S. Department of Commerce, Springfield, VA 22161; phone: (800) 553–6847. Where possible, accession numbers are provided.

## A.1 AMS/EPA Regulatory Model--AERMOD

### References

Environmental Protection Agency, 2004. AERMOD: Description of Model Formulation. Publication No. EPA–454/R–03–004. U.S. Environmental Protection Agency, Research Triangle Park, NC 27711; September 2004. (Available at http://www.epa.gov/scram001/)

Cimorelli, A. et al., 2005. AERMOD: A Dispersion Model for Industrial Source Applications. Part I: General Model Formulation and Boundary Layer Characterization. Journal of Applied Meteorology, 44(5): 682–693.

Perry, S. et al., 2005. AERMOD: A Dispersion Model for Industrial Source Applications. Part II: Model Performance against 17 Field Study Databases. Journal of Applied Meteorology, 44(5): 694–708.

Environmental Protection Agency, 2004. User's Guide for the AMS/EPA Regulatory Model--AERMOD. Publication No. EPA–454/B–03–001. U.S. Environmental Protection Agency, Research Triangle Park, NC 27711; September 2004. (Available at http://www.epa.gov/scram001/)

Environmental Protection Agency, 2004. User's Guide for the AERMOD Meteorological Preprocessor (AERMET). Publication No. EPA–454/B–03–002. U.S. Environmental Protection Agency, Research Triangle Park, NC 27711; November 2004. (Available at http://www.epa.gov/scram001/)

Environmental Protection Agency, 2004. User's Guide for the AERMOD Terrain Preprocessor (AERMAP). Publication No. EPA–454/B–03–003. U.S. Environmental Protection Agency, Research Triangle Park, NC 27711; October 2004. (Available at http://www.epa.gov/scram001/)

Schulman, L.L., D.G. Strimaitis and J.S. Scire, 2000. Development and evaluation of the PRIME plume rise and building downwash model. Journal of the Air and Waste Management Association, 50: 378–390.

Availability

The model codes and associated documentation are available on EPA's Internet SCRAM Web site (Section A.0).

Abstract

AERMOD is a steady-state plume dispersion model for assessment of pollutant concentrations from a variety of sources. AERMOD simulates transport and dispersion from multiple point, area, or volume sources based on an up-to-date characterization of the atmospheric boundary layer. Sources may be located in rural or urban areas, and receptors may be located in simple or complex terrain. AERMOD accounts for building wake effects (i.e., plume downwash) based on the PRIME building downwash algorithms. The model employs hourly sequential preprocessed meteorological data to estimate concentrations for averaging times from one hour to one year (also multiple years). AERMOD is designed to operate in concert with two pre-processor codes: AERMET processes meteorological data for input to AERMOD, and AERMAP processes terrain elevation data and generates receptor information for input to AERMOD.

a. Recommendations for Regulatory Use

(1) AERMOD is appropriate for the following applications:

• Point, volume, and area sources;

• Surface, near-surface, and elevated releases;

• Rural or urban areas;

• Simple and complex terrain;

• Transport distances over which steady-state assumptions are appropriate, up to 50km;

• 1–hour to annual averaging times; and

• Continuous toxic air emissions.

(2) For regulatory applications of AERMOD, the regulatory default option should be set, i.e., the parameter DFAULT should be employed in the MODELOPT record in the COntrol Pathway. The DFAULT option requires the use of terrain elevation data, stack-tip downwash, sequential date checking, and does not permit the use of the model in the SCREEN mode. In the regulatory default mode, pollutant half life or decay options are not employed, except in the case of an urban source of sulfur dioxide where a four-hour half life is applied. Terrain elevation data from the U.S. Geological Survey 7.5–Minute Digital Elevation Model (edcwww.cr.usgs.gov/doc/edchome/ndcdb/ndcdb.html) or equivalent (approx. 30–meter resolution) should be used in all applications. In some cases, exceptions of the terrain data requirement may be made in consultation with the permit/SIP reviewing authority.

b. Input Requirements

(1) Source data: Required input includes source type, location, emission rate, stack height, stack inside diameter, stack gas exit velocity, stack gas temperature, area and volume source dimensions, and source elevation. Building dimensions and variable emission rates are optional.

(2) Meteorological data: The AERMET meteorological preprocessor requires input of surface characteristics, including surface roughness (zo), Bowen ratio, and albedo, as well as, hourly observations of wind speed between 7zo and 100m (reference wind speed measurement from which a vertical profile can be developed), wind direction, cloud cover, and temperature between zo and 100m (reference temperature measurement from which a vertical profile can be developed). Surface characteristics may be varied by wind sector and by season or month. A morning sounding (in National Weather Service format) from a representative upper air station, latitude, longitude, time zone, and wind speed threshold are also required in AERMET (instrument threshold is only required for site specific data). Additionally, measured profiles of wind, temperature, vertical and lateral turbulence may be required in certain applications (e.g., in complex terrain) to adequately represent the meteorology affecting plume transport and dispersion. Optionally, measurements of solar, or net radiation may be input to AERMET. Two files are produced by the AERMET meteorological preprocessor for input to the AERMOD dispersion model. The surface file contains observed and calculated surface variables, one record per hour. The profile file contains the observations made at each level of a meteorological tower (or remote sensor), or the one-level observations taken from other representative data (e.g., National Weather Service surface observations), one record per level per hour.

(i) Data used as input to AERMET should possess an adequate degree of representativeness to insure that the wind, temperature and turbulence profiles derived by AERMOD are both laterally and vertically representative of the source area. The adequacy of input data should be judged independently for each variable. The values for surface roughness, Bowen ratio, and albedo should reflect the surface characteristics in the vicinity of the meteorological tower, and should be adequately representative of the modeling domain. Finally, the primary atmospheric input variables including wind speed and direction, ambient temperature, cloud cover, and a morning upper air sounding should also be adequately representative of the source area.

(ii) For recommendations regarding the length of meteorological record needed to perform a regulatory analysis with AERMOD, see Section 8.3.1.

(3) Receptor data: Receptor coordinates, elevations, height above ground, and hill height scales are produced by the AERMAP terrain preprocessor for input to AERMOD. Discrete receptors and/or multiple receptor grids, Cartesian and/or polar, may be employed in AERMOD. AERMAP requires input of Digital Elevation Model (DEM) terrain data produced by the U.S. Geological Survey (USGS), or other equivalent data. AERMAP can be used optionally to estimate source elevations.

c. Output

Printed output options include input information, high concentration summary tables by receptor for user-specified averaging periods, maximum concentration summary tables, and concurrent values summarized by receptor for each day processed. Optional output files can be generated for: a listing of occurrences of exceedances of user-specified threshold value; a listing of concurrent (raw) results at each receptor for each hour modeled, suitable for post-processing; a listing of design values that can be imported into graphics software for plotting contours; an unformatted listing of raw results above a threshold value with a special structure for use with the TOXX model component of TOXST; a listing of concentrations by rank (e.g., for use in quantile-quantile plots); and, a listing of concentrations, including arc-maximum normalized concentrations, suitable for model evaluation studies.

d. Type of Model

AERMOD is a steady-state plume model, using Gaussian distributions in the vertical and horizontal for stable conditions, and in the horizontal for convective conditions. The vertical concentration distribution for convective conditions results from an assumed bi–Gaussian probability density function of the vertical velocity.

e. Pollutant Types

AERMOD is applicable to primary pollutants and continuous releases of toxic and hazardous waste pollutants. Chemical transformation is treated by simple exponential decay.

f. Source–Receptor Relationships

AERMOD applies user-specified locations for sources and receptors. Actual separation between each source-receptor pair is used. Source and receptor elevations are user input or are determined by AERMAP using USGS DEM terrain data. Receptors may be located at user-specified heights above ground level.

g. Plume Behavior

(1) In the convective boundary layer (CBL), the transport and dispersion of a plume is characterized as the superposition of three modeled plumes: The direct plume (from the stack), the indirect plume, and the penetrated plume, where the indirect plume accounts for the lofting of a buoyant plume near the top of the boundary layer, and the penetrated plume accounts for the portion of a plume that, due to its buoyancy, penetrates above the mixed layer, but can disperse downward and re-enter the mixed layer. In the CBL, plume rise is superposed on the displacements by random convective velocities (Weil et al., 1997).

(2) In the stable boundary layer, plume rise is estimated using an iterative approach, similar to that in the CTDMPLUS model (see A.5 in this appendix).

(3) Stack-tip downwash and buoyancy induced dispersion effects are modeled. Building wake effects are simulated for stacks less than good engineering practice height using the methods contained in the PRIME downwash algorithms (Schulman, et al., 2000). For plume rise affected by the presence of a building, the PRIME downwash algorithm uses a numerical solution of the mass, energy and momentum conservation laws (Zhang and Ghoniem, 1993). Streamline deflection and the position of the stack relative to the building affect plume trajectory and dispersion. Enhanced dispersion is based on the approach of Weil (1996). Plume mass captured by the cavity is well-mixed within the cavity. The captured plume mass is re-emitted to the far wake as a volume source.

(4) For elevated terrain, AERMOD incorporates the concept of the critical dividing streamline height, in which flow below this height remains horizontal, and flow above this height tends to rise up and over terrain (Snyder et al., 1985). Plume concentration estimates are the weighted sum of these two limiting plume states. However, consistent with the steady-state assumption of uniform horizontal wind direction over the modeling domain, straight-line plume trajectories are assumed, with adjustment in the plume/receptor geometry used to account for the terrain effects.

h. Horizontal Winds

Vertical profiles of wind are calculated for each hour based on measurements and surface-layer similarity (scaling) relationships. At a given height above ground, for a given hour, winds are assumed constant over the modeling domain. The effect of the vertical variation in horizontal wind speed on dispersion is accounted for through simple averaging over the plume depth.

i. Vertical Wind Speed

In convective conditions, the effects of random vertical updraft and downdraft velocities are simulated with a bi–Gaussian probability density function. In both convective and stable conditions, the mean vertical wind speed is assumed equal to zero.

j. Horizontal Dispersion

Gaussian horizontal dispersion coefficients are estimated as continuous functions of the parameterized (or measured) ambient lateral turbulence and also account for buoyancy-induced and building wake-induced turbulence. Vertical profiles of lateral turbulence are developed from measurements and similarity (scaling) relationships. Effective turbulence values are determined from the portion of the vertical profile of lateral turbulence between the plume height and the receptor height. The effective lateral turbulence is then used to estimate horizontal dispersion.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

k. Vertical Dispersion

In the stable boundary layer, Gaussian vertical dispersion coefficients are estimated as continuous functions of parameterized vertical turbulence. In the convective boundary layer, vertical dispersion is characterized by a bi–Gaussian probability density function, and is also estimated as a continuous function of parameterized vertical turbulence. Vertical turbulence profiles are developed from measurements and similarity (scaling) relationships. These turbulence profiles account for both convective and mechanical turbulence. Effective turbulence values are determined from the portion of the vertical profile of vertical turbulence between the plume height and the receptor height. The effective vertical turbulence is then used to estimate vertical dispersion.

l. Chemical Transformation

Chemical transformations are generally not treated by AERMOD. However, AERMOD does contain an option to treat chemical transformation using simple exponential decay, although this option is typically not used in regulatory applications, except for sources of sulfur dioxide in urban areas. Either a decay coefficient or a half life is input by the user. Note also that the Plume Volume Molar Ratio Method (subsection 5.1) and the Ozone Limiting Method (subsection 5.2.4) and for point-source $NO_2$ analyses are available as non-regulatory options.

m. Physical Removal

AERMOD can be used to treat dry and wet deposition for both gases and particles.

n. Evaluation Studies

American Petroleum Institute, 1998. Evaluation of State of the Science of Air Quality Dispersion Model, Scientific Evaluation, prepared by Woodward–Clyde Consultants, Lexington, Massachusetts, for American Petroleum Institute, Washington, D.C., 20005–4070.

Brode, R.W., 2002. Implementation and Evaluation of PRIME in AERMOD. Preprints of the 12th Joint Conference on Applications of Air Pollution Meteorology, May 20–24, 2002; American Meteorological Society, Boston, MA.

Brode, R.W., 2004. Implementation and Evaluation of Bulk Richardson Number Scheme in AERMOD. 13th Joint Conference on Applications of Air Pollution Meteorology, August 23–26, 2004; American Meteorological Society, Boston, MA.

Environmental Protection Agency, 2003. AERMOD: Latest Features and Evaluation Results. Publication No. EPA–454/R–03–003. U.S. Environmental Protection Agency, Research Triangle Park, NC. Available at http://www.epa.gov/scram001/.

A.2 Buoyant Line and Point Source Dispersion Model (BLP)

Reference

Schulman, Lloyd L., and Joseph S. Scire, 1980. Buoyant Line and Point Source (BLP) Dispersion Model User's Guide. Document P–7304B. Environmental Research and Technology, Inc., Concord, MA. (NTIS No. PB 81–164642; also available at http://www.epa.gov/scram001/)

Availability

The computer code is available on EPA's Internet SCRAM Web site and also on diskette (as PB 2002–500051) from the National Technical Information Service (see Section A.0).

Abstract

BLP is a Gaussian plume dispersion model designed to handle unique modeling problems associated with aluminum reduction plants, and other industrial sources where plume rise and downwash effects from stationary line sources are important.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

a. Recommendations for Regulatory Use

(1) The BLP model is appropriate for the following applications:

• Aluminum reduction plants which contain buoyant, elevated line sources;

• Rural areas;

• Transport distances less than 50 kilometers;

• Simple terrain; and

• One hour to one year averaging times.

(2) The following options should be selected for regulatory applications:

(i) Rural (IRU=1) mixing height option;

(ii) Default (no selection) for plume rise wind shear (LSHEAR), transitional point source plume rise (LTRANS), vertical potential temperature gradient (DTHTA), vertical wind speed power law profile exponents (PEXP), maximum variation in number of stability classes per hour (IDELS), pollutant decay (DECFAC), the constant in Briggs' stable plume rise equation (CONST2), constant in Briggs' neutral plume rise equation (CONST3), convergence criterion for the line source calculations (CRIT), and maximum iterations allowed for line source calculations (MAXIT); and

(iii) Terrain option (TERAN) set equal to 0.0, 0.0, 0.0, 0.0, 0.0, 0.0

(3) For other applications, BLP can be used if it can be demonstrated to give the same estimates as a recommended model for the same application, and will subsequently be executed in that mode.

(4) BLP can be used on a case-by-case basis with specific options not available in a recommended model if it can be demonstrated, using the criteria in Section 3.2, that the model is more appropriate for a specific application.

b. Input Requirements

(1) Source data: point sources require stack location, elevation of stack base, physical stack height, stack inside diameter, stack gas exit velocity, stack gas exit temperature, and pollutant emission rate. Line sources require coordinates of the end points of the line, release height, emission rate, average line source width, average building width, average spacing between buildings, and average line source buoyancy parameter.

(2) Meteorological data: surface weather data from a preprocessor such as PCRAMMET which provides hourly stability class, wind direction, wind speed, temperature, and mixing height.

(3) Receptor data: locations and elevations of receptors, or location and size of receptor grid or request automatically generated receptor grid.

c. Output

(1) Printed output (from a separate post-processor program) includes:

(2) Total concentration or, optionally, source contribution analysis; monthly and annual frequency distributions for 1–, 3–, and 24–hour average concentrations; tables of 1–, 3–, and 24–hour average concentrations at each receptor; table of the annual (or length of run) average concentrations at each receptor;

(3) Five highest 1–, 3–, and 24–hour average concentrations at each receptor; and

(4) Fifty highest 1–, 3–, and 24–hour concentrations over the receptor field.

d. Type of Model

BLP is a gaussian plume model.

e. Pollutant Types

BLP may be used to model primary pollutants. This model does not treat settling and deposition.

f. Source–Receptor Relationship

(1) BLP treats up to 50 point sources, 10 parallel line sources, and 100 receptors arbitrarily located.

(2) User-input topographic elevation is applied for each stack and each receptor.

g. Plume Behavior

(1) BLP uses plume rise formulas of Schulman and Scire (1980).

(2) Vertical potential temperature gradients of 0.02 Kelvin per meter for E stability and 0.035 Kelvin per meter are used for stable plume rise calculations. An option for user input values is included.

(3) Transitional rise is used for line sources.

(4) Option to suppress the use of transitional plume rise for point sources is included.

(5) The building downwash algorithm of Schulman and Scire (1980) is used.

h. Horizontal Winds

(1) Constant, uniform (steady-state) wind is assumed for an hour.

Straight line plume transport is assumed to all downwind distances.

(2) Wind speeds profile exponents of 0.10, 0.15, 0.20, 0.25, 0.30, and 0.30 are used for stability classes A through F, respectively. An option for user-defined values and an option to suppress the use of the wind speed profile feature are included.

i. Vertical Wind Speed

Vertical wind speed is assumed equal to zero.

j. Horizontal Dispersion

(1) Rural dispersion coefficients are from Turner (1969), with no adjustment made for variations in surface roughness or averaging time.

(2) Six stability classes are used.

k. Vertical Dispersion

(1) Rural dispersion coefficients are from Turner (1969), with no adjustment made for variations in surface roughness.

(2) Six stability classes are used.

(3) Mixing height is accounted for with multiple reflections until the vertical plume standard deviation equals 1.6 times the mixing height; uniform mixing is assumed beyond that point.

(4) Perfect reflection at the ground is assumed.

l. Chemical Transformation

Chemical transformations are treated using linear decay. Decay rate is input by the user.

m. Physical Removal

Physical removal is not explicitly treated.

n. Evaluation Studies

Schulman, L.L. and J.S. Scire, 1980. Buoyant Line and Point Source (BLP) Dispersion Model User's Guide, P–7304B. Environmental Research and Technology, Inc., Concord, MA.

Scire, J.S. and L.L. Schulman, 1981. Evaluation of the BLP and ISC Models with $SF_6$ Tracer Data and $SO_2$ Measurements at Aluminum Reduction Plants. APCA Specialty Conference on Dispersion Modeling for Complex Sources, St. Louis, MO.

A.3 CALINE3

Reference

Benson, Paul E., 1979. CALINE3--A Versatile Dispersion Model for Predicting Air Pollutant Levels Near Highways and Arterial Streets. Interim Report, Report Number FHWA/CA/TL–79/23. Federal Highway Administration, Washington, DC (NTIS No. PB 80–220841).

Availability

The CALINE3 model is available on diskette (as PB 95–502712) from NTIS. The source code and user's guide are also available on EPA's Internet SCRAM Web site (Section A.0).

Abstract

CALINE3 can be used to estimate the concentrations of nonreactive pollutants from highway traffic. This steady-state Gaussian model can be applied to determine air pollution concentrations at receptor locations downwind of “at-grade,” “fill,” “bridge,” and “cut section” highways located in relatively uncomplicated terrain. The model is applicable for any wind direction, highway orientation, and receptor location. The model has adjustments for averaging time and surface roughness, and can handle up to 20 links and 20 receptors. It also contains an algorithm for deposition and settling velocity so that particulate concentrations can be predicted.

a. Recommendations for Regulatory Use

CALINE–3 is appropriate for the following applications:

• Highway (line) sources;

• Urban or rural areas;

• Simple terrain;

• Transport distances less than 50 kilometers; and

• One-hour to 24–hour averaging times.

b. Input Requirements

(1) Source data: up to 20 highway links classed as “at-grade,” “fill,” “bridge,” or “depressed”; coordinates of link end points; traffic volume; emission factor; source height; and mixing zone width.

(2) Meteorological data: wind speed, wind angle (measured in degrees clockwise from the Y axis), stability class, mixing height, ambient (background to the highway) concentration of pollutant.

(3) Receptor data: coordinates and height above ground for each receptor.

c. Output

Printed output includes concentration at each receptor for the specified meteorological condition.

d. Type of Model

CALINE–3 is a Gaussian plume model.

e. Pollutant Types

CALINE–3 may be used to model primary pollutants.

f. Source–Receptor Relationship

(1) Up to 20 highway links are treated.

(2) CALINE–3 applies user input location and emission rate for each link. User-input receptor locations are applied.

g. Plume Behavior

Plume rise is not treated.

h. Horizontal Winds

(1) User-input hourly wind speed and direction are applied.

(2) Constant, uniform (steady-state) wind is assumed for an hour.

i. Vertical Wind Speed

Vertical wind speed is assumed equal to zero.

j. Horizontal Dispersion

(1) Six stability classes are used.

(2) Rural dispersion coefficients from Turner (1969) are used, with adjustment for roughness length and averaging time.

(3) Initial traffic-induced dispersion is handled implicitly by plume size parameters.

k. Vertical Dispersion

(1) Six stability classes are used.

(2) Empirical dispersion coefficients from Benson (1979) are used including an adjustment for roughness length.

(3) Initial traffic-induced dispersion is handled implicitly by plume size parameters.

(4) Adjustment for averaging time is included.

l. Chemical Transformation

Not treated.

m. Physical Removal

Optional deposition calculations are included.

n. Evaluation Studies

Bemis, G.R. et al., 1977. Air Pollution and Roadway Location, Design, and Operation--Project Overview. FHWA–CA–TL–7080–77–25, Federal Highway Administration, Washington, DC.

Cadle, S.H. et al., 1976. Results of the General Motors Sulfate Dispersion Experiment, GMR–2107. General Motors Research Laboratories, Warren, MI.

Dabberdt, W.F., 1975. Studies of Air Quality on and Near Highways, Project 2761. Stanford Research Institute, Menlo Park, CA.

Environmental Protection Agency, 1986. Evaluation of Mobile Source Air Quality Simulation Models. EPA Publication No. EPA–450/4–86–002. Office of Air Quality Planning & Standards, Research Triangle Park, NC. (NTIS No. PB 86–167293)

A.4 CALPUFF

References

Scire, J.S., D.G. Strimaitis and R.J. Yamartino, 2000. A User's Guide for the CALPUFF Dispersion Model (Version 5.0). Earth Tech, Inc., Concord, MA.

Scire J.S., F.R. Robe, M.E. Fernau and R.J. Yamartino, 2000. A User's Guide for the CALMET Meteorological Model (Version 5.0). Earth Tech, Inc., Concord, MA.

Availability

The model code and its documentation are available at no cost for download from the model developers' Internet Web site: http://www.src.com/calpuff/calpuff1.htm. You may also contact Joseph Scire, Earth Tech, Inc., 196 Baker Avenue, Concord, MA 01742; Telephone: (978) 371–4270; Fax: (978) 371–2468; e-mail: JScire@alum.mit.edu.

Abstract

CALPUFF is a multi-layer, multi-species non-steady-state puff dispersion modeling system that simulates the effects of time- and space-varying meteorological conditions on pollutant transport, transformation, and removal. CALPUFF is intended for use on scales from tens of meters from a source to hundreds of kilometers. It includes algorithms for near-field effects such as stack tip downwash, building downwash, transitional buoyant and momentum plume rise, rain cap effects, partial plume penetration, subgrid scale terrain and coastal interactions effects, and terrain impingement as well as longer range effects such as pollutant removal due to wet scavenging and dry deposition, chemical transformation, vertical wind shear effects, overwater transport, plume fumigation, and visibility effects of particulate matter concentrations.

a. Recommendations for Regulatory Use

(1) CALPUFF is appropriate for long range transport (source-receptor distances of 50 to several hundred kilometers) of emissions from point, volume, area, and line sources. The meteorological input data should be fully characterized with time-and-space-varying three dimensional wind and meteorological conditions using CALMET, as discussed in paragraphs 8.3(d) and 8.3.1.2(d) of Appendix W.

(2) CALPUFF may also be used on a case-by-case basis if it can be demonstrated using the criteria in Section 3.2 that the model is more appropriate for the specific application. The purpose of choosing a modeling system like CALPUFF is to fully treat stagnation, wind reversals, and time and space variations of meteorological conditions on transport and dispersion, as discussed in paragraph 7.2.8(a).

(3) For regulatory applications of CALMET and CALPUFF, the regulatory default option should be used. Inevitably, some of the model control options will have to be set specific for the application using expert judgment and in consultation with the appropriate reviewing authorities.

b. Input Requirements

Source Data:

1. Point sources: Source location, stack height, diameter, exit velocity, exit temperature, base elevation, wind direction specific building dimensions (for building downwash calculations), and emission rates for each pollutant. Particle size distributions may be entered for particulate matter. Temporal emission factors (diurnal cycle, monthly cycle, hour/season, wind speed/stability class, or temperature-dependent emission factors) may also be entered. Arbitrarily-varying point source parameters may be entered from an external file.

2. Area sources: Source location and shape, release height, base elevation, initial vertical distribution ($\#_z$) and emission rates for each pollutant. Particle size distributions may be entered for particulate matter. Temporal emission factors (diurnal cycle, monthly cycle, hour/season, wind speed/stability class, or temperature-dependent emission factors) may also be entered. Arbitrarily-varying area source parameters may be entered from an external file. Area sources specified in the external file are allowed to be buoyant and their location, size, shape, and other source characteristics are allowed to change in time.

3. Volume sources: Source location, release height, base elevation, initial horizontal and vertical distributions ($\#_y$, $\#_z$) and emission rates for each pollutant. Particle size distributions may be entered for particulate matter. Temporal emission factors (diurnal cycle, monthly cycle, hour/season, wind speed/stability class, or temperature-dependent emission factors) may also be entered. Arbitrarily-varying volume source parameters may be entered from an external file. Volume sources with buoyancy can be simulated by treating the source as a point source and entering initial plume size parameters--initial ($\#_y$, $\#_z$)--to define the initial size of the volume source.

4. Line sources: Source location, release height, base elevation, average buoyancy parameter, and emission rates for each pollutant. Building data may be entered for line source emissions experiencing building downwash effects. Particle size distributions may be entered for particulate matter. Temporal emission factors (diurnal cycle, monthly cycle, hour/season, wind speed/stability class, or temperature-dependent emission factors) may also be entered. Arbitrarily-varying line source parameters may be entered from an external file.

Meteorological Data (different forms of meteorological input can be used by CALPUFF):

1. Time-dependent three-dimensional (3–D) meteorological fields generated by CALMET. This is the preferred mode for running CALPUFF. Data inputs used by CALMET include surface observations of wind speed, wind direction, temperature, cloud cover, ceiling height, relative humidity, surface pressure, and precipitation (type and amount), and upper air sounding data (wind speed, wind direction, temperature, and height) and air-sea temperature differences (over water). Optional 3–D meteorological prognostic model output (e.g., from models such as MM5, RUC, Eta and RAMS) can be used by CALMET as well (paragraph 8.3.1.2(d)). CALMET contains an option to be run in “No-observations” mode (Robe et al., 2002), which

allows the 3–D CALMET meteorological fields to be based on prognostic model output alone, without observations. This allows CALMET and CALPUFF to be run in prognostic mode for forecast applications.

2. Single station surface and upper air meteorological data in CTDMPLUS data file formats (SURFACE.DAT and PROFILE.DAT files) or AERMOD data file formats. These options allow a vertical variation in the meteorological parameters but no horizontal spatial variability.

3. Single station meteorological data in ISCST3 data file format. This option does not account for variability of the meteorological parameters in the horizontal or vertical, except as provided for by the use of stability-dependent wind shear exponents and average temperature lapse rates.

Gridded terrain and land use data are required as input into CALMET when Option 1 is used. Geophysical processor programs are provided that interface the modeling system to standard terrain and land use data bases available from various sources such as the U.S. Geological Survey (USGS) and the National Aeronautics and Space Administration (NASA).

Receptor Data:

CALPUFF includes options for gridded and non-gridded (discrete) receptors. Special subgrid-scale receptors are used with the subgrid-scale complex terrain option. An option is provided for discrete receptors to be placed at ground-level or above the local ground level (i.e., flagpole receptors). Gridded and subgrid-scale receptors are placed at the local ground level only.

Other Input:

CALPUFF accepts hourly observations of ozone concentrations for use in its chemical transformation algorithm. Monthly concentrations of ammonia concentrations can be specified in the CALPUFF input file, although higher time-resolution ammonia variability can be computed using the POSTUTIL program. Subgrid-scale coastlines can be specified in its coastal boundary file. Optional, user-specified deposition velocities and chemical transformation rates can also be entered. CALPUFF accepts the CTDMPLUS terrain and receptor files for use in its subgrid-scale terrain algorithm. Inflow boundary conditions of modeled pollutants can be specified in a boundary condition file. Liquid water content variables including cloud water/ice and precipitation water/ice can be used as input for visibility analyses and other CALPUFF modules.

c. Output

CALPUFF produces files of hourly concentrations of ambient concentrations for each modeled species, wet deposition fluxes, dry deposition fluxes, and for visibility applications, extinction coefficients. Postprocessing programs (PRTMET, CALPOST, CALSUM, APPEND, and POSTUTIL) provide options for summing, scaling, analyzing and displaying the modeling results. CALPOST contains options for computing of light extinction (visibility) and POSTUTIL allows the re-partitioning of nitric acid and nitrate to account for the effects of ammonia limitation (Scire et al., 2001; Escoffier–Czaja and Scire, 2002). CALPUFF contains an options to output liquid water concentrations for use in computing visible plume lengths and frequency of icing and fogging from cooling towers and other water vapor sources. The CALPRO Graphical User Interface (GUI) contains options for creating graphics such as contour plots, vector plots and other displays when linked to graphics software.

d. Type of Model

(1) CALPUFF is a non-steady-state time- and space-dependent Gaussian puff model. CALPUFF treats primary pollutants and simulates secondary pollutant formation using a parameterized, quasi-linear chemical conversion mechanism. Pollutants treated include $SO_2$, $SO_4$=, $NO_X$ (i.e., NO + $NO_2$), $HNO_3$, $NO_3$-, $NH_3$, PM–10, PM–2.5, toxic pollutants and others pollutant species that are either inert or subject to quasi-linear chemical reactions. The model includes a resistance-based dry deposition model for both gaseous pollutants and particulate matter. Wet deposition is treated using a scavenging coefficient approach. The model has detailed parameterizations of complex terrain effects, including terrain impingement, side-wall scrapping, and steep-walled terrain influences on lateral plume growth. A subgrid-scale complex terrain module based on a dividing streamline concept divides the flow into a lift component traveling over the obstacle and a wrap component deflected around the obstacle.

(2) The meteorological fields used by CALPUFF are produced by the CALMET meteorological model. CALMET includes a diagnostic wind field model containing parameterized treatments of slope flows, valley flows, terrain blocking effects, and kinematic terrain effects, lake and sea breeze circulations, a divergence minimization procedure, and objective analysis of observational data. An energy-balance scheme is used to compute sensible and latent heat fluxes and turbulence parameters over land surfaces. A profile method is used over water. CALMET contains interfaces to prognostic meteorological models such as the Penn State/NCAR Mesoscale Model (e.g., MM5; Section 12.0, ref. 86), as well as the RAMS, Ruc and Eta models.

e. Pollutant Types

CALPUFF may be used to model gaseous pollutants or particulate matter that are inert or which undergo quasi-linear chemical reactions, such as $SO_2$, $SO_4$=, $NO_X$ (i.e., NO + $NO_2$), $HNO_3$, $NO_3$-, $NH_3$, PM–10, PM–2.5 and toxic pollutants. For regional haze analyses, sulfate and nitrate particulate components are explicitly treated.

f. Source–Receptor Relationships

CALPUFF contains no fundamental limitations on the number of sources or receptors. Parameter files are provided that allow the user to specify the maximum number of sources, receptors, puffs, species, grid cells, vertical layers, and other model parameters. Its algorithms are designed to be suitable for source-receptor distances from tens of meters to hundreds of kilometers.

g. Plume Behavior

Momentum and buoyant plume rise is treated according to the plume rise equations of Briggs (1975) for non-downwashing point sources, Schulman and Scire (1980) for line sources and point sources subject to building downwash effects using the Schulman–Scire downwash algorithm, and Zhang (1993) for buoyant area sources and point sources affected by building downwash when using the PRIME building downwash method. Stack tip downwash effects and partial plume penetration into elevated temperature inversions are included. An algorithm to treat horizontally-oriented vents and stacks with rain caps is included.

h. Horizontal Winds

A three-dimensional wind field is computed by the CALMET meteorological model. CALMET combines an objective analysis procedure using wind observations with parameterized treatments of slope flows, valley flows, terrain kinematic effects, terrain blocking effects, and sea/lake breeze circulations. CALPUFF may optionally use single station (horizontally-constant) wind fields in the CTDMPLUS, AERMOD or ISCST3 data formats.

i. Vertical Wind Speed

Vertical wind speeds are not used explicitly by CALPUFF. Vertical winds are used in the development of the horizontal wind components by CALMET.

j. Horizontal Dispersion

Turbulence-based dispersion coefficients provide estimates of horizontal plume dispersion based on measured or computed values of $\#_v$. The effects of building downwash and buoyancy-induced dispersion are included. The effects of vertical wind shear are included through the puff splitting algorithm. Options are provided to use Pasquill–Gifford (rural) and McElroy–Pooler (urban) dispersion coefficients. Initial plume size from area or volume sources is allowed.

k. Vertical Dispersion

Turbulence-based dispersion coefficients provide estimates of vertical plume dispersion based on measured or computed values of $\#_w$. The effects of building downwash and buoyancy-induced dispersion are included. Vertical dispersion during convective conditions is simulated with a probability density function (pdf) model based on Weil et al. (1997). Options are provided to use

Pasquill–Gifford (rural) and McElroy–Pooler (urban) dispersion coefficients. Initial plume size from area or volume sources is allowed.

l. Chemical Transformation

Gas phase chemical transformations are treated using parameterized models of $SO_2$ conversion to $SO_4$= and NO conversion to $NO_{3-}$, $HNO_3$, and $NO_2$. Organic aerosol formation is treated. The POSTUTIL program contains an option to re-partition $HNO_3$ and $NO_{3-}$ in order to treat the effects of ammonia limitation.

m. Physical Removal

Dry deposition of gaseous pollutants and particulate matter is parameterized in terms of a resistance-based deposition model. Gravitational settling, inertial impaction, and Brownian motion effects on deposition of particulate matter is included. CALPUFF contains an option to evaluate the effects of plume tilt resulting from gravitational settling. Wet deposition of gases and particulate matter is parameterized in terms of a scavenging coefficient approach.

n. Evaluation Studies

Berman, S., J.Y. Ku, J. Zhang and S.T. Rao, 1977. Uncertainties in estimating the mixing depth--Comparing three mixing depth models with profiler measurements, Atmospheric Environment, 31: 3023–3039.

Chang, J.C., P. Franzese, K. Chayantrakom and S.R. Hanna, 2001. Evaluations of CALPUFF, HPAC and VLSTRACK with Two Mesoscale Field Datasets. Journal of Applied Meteorology, 42(4): 453–466.

Environmental Protection Agency, 1998. Interagency Workgroup on Air Quality Modeling (IWAQM) Phase 2 Summary Report and Recommendations for Modeling Long–Range Transport Impacts. EPA Publication No. EPA–454/R–98–019. Office of Air Quality Planning & Standards, Research Triangle Park, NC.

Irwin, J.S., 1997. A Comparison of CALPUFF Modeling Results with 1997 INEL Field Data Results. In Air Pollution Modeling and its Application, XII. Edited by S.E. Gyrning and N. Chaumerliac. Plenum Press, New York, NY.

Irwin, J.S., J.S. Scire and D.G. Strimaitis, 1996. A Comparison of CALPUFF Modeling Results with CAPTEX Field Data Results. In Air Pollution Modeling and its Application, XI. Edited by S.E. Gyrning and F.A. Schiermeier. Plenum Press, New York, NY.

Morrison, K, Z–X Wu, J.S. Scire, J. Chenier and T. Jeffs–Schonewille, 2003. CALPUFF–Based Predictive and Reactive Emission Control System. 96th A & WMA Annual Conference & Exhibition, 22–26 June 2003; San Diego, CA.

Schulman, L.L., D.G. Strimaitis and J.S. Scire, 2000. Development and evaluation of the PRIME Plume Rise and Building Downwash Model. JAWMA, 50: 378–390.

Scire, J.S., Z–X Wu, D.G. Strimaitis and G.E. Moore, 2001. The Southwest Wyoming Regional CALPUFF Air Quality Modeling Study--Volume I. Prepared for the Wyoming Dept. of Environmental Quality. Available from Earth Tech at http://www.src.com.

Strimaitis, D.G., J.S. Scire and J.C. Chang, 1998. Evaluation of the CALPUFF Dispersion Model with Two Power Plant Data Sets. Tenth Joint Conference on the Application of Air Pollution Meteorology, Phoenix, Arizona. American Meteorological Society, Boston, MA. January 11–16, 1998.

A.5 Complex Terrain Dispersion Model Plus Algorithms for Unstable Situations (CTDMPLUS)

Reference

Perry, S.G., D.J. Burns, L.H. Adams, R.J. Paine, M.G. Dennis, M.T. Mills, D.G. Strimaitis, R.J. Yamartino and E.M. Insley, 1989. User's Guide to the Complex Terrain Dispersion Model Plus Algorithms for Unstable Situations (CTDMPLUS). Volume 1: Model Descriptions and User Instructions. EPA Publication No. EPA–600/8–89–041. Environmental Protection Agency, Research Triangle Park, NC. (NTIS No. PB 89–181424)

Perry, S.G., 1992. CTDMPLUS: A Dispersion Model for Sources near Complex Topography. Part I: Technical Formulations. Journal of Applied Meteorology, 31(7): 633–645.

Availability

This model code is available on EPA's Internet SCRAM Web site and also on diskette (as PB 90–504119) from the National Technical Information Service (Section A.0).

Abstract

CTDMPLUS is a refined point source Gaussian air quality model for use in all stability conditions for complex terrain applications. The model contains, in its entirety, the technology of CTDM for stable and neutral conditions. However, CTDMPLUS can also simulate daytime, unstable conditions, and has a number of additional capabilities for improved user friendliness. Its use of meteorological data and terrain information is different from other EPA models; considerable detail for both types of input data is required and is supplied by preprocessors specifically designed for CTDMPLUS. CTDMPLUS requires the parameterization of individual hill shapes using the terrain preprocessor and the association of each model receptor with a particular hill.

a. Recommendation for Regulatory Use

CTDMPLUS is appropriate for the following applications:

• Elevated point sources;

• Terrain elevations above stack top;

• Rural or urban areas;

• Transport distances less than 50 kilometers; and

• One hour to annual averaging times when used with a post-processor program such as CHAVG.

b. Input Requirements

(1) Source data: For each source, user supplies source location, height, stack diameter, stack exit velocity, stack exit temperature, and emission rate; if variable emissions are appropriate, the user supplies hourly values for emission rate, stack exit velocity, and stack exit temperature.

(2) Meteorological data: For applications of CTDMPLUS, multiple level (typically three or more) measurements of wind speed and direction, temperature and turbulence (wind fluctuation statistics) are required to create the basic meteorological data file (“PROFILE”). Such measurements should be obtained up to the representative plume height(s) of interest (i.e., the plume height(s) under those conditions important to the determination of the design concentration). The representative plume height(s) of interest should be determined using an appropriate complex terrain screening procedure (e.g., CTSCREEN) and should be documented in the monitoring/modeling protocol. The necessary meteorological measurements should be obtained from an appropriately sited meteorological tower augmented by SODAR and/or RASS if the representative plume height(s) of interest is above the levels represented by the tower measurements. Meteorological preprocessors then create a SURFACE data file (hourly values of mixed layer heights, surface friction velocity, Monin–Obukhov length and surface roughness length) and a RAWINsonde data file (upper air measurements of pressure, temperature, wind direction, and wind speed).

(3) Receptor data: receptor names (up to 400) and coordinates, and hill number (each receptor must have a hill number assigned).

(4) Terrain data: user inputs digitized contour information to the terrain preprocessor which creates the TERRAIN data file (for up to 25 hills).

c. Output

(1) When CTDMPLUS is run, it produces a concentration file, in either binary or text format (user's choice), and a list file containing a verification of model inputs, i.e.,

• Input meteorological data from “SURFACE” and “PROFILE”.

• Stack data for each source.

• Terrain information.

• Receptor information.

• Source-receptor location (line printer map).

(2) In addition, if the case-study option is selected, the listing includes:

• Meteorological variables at plume height.

• Geometrical relationships between the source and the hill.

• Plume characteristics at each receptor, i.e.,

--Distance in along-flow and cross flow direction

--Effective plume-receptor height difference

--Effective $\#_y$ & $\#_z$ values, both flat terrain and hill induced (the difference shows the effect of the hill)

--Concentration components due to WRAP, LIFT and FLAT.

(3) If the user selects the TOPN option, a summary table of the top 4 concentrations at each receptor is given. If the ISOR option is selected, a source contribution table for every hour will be printed.

(4) A separate disk file of predicted (1–hour only) concentrations (“CONC”) is written if the user chooses this option. Three forms of output are possible:

(i) A binary file of concentrations, one value for each receptor in the hourly sequence as run;

(ii) A text file of concentrations, one value for each receptor in the hourly sequence as run; or

(iii) A text file as described above, but with a listing of receptor information (names, positions, hill number) at the beginning of the file.

(3) Hourly information provided to these files besides the concentrations themselves includes the year, month, day, and hour information as well as the receptor number with the highest concentration.

d. Type of Model

CTDMPLUS is a refined steady-state, point source plume model for use in all stability conditions for complex terrain applications.

e. Pollutant Types

CTDMPLUS may be used to model non-reactive, primary pollutants.

f. Source–Receptor Relationship

Up to 40 point sources, 400 receptors and 25 hills may be used. Receptors and sources are allowed at any location. Hill slopes are assumed not to exceed 15°, so that the linearized equation of motion for Boussinesq flow are applicable. Receptors upwind of the impingement point, or those associated with any of the hills in the modeling domain, require separate treatment.

g. Plume Behavior

(1) As in CTDM, the basic plume rise algorithms are based on Briggs' (1975) recommendations.

(2) A central feature of CTDMPLUS for neutral/stable conditions is its use of a critical dividing-streamline height ($H_c$) to separate the flow in the vicinity of a hill into two separate layers. The plume component in the upper layer has sufficient kinetic energy to pass over the top of the hill while streamlines in the lower portion are constrained to flow in a horizontal plane around the hill. Two separate components of CTDMPLUS compute ground-level concentrations resulting from plume material in each of these flows.

(3) The model calculates on an hourly (or appropriate steady averaging period) basis how the plume trajectory (and, in stable/neutral conditions, the shape) is deformed by each hill. Hourly profiles of wind and temperature measurements are used by CTDMPLUS to compute plume rise, plume penetration (a formulation is included to handle penetration into elevated stable layers, based on Briggs (1984)), convective scaling parameters, the value of $H_c$, and the Froude number above $H_c$.

h. Horizontal Winds

CTDMPLUS does not simulate calm meteorological conditions. Both scalar and vector wind speed observations can be read by the model. If vector wind speed is unavailable, it is calculated from the scalar wind speed. The assignment of wind speed (either vector or scalar) at plume height is done by either:

• Interpolating between observations above and below the plume height, or

• Extrapolating (within the surface layer) from the nearest measurement height to the plume height.

i. Vertical Wind Speed

Vertical flow is treated for the plume component above the critical dividing streamline height ($H_c$); see “Plume Behavior”.

j. Horizontal Dispersion

Horizontal dispersion for stable/neutral conditions is related to the turbulence velocity scale for lateral fluctuations, $\#_v$, for which a minimum value of 0.2 m/s is used. Convective scaling formulations are used to estimate horizontal dispersion for unstable conditions.

k. Vertical Dispersion

Direct estimates of vertical dispersion for stable/neutral conditions are based on observed vertical turbulence intensity, e.g., $\#_w$ (standard deviation of the vertical velocity fluctuation). In simulating unstable (convective) conditions, CTDMPLUS relies on a

skewed, bi–Gaussian probability density function (pdf) description of the vertical velocities to estimate the vertical distribution of pollutant concentration.

l. Chemical Transformation

Chemical transformation is not treated by CTDMPLUS.

m. Physical Removal

Physical removal is not treated by CTDMPLUS (complete reflection at the ground/hill surface is assumed).

n. Evaluation Studies

Burns, D.J., L.H. Adams and S.G. Perry, 1990. Testing and Evaluation of the CTDMPLUS Dispersion Model: Daytime Convective Conditions. Environmental Protection Agency, Research Triangle Park, NC.

Paumier, J.O., S.G. Perry and D.J. Burns, 1990. An Analysis of CTDMPLUS Model Predictions with the Lovett Power Plant Data Base. Environmental Protection Agency, Research Triangle Park, NC.

Paumier, J.O., S.G. Perry and D.J. Burns, 1992. CTDMPLUS: A Dispersion Model for Sources near Complex Topography. Part II: Performance Characteristics. Journal of Applied Meteorology, 31(7): 646–660.

A.6 Offshore and Coastal Dispersion Model (OCD)

Reference

DiCristofaro, D.C. and S.R. Hanna, 1989. OCD: The Offshore and Coastal Dispersion Model, Version 4. Volume I: User's Guide, and Volume II: Appendices. Sigma Research Corporation, Westford, MA. (NTIS Nos. PB 93–144384 and PB 93–144392; also available at http://www.epa.gov/scram001/)

Availability

This model code is available on EPA's Internet SCRAM Web site and also on diskette (as PB 91–505230) from the National Technical Information Service (see Section A.0). Official contact at Minerals Management Service: Mr. Dirk Herkhof, Parkway Atrium Building, 381 Elden Street, Herndon, VA 20170, Phone: (703) 787–1735.

Abstract

(1) OCD is a straight-line Gaussian model developed to determine the impact of offshore emissions from point, area or line sources on the air quality of coastal regions. OCD incorporates overwater plume transport and dispersion as well as changes that occur as the plume crosses the shoreline. Hourly meteorological data are needed from both offshore and onshore locations. These include water surface temperature, overwater air temperature, mixing height, and relative humidity.

(2) Some of the key features include platform building downwash, partial plume penetration into elevated inversions, direct use of turbulence intensities for plume dispersion, interaction with the overland internal boundary layer, and continuous shoreline fumigation.

a. Recommendations for Regulatory Use

OCD has been recommended for use by the Minerals Management Service for emissions located on the Outer Continental Shelf (50 FR 12248; 28 March 1985). OCD is applicable for overwater sources where onshore receptors are below the lowest source height. Where onshore receptors are above the lowest source height, offshore plume transport and dispersion may be modeled on a case-by-case basis in consultation with the appropriate reviewing authority (paragraph 3.0(b)).

b. Input Requirements

(1) Source data: Point, area or line source location, pollutant emission rate, building height, stack height, stack gas temperature, stack inside diameter, stack gas exit velocity, stack angle from vertical, elevation of stack base above water surface and gridded specification of the land/water surfaces. As an option, emission rate, stack gas exit velocity and temperature can be varied hourly.

(2) Meteorological data (over water): Wind direction, wind speed, mixing height, relative humidity, air temperature, water surface temperature, vertical wind direction shear (optional), vertical temperature gradient (optional), turbulence intensities (optional).

(2) Meteorological data:

Over land: Surface weather data from a preprocessor such as PCRAMMET which provides hourly stability class, wind direction, wind speed, ambient temperature, and mixing height are required.

Over water: Hourly values for mixing height, relative humidity, air temperature, and water surface temperature are required; if wind speed/direction are missing, values over land will be used (if available); vertical wind direction shear, vertical temperature gradient, and turbulence intensities are optional.

(3) Receptor data: Location, height above local ground-level, ground-level elevation above the water surface.

c. Output

(1) All input options, specification of sources, receptors and land/water map including locations of sources and receptors.

(2) Summary tables of five highest concentrations at each receptor for each averaging period, and average concentration for entire run period at each receptor.

(3) Optional case study printout with hourly plume and receptor characteristics. Optional table of annual impact assessment from non-permanent activities.

(4) Concentration files written to disk or tape can be used by ANALYSIS postprocessor to produce the highest concentrations for each receptor, the cumulative frequency distributions for each receptor, the tabulation of all concentrations exceeding a given threshold, and the manipulation of hourly concentration files.

d. Type of Model

OCD is a Gaussian plume model constructed on the framework of the MPTER model.

e. Pollutant Types

OCD may be used to model primary pollutants. Settling and deposition are not treated.

f. Source–Receptor Relationship

(1) Up to 250 point sources, 5 area sources, or 1 line source and 180 receptors may be used.

(2) Receptors and sources are allowed at any location.

(3) The coastal configuration is determined by a grid of up to 3600 rectangles. Each element of the grid is designated as either land or water to identify the coastline.

g. Plume Behavior

(1) As in ISC, the basic plume rise algorithms are based on Briggs' recommendations.

(2) Momentum rise includes consideration of the stack angle from the vertical.

(3) The effect of drilling platforms, ships, or any overwater obstructions near the source are used to decrease plume rise using a revised platform downwash algorithm based on laboratory experiments.

(4) Partial plume penetration of elevated inversions is included using the suggestions of Briggs (1975) and Weil and Brower (1984).

(5) Continuous shoreline fumigation is parameterized using the Turner method where complete vertical mixing through the thermal internal boundary layer (TIBL) occurs as soon as the plume intercepts the TIBL.

h. Horizontal Winds

(1) Constant, uniform wind is assumed for each hour.

(2) Overwater wind speed can be estimated from overland wind speed using relationship of Hsu (1981).

(3) Wind speed profiles are estimated using similarity theory (Businger, 1973). Surface layer fluxes for these formulas are calculated from bulk aerodynamic methods.

i. Vertical Wind Speed

Vertical wind speed is assumed equal to zero.

j. Horizontal Dispersion

(1) Lateral turbulence intensity is recommended as a direct estimate of horizontal dispersion. If lateral turbulence intensity is not available, it is estimated from boundary layer theory. For wind speeds less than 8 m/s, lateral turbulence intensity is assumed inversely proportional to wind speed.

(2) Horizontal dispersion may be enhanced because of obstructions near the source. A virtual source technique is used to simulate the initial plume dilution due to downwash.

(3) Formulas recommended by Pasquill (1976) are used to calculate buoyant plume enhancement and wind direction shear enhancement.

(4) At the water/land interface, the change to overland dispersion rates is modeled using a virtual source. The overland dispersion rates can be calculated from either lateral turbulence intensity or Pasquill–Gifford curves. The change is implemented where the plume intercepts the rising internal boundary layer.

k. Vertical Dispersion

(1) Observed vertical turbulence intensity is not recommended as a direct estimate of vertical dispersion. Turbulence intensity should be estimated from boundary layer theory as default in the model. For very stable conditions, vertical dispersion is also a function of lapse rate.

(2) Vertical dispersion may be enhanced because of obstructions near the source. A virtual source technique is used to simulate the initial plume dilution due to downwash.

(3) Formulas recommended by Pasquill (1976) are used to calculate buoyant plume enhancement.

(4) At the water/land interface, the change to overland dispersion rates is modeled using a virtual source. The overland dispersion rates can be calculated from either vertical turbulence intensity or the Pasquill–Gifford coefficients. The change is implemented where the plume intercepts the rising internal boundary layer.

1. Chemical Transformation

Chemical transformations are treated using exponential decay. Different rates can be specified by month and by day or night.

m. Physical Removal

Physical removal is also treated using exponential decay.

n. Evaluation Studies

DiCristofaro, D.C. and S.R. Hanna, 1989. OCD: The Offshore and Coastal Dispersion Model. Volume I: User's Guide. Sigma Research Corporation, Westford, MA.

Hanna, S.R., L.L. Schulman, R.J. Paine and J.E. Pleim, 1984. The Offshore and Coastal Dispersion (OCD) Model User's Guide, Revised. OCS Study, MMS 84–0069. Environmental Research & Technology, Inc., Concord, MA. (NTIS No. PB 86–159803).

Hanna, S.R., L.L. Schulman, R.J. Paine, J.E. Pleim and M. Baer, 1985. Development and Evaluation of the Offshore and Coastal Dispersion (OCD) Model. Journal of the Air Pollution Control Association, 35: 1039–1047.

Hanna, S.R. and D.C. DiCristofaro, 1988. Development and Evaluation of the OCD/API Model. Final Report, API Pub. 4461, American Petroleum Institute, Washington, DC.

A. REFERENCES

Benson, P.E., 1979. CALINE3--A Versatile Dispersion Model for Predicting Air Pollution Levels Near Highways and Arterial Streets. Interim Report, Report Number FHWA/CA/TL–79/23. Federal Highway Administration, Washington, DC.

Briggs, G.A., 1975. Plume Rise Predictions. Lectures on Air Pollution and Environmental Impact Analyses. American Meteorological Society, Boston, MA, pp. 59–111.

Briggs, G.A., 1984. Analytical Parameterizations of Diffusion: The Convective Boundary Layer. Journal of Climate and Applied Meteorology, 24(11): 1167–1186.

Environmental Protection Agency, 1980. Recommendations on Modeling (October 1980 Meetings). Appendix G to: Summary of Comments and Responses on the October 1980 Proposed Revisions to the Guideline on Air Quality Models. Meteorology and Assessment Division, Office of Research and Development, Research Triangle Park, NC 27711.

Environmental Protection Agency, 1998. Interagency Workgroup on Air Quality Modeling (IWAQM) Phase 2 Summary Report and Recommendations for Modeling Long–Range Transport Impacts. Publication No. EPA–454/R–98–019. (NTIS No. PB 99–121089).

Escoffier–Czaja, C. and J.S. Scire, 2002. The Effects of Ammonia Limitation on Nitrate Aerosol Formation and Visibility Impacts in Class I Areas. Twelfth AMS/AWMA Conference on the Application of Air Pollution Meteorology, 20–24 May 2002; Norfolk, VA.

Gifford, F.A., Jr. 1976. Turbulent Diffusion Typing Schemes--A Review. Nuclear Safety, 17: 68–86.

Horst, T.W., 1983. A Correction to the Gaussian Source-depletion Model. In Precipitation Scavenging, Dry Deposition and Resuspension. H. R. Pruppacher, R.G. Semonin and W.G.N. Slinn, eds., Elsevier, NY.

Hsu, S.A., 1981. Models for Estimating Offshore Winds from Onshore Meteorological Measurements. Boundary Layer Meteorology, 20: 341–352.

Huber, A.H. and W.H. Snyder, 1976. Building Wake Effects on Short Stack Effluents. Third Symposium on Atmospheric Turbulence, Diffusion and Air Quality, American Meteorological Society, Boston, MA.

Irwin, J.S., 1979. A Theoretical Variation of the Wind Profile Power–Law Exponent as a Function of Surface Roughness and Stability. Atmospheric Environment, 13: 191–194.

Liu, M.K. et al., 1976. The Chemistry, Dispersion, and Transport of Air Pollutants Emitted from Fossil Fuel Power Plants in California: Data Analysis and Emission Impact Model. Systems Applications, Inc., San Rafael, CA.

Pasquill, F., 1976. Atmospheric Dispersion Parameters in Gaussian Plume Modeling Part II. Possible Requirements for Change in the Turner Workbook Values. Publication No. EPA–600/4–76–030b. Office of Air Quality Planning & Standards, Research Triangle Park, NC 27711.

Petersen, W.B., 1980. User's Guide for HIWAY–2 A Highway Air Pollution Model. Publication No. EPA–600/8–80–018. Office of Research & Development, Research Triangle Park, NC 27711. (NTIS PB 80–227556)

Rao, T.R. and M.T. Keenan, 1980. Suggestions for Improvement of the EPA–HIWAY Model. Journal of the Air Pollution Control Association, 30: 247–256 (and reprinted as Appendix C in Petersen, 1980).

Robe, F.R., Z–X. Wu and J.S. Scire, 2002: Real-time $SO_2$ Forecasting System with Combined ETA Analysis and CALPUFF Modeling. Proceedings of the 8th International Conference on Harmonisation within Atmospheric Dispersion Modelling for Regulatory Purposes, 14–17 October 2002; Sofia, Bulgaria.

Schulman, L.L. and J.S. Scire, 1980: Buoyant Line and Point Source (BLP) dispersion model user's guide. The Aluminum Association; Washington, DC. (See A.2 in this appendix.)

Schulman, L.L. and S.R. Hanna, 1986. Evaluation of Downwash Modification to the Industrial Source Complex Model. Journal of the Air Pollution Control Association, 36: 258–264.

Segal, H.M., 1983. Microcomputer Graphics in Atmospheric Dispersion Modeling. Journal of the Air Pollution Control Association, 23: 598–600.

Snyder, W.H., R.S. Thompson, R.E. Eskridge, R.E. Lawson, I.P. Castro, J.T. Lee, J.C.R. Hunt, and Y. Ogawa, 1985. The structure of the strongly stratified flow over hills: Dividing streamline concept. Journal of Fluid Mechanics, 152: 249–288.

Turner, D.B., 1969. Workbook of Atmospheric Dispersion Estimates. PHS Publication No. 999–26. U.S. Environmental Protection Agency, Research Triangle, Park, NC 27711.

Weil, J.C. and R.P. Brower, 1984. An Updated Gaussian Plume Model for Tall Stacks. Journal of the Air Pollution Control Association, 34: 818–827.

Weil, J.C., 1996. A new dispersion algorithm for stack sources in building wakes, Paper 6.6. Ninth Joint Conference on Applications of Air Pollution Meteorology with A & WMA, January 28–February 2, 1996. Atlanta, GA.

Weil, J.C., L.A. Corio, and R.P. Brower, 1997. A PDF dispersion model for buoyant plumes in the convective boundary layer. Journal of Applied Meteorology, 36: 982–1003.

Zhang, X., 1993. A computational analysis of the rise, dispersion, and deposition of buoyant plumes. Ph.D. Thesis, Massachusetts Institute of Technology, Cambridge, MA.

Zhang, X. and A.F. Ghoniem, 1993. A computational model for the rise and dispersion of wind-blown, buoyancy-driven plumes--I. Neutrally stratified atmosphere. Atmospheric Environment, 15: 2295–2311.

Credits
[58 FR 38822, July 20, 1993; 60 FR 40468–40471, Aug. 9, 1995; 61 FR 41840, Aug. 12, 1996; 68 FR 18448, April 15, 2003; 68 FR 25684, May 13, 2003; 70 FR 68228, Nov. 9, 2005]
SOURCE: 36 FR 22398, Nov. 25, 1971; 52 FR 24712, July 1, 1987; 55 FR 14249, April 17, 1990; 56 FR 42219, Aug. 26, 1991; 57 FR 32334, July 21, 1992; 57 FR 52987, Nov. 5, 1992; 58 FR 38821, July 20, 1993; 60 FR 40100, Aug. 7, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 43801, Aug. 15, 1997; 62 FR 44903, Aug. 25, 1997; 63 FR 24433, May 4, 1998; 64 FR 35763, July 1, 1999; 65 FR 45532, July 24, 2000; 72 FR 28613, May 22, 2007, unless otherwise noted.

AUTHORITY: 23 U.S.C. 101; 42 U.S.C. 7401–7671q.

Current through November 3, 2011; 76 FR 68118.

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter C. Air Programs
Part 50. National Primary and Secondary Ambient Air Quality Standards (Refs & Annos)

40 C.F.R. § 50.13

# § 50.13 National primary and secondary ambient air quality standards for $PM_{2.5}$.

Effective: December 18, 2006
Currentness

(a) The national primary and secondary ambient air quality standards for particulate matter are 15.0 micrograms per cubic meter ($\mu g/m^3$) annual arithmetic mean concentration, and 35 $\mu g/m^3$ 24–hour average concentration measured in the ambient air as $PM_{2.5}$ (particles with an aerodynamic diameter less than or equal to a nominal 2.5 micrometers) by either:

(1) A reference method based on appendix L of this part and designated in accordance with part 53 of this chapter; or

(2) An equivalent method designated in accordance with part 53 of this chapter.

(b) The annual primary and secondary $PM_{2.5}$ standards are met when the annual arithmetic mean concentration, as determined in accordance with appendix N of this part, is less than or equal to 15.0 $\mu g/m^3$.

(c) The 24–hour primary and secondary $PM_{2.5}$ standards are met when the 98th percentile 24–hour concentration, as determined in accordance with appendix N of this part, is less than or equal to 35 $\mu g/m^3$.

**Credits**
[71 FR 61224, Oct. 17, 2006]
SOURCE: 36 FR 22384, Nov. 25, 1971; 50 FR 25544, June 19, 1985; 63 FR 7274, Feb. 12, 1998 unless otherwise noted., unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401, et seq.

Notes of Decisions (1)

Current through November 3, 2011; 76 FR 68118.

End of Document
© 2011 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter C. Air Programs
Part 51. Requirements for Preparation, Adoption, and Submittal of Implementation Plans (Refs & Annos)
Subpart I. Review of New Sources and Modifications (Refs & Annos)

40 C.F.R. § 51.161

§ 51.161 Public availability of information.

Currentness

(a) The legally enforceable procedures in § 51.160 must also require the State or local agency to provide opportunity for public comment on information submitted by owners and operators. The public information must include the agency's analysis of the effect of construction or modification on ambient air quality, including the agency's proposed approval or disapproval.

(b) For purposes of paragraph (a) of this section, opportunity for public comment shall include, as a minimum--

(1) Availability for public inspection in at least one location in the area affected of the information submitted by the owner or operator and of the State or local agency's analysis of the effect on air quality;

(2) A 30–day period for submittal of public comment; and

(3) A notice by prominent advertisement in the area affected of the location of the source information and analysis specified in paragraph (b)(1) of this section.

(c) Where the 30–day comment period required in paragraph (b) of this section would conflict with existing requirements for acting on requests for permission to construct or modify, the State may submit for approval a comment period which is consistent with such existing requirements.

(d) A copy of the notice required by paragraph (b) of this section must also be sent to the Administrator through the appropriate Regional Office, and to all other State and local air pollution control agencies having jurisdiction in the region in which such new or modified installation will be located. The notice also must be sent to any other agency in the region having responsibility for implementing the procedures required under this subpart. For lead, a copy of the notice is required for all point sources. The definition of point for lead is given in § 51.100(k)(2).
SOURCE: 36 FR 22398, Nov. 25, 1971; 51 FR 40669, Nov. 7, 1986; 52 FR 24712, July 1, 1987; 55 FR 14249, April 17, 1990; 56 FR 42219, Aug. 26, 1991; 57 FR 32334, July 21, 1992; 57 FR 52987, Nov. 5, 1992; 58 FR 38821, July 20, 1993; 60 FR 40100, Aug. 7, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 43801, Aug. 15, 1997; 62 FR 44903, Aug. 25, 1997; 63 FR 24433, May 4, 1998; 64 FR 35763, July 1, 1999; 65 FR 45532, July 24, 2000; 72 FR 28613, May 22, 2007, unless otherwise noted.

AUTHORITY: 23 U.S.C. 101; 42 U.S.C. 7401–7671q.

Notes of Decisions (1)

Current through November 3, 2011; 76 FR 68118.

**End of Document** © 2011 Thomson Reuters. No claim to original U.S. Government Works.

40 C.F.R. § 51.165

§ 51.165 Permit requirements.

Effective: March 30, 2011
Currentness

(a) State Implementation Plan and Tribal Implementation Plan provisions satisfying sections 172(c)(5) and 173 of the Act shall meet the following conditions:

(1) All such plans shall use the specific definitions. Deviations from the following wording will be approved only if the State specifically demonstrates that the submitted definition is more stringent, or at least as stringent, in all respects as the corresponding definition below:

(i) Stationary source means any building, structure, facility, or installation which emits or may emit a regulated NSR pollutant.

(ii) Building, structure, facility, or installation means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any vessel. Pollutant-emitting activities shall be considered as part of the same industrial grouping if they belong to the same Major Group (i.e., which have the same two-digit code) as described in the Standard Industrial Classification Manual, 1972, as amended by the 1977 Supplement (U.S. Government Printing Office stock numbers 4101–0065 and 003–005–00176–0, respectively).

(iii) Potential to emit means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design only if the limitation or the effect it would have on emissions is federally enforceable. Secondary emissions do not count in determining the potential to emit of a stationary source.

(iv)(A) Major stationary source means:

(1) Any stationary source of air pollutants that emits, or has the potential to emit, 100 tons per year or more of any regulated NSR pollutant, except that lower emissions thresholds shall apply in areas subject to subpart 2, subpart 3, or subpart 4 of part D, title I of the Act, according to paragraphs (a)(1)(iv)(A)(1)(i) through (vi) of this section.

(i) 50 tons per year of volatile organic compounds in any serious ozone nonattainment area.

(ii) 50 tons per year of volatile organic compounds in an area within an ozone transport region, except for any severe or extreme ozone nonattainment area.

(iii) 25 tons per year of volatile organic compounds in any severe ozone nonattainment area.

(iv) 10 tons per year of volatile organic compounds in any extreme ozone nonattainment area.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(v) 50 tons per year of carbon monoxide in any serious nonattainment area for carbon monoxide, where stationary sources contribute significantly to carbon monoxide levels in the area (as determined under rules issued by the Administrator).

(vi) 70 tons per year of PM–10 in any serious nonattainment area for PM–10;

(2) For the purposes of applying the requirements of paragraph (a)(8) of this section to stationary sources of nitrogen oxides located in an ozone nonattainment area or in an ozone transport region, any stationary source which emits, or has the potential to emit, 100 tons per year or more of nitrogen oxides emissions, except that the emission thresholds in paragraphs (a)(1)(iv)(A)(2)(i) through (vi) of this section shall apply in areas subject to subpart 2 of part D, title I of the Act.

(i) 100 tons per year or more of nitrogen oxides in any ozone nonattainment area classified as marginal or moderate.

(ii) 100 tons per year or more of nitrogen oxides in any ozone nonattainment area classified as a transitional, submarginal, or incomplete or no data area, when such area is located in an ozone transport region.

(iii) 100 tons per year or more of nitrogen oxides in any area designated under section 107(d) of the Act as attainment or unclassifiable for ozone that is located in an ozone transport region.

(iv) 50 tons per year or more of nitrogen oxides in any serious nonattainment area for ozone.

(v) 25 tons per year or more of nitrogen oxides in any severe nonattainment area for ozone.

(vi) 10 tons per year or more of nitrogen oxides in any extreme nonattainment area for ozone; or

(3) Any physical change that would occur at a stationary source not qualifying under paragraphs (a)(1)(iv)(A)(1) or (2) of this section as a major stationary source, if the change would constitute a major stationary source by itself.

(B) A major stationary source that is major for volatile organic compounds shall be considered major for ozone

(C) The fugitive emissions of a stationary source shall not be included in determining for any of the purposes of this paragraph whether it is a major stationary source, unless the source belongs to one of the following categories of stationary sources:

(1) Coal cleaning plants (with thermal dryers);

(2) Kraft pulp mills;

(3) Portland cement plants;

(4) Primary zinc smelters;

(5) Iron and steel mills;

(6) Primary aluminum ore reduction plants;

(7) Primary copper smelters;

(8) Municipal incinerators capable of charging more than 250 tons of refuse per day;

(9) Hydrofluoric, sulfuric, or nitric acid plants;

(10) Petroleum refineries;

(11) Lime plants;

(12) Phosphate rock processing plants;

(13) Coke oven batteries;

(14) Sulfur recovery plants;

(15) Carbon black plants (furnace process);

(16) Primary lead smelters;

(17) Fuel conversion plants;

(18) Sintering plants;

(19) Secondary metal production plants;

(20) Chemical process plants--The term chemical processing plant shall not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140;

(21) Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

(22) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

(23) Taconite ore processing plants;

(24) Glass fiber processing plants;

(25) Charcoal production plants;

(26) Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input; and

(27) Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act.

(v)(A) Major modification means any physical change in or change in the method of operation of a major stationary source that would result in:

(1) A significant emissions increase of a regulated NSR pollutant (as defined in paragraph (a)(1)(xxxvii) of this section); and

(2) A significant net emissions increase of that pollutant from the major stationary source.

(B) Any significant emissions increase (as defined in paragraph (a)(1)(xxvii) of this section) from any emissions units or net emissions increase (as defined in paragraph (a)(1)(vi) of this section) at a major stationary source that is significant for volatile organic compounds shall be considered significant for ozone.

(C) A physical change or change in the method of operation shall not include:

(1) Routine maintenance, repair and replacement. Routine maintenance, repair and replacement shall include, but not be limited to, any activity(s) that meets the requirements of the equipment replacement provisions contained in paragraph (h) of this section;

Note to paragraph (a)(1)(v)(C)(1): On December 24, 2003, the second sentence of this paragraph (a)(1)(v)(C)(1) is stayed indefinitely by court order. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(2) Use of an alternative fuel or raw material by reason of an order under sections 2 (a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (or any superseding legislation) or by reason of a natural gas curtailment plan pursuant to the Federal Power Act;

(3) Use of an alternative fuel by reason of an order or rule section 125 of the Act;

(4) Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste;

(5) Use of an alternative fuel or raw material by a stationary source which;

(i) The source was capable of accommodating before December 21, 1976, unless such change would be prohibited under any federally enforceable permit condition which was established after December 12, 1976 pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR subpart I or § 51.166, or

(ii) The source is approved to use under any permit issued under regulations approved pursuant to this section;

(6) An increase in the hours of operation or in the production rate, unless such change is prohibited under any federally enforceable permit condition which was established after December 21, 1976 pursuant to 40 CFR 52.21 or regulations approved pursuant to 40 CFR part 51 subpart I or 40 CFR 51.166.

(7) Any change in ownership at a stationary source.

(8) [Reserved]

(9) The installation, operation, cessation, or removal of a temporary clean coal technology demonstration project, provided that the project complies with:

(i) The State Implementation Plan for the State in which the project is located, and

(ii) Other requirements necessary to attain and maintain the national ambient air quality standard during the project and after it is terminated.

(D) This definition shall not apply with respect to a particular regulated NSR pollutant when the major stationary source is complying with the requirements under paragraph (f) of this section for a PAL for that pollutant. Instead, the definition at paragraph (f)(2)(viii) of this section shall apply.

(E) For the purpose of applying the requirements of (a)(8) of this section to modifications at major stationary sources of nitrogen oxides located in ozone nonattainment areas or in ozone transport regions, whether or not subject to subpart 2, part D, title I of the Act, any significant net emissions increase of nitrogen oxides is considered significant for ozone.

(F) Any physical change in, or change in the method of operation of, a major stationary source of volatile organic compounds that results in any increase in emissions of volatile organic compounds from any discrete operation, emissions unit, or other pollutant emitting activity at the source shall be considered a significant net emissions increase and a major modification for ozone, if the major stationary source is located in an extreme ozone nonattainment area that is subject to subpart 2, part D, title I of the Act.

<Text of subsection (a)(1)(v)(G) stayed effective March 30, 2011.>

(G) Fugitive emissions shall not be included in determining for any of the purposes of this section whether a physical change in or change in the method of operation of a major stationary source is a major modification, unless the source belongs to one of the source categories listed in paragraph (a)(1)(iv)(C) of this section.

(vi)(A) Net emissions increase means, with respect to any regulated NSR pollutant emitted by a major stationary source, the amount by which the sum of the following exceeds zero:

(1) The increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated pursuant to paragraph (a)(2)(ii) of this section; and

(2) Any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable. Baseline actual emissions for calculating increases and decreases under this paragraph (a)(1)(vi)(A)(2) shall be determined as provided in paragraph (a)(1)(xxxv) of this section, except that paragraphs (a)(1)(xxxv)(A)(3) and (a)(1)(xxxv)(B)(4) of this section shall not apply.

(B) An increase or decrease in actual emissions is contemporaneous with the increase from the particular change only if it occurs before the date that the increase from the particular change occurs;

(C) An increase or decrease in actual emissions is creditable only if:

(1) It occurs within a reasonable period to be specified by the reviewing authority; and

(2) The reviewing authority has not relied on it in issuing a permit for the source under regulations approved pursuant to this section, which permit is in effect when the increase in actual emissions from the particular change occurs; and

<Text of subsection (a)(1)(vi)(C)(3) stayed effective March 30, 2011.>

(3) As it pertains to an increase or decrease in fugitive emissions (to the extent quantifiable), it occurs at an emissions unit that is part of one of the source categories listed in paragraph (a)(1)(iv)(C) of this section or it occurs at an emissions unit that is located at a major stationary source that belongs to one of the listed source categories. Fugitive emission increases or decreases are not creditable for those emissions units located at a facility whose primary activity is not represented by one of the source categories listed in paragraph (a)(1)(iv)(C) of this section and that are not, by themselves, part of a listed source category.

(D) An increase in actual emissions is creditable only to the extent that the new level of actual emissions exceeds the old level.

(E) A decrease in actual emissions is creditable only to the extent that:

(1) The old level of actual emission or the old level of allowable emissions whichever is lower, exceeds the new level of actual emissions;

(2) It is enforceable as a practical matter at and after the time that actual construction on the particular change begins; and

(3) The reviewing authority has not relied on it in issuing any permit under regulations approved pursuant to 40 CFR part 51 subpart I or the State has not relied on it in demonstrating attainment or reasonable further progress;

(4) It has approximately the same qualitative significance for public health and welfare as that attributed to the increase from the particular change; and

(5) [Reserved]

(F) An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred becomes operational and begins to emit a particular pollutant. Any replacement unit that requires shakedown becomes operational only after a reasonable shakedown period, not to exceed 180 days.

(G) Paragraph (a)(1)(xii)(B) of this section shall not apply for determining creditable increases and decreases or after a change.

(vii) Emissions unit means any part of a stationary source that emits or would have the potential to emit any regulated NSR pollutant and includes an electric steam generating unit as defined in paragraph (a)(1)(xx) of this section. For purposes of this section, there are two types of emissions units as described in paragraphs (a)(1)(vii)(A) and (B) of this section.

(A) A new emissions unit is any emissions unit which is (or will be) newly constructed and which has existed for less than 2 years from the date such emissions unit first operated.

(B) An existing emissions unit is any emissions unit that does not meet the requirements in paragraph (a)(1)(vii)(A) of this section. A replacement unit, as defined in paragraph (a)(1)(xxi) of this section, is an existing emissions unit.

(viii) Secondary emissions means emissions which would occur as a result of the construction or operation of a major stationary source or major modification, but do not come from the major stationary source or major modification itself. For the purpose of this section, secondary emissions must be specific, well defined, quantifiable, and impact the same general area as the stationary source or modification which causes the secondary emissions. Secondary emissions include emissions from any offsite support facility which would not be constructed or increase its emissions except as a result of the construction of operation of the major stationary source of major modification. Secondary emissions do not include any emissions which come directly from a mobile source such as emissions from the tailpipe of a motor vehicle, from a train, or from a vessel.

(ix) Fugitive emissions means those emissions which could not reasonably pass through a stack, chimney, vent or other functionally equivalent opening.

(x)(A) Significant means, in reference to a net emissions increase or the potential of a source to emit any of the following pollutants, a rate of emissions that would equal or exceed any of the following rates:

Pollutant Emission Rate

Carbon monoxide: 100 tons per year (tpy)

Nitrogen oxides: 40 tpy

Sulfur dioxide: 40 tpy

Ozone: 40 tpy of volatile organic compounds or nitrogen oxides

Lead: 0.6 tpy

$PM_{10}$: 15 tpy

$PM_{2.5}$: 10 tpy of direct $PM_{2.5}$ emissions; 40 tpy of sulfur dioxide emissions; 40 tpy of nitrogen oxide emissions unless demonstrated not to be a $PM_{2.5}$ precursor under paragraph (a)(1)(xxxvii) of this section

(B) Notwithstanding the significant emissions rate for ozone in paragraph (a)(1)(x)(A) of this section, significant means, in reference to an emissions increase or a net emissions increase, any increase in actual emissions of volatile

organic compounds that would result from any physical change in, or change in the method of operation of, a major stationary source locating in a serious or severe ozone nonattainment area that is subject to subpart 2, part D, title I of the Act, if such emissions increase of volatile organic compounds exceeds 25 tons per year.

(C) For the purposes of applying the requirements of paragraph (a)(8) of this section to modifications at major stationary sources of nitrogen oxides located in an ozone nonattainment area or in an ozone transport region, the significant emission rates and other requirements for volatile organic compounds in paragraphs (a)(1)(x)(A), (B), and (E) of this section shall apply to nitrogen oxides emissions.

(D) Notwithstanding the significant emissions rate for carbon monoxide under paragraph (a)(1)(x)(A) of this section, significant means, in reference to an emissions increase or a net emissions increase, any increase in actual emissions of carbon monoxide that would result from any physical change in, or change in the method of operation of, a major stationary source in a serious nonattainment area for carbon monoxide if such increase equals or exceeds 50 tons per year, provided the Administrator has determined that stationary sources contribute significantly to carbon monoxide levels in that area.

(E) Notwithstanding the significant emissions rates for ozone under paragraphs (a)(1)(x)(A) and (B) of this section, any increase in actual emissions of volatile organic compounds from any emissions unit at a major stationary source of volatile organic compounds located in an extreme ozone nonattainment area that is subject to subpart 2, part D, title I of the Act shall be considered a significant net emissions increase.

(xi) Allowable emissions means the emissions rate of a stationary source calculated using the maximum rated capacity of the source (unless the source is subject to federally enforceable limits which restrict the operating rate, or hours of operation, or both) and the most stringent of the following:

(A) The applicable standards set forth in 40 CFR part 60 or 61;

(B) Any applicable State Implementation Plan emissions limitation including those with a future compliance date; or

(C) The emissions rate specified as a federally enforceable permit condition, including those with a future compliance date.

(xii)(A) Actual emissions means the actual rate of emissions of a regulated NSR pollutant from an emissions unit, as determined in accordance with paragraphs (a)(1)(xii)(B) through (D) of this section, except that this definition shall not apply for calculating whether a significant emissions increase has occurred, or for establishing a PAL under paragraph (f) of this section. Instead, paragraphs (a)(1)(xxviii) and (xxxv) of this section shall apply for those purposes.

(B) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a consecutive 24–month period which precedes the particular date and which is representative of normal source operation. The reviewing authority shall allow the use of a different time period upon a determination that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

(C) The reviewing authority may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit.

(D) For any emissions unit that has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

(xiii) Lowest achievable emission rate (LAER) means, for any source, the more stringent rate of emissions based on the following:

(A) The most stringent emissions limitation which is contained in the implementation plan of any State for such class or category of stationary source, unless the owner or operator of the proposed stationary source demonstrates that such limitations are not achievable; or

(B) The most stringent emissions limitation which is achieved in practice by such class or category of stationary sources. This limitation, when applied to a modification, means the lowest achievable emissions rate for the new or modified emissions units within or stationary source. In no event shall the application of the term permit a proposed new or modified stationary source to emit any pollutant in excess of the amount allowable under an applicable new source standard of performance.

(xiv) Federally enforceable means all limitations and conditions which are enforceable by the Administrator, including those requirements developed pursuant to 40 CFR parts 60 and 61, requirements within any applicable State implementation plan, any permit requirements established pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR part 51, subpart I, including operating permits issued under an EPA-approved program that is incorporated into the State implementation plan and expressly requires adherence to any permit issued under such program.

(xv) Begin actual construction means in general, initiation of physical on-site construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying of underground pipework, and construction of permanent storage structures. With respect to a change in method of operating this term refers to those on-site activities other than preparatory activities which mark the initiation of the change.

(xvi) Commence as applied to construction of a major stationary source or major modification means that the owner or operator has all necessary preconstruction approvals or permits and either has:

(A) Begun, or caused to begin, a continuous program of actual on-site construction of the source, to be completed within a reasonable time; or

(B) Entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of actual construction of the source to be completed within a reasonable time.

(xvii) Necessary preconstruction approvals or permits means those Federal air quality control laws and regulations and those air quality control laws and regulations which are part of the applicable State Implementation Plan.

(xviii) Construction means any physical change or change in the method of operation (including fabrication, erection, installation, demolition, or modification of an emissions unit) that would result in a change in emissions.

(xix) Volatile organic compounds (VOC) is as defined in § 51.100(s) of this part.

(xx) Electric utility steam generating unit means any steam electric generating unit that is constructed for the purpose of supplying more than one-third of its potential electric output capacity and more than 25 MW electrical output to any utility power distribution system for sale. Any steam supplied to a steam distribution system for the purpose of providing steam to a steam-electric generator that would produce electrical energy for sale is also considered in determining the electrical energy output capacity of the affected facility.

(xxi) Replacement unit means an emissions unit for which all the criteria listed in paragraphs (a)(1)(xxi)(A) through (D) of this section are met. No creditable emission reductions shall be generated from shutting down the existing emissions unit that is replaced.

(A) The emissions unit is a reconstructed unit within the meaning of § 60.15(b)(1) of this chapter, or the emissions unit completely takes the place of an existing emissions unit.

(B) The emissions unit is identical to or functionally equivalent to the replaced emissions unit.

(C) The replacement does not alter the basic design parameters (as discussed in paragraph (h)(2) of this section) of the process unit.

(D) The replaced emissions unit is permanently removed from the major stationary source, otherwise permanently disabled, or permanently barred from operation by a permit that is enforceable as a practical matter. If the replaced emissions unit is brought back into operation, it shall constitute a new emissions unit.

(xxii) Temporary clean coal technology demonstration project means a clean coal technology demonstration project that is operated for a period of 5 years or less, and which complies with the State Implementation Plan for the State in which the project is located and other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

(xxiii) Clean coal technology means any technology, including technologies applied at the precombustion, combustion, or post combustion stage, at a new or existing facility which will achieve significant reductions in air emissions of sulfur dioxide or oxides of nitrogen associated with the utilization of coal in the generation of electricity, or process steam which was not in widespread use as of November 15, 1990.

(xxiv) Clean coal technology demonstration project means a project using funds appropriated under the heading “Department of Energy–Clean Coal Technology,” up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the Environmental Protection Agency. The Federal contribution for a qualifying project shall be at least 20 percent of the total cost of the demonstration project.

(xxv) [Reserved]

(xxvi) Pollution prevention means any activity that through process changes, product reformulation or redesign, or substitution of less polluting raw materials, eliminates or reduces the release of air pollutants (including fugitive emissions) and other pollutants to the environment prior to recycling, treatment, or disposal; it does not mean recycling (other than certain “in-process recycling” practices), energy recovery, treatment, or disposal.

(xxvii) Significant emissions increase means, for a regulated NSR pollutant, an increase in emissions that is significant (as defined in paragraph (a)(1)(x) of this section) for that pollutant.

(xxviii)(A) Projected actual emissions means, the maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit a regulated NSR pollutant in any one of the 5 years (12–month period) following the date the unit resumes regular operation after the project, or in any one of the 10 years following that date, if the project involves increasing the emissions unit's design capacity or its potential to emit of that regulated NSR pollutant and full utilization of the unit would result in a significant emissions increase or a significant net emissions increase at the major stationary source.

(B) In determining the projected actual emissions under paragraph (a)(1)(xxviii)(A) of this section before beginning actual construction, the owner or operator of the major stationary source:

(1) Shall consider all relevant information, including but not limited to, historical operational data, the company's own representations, the company's expected business activity and the company's highest projections of business activity, the company's filings with the State or Federal regulatory authorities, and compliance plans under the approved plan; and

(2) Shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions; and

(3) Shall exclude, in calculating any increase in emissions that results from the particular project, that portion of the unit's emissions following the project that an existing unit could have accommodated during the consecutive 24–month period used to establish the baseline actual emissions under paragraph (a)(1)(xxxv) of this section and that are also unrelated to the particular project, including any increased utilization due to product demand growth; or,

(4) In lieu of using the method set out in paragraphs (a)(1)(xxviii)(B)(1) through (3) of this section, may elect to use the emissions unit's potential to emit, in tons per year, as defined under paragraph (a)(1)(iii) of this section.

(xxix) [Reserved]

(xxx) Nonattainment major new source review (NSR) program means a major source preconstruction permit program that has been approved by the Administrator and incorporated into the plan to implement the requirements of this section, or a program that implements part 51, appendix S, Sections I through VI of this chapter. Any permit issued under such a program is a major NSR permit.

(xxxi) Continuous emissions monitoring system (CEMS) means all of the equipment that may be required to meet the data acquisition and availability requirements of this section, to sample, condition (if applicable), analyze, and provide a record of emissions on a continuous basis.

(xxxii) Predictive emissions monitoring system (PEMS) means all of the equipment necessary to monitor process and control device operational parameters (for example, control device secondary voltages and electric currents) and other information (for example, gas flow rate, $O_2$ or $CO_2$ concentrations), and calculate and record the mass emissions rate (for example, lb/hr) on a continuous basis.

(xxxiii) Continuous parameter monitoring system (CPMS) means all of the equipment necessary to meet the data acquisition and availability requirements of this section, to monitor process and control device operational parameters (for example, control device secondary voltages and electric currents) and other information (for example, gas flow rate, $O_2$ or $CO_2$ concentrations), and to record average operational parameter value(s) on a continuous basis.

(xxxiv) Continuous emissions rate monitoring system (CERMS) means the total equipment required for the determination and recording of the pollutant mass emissions rate (in terms of mass per unit of time).

(xxxv) Baseline actual emissions means the rate of emissions, in tons per year, of a regulated NSR pollutant, as determined in accordance with paragraphs (a)(1)(xxxv)(A) through (D) of this section.

(A) For any existing electric utility steam generating unit, baseline actual emissions means the average rate, in tons per year, at which the unit actually emitted the pollutant during any consecutive 24–month period selected by the owner or operator within the 5–year period immediately preceding when the owner or operator begins actual construction of the project. The reviewing authority shall allow the use of a different time period upon a determination that it is more representative of normal source operation.

(1) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(2) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above any emission limitation that was legally enforceable during the consecutive 24–month period.

(3) For a regulated NSR pollutant, when a project involves multiple emissions units, only one consecutive 24–month period must be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24–month period can be used for each regulated NSR pollutant.

(4) The average rate shall not be based on any consecutive 24–month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraph (a)(1)(xxxv)(A)(2) of this section.

(B) For an existing emissions unit (other than an electric utility steam generating unit), baseline actual emissions means the average rate, in tons per year, at which the emissions unit actually emitted the pollutant during any consecutive 24–month period selected by the owner or operator within the 10–year period immediately preceding either the date the owner or operator begins actual construction of the project, or the date a complete permit application is received by the reviewing authority for a permit required either under this section or under a plan approved by the Administrator, whichever is earlier, except that the 10–year period shall not include any period earlier than November 15, 1990.

(1) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(2) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above an emission limitation that was legally enforceable during the consecutive 24–month period.

(3) The average rate shall be adjusted downward to exclude any emissions that would have exceeded an emission limitation with which the major stationary source must currently comply, had such major stationary source been required to comply with such limitations during the consecutive 24–month period. However, if an emission limitation is part of a maximum achievable control technology standard that the Administrator proposed or promulgated under part 63 of this chapter, the baseline actual emissions need only be adjusted if the State has taken credit for such emissions reductions in an attainment demonstration or maintenance plan consistent with the requirements of paragraph (a)(3)(ii)(G) of this section.

(4) For a regulated NSR pollutant, when a project involves multiple emissions units, only one consecutive 24–month period must be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24–month period can be used For each regulated NSR pollutant.

(5) The average rate shall not be based on any consecutive 24–month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraphs (a)(1)(xxxv)(B)(2) and (3) of this section.

(C) For a new emissions unit, the baseline actual emissions for purposes of determining the emissions increase that will result from the initial construction and operation of such unit shall equal zero; and thereafter, for all other purposes, shall equal the unit's potential to emit.

(D) For a PAL for a major stationary source, the baseline actual emissions shall be calculated for existing electric utility steam generating units in accordance with the procedures contained in paragraph (a)(1)(xxxv)(A) of this section, for other existing emissions units in accordance with the procedures contained in paragraph (a)(1)(xxxv)(B) of this section, and for a new emissions unit in accordance with the procedures contained in paragraph (a)(1)(xxxv)(C) of this section.

(xxxvi) [Reserved]

(xxxvii) Regulated NSR pollutant, for purposes of this section, means the following:

(A) Nitrogen oxides or any volatile organic compounds;

(B) Any pollutant for which a national ambient air quality standard has been promulgated;

(C) Any pollutant that is identified under this paragraph (a)(1)(xxxvii)(C) as a constituent or precursor of a general pollutant listed under paragraph (a)(1)(xxxvii)(A) or (B) of this section, provided that such constituent or precursor pollutant may only be regulated under NSR as part of regulation of the general pollutant. Precursors identified by the Administrator for purposes of NSR are the following:

(1) Volatile organic compounds and nitrogen oxides are precursors to ozone in all ozone nonattainment areas.

(2) Sulfur dioxide is a precursor to $PM_{2.5}$ in all $PM_{2.5}$ nonattainment areas.

(3) Nitrogen oxides are presumed to be precursors to $PM_{2.5}$ in all $PM_{2.5}$ nonattainment areas, unless the State demonstrates to the Administrator's satisfaction or EPA demonstrates that emissions of nitrogen oxides from sources in a specific area are not a significant contributor to that area's ambient $PM_{2.5}$ concentrations.

(4) Volatile organic compounds and ammonia are presumed not to be precursors to $PM_{2.5}$ in any $PM_{2.5}$ nonattainment area, unless the State demonstrates to the Administrator's satisfaction or EPA demonstrates that emissions of volatile organic compounds or ammonia from sources in a specific area are a significant contributor to that area's ambient $PM_{2.5}$ concentrations; or

(D) $PM_{2.5}$ emissions and $PM_{10}$ emissions shall include gaseous emissions from a source or activity which condense to form particulate matter at ambient temperatures. On or after January 1, 2011 (or any earlier date established in the upcoming rulemaking codifying test methods), such condensable particulate matter shall be accounted for in applicability determinations and in establishing emissions limitations for $PM_{2.5}$ and $PM_{10}$ in nonattainment major NSR permits. Compliance with emissions limitations for $PM_{2.5}$ and $PM_{10}$ issued prior to this date shall not be based on condensable particulate matter unless required by the terms and conditions of the permit or the applicable implementation plan. Applicability determinations made prior to this date without accounting for condensable particulate matter shall not be considered in violation of this section unless the applicable implementation plan required condensable particulate matter to be included.

(xxxviii) Reviewing authority means the State air pollution control agency, local agency, other State agency, Indian tribe, or other agency authorized by the Administrator to carry out a permit program under this section and § 51.166, or the Administrator in the case of EPA-implemented permit programs under § 52.21.

(xxxix) Project means a physical change in, or change in the method of operation of, an existing major stationary source.

(xl) Best available control technology (BACT) means an emissions limitation (including a visible emissions standard) based on the maximum degree of reduction for each regulated NSR pollutant which would be emitted from any proposed major stationary source or major modification which the reviewing authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant. In no event shall application of best available control technology result in emissions of any pollutant which would exceed the emissions allowed by any applicable standard under 40 CFR part 60 or 61. If the reviewing authority determines that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emissions standard infeasible, a design, equipment, work practice, operational standard, or combination thereof, may be prescribed instead to satisfy the requirement for the application of BACT. Such standard shall, to the degree possible,

set forth the emissions reduction achievable by implementation of such design, equipment, work practice or operation, and shall provide for compliance by means which achieve equivalent results.

(xli) Prevention of Significant Deterioration (PSD) permit means any permit that is issued under a major source preconstruction permit program that has been approved by the Administrator and incorporated into the plan to implement the requirements of § 51.166 of this chapter, or under the program in § 52.21 of this chapter.

(xlii) Federal Land Manager means, with respect to any lands in the United States, the Secretary of the department with authority over such lands.

(xliii)(A) In general, process unit means any collection of structures and/or equipment that processes, assembles, applies, blends, or otherwise uses material inputs to produce or store an intermediate or a completed product. A single stationary source may contain more than one process unit, and a process unit may contain more than one emissions unit.

(B) Pollution control equipment is not part of the process unit, unless it serves a dual function as both process and control equipment. Administrative and warehousing facilities are not part of the process unit.

(C) For replacement cost purposes, components shared between two or more process units are proportionately allocated based on capacity.

(D) The following list identifies the process units at specific categories of stationary sources.

(1) For a steam electric generating facility, the process unit consists of those portions of the plant that contribute directly to the production of electricity. For example, at a pulverized coal-fired facility, the process unit would generally be the combination of those systems from the coal receiving equipment through the emission stack (excluding post-combustion pollution controls), including the coal handling equipment, pulverizers or coal crushers, feedwater heaters, ash handling, boiler, burners, turbine-generator set, condenser, cooling tower, water treatment system, air preheaters, and operating control systems. Each separate generating unit is a separate process unit.

(2) For a petroleum refinery, there are several categories of process units: those that separate and/or distill petroleum feedstocks; those that change molecular structures; petroleum treating processes; auxiliary facilities, such as steam generators and hydrogen production units; and those that load, unload, blend or store intermediate or completed products.

(3) For an incinerator, the process unit would consist of components from the feed pit or refuse pit to the stack, including conveyors, combustion devices, heat exchangers and steam generators, quench tanks, and fans.

Note to paragraph (a)(1)(xliii): By a court order on December 24, 2003, this paragraph (a)(1)(xliii) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(xliv) Functionally equivalent component means a component that serves the same purpose as the replaced component.

Note to paragraph (a)(1)(xliv): By a court order on December 24, 2003, this paragraph (a)(1)(xliv) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(xlv) Fixed capital cost means the capital needed to provide all the depreciable components. “Depreciable components” refers to all components of fixed capital cost and is calculated by subtracting land and working capital from the total capital investment, as defined in paragraph (a)(1)(xlvi) of this section.

Note to paragraph (a)(1)(xlv): By a court order on December 24, 2003, this paragraph (a)(1)(xlv) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(xlvi) Total capital investment means the sum of the following: All costs required to purchase needed process equipment (purchased equipment costs); the costs of labor and materials for installing that equipment (direct installation costs); the costs of site preparation and buildings; other costs such as engineering, construction and field expenses, fees to contractors, startup and performance tests, and contingencies (indirect installation costs); land for the process equipment; and working capital for the process equipment.

Note to paragraph (a)(1)(xlvi): By a court order on December 24, 2003, this paragraph (a)(1)(xlvi) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(2) Applicability procedures.

(i) Each plan shall adopt a preconstruction review program to satisfy the requirements of sections 172(c)(5) and 173 of the Act for any area designated nonattainment for any national ambient air quality standard under subpart C of 40 CFR part 81. Such a program shall apply to any new major stationary source or major modification that is major for the pollutant for which the area is designated nonattainment under section 107(d)(1)(A)(i) of the Act, if the stationary source or modification would locate anywhere in the designated nonattainment area.

(ii) Each plan shall use the specific provisions of paragraphs (a)(2)(ii)(A) through (F) of this section. Deviations from these provisions will be approved only if the State specifically demonstrates that the submitted provisions are more stringent than or at least as stringent in all respects as the corresponding provisions in paragraphs (a)(2)(ii)(A) through (F) of this section.

(A) Except as otherwise provided in paragraphs (a)(2)(iii) and (iv) of this section, and consistent with the definition of major modification contained in paragraph (a)(1)(v)(A) of this section, a project is a major modification for a regulated NSR pollutant if it causes two types of emissions increases--a significant emissions increase (as defined in paragraph (a)(1)(xxvii) of this section), and a significant net emissions increase (as defined in paragraphs (a)(1)(vi) and (x) of this section). The project is not a major modification if it does not cause a significant emissions increase. If the project causes a significant emissions increase, then the project is a major modification only if it also results in a significant net emissions increase.

(B) The procedure for calculating (before beginning actual construction) whether a significant emissions increase (i.e., the first step of the process) will occur depends upon the type of emissions units being modified, according to paragraphs (a)(2)(ii)(C) through (F) of this section. The procedure for calculating (before beginning actual construction) whether a significant net emissions increase will occur at the major stationary source (i.e., the second step of the process) is contained in the definition in paragraph (a)(1)(vi) of this section. Regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase.

(C) Actual-to-projected-actual applicability test for projects that only involve existing emissions units. A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the projected actual emissions (as defined in paragraph (a)(1)(xxviii) of this section) and the baseline actual emissions (as defined in paragraphs (a)(1)(xxxv)(A) and (B) of this section, as applicable), for each existing emissions unit, equals or exceeds the significant amount for that pollutant (as defined in paragraph (a)(1)(x) of this section).

(D) Actual-to-potential test for projects that only involve construction of a new emissions unit(s). A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the potential to emit (as defined in paragraph (a)(1)(iii) of this section) from each new emissions unit following completion of the project and the baseline actual emissions (as defined in paragraph (a)(1)(xxxv)(C) of this section) of these units before the project equals or exceeds the significant amount for that pollutant (as defined in paragraph (a)(1)(x) of this section).

(E) [Reserved]

(F) Hybrid test for projects that involve multiple types of emissions units. A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the emissions increases for each emissions unit, using the method specified in paragraphs (a)(2)(ii)(C) through (D) of this section as applicable with respect to each emissions unit, for each type of emissions unit equals or exceeds the significant amount for that pollutant (as defined in paragraph (a)(1)(x) of this section).

(iii) The plan shall require that for any major stationary source for a PAL for a regulated NSR pollutant, the major stationary source shall comply with requirements under paragraph (f) of this section.

(iv) [Reserved]

(3)(i) Each plan shall provide that for sources and modifications subject to any preconstruction review program adopted pursuant to this subsection the baseline for determining credit for emissions reductions is the emissions limit under the applicable State Implementation Plan in effect at the time the application to construct is filed, except that the offset baseline shall be the actual emissions of the source from which offset credit is obtained where;

(A) The demonstration of reasonable further progress and attainment of ambient air quality standards is based upon the actual emissions of sources located within a designated nonattainment area for which the preconstruction review program was adopted; or

(B) The applicable State Implementation Plan does not contain an emissions limitation for that source or source category.

(ii) The plan shall further provide that:

(A) Where the emissions limit under the applicable State Implementation Plan allows greater emissions than the potential to emit of the source, emissions offset credit will be allowed only for control below this potential;

(B) For an existing fuel combustion source, credit shall be based on the allowable emissions under the applicable State Implementation Plan for the type of fuel being burned at the time the application to construct is filed. If the existing source commits to switch to a cleaner fuel at some future date, emissions offset credit based on the allowable (or actual) emissions for the fuels involved is not acceptable, unless the permit is conditioned to require the use of a specified alternative control measure which would achieve the same degree of emissions reduction should the source switch back to a dirtier fuel at some later date. The reviewing authority should ensure that adequate long-term supplies of the new fuel are available before granting emissions offset credit for fuel switches,

(C)(1) Emissions reductions achieved by shutting down an existing emission unit or curtailing production or operating hours may be generally credited for offsets if they meet the requirements in paragraphs (a)(3)(ii)(C)(1)(i) through (ii) of this section.

(i) Such reductions are surplus, permanent, quantifiable, and federally enforceable.

(ii) The shutdown or curtailment occurred after the last day of the base year for the SIP planning process. For purposes of this paragraph, a reviewing authority may choose to consider a prior shutdown or curtailment to have occurred after the last day of the base year if the projected emissions inventory used to develop the attainment demonstration explicitly includes the emissions from such previously shutdown or curtailed emission units. However, in no event may credit be given for shutdowns that occurred before August 7, 1977.

(2) Emissions reductions achieved by shutting down an existing emissions unit or curtailing production or operating hours and that do not meet the requirements in paragraph (a)(3)(ii)(C)(1)(ii) of this section may be generally credited only if:

(i) The shutdown or curtailment occurred on or after the date the construction permit application is filed; or

(ii) The applicant can establish that the proposed new emissions unit is a replacement for the shutdown or curtailed emissions unit, and the emissions reductions achieved by the shutdown or curtailment met the requirements of paragraph (a)(3)(ii)(C)(1)(i) of this section.

(D) No emissions credit may be allowed for replacing one hydrocarbon compound with another of lesser reactivity, except for those compounds listed in Table 1 of EPA's “Recommended Policy on Control of Volatile Organic Compounds” (42 FR 35314, July 8, 1977; (This document is also available from Mr. Ted Creekmore, Office of Air Quality Planning and Standards, (MD–15) Research Triangle Park, NC 27711.))

(E) All emission reductions claimed as offset credit shall be federally enforceable;

(F) Procedures relating to the permissible location of offsetting emissions shall be followed which are at least as stringent as those set out in 40 CFR part 51 appendix S section IV.D.

(G) Credit for an emissions reduction can be claimed to the extent that the reviewing authority has not relied on it in issuing any permit under regulations approved pursuant to 40 CFR part 51 subpart I or the State has not relied on it in demonstration attainment or reasonable further progress.

(H), (I) [Reserved]

(J) The total tonnage of increased emissions, in tons per year, resulting from a major modification that must be offset in accordance with section 173 of the Act shall be determined by summing the difference between the allowable emissions after the modification (as defined by paragraph (a)(1)(xi) of this section) and the actual emissions before the modification (as defined in paragraph (a)(1)(xii) of this section) for each emissions unit.

(4) Each plan may provide that the provisions of this paragraph do not apply to a source or modification that would be a major stationary source or major modification only if fugitive emissions, to the extent quantifiable, are considered in calculating the potential to emit of the stationary source or modification and the source does not belong to any of the following categories:

(i) Coal cleaning plants (with thermal dryers);

(ii) Kraft pulp mills;

(iii) Portland cement plants;

(iv) Primary zinc smelters;

(v) Iron and steel mills;

(vi) Primary aluminum ore reduction plants;

(vii) Primary copper smelters;

(viii) Municipal incinerators capable of charging more than 250 tons of refuse per day;

(ix) Hydrofluoric, sulfuric, or citric acid plants;

(x) Petroleum refineries;

(xi) Lime plants;

(xii) Phosphate rock processing plants;

(xiii) Coke oven batteries;

(xiv) Sulfur recovery plants;

(xv) Carbon black plants (furnace process);

(xvi) Primary lead smelters;

(xvii) Fuel conversion plants;

(xviii) Sintering plants;

(xix) Secondary metal production plants;

(xx) Chemical process plants--The term chemical processing plant shall not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140;

(xxi) Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

(xxii) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

(xxiii) Taconite ore processing plants;

(xxiv) Glass fiber processing plants;

(xxv) Charcoal production plants;

(xxvi) Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input;

(xxvii) Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act.

(5) Each plan shall include enforceable procedures to provide that:

(i) Approval to construct shall not relieve any owner or operator of the responsibility to comply fully with applicable provision of the plan and any other requirements under local, State or Federal law.

(ii) At such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in any enforcement limitation which was established after August 7, 1980, on the capacity of the source or modification otherwise to emit a pollutant, such as a restriction on hours of operation, then the requirements of regulations approved pursuant to this section shall apply to the source or modification as though construction had not yet commenced on the source or modification;

(6) Each plan shall provide that, except as otherwise provided in paragraph (a)(6)(vi) of this section, the following specific provisions apply with respect to any regulated NSR pollutant emitted from projects at existing emissions units at a major stationary source (other than projects at a source with a PAL) in circumstances where there is a reasonable possibility, within the meaning of paragraph (a)(6)(vi) of this section, that a project that is not a part of a major modification may result in a significant emissions increase of such pollutant, and the owner or operator elects to use the method specified in

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

paragraphs (a)(1)(xxviii)(B)(1) through (3) of this section for calculating projected actual emissions. Deviations from these provisions will be approved only if the State specifically demonstrates that the submitted provisions are more stringent than or at least as stringent in all respects as the corresponding provisions in paragraphs (a)(6)(i) through (vi) of this section.

(i) Before beginning actual construction of the project, the owner or operator shall document and maintain a record of the following information:

(A) A description of the project;

(B) Identification of the emissions unit(s) whose emissions of a regulated NSR pollutant could be affected by the project; and

(C) A description of the applicability test used to determine that the project is not a major modification for any regulated NSR pollutant, including the baseline actual emissions, the projected actual emissions, the amount of emissions excluded under paragraph (a)(1)(xxviii)(B)(3) of this section and an explanation for why such amount was excluded, and any netting calculations, if applicable.

(ii) If the emissions unit is an existing electric utility steam generating unit, before beginning actual construction, the owner or operator shall provide a copy of the information set out in paragraph (a)(6)(i) of this section to the reviewing authority. Nothing in this paragraph (a)(6)(ii) shall be construed to require the owner or operator of such a unit to obtain any determination from the reviewing authority before beginning actual construction.

(iii) The owner or operator shall monitor the emissions of any regulated NSR pollutant that could increase as a result of the project and that is emitted by any emissions units identified in paragraph (a)(6)(i)(B) of this section; and calculate and maintain a record of the annual emissions, in tons per year on a calendar year basis, for a period of 5 years following resumption of regular operations after the change, or for a period of 10 years following resumption of regular operations after the change if the project increases the design capacity or potential to emit of that regulated NSR pollutant at such emissions unit.

(iv) If the unit is an existing electric utility steam generating unit, the owner or operator shall submit a report to the reviewing authority within 60 days after the end of each year during which records must be generated under paragraph (a)(6)(iii) of this section setting out the unit's annual emissions during the year that preceded submission of the report.

(v) If the unit is an existing unit other than an electric utility steam generating unit, the owner or operator shall submit a report to the reviewing authority if the annual emissions, in tons per year, from the project identified in paragraph (a)(6)(i) of this section, exceed the baseline actual emissions (as documented and maintained pursuant to paragraph (a)(6)(i)(C) of this section, by a significant amount (as defined in paragraph (a)(1)(x) of this section) for that regulated NSR pollutant, and if such emissions differ from the preconstruction projection as documented and maintained pursuant to paragraph (a)(6)(i)(C) of this section. Such report shall be submitted to the reviewing authority within 60 days after the end of such year. The report shall contain the following:

(A) The name, address and telephone number of the major stationary source;

(B) The annual emissions as calculated pursuant to paragraph (a)(6)(iii) of this section; and

(C) Any other information that the owner or operator wishes to include in the report (e.g., an explanation as to why the emissions differ from the preconstruction projection).

(vi) A "reasonable possibility" under paragraph (a)(6) of this section occurs when the owner or operator calculates the project to result in either:

(A) A projected actual emissions increase of at least 50 percent of the amount that is a "significant emissions increase," as defined under paragraph (a)(1)(xxvii) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant; or

(B) A projected actual emissions increase that, added to the amount of emissions excluded under paragraph (a)(1)(xxviii)(B)(3), sums to at least 50 percent of the amount that is a "significant emissions increase," as defined under paragraph (a)(1)(xxvii) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant. For a project for which a reasonable possibility occurs only within the meaning of paragraph (a)(6)(vi)(B) of this section, and not also within the meaning of paragraph (a)(6)(vi)(A) of this section, then provisions (a)(6)(ii) through (v) do not apply to the project.

(7) Each plan shall provide that the owner or operator of the source shall make the information required to be documented and maintained pursuant to paragraph (a)(6) of this section available for review upon a request for inspection by the reviewing authority or the general public pursuant to the requirements contained in § 70.4(b)(3)(viii) of this chapter.

(8) The plan shall provide that the requirements of this section applicable to major stationary sources and major modifications of volatile organic compounds shall apply to nitrogen oxides emissions from major stationary sources and major modifications of nitrogen oxides in an ozone transport region or in any ozone nonattainment area, except in ozone nonattainment areas or in portions of an ozone transport region where the Administrator has granted a $NO_X$ waiver applying the standards set forth under section 182(f) of the Act and the waiver continues to apply.

(9)(i) The plan shall require that in meeting the emissions offset requirements of paragraph (a)(3) of this section, the ratio of total actual emissions reductions to the emissions increase shall be at least 1:1 unless an alternative ratio is provided for the applicable nonattainment area in paragraphs (a)(9)(ii) through (a)(9)(iv) of this section.

(ii) The plan shall require that in meeting the emissions offset requirements of paragraph (a)(3) of this section for ozone nonattainment areas that are subject to subpart 2, part D, title I of the Act, the ratio of total actual emissions reductions of VOC to the emissions increase of VOC shall be as follows:

(A) In any marginal nonattainment area for ozone--at least 1.1:1;

(B) In any moderate nonattainment area for ozone--at least 1.15:1;

(C) In any serious nonattainment area for ozone--at least 1.2:1;

(D) In any severe nonattainment area for ozone--at least 1.3:1 (except that the ratio may be at least 1.2:1 if the approved plan also requires all existing major sources in such nonattainment area to use BACT for the control of VOC); and

(E) In any extreme nonattainment area for ozone--at least 1.5:1 (except that the ratio may be at least 1.2:1 if the approved plan also requires all existing major sources in such nonattainment area to use BACT for the control of VOC); and

(iii) Notwithstanding the requirements of paragraph (a)(9)(ii) of this section for meeting the requirements of paragraph (a)(3) of this section, the ratio of total actual emissions reductions of VOC to the emissions increase of VOC shall be at least 1.15:1 for all areas within an ozone transport region that is subject to subpart 2, part D, title I of the Act, except for serious, severe, and extreme ozone nonattainment areas that are subject to subpart 2, part D, title I of the Act.

(iv) The plan shall require that in meeting the emissions offset requirements of paragraph (a)(3) of this section for ozone nonattainment areas that are subject to subpart 1, part D, title I of the Act (but are not subject to subpart 2, part D, title I of the Act, including 8–hour ozone nonattainment areas subject to 40 CFR 51.902(b)), the ratio of total actual emissions reductions of VOC to the emissions increase of VOC shall be at least 1:1.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(10) The plan shall require that the requirements of this section applicable to major stationary sources and major modifications of PM–10 shall also apply to major stationary sources and major modifications of PM–10 precursors, except where the Administrator determines that such sources do not contribute significantly to PM–10 levels that exceed the PM–10 ambient standards in the area.

(11) The plan shall require that in meeting the emissions offset requirements of paragraph (a)(3) of this section, the emissions offsets obtained shall be for the same regulated NSR pollutant unless interprecursor offsetting is permitted for a particular pollutant as specified in this paragraph. The plan may allow the offset requirements in paragraph (a)(3) of this section for direct $PM_{2.5}$ emissions or emissions of precursors of $PM_{2.5}$ to be satisfied by offsetting reductions in direct $PM_{2.5}$ emissions or emissions of any $PM_{2.5}$ precursor identified under paragraph (a)(1)(xxxvii)(C) of this section if such offsets comply with the interprecursor trading hierarchy and ratio established in the approved plan for a particular nonattainment area.

(b)(1) Each plan shall include a preconstruction review permit program or its equivalent to satisfy the requirements of section 110(a)(2)(D)(i) of the Act for any new major stationary source or major modification as defined in paragraphs (a)(1) (iv) and (v) of this section. Such a program shall apply to any such source or modification that would locate in any area designated as attainment or unclassifiable for any national ambient air quality standard pursuant to section 107 of the Act, when it would cause or contribute to a violation of any national ambient air quality standard.

(2) A major source or major modification will be considered to cause or contribute to a violation of a national ambient air quality standard when such source or modification would, at a minimum, exceed the following significance levels at any locality that does not or would not meet the applicable national standard:

| **Pollutant** | **Annual** | **Averaging time (hours)** | | | |
|---|---|---|---|---|---|
| **24** | **8** | | **3** | **1** | |
| $SO_2$ | 1.0 µg/$m^3$ | 5 µg/$m^3$ | | 25 µg/$m^3$ | |
| $PM_{10}$ | 1.0 µg/$m^3$ | 5 µg/$m^3$ | | | |
| $PM_{2.5}$ | 0.3 µg/$m^3$ | 1.2 µg/$m^3$ | | | |
| $NO_2$ | 1.0 µg/$m^3$ | | | | |
| CO | | | 0.5 mg/$m^3$ | | 2 mg/$m^3$ |

(3) Such a program may include a provision which allows a proposed major source or major modification subject to paragraph (b) of this section to reduce the impact of its emissions upon air quality by obtaining sufficient emission reductions to, at a minimum, compensate for its adverse ambient impact where the major source or major modification would otherwise cause or contribute to a violation of any national ambient air quality standard. The plan shall require that, in the absence of such emission reductions, the State or local agency shall deny the proposed construction.

(4) The requirements of paragraph (b) of this section shall not apply to a major stationary source or major modification with respect to a particular pollutant if the owner or operator demonstrates that, as to that pollutant, the source or modification is located in an area designated as nonattainment pursuant to section 107 of the Act.

(c) to (e) [Reserved]

(f) Actuals PALs. The plan shall provide for PALs according to the provisions in paragraphs (f)(1) through (15) of this section.

(1) Applicability.

(i) The reviewing authority may approve the use of an actuals PAL for any existing major stationary source (except as provided in paragraph (f)(1)(ii) of this section) if the PAL meets the requirements in paragraphs (f)(1) through (15) of this section. The term “PAL” shall mean “actuals PAL” throughout paragraph (f) of this section.

(ii) The reviewing authority shall not allow an actuals PAL for VOC or $NO_X$ for any major stationary source located in an extreme ozone nonattainment area.

(iii) Any physical change in or change in the method of operation of a major stationary source that maintains its total source-wide emissions below the PAL level, meets the requirements in paragraphs (f)(1) through (15) of this section, and complies with the PAL permit:

(A) Is not a major modification for the PAL pollutant;

(B) Does not have to be approved through the plan's nonattainment major NSR program; and

(C) Is not subject to the provisions in paragraph (a)(5)(ii) of this section (restrictions on relaxing enforceable emission limitations that the major stationary source used to avoid applicability of the nonattainment major NSR program).

(iv) Except as provided under paragraph (f)(1)(iii)(C) of this section, a major stationary source shall continue to comply with all applicable Federal or State requirements, emission limitations, and work practice requirements that were established prior to the effective date of the PAL.

(2) Definitions. The plan shall use the definitions in paragraphs (f)(2)(i) through (xi) of this section for the purpose of developing and implementing regulations that authorize the use of actuals PALs consistent with paragraphs (f)(1) through (15) of this section. When a term is not defined in these paragraphs, it shall have the meaning given in paragraph (a)(1) of this section or in the Act.

(i) Actuals PAL for a major stationary source means a PAL based on the baseline actual emissions (as defined in paragraph (a)(1)(xxxv) of this section) of all emissions units (as defined in paragraph (a)(1)(vii) of this section) at the source, that emit or have the potential to emit the PAL pollutant.

(ii) Allowable emissions means “allowable emissions” as defined in paragraph (a)(1)(xi) of this section, except as this definition is modified according to paragraphs (f)(2)(ii)(A) through (B) of this section.

(A) The allowable emissions for any emissions unit shall be calculated considering any emission limitations that are enforceable as a practical matter on the emissions unit's potential to emit.

(B) An emissions unit's potential to emit shall be determined using the definition in paragraph (a)(1)(iii) of this section, except that the words “or enforceable as a practical matter” should be added after “federally enforceable.”

(iii) Small emissions unit means an emissions unit that emits or has the potential to emit the PAL pollutant in an amount less than the significant level for that PAL pollutant, as defined in paragraph (a)(1)(x) of this section or in the Act, whichever is lower.

(iv) Major emissions unit means:

(A) Any emissions unit that emits or has the potential to emit 100 tons per year or more of the PAL pollutant in an attainment area; or

(B) Any emissions unit that emits or has the potential to emit the PAL pollutant in an amount that is equal to or greater than the major source threshold for the PAL pollutant as defined by the Act for nonattainment areas. For example, in accordance with the definition of major stationary source in section 182(c) of the Act, an emissions unit would be a major emissions unit for VOC if the emissions unit is located in a serious ozone nonattainment area and it emits or has the potential to emit 50 or more tons of VOC per year.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(v) Plantwide applicability limitation (PAL) means an emission limitation expressed in tons per year, for a pollutant at a major stationary source, that is enforceable as a practical matter and established source-wide in accordance with paragraphs (f)(1) through (f)(15) of this section.

(vi) PAL effective date generally means the date of issuance of the PAL permit. However, the PAL effective date for an increased PAL is the date any emissions unit which is part of the PAL major modification becomes operational and begins to emit the PAL pollutant.

(vii) PAL effective period means the period beginning with the PAL effective date and ending 10 years later.

(viii) PAL major modification means, notwithstanding paragraphs (a)(1)(v) and (vi) of this section (the definitions for major modification and net emissions increase), any physical change in or change in the method of operation of the PAL source that causes it to emit the PAL pollutant at a level equal to or greater than the PAL.

(ix) PAL permit means the major NSR permit, the minor NSR permit, or the State operating permit under a program that is approved into the plan, or the title V permit issued by the reviewing authority that establishes a PAL for a major stationary source.

(x) PAL pollutant means the pollutant for which a PAL is established at a major stationary source.

(xi) Significant emissions unit means an emissions unit that emits or has the potential to emit a PAL pollutant in an amount that is equal to or greater than the significant level (as defined in paragraph (a)(1)(x) of this section or in the Act, whichever is lower) for that PAL pollutant, but less than the amount that would qualify the unit as a major emissions unit as defined in paragraph (f)(2)(iv) of this section.

(3) Permit application requirements. As part of a permit application requesting a PAL, the owner or operator of a major stationary source shall submit the following information to the reviewing authority for approval:

(i) A list of all emissions units at the source designated as small, significant or major based on their potential to emit. In addition, the owner or operator of the source shall indicate which, if any, Federal or State applicable requirements, emission limitations or work practices apply to each unit.

(ii) Calculations of the baseline actual emissions (with supporting documentation). Baseline actual emissions are to include emissions associated not only with operation of the unit, but also emissions associated with startup, shutdown and malfunction.

(iii) The calculation procedures that the major stationary source owner or operator proposes to use to convert the monitoring system data to monthly emissions and annual emissions based on a 12–month rolling total for each month as required by paragraph (f)(13)(i) of this section.

(4) General requirements for establishing PALs.

(i) The plan allows the reviewing authority to establish a PAL at a major stationary source, provided that at a minimum, the requirements in paragraphs (f)(4)(i)(A) through (G) of this section are met.

(A) The PAL shall impose an annual emission limitation in tons per year, that is enforceable as a practical matter, for the entire major stationary source. For each month during the PAL effective period after the first 12 months of establishing a PAL, the major stationary source owner or operator shall show that the sum of the monthly emissions from each emissions unit under the PAL for the previous 12 consecutive months is less than the PAL (a 12–month average, rolled monthly). For each month during the first 11 months from the PAL effective date, the major stationary source owner or operator shall show that the sum of the preceding monthly emissions from the PAL effective date for each emissions unit under the PAL is less than the PAL.

(B) The PAL shall be established in a PAL permit that meets the public participation requirements in paragraph (f)(5) of this section.

(C) The PAL permit shall contain all the requirements of paragraph (f)(7) of this section.

(D) The PAL shall include fugitive emissions, to the extent quantifiable, from all emissions units that emit or have the potential to emit the PAL pollutant at the major stationary source.

(E) Each PAL shall regulate emissions of only one pollutant.

(F) Each PAL shall have a PAL effective period of 10 years.

(G) The owner or operator of the major stationary source with a PAL shall comply with the monitoring, recordkeeping, and reporting requirements provided in paragraphs (f)(12) through (14) of this section for each emissions unit under the PAL through the PAL effective period.

(ii) At no time (during or after the PAL effective period) are emissions reductions of a PAL pollutant, which occur during the PAL effective period, creditable as decreases for purposes of offsets under paragraph (a)(3)(ii) of this section unless the level of the PAL is reduced by the amount of such emissions reductions and such reductions would be creditable in the absence of the PAL.

(5) Public participation requirement for PALs. PALs for existing major stationary sources shall be established, renewed, or increased through a procedure that is consistent with §§ 51.160 and 51.161 of this chapter. This includes the requirement that the reviewing authority provide the public with notice of the proposed approval of a PAL permit and at least a 30–day period for submittal of public comment. The reviewing authority must address all material comments before taking final action on the permit.

(6) Setting the 10–year actuals PAL level.

(i) Except as provided in paragraph (f)(6)(ii) of this section, the plan shall provide that the actuals PAL level for a major stationary source shall be established as the sum of the baseline actual emissions (as defined in paragraph (a)(1)(xxxv) of this section) of the PAL pollutant for each emissions unit at the source; plus an amount equal to the applicable significant level for the PAL pollutant under paragraph (a)(1)(x) of this section or under the Act, whichever is lower. When establishing the actuals PAL level, for a PAL pollutant, only one consecutive 24–month period must be used to determine the baseline actual emissions for all existing emissions units. However, a different consecutive 24–month period may be used for each different PAL pollutant. Emissions associated with units that were permanently shut down after this 24–month period must be subtracted from the PAL level. The reviewing authority shall specify a reduced PAL level(s) (in tons/yr) in the PAL permit to become effective on the future compliance date(s) of any applicable Federal or State regulatory requirement(s) that the reviewing authority is aware of prior to issuance of the PAL permit. For instance, if the source owner or operator will be required to reduce emissions from industrial boilers in half from baseline emissions of 60 ppm $NO_X$ to a new rule limit of 30 ppm, then the permit shall contain a future effective PAL level that is equal to the current PAL level reduced by half of the original baseline emissions of such unit(s).

(ii) For newly constructed units (which do not include modifications to existing units) on which actual construction began after the 24–month period, in lieu of adding the baseline actual emissions as specified in paragraph (f)(6)(i) of this section, the emissions must be added to the PAL level in an amount equal to the potential to emit of the units.

(7) Contents of the PAL permit. The plan shall require that the PAL permit contain, at a minimum, the information in paragraphs (f)(7)(i) through (x) of this section.

(i) The PAL pollutant and the applicable source-wide emission limitation in tons per year.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(ii) The PAL permit effective date and the expiration date of the PAL (PAL effective period).

(iii) Specification in the PAL permit that if a major stationary source owner or operator applies to renew a PAL in accordance with paragraph (f)(10) of this section before the end of the PAL effective period, then the PAL shall not expire at the end of the PAL effective period. It shall remain in effect until a revised PAL permit is issued by the reviewing authority.

(iv) A requirement that emission calculations for compliance purposes include emissions from startups, shutdowns and malfunctions.

(v) A requirement that, once the PAL expires, the major stationary source is subject to the requirements of paragraph (f)(9) of this section.

(vi) The calculation procedures that the major stationary source owner or operator shall use to convert the monitoring system data to monthly emissions and annual emissions based on a 12–month rolling total for each month as required by paragraph (f)(13)(i) of this section.

(vii) A requirement that the major stationary source owner or operator monitor all emissions units in accordance with the provisions under paragraph (f)(12) of this section.

(viii) A requirement to retain the records required under paragraph (f)(13) of this section on site. Such records may be retained in an electronic format.

(ix) A requirement to submit the reports required under paragraph (f)(14) of this section by the required deadlines.

(x) Any other requirements that the reviewing authority deems necessary to implement and enforce the PAL.

(8) PAL effective period and reopening of the PAL permit. The plan shall require the information in paragraphs (f)(8)(i) and (ii) of this section.

(i) PAL effective period. The reviewing authority shall specify a PAL effective period of 10 years.

(ii) Reopening of the PAL permit.

(A) During the PAL effective period, the plan shall require the reviewing authority to reopen the PAL permit to:

(1) Correct typographical/calculation errors made in setting the PAL or reflect a more accurate determination of emissions used to establish the PAL.

(2) Reduce the PAL if the owner or operator of the major stationary source creates creditable emissions reductions for use as offsets under paragraph (a)(3)(ii) of this section.

(3) Revise the PAL to reflect an increase in the PAL as provided under paragraph (f)(11) of this section.

(B) The plan shall provide the reviewing authority discretion to reopen the PAL permit for the following:

(1) Reduce the PAL to reflect newly applicable Federal requirements (for example, NSPS) with compliance dates after the PAL effective date.

(2) Reduce the PAL consistent with any other requirement, that is enforceable as a practical matter, and that the State may impose on the major stationary source under the plan.

(3) Reduce the PAL if the reviewing authority determines that a reduction is necessary to avoid causing or contributing to a NAAQS or PSD increment violation, or to an adverse impact on an air quality related value that

has been identified for a Federal Class I area by a Federal Land Manager and for which information is available to the general public.

(C) Except for the permit reopening in paragraph (f)(8)(ii)(A)(1) of this section for the correction of typographical/calculation errors that do not increase the PAL level, all other reopenings shall be carried out in accordance with the public participation requirements of paragraph (f)(5) of this section.

(9) Expiration of a PAL. Any PAL which is not renewed in accordance with the procedures in paragraph (f)(10) of this section shall expire at the end of the PAL effective period, and the requirements in paragraphs (f)(9)(i) through (v) of this section shall apply.

(i) Each emissions unit (or each group of emissions units) that existed under the PAL shall comply with an allowable emission limitation under a revised permit established according to the procedures in paragraphs (f)(9)(i)(A) through (B) of this section.

(A) Within the time frame specified for PAL renewals in paragraph (f)(10)(ii) of this section, the major stationary source shall submit a proposed allowable emission limitation for each emissions unit (or each group of emissions units, if such a distribution is more appropriate as decided by the reviewing authority) by distributing the PAL allowable emissions for the major stationary source among each of the emissions units that existed under the PAL. If the PAL had not yet been adjusted for an applicable requirement that became effective during the PAL effective period, as required under paragraph (f)(10)(v) of this section, such distribution shall be made as if the PAL had been adjusted.

(B) The reviewing authority shall decide whether and how the PAL allowable emissions will be distributed and issue a revised permit incorporating allowable limits for each emissions unit, or each group of emissions units, as the reviewing authority determines is appropriate.

(ii) Each emissions unit(s) shall comply with the allowable emission limitation on a 12–month rolling basis. The reviewing authority may approve the use of monitoring systems (source testing, emission factors, etc.) other than CEMS, CERMS, PEMS or CPMS to demonstrate compliance with the allowable emission limitation.

(iii) Until the reviewing authority issues the revised permit incorporating allowable limits for each emissions unit, or each group of emissions units, as required under paragraph (f)(9)(i)(A) of this section, the source shall continue to comply with a source-wide, multi-unit emissions cap equivalent to the level of the PAL emission limitation.

(iv) Any physical change or change in the method of operation at the major stationary source will be subject to the nonattainment major NSR requirements if such change meets the definition of major modification in paragraph (a)(1)(v) of this section.

(v) The major stationary source owner or operator shall continue to comply with any State or Federal applicable requirements (BACT, RACT, NSPS, etc.) that may have applied either during the PAL effective period or prior to the PAL effective period except for those emission limitations that had been established pursuant to paragraph (a)(5)(ii) of this section, but were eliminated by the PAL in accordance with the provisions in paragraph (f)(1)(iii)(C) of this section.

(10) Renewal of a PAL.

(i) The reviewing authority shall follow the procedures specified in paragraph (f)(5) of this section in approving any request to renew a PAL for a major stationary source, and shall provide both the proposed PAL level and a written rationale for the proposed PAL level to the public for review and comment. During such public review, any person may propose a PAL level for the source for consideration by the reviewing authority.

(ii) Application deadline. The plan shall require that a major stationary source owner or operator shall submit a timely application to the reviewing authority to request renewal of a PAL. A timely application is one that is submitted at least 6 months prior to, but not earlier than 18 months from, the date of permit expiration. This deadline for application submittal

is to ensure that the permit will not expire before the permit is renewed. If the owner or operator of a major stationary source submits a complete application to renew the PAL within this time period, then the PAL shall continue to be effective until the revised permit with the renewed PAL is issued.

(iii) Application requirements. The application to renew a PAL permit shall contain the information required in paragraphs (f)(10)(iii)(A) through (D) of this section.

(A) The information required in paragraphs (f)(3)(i) through (iii) of this section.

(B) A proposed PAL level.

(C) The sum of the potential to emit of all emissions units under the PAL (with supporting documentation).

(D) Any other information the owner or operator wishes the reviewing authority to consider in determining the appropriate level for renewing the PAL.

(iv) PAL adjustment. In determining whether and how to adjust the PAL, the reviewing authority shall consider the options outlined in paragraphs (f)(10)(iv)(A) and (B) of this section. However, in no case may any such adjustment fail to comply with paragraph (f)(10)(iv)(C) of this section.

(A) If the emissions level calculated in accordance with paragraph (f)(6) of this section is equal to or greater than 80 percent of the PAL level, the reviewing authority may renew the PAL at the same level without considering the factors set forth in paragraph (f)(10)(iv)(B) of this section; or

(B) The reviewing authority may set the PAL at a level that it determines to be more representative of the source's baseline actual emissions, or that it determines to be appropriate considering air quality needs, advances in control technology, anticipated economic growth in the area, desire to reward or encourage the source's voluntary emissions reductions, or other factors as specifically identified by the reviewing authority in its written rationale.

(C) Notwithstanding paragraphs (f)(10)(iv)(A) and (B) of this section,

(1) If the potential to emit of the major stationary source is less than the PAL, the reviewing authority shall adjust the PAL to a level no greater than the potential to emit of the source; and

(2) The reviewing authority shall not approve a renewed PAL level higher than the current PAL, unless the major stationary source has complied with the provisions of paragraph (f)(11) of this section (increasing a PAL).

(v) If the compliance date for a State or Federal requirement that applies to the PAL source occurs during the PAL effective period, and if the reviewing authority has not already adjusted for such requirement, the PAL shall be adjusted at the time of PAL permit renewal or title V permit renewal, whichever occurs first.

(11) Increasing a PAL during the PAL effective period.

(i) The plan shall require that the reviewing authority may increase a PAL emission limitation only if the major stationary source complies with the provisions in paragraphs (f)(11)(i)(A) through (D) of this section.

(A) The owner or operator of the major stationary source shall submit a complete application to request an increase in the PAL limit for a PAL major modification. Such application shall identify the emissions unit(s) contributing to the increase in emissions so as to cause the major stationary source's emissions to equal or exceed its PAL.

(B) As part of this application, the major stationary source owner or operator shall demonstrate that the sum of the baseline actual emissions of the small emissions units, plus the sum of the baseline actual emissions of the significant and major emissions units assuming application of BACT equivalent controls, plus the sum of the allowable emissions of the new or modified emissions unit(s) exceeds the PAL. The level of control that would result from BACT

equivalent controls on each significant or major emissions unit shall be determined by conducting a new BACT analysis at the time the application is submitted, unless the emissions unit is currently required to comply with a BACT or LAER requirement that was established within the preceding 10 years. In such a case, the assumed control level for that emissions unit shall be equal to the level of BACT or LAER with which that emissions unit must currently comply.

(C) The owner or operator obtains a major NSR permit for all emissions unit(s) identified in paragraph (f)(11)(i)(A) of this section, regardless of the magnitude of the emissions increase resulting from them (that is, no significant levels apply). These emissions unit(s) shall comply with any emissions requirements resulting from the nonattainment major NSR program process (for example, LAER), even though they have also become subject to the PAL or continue to be subject to the PAL.

(D) The PAL permit shall require that the increased PAL level shall be effective on the day any emissions unit that is part of the PAL major modification becomes operational and begins to emit the PAL pollutant.

(ii) The reviewing authority shall calculate the new PAL as the sum of the allowable emissions for each modified or new emissions unit, plus the sum of the baseline actual emissions of the significant and major emissions units (assuming application of BACT equivalent controls as determined in accordance with paragraph (f)(11)(i)(B)), plus the sum of the baseline actual emissions of the small emissions units.

(iii) The PAL permit shall be revised to reflect the increased PAL level pursuant to the public notice requirements of paragraph (f)(5) of this section.

(12) Monitoring requirements for PALs--

(i) General requirements.

(A) Each PAL permit must contain enforceable requirements for the monitoring system that accurately determines plantwide emissions of the PAL pollutant in terms of mass per unit of time. Any monitoring system authorized for use in the PAL permit must be based on sound science and meet generally acceptable scientific procedures for data quality and manipulation. Additionally, the information generated by such system must meet minimum legal requirements for admissibility in a judicial proceeding to enforce the PAL permit.

(B) The PAL monitoring system must employ one or more of the four general monitoring approaches meeting the minimum requirements set forth in paragraphs (f)(12)(ii)(A) through (D) of this section and must be approved by the reviewing authority.

(C) Notwithstanding paragraph (f)(12)(i)(B) of this section, you may also employ an alternative monitoring approach that meets paragraph (f)(12)(i)(A) of this section if approved by the reviewing authority.

(D) Failure to use a monitoring system that meets the requirements of this section renders the PAL invalid.

(ii) Minimum Performance Requirements for Approved Monitoring Approaches. The following are acceptable general monitoring approaches when conducted in accordance with the minimum requirements in paragraphs (f)(12)(iii) through (ix) of this section:

(A) Mass balance calculations for activities using coatings or solvents;

(B) CEMS;

(C) CPMS or PEMS; and

(D) Emission Factors.

(iii) Mass Balance Calculations. An owner or operator using mass balance calculations to monitor PAL pollutant emissions from activities using coating or solvents shall meet the following requirements:

(A) Provide a demonstrated means of validating the published content of the PAL pollutant that is contained in or created by all materials used in or at the emissions unit;

(B) Assume that the emissions unit emits all of the PAL pollutant that is contained in or created by any raw material or fuel used in or at the emissions unit, if it cannot otherwise be accounted for in the process; and

(C) Where the vendor of a material or fuel, which is used in or at the emissions unit, publishes a range of pollutant content from such material, the owner or operator must use the highest value of the range to calculate the PAL pollutant emissions unless the reviewing authority determines there is site-specific data or a site-specific monitoring program to support another content within the range.

(iv) CEMS. An owner or operator using CEMS to monitor PAL pollutant emissions shall meet the following requirements:

(A) CEMS must comply with applicable Performance Specifications found in 40 CFR part 60, appendix B; and

(B) CEMS must sample, analyze and record data at least every 15 minutes while the emissions unit is operating.

(v) CPMS or PEMS. An owner or operator using CPMS or PEMS to monitor PAL pollutant emissions shall meet the following requirements:

(A) The CPMS or the PEMS must be based on current site-specific data demonstrating a correlation between the monitored parameter(s) and the PAL pollutant emissions across the range of operation of the emissions unit; and

(B) Each CPMS or PEMS must sample, analyze, and record data at least every 15 minutes, or at another less frequent interval approved by the reviewing authority, while the emissions unit is operating.

(vi) Emission factors. An owner or operator using emission factors to monitor PAL pollutant emissions shall meet the following requirements:

(A) All emission factors shall be adjusted, if appropriate, to account for the degree of uncertainty or limitations in the factors' development;

(B) The emissions unit shall operate within the designated range of use for the emission factor, if applicable; and

(C) If technically practicable, the owner or operator of a significant emissions unit that relies on an emission factor to calculate PAL pollutant emissions shall conduct validation testing to determine a site-specific emission factor within 6 months of PAL permit issuance, unless the reviewing authority determines that testing is not required.

(vii) A source owner or operator must record and report maximum potential emissions without considering enforceable emission limitations or operational restrictions for an emissions unit during any period of time that there is no monitoring data, unless another method for determining emissions during such periods is specified in the PAL permit.

(viii) Notwithstanding the requirements in paragraphs (f)(12)(iii) through (vii) of this section, where an owner or operator of an emissions unit cannot demonstrate a correlation between the monitored parameter(s) and the PAL pollutant emissions rate at all operating points of the emissions unit, the reviewing authority shall, at the time of permit issuance:

(A) Establish default value(s) for determining compliance with the PAL based on the highest potential emissions reasonably estimated at such operating point(s); or

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(B) Determine that operation of the emissions unit during operating conditions when there is no correlation between monitored parameter(s) and the PAL pollutant emissions is a violation of the PAL.

(ix) Re-validation. All data used to establish the PAL pollutant must be re-validated through performance testing or other scientifically valid means approved by the reviewing authority. Such testing must occur at least once every 5 years after issuance of the PAL.

(13) Recordkeeping requirements.

(i) The PAL permit shall require an owner or operator to retain a copy of all records necessary to determine compliance with any requirement of paragraph (f) of this section and of the PAL, including a determination of each emissions unit's 12–month rolling total emissions, for 5 years from the date of such record.

(ii) The PAL permit shall require an owner or operator to retain a copy of the following records for the duration of the PAL effective period plus 5 years:

(A) A copy of the PAL permit application and any applications for revisions to the PAL; and

(B) Each annual certification of compliance pursuant to title V and the data relied on in certifying the compliance.

(14) Reporting and notification requirements. The owner or operator shall submit semi-annual monitoring reports and prompt deviation reports to the reviewing authority in accordance with the applicable title V operating permit program. The reports shall meet the requirements in paragraphs (f)(14)(i) through (iii).

(i) Semi–Annual Report. The semi-annual report shall be submitted to the reviewing authority within 30 days of the end of each reporting period. This report shall contain the information required in paragraphs (f)(14)(i)(A) through (G) of this section.

(A) The identification of owner and operator and the permit number.

(B) Total annual emissions (tons/year) based on a 12–month rolling total for each month in the reporting period recorded pursuant to paragraph (f)(13)(i) of this section.

(C) All data relied upon, including, but not limited to, any Quality Assurance or Quality Control data, in calculating the monthly and annual PAL pollutant emissions.

(D) A list of any emissions units modified or added to the major stationary source during the preceding 6–month period.

(E) The number, duration, and cause of any deviations or monitoring malfunctions (other than the time associated with zero and span calibration checks), and any corrective action taken.

(F) A notification of a shutdown of any monitoring system, whether the shutdown was permanent or temporary, the reason for the shutdown, the anticipated date that the monitoring system will be fully operational or replaced with another monitoring system, and whether the emissions unit monitored by the monitoring system continued to operate, and the calculation of the emissions of the pollutant or the number determined by method included in the permit, as provided by paragraph (f)(12)(vii) of this section.

(G) A signed statement by the responsible official (as defined by the applicable title V operating permit program) certifying the truth, accuracy, and completeness of the information provided in the report.

(ii) Deviation report. The major stationary source owner or operator shall promptly submit reports of any deviations or exceedance of the PAL requirements, including periods where no monitoring is available. A report submitted pursuant to

§ 70.6(a)(3)(iii)(B) of this chapter shall satisfy this reporting requirement. The deviation reports shall be submitted within the time limits prescribed by the applicable program implementing § 70.6(a)(3)(iii)(B) of this chapter. The reports shall contain the following information:

(A) The identification of owner and operator and the permit number;

(B) The PAL requirement that experienced the deviation or that was exceeded;

(C) Emissions resulting from the deviation or the exceedance; and

(D) A signed statement by the responsible official (as defined by the applicable title V operating permit program) certifying the truth, accuracy, and completeness of the information provided in the report.

(iii) Re-validation results. The owner or operator shall submit to the reviewing authority the results of any re-validation test or method within 3 months after completion of such test or method.

(15) Transition requirements.

(i) No reviewing authority may issue a PAL that does not comply with the requirements in paragraphs (f)(1) through (15) of this section after the Administrator has approved regulations incorporating these requirements into a plan.

(ii) The reviewing authority may supersede any PAL which was established prior to the date of approval of the plan by the Administrator with a PAL that complies with the requirements of paragraphs (f)(1) through (15) of this section.

(g) If any provision of this section, or the application of such provision to any person or circumstance, is held invalid, the remainder of this section, or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.

(h) Equipment replacement provision. Without regard to other considerations, routine maintenance, repair and replacement includes, but is not limited to, the replacement of any component of a process unit with an identical or functionally equivalent component(s), and maintenance and repair activities that are part of the replacement activity, provided that all of the requirements in paragraphs (h)(1) through (3) of this section are met.

(1) Capital Cost threshold for Equipment Replacement.

(i) For an electric utility steam generating unit, as defined in § 51.165(a)(1)(xx), the fixed capital cost of the replacement component(s) plus the cost of any associated maintenance and repair activities that are part of the replacement shall not exceed 20 percent of the replacement value of the process unit, at the time the equipment is replaced. For a process unit that is not an electric utility steam generating unit the fixed capital cost of the replacement component(s) plus the cost of any associated maintenance and repair activities that are part of the replacement shall not exceed 20 percent of the replacement value of the process unit, at the time the equipment is replaced.

(ii) In determining the replacement value of the process unit; and, except as otherwise allowed under paragraph (h)(1)(iii) of this section, the owner or operator shall determine the replacement value of the process unit on an estimate of the fixed capital cost of constructing a new process unit, or on the current appraised value of the process unit.

(iii) As an alternative to paragraph (h)(1)(ii) of this section for determining the replacement value of a process unit, an owner or operator may choose to use insurance value (where the insurance value covers only complete replacement), investment value adjusted for inflation, or another accounting procedure if such procedure is based on Generally Accepted Accounting Principles, provided that the owner or operator sends a notice to the reviewing authority. The first time that an owner or operator submits such a notice for a particular process unit, the notice may be submitted at any time, but any subsequent notice for that process unit may be submitted only at the beginning of the process unit's fiscal year. Unless the owner or operator submits a notice to the reviewing authority, then paragraph (h)(1)(ii) of this section will be used to establish

the replacement value of the process unit. Once the owner or operator submits a notice to use an alternative accounting procedure, the owner or operator must continue to use that procedure for the entire fiscal year for that process unit. In subsequent fiscal years, the owner or operator must continue to use this selected procedure unless and until the owner or operator sends another notice to the reviewing authority selecting another procedure consistent with this paragraph or paragraph (h)(1)(ii) of this section at the beginning of such fiscal year.

(2) Basic design parameters. The replacement does not change the basic design parameter(s) of the process unit to which the activity pertains.

(i) Except as provided in paragraph (h)(2)(iii) of this section, for a process unit at a steam electric generating facility, the owner or operator may select as its basic design parameters either maximum hourly heat input and maximum hourly fuel consumption rate or maximum hourly electric output rate and maximum steam flow rate. When establishing fuel consumption specifications in terms of weight or volume, the minimum fuel quality based on British Thermal Units content shall be used for determining the basic design parameter(s) for a coal-fired electric utility steam generating unit.

(ii) Except as provided in paragraph (h)(2)(iii) of this section, the basic design parameter(s) for any process unit that is not at a steam electric generating facility are maximum rate of fuel or heat input, maximum rate of material input, or maximum rate of product output. Combustion process units will typically use maximum rate of fuel input. For sources having multiple end products and raw materials, the owner or operator should consider the primary product or primary raw material when selecting a basic design parameter.

(iii) If the owner or operator believes the basic design parameter(s) in paragraphs (h)(2)(i) and (ii) of this section is not appropriate for a specific industry or type of process unit, the owner or operator may propose to the reviewing authority an alternative basic design parameter(s) for the source's process unit(s). If the reviewing authority approves of the use of an alternative basic design parameter(s), the reviewing authority shall issue a permit that is legally enforceable that records such basic design parameter(s) and requires the owner or operator to comply with such parameter(s).

(iv) The owner or operator shall use credible information, such as results of historic maximum capability tests, design information from the manufacturer, or engineering calculations, in establishing the magnitude of the basic design parameter(s) specified in paragraphs (h)(2)(i) and (ii) of this section.

(v) If design information is not available for a process unit, then the owner or operator shall determine the process unit's basic design parameter(s) using the maximum value achieved by the process unit in the five-year period immediately preceding the planned activity.

(vi) Efficiency of a process unit is not a basic design parameter.

(3) The replacement activity shall not cause the process unit to exceed any emission limitation, or operational limitation that has the effect of constraining emissions, that applies to the process unit and that is legally enforceable.

Note to paragraph (h): By a court order on December 24, 2003, this paragraph (h) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

Credits
[52 FR 24713, July 1, 1987; 52 FR 29386, Aug. 7, 1987; 54 FR 27285, 27299, June 28, 1989; 57 FR 3946, Feb. 3, 1992; 57 FR 32334, July 21, 1992; 67 FR 80244, Dec. 31, 2002; 68 FR 61276, Oct. 27, 2003; 68 FR 63027, Nov. 7, 2003; 69 FR 40275, July 1, 2004; 70 FR 71698, Nov. 29, 2005; 72 FR 24077, May 1, 2007; 72 FR 32528, June 13, 2007; 72 FR 72616, Dec. 21, 2007; 73 FR 28347, May 16, 2008; 73 FR 77895, Dec. 19, 2008; 74 FR 50116, Sept. 30, 2009; 74 FR 65694, Dec. 11, 2009; 75 FR 16015, March 31, 2010; 75 FR 64902, Oct. 20, 2010; 76 FR 17552, March 30, 2011]
SOURCE: 36 FR 22398, Nov. 25, 1971; 51 FR 40669, Nov. 7, 1986; 52 FR 24712, July 1, 1987; 55 FR 14249, April 17, 1990; 56 FR 42219, Aug. 26, 1991; 57 FR 32334, July 21, 1992; 57 FR 52987, Nov. 5, 1992; 58 FR 38821, July 20, 1993; 60 FR

40100, Aug. 7, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 43801, Aug. 15, 1997; 62 FR 44903, Aug. 25, 1997; 63 FR 24433, May 4, 1998; 64 FR 35763, July 1, 1999; 65 FR 45532, July 24, 2000; 72 FR 28613, May 22, 2007, unless otherwise noted.

AUTHORITY: 23 U.S.C. 101; 42 U.S.C. 7401–7671q.

Notes of Decisions (15)

Current through November 3, 2011; 76 FR 68118.

**End of Document** © 2011 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter C. Air Programs
Part 51. Requirements for Preparation, Adoption, and Submittal of Implementation Plans (Refs & Annos)
Subpart I. Review of New Sources and Modifications (Refs & Annos)

40 C.F.R. § 51.166

§ 51.166 Prevention of significant deterioration of air quality.

Effective: July 20, 2011
Currentness

(a)(1) Plan requirements. In accordance with the policy of section 101(b)(1) of the Act and the purposes of section 160 of the Act, each applicable State Implementation Plan and each applicable Tribal Implementation Plan shall contain emission limitations and such other measures as may be necessary to prevent significant deterioration of air quality.

(2) Plan revisions. If a State Implementation Plan revision would result in increased air quality deterioration over any baseline concentration, the plan revision shall include a demonstration that it will not cause or contribute to a violation of the applicable increment(s). If a plan revision proposing less restrictive requirements was submitted after August 7, 1977 but on or before any applicable baseline date and was pending action by the Administrator on that date, no such demonstration is necessary with respect to the area for which a baseline date would be established before final action is taken on the plan revision. Instead, the assessment described in paragraph (a)(4) of this section, shall review the expected impact to the applicable increment(s).

(3) Required plan revision. If the State or the Administrator determines that a plan is substantially inadequate to prevent significant deterioration or that an applicable increment is being violated, the plan shall be revised to correct the inadequacy or the violation. The plan shall be revised within 60 days of such a finding by a State or within 60 days following notification by the Administrator, or by such later date as prescribed by the Administrator after consultation with the State.

(4) Plan assessment. The State shall review the adequacy of a plan on a periodic basis and within 60 days of such time as information becomes available that an applicable increment is being violated.

(5) Public participation. Any State action taken under this paragraph shall be subject to the opportunity for public hearing in accordance with procedures equivalent to those established in § 51.102.

(6) Amendments.

(i) Any State required to revise its implementation plan by reason of an amendment to this section, with the exception of amendments to add new maximum allowable increases or other measures pursuant to section 166(a) of the Act, shall adopt and submit such plan revision to the Administrator for approval no later than 3 years after such amendment is published in the Federal Register. With regard to a revision to an implementation plan by reason of an amendment to paragraph (c) of this section to add maximum allowable increases or other measures, the State shall submit such plan revision to the Administrator for approval within 21 months after such amendment is published in the Federal Register.

(ii) Any revision to an implementation plan that would amend the provisions for the prevention of significant air quality deterioration in the plan shall specify when and as to what sources and modifications the revision is to take effect.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

(iii) Any revision to an implementation plan that an amendment to this section required shall take effect no later than the date of its approval and may operate prospectively.

(7) Applicability. Each plan shall contain procedures that incorporate the requirements in paragraphs (a)(7)(i) through (vi) of this section.

(i) The requirements of this section apply to the construction of any new major stationary source (as defined in paragraph (b)(1) of this section) or any project at an existing major stationary source in an area designated as attainment or unclassifiable under sections 107(d)(1)(A)(ii) or (iii) of the Act.

(ii) The requirements of paragraphs (j) through (r) of this section apply to the construction of any new major stationary source or the major modification of any existing major stationary source, except as this section otherwise provides.

(iii) No new major stationary source or major modification to which the requirements of paragraphs (j) through (r)(5) of this section apply shall begin actual construction without a permit that states that the major stationary source or major modification will meet those requirements.

(iv) Each plan shall use the specific provisions of paragraphs (a)(7)(iv)(a) through (f) of this section. Deviations from these provisions will be approved only if the State specifically demonstrates that the submitted provisions are more stringent than or at least as stringent in all respects as the corresponding provisions in paragraphs (a)(7)(iv)(a) through (f) of this section.

(a) Except as otherwise provided in paragraphs (a)(7)(v) and (vi) of this section, and consistent with the definition of major modification contained in paragraph (b)(2) of this section, a project is a major modification for a regulated NSR pollutant if it causes two types of emissions increases--a significant emissions increase (as defined in paragraph (b)(39) of this section), and a significant net emissions increase (as defined in paragraphs (b)(3) and (b)(23) of this section). The project is not a major modification if it does not cause a significant emissions increase. If the project causes a significant emissions increase, then the project is a major modification only if it also results in a significant net emissions increase.

(b) The procedure for calculating (before beginning actual construction) whether a significant emissions increase (i.e., the first step of the process) will occur depends upon the type of emissions units being modified, according to paragraphs (a)(7)(iv)(c) through (f) of this section. The procedure for calculating (before beginning actual construction) whether a significant net emissions increase will occur at the major stationary source (i.e., the second step of the process) is contained in the definition in paragraph (b)(3) of this section. Regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase.

(c) Actual-to-projected-actual applicability test for projects that only involve existing emissions units. A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the projected actual emissions (as defined in paragraph (b)(40) of this section) and the baseline actual emissions (as defined in paragraphs (b)(47)(i) and (ii) of this section) for each existing emissions unit, equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(d) Actual-to-potential test for projects that only involve construction of a new emissions unit(s). A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the potential to emit (as defined in paragraph (b)(4) of this section) from each new emissions unit following completion of the project and the baseline actual emissions (as defined in paragraph (b)(47)(iii) of this section) of these units before the project equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(e) [Reserved]

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(f) Hybrid test for projects that involve multiple types of emissions units. A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the emissions increases for each emissions unit, using the method specified in paragraphs (a)(7)(iv)(c) through (d) of this section as applicable with respect to each emissions unit, for each type of emissions unit equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(v) The plan shall require that for any major stationary source for a PAL for a regulated NSR pollutant, the major stationary source shall comply with requirements under paragraph (w) of this section.

(vi) [Reserved]

(b) Definitions. All State plans shall use the following definitions for the purposes of this section. Deviations from the following wording will be approved only if the State specifically demonstrates that the submitted definition is more stringent, or at least as stringent, in all respects as the corresponding definitions below:

(1)(i) Major stationary source means:

(a) Any of the following stationary sources of air pollutants which emits, or has the potential to emit, 100 tons per year or more of any regulated NSR pollutant: Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input, coal cleaning plants (with thermal dryers), kraft pulp mills, portland cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants (with thermal dryers), primary copper smelters, municipal incinerators capable of charging more than 250 tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production plants, chemical process plants (which does not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140), fossil-fuel boilers (or combinations thereof) totaling more than 250 million British thermal units per hour heat input, petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels, taconite ore processing plants, glass fiber processing plants, and charcoal production plants;

(b) Notwithstanding the stationary source size specified in paragraph (b)(1)(i)(a) of this section, any stationary source which emits, or has the potential to emit, 250 tons per year or more of a regulated NSR pollutant; or

(c) Any physical change that would occur at a stationary source not otherwise qualifying under paragraph (b)(1) of this section, as a major stationary source if the change would constitute a major stationary source by itself.

(ii) A major source that is major for volatile organic compounds or $NO_X$ shall be considered major for ozone.

(iii) The fugitive emissions of a stationary source shall not be included in determining for any of the purposes of this section whether it is a major stationary source, unless the source belongs to one of the following categories of stationary sources:

(a) Coal cleaning plants (with thermal dryers);

(b) Kraft pulp mills;

(c) Portland cement plants;

(d) Primary zinc smelters;

(e) Iron and steel mills;

(f) Primary aluminum ore reduction plants;

(g) Primary copper smelters;

(h) Municipal incinerators capable of charging more than 250 tons of refuse per day;

(i) Hydrofluoric, sulfuric, or nitric acid plants;

(j) Petroleum refineries;

(k) Lime plants;

(l) Phosphate rock processing plants;

(m) Coke oven batteries;

(n) Sulfur recovery plants;

(o) Carbon black plants (furnace process);

(p) Primary lead smelters;

(q) Fuel conversion plants;

(r) Sintering plants;

(s) Secondary metal production plants;

(t) Chemical process plants--The term chemical processing plant shall not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140;

(u) Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

(v) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

(w) Taconite ore processing plants;

(x) Glass fiber processing plants;

(y) Charcoal production plants;

(z) Fossil fuel-fired steam electric plants of more that 250 million British thermal units per hour heat input;

(aa) Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act.

(2)(i) Major modification means any physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase (as defined in paragraph (b)(39) of this section) of a regulated NSR pollutant (as defined in paragraph (b)(49) of this section); and a significant net emissions increase of that pollutant from the major stationary source.

(ii) Any significant emissions increase (as defined at paragraph (b)(39) of this section) from any emissions units or net emissions increase (as defined in paragraph (b)(3) of this section) at a major stationary source that is significant for volatile organic compounds or $NO_X$ shall be considered significant for ozone.

(iii) A physical change or change in the method of operation shall not include:

(a) Routine maintenance, repair and replacement. Routine maintenance, repair and replacement shall include, but not be limited to, any activity(s) that meets the requirements of the equipment replacement provisions contained in paragraph (y) of this section;

Note to paragraph (b)(2)(iii)(a): On December 24, 2003, the second sentence of this paragraph (b)(2)(iii)(a) is stayed indefinitely by court order. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(b) Use of an alternative fuel or raw material by reason of any order under sections 2 (a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (or any superseding legislation) or by reason of a natural gas curtailment plan pursuant to the Federal Power Act;

(c) Use of an alternative fuel by reason of an order or rule under section 125 of the Act;

(d) Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste;

(e) Use of an alternative fuel or raw material by a stationary source which:

(1) The source was capable of accommodating before January 6, 1975, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975 pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR subpart I or § 51.166; or

(2) The source is approved to use under any permit issued under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166;

(f) An increase in the hours of operation or in the production rate, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975, pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR subpart I or § 51.166.

(g) Any change in ownership at a stationary source.

(h) [Reserved]

(i) The installation, operation, cessation, or removal of a temporary clean coal technology demonstration project, provided that the project complies with:

(1) The State implementation plan for the State in which the project is located; and

(2) Other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

(j) The installation or operation of a permanent clean coal technology demonstration project that constitutes repowering, provided that the project does not result in an increase in the potential to emit of any regulated pollutant emitted by the unit. This exemption shall apply on a pollutant-by-pollutant basis.

(k) The reactivation of a very clean coal-fired electric utility steam generating unit.

(iv) This definition shall not apply with respect to a particular regulated NSR pollutant when the major stationary source is complying with the requirements under paragraph (w) of this section for a PAL for that pollutant. Instead, the definition at paragraph (w)(2)(viii) of this section shall apply.

<Text of subsection (b)(2)(v) stayed effective March 30, 2011.>

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(v) Fugitive emissions shall not be included in determining for any of the purposes of this section whether a physical change in or change in the method of operation of a major stationary source is a major modification, unless the source belongs to one of the source categories listed in paragraph (b)(1)(iii) of this section.

(3)(i) Net emissions increase means, with respect to any regulated NSR pollutant emitted by a major stationary source, the amount by which the sum of the following exceeds zero:

(a) The increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated pursuant to paragraph (a)(7)(iv) of this section; and

(b) Any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable. Baseline actual emissions for calculating increases and decreases under this paragraph (b)(3)(i)(b) shall be determined as provided in paragraph (b)(47), except that paragraphs (b)(47)(i)(c) and (b)(47)(ii)(d) of this section shall not apply.

(ii) An increase or decrease in actual emissions is contemporaneous with the increase from the particular change only if it occurs within a reasonable period (to be specified by the State) before the date that the increase from the particular change occurs.

(iii) An increase or decrease in actual emissions is creditable only if:

(a) It occurs within a reasonable period (to be specified by the reviewing authority); and

(b) The reviewing authority has not relied on it in issuing a permit for the source under regulations approved pursuant to this section, which permit is in effect when the increase in actual emissions from the particular change occurs; and

(c) The increase or decrease in emissions did not occur at a Clean Unit, except as provided in paragraphs (t)(8) and (u)(10) of this section.

<Text of subsection (b)(3)(iii)(d) stayed effective March 30, 2011.>

(d) As it pertains to an increase or decrease in fugitive emissions (to the extent quantifiable), it occurs at an emissions unit that is part of one of the source categories listed in paragraph (b)(1)(iii) of this section or it occurs at an emission unit that is located at a major stationary source that belongs to one of the listed source categories. Fugitive emission increases or decreases are not included for those emissions units located at a facility whose primary activity is not represented by one of the source categories listed in paragraph (b)(1)(iii) of this section and that are not, by themselves, part of a listed source category.

(iv) An increase or decrease in actual emissions of sulfur dioxide, particulate matter, or nitrogen oxides that occurs before the applicable minor source baseline date is creditable only if it is required to be considered in calculating the amount of maximum allowable increases remaining available.

(v) An increase in actual emissions is creditable only to the extent that the new level of actual emissions exceeds the old level.

(vi) A decrease in actual emissions is creditable only to the extent that:

(a) The old level of actual emissions or the old level of allowable emissions, whichever is lower, exceeds the new level of actual emissions;

(b) It is enforceable as a practical matter at and after the time that actual construction on the particular change begins;

(c) It has approximately the same qualitative significance for public health and welfare as that attributed to the increase from the particular change; and

(d) [Reserved]

(vii) An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred becomes operational and begins to emit a particular pollutant. Any replacement unit that requires shakedown becomes operational only after a reasonable shakedown period, not to exceed 180 days.

(viii) Paragraph (b)(21)(ii) of this section shall not apply for determining creditable increases and decreases.

(4) Potential to emit means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable. Secondary emissions do not count in determining the potential to emit of a stationary source.

(5) Stationary source means any building, structure, facility, or installation which emits or may emit a regulated NSR pollutant.

(6) Building, structure, facility, or installation means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any vessel. Pollutant-emitting activities shall be considered as part of the same industrial grouping if they belong to the same Major Group (i.e., which have the same two-digit code) as described in the Standard Industrial Classification Manual, 1972, as amended by the 1977 Supplement (U.S. Government Printing Office stock numbers 4101–0066 and 003–005–00176–0, respectively).

(7) Emissions unit means any part of a stationary source that emits or would have the potential to emit any regulated NSR pollutant and includes an electric utility steam generating unit as defined in paragraph (b)(30) of this section. For purposes of this section, there are two types of emissions units as described in paragraphs (b)(7)(i) and (ii) of this section.

(i) A new emissions unit is any emissions unit that is (or will be) newly constructed and that has existed for less than 2 years from the date such emissions unit first operated.

(ii) An existing emissions unit is any emissions unit that does not meet the requirements in paragraph (b)(7)(i) of this section. A replacement unit, as defined in paragraph (b)(32) of this section, is an existing emissions unit.

(8) Construction means any physical change or change in the method of operation (including fabrication, erection, installation, demolition, or modification of an emissions unit) that would result in a change in emissions.

(9) Commence as applied to construction of a major stationary source or major modification means that the owner or operator has all necessary preconstruction approvals or permits and either has:

(i) Begun, or caused to begin, a continuous program of actual on-site construction of the source, to be completed within a reasonable time; or

(ii) Entered into binding agreements or contractual obligations, which cannot be cancelled or modified without substantial loss to the owner or operator, to undertake a program of actual construction of the source to be completed within a reasonable time.

(10) Necessary preconstruction approvals or permits means those permits or approvals required under Federal air quality control laws and regulations and those air quality control laws and regulations which are part of the applicable State Implementation Plan.

(11) Begin actual construction means, in general, initiation of physical on-site construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying of underground pipework, and construction of permanent storage structures. With respect to a change in method of operation this term refers to those on-site activities, other than preparatory activities, which mark the initiation of the change.

(12) Best available control technology means an emissions limitation (including a visible emissions standard) based on the maximum degree of reduction for each a regulated NSR pollutant which would be emitted from any proposed major stationary source or major modification which the reviewing authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combination techniques for control of such pollutant. In no event shall application of best available control technology result in emissions of any pollutant which would exceed the emissions allowed by any applicable standard under 40 CFR parts 60 and 61. If the reviewing authority determines that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emissions standard infeasible, a design, equipment, work practice, operational standard or combination thereof, may be prescribed instead to satisfy the requirement for the application of best available control technology. Such standard shall, to the degree possible, set forth the emissions reduction achievable by implementation of such design, equipment, work practice or operation, and shall provide for compliance by means which achieve equivalent results.

(13)(i) Baseline concentration means that ambient concentration level that exists in the baseline area at the time of the applicable minor source baseline date. A baseline concentration is determined for each pollutant for which a minor source baseline date is established and shall include:

(a) The actual emissions, as defined in paragraph (b)(21) of this section, representative of sources in existence on the applicable minor source baseline date, except as provided in paragraph (b)(13)(ii) of this section;

(b) The allowable emissions of major stationary sources that commenced construction before the major source baseline date, but were not in operation by the applicable minor source baseline date.

(ii) The following will not be included in the baseline concentration and will affect the applicable maximum allowable increase(s):

(a) Actual emissions, as defined in paragraph (b)(21) of this section, from any major stationary source on which construction commenced after the major source baseline date; and

(b) Actual emissions increases and decreases, as defined in paragraph (b)(21) of this section, at any stationary source occurring after the minor source baseline date.

(14)(i) Major source baseline date means:

(a) In the case of $PM_{10}$ and sulfur dioxide, January 6, 1975;

(b) In the case of nitrogen dioxide, February 8, 1988; and

(c) In the case of $PM_{2.5}$, October 20, 2010.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(ii) Minor source baseline date means the earliest date after the trigger date on which a major stationary source or a major modification subject to 40 CFR 52.21 or to regulations approved pursuant to 40 CFR 51.166 submits a complete application under the relevant regulations. The trigger date is:

(a) In the case of $PM_{10}$ and sulfur dioxide, August 7, 1977;

(b) In the case of nitrogen dioxide, February 8, 1988; and

(c) In the case of $PM_{2.5}$, October 20, 2011.

(iii) The baseline date is established for each pollutant for which increments or other equivalent measures have been established if:

(a) The area in which the proposed source or modification would construct is designated as attainment or unclassifiable under section 107(d)(1)(A)(ii) or (iii) of the Act for the pollutant on the date of its complete application under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166; and

(b) In the case of a major stationary source, the pollutant would be emitted in significant amounts, or, in the case of a major modification, there would be a significant net emissions increase of the pollutant.

(iv) Any minor source baseline date established originally for the TSP increments shall remain in effect and shall apply for purposes of determining the amount of available PM–10 increments, except that the reviewing authority may rescind any such minor source baseline date where it can be shown, to the satisfaction of the reviewing authority, that the emissions increase from the major stationary source, or the net emissions increase from the major modification, responsible for triggering that date did not result in a significant amount of PM–10 emissions.

(15)(i) Baseline area means any intrastate area (and every part thereof) designated as attainment or unclassifiable under section 107(d)(1)(A)(ii) or (iii) of the Act in which the major source or major modification establishing the minor source baseline date would construct or would have an air quality impact for the pollutant for which the baseline date is established, as follows: Equal to or greater than 1 $\mu g/m^3$ (annual average) for $SO_2$, $NO_2$, or $PM_{10}$ ; or equal or greater than 0.3 $\mu g/m^3$ (annual average) for $PM_{2.5}$ .

(ii) Area redesignations under section 107(d)(1)(A)(ii) or (iii) of the Act cannot intersect or be smaller than the area of impact of any major stationary source or major modification which:

(a) Establishes a minor source baseline date; or

(b) Is subject to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166, and would be constructed in the same State as the State proposing the redesignation.

(iii) Any baseline area established originally for the TSP increments shall remain in effect and shall apply for purposes of determining the amount of available PM–10 increments, except that such baseline area shall not remain in effect if the permit authority rescinds the corresponding minor source baseline date in accordance with paragraph (b)(14)(iv) of this section.

(16) Allowable emissions means the emissions rate of a stationary source calculated using the maximum rated capacity of the source (unless the source is subject to federally enforceable limits which restrict the operating rate, or hours of operation, or both) and the most stringent of the following:

(i) The applicable standards as set forth in 40 CFR parts 60 and 61;

(ii) The applicable State Implementation Plan emissions limitation, including those with a future compliance date; or

(iii) The emissions rate specified as a federally enforceable permit condition.

(17) Federally enforceable means all limitations and conditions which are enforceable by the Administrator, including those requirements developed pursuant to 40 CFR parts 60 and 61, requirements within any applicable State implementation plan, any permit requirements established pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR part 51, subpart I, including operating permits issued under an EPA-approved program that is incorporated into the State implementation plan and expressly requires adherence to any permit issued under such program.

(18) Secondary emissions means emissions which occur as a result of the construction or operation of a major stationary source or major modification, but do not come from the major stationary source or major modification itself. For the purposes of this section, secondary emissions must be specific, well defined, quantifiable, and impact the same general areas the stationary source modification which causes the secondary emissions. Secondary emissions include emissions from any offsite support facility which would not be constructed or increase its emissions except as a result of the construction or operation of the major stationary source or major modification. Secondary emissions do not include any emissions which come directly from a mobile source, such as emissions from the tailpipe of a motor vehicle, from a train, or from a vessel.

(19) Innovative control technology means any system of air pollution control that has not been adequately demonstrated in practice, but would have a substantial likelihood of achieving greater continuous emissions reduction than any control system in current practice or of achieving at least comparable reductions at lower cost in terms of energy, economics, or nonair quality environmental impacts.

(20) Fugitive emissions means those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening.

(21)(i) Actual emissions means the actual rate of emissions of a regulated NSR pollutant from an emissions unit, as determined in accordance with paragraphs (b)(21)(ii) through (iv) of this section, except that this definition shall not apply for calculating whether a significant emissions increase has occurred, or for establishing a PAL under paragraph (w) of this section. Instead, paragraphs (b)(40) and (b)(47) of this section shall apply for those purposes.

(ii) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a consecutive 24–month period which precedes the particular date and which is representative of normal source operation. The reviewing authority shall allow the use of a different time period upon a determination that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

(iii) The reviewing authority may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit.

(iv) For any emissions unit that has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

(22) Complete means, in reference to an application for a permit, that the application contains all the information necessary for processing the application. Designating an application complete for purposes of permit processing does not preclude the reviewing authority from requesting or accepting any additional information.

(23)(i) Significant means, in reference to a net emissions increase or the potential of a source to emit any of the following pollutants, a rate of emissions that would equal or exceed any of the following rates:

Pollutant and Emissions Rate

Carbon monoxide: 100 tons per year (tpy)

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

Nitrogen oxides: 40 tpy

Sulfur dioxide: 40 tpy

Particulate matter: 25 tpy of particulate matter emissions. 15 tpy of $PM_{10}$ emissions

$PM_{2.5}$: 10 tpy of direct $PM_{2.5}$ emissions; 40 tpy of sulfur dioxide emissions; 40 tpy of nitrogen oxide emissions unless demonstrated not to be a $PM_{2.5}$ precursor under paragraph (b)(49) of this section

Ozone: 40 tpy of volatile organic compounds or nitrogen oxides

Lead: 0.6 tpy

Fluorides: 3 tpy

Sulfuric acid mist: 7 tpy

Hydrogen sulfide ($H_2S$): 10 tpy

Total reduced sulfur (including $H_2S$): 10 tpy

Reduced sulfur compounds (including $H_2S$): 10 tpy

Municipal waste combustor organics (measured as total tetra-through octa-chlorinated dibenzo-p-dioxins and dibenzofurans): 3.2 x 10–$^{-6}$ megagrams per year (3.5 x $10^{-6}$ tons per year)

Municipal waste combustor metals (measured as particulate matter): 14 megagrams per year (15 tons per year)

Municipal waste combustor acid gases (measured as sulfur dioxide and hydrogen chloride): 36 megagrams per year (40 tons per year)

Municipal solid waste landfill emissions (measured as nonmethane organic compounds): 45 megagrams per year (50 tons per year)

(ii) Significant means, in reference to a net emissions increase or the potential of a source to emit a regulated NSR pollutant that paragraph (b)(23)(i) of this section, does not list, any emissions rate.

(iii) Notwithstanding paragraph (b)(23)(i) of this section, significant means any emissions rate or any net emissions increase associated with a major stationary source or major modification, which would construct within 10 kilometers of a Class I area, and have an impact on such area equal to or greater than 1 $\mu g/m^3$ (24–hour average).

(24) Federal Land Manager means, with respect to any lands in the United States, the Secretary of the department with authority over such lands.

(25) High terrain means any area having an elevation 900 feet or more above the base of the stack of a source.

(26) Low terrain means any area other than high terrain.

(27) Indian Reservation means any federally recognized reservation established by Treaty, Agreement, Executive Order, or Act of Congress.

(28) Indian Governing Body means the governing body of any tribe, band, or group of Indians subject to the jurisdiction of the United States and recognized by the United States as possessing power of self-government.

(29) Volatile organic compounds (VOC) is as defined in § 51.100(s) of this part.

(30) Electric utility steam generating unit means any steam electric generating unit that is constructed for the purpose of supplying more than one-third of its potential electric output capacity and more than 25 MW electrical output to any utility power distribution system for sale. Any steam supplied to a steam distribution system for the purpose of providing steam to a steam-electric generator that would produce electrical energy for sale is also considered in determining the electrical energy output capacity of the affected facility.

(31) [Reserved]

(32) Replacement unit means an emissions unit for which all the criteria listed in paragraphs (b)(32)(i) through (iv) of this section are met. No creditable emission reductions shall be generated from shutting down the existing emissions unit that is replaced.

(i) The emissions unit is a reconstructed unit within the meaning of § 60.15(b)(1) of this chapter, or the emissions unit completely takes the place of an existing emissions unit.

(ii) The emissions unit is identical to or functionally equivalent to the replaced emissions unit.

(iii) The replacement does not change the basic design parameter(s) (as discussed in paragraph (y)(2) of this section) of the process unit.

(iv) The replaced emissions unit is permanently removed from the major stationary source, otherwise permanently disabled, or permanently barred from operation by a permit that is enforceable as a practical matter. If the replaced emissions unit is brought back into operation, it shall constitute a new emissions unit.

(33) Clean coal technology means any technology, including technologies applied at the precombustion, combustion, or post combustion stage, at a new or existing facility which will achieve significant reductions in air emissions of sulfur dioxide or oxides of nitrogen associated with the utilization of coal in the generation of electricity, or process steam which was not in widespread use as of November 15, 1990.

(34) Clean coal technology demonstration project means a project using funds appropriated under the heading "Department of Energy--Clean Coal Technology", up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the Environmental Protection Agency. The Federal contribution for a qualifying project shall be at least 20 percent of the total cost of the demonstration project.

(35) Temporary clean coal technology demonstration project means a clean coal technology demonstration project that is operated for a period of 5 years or less, and which complies with the State implementation plan for the State in which the project is located and other requirements necessary to attain and maintain the national ambient air quality standards during and after the project is terminated.

(36)(i) Repowering means replacement of an existing coal-fired boiler with one of the following clean coal technologies: atmospheric or pressurized fluidized bed combustion, integrated gasification combined cycle, magnetohydrodynamics, direct and indirect coal-fired turbines, integrated gasification fuel cells, or as determined by the Administrator, in consultation with the Secretary of Energy, a derivative of one or more of these technologies, and any other technology capable of controlling multiple combustion emissions simultaneously with improved boiler or generation efficiency and with significantly greater waste reduction relative to the performance of technology in widespread commercial use as of November 15, 1990.

(ii) Repowering shall also include any oil and/or gas-fired unit which has been awarded clean coal technology demonstration funding as of January 1, 1991, by the Department of Energy.

(iii) The reviewing authority shall give expedited consideration to permit applications for any source that satisfies the requirements of this subsection and is granted an extension under section 409 of the Clean Air Act.

(37) Reactivation of a very clean coal-fired electric utility steam generating unit means any physical change or change in the method of operation associated with the commencement of commercial operations by a coal-fired utility unit after a period of discontinued operation where the unit:

(i) Has not been in operation for the two-year period prior to the enactment of the Clean Air Act Amendments of 1990, and the emissions from such unit continue to be carried in the permitting authority's emissions inventory at the time of enactment;

(ii) Was equipped prior to shutdown with a continuous system of emissions control that achieves a removal efficiency for sulfur dioxide of no less than 85 percent and a removal efficiency for particulates of no less than 98 percent;

(iii) Is equipped with low-$NO_X$ burners prior to the time of commencement of operations following reactivation; and

(iv) Is otherwise in compliance with the requirements of the Clean Air Act.

(38) Pollution prevention means any activity that through process changes, product reformulation or redesign, or substitution of less polluting raw materials, eliminates or reduces the release of air pollutants (including fugitive emissions) and other pollutants to the environment prior to recycling, treatment, or disposal; it does not mean recycling (other than certain “in-process recycling” practices), energy recovery, treatment, or disposal.

(39) Significant emissions increase means, for a regulated NSR pollutant, an increase in emissions that is significant (as defined in paragraph (b)(23) of this section) for that pollutant.

(40)(i) Projected actual emissions means the maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit a regulated NSR pollutant in any one of the 5 years (12–month period) following the date the unit resumes regular operation after the project, or in any one of the 10 years following that date, if the project involves increasing the emissions unit's design capacity or its potential to emit that regulated NSR pollutant, and full utilization of the unit would result in a significant emissions increase, or a significant net emissions increase at the major stationary source.

(ii) In determining the projected actual emissions under paragraph (b)(40)(i) of this section (before beginning actual construction), the owner or operator of the major stationary source:

(a) Shall consider all relevant information, including but not limited to, historical operational data, the company's own representations, the company's expected business activity and the company's highest projections of business activity, the company's filings with the State or Federal regulatory authorities, and compliance plans under the approved plan; and

(b) Shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions; and

(c) Shall exclude, in calculating any increase in emissions that results from the particular project, that portion of the unit's emissions following the project that an existing unit could have accommodated during the consecutive 24–month period used to establish the baseline actual emissions under paragraph (b)(47) of this section and that are also unrelated to the particular project, including any increased utilization due to product demand growth; or,

(d) In lieu of using the method set out in paragraphs (b)(40)(ii)(a) through (c) of this section, may elect to use the emissions unit's potential to emit, in tons per year, as defined under paragraph (b)(4) of this section.

(41) [Reserved]

(42) Prevention of Significant Deterioration Program (PSD) program means a major source preconstruction permit program that has been approved by the Administrator and incorporated into the plan to implement the requirements of this section, or the program in § 52.21 of this chapter. Any permit issued under such a program is a major NSR permit.

(43) Continuous emissions monitoring system (CEMS) means all of the equipment that may be required to meet the data acquisition and availability requirements of this section, to sample, condition (if applicable), analyze, and provide a record of emissions on a continuous basis.

(44) Predictive emissions monitoring system (PEMS) means all of the equipment necessary to monitor process and control device operational parameters (for example, control device secondary voltages and electric currents) and other information (for example, gas flow rate, $O^2$ or $CO^2$ concentrations), and calculate and record the mass emissions rate (for example, lb/hr) on a continuous basis.

(45) Continuous parameter monitoring system (CPMS) means all of the equipment necessary to meet the data acquisition and availability requirements of this section, to monitor process and control device operational parameters (for example, control device secondary voltages and electric currents) and other information (for example, gas flow rate, $O^2$ or $CO^2$ concentrations), and to record average operational parameter value(s) on a continuous basis.

(46) Continuous emissions rate monitoring system (CERMS) means the total equipment required for the determination and recording of the pollutant mass emissions rate (in terms of mass per unit of time).

(47) Baseline actual emissions means the rate of emissions, in tons per year, of a regulated NSR pollutant, as determined in accordance with paragraphs (b)(47)(i) through (iv) of this section.

(i) For any existing electric utility steam generating unit, baseline actual emissions means the average rate, in tons per year, at which the unit actually emitted the pollutant during any consecutive 24–month period selected by the owner or operator within the 5–year period immediately preceding when the owner or operator begins actual construction of the project. The reviewing authority shall allow the use of a different time period upon a determination that it is more representative of normal source operation.

(a) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(b) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above an emission limitation that was legally enforceable during the consecutive 24–month period.

(c) For a regulated NSR pollutant, when a project involves multiple emissions units, only one consecutive 24–month period must be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24–month period can be used For each regulated NSR pollutant.

(d) The average rate shall not be based on any consecutive 24–month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraph (b)(47)(i)(b) of this section.

(ii) For an existing emissions unit (other than an electric utility steam generating unit), baseline actual emissions means the average rate, in tons per year, at which the emissions unit actually emitted the pollutant during any consecutive 24–month period selected by the owner or operator within the 10–year period immediately preceding either the date the owner or operator begins actual construction of the project, or the date a complete permit application is received by the reviewing authority for a permit required either under this section or under a plan approved by the Administrator, whichever is earlier, except that the 10–year period shall not include any period earlier than November 15, 1990.

(a) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(b) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above an emission limitation that was legally enforceable during the consecutive 24–month period.

(c) The average rate shall be adjusted downward to exclude any emissions that would have exceeded an emission limitation with which the major stationary source must currently comply, had such major stationary source been required to comply with such limitations during the consecutive 24–month period. However, if an emission limitation is part of a maximum achievable control technology standard that the Administrator proposed or promulgated under part 63 of this chapter, the baseline actual emissions need only be adjusted if the State has taken credit for such emissions reductions in an attainment demonstration or maintenance plan consistent with the requirements of § 51.165(a)(3)(ii)(G).

(d) For a regulated NSR pollutant, when a project involves multiple emissions units, only one consecutive 24–month period must be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24–month period can be used For each regulated NSR pollutant.

(e) The average rate shall not be based on any consecutive 24–month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraphs (b)(47)(ii)(b) and (c) of this section.

(iii) For a new emissions unit, the baseline actual emissions for purposes of determining the emissions increase that will result from the initial construction and operation of such unit shall equal zero; and thereafter, for all other purposes, shall equal the unit's potential to emit.

(iv) For a PAL for a stationary source, the baseline actual emissions shall be calculated for existing electric utility steam generating units in accordance with the procedures contained in paragraph (b)(47)(i) of this section, for other existing emissions units in accordance with the procedures contained in paragraph (b)(47)(ii) of this section, and for a new emissions unit in accordance with the procedures contained in paragraph (b)(47)(iii) of this section.

(48) Subject to regulation means, for any air pollutant, that the pollutant is subject to either a provision in the Clean Air Act, or a nationally-applicable regulation codified by the Administrator in subchapter C of this chapter, that requires actual control of the quantity of emissions of that pollutant, and that such a control requirement has taken effect and is operative to control, limit or restrict the quantity of emissions of that pollutant released from the regulated activity. Except that:

(i) Greenhouse gases (GHGs), the air pollutant defined in § 86.1818–12(a) of this chapter as the aggregate group of six greenhouse gases: Carbon dioxide, nitrous oxide, methane, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride, shall not be subject to regulation except as provided in paragraphs (b)(48)(iv) through (v) of this section.

(ii) For purposes of paragraphs (b)(48)(iii) through (v) of this section, the term tpy $CO_2$ equivalent emissions ($CO_2e$) shall represent an amount of GHGs emitted, and shall be computed as follows:

(a) Multiplying the mass amount of emissions (tpy), for each of the six greenhouse gases in the pollutant GHGs, by the gas's associated global warming potential published at Table A–1 to subpart A of part 98 of this chapter--Global Warming Potentials. For purposes of this paragraph (b)(48)(ii)(a), prior to July 21, 2014, the mass of the greenhouse gas carbon dioxide shall not include carbon dioxide emissions resulting from the combustion or decomposition of non-fossilized and biodegradable organic material originating from plants, animals, or micro-organisms (including products, by-products, residues and waste from agriculture, forestry and related industries as well as the non-fossilized

and biodegradable organic fractions of industrial and municipal wastes, including gases and liquids recovered from the decomposition of non-fossilized and biodegradable organic material).

(b) Sum the resultant value from paragraph (b)(48)(ii)(a) of this section for each gas to compute a tpy $CO_2e$.

(iii) The term emissions increase as used in paragraphs (b)(48)(iv) through (v) of this section shall mean that both a significant emissions increase (as calculated using the procedures in (a)(7)(iv) of this section) and a significant net emissions increase (as defined in paragraphs (b)(3) and (b)(23) of this section) occur. For the pollutant GHGs, an emissions increase shall be based on tpy $CO_2e$, and shall be calculated assuming the pollutant GHGs is a regulated NSR pollutant, and "significant" is defined as 75,000 tpy $CO_2e$ instead of applying the value in paragraph (b)(23)(ii) of this section.

(iv) Beginning January 2, 2011, the pollutant GHGs is subject to regulation if:

(a) The stationary source is a new major stationary source for a regulated NSR pollutant that is not GHGs, and also will emit or will have the potential to emit 75,000 tpy $CO_2e$ or more; or

(b) The stationary source is an existing major stationary source for a regulated NSR pollutant that is not GHGs, and also will have an emissions increase of a regulated NSR pollutant, and an emissions increase of 75,000 tpy $CO_2e$ or more; and,

(v) Beginning July 1, 2011, in addition to the provisions in paragraph (b)(48)(iv) of this section, the pollutant GHGs shall also be subject to regulation:

(a) At a new stationary source that will emit or have the potential to emit 100,000 tpy $CO_2e$; or

(b) At an existing stationary source that emits or has the potential to emit 100,000 tpy $CO_2e$, when such stationary source undertakes a physical change or change in the method of operation that will result in an emissions increase of 75,000 tpy $CO_2e$ or more.

(49) Regulated NSR pollutant, for purposes of this section, means the following:

(i) Any pollutant for which a national ambient air quality standard has been promulgated and any pollutant identified under this paragraph (b)(49)(i) as a constituent or precursor to such pollutant. Precursors identified by the Administrator for purposes of NSR are the following:

(a) Volatile organic compounds and nitrogen oxides are precursors to ozone in all attainment and unclassifiable areas.

(b) Sulfur dioxide is a precursor to $PM_{2.5}$ in all attainment and unclassifiable areas.

(c) Nitrogen oxides are presumed to be precursors to $PM_{2.5}$ in all attainment and unclassifiable areas, unless the State demonstrates to the Administrator's satisfaction or EPA demonstrates that emissions of nitrogen oxides from sources in a specific area are not a significant contributor to that area's ambient $PM_{2.5}$ concentrations.

(d) Volatile organic compounds are presumed not to be precursors to $PM_{2.5}$ in any attainment or unclassifiable area, unless the State demonstrates to the Administrator's satisfaction or EPA demonstrates that emissions of volatile organic compounds from sources in a specific area are a significant contributor to that area's ambient $PM_{2.5}$ concentrations.

(ii) Any pollutant that is subject to any standard promulgated under section 111 of the Act;

(iii) Any Class I or II substance subject to a standard promulgated under or established by title VI of the Act;

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(iv) Any pollutant that otherwise is subject to regulation under the Act as defined in paragraph (b)(48) of this section.

(v) Notwithstanding paragraphs (b)(49)(i) through (iv) of this section, the term regulated NSR pollutant shall not include any or all hazardous air pollutants either listed in section 112 of the Act, or added to the list pursuant to section 112(b)(2) of the Act, and which have not been delisted pursuant to section 112(b)(3) of the Act, unless the listed hazardous air pollutant is also regulated as a constituent or precursor of a general pollutant listed under section 108 of the Act.

(vi) Particulate matter (PM) emissions, $PM_{2.5}$ emissions, and $PM_{10}$ emissions shall include gaseous emissions from a source or activity which condense to form particulate matter at ambient temperatures. On or after January 1, 2011 (or any earlier date established in the upcoming rulemaking codifying test methods), such condensable particulate matter shall be accounted for in applicability determinations and in establishing emissions limitations for PM, $PM_{2.5}$ and $PM_{10}$ in PSD permits. Compliance with emissions limitations for PM, $PM_{2.5}$ and $PM_{10}$ issued prior to this date shall not be based on condensable particular matter unless required by the terms and conditions of the permit or the applicable implementation plan. Applicability determinations made prior to this date without accounting for condensable particular matter shall not be considered in violation of this section unless the applicable implementation plan required condensable particular matter to be included.

(50) Reviewing authority means the State air pollution control agency, local agency, other State agency, Indian tribe, or other agency authorized by the Administrator to carry out a permit program under § 51.165 and this section, or the Administrator in the case of EPA-implemented permit programs under § 52.21 of this chapter.

(51) Project means a physical change in, or change in method of operation of, an existing major stationary source.

(52) Lowest achievable emission rate (LAER) is as defined in § 51.165(a)(1)(xiii).

(53)(i) In general, process unit means any collection of structures and/or equipment that processes, assembles, applies, blends, or otherwise uses material inputs to produce or store an intermediate or a completed product. A single stationary source may contain more than one process unit, and a process unit may contain more than one emissions unit.

(ii) Pollution control equipment is not part of the process unit, unless it serves a dual function as both process and control equipment. Administrative and warehousing facilities are not part of the process unit.

(iii) For replacement cost purposes, components shared between two or more process units are proportionately allocated based on capacity.

(iv) The following list identifies the process units at specific categories of stationary sources.

(a) For a steam electric generating facility, the process unit consists of those portions of the plant that contribute directly to the production of electricity. For example, at a pulverized coal-fired facility, the process unit would generally be the combination of those systems from the coal receiving equipment through the emission stack (excluding post-combustion pollution controls), including the coal handling equipment, pulverizers or coal crushers, feedwater heaters, ash handling, boiler, burners, turbine-generator set, condenser, cooling tower, water treatment system, air preheaters, and operating control systems. Each separate generating unit is a separate process unit.

(b) For a petroleum refinery, there are several categories of process units: those that separate and/or distill petroleum feedstocks; those that change molecular structures; petroleum treating processes; auxiliary facilities, such as steam generators and hydrogen production units; and those that load, unload, blend or store intermediate or completed products.

(c) For an incinerator, the process unit would consist of components from the feed pit or refuse pit to the stack, including conveyors, combustion devices, heat exchangers and steam generators, quench tanks, and fans.

 © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

Note to paragraph (b)(53): By a court order on December 24, 2003, this paragraph (b)(53) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(54) Functionally equivalent component means a component that serves the same purpose as the replaced component.

Note to paragraph (b)(54): By a court order on December 24, 2003, this paragraph (b)(54) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(55) Fixed capital cost means the capital needed to provide all the depreciable components. “Depreciable components” refers to all components of fixed capital cost and is calculated by subtracting land and working capital from the total capital investment, as defined in paragraph (b)(56) of this section.

Note to paragraph (b)(55): By a court order on December 24, 2003, this paragraph (b)(55) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(56) Total capital investment means the sum of the following: all costs required to purchase needed process equipment (purchased equipment costs); the costs of labor and materials for installing that equipment (direct installation costs); the costs of site preparation and buildings; other costs such as engineering, construction and field expenses, fees to contractors, startup and performance tests, and contingencies (indirect installation costs); land for the process equipment; and working capital for the process equipment.

Note to paragraph (b)(56): By a court order on December 24, 2003, this paragraph (b)(56) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(c) Ambient air increments and other measures.

(1) The plan shall contain emission limitations and such other measures as may be necessary to assure that in areas designated as Class I, II, or III, increases in pollutant concentrations over the baseline concentration shall be limited to the following:

| **Pollutant** | **Maximum allowable increase (micrograms per cubic meter)** |
|---|---|
| Class I Area | |
| $PM_{2.5}$: | |
| Annual arithmetic mean...................................................... | 1 |
| 24-hr maximum.................................................................. | 2 |
| $PM_{10}$: | |
| Annual arithmetic mean...................................................... | 4 |
| 24-hr maximum.................................................................. | 8 |
| Sulfur dioxide: | |
| Annual arithmetic mean...................................................... | 2 |
| 24-hr maximum.................................................................. | 5 |
| 3-hr maximum.................................................................... | 25 |
| Nitrogen dioxide: | |
| Annual arithmetic mean...................................................... | 2.5 |
| Class II Area | |
| $PM_{2.5}$: | |

| | |
|---|---|
| Annual arithmetic mean | 4 |
| 24-hr maximum | 9 |
| $PM_{10}$: | |
| Annual arithmetic mean | 17 |
| 24-hr maximum | 30 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 20 |
| 24-hr maximum | 91 |
| 3-hr maximum | 512 |
| Nitrogen dioxide: | |
| Annual arithmetic mean | 25 |
| Class III Area | |
| $PM_{2.5}$: | |
| Annual arithmetic mean | 8 |
| 24-hr maximum | 18 |
| $PM_{10}$: | |
| Annual arithmetic mean | 34 |
| 24-hr maximum | 60 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 40 |
| 24-hr maximum | 182 |
| 3-hr maximum | 700 |
| Nitrogen dioxide: | |
| Annual arithmetic mean | 50 |

For any period other than an annual period, the applicable maximum allowable increase may be exceeded during one such period per year at any one location.

(2) Where the State can demonstrate that it has alternative measures in its plan other than maximum allowable increases as defined under paragraph (c)(1) of this section, that satisfy the requirements in sections 166(c) and 166(d) of the Clean Air Act for a regulated NSR pollutant for which the Administrator has established maximum allowable increases pursuant to section 166(a) of the Act, the requirements for maximum allowable increases for that pollutant under paragraph (c)(1) of this section shall not apply upon approval of the plan by the Administrator. The following regulated NSR pollutants are eligible for such treatment:

(i) Nitrogen dioxide.

(ii) $PM_{2.5}$.

(d) Ambient air ceilings. The plan shall provide that no concentration of a pollutant shall exceed:

(1) The concentration permitted under the national secondary ambient air quality standard, or

(2) The concentration permitted under the national primary ambient air quality standard, whichever concentration is lowest for the pollutant for a period of exposure.

(e) Restrictions on area classifications. The plan shall provide that--

(1) All of the following areas which were in existence on August 7, 1977, shall be Class I areas and may not be redesignated:

(i) International parks,

 © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(ii) National wilderness areas which exceed 5,000 acres in size,

(iii) National memorial parks which exceed 5,000 acres in size, and

(iv) National parks which exceed 6,000 acres in size.

(2) Areas which were redesignated as Class I under regulations promulgated before August 7, 1977, shall remain Class I, but may be redesignated as provided in this section.

(3) Any other area, unless otherwise specified in the legislation creating such an area, is initially designated Class II, but may be redesignated as provided in this section.

(4) The following areas may be redesignated only as Class I or II:

(i) An area which as of August 7, 1977, exceeded 10,000 acres in size and was a national monument, a national primitive area, a national preserve, a national recreational area, a national wild and scenic river, a national wildlife refuge, a national lakeshore or seashore; and

(ii) A national park or national wilderness area established after August 7, 1977, which exceeds 10,000 acres in size.

(f) Exclusions from increment consumption.

(1) The plan may provide that the following concentrations shall be excluded in determining compliance with a maximum allowable increase:

(i) Concentrations attributable to the increase in emissions from stationary sources which have converted from the use of petroleum products, natural gas, or both by reason of an order in effect under sections 2 (a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (or any superseding legislation) over the emissions from such sources before the effective date of such an order;

(ii) Concentrations attributable to the increase in emissions from sources which have converted from using natural gas by reason of natural gas curtailment plan in effect pursuant to the Federal Power Act over the emissions from such sources before the effective date of such plan;

(iii) Concentrations of particulate matter attributable to the increase in emissions from construction or other temporary emission-related activities of new or modified sources;

(iv) The increase in concentrations attributable to new sources outside the United States over the concentrations attributable to existing sources which are included in the baseline concentration; and

(v) Concentrations attributable to the temporary increase in emissions of sulfur dioxide, particulate matter, or nitrogen oxides from stationary sources which are affected by plan revisions approved by the Administrator as meeting the criteria specified in paragraph (f)(4) of this section.

(2) If the plan provides that the concentrations to which paragraph (f)(1)(i) or (ii) of this section, refers shall be excluded, it shall also provide that no exclusion of such concentrations shall apply more than five years after the effective date of the order to which paragraph (f)(1)(i) of this section, refers or the plan to which paragraph (f)(1)(ii) of this section, refers, whichever is applicable. If both such order and plan are applicable, no such exclusion shall apply more than five years after the later of such effective dates.

(3) [Reserved]

(4) For purposes of excluding concentrations pursuant to paragraph (f)(1)(v) of this section, the Administrator may approve a plan revision that:

(i) Specifies the time over which the temporary emissions increase of sulfur dioxide, particulate matter, or nitrogen oxides would occur. Such time is not to exceed 2 years in duration unless a longer time is approved by the Administrator.

(ii) Specifies that the time period for excluding certain contributions in accordance with paragraph (f)(4)(i) of this section, is not renewable;

(iii) Allows no emissions increase from a stationary source which would:

(a) Impact a Class I area or an area where an applicable increment is known to be violated; or

(b) Cause or contribute to the violation of a national ambient air quality standard;

(iv) Requires limitations to be in effect the end of the time period specified in accordance with paragraph (f)(4)(i) of this section, which would ensure that the emissions levels from stationary sources affected by the plan revision would not exceed those levels occurring from such sources before the plan revision was approved.

(g) Redesignation.

(1) The plan shall provide that all areas of the State (except as otherwise provided under paragraph (e) of this section) shall be designated either Class I, Class II, or Class III. Any designation other than Class II shall be subject to the redesignation procedures of this paragraph. Redesignation (except as otherwise precluded by paragraph (e) of this section) may be proposed by the respective States or Indian Governing Bodies, as provided below, subject to approval by the Administrator as a revision to the applicable State implementation plan.

(2) The plan may provide that the State may submit to the Administrator a proposal to redesignate areas of the State Class I or Class II: *Provided*, That:

(i) At least one public hearing has been held in accordance with procedures established in § 51.102.

(ii) Other States, Indian Governing Bodies, and Federal Land Managers whose lands may be affected by the proposed redesignation were notified at least 30 days prior to the public hearing;

(iii) A discussion of the reasons for the proposed redesignation, including a satisfactory description and analysis of the health, environmental, economic, social, and energy effects of the proposed redesignation, was prepared and made available for public inspection at least 30 days prior to the hearing and the notice announcing the hearing contained appropriate notification of the availability of such discussion;

(iv) Prior to the issuance of notice respecting the redesignation of an area that includes any Federal lands, the State has provided written notice to the appropriate Federal Land Manager and afforded adequate opportunity (not in excess of 60 days) to confer with the State respecting the redesignation and to submit written comments and recommendations. In redesignating any area with respect to which any Federal Land Manager had submitted written comments and recommendations, the State shall have published a list of any inconsistency between such redesignation and such comments and recommendations (together with the reasons for making such redesignation against the recommendation of the Federal Land Manager); and

(v) The State has proposed the redesignation after consultation with the elected leadership of local and other substate general purpose governments in the area covered by the proposed redesignation.

(3) The plan may provide that any area other than an area to which paragraph (e) of this section refers may be redesignated as Class III if--

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(i) The redesignation would meet the requirements of provisions established in accordance with paragraph (g)(2) of this section;

(ii) The redesignation, except any established by an Indian Governing Body, has been specifically approved by the Governor of the State, after consultation with the appropriate committees of the legislature, if it is in session, or with the leadership of the legislature, if it is not in session (unless State law provides that such redesignation must be specifically approved by State legislation) and if general purpose units of local government representing a majority of the residents of the area to be redesignated enact legislation (including resolutions where appropriate) concurring in the redesignation;

(iii) The redesignation would not cause, or contribute to, a concentration of any air pollutant which would exceed any maximum allowable increase permitted under the classification of any other area or any national ambient air quality standard; and

(iv) Any permit application for any major stationary source or major modification subject to provisions established in accordance with paragraph (l) of this section which could receive a permit only if the area in question were redesignated as Class III, and any material submitted as part of that application, were available, insofar as was practicable, for public inspection prior to any public hearing on redesignation of any area as Class III.

(4) The plan shall provide that lands within the exterior boundaries of Indian Reservations may be redesignated only by the appropriate Indian Governing Body. The appropriate Indian Governing Body may submit to the Administrator a proposal to redesignate areas Class I, Class II, or Class III: *Provided*, That:

(i) The Indian Governing Body has followed procedures equivalent to those required of a State under paragraphs (g)(2), (3)(iii), and (3)(iv) of this section; and

(ii) Such redesignation is proposed after consultation with the State(s) in which the Indian Reservation is located and which border the Indian Reservation.

(5) The Administrator shall disapprove, within 90 days of submission, a proposed redesignation of any area only if he finds, after notice and opportunity for public hearing, that such redesignation does not meet the procedural requirements of this section or is inconsistent with paragraph (e) of this section. If any such disapproval occurs, the classification of the area shall be that which was in effect prior to the redesignation which was disapproved.

(6) If the Administrator disapproves any proposed area designation, the State or Indian Governing Body, as appropriate, may resubmit the proposal after correcting the deficiencies noted by the Administrator.

(h) Stack heights. The plan shall provide, as a minimum, that the degree of emission limitation required for control of any air pollutant under the plan shall not be affected in any manner by--

(1) So much of a stack height, not in existence before December 31, 1970, as exceeds good engineering practice, or

(2) Any other dispersion technique not implemented before then.

(i) Exemptions.

(1) The plan may provide that requirements equivalent to those contained in paragraphs (j) through (r) of this section do not apply to a particular major stationary source or major modification if:

(i) The major stationary source would be a nonprofit health or nonprofit educational institution or a major modification that would occur at such an institution; or

(ii) The source or modification would be a major stationary source or major modification only if fugitive emissions, to the extent quantifiable, are considered in calculating the potential to emit of the stationary source or modification and such source does not belong to any of the following categories:

(a) Coal cleaning plants (with thermal dryers);

(b) Kraft pulp mills;

(c) Portland cement plants;

(d) Primary zinc smelters;

(e) Iron and steel mills;

(f) Primary aluminum ore reduction plants;

(g) Primary copper smelters;

(h) Municipal incinerators capable of charging more than 250 tons of refuse per day;

(i) Hydrofluoric, sulfuric, or nitric acid plants;

(j) Petroleum refineries;

(k) Lime plants;

(l) Phosphate rock processing plants;

(m) Coke oven batteries;

(n) Sulfur recovery plants;

(o) Carbon black plants (furnace process);

(p) Primary lead smelters;

(q) Fuel conversion plants;

(r) Sintering plants;

(s) Secondary metal production plants;

(t) Chemical process plants--The term chemical processing plant shall not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140;

(u) Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

(v) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

(w) Taconite ore processing plants;

(x) Glass fiber processing plants;

(y) Charcoal production plants;

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(z) Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input;

(aa) Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act; or

(iii) The source or modification is a portable stationary source which has previously received a permit under requirements equivalent to those contained in paragraphs (j) through (r) of this section, if:

(a) The source proposes to relocate and emissions of the source at the new location would be temporary; and

(b) The emissions from the source would not exceed its allowable emissions; and

(c) The emissions from the source would impact no Class I area and no area where an applicable increment is known to be violated; and

(d) Reasonable notice is given to the reviewing authority prior to the relocation identifying the proposed new location and the probable duration of operation at the new location. Such notice shall be given to the reviewing authority not less than 10 days in advance of the proposed relocation unless a different time duration is previously approved by the reviewing authority.

(2) The plan may provide that requirements equivalent to those contained in paragraphs (j) through (r) of this section do not apply to a major stationary source or major modification with respect to a particular pollutant if the owner or operator demonstrates that, as to that pollutant, the source or modification is located in an area designated as nonattainment under section 107 of the Act.

(3) The plan may provide that requirements equivalent to those contained in paragraphs (k), (m), and (o) of this section do not apply to a proposed major stationary source or major modification with respect to a particular pollutant, if the allowable emissions of that pollutant from a new source, or the net emissions increase of that pollutant from a modification, would be temporary and impact no Class I area and no area where an applicable increment is known to be violated.

(4) The plan may provide that requirements equivalent to those contained in paragraphs (k), (m), and (o) of this section as they relate to any maximum allowable increase for a Class II area do not apply to a modification of a major stationary source that was in existence on March 1, 1978, if the net increase in allowable emissions of each a regulated NSR pollutant from the modification after the application of best available control technology would be less than 50 tons per year.

(5) The plan may provide that the reviewing authority may exempt a proposed major stationary source or major modification from the requirements of paragraph (m) of this section, with respect to monitoring for a particular pollutant, if:

(i) The emissions increase of the pollutant from a new stationary source or the net emissions increase of the pollutant from a modification would cause, in any area, air quality impacts less than the following amounts:

(a) Carbon monoxide--575 $\mu g/m^3$, 8–hour average;

(b) Nitrogen dioxide--14 $\mu g/m^3$, annual average;

(c) $PM_{2.5}$-4 $\mu g/m^3$, 24–hour average;

(d) $PM_{10}$-10 $\mu g/m^3$, 24–hour average;

(e) Sulfur dioxide--13 $ug/m^3$, 24–hour average;

(f) Ozone; [1]

1 No de minimis air quality level is provided for ozone. However, any net emissions increase of 100 tons per year or more of volatile organic compounds or nitrogen oxides subject to PSD would be required to perform an ambient impact analysis, including the gathering of air quality data.

(g) Lead--0.1 μg/m$^3$, 3–month average.

(h) Fluorides--0.25 μg/m$^3$, 24–hour average;

(i) Total reduced sulfur--10 μg/m$^3$, 1–hour average

(j) Hydrogen sulfide--0.2 μg/m$^3$, 1–hour average;

(k) Reduced sulfur compounds--10 μg/m$^3$, 1–hour average; or

(ii) The concentrations of the pollutant in the area that the source or modification would affect are less than the concentrations listed in paragraph (i)(5)(i) of this section; or

(iii) The pollutant is not listed in paragraph (i)(5)(i) of this section.

(6) If EPA approves a plan revision under 40 CFR 51.166 as in effect before August 7, 1980, any subsequent revision which meets the requirements of this section may contain transition provisions which parallel the transition provisions of 40 CFR 52.21(i)(9), (i)(10) and (m)(1)(v) as in effect on that date, which provisions relate to requirements for best available control technology and air quality analyses. Any such subsequent revision may not contain any transition provision which in the context of the revision would operate any less stringently than would its counterpart in 40 CFR 52.21.

(7) If EPA approves a plan revision under § 51.166 as in effect [before July 31, 1987], any subsequent revision which meets the requirements of this section may contain transition provisions which parallel the transition provisions of § 52.21 (i)(11), and (m)(1) (vii) and (viii) of this chapter as in effect on that date, these provisions being related to monitoring requirements for particulate matter. Any such subsequent revision may not contain any transition provision which in the context of the revision would operate any less stringently than would its counterpart in § 52.21 of this chapter.

(8) The plan may provide that the permitting requirements equivalent to those contained in paragraph (k)(1)(ii) of this section do not apply to a stationary source or modification with respect to any maximum allowable increase for nitrogen oxides if the owner or operator of the source or modification submitted an application for a permit under the applicable permit program approved or promulgated under the Act before the provisions embodying the maximum allowable increase took effect as part of the plan and the permitting authority subsequently determined that the application as submitted before that date was complete.

(9) The plan may provide that the permitting requirements equivalent to those contained in paragraph (k)(1)(ii) of this section shall not apply to a stationary source or modification with respect to any maximum allowable increase for PM–10 if (i) the owner or operator of the source or modification submitted an application for a permit under the applicable permit program approved under the Act before the provisions embodying the maximum allowable increases for PM–10 took effect as part of the plan, and (ii) the permitting authority subsequently determined that the application as submitted before that date was complete. Instead, the applicable requirements equivalent to paragraph (k)(1)(ii) shall apply with respect to the maximum allowable increases for TSP as in effect on the date the application was submitted.

(j) Control technology review. The plan shall provide that:

(1) A major stationary source or major modification shall meet each applicable emissions limitation under the State Implementation Plan and each applicable emission standards and standard of performance under 40 CFR parts 60 and 61.

(2) A new major stationary source shall apply best available control technology for each a regulated NSR pollutant that it would have the potential to emit in significant amounts.

(3) A major modification shall apply best available control technology for each a regulated NSR pollutant for which it would be a significant net emissions increase at the source. This requirement applies to each proposed emissions unit at which a net emissions increase in the pollutant would occur as a result of a physical change or change in the method of operation in the unit.

(4) For phased construction projects, the determination of best available control technology shall be reviewed and modified as appropriate at the least reasonable time which occurs no later than 18 months prior to commencement of construction of each independent phase of the project. At such time, the owner or operator of the applicable stationary source may be required to demonstrate the adequacy of any previous determination of best available control technology for the source.

(k) Source impact analysis--

(1) Required demonstration. The owner or operator of the proposed source or modification shall demonstrate that allowable emission increases from the proposed source or modification, in conjunction with all other applicable emissions increases or reductions (including secondary emissions), would not cause or contribute to air pollution in violation of:

(i) Any national ambient air quality standard in any air quality control region; or

(ii) Any applicable maximum allowable increase over the baseline concentration in any area.

(2) Significant impact levels. For purposes of $PM_{2.5}$, the demonstration required in paragraph (k)(1) of this section is deemed to have been made if the emissions increase from the new stationary source alone or from the modification alone would cause, in all areas, air quality impacts less than the following amounts:

| Pollutant | Averaging time | Class I area | Class II area | Class III area |
|---|---|---|---|---|
| $PM^{2.5}$ .................... | Annual...................................... | 0.06 $\mu g/m^3$ | 0.3 $\mu g/m^3$ | 0.3 $\mu g/m^3$ |
| ............................... | 24-hour..................................... | 0.07 $\mu g/m^3$ | 1.2 $\mu g/m^3$ | 1.2 $\mu g/m^3$ |

(l) Air quality models. The plan shall provide for procedures which specify that--

(1) All applications of air quality modeling involved in this subpart shall be based on the applicable models, data bases, and other requirements specified in appendix W of this part (Guideline on Air Quality Models).

(2) Where an air quality model specified in appendix W of this part (Guideline on Air Quality Models) is inappropriate, the model may be modified or another model substituted. Such a modification or substitution of a model may be made on a case-by-case basis or, where appropriate, on a generic basis for a specific State program. Written approval of the Administrator must be obtained for any modification or substitution. In addition, use of a modified or substituted model must be subject to notice and opportunity for public comment under procedures set forth in § 51.102.

(m) Air quality analysis.

(1) Preapplication analysis.

(i) The plan shall provide that any application for a permit under regulations approved pursuant to this section shall contain an analysis of ambient air quality in the area that the major stationary source or major modification would affect for each of the following pollutants:

(a) For the source, each pollutant that it would have the potential to emit in a significant amount;

(b) For the modification, each pollutant for which it would result in a significant net emissions increase.

(ii) The plan shall provide that, with respect to any such pollutant for which no National Ambient Air Quality Standard exists, the analysis shall contain such air quality monitoring data as the reviewing authority determines is necessary to assess ambient air quality for that pollutant in any area that the emissions of that pollutant would affect.

(iii) The plan shall provide that with respect to any such pollutant (other than nonmethane hydrocarbons) for which such a standard does exist, the analysis shall contain continuous air quality monitoring data gathered for purposes of determining whether emissions of that pollutant would cause or contribute to a violation of the standard or any maximum allowable increase.

(iv) The plan shall provide that, in general, the continuous air monitoring data that is required shall have been gathered over a period of one year and shall represent the year preceding receipt of the application, except that, if the reviewing authority determines that a complete and adequate analysis can be accomplished with monitoring data gathered over a period shorter than one year (but not to be less than four months), the data that is required shall have been gathered over at least that shorter period.

(v) The plan may provide that the owner or operator of a proposed major stationary source or major modification of volatile organic compounds who satisfies all conditions of 40 CFR part 51 appendix S, section IV may provide postapproval monitoring data for ozone in lieu of providing preconstruction data as required under paragraph (m)(1) of this section.

(2) Post-construction monitoring. The plan shall provide that the owner or operator of a major stationary source or major modification shall, after construction of the stationary source or modification, conduct such ambient monitoring as the reviewing authority determines is necessary to determine the effect emissions from the stationary source or modification may have, or are having, on air quality in any area.

(3) Operation of monitoring stations. The plan shall provide that the owner or operator of a major stationary source or major modification shall meet the requirements of appendix B to part 58 of this chapter during the operation of monitoring stations for purposes of satisfying paragraph (m) of this section.

(n) Source information.

(1) The plan shall provide that the owner or operator of a proposed source or modification shall submit all information necessary to perform any analysis or make any determination required under procedures established in accordance with this section.

(2) The plan may provide that such information shall include:

(i) A description of the nature, location, design capacity, and typical operating schedule of the source or modification, including specifications and drawings showing its design and plant layout;

(ii) A detailed schedule for construction of the source or modification;

(iii) A detailed description as to what system of continuous emission reduction is planned by the source or modification, emission estimates, and any other information as necessary to determine that best available control technology as applicable would be applied;

(3) The plan shall provide that upon request of the State, the owner or operator shall also provide information on:

(i) The air quality impact of the source or modification, including meteorological and topographical data necessary to estimate such impact; and

(ii) The air quality impacts and the nature and extent of any or all general commercial, residential, industrial, and other growth which has occurred since August 7, 1977, in the area the source or modification would affect.

(o) Additional impact analyses. The plan shall provide that--

(1) The owner or operator shall provide an analysis of the impairment to visibility, soils, and vegetation that would occur as a result of the source or modification and general commercial, residential, industrial, and other growth associated with the source or modification. The owner or operator need not provide an analysis of the impact on vegetation having no significant commercial or recreational value.

(2) The owner or operator shall provide an analysis of the air quality impact projected for the area as a result of general commercial, residential, industrial, and other growth associated with the source or modification.

(p) Sources impacting Federal Class I areas--additional requirements--

(1) Notice to EPA. The plan shall provide that the reviewing authority shall transmit to the Administrator a copy of each permit application relating to a major stationary source or major modification and provide notice to the Administrator of every action related to the consideration of such permit.

(2) Federal Land Manager. The Federal Land Manager and the Federal official charged with direct responsibility for management of Class I lands have an affirmative responsibility to protect the air quality related values (including visibility) of any such lands and to consider, in consultation with the Administrator, whether a proposed source or modification would have an adverse impact on such values.

(3) Denial--impact on air quality related values. The plan shall provide a mechanism whereby a Federal Land Manager of any such lands may present to the State, after the reviewing authority's preliminary determination required under procedures developed in accordance with paragraph (r) of this section, a demonstration that the emissions from the proposed source or modification would have an adverse impact on the air quality-related values (including visibility) of any Federal mandatory Class I lands, notwithstanding that the change in air quality resulting from emissions from such source or modification would not cause or contribute to concentrations which would exceed the maximum allowable increases for a Class I area. If the State concurs with such demonstration, the reviewing authority shall not issue the permit.

(4) Class I Variances. The plan may provide that the owner or operator of a proposed source or modification may demonstrate to the Federal Land Manager that the emissions from such source would have no adverse impact on the air quality related values of such lands (including visibility), notwithstanding that the change in air quality resulting from emissions from such source or modification would cause or contribute to concentrations which would exceed the maximum allowable increases for a Class I area. If the Federal land manager concurs with such demonstration and so certifies to the State, the reviewing authority may: *Provided*, That applicable requirements are otherwise met, issue the permit with such emission limitations as may be necessary to assure that emissions of sulfur dioxide, $PM_{2.5}$, $PM_{10}$, and nitrogen oxides would not exceed the following maximum allowable increases over minor source baseline concentration for such pollutants:

| **Pollutant** | **Maximum allowable increase (micrograms per cubic meter)** |
| --- | --- |
| $PM_{2.5}$: | |

 © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

| | |
|---|---|
| Annual arithmetic mean | 4 |
| 24-hr maximum | 9 |
| $PM_{10}$: | |
| Annual arithmetic mean | 17 |
| 24-hr maximum | 30 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 20 |
| 24-hr maximum | 91 |
| 3-hr maximum | 325 |
| Nitrogen dioxide: | |
| Annual arithmetic mean | 25 |

(5) Sulfur dioxide variance by Governor with Federal Land Manager's concurrence. The plan may provide that--

(i) The owner or operator of a proposed source or modification which cannot be approved under procedures developed pursuant to paragraph (q)(4) of this section may demonstrate to the Governor that the source or modification cannot be constructed by reason of any maximum allowable increase for sulfur dioxide for periods of twenty-four hours or less applicable to any Class I area and, in the case of Federal mandatory Class I areas, that a variance under this clause would not adversely affect the air quality related values of the area (including visibility);

(ii) The Governor, after consideration of the Federal Land Manager's recommendation (if any) and subject to his concurrence, may grant, after notice and an opportunity for a public hearing, a variance from such maximum allowable increase; and

(iii) If such variance is granted, the reviewing authority may issue a permit to such source or modification in accordance with provisions developed pursuant to paragraph (q)(7) of this section: *Provided*, That the applicable requirements of the plan are otherwise met.

(6) Variance by the Governor with the President's concurrence. The plan may provide that--

(i) The recommendations of the Governor and the Federal Land Manager shall be transferred to the President in any case where the Governor recommends a variance in which the Federal Land Manager does not concur;

(ii) The President may approve the Governor's recommendation if he finds that such variance is in the national interest; and

(iii) If such a variance is approved, the reviewing authority may issue a permit in accordance with provisions developed pursuant to the requirements of paragraph (q)(7) of this section: *Provided*, That the applicable requirements of the plan are otherwise met.

(7) Emission limitations for Presidential or gubernatorial variance. The plan shall provide that in the case of a permit issued under procedures developed pursuant to paragraph (q)(5) or (6) of this section, the source or modification shall comply with emission limitations as may be necessary to assure that emissions of sulfur dioxide from the source or modification would not (during any day on which the otherwise applicable maximum allowable increases are exceeded) cause or contribute to concentrations which would exceed the following maximum allowable increases over the baseline concentration and to assure that such emissions would not cause or contribute to concentrations which exceed the otherwise applicable maximum allowable increases for periods of exposure of 24 hours or less for more than 18 days, not necessarily consecutive, during any annual period:

**MAXIMUM ALLOWABLE INCREASE**
**[Micrograms per cubic meter]**

| Period of exposure | Terrain areas | |
|---|---|---|
| | Low | High |
| 24-hr maximum | 36 | 62 |
| 3-hr maximum | 130 | 221 |

(q) Public participation. The plan shall provide that--

(1) The reviewing authority shall notify all applicants within a specified time period as to the completeness of the application or any deficiency in the application or information submitted. In the event of such a deficiency, the date of receipt of the application shall be the date on which the reviewing authority received all required information.

(2) Within one year after receipt of a complete application, the reviewing authority shall:

(i) Make a preliminary determination whether construction should be approved, approved with conditions, or disapproved.

(ii) Make available in at least one location in each region in which the proposed source would be constructed a copy of all materials the applicant submitted, a copy of the preliminary determination, and a copy or summary of other materials, if any, considered in making the preliminary determination.

(iii) Notify the public, by advertisement in a newspaper of general circulation in each region in which the proposed source would be constructed, of the application, the preliminary determination, the degree of increment consumption that is expected from the source or modification, and of the opportunity for comment at a public hearing as well as written public comment.

(iv) Send a copy of the notice of public comment to the applicant, the Administrator and to officials and agencies having cognizance over the location where the proposed construction would occur as follows: Any other State or local air pollution control agencies, the chief executives of the city and county where the source would be located; any comprehensive regional land use planning agency, and any State, Federal Land Manager, or Indian Governing body whose lands may be affected by emissions from the source or modification.

(v) Provide opportunity for a public hearing for interested persons to appear and submit written or oral comments on the air quality impact of the source, alternatives to it, the control technology required, and other appropriate considerations.

(vi) Consider all written comments submitted within a time specified in the notice of public comment and all comments received at any public hearing(s) in making a final decision on the approvability of the application. The reviewing authority shall make all comments available for public inspection in the same locations where the reviewing authority made available preconstruction information relating to the proposed source or modification.

(vii) Make a final determination whether construction should be approved, approved with conditions, or disapproved.

(viii) Notify the applicant in writing of the final determination and make such notification available for public inspection at the same location where the reviewing authority made available preconstruction information and public comments relating to the source.

(r) Source obligation.

(1) The plan shall include enforceable procedures to provide that approval to construct shall not relieve any owner or operator of the responsibility to comply fully with applicable provisions of the plan and any other requirements under local, State or Federal law.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(2) The plan shall provide that at such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in any enforceable limitation which was established after August 7, 1980, on the capacity of the source or modification otherwise to emit a pollutant, such as a restriction on hours of operation, then the requirements of paragraphs (j) through (s) of this section shall apply to the source or modification as though construction had not yet commenced on the source or modification.

(3) to (5) [Reserved]

(6) Each plan shall provide that, except as otherwise provided in paragraph (r)(6)(vi) of this section, the following specific provisions apply with respect to any regulated NSR pollutant emitted from projects at existing emissions units at a major stationary source (other than projects at a source with a PAL) in circumstances where there is a reasonable possibility, within the meaning of paragraph (r)(6)(vi) of this section, that a project that is not a part of a major modification may result in a significant emissions increase of such pollutant, and the owner or operator elects to use the method specified in paragraphs (b)(40)(ii)(a) through (c) of this section for calculating projected actual emissions. Deviations from these provisions will be approved only if the State specifically demonstrates that the submitted provisions are more stringent than or at least as stringent in all respects as the corresponding provisions in paragraphs (r)(6)(i) through (vi) of this section.

(i) Before beginning actual construction of the project, the owner or operator shall document and maintain a record of the following information:

(a) A description of the project;

(b) Identification of the emissions unit(s) whose emissions of a regulated NSR pollutant could be affected by the project; and

(c) A description of the applicability test used to determine that the project is not a major modification for any regulated NSR pollutant, including the baseline actual emissions, the projected actual emissions, the amount of emissions excluded under paragraph (b)(40)(ii)(c) of this section and an explanation for why such amount was excluded, and any netting calculations, if applicable.

(ii) If the emissions unit is an existing electric utility steam generating unit, before beginning actual construction, the owner or operator shall provide a copy of the information set out in paragraph (r)(6)(i) of this section to the reviewing authority. Nothing in this paragraph (r)(6)(ii) shall be construed to require the owner or operator of such a unit to obtain any determination from the reviewing authority before beginning actual construction.

(iii) The owner or operator shall monitor the emissions of any regulated NSR pollutant that could increase as a result of the project and that is emitted by any emissions unit identified in paragraph (r)(6)(i)(b) of this section; and calculate and maintain a record of the annual emissions, in tons per year on a calendar year basis, for a period of 5 years following resumption of regular operations after the change, or for a period of 10 years following resumption of regular operations after the change if the project increases the design capacity or potential to emit of that regulated NSR pollutant at such emissions unit.

(iv) If the unit is an existing electric utility steam generating unit, the owner or operator shall submit a report to the reviewing authority within 60 days after the end of each year during which records must be generated under paragraph (r)(6)(iii) of this section setting out the unit's annual emissions during the calendar year that preceded submission of the report.

(v) If the unit is an existing unit other than an electric utility steam generating unit, the owner or operator shall submit a report to the reviewing authority if the annual emissions, in tons per year, from the project identified in paragraph (r)(6)(i) of this section, exceed the baseline actual emissions (as documented and maintained pursuant to paragraph (r)(6)(i)(c) of this section) by a significant amount (as defined in paragraph (b)(23) of this section) for that regulated NSR pollutant, and if such emissions differ from the preconstruction projection as documented and maintained pursuant to paragraph (r)(6)

(i)(c) of this section. Such report shall be submitted to the reviewing authority within 60 days after the end of such year. The report shall contain the following:

(a) The name, address and telephone number of the major stationary source;

(b) The annual emissions as calculated pursuant to paragraph (r)(6)(iii) of this section; and

(c) Any other information that the owner or operator wishes to include in the report (e.g., an explanation as to why the emissions differ from the preconstruction projection).

(vi) A "reasonable possibility" under paragraph (r)(6) of this section occurs when the owner or operator calculates the project to result in either:

(a) A projected actual emissions increase of at least 50 percent of the amount that is a "significant emissions increase," as defined under paragraph (b)(39) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant; or

(b) A projected actual emissions increase that, added to the amount of emissions excluded under paragraph (b)(40)(ii)(c), sums to at least 50 percent of the amount that is a "significant emissions increase," as defined under paragraph (b)(39) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant. For a project for which a reasonable possibility occurs only within the meaning of paragraph (r)(6)(vi)(b) of this section, and not also within the meaning of paragraph (a)(6)(vi)(a) of this section, then provisions (a)(6)(ii) through (v) do not apply to the project.

(7) Each plan shall provide that the owner or operator of the source shall make the information required to be documented and maintained pursuant to paragraph (r)(6) of this section available for review upon request for inspection by the reviewing authority or the general public pursuant to the requirements contained in § 70.4(b)(3)(viii) of this chapter.

(s) Innovative control technology.

(1) The plan may provide that an owner or operator of a proposed major stationary source or major modification may request the reviewing authority to approve a system of innovative control technology.

(2) The plan may provide that the reviewing authority may, with the consent of the Governor(s) of other affected State(s), determine that the source or modification may employ a system of innovative control technology, if:

(i) The proposed control system would not cause or contribute to an unreasonable risk to public health, welfare, or safety in its operation or function;

(ii) The owner or operator agrees to achieve a level of continuous emissions reduction equivalent to that which would have been required under paragraph (j)(2) of this section, by a date specified by the reviewing authority. Such date shall not be later than 4 years from the time of startup or 7 years from permit issuance;

(iii) The source or modification would meet the requirements equivalent to those in paragraphs (j) and (k) of this section, based on the emissions rate that the stationary source employing the system of innovative control technology would be required to meet on the date specified by the reviewing authority;

(iv) The source or modification would not before the date specified by the reviewing authority:

(a) Cause or contribute to any violation of an applicable national ambient air quality standard; or

(b) Impact any area where an applicable increment is known to be violated;

(v) All other applicable requirements including those for public participation have been met.

(vi) The provisions of paragraph (p) of this section (relating to Class I areas) have been satisfied with respect to all periods during the life of the source or modification.

(3) The plan shall provide that the reviewing authority shall withdraw any approval to employ a system of innovative control technology made under this section, if:

(i) The proposed system fails by the specified date to achieve the required continuous emissions reduction rate; or

(ii) The proposed system fails before the specified date so as to contribute to an unreasonable risk to public health, welfare, or safety; or

(iii) The reviewing authority decides at any time that the proposed system is unlikely to achieve the required level of control or to protect the public health, welfare, or safety.

(4) The plan may provide that if a source or modification fails to meet the required level of continuous emissions reduction within the specified time period, or if the approval is withdrawn in accordance with paragraph (s)(3) of this section, the reviewing authority may allow the source or modification up to an additional 3 years to meet the requirement for the application of best available control technology through use of a demonstrated system of control.

(t) to (v) [Reserved]

(w) Actuals PALs. The plan shall provide for PALs according to the provisions in paragraphs (w)(1) through (15) of this section.

(1) Applicability.

(i) The reviewing authority may approve the use of an actuals PAL for any existing major stationary source if the PAL meets the requirements in paragraphs (w)(1) through (15) of this section. The term “PAL” shall mean “actuals PAL” throughout paragraph (w) of this section.

(ii) Any physical change in or change in the method of operation of a major stationary source that maintains its total source-wide emissions below the PAL level, meets the requirements in paragraphs (w)(1) through (15) of this section, and complies with the PAL permit:

(a) Is not a major modification for the PAL pollutant;

(b) Does not have to be approved through the plan's major NSR program; and

(c) Is not subject to the provisions in paragraph (r)(2) of this section (restrictions on relaxing enforceable emission limitations that the major stationary source used to avoid applicability of the major NSR program).

(iii) Except as provided under paragraph (w)(1)(ii)(c) of this section, a major stationary source shall continue to comply with all applicable Federal or State requirements, emission limitations, and work practice requirements that were established prior to the effective date of the PAL.

(2) Definitions. The plan shall use the definitions in paragraphs (w)(2)(i) through (xi) of this section for the purpose of developing and implementing regulations that authorize the use of actuals PALs consistent with paragraphs (w)(1) through (15) of this section. When a term is not defined in these paragraphs, it shall have the meaning given in paragraph (b) of this section or in the Act.

(i) Actuals PAL for a major stationary source means a PAL based on the baseline actual emissions (as defined in paragraph (b)(47) of this section) of all emissions units (as defined in paragraph (b)(7) of this section) at the source, that emit or have the potential to emit the PAL pollutant.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(ii) Allowable emissions means "allowable emissions" as defined in paragraph (b)(16) of this section, except as this definition is modified according to paragraphs (w)(2)(ii)(a) and (b) of this section.

(a) The allowable emissions for any emissions unit shall be calculated considering any emission limitations that are enforceable as a practical matter on the emissions unit's potential to emit.

(b) An emissions unit's potential to emit shall be determined using the definition in paragraph (b)(4) of this section, except that the words "or enforceable as a practical matter" should be added after "federally enforceable."

(iii) Small emissions unit means an emissions unit that emits or has the potential to emit the PAL pollutant in an amount less than the significant level for that PAL pollutant, as defined in paragraph (b)(23) of this section or in the Act, whichever is lower.

(iv) Major emissions unit means:

(a) Any emissions unit that emits or has the potential to emit 100 tons per year or more of the PAL pollutant in an attainment area; or

(b) Any emissions unit that emits or has the potential to emit the PAL pollutant in an amount that is equal to or greater than the major source threshold for the PAL pollutant as defined by the Act for nonattainment areas. For example, in accordance with the definition of major stationary source in section 182(c) of the Act, an emissions unit would be a major emissions unit for VOC if the emissions unit is located in a serious ozone nonattainment area and it emits or has the potential to emit 50 or more tons of VOC per year.

(v) Plantwide applicability limitation (PAL) means an emission limitation expressed in tons per year, for a pollutant at a major stationary source, that is enforceable as a practical matter and established source-wide in accordance with paragraphs (w)(1) through (15) of this section.

(vi) PAL effective date generally means the date of issuance of the PAL permit. However, the PAL effective date for an increased PAL is the date any emissions unit that is part of the PAL major modification becomes operational and begins to emit the PAL pollutant.

(vii) PAL effective period means the period beginning with the PAL effective date and ending 10 years later.

(viii) PAL major modification means, notwithstanding paragraphs (b)(2) and (b)(3) of this section (the definitions for major modification and net emissions increase), any physical change in or change in the method of operation of the PAL source that causes it to emit the PAL pollutant at a level equal to or greater than the PAL.

(ix) PAL permit means the major NSR permit, the minor NSR permit, or the State operating permit under a program that is approved into the plan, or the title V permit issued by the reviewing authority that establishes a PAL for a major stationary source.

(x) PAL pollutant means the pollutant for which a PAL is established at a major stationary source.

(xi) Significant emissions unit means an emissions unit that emits or has the potential to emit a PAL pollutant in an amount that is equal to or greater than the significant level (as defined in paragraph (b)(23) of this section or in the Act, whichever is lower) for that PAL pollutant, but less than the amount that would qualify the unit as a major emissions unit as defined in paragraph (w)(2)(iv) of this section.

(3) Permit application requirements. As part of a permit application requesting a PAL, the owner or operator of a major stationary source shall submit the following information in paragraphs (w)(3)(i) through (iii) of this section to the reviewing authority for approval.

(i) A list of all emissions units at the source designated as small, significant or major based on their potential to emit. In addition, the owner or operator of the source shall indicate which, if any, Federal or State applicable requirements, emission limitations, or work practices apply to each unit.

(ii) Calculations of the baseline actual emissions (with supporting documentation). Baseline actual emissions are to include emissions associated not only with operation of the unit, but also emissions associated with startup, shutdown, and malfunction.

(iii) The calculation procedures that the major stationary source owner or operator proposes to use to convert the monitoring system data to monthly emissions and annual emissions based on a 12–month rolling total for each month as required by paragraph (w)(13)(i) of this section.

(4) General requirements for establishing PALs.

(i) The plan allows the reviewing authority to establish a PAL at a major stationary source, provided that at a minimum, the requirements in paragraphs (w)(4)(i)(a) through (g) of this section are met.

(a) The PAL shall impose an annual emission limitation in tons per year, that is enforceable as a practical matter, for the entire major stationary source. For each month during the PAL effective period after the first 12 months of establishing a PAL, the major stationary source owner or operator shall show that the sum of the monthly emissions from each emissions unit under the PAL for the previous 12 consecutive months is less than the PAL (a 12–month average, rolled monthly). For each month during the first 11 months from the PAL effective date, the major stationary source owner or operator shall show that the sum of the preceding monthly emissions from the PAL effective date for each emissions unit under the PAL is less than the PAL.

(b) The PAL shall be established in a PAL permit that meets the public participation requirements in paragraph (w)(5) of this section.

(c) The PAL permit shall contain all the requirements of paragraph (w)(7) of this section.

(d) The PAL shall include fugitive emissions, to the extent quantifiable, from all emissions units that emit or have the potential to emit the PAL pollutant at the major stationary source.

(e) Each PAL shall regulate emissions of only one pollutant.

(f) Each PAL shall have a PAL effective period of 10 years.

(g) The owner or operator of the major stationary source with a PAL shall comply with the monitoring, recordkeeping, and reporting requirements provided in paragraphs (w)(12) through (14) of this section for each emissions unit under the PAL through the PAL effective period.

(ii) At no time (during or after the PAL effective period) are emissions reductions of a PAL pollutant that occur during the PAL effective period creditable as decreases for purposes of offsets under § 51.165(a)(3)(ii) of this chapter unless the level of the PAL is reduced by the amount of such emissions reductions and such reductions would be creditable in the absence of the PAL.

(5) Public participation requirements for PALs. PALs for existing major stationary sources shall be established, renewed, or increased, through a procedure that is consistent with §§ 51.160 and 51.161 of this chapter. This includes the requirement that the reviewing authority provide the public with notice of the proposed approval of a PAL permit and at least a 30–day period for submittal of public comment. The reviewing authority must address all material comments before taking final action on the permit.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(6) Setting the 10–year actuals PAL level.

(i) Except as provided in paragraph (w)(6)(ii) of this section, the plan shall provide that the actuals PAL level for a major stationary source shall be established as the sum of the baseline actual emissions (as defined in paragraph (b)(47) of this section) of the PAL pollutant for each emissions unit at the source; plus an amount equal to the applicable significant level for the PAL pollutant under paragraph (b)(23) of this section or under the Act, whichever is lower. When establishing the actuals PAL level, for a PAL pollutant, only one consecutive 24–month period must be used to determine the baseline actual emissions for all existing emissions units. However, a different consecutive 24–month period may be used for each different PAL pollutant. Emissions associated with units that were permanently shut down after this 24–month period must be subtracted from the PAL level. The reviewing authority shall specify a reduced PAL level(s) (in tons/yr) in the PAL permit to become effective on the future compliance date(s) of any applicable Federal or State regulatory requirement(s) that the reviewing authority is aware of prior to issuance of the PAL permit. For instance, if the source owner or operator will be required to reduce emissions from industrial boilers in half from baseline emissions of 60 ppm $NO_X$ to a new rule limit of 30 ppm, then the permit shall contain a future effective PAL level that is equal to the current PAL level reduced by half of the original baseline emissions of such unit(s).

(ii) For newly constructed units (which do not include modifications to existing units) on which actual construction began after the 24–month period, in lieu of adding the baseline actual emissions as specified in paragraph (w)(6)(i) of this section, the emissions must be added to the PAL level in an amount equal to the potential to emit of the units.

(7) Contents of the PAL permit. The plan shall require that the PAL permit contain, at a minimum, the information in paragraphs (w)(7)(i) through (x) of this section.

(i) The PAL pollutant and the applicable source-wide emission limitation in tons per year.

(ii) The PAL permit effective date and the expiration date of the PAL (PAL effective period).

(iii) Specification in the PAL permit that if a major stationary source owner or operator applies to renew a PAL in accordance with paragraph (w)(10) of this section before the end of the PAL effective period, then the PAL shall not expire at the end of the PAL effective period. It shall remain in effect until a revised PAL permit is issued by the reviewing authority.

(iv) A requirement that emission calculations for compliance purposes include emissions from startups, shutdowns and malfunctions.

(v) A requirement that, once the PAL expires, the major stationary source is subject to the requirements of paragraph (w)(9) of this section.

(vi) The calculation procedures that the major stationary source owner or operator shall use to convert the monitoring system data to monthly emissions and annual emissions based on a 12–month rolling total for each month as required by paragraph (w)(3)(i) of this section.

(vii) A requirement that the major stationary source owner or operator monitor all emissions units in accordance with the provisions under paragraph (w)(13) of this section.

(viii) A requirement to retain the records required under paragraph (w)(13) of this section on site. Such records may be retained in an electronic format.

(ix) A requirement to submit the reports required under paragraph (w)(14) of this section by the required deadlines.

(x) Any other requirements that the reviewing authority deems necessary to implement and enforce the PAL.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(8) PAL effective period and reopening of the PAL permit. The plan shall require the information in paragraphs (w)(8)(i) and (ii) of this section.

(i) PAL effective period. The reviewing authority shall specify a PAL effective period of 10 years.

(ii) Reopening of the PAL permit.

(a) During the PAL effective period, the plan shall require the reviewing authority to reopen the PAL permit to:

(1) Correct typographical/calculation errors made in setting the PAL or reflect a more accurate determination of emissions used to establish the PAL;

(2) Reduce the PAL if the owner or operator of the major stationary source creates creditable emissions reductions for use as offsets under § 51.165(a)(3)(ii) of this chapter; and

(3) Revise the PAL to reflect an increase in the PAL as provided under paragraph (w)(11) of this section.

(b) The plan shall provide the reviewing authority discretion to reopen the PAL permit for the following:

(1) Reduce the PAL to reflect newly applicable Federal requirements (for example, NSPS) with compliance dates after the PAL effective date;

(2) Reduce the PAL consistent with any other requirement, that is enforceable as a practical matter, and that the State may impose on the major stationary source under the plan; and

(3) Reduce the PAL if the reviewing authority determines that a reduction is necessary to avoid causing or contributing to a NAAQS or PSD increment violation, or to an adverse impact on an AQRV that has been identified for a Federal Class I area by a Federal Land Manager and for which information is available to the general public.

(c) Except for the permit reopening in paragraph (w)(8)(ii)(a)(1) of this section for the correction of typographical/calculation errors that do not increase the PAL level, all reopenings shall be carried out in accordance with the public participation requirements of paragraph (w)(5) of this section.

(9) Expiration of a PAL. Any PAL that is not renewed in accordance with the procedures in paragraph (w)(10) of this section shall expire at the end of the PAL effective period, and the requirements in paragraphs (w)(9)(i) through (v) of this section shall apply.

(i) Each emissions unit (or each group of emissions units) that existed under the PAL shall comply with an allowable emission limitation under a revised permit established according to the procedures in paragraphs (w)(9)(i)(a) and (b) of this section.

(a) Within the time frame specified for PAL renewals in paragraph (w)(10)(ii) of this section, the major stationary source shall submit a proposed allowable emission limitation for each emissions unit (or each group of emissions units, if such a distribution is more appropriate as decided by the reviewing authority) by distributing the PAL allowable emissions for the major stationary source among each of the emissions units that existed under the PAL. If the PAL had not yet been adjusted for an applicable requirement that became effective during the PAL effective period, as required under paragraph (w)(10)(v) of this section, such distribution shall be made as if the PAL had been adjusted.

(b) The reviewing authority shall decide whether and how the PAL allowable emissions will be distributed and issue a revised permit incorporating allowable limits for each emissions unit, or each group of emissions units, as the reviewing authority determines is appropriate.

(ii) Each emissions unit(s) shall comply with the allowable emission limitation on a 12–month rolling basis. The reviewing authority may approve the use of monitoring systems (source testing,emission factors, etc.) other than CEMS, CERMS, PEMS or CPMS to demonstrate compliance with the allowable emission limitation.

(iii) Until the reviewing authority issues the revised permit incorporating allowable limits for each emissions unit, or each group of emissions units, as required under paragraph (w)(9)(i)(b) of this section, the source shall continue to comply with a source-wide, multi-unit emissions cap equivalent to the level of the PAL emission limitation.

(iv) Any physical change or change in the method of operation at the major stationary source will be subject to major NSR requirements if such change meets the definition of major modification in paragraph (b)(2) of this section.

(v) The major stationary source owner or operator shall continue to comply with any State or Federal applicable requirements (BACT, RACT, NSPS, etc.) that may have applied either during the PAL effective period or prior to the PAL effective period except for those emission limitations that had been established pursuant to paragraph (r)(2) of this section, but were eliminated by the PAL in accordance with the provisions in paragraph (w)(1)(ii)(c) of this section.

(10) Renewal of a PAL.

(i) The reviewing authority shall follow the procedures specified in paragraph (w)(5) of this section in approving any request to renew a PAL for a major stationary source, and shall provide both the proposed PAL level and a written rationale for the proposed PAL level to the public for review and comment. During such public review, any person may propose a PAL level for the source for consideration by the reviewing authority.

(ii) Application deadline. The plan shall require that a major stationary source owner or operator shall submit a timely application to the reviewing authority to request renewal of a PAL. A timely application is one that is submitted at least 6 months prior to, but not earlier than 18 months from, the date of permit expiration. This deadline for application submittal is to ensure that the permit will not expire before the permit is renewed. If the owner or operator of a major stationary source submits a complete application to renew the PAL within this time period, then the PAL shall continue to be effective until the revised permit with the renewed PAL is issued.

(iii) Application requirements. The application to renew a PAL permit shall contain the information required in paragraphs (w)(10)(iii) (a) through (d) of this section.

(a) The information required in paragraphs (w)(3)(i) through (iii) of this section.

(b) A proposed PAL level.

(c) The sum of the potential to emit of all emissions units under the PAL (with supporting documentation).

(d) Any other information the owner or operator wishes the reviewing authority to consider in determining the appropriate level for renewing the PAL.

(iv) PAL adjustment. In determining whether and how to adjust the PAL, the reviewing authority shall consider the options outlined in paragraphs (w)(10)(iv) (a) and (b) of this section. However, in no case may any such adjustment fail to comply with paragraph (w)(10)(iv)(c) of this section.

(a) If the emissions level calculated in accordance with paragraph (w)(6) of this section is equal to or greater than 80 percent of the PAL level, the reviewing authority may renew the PAL at the same level without considering the factors set forth in paragraph (w)(10)(iv)(b) of this section; or

(b) The reviewing authority may set the PAL at a level that it determines to be more representative of the source's baseline actual emissions, or that it determines to be appropriate considering air quality needs, advances in control

technology, anticipated economic growth in the area, desire to reward or encourage the source's voluntary emissions reductions, or other factors as specifically identified by the reviewing authority in its written rationale.

(c) Notwithstanding paragraphs (w)(10)(iv) (a) and (b) of this section:

(1) If the potential to emit of the major stationary source is less than the PAL, the reviewing authority shall adjust the PAL to a level no greater than the potential to emit of the source; and

(2) The reviewing authority shall not approve a renewed PAL level higher than the current PAL, unless the major stationary source has complied with the provisions of paragraph (w)(11) of this section (increasing a PAL).

(v) If the compliance date for a State or Federal requirement that applies to the PAL source occurs during the PAL effective period, and if the reviewing authority has not already adjusted for such requirement, the PAL shall be adjusted at the time of PAL permit renewal or title V permit renewal, whichever occurs first.

(11) Increasing a PAL during the PAL effective period.

(i) The plan shall require that the reviewing authority may increase a PAL emission limitation only if the major stationary source complies with the provisions in paragraphs (w)(11)(i) (a) through (d) of this section.

(a) The owner or operator of the major stationary source shall submit a complete application to request an increase in the PAL limit for a PAL major modification. Such application shall identify the emissions unit(s) contributing to the increase in emissions so as to cause the major stationary source's emissions to equal or exceed its PAL.

(b) As part of this application, the major stationary source owner or operator shall demonstrate that the sum of the baseline actual emissions of the small emissions units, plus the sum of the baseline actual emissions of the significant and major emissions units assuming application of BACT equivalent controls, plus the sum of the allowable emissions of the new or modified emissions unit(s), exceeds the PAL. The level of control that would result from BACT equivalent controls on each significant or major emissions unit shall be determined by conducting a new BACT analysis at the time the application is submitted, unless the emissions unit is currently required to comply with a BACT or LAER requirement that was established within the preceding 10 years. In such a case, the assumed control level for that emissions unit shall be equal to the level of BACT or LAER with which that emissions unit must currently comply.

(c) The owner or operator obtains a major NSR permit for all emissions unit(s) identified in paragraph (w)(11)(i)(a) of this section, regardless of the magnitude of the emissions increase resulting from them (that is, no significant levels apply). These emissions unit(s) shall comply with any emissions requirements resulting from the major NSR process (for example, BACT), even though they have also become subject to the PAL or continue to be subject to the PAL.

(d) The PAL permit shall require that the increased PAL level shall be effective on the day any emissions unit that is part of the PAL major modification becomes operational and begins to emit the PAL pollutant.

(ii) The reviewing authority shall calculate the new PAL as the sum of the allowable emissions for each modified or new emissions unit, plus the sum of the baseline actual emissions of the significant and major emissions units (assuming application of BACT equivalent controls as determined in accordance with paragraph (w)(11)(i)(b) of this section), plus the sum of the baseline actual emissions of the small emissions units.

(iii) The PAL permit shall be revised to reflect the increased PAL level pursuant to the public notice requirements of paragraph (w)(5) of this section.

(12) Monitoring requirements for PALs--

(i) General requirements.

(a) Each PAL permit must contain enforceable requirements for the monitoring system that accurately determines plantwide emissions of the PAL pollutant in terms of mass per unit of time. Any monitoring system authorized for use in the PAL permit must be based on sound science and meet generally acceptable scientific procedures for data quality and manipulation. Additionally, the information generated by such system must meet minimum legal requirements for admissibility in a judicial proceeding to enforce the PAL permit.

(b) The PAL monitoring system must employ one or more of the four general monitoring approaches meeting the minimum requirements set forth in paragraphs (w)(12)(ii) (a) through (d) of this section and must be approved by the reviewing authority.

(c) Notwithstanding paragraph (w)(12)(i)(b) of this section, you may also employ an alternative monitoring approach that meets paragraph (w)(12)(i)(a) of this section if approved by the reviewing authority.

(d) Failure to use a monitoring system that meets the requirements of this section renders the PAL invalid.

(ii) Minimum performance requirements for approved monitoring approaches. The following are acceptable general monitoring approaches when conducted in accordance with the minimum requirements in paragraphs (w)(12)(iii) through (ix) of this section:

(a) Mass balance calculations for activities using coatings or solvents;

(b) CEMS;

(c) CPMS or PEMS; and

(d) Emission factors.

(iii) Mass balance calculations. An owner or operator using mass balance calculations to monitor PAL pollutant emissions from activities using coating or solvents shall meet the following requirements:

(a) Provide a demonstrated means of validating the published content of the PAL pollutant that is contained in or created by all materials used in or at the emissions unit;

(b) Assume that the emissions unit emits all of the PAL pollutant that is contained in or created by any raw material or fuel used in or at the emissions unit, if it cannot otherwise be accounted for in the process; and

(c) Where the vendor of a material or fuel, which is used in or at the emissions unit, publishes a range of pollutant content from such material, the owner or operator must use the highest value of the range to calculate the PAL pollutant emissions unless the reviewing authority determines there is site-specific data or a site-specific monitoring program to support another content within the range.

(iv) CEMS. An owner or operator using CEMS to monitor PAL pollutant emissions shall meet the following requirements:

(a) CEMS must comply with applicable Performance Specifications found in 40 CFR part 60, appendix B; and

(b) CEMS must sample, analyze, and record data at least every 15 minutes while the emissions unit is operating.

(v) CPMS or PEMS. An owner or operator using CPMS or PEMS to monitor PAL pollutant emissions shall meet the following requirements:

(a) The CPMS or the PEMS must be based on current site-specific data demonstrating a correlation between the monitored parameter(s) and the PAL pollutant emissions across the range of operation of the emissions unit; and

(b) Each CPMS or PEMS must sample, analyze, and record data at least every 15 minutes, or at another less frequent interval approved by the reviewing authority, while the emissions unit is operating.

(vi) Emission factors. An owner or operator using emission factors to monitor PAL pollutant emissions shall meet the following requirements:

(a) All emission factors shall be adjusted, if appropriate, to account for the degree of uncertainty or limitations in the factors' development;

(b) The emissions unit shall operate within the designated range of use for the emission factor, if applicable; and

(c) If technically practicable, the owner or operator of a significant emissions unit that relies on an emission factor to calculate PAL pollutant emissions shall conduct validation testing to determine a site-specific emission factor within 6 months of PAL permit issuance, unless the reviewing authority determines that testing is not required.

(vii) A source owner or operator must record and report maximum potential emissions without considering enforceable emission limitations or operational restrictions for an emissions unit during any period of time that there is no monitoring data, unless another method for determining emissions during such periods is specified in the PAL permit.

(viii) Notwithstanding the requirements in paragraphs (w)(12)(iii) through (vii) of this section, where an owner or operator of an emissions unit cannot demonstrate a correlation between the monitored parameter(s) and the PAL pollutant emissions rate at all operating points of the emissions unit, the reviewing authority shall, at the time of permit issuance:

(a) Establish default value(s) for determining compliance with the PAL based on the highest potential emissions reasonably estimated at such operating point(s); or

(b) Determine that operation of the emissions unit during operating conditions when there is no correlation between monitored parameter(s) and the PAL pollutant emissions is a violation of the PAL.

(ix) Re-validation. All data used to establish the PAL pollutant must be re-validated through performance testing or other scientifically valid means approved by the reviewing authority. Such testing must occur at least once every 5 years after issuance of the PAL.

(13) Recordkeeping requirements.

(i) The PAL permit shall require an owner or operator to retain a copy of all records necessary to determine compliance with any requirement of paragraph (w) of this section and of the PAL, including a determination of each emissions unit's 12–month rolling total emissions, for 5 years from the date of such record.

(ii) The PAL permit shall require an owner or operator to retain a copy of the following records, for the duration of the PAL effective period plus 5 years:

(a) A copy of the PAL permit application and any applications for revisions to the PAL; and

(b) Each annual certification of compliance pursuant to title V and the data relied on in certifying the compliance.

(14) Reporting and notification requirements. The owner or operator shall submit semi-annual monitoring reports and prompt deviation reports to the reviewing authority in accordance with the applicable title V operating permit program. The reports shall meet the requirements in paragraphs (w)(14)(i) through (iii) of this section.

(i) Semi-annual report. The semi-annual report shall be submitted to the reviewing authority within 30 days of the end of each reporting period. This report shall contain the information required in paragraphs (w)(14)(i)(a) through (g) of this section.

(a) The identification of owner and operator and the permit number.

(b) Total annual emissions (tons/year) based on a 12–month rolling total for each month in the reporting period recorded pursuant to paragraph (w)(13)(i) of this section.

(c) All data relied upon, including, but not limited to, any Quality Assurance or Quality Control data, in calculating the monthly and annual PAL pollutant emissions.

(d) A list of any emissions units modified or added to the major stationary source during the preceding 6–month period.

(e) The number, duration, and cause of any deviations or monitoring malfunctions (other than the time associated with zero and span calibration checks), and any corrective action taken.

(f) A notification of a shutdown of any monitoring system, whether the shutdown was permanent or temporary, the reason for the shutdown, the anticipated date that the monitoring system will be fully operational or replaced with another monitoring system, and whether the emissions unit monitored by the monitoring system continued to operate, and the calculation of the emissions of the pollutant or the number determined by method included in the permit, as provided by paragraph (w)(12)(vii) of this section.

(g) A signed statement by the responsible official (as defined by the applicable title V operating permit program) certifying the truth, accuracy, and completeness of the information provided in the report.

(ii) Deviation report. The major stationary source owner or operator shall promptly submit reports of any deviations or exceedance of the PAL requirements, including periods where no monitoring is available. A report submitted pursuant to § 70.6(a)(3)(iii)(B) of this chapter shall satisfy this reporting requirement. The deviation reports shall be submitted within the time limits prescribed by the applicable program implementing § 70.6(a)(3)(iii)(B) of this chapter. The reports shall contain the following information:

(a) The identification of owner and operator and the permit number;

(b) The PAL requirement that experienced the deviation or that was exceeded;

(c) Emissions resulting from the deviation or the exceedance; and

(d) A signed statement by the responsible official (as defined by the applicable title V operating permit program) certifying the truth, accuracy, and completeness of the information provided in the report.

(iii) Re-validation results. The owner or operator shall submit to the reviewing authority the results of any re-validation test or method within three months after completion of such test or method.

(15) Transition requirements.

(i) No reviewing authority may issue a PAL that does not comply with the requirements in paragraphs (w)(1) through (15) of this section after the Administrator has approved regulations incorporating these requirements into a plan.

(ii) The reviewing authority may supersede any PAL which was established prior to the date of approval of the plan by the Administrator with a PAL that complies with the requirements of paragraphs (w)(1) through (15) of this section.

(x) If any provision of this section, or the application of such provision to any person or circumstance, is held invalid, the remainder of this section, or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.

(y) Equipment replacement provision. Without regard to other considerations, routine maintenance, repair and replacement includes, but is not limited to, the replacement of any component of a process unit with an identical or functionally equivalent component(s), and maintenance and repair activities that are part of the replacement activity, provided that all of the requirements in paragraphs (y)(1) through (3) of this section are met.

(1) Capital Cost threshold for Equipment Replacement.

(i) For an electric utility steam generating unit, as defined in § 51.166(b)(30), the fixed capital cost of the replacement component(s) plus the cost of any associated maintenance and repair activities that are part of the replacement shall not exceed 20 percent of the replacement value of the process unit, at the time the equipment is replaced. For a process unit that is not an electric utility steam generating unit the fixed capital cost of the replacement component(s) plus the cost of any associated maintenance and repair activities that are part of the replacement shall not exceed 20 percent of the replacement value of the process unit, at the time the equipment is replaced.

(ii) In determining the replacement value of the process unit; and, except as otherwise allowed under paragraph (y)(1)(iii) of this section, the owner or operator shall determine the replacement value of the process unit on an estimate of the fixed capital cost of constructing a new process unit, or on the current appraised value of the process unit.

(iii) As an alternative to paragraph (y)(1)(ii) of this section for determining the replacement value of a process unit, an owner or operator may choose to use insurance value (where the insurance value covers only complete replacement), investment value adjusted for inflation, or another accounting procedure if such procedure is based on Generally Accepted Accounting Principles, provided that the owner or operator sends a notice to the reviewing authority. The first time that an owner or operator submits such a notice for a particular process unit, the notice may be submitted at any time, but any subsequent notice for that process unit may be submitted only at the beginning of the process unit's fiscal year. Unless the owner or operator submits a notice to the reviewing authority, then paragraph (y)(1)(ii) of this section will be used to establish the replacement value of the process unit. Once the owner or operator submits a notice to use an alternative accounting procedure, the owner or operator must continue to use that procedure for the entire fiscal year for that process unit. In subsequent fiscal years, the owner or operator must continue to use this selected procedure unless and until the owner or operator sends another notice to the reviewing authority selecting another procedure consistent with this paragraph or paragraph (y)(1)(ii) of this section at the beginning of such fiscal year.

(2) Basic design parameters. The replacement does not change the basic design parameter(s) of the process unit to which the activity pertains.

(i) Except as provided in paragraph (y)(2)(iii) of this section, for a process unit at a steam electric generating facility, the owner or operator may select as its basic design parameters either maximum hourly heat input and maximum hourly fuel consumption rate or maximum hourly electric output rate and maximum steam flow rate. When establishing fuel consumption specifications in terms of weight or volume, the minimum fuel quality based on British Thermal Units content shall be used for determining the basic design parameter(s) for a coal-fired electric utility steam generating unit.

(ii) Except as provided in paragraph (y)(2)(iii) of this section, the basic design parameter(s) for any process unit that is not at a steam electric generating facility are maximum rate of fuel or heat input, maximum rate of material input, or maximum rate of product output. Combustion process units will typically use maximum rate of fuel input. For sources having multiple end products and raw materials, the owner or operator should consider the primary product or primary raw material when selecting a basic design parameter.

(iii) If the owner or operator believes the basic design parameter(s) in paragraphs (y)(2)(i) and (ii) of this section is not appropriate for a specific industry or type of process unit, the owner or operator may propose to the reviewing authority an alternative basic design parameter(s) for the source's process unit(s). If the reviewing authority approves of the use of an alternative basic design parameter(s), the reviewing authority shall issue a permit that is legally enforceable that records such basic design parameter(s) and requires the owner or operator to comply with such parameter(s).

(iv) The owner or operator shall use credible information, such as results of historic maximum capability tests, design information from the manufacturer, or engineering calculations, in establishing the magnitude of the basic design parameter(s) specified in paragraphs (y)(2)(i) and (ii) of this section.

(v) If design information is not available for a process unit, then the owner or operator shall determine the process unit's basic design parameter(s) using the maximum value achieved by the process unit in the five-year period immediately preceding the planned activity.

(vi) Efficiency of a process unit is not a basic design parameter.

(3) The replacement activity shall not cause the process unit to exceed any emission limitation, or operational limitation that has the effect of constraining emissions, that applies to the process unit and that is legally enforceable.

Note to paragraph (y): By a court order on December 24, 2003, this paragraph (y) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(Authority: Secs. 101(b)(1), 110, 160–169, 171–178, and 301(a), Clean Air Act, as amended (42 U.S.C. 7401(b)(1), 7410, 7470–7479, 7501–7508, and 7601(a)); sec. 129(a), Clean Air Act Amendments of 1977 (Pub.L. 95–95, 91 Stat. 685 (Aug. 7, 1977)))

**Credits**

[43 FR 26382, June 19, 1978; 43 FR 40010, Sept. 8, 1978, as amended at 44 FR 27569, May 10, 1979; 45 FR 52729, Aug. 7, 1980; 47 FR 27560, June 25, 1982; 49 FR 43209, Oct. 26, 1984; 51 FR 40661, 40675, Nov. 7, 1986; 52 FR 24713, July 1, 1987; 52 FR 29386, Aug. 7, 1987; 53 FR 40670, Oct. 17, 1988; 54 FR 27285, 27299, June 28, 1989; 56 FR 5506, Feb. 11, 1991; 57 FR 3946, Feb. 3, 1992; 57 FR 32335, July 21, 1992; 58 FR 31636, June 3, 1993; 58 FR 38822, July 20, 1993; 60 FR 40468, Aug. 9, 1995; 61 FR 9918, March 12, 1996; 61 FR 41840, Aug. 12, 1996; 67 FR 80259, 80260, Dec. 31, 2002; 68 FR 61278, Oct. 27, 2003; 68 FR 63028, Nov. 7, 2003; 69 FR 40275, July 1, 2004; 70 FR 59618, Oct. 12, 2005; 70 FR 71699, Nov. 29, 2005; 72 FR 24077, May 1, 2007; 72 FR 32528, June 13, 2007; 72 FR 72616, Dec. 21, 2007; 73 FR 28347, May 16, 2008; 73 FR 77897, Dec. 19, 2008; 74 FR 50116, Sept. 30, 2009; 74 FR 65695, Dec. 11, 2009; 75 FR 16016, March 31, 2010; 75 FR 31606, June 3, 2010; 75 FR 64902, Oct. 20, 2010; 76 FR 17553, March 30, 2011; 76 FR 18870, April 6, 2011; 76 FR 43507, July 20, 2011]

SOURCE: 36 FR 22398, Nov. 25, 1971; 51 FR 40669, Nov. 7, 1986; 52 FR 24712, July 1, 1987; 55 FR 14249, April 17, 1990; 56 FR 42219, Aug. 26, 1991; 57 FR 32334, July 21, 1992; 57 FR 52987, Nov. 5, 1992; 58 FR 38821, July 20, 1993; 60 FR 40100, Aug. 7, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 43801, Aug. 15, 1997; 62 FR 44903, Aug. 25, 1997; 63 FR 24433, May 4, 1998; 64 FR 35763, July 1, 1999; 65 FR 45532, July 24, 2000; 72 FR 28613, May 22, 2007, unless otherwise noted.

AUTHORITY: 23 U.S.C. 101; 42 U.S.C. 7401–7671q.

Notes of Decisions (72)

Current through November 3, 2011; 76 FR 68118.

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter C. Air Programs
Part 52. Approval and Promulgation of Implementation Plans (Refs & Annos)
Subpart A. General Provisions (Refs & Annos)

40 C.F.R. § 52.21

§ 52.21 Prevention of significant deterioration of air quality.

Effective: July 20, 2011
Currentness

(a)(1) Plan disapproval. The provisions of this section are applicable to any State implementation plan which has been disapproved with respect to prevention of significant deterioration of air quality in any portion of any State where the existing air quality is better than the national ambient air quality standards. Specific disapprovals are listed where applicable, in Subparts B through DDD of this part. The provisions of this section have been incorporated by reference into the applicable implementation plans for various States, as provided in Subparts B through DDD of this part. Where this section is so incorporated, the provisions shall also be applicable to all lands owned by the Federal Government and Indian Reservations located in such State. No disapproval with respect to a State's failure to prevent significant deterioration of air quality shall invalidate or otherwise affect the obligations of States, emission sources, or other persons with respect to all portions of plans approved or promulgated under this part.

(2) Applicability procedures.

(i) The requirements of this section apply to the construction of any new major stationary source (as defined in paragraph (b)(1) of this section) or any project at an existing major stationary source in an area designated as attainment or unclassifiable under sections 107(d)(1)(A)(ii) or (iii) of the Act.

(ii) The requirements of paragraphs (j) through (r) of this section apply to the construction of any new major stationary source or the major modification of any existing major stationary source, except as this section otherwise provides.

(iii) No new major stationary source or major modification to which the requirements of paragraphs (j) through (r)(5) of this section apply shall begin actual construction without a permit that states that the major stationary source or major modification will meet those requirements. The Administrator has authority to issue any such permit.

(iv) The requirements of the program will be applied in accordance with the principles set out in paragraphs (a)(2)(iv)(a) through (f) of this section.

(a) Except as otherwise provided in paragraphs (a)(2)(v) and (vi) of this section, and consistent with the definition of major modification contained in paragraph (b)(2) of this section, a project is a major modification for a regulated NSR pollutant if it causes two types of emissions increases--a significant emissions increase (as defined in paragraph (b)(40) of this section), and a significant net emissions increase (as defined in paragraphs (b)(3) and (b)(23) of this section). The project is not a major modification if it does not cause a significant emissions increase. If the project causes a significant emissions increase, then the project is a major modification only if it also results in a significant net emissions increase.

(b) The procedure for calculating (before beginning actual construction) whether a significant emissions increase (i.e., the first step of the process) will occur depends upon the type of emissions units being modified, according

to paragraphs (a)(2)(iv)(c) through (f) of this section. The procedure for calculating (before beginning actual construction) whether a significant net emissions increase will occur at the major stationary source (i.e., the second step of the process) is contained in the definition in paragraph (b)(3) of this section. Regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase.

(c) Actual-to-projected-actual applicability test for projects that only involve existing emissions units. A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the projected actual emissions (as defined in paragraph (b)(41) of this section) and the baseline actual emissions (as defined in paragraphs (b)(48)(i) and (ii) of this section), for each existing emissions unit, equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(d) Actual-to-potential test for projects that only involve construction of a new emissions unit(s). A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the potential to emit (as defined in paragraph (b)(4) of this section) from each new emissions unit following completion of the project and the baseline actual emissions (as defined in paragraph (b)(48)(iii) of this section) of these units before the project equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(e) [Reserved]

(f) Hybrid test for projects that involve multiple types of emissions units. A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the emissions increases for each emissions unit, using the method specified in paragraphs (a)(2)(iv)(c) through (d) of this section as applicable with respect to each emissions unit, for each type of emissions unit equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(v) For any major stationary source for a PAL for a regulated NSR pollutant, the major stationary source shall comply with the requirements under paragraph (aa) of this section.

(vi) [Reserved]

(b) Definitions. For the purposes of this section:

(1)(i) Major stationary source means:

(a) Any of the following stationary sources of air pollutants which emits, or has the potential to emit, 100 tons per year or more of any regulated NSR pollutant: Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input, coal cleaning plants (with thermal dryers), kraft pulp mills, portland cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants (with thermal dryers), primary copper smelters, municipal incinerators capable of charging more than 250 tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production plants, chemical process plants (which does not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140), fossil-fuel boilers (or combinations thereof) totaling more than 250 million British thermal units per hour heat input, petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels, taconite ore processing plants, glass fiber processing plants, and charcoal production plants;

(b) Notwithstanding the stationary source size specified in paragraph (b)(1)(i) of this section, any stationary source which emits, or has the potential to emit, 250 tons per year or more of a regulated NSR pollutant; or

(c) Any physical change that would occur at a stationary source not otherwise qualifying under paragraph (b)(1) of this section, as a major stationary source, if the changes would constitute a major stationary source by itself.

(ii) A major source that is major for volatile organic compounds or $NO_X$ shall be considered major for ozone.

(iii) The fugitive emissions of a stationary source shall not be included in determining for any of the purposes of this section whether it is a major stationary source, unless the source belongs to one of the following categories of stationary sources:

(a) Coal cleaning plants (with thermal dryers);

(b) Kraft pulp mills;

(c) Portland cement plants;

(d) Primary zinc smelters;

(e) Iron and steel mills;

(f) Primary aluminum ore reduction plants;

(g) Primary copper smelters;

(h) Municipal incinerators capable of charging more than 250 tons of refuse per day;

(i) Hydrofluoric, sulfuric, or nitric acid plants;

(j) Petroleum refineries;

(k) Lime plants;

(l) Phosphate rock processing plants;

(m) Coke oven batteries;

(n) Sulfur recovery plants;

(o) Carbon black plants (furnace process);

(p) Primary lead smelters;

(q) Fuel conversion plants;

(r) Sintering plants;

(s) Secondary metal production plants;

(t) Chemical process plants--The term chemical processing plant shall not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140;

(u) Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

(v) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

(w) Taconite ore processing plants;

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(x) Glass fiber processing plants;

(y) Charcoal production plants;

(z) Fossil fuel-fired steam electric plants of more that 250 million British thermal units per hour heat input, and

(aa) Any other stationary source category which, as of August 7, 1980, is being regulated under Section 111 or 112 of the Act.

(2)(i) Major modification means any physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase (as defined in paragraph (b)(40) of this section) of a regulated NSR pollutant (as defined in paragraph (b)(50) of this section); and a significant net emissions increase of that pollutant from the major stationary source.

(ii) Any significant emissions increase (as defined at paragraph (b)(40) of this section) from any emissions units or net emissions increase (as defined in paragraph (b)(3) of this section) at a major stationary source that is significant for volatile organic compounds or $NO_X$ shall be considered significant for ozone.

(iii) A physical change or change in the method of operation shall not include:

(a) Routine maintenance, repair and replacement. Routine maintenance, repair and replacement shall include, but not be limited to, any activity(s) that meets the requirements of the equipment replacement provisions contained in paragraph (cc) of this section;

Note to paragraph (b)(2)(iii)(a): By court order on December 24, 2003, the second sentence of this paragraph (b)(2)(iii)(a) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(b) Use of an alternative fuel or raw material by reason of an order under sections 2 (a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (or any superseding legislation) or by reason of a natural gas curtailment plant pursuant to the Federal Power Act;

(c) Use of an alternative fuel by reason of an order or rule under section 125 of the Act;

(d) Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste;

(e) Use of an alternative fuel or raw material by a stationary source which:

(1) The source was capable of accommodating before January 6, 1975, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975 pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR Subpart I or 40 CFR 51.166; or

(2) The source is approved to use under any permit issued under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166;

(f) An increase in the hours of operation or in the production rate, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975, pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR Subpart I or 40 CFR 51.166.

(g) Any change in ownership at a stationary source.

(h) [Reserved]

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(i) The installation, operation, cessation, or removal of a temporary clean coal technology demonstration project, provided that the project complies with:

(1) The State implementation plan for the State in which the project is located, and

(2) Other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

(j) The installation or operation of a permanent clean coal technology demonstration project that constitutes repowering, provided that the project does not result in an increase in the potential to emit of any regulated pollutant emitted by the unit. This exemption shall apply on a pollutant-by-pollutant basis.

(k) The reactivation of a very clean coal-fired electric utility steam generating unit.

(iv) This definition shall not apply with respect to a particular regulated NSR pollutant when the major stationary source is complying with the requirements under paragraph (aa) of this section for a PAL for that pollutant. Instead, the definition at paragraph (aa)(2)(viii) of this section shall apply.

<Text of subsection (b)(2)(v) stayed effective March 30, 2011.>

(v) Fugitive emissions shall not be included in determining for any of the purposes of this section whether a physical change in or change in the method of operation of a major stationary source is a major modification, unless the source belongs to one of the source categories listed in paragraph (b)(1)(iii) of this section.

(3)(i) Net emissions increase means, with respect to any regulated NSR pollutant emitted by a major stationary source, the amount by which the sum of the following exceeds zero:

(a) The increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated pursuant to paragraph (a)(2)(iv) of this section; and

(b) Any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable. Baseline actual emissions for calculating increases and decreases under this paragraph (b)(3)(i)(b) shall be determined as provided in paragraph (b)(48) of this section, except that paragraphs (b)(48)(i)(c) and (b)(48)(ii)(d) of this section shall not apply.

(ii) An increase or decrease in actual emissions is contemporaneous with the increase from the particular change only if it occurs between:

(a) The date five years before construction on the particular change commences; and

(b) The date that the increase from the particular change occurs.

(iii) An increase or decrease in actual emissions is creditable only if:

(a) The Administrator or other reviewing authority has not relied on it in issuing a permit for the source under this section, which permit is in effect when the increase in actual emissions from the particular change occurs; and

(b) The increase or decrease in emissions did not occur at a Clean Unit except as provided in paragraphs (x)(8) and (y)(10) of this section.

<Text of subsection (b)(3)(iii)(c) stayed effective March 30, 2011.>

(c) As it pertains to an increase or decrease in fugitive emissions (to the extent quantifiable), it occurs at an emissions unit that is part of one of the source categories listed in paragraph (b)(1)(iii) of this section or it occurs at an emission unit that is located at a major stationary source that belongs to one of the listed source categories.

(iv) An increase or decrease in actual emissions of sulfur dioxide, particulate matter, or nitrogen oxides that occurs before the applicable minor source baseline date is creditable only if it is required to be considered in calculating the amount of maximum allowable increases remaining available.

(v) An increase in actual emissions is creditable only to the extent that the new level of actual emissions exceeds the old level.

(vi) A decrease in actual emissions is creditable only to the extent that:

(a) The old level of actual emissions or the old level of allowable emissions, whichever is lower, exceeds the new level of actual emissions;

(b) It is enforceable as a practical matter at and after the time that actual construction on the particular change begins.

(c) It has approximately the same qualitative significance for public health and welfare as that attributed to the increase from the particular change; and

(d) [Reserved]

(vii) [Reserved]

(viii) An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred becomes operational and begins to emit a particular pollutant. Any replacement unit that requires shakedown becomes operational only after a reasonable shakedown period, not to exceed 180 days.

(ix) Paragraph (b)(21)(ii) of this section shall not apply for determining creditable increases and decreases.

(4) Potential to emit means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable. Secondary emissions do not count in determining the potential to emit of a stationary source.

(5) Stationary source means any building, structure, facility, or installation which emits or may emit a regulated NSR pollutant.

(6) Building, structure, facility, or installation means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any vessel. Pollutant-emitting activities shall be considered as part of the same industrial grouping if they belong to the same "Major Group" (i.e., which have the same first two digit code) as described in the Standard Industrial Classification Manual, 1972, as amended by the 1977 Supplement (U.S. Government Printing Office stock numbers 4101–0066 and 003–005–00176–0, respectively).

(7) Emissions unit means any part of a stationary source that emits or would have the potential to emit any regulated NSR pollutant and includes an electric utility steam generating unit as defined in paragraph (b)(31) of this section. For purposes of this section, there are two types of emissions units as described in paragraphs (b)(7)(i) and (ii) of this section.

(i) A new emissions unit is any emissions unit that is (or will be) newly constructed and that has existed for less than 2 years from the date such emissions unit first operated.

(ii) An existing emissions unit is any emissions unit that does not meet the requirements in paragraph (b)(7)(i) of this section. A replacement unit, as defined in paragraph (b)(33) of this section, is an existing emissions unit.

(8) Construction means any physical change or change in the method of operation (including fabrication, erection, installation, demolition, or modification of an emissions unit) that would result in a change in emissions.

(9) Commence as applied to construction of a major stationary source or major modification means that the owner or operator has all necessary preconstruction approvals or permits and either has:

(i) Begun, or caused to begin, a continuous program of actual on-site construction of the source, to be completed within a reasonable time; or

(ii) Entered into binding agreements or contractual obligations, which cannot be cancelled or modified without substantial loss to the owner or operator, to undertake a program of actual construction of the source to be completed within a reasonable time.

(10) Necessary preconstruction approvals or permits means those permits or approvals required under federal air quality control laws and regulations and those air quality control laws and regulations which are part of the applicable State Implementation Plan.

(11) Begin actual construction means, in general, initiation of physical on-site construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying underground pipework and construction of permanent storage structures. With respect to a change in method of operations, this term refers to those on-site activities other than preparatory activities which mark the initiation of the change.

(12) Best available control technology means an emissions limitation (including a visible emission standard) based on the maximum degree of reduction for each pollutant subject to regulation under Act which would be emitted from any proposed major stationary source or major modification which the Administrator, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant. In no event shall application of best available control technology result in emissions of any pollutant which would exceed the emissions allowed by any applicable standard under 40 CFR Parts 60 and 61. If the Administrator determines that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emissions standard infeasible, a design, equipment, work practice, operational standard, or combination thereof, may be prescribed instead to satisfy the requirement for the application of best available control technology. Such standard shall, to the degree possible, set forth the emissions reduction achievable by implementation of such design, equipment, work practice or operation, and shall provide for compliance by means which achieve equivalent results.

(13)(i) Baseline concentration means that ambient concentration level that exists in the baseline area at the time of the applicable minor source baseline date. A baseline concentration is determined for each pollutant for which a minor source baseline date is established and shall include:

(a) The actual emissions, as defined in paragraph (b)(21) of this section, representative of sources in existence on the applicable minor source baseline date, except as provided in paragraph (b)(13)(ii) of this section; and

(b) The allowable emissions of major stationary sources that commenced construction before the major source baseline date, but were not in operation by the applicable minor source baseline date.

(ii) The following will not be included in the baseline concentration and will affect the applicable maximum allowable increase(s):

(a) Actual emissions, as defined in paragraph (b)(21) of this section, from any major stationary source on which construction commenced after the major source baseline date; and

(b) Actual emissions increases and decreases, as defined in paragraph (b)(21) of this section, at any stationary source occurring after the minor source baseline date.

(14)(i) Major source baseline date means:

(a) In the case of $PM_{10}$ and sulfur dioxide, January 6, 1975;

(b) In the case of nitrogen dioxide, February 8, 1988; and

(c) In the case of $PM_{2.5}$, October 20, 2010.

(ii) “Minor source baseline date” means the earliest date after the trigger date on which a major stationary source or a major modification subject to 40 CFR 52.21 or to regulations approved pursuant to 40 CFR 51.166 submits a complete application under the relevant regulations. The trigger date is:

(a) In the case of $PM_{10}$ and sulfur dioxide, August 7, 1977;

(b) In the case of nitrogen dioxide, February 8, 1988; and

(c) In the case of $PM_{2.5}$, October 20, 2011.

(iii) The baseline date is established for each pollutant for which increments or other equivalent measures have been established if:

(a) The area in which the proposed source or modification would construct is designated as attainment or unclassifiable under section 107(d)(1)(A)(ii) or (iii) of the Act for the pollutant on the date of its complete application under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166; and

(b) In the case of a major stationary source, the pollutant would be emitted in significant amounts, or, in the case of a major modification, there would be a significant net emissions increase of the pollutant.

(iv) Any minor source baseline date established originally for the TSP increments shall remain in effect and shall apply for purposes of determining the amount of available PM–10 increments, except that the Administrator shall rescind a minor source baseline date where it can be shown, to the satisfaction of the Administrator, that the emissions increase from the major stationary source, or net emissions increase from the major modification, responsible for triggering that date did not result in a significant amount of PM–10 emissions.

(15)(i) Baseline area means any intrastate area (and every part thereof) designated as attainment or unclassifiable under section 107(d)(1)(A)(ii) or (iii) of the Act in which the major source or major modification establishing the minor source baseline date would construct or would have an air quality impact for the pollutant for which the baseline date is established, as follows: equal to or greater than 1 $\mu g/m^3$ (annual average) for $SO_2$, $NO_2$, or $PM_{10}$; or equal or greater than 0.3 $\mu g/m^3$ (annual average) for $PM_{2.5}$ .

(ii) Area redesignations under section 107(d)(1)(A)(ii) or (iii) of the Act cannot intersect or be smaller than the area of impact of any major stationary source or major modification which:

(a) Establishes a minor source baseline date; or

(b) Is subject to 40 CFR 52.21 and would be constructed in the same state as the state proposing the redesignation.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(iii) Any baseline area established originally for the TSP increments shall remain in effect and shall apply for purposes of determining the amount of available PM–10 increments, except that such baseline area shall not remain in effect if the Administrator rescinds the corresponding minor source baseline date in accordance with paragraph (b)(14)(iv) of this section.

(16) Allowable emissions means the emissions rate of a stationary source calculated using the maximum rated capacity of the source (unless the source is subject to federally enforceable limits which restrict the operating rate, or hours of operation, or both) and the most stringent of the following:

(i) The applicable standards as set forth in 40 CFR Parts 60 and 61;

(ii) The applicable State Implementation Plan emissions limitation, including those with a future compliance date; or

(iii) The emissions rate specified as a federally enforceable permit condition, including those with a future compliance date.

(17) Federally enforceable means all limitations and conditions which are enforceable by the Administrator, including those requirements developed pursuant to 40 CFR Parts 60 and 61, requirements within any applicable State implementation plan, any permit requirements established pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR Part 51, Subpart I, including operating permits issued under an EPA-approved program that is incorporated into the State implementation plan and expressly requires adherence to any permit issued under such program.

(18) Secondary emissions means emissions which would occur as a result of the construction or operation of a major stationary source or major modification, but do not come from the major stationary source or major modification itself. Secondary emissions include emissions from any offsite support facility which would not be constructed or increase its emissions except as a result of the construction or operation of the major stationary source or major modification. Secondary emissions do not include any emissions which come directly from a mobile source, such as emissions from the tailpipe of a motor vehicle, from a train, or from a vessel.

(i) Emissions from ships or trains coming to or from the new or modified stationary source; and

(ii) Emissions from any offsite support facility which would not otherwise be constructed or increase its emissions as a result of the construction or operation of the major stationary source or major modification.

(19) Innovative control technology means any system of air pollution control that has not been adequately demonstrated in practice, but would have a substantial likelihood of achieving greater continuous emissions reduction than any control system in current practice or of achieving at least comparable reductions at lower cost in terms of energy, economics, or nonair quality environmental impacts.

(20) Fugitive emissions means those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening.

(21)(i) Actual emissions means the actual rate of emissions of a regulated NSR pollutant from an emissions unit, as determined in accordance with paragraphs (b)(21)(ii) through (iv) of this section, except that this definition shall not apply for calculating whether a significant emissions increase has occurred, or for establishing a PAL under paragraph (aa) of this section. Instead, paragraphs (b)(41) and (b)(48) of this section shall apply for those purposes.

(ii) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a consecutive 24–month period which precedes the particular date and which is representative of normal source operation. The Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

(iii) The Administrator may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit.

(iv) For any emissions unit that has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

(22) Complete means, in reference to an application for a permit, that the application contains all of the information necessary for processing the application.

(23)(i) Significant means, in reference to a net emissions increase or the potential of a source to emit any of the following pollutants, a rate of emissions that would equal or exceed any of the following rates:

Pollutant and Emissions Rate

Carbon monoxide: 100 tons per year (tpy)

Nitrogen oxides: 40 tpy

Sulfur dioxide: 40 tpy

Particulate matter: 25 tpy of particulate matter emissions

$PM_{10}$: 15 tpy

$PM_{2.5}$: 10 tpy of direct $PM_{2.5}$ emissions; 40 tpy of sulfur dioxide emissions; 40 tpy of nitrogen oxide emissions unless demonstrated not to be a $PM_{2.5}$ precursor under paragraph (b)(50) of this section

Ozone: 40 tpy of volatile organic compounds or nitrogen oxides

Lead: 0.6 tpy

Fluorides: 3 tpy

Sulfuric acid mist: 7 tpy

Hydrogen sulfide ($H_2S$): 10 tpy

Total reduced sulfur (including $H_2S$): 10 tpy

Reduced sulfur compounds (including $H_2S$): 10 tpy

Municipal waste combustor organics (measured as total tetra-through octa-chlorinated dibenzo-p-dioxins and dibenzofurans): 3.2 x $10^{-6}$ megagrams per year (3.5 x $10^{-6}$ tons per year)

Municipal waste combustor metals (measured as particulate matter): 14 megagrams per year (15 tons per year)

Municipal waste combustor acid gases (measured as sulfur dioxide and hydrogen chloride): 36 megagrams per year (40 tons per year)

Municipal solid waste landfills emissions (measured as nonmethane organic compounds): 45 megagrams per year (50 tons per year)

(ii) Significant means, in reference to a net emissions increase or the potential of a source to emit a regulated NSR pollutant that paragraph (b)(23)(i) of this section, does not list, any emissions rate.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(iii) Notwithstanding paragraph (b)(23)(i) of this section, significant means any emissions rate or any net emissions increase associated with a major stationary source or major modification, which would construct within 10 kilometers of a Class I area, and have an impact on such area equal to or greater than 1 $\mu g/m^3$, (24–hour average).

(24) Federal Land Manager means, with respect to any lands in the United States, the Secretary of the department with authority over such lands.

(25) High terrain means any area having an elevation 900 feet or more above the base of the stack of a source.

(26) Low terrain means any area other than high terrain.

(27) Indian Reservation means any federally recognized reservation established by Treaty, Agreement, Executive Order, or Act of Congress.

(28) Indian Governing Body means the governing body of any tribe, band, or group of Indians subject to the jurisdiction of the United States and recognized by the United States as possessing power of self government.

(29) Adverse impact on visibility means visibility impairment which interferes with the management, protection, preservation or enjoyment of the visitor's visual experience of the Federal Class I area. This determination must be made on a case-by-case basis taking into account the geographic extent, intensity, duration, frequency and time of visibility impairment, and how these factors correlate with (1) times of visitor use of the Federal Class I area, and (2) the frequency and timing of natural conditions that reduce visibility.

(30) Volatile organic compounds (VOC) is as defined in § 51.100(s) of this chapter.

(31) Electric utility steam generating unit means any steam electric generating unit that is constructed for the purpose of supplying more than one-third of its potential electric output capacity and more than 25 MW electrical output to any utility power distribution system for sale. Any steam supplied to a steam distribution system for the purpose of providing steam to a steam-electric generator that would produce electrical energy for sale is also considered in determining the electrical energy output capacity of the affected facility.

(32) [Reserved]

(33) Replacement unit means an emissions unit for which all the criteria listed in paragraphs (b)(33)(i) through (iv) of this section are met. No creditable emission reductions shall be generated from shutting down the existing emissions unit that is replaced.

(i) The emissions unit is a reconstructed unit within the meaning of § 60.15(b)(1) of this chapter, or the emissions unit completely takes the place of an existing emissions unit.

(ii) The emissions unit is identical to or functionally equivalent to the replaced emissions unit.

(iii) The replacement does not alter the basic design parameters (as discussed in paragraph (cc)(2) of this section) of the process unit.

(iv) The replaced emissions unit is permanently removed from the major stationary source, otherwise permanently disabled, or permanently barred from operation by a permit that is enforceable as a practical matter. If the replaced emissions unit is brought back into operation, it shall constitute a new emissions unit.

(34) Clean coal technology means any technology, including technologies applied at the precombustion, combustion, or post combustion stage, at a new or existing facility which will achieve significant reductions in air emissions of sulfur

dioxide or oxides of nitrogen associated with the utilization of coal in the generation of electricity, or process steam which was not in widespread use as of November 15, 1990.

(35) Clean coal technology demonstration project means a project using funds appropriated under the heading "Department of Energy–Clean Coal Technology", up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the Environmental Protection Agency. The Federal contribution for a qualifying project shall be at least 20 percent of the total cost of the demonstration project.

(36) Temporary clean coal technology demonstration project means a clean coal technology demonstration project that is operated for a period of 5 years or less, and which complies with the State implementation plans for the State in which the project is located and other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

(37)(i) Repowering means replacement of an existing coal-fired boiler with one of the following clean coal technologies: atmospheric or pressurized fluidized bed combustion, integrated gasification combined cycle, magnetohydrodynamics, direct and indirect coal-fired turbines, integrated gasification fuel cells, or as determined by the Administrator, in consultation with the Secretary of Energy, a derivative of one or more of these technologies, and any other technology capable of controlling multiple combustion emissions simultaneously with improved boiler or generation efficiency and with significantly greater waste reduction relative to the performance of technology in widespread commercial use as of November 15, 1990.

(ii) Repowering shall also include any oil and/or gas-fired unit which has been awarded clean coal technology demonstration funding as of January 1, 1991, by the Department of Energy.

(iii) The Administrator shall give expedited consideration to permit applications for any source that satisfies the requirements of this subsection and is granted an extension under section 409 of the Clean Air Act.

(38) Reactivation of a very clean coal-fired electric utility steam generating unit means any physical change or change in the method of operation associated with the commencement of commercial operations by a coal-fired utility unit after a period of discontinued operation where the unit:

(i) Has not been in operation for the two-year period prior to the enactment of the Clean Air Act Amendments of 1990, and the emissions from such unit continue to be carried in the permitting authority's emissions inventory at the time of enactment;

(ii) Was equipped prior to shut-down with a continuous system of emissions control that achieves a removal efficiency for sulfur dioxide of no less than 85 percent and a removal efficiency for particulates of no less than 98 percent;

(iii) Is equipped with low-$NO_x$ burners prior to the time of commencement of operations following reactivation; and

(iv) Is otherwise in compliance with the requirements of the Clean Air Act.

(39) Pollution prevention means any activity that through process changes, product reformulation or redesign, or substitution of less polluting raw materials, eliminates or reduces the release of air pollutants (including fugitive emissions) and other pollutants to the environment prior to recycling, treatment, or disposal; it does not mean recycling (other than certain "in-process recycling" practices), energy recovery, treatment, or disposal.

(40) Significant emissions increase means, for a regulated NSR pollutant, an increase in emissions that is significant (as defined in paragraph (b)(23) of this section) for that pollutant.

(41)(i) Projected actual emissions means the maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit a regulated NSR pollutant in any one of the 5 years (12–month period) following the date the unit resumes regular operation after the project, or in any one of the 10 years following that date, if the project involves increasing the

 © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

emissions unit's design capacity or its potential to emit that regulated NSR pollutant and full utilization of the unit would result in a significant emissions increase or a significant net emissions increase at the major stationary source.

(ii) In determining the projected actual emissions under paragraph (b)(41)(i) of this section (before beginning actual construction), the owner or operator of the major stationary source:

(a) Shall consider all relevant information, including but not limited to, historical operational data, the company's own representations, the company's expected business activity and the company's highest projections of business activity, the company's filings with the State or Federal regulatory authorities, and compliance plans under the approved State Implementation Plan; and

(b) Shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions; and

(c) Shall exclude, in calculating any increase in emissions that results from he particular project, that portion of the unit's emissions following the project that an existing unit could have accommodated during the consecutive 24–month period used to establish the baseline actual emissions under paragraph (b)(48) of this section and that are also unrelated to the particular project, including any increased utilization due to product demand growth; or

(d) In lieu of using the method set out in paragraphs (a)(41)(ii)(a) through (c) of this section, may elect to use the emissions unit's potential to emit, in tons per year, as defined under paragraph (b)(4) of this section.

(42) [Reserved]

(43) Prevention of Significant Deterioration (PSD) program means the EPA-implemented major source preconstruction permit programs under this section or a major source preconstruction permit program that has been approved by the Administrator and incorporated into the State Implementation Plan pursuant to § 51.166 of this chapter to implement the requirements of that section. Any permit issued under such a program is a major NSR permit.

(44) Continuous emissions monitoring system (CEMS) means all of the equipment that may be required to meet the data acquisition and availability requirements of this section, to sample, condition (if applicable), analyze, and provide a record of emissions on a continuous basis.

(45) Predictive emissions monitoring system (PEMS) means all of the equipment necessary to monitor process and control device operational parameters (for example, control device secondary voltages and electric currents) and other information (for example, gas flow rate, $O_2$ or $CO_2$ concentrations), and calculate and record the mass emissions rate (for example, lb/hr) on a continuous basis.

(46) Continuous parameter monitoring system (CPMS) means all of the equipment necessary to meet the data acquisition and availability requirements of this section, to monitor process and control device operational parameters (for example, control device secondary voltages and electric currents) and other information (for example, gas flow rate, $O_2$ or $CO_2$ concentrations), and to record average operational parameter value(s) on a continuous basis.

(47) Continuous emissions rate monitoring system (CERMS) means the total equipment required for the determination and recording of the pollutant mass emissions rate (in terms of mass per unit of time).

(48) Baseline actual emissions means the rate of emissions, in tons per year, of a regulated NSR pollutant, as determined in accordance with paragraphs (b)(48)(i) through (iv) of this section.

(i) For any existing electric utility steam generating unit, baseline actual emissions means the average rate, in tons per year, at which the unit actually emitted the pollutant during any consecutive 24–month period selected by the owner or operator within the 5–year period immediately preceding when the owner or operator begins actual construction of the

project. The Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation.

(a) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(b) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above any emission limitation that was legally enforceable during the consecutive 24–month period.

(c) For a regulated NSR pollutant, when a project involves multiple emissions units, only one consecutive 24–month period must be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24–month period can be used For each regulated NSR pollutant.

(d) The average rate shall not be based on any consecutive 24–month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraph (b)(48)(i)(b) of this section.

(ii) For an existing emissions unit (other than an electric utility steam generating unit), baseline actual emissions means the average rate, in tons per year, at which the emissions unit actually emitted the pollutant during any consecutive 24–month period selected by the owner or operator within the 10–year period immediately preceding either the date the owner or operator begins actual construction of the project, or the date a complete permit application is received by the Administrator for a permit required under this section or by the reviewing authority for a permit required by a plan, whichever is earlier, except that the 10–year period shall not include any period earlier than November 15, 1990.

(a) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(b) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above an emission limitation that was legally enforceable during the consecutive 24–month period.

(c) The average rate shall be adjusted downward to exclude any emissions that would have exceeded an emission limitation with which the major stationary source must currently comply, had such major stationary source been required to comply with such limitations during the consecutive 24–month period. However, if an emission limitation is part of a maximum achievable control technology standard that the Administrator proposed or promulgated under part 63 of this chapter, the baseline actual emissions need only be adjusted if the State has taken credit for such emissions reductions in an attainment demonstration or maintenance plan consistent with the requirements of § 51.165(a)(3)(ii)(G) of this chapter.

(d) For a regulated NSR pollutant, when a project involves multiple emissions units, only one consecutive 24–month period must be used to determine the baseline actual emissions for all the emissions units being changed. A different consecutive 24–month period can be used For each regulated NSR pollutant.

(e) The average rate shall not be based on any consecutive 24–month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraphs (b)(48)(ii)(b) and (c) of this section.

(iii) For a new emissions unit, the baseline actual emissions for purposes of determining the emissions increase that will result from the initial construction and operation of such unit shall equal zero; and thereafter, for all other purposes, shall equal the unit's potential to emit.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(iv) For a PAL for a stationary source, the baseline actual emissions shall be calculated for existing electric utility steam generating units in accordance with the procedures contained in paragraph (b)(48)(i) of this section, for other existing emissions units in accordance with the procedures contained in paragraph (b)(48)(ii) of this section, and for a new emissions unit in accordance with the procedures contained in paragraph (b)(48)(iii) of this section.

(49) Subject to regulation means, for any air pollutant, that the pollutant is subject to either a provision in the Clean Air Act, or a nationally-applicable regulation codified by the Administrator in subchapter C of this chapter, that requires actual control of the quantity of emissions of that pollutant, and that such a control requirement has taken effect and is operative to control, limit or restrict the quantity of emissions of that pollutant released from the regulated activity. Except that:

(i) Greenhouse gases (GHGs), the air pollutant defined in § 86.1818–12(a) of this chapter as the aggregate group of six greenhouse gases: Carbon dioxide, nitrous oxide, methane, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride, shall not be subject to regulation except as provided in paragraphs (b)(49)(iv) through (v) of this section.

(ii) For purposes of paragraphs (b)(49)(iii) through (v) of this section, the term tpy $CO_2$ equivalent emissions ($CO_2e$) shall represent an amount of GHGs emitted, and shall be computed as follows:

(a) Multiplying the mass amount of emissions (tpy), for each of the six greenhouse gases in the pollutant GHGs, by the gas's associated global warming potential published at Table A–1 to subpart A of part 98 of this chapter--Global Warming Potentials. For purposes of this paragraph, prior to July 21, 2014, the mass of the greenhouse gas carbon dioxide shall not include carbon dioxide emissions resulting from the combustion or decomposition of non-fossilized and biodegradable organic material originating from plants, animals, or micro-organisms (including products, by-products, residues and waste from agriculture, forestry and related industries as well as the non-fossilized and biodegradable organic fractions of industrial and municipal wastes, including gases and liquids recovered from the decomposition of non-fossilized and biodegradable organic material).

(b) Sum the resultant value from paragraph (b)(49)(ii)(a) of this section for each gas to compute a tpy $CO_2e$.

(iii) The term emissions increase as used in paragraphs (b)(49)(iv) through (v) of this section shall mean that both a significant emissions increase (as calculated using the procedures in paragraph (a)(2)(iv) of this section) and a significant net emissions increase (as defined in paragraphs (b)(3) and (b)(23) of this section) occur. For the pollutant GHGs, an emissions increase shall be based on tpy $CO_2e$, and shall be calculated assuming the pollutant GHGs is a regulated NSR pollutant, and “significant” is defined as 75,000 tpy $CO_2e$ instead of applying the value in paragraph (b)(23)(ii) of this section.

(iv) Beginning January 2, 2011, the pollutant GHGs is subject to regulation if:

(a) The stationary source is a new major stationary source for a regulated NSR pollutant that is not GHGs, and also will emit or will have the potential to emit 75,000 tpy $CO_2e$ or more; or

(b) The stationary source is an existing major stationary source for a regulated NSR pollutant that is not GHGs, and also will have an emissions increase of a regulated NSR pollutant, and an emissions increase of 75,000 tpy $CO_2e$ or more; and,

(v) Beginning July 1, 2011, in addition to the provisions in paragraph (b)(49)(iv) of this section, the pollutant GHGs shall also be subject to regulation

(a) At a new stationary source that will emit or have the potential to emit 100,000 tpy $CO_2e$; or

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(b) At an existing stationary source that emits or has the potential to emit 100,000 tpy $CO_2e$, when such stationary source undertakes a physical change or change in the method of operation that will result in an emissions increase of 75,000 tpy $CO_2e$ or more.

(50) Regulated NSR pollutant, for purposes of this section, means the following:

(i) Any pollutant for which a national ambient air quality standard has been promulgated and any pollutant identified under this paragraph (b)(50)(i) as a constituent or precursor for such pollutant. Precursors identified by the Administrator for purposes of NSR are the following:

(a) Volatile organic compounds and nitrogen oxides are precursors to ozone in all attainment and unclassifiable areas.

(b) Sulfur dioxide is a precursor to $PM_{2.5}$ in all attainment and unclassifiable areas.

(c) Nitrogen oxides are presumed to be precursors to $PM_{2.5}$ in all attainment and unclassifiable areas, unless the State demonstrates to the Administrator's satisfaction or EPA demonstrates that emissions of nitrogen oxides from sources in a specific area are not a significant contributor to that area's ambient $PM_{2.5}$ concentrations.

(d) Volatile organic compounds are presumed not to be precursors to $PM_{2.5}$ in any attainment or unclassifiable area, unless the State demonstrates to the Administrator's satisfaction or EPA demonstrates that emissions of volatile organic compounds from sources in a specific area are a significant contributor to that area's ambient $PM_{2.5}$ concentrations.

(ii) Any pollutant that is subject to any standard promulgated under section 111 of the Act;

(iii) Any Class I or II substance subject to a standard promulgated under or established by title VI of the Act;

(iv) Any pollutant that otherwise is subject to regulation under the Act as defined in paragraph (b)(49) of this section.

(v) Notwithstanding paragraphs (b)(50)(i) through (iv) of this section, the term regulated NSR pollutant shall not include any or all hazardous air pollutants either listed in section 112 of the Act, or added to the list pursuant to section 112(b)(2) of the Act, and which have not been delisted pursuant to section 112(b)(3) of the Act, unless the listed hazardous air pollutant is also regulated as a constituent or precursor of a general pollutant listed under section 108 of the Act.

(vi) Particulate matter (PM) emissions, $PM_{2.5}$ emissions and $PM_{10}$ emissions shall include gaseous emissions from a source or activity which condense to form particulate matter at ambient temperatures. On or after January 1, 2011 (or any earlier date established in the upcoming rulemaking codifying test methods), such condensable particulate matter shall be accounted for in applicability determinations and in establishing emissions limitations for PM, $PM_{2.5}$ and $PM_{10}$ in PSD permits. Compliance with emissions limitations for PM, $PM_{2.5}$ and $PM_{10}$ issued prior to this date shall not be based on condensable particular matter unless required by the terms and conditions of the permit or the applicable implementation plan. Applicability determinations made prior to this date without accounting for condensable particular matter shall not be considered in violation of this section unless the applicable implementation plan required condensable particular matter to be included.

(51) Reviewing authority means the State air pollution control agency, local agency, other State agency, Indian tribe, or other agency authorized by the Administrator to carry out a permit program under § 51.165 and § 51.166 of this chapter, or the Administrator in the case of EPA–implemented permit programs under this section.

(52) Project means a physical change in, or change in the method of operation of, an existing major stationary source.

(53) Lowest achievable emission rate (LAER) is as defined in § 51.165(a)(1)(xiii) of this chapter.

(54) Reasonably available control technology (RACT) is as defined in § 51.100(o) of this chapter.

(55)(i) In general, process unit means any collection of structures and/or equipment that processes, assembles, applies, blends, or otherwise uses material inputs to produce or store an intermediate or a completed product. A single stationary source may contain more than one process unit, and a process unit may contain more than one emissions unit.

(ii) Pollution control equipment is not part of the process unit, unless it serves a dual function as both process and control equipment. Administrative and warehousing facilities are not part of the process unit.

(iii) For replacement cost purposes, components shared between two or more process units are proportionately allocated based on capacity.

(iv) The following list identifies the process units at specific categories of stationary sources.

(a) For a steam electric generating facility, the process unit consists of those portions of the plant that contribute directly to the production of electricity. For example, at a pulverized coal-fired facility, the process unit would generally be the combination of those systems from the coal receiving equipment through the emission stack (excluding post-combustion pollution controls), including the coal handling equipment, pulverizers or coal crushers, feedwater heaters, ash handling, boiler, burners, turbine-generator set, condenser, cooling tower, water treatment system, air preheaters, and operating control systems. Each separate generating unit is a separate process unit.

(b) For a petroleum refinery, there are several categories of process units: those that separate and/or distill petroleum feedstocks; those that change molecular structures; petroleum treating processes; auxiliary facilities, such as steam generators and hydrogen production units; and those that load, unload, blend or store intermediate or completed products.

(c) For an incinerator, the process unit would consist of components from the feed pit or refuse pit to the stack, including conveyors, combustion devices, heat exchangers and steam generators, quench tanks, and fans.

Note to paragraph (b)(55): By a court order on December 24, 2003, this paragraph (b)(55) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(56) Functionally equivalent component means a component that serves the same purpose as the replaced component.
Note to paragraph (b)(56): By a court order on December 24, 2003, this paragraph (b)(56) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(57) Fixed capital cost means the capital needed to provide all the depreciable components. “Depreciable components” refers to all components of fixed capital cost and is calculated by subtracting land and working capital from the total capital investment, as defined in paragraph (b)(58) of this section.

Note to paragraph (b)(57): By a court order on December 24, 2003, this paragraph (b)(57) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(58) Total capital investment means the sum of the following: all costs required to purchase needed process equipment (purchased equipment costs); the costs of labor and materials for installing that equipment (direct installation costs); the costs of site preparation and buildings; other costs such as engineering, construction and field expenses, fees to contractors, startup and performance tests, and contingencies (indirect installation costs); land for the process equipment; and working capital for the process equipment.

Note to paragraph (b)(58): By a court order on December 24, 2003, this paragraph (b)(58) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(c) Ambient air increments. In areas designated as Class I, II or III, increases in pollutant concentration over the baseline concentration shall be limited to the following:

| **Pollutant** | **Maximum allowable increase (micrograms per cubic meter)** |
|---|---|
| Class I Area | |
| $PM_{2.5}$: | |
| Annual arithmetic mean | 1 |
| 24-hr maximum | 2 |
| $PM_{10}$: | |
| Annual arithmetic mean | 4 |
| 24-hr maximum | 8 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 2 |
| 24-hr maximum | 5 |
| 3-hr maximum | 25 |
| Nitrogen dioxide: | |
| Annual arithmetic mean | 2.5 |
| Class II Area | |
| $PM_{2.5}$: | |
| Annual arithmetic mean | 4 |
| 24-hr maximum | 9 |
| $PM_{10}$: | |
| Annual arithmetic mean | 17 |
| 24-hr maximum | 30 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 20 |
| 24-hr maximum | 91 |
| 3-hr maximum | 512 |
| Nitrogen dioxide: | |
| Annual arithmetic mean | 25 |
| Class III Area | |
| $PM_{2.5}$: | |
| Annual arithmetic mean | 8 |
| 24-hr maximum | 18 |
| $PM_{10}$: | |
| Annual arithmetic mean | 34 |
| 24-hr maximum | 60 |
| Sulfur dioxide: | |
| Annual arithmetic mean | 40 |
| 24-hr maximum | 182 |
| 3-hr maximum | 700 |
| Nitrogen dioxide: | |

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

| | |
|---|---|
| Annual arithmetic mean....................................................... | 50 |

For any period other than an annual period, the applicable maximum allowable increase may be exceeded during one such period per year at any one location.

(d) Ambient air ceilings. No concentration of a pollutant shall exceed:

(1) The concentration permitted under the national secondary ambient air quality standard, or

(2) The concentration permitted under the national primary ambient air quality standard, whichever concentration is lowest for the pollutant for a period of exposure.

(e) Restrictions on area classifications.

(1) All of the following areas which were in existence on August 7, 1977, shall be Class I areas and may not be redesignated:

(i) International parks,

(ii) National wilderness areas which exceed 5,000 acres in size,

(iii) National memorial parks which exceed 5,000 acres in size, and

(iv) National parks which exceed 6,000 acres in size.

(2) Areas which were redesignated as Class I under regulations promulgated before August 7, 1977, shall remain Class I, but may be redesignated as provided in this section.

(3) Any other area, unless otherwise specified in the legislation creating such an area, is initially designated Class II, but may be redesignated as provided in this section.

(4) The following areas may be redesignated only as Class I or II:

(i) An area which as of August 7, 1977, exceeded 10,000 acres in size and was a national monument, a national primitive area, a national preserve, a national recreational area, a national wild and scenic river, a national wildlife refuge, a national lakeshore or seashore; and

(ii) A national park or national wilderness area established after August 7, 1977, which exceeds 10,000 acres in size.

(f) [Reserved]

(g) Redesignation.

(1) All areas (except as otherwise provided under paragraph (e) of this section) are designated Class II as of December 5, 1974. Redesignation (except as otherwise precluded by paragraph (e) of this section) may be proposed by the respective States or Indian Governing Bodies, as provided below, subject to approval by the Administrator as a revision to the applicable State implementation plan.

(2) The State may submit to the Administrator a proposal to redesignate areas of the State Class I or Class II provided that:

(i) At least one public hearing has been held in accordance with procedures established in § 51.102 of this chapter;

(ii) Other States, Indian Governing Bodies, and Federal Land Managers whose lands may be affected by the proposed redesignation were notified at least 30 days prior to the public hearing;

(iii) A discussion of the reasons for the proposed redesignation, including a satisfactory description and analysis of the health, environmental, economic, social and energy effects of the proposed redesignation, was prepared and made available

for public inspection at least 30 days prior to the hearing and the notice announcing the hearing contained appropriate notification of the availability of such discussion;

(iv) Prior to the issuance of notice respecting the redesignation of an area that includes any Federal lands, the State has provided written notice to the appropriate Federal Land Manager and afforded adequate opportunity (not in excess of 60 days) to confer with the State respecting the redesignation and to submit written comments and recommendations. In redesignating any area with respect to which any Federal Land Manager had submitted written comments and recommendations, the State shall have published a list of any inconsistency between such redesignation and such comments and recommendations (together with the reasons for making such redesignation against the recommendation of the Federal Land Manager); and

(v) The State has proposed the redesignation after consultation with the elected leadership of local and other substate general purpose governments in the area covered by the proposed redesignation.

(3) Any area other than an area to which paragraph (e) of this section refers may be redesignated as Class III if--

(i) The redesignation would meet the requirements of paragraph (g)(2) of this section;

(ii) The redesignation, except any established by an Indian Governing Body, has been specifically approved by the Governor of the State, after consultation with the appropriate committees of the legislature, if it is in session, or with the leadership of the legislature, if it is not in session (unless State law provides that the redesignation must be specifically approved by State legislation) and if general purpose units of local government representing a majority of the residents of the area to be redesignated enact legislation or pass resolutions concurring in the redesignation:

(iii) The redesignation would not cause, or contribute to, a concentration of any air pollutant which would exceed any maximum allowable increase permitted under the classification of any other area or any national ambient air quality standard; and

(iv) Any permit application for any major stationary source or major modification, subject to review under paragraph (l) of this section, which could receive a permit under this section only if the area in question were redesignated as Class III, and any material submitted as part of that application, were available insofar as was practicable for public inspection prior to any public hearing on redesignation of the area as Class III.

(4) Lands within the exterior boundaries of Indian Reservations may be redesignated only by the appropriate Indian Governing Body. The appropriate Indian Governing Body may submit to the Administrator a proposal to redesignate areas Class I, Class II, or Class III: *Provided*, That:

(i) The Indian Governing Body has followed procedures equivalent to those required of a State under paragraphs (g)(2), (g)(3)(iii), and (g)(3)(iv) of this section; and

(ii) Such redesignation is proposed after consultation with the State(s) in which the Indian Reservation is located and which border the Indian Reservation.

(5) The Administrator shall disapprove, within 90 days of submission, a proposed redesignation of any area only if he finds, after notice and opportunity for public hearing, that such redesignation does not meet the procedural requirements of this paragraph or is inconsistent with paragraph (e) of this section. If any such disapproval occurs, the classification of the area shall be that which was in effect prior to the redesignation which was disapproved.

(6) If the Administrator disapproves any proposed redesignation, the State or Indian Governing Body, as appropriate, may resubmit the proposal after correcting the deficiencies noted by the Administrator.

(h) Stack heights.

(1) The degree of emission limitation required for control of any air pollutant under this section shall not be affected in any manner by--

(i) So much of the stack height of any source as exceeds good engineering practice, or

(ii) Any other dispersion technique.

(2) Paragraph (h)(1) of this section shall not apply with respect to stack heights in existence before December 31, 1970, or to dispersion techniques implemented before then.

(i) Exemptions.

(1) The requirements of paragraphs (j) through (r) of this section shall not apply to a particular major stationary source or major modification, if;

(i) Construction commenced on the source or modification before August 7, 1977. The regulations at 40 CFR 52.21 as in effect before August 7, 1977, shall govern the review and permitting of any such source or modification; or

(ii) The source or modification was subject to the review requirements of 40 CFR 52.21(d)(i) as in effect before March 1, 1978, and the owner or operator:

(a) Obtained under 40 CFR 52.21 a final approval effective before March 1, 1978;

(b) Commenced construction before March 19, 1979; and

(c) Did not discontinue construction for a period of 18 months or more and completed construction within a reasonable time; or

(iii) The source or modification was subject to 40 CFR 52.21 as in effect before March 1, 1978, and the review of an application for approval for the stationary source or modification under 40 CFR 52.21 would have been completed by March 1, 1978, but for an extension of the public comment period pursuant to a request for such an extension. In such a case, the application shall continue to be processed, and granted or denied, under 40 CFR 52.21 as in effect prior to March 1, 1978; or

(iv) The source or modification was not subject to 40 CFR 52.21 as in effect before March 1, 1978, and the owner or operator:

(a) Obtained all final federal, state and local preconstruction approvals or permits necessary under the applicable State Implementation Plan before March 1, 1978;

(b) Commenced construction before March 19, 1979; and

(c) Did not discontinue construction for a period of 18 months or more and completed construction within a reasonable time; or

(v) The source or modification was not subject to 40 CFR 52.21 as in effect on June 19, 1978 or under the partial stay of regulations published on February 5, 1980 (45 FR 7800), and the owner or operator:

(a) Obtained all final federal, state and local preconstruction approvals or permits necessary under the applicable State Implementation Plan before August 7, 1980;

(b) Commenced construction within 18 months from August 7, 1980, or any earlier time required under the applicable State Implementation Plan; and

(c) Did not discontinue construction for a period of 18 months or more and completed construction within a reasonable time; or

(vi) The source or modification would be a nonprofit health or nonprofit educational institution, or a major modification would occur at such an institution, and the governor of the state in which the source or modification would be located requests that it be exempt from those requirements; or

(vii) The source or modification would be a major stationary source or major modification only if fugitive emissions, to the extent quantifiable, are considered in calculating the potential to emit of the stationary source or modification and the source does not belong to any of the following categories:

(a) Coal cleaning plants (with thermal dryers);

(b) Kraft pulp mills;

(c) Portland cement plants;

(d) Primary zinc smelters;

(e) Iron and steel mills;

(f) Primary aluminum ore reduction plants;

(g) Primary copper smelters;

(h) Municipal incinerators capable of charging more than 250 tons of refuse per day;

(i) Hydrofluoric, sulfuric, or nitric acid plants;

(j) Petroleum refineries;

(k) Lime plants;

(l) Phosphate rock processing plants;

(m) Coke oven batteries;

(n) Sulfur recovery plants;

(o) Carbon black plants (furnace process);

(p) Primary lead smelters;

(q) Fuel conversion plants;

(r) Sintering plants;

(s) Secondary metal production plants;

(t) Chemical process plants--The term chemical processing plant shall not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140;

(u) Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

(v) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

(w) Taconite ore processing plants;

(x) Glass fiber processing plants;

(y) Charcoal production plants;

(z) Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input;

(aa) Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act; or

(viii) The source is a portable stationary source which has previously received a permit under this section, and

(a) The owner or operator proposes to relocate the source and emissions of the source at the new location would be temporary; and

(b) The emissions from the source would not exceed its allowable emissions; and

(c) The emissions from the source would impact no Class I area and no area where an applicable increment is known to be violated; and

(d) Reasonable notice is given to the Administrator prior to the relocation identifying the proposed new location and the probable duration of operation at the new location. Such notice shall be given to the Administrator not less than 10 days in advance of the proposed relocation unless a different time duration is previously approved by the Administrator.

(ix) The source or modification was not subject to § 52.21, with respect to particulate matter, as in effect before July 31, 1987, and the owner or operator:

(a) Obtained all final Federal, State, and local preconstruction approvals or permits necessary under the applicable State implementation plan before July 31, 1987;

(b) Commenced construction within 18 months after July 31, 1987, or any earlier time required under the State implementation plan: and

(c) Did not discontinue construction for a period of 18 months or more and completed construction within a reasonable period of time.

(x) The source or modification was subject to 40 CFR 52.21, with respect to particulate matter, as in effect before July 31, 1987 and the owner or operator submitted an application for a permit under this section before that date, and the Administrator subsequently determines that the application as submitted was complete with respect to the particulate matter requirements then in effect in this section. Instead, the requirements of paragraphs (j) through (r) of this section that were in effect before July 31, 1987 shall apply to such source or modification.

(2) The requirements of paragraphs (j) through (r) of this section shall not apply to a major stationary source or major modification with respect to a particular pollutant if the owner or operator demonstrates that, as to that pollutant, the source or modification is located in an area designated as nonattainment under section 107 of the Act.

(3) The requirements of paragraphs (k), (m) and (o) of this section shall not apply to a major stationary source or major modification with respect to a particular pollutant, if the allowable emissions of that pollutant from the source, or the net emissions increase of that pollutant from the modification:

(i) Would impact no Class I area and no area where an applicable increment is known to be violated, and

(ii) Would be temporary.

(4) The requirements of paragraphs (k), (m) and (o) of this section as they relate to any maximum allowable increase for a Class II area shall not apply to a major modification at a stationary source that was in existence on March 1, 1978, if the net increase in allowable emissions of each regulated NSR pollutant from the modification after the application of best available control technology would be less than 50 tons per year.

(5) The Administrator may exempt a stationary source or modification from the requirements of paragraph (m) of this section, with respect to monitoring for a particular pollutant if:

(i) The emissions increase of the pollutant from the new source or the net emissions increase of the pollutant from the modification would cause, in any area, air quality impacts less than the following amounts:

(a) Carbon monoxide--575 μg/m$^3$, 8–hour average;

(b) Nitrogen dioxide--14 μg/m$^3$, annual average;

(c) $PM_{2.5}$ --4 μg/m$^3$, 24–hour average;

(d) $PM_{10}$ --10 μg/m$^3$, 24–hour average;

(e) Sulfur dioxide--13 μg/m$^3$, 24–hour average;

(f) Ozone;

(g) Lead--0.1 μg/m$^3$, 3–month average;

(h) Fluorides--0.25 μg/m$^3$, 24–hour average;

(i) Total reduced sulfur--10 μg/m$^3$, 1–hour average;

(j) Hydrogen sulfide--0.2 μg/m$^3$, 1–hour average;

(k) Reduced sulfur compounds-- 10 μg/m$^3$, 1–hour average; or

Note to paragraph (c)(50)(i)(f):

No de minimis air quality level is provided for ozone. However, any net emissions increase of 100 tons per year or more of volatile organic compounds or nitrogen oxides subject to PSD would be required to perform an ambient impact analysis, including the gathering of ambient air quality data.

(ii) The concentrations of the pollutant in the area that the source or modification would affect are less than the concentrations listed in paragraph (i)(5)(i) of this section; or

(iii) The pollutant is not listed in paragraph (i)(5)(i) of this section.

(6) The requirements for best available control technology in paragraph (j) of this section and the requirements for air quality analyses in paragraph (m)(1) of this section, shall not apply to a particular stationary source or modification that was subject to 40 CFR 52.21 as in effect on June 19, 1978, if the owner or operator of the source or modification submitted

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

an application for a permit under those regulations before August 7, 1980, and the Administrator subsequently determines that the application as submitted before that date was complete. Instead, the requirements at 40 CFR 52.21(j) and (n) as in effect on June 19, 1978 apply to any such source or modification.

(7)(i) The requirements for air quality monitoring in paragraphs (m)(1)(ii)--(iv) of this section shall not apply to a particular source or modification that was subject to 40 CFR 52.21 as in effect on June 19, 1978, if the owner or operator of the source or modification submits an application for a permit under this section on or before June 8, 1981, and the Administrator subsequently determines that the application as submitted before that date was complete with respect to the requirements of this section other than those in paragraphs (m)(1)(ii)--(iv) of this section, and with respect to the requirements for such analyses at 40 CFR 52.21(m)(2) as in effect on June 19, 1978. Instead, the latter requirements shall apply to any such source or modification.

(ii) The requirements for air quality monitoring in paragraphs (m)(1)(ii)--(iv) of this section shall not apply to a particular source or modification that was not subject to 40 CFR 52.21 as in effect on June 19, 1978, if the owner or operator of the source or modification submits an application for a permit under this section on or before June 8, 1981, and the Administrator subsequently determines that the application as submitted before that date was complete, except with respect to the requirements in paragraphs (m)(1)(ii)--(iv).

(8)(i) At the discretion of the Administrator, the requirements for air quality monitoring of $PM_{10}$ in paragraphs (m)(1)(i)–(iv) of this section may not apply to a particular source or modification when the owner or operator of the source or modification submits an application for a permit under this section on or before June 1, 1988 and the Administrator subsequently determines that the application as submitted before that date was complete, except with respect to the requirements for monitoring particulate matter in paragraphs (m)(1)(i)–(iv).

(ii) The requirements for air quality monitoring of $PM_{10}$ in paragraphs (m)(1) (iii) and (iv) and (m)(3) of this section shall apply to a particular source or modification if the owner or operator of the source or modification submits an application for a permit under this section after June 1, 1988 and no later than December 1, 1988. The data shall have been gathered over at least the period from February 1, 1988 to the date the application becomes otherwise complete in accordance with the provisions set forth under paragraph (m)(1)(viii) of this section, except that if the Administrator determines that a complete and adequate analysis can be accomplished with monitoring data over a shorter period (not to be less than 4 months), the data that paragraph (m)(1)(iii) requires shall have been gathered over that shorter period.

(9) The requirements of paragraph (k)(1)(ii) of this section shall not apply to a stationary source or modification with respect to any maximum allowable increase for nitrogen oxides if the owner or operator of the source or modification submitted an application for a permit under this section before the provisions embodying the maximum allowable increase took effect as part of the applicable implementation plan and the Administrator subsequently determined that the application as submitted before that date was complete.

(10) The requirements in paragraph (k)(1)(ii) of this section shall not apply to a stationary source or modification with respect to any maximum allowable increase for PM–10 if (i) the owner or operator of the source or modification submitted an application for a permit under this section before the provisions embodying the maximum allowable increases for PM–10 took effect in an implementation plan to which this section applies, and (ii) the Administrator subsequently determined that the application as submitted before that date was otherwise complete. Instead, the requirements in paragraph (k)(1)(ii) shall apply with respect to the maximum allowable increases for TSP as in effect on the date the application was submitted.

(j) Control Technology Review.

(1) A major stationary source or major modification shall meet each applicable emissions limitation under the State Implementation Plan and each applicable emissions standard and standard of performance under 40 CFR Parts 60 and 61.

(2) A new major stationary source shall apply best available control technology for each regulated NSR pollutant that it would have the potential to emit in significant amounts.

(3) A major modification shall apply best available control technology for each regulated NSR pollutant for which it would result in a significant net emissions increase at the source. This requirement applies to each proposed emissions unit at which a net emissions increase in the pollutant would occur as a result of a physical change or change in the method of operation in the unit.

(4) For phased construction projects, the determination of best available control technology shall be reviewed and modified as appropriate at the latest reasonable time which occurs no later than 18 months prior to commencement of construction of each independent phase of the project. At such time, the owner or operator of the applicable stationary source may be required to demonstrate the adequacy of any previous determination of best available control technology for the source.

(k) Source impact analysis--

(1) Required demonstration. The plan shall provide that the owner or operator of the proposed source or modification shall demonstrate that allowable emission increases from the proposed source or modification, in conjunction with all other applicable emissions increases or reduction (including secondary emissions), would not cause or contribute to air pollution in violation of:

(i) Any national ambient air quality standard in any air quality control region; or

(ii) Any applicable maximum allowable increase over the baseline concentration in any area.

(2) Significant impact levels. The plan may provide that, for purposes of $PM_{2.5}$, the demonstration required in paragraph (k)(1) of this section is deemed to have been made if the emissions increase from the new stationary source alone or from the modification alone would cause, in all areas, air quality impacts less than the following amounts:

| **Pollutant** | **Averaging time** | **Class I area** | **Class II area** | **Class III area** |
|---|---|---|---|---|
| $PM^{2.5}$ ........................ | Annual........................ | 0.06 µg/$m^3$ | 0.3 µg/$m^3$ | 0.3 µg/$m^3$ |
| ................................... | 24-hour....................... | 0.07 µg/$m^3$ | 1.2 µg/$m^3$ | 1.2 µg/$m^3$ |

(l) Air quality models.

(1) All estimates of ambient concentrations required under this paragraph shall be based on applicable air quality models, data bases, and other requirements specified in appendix W of part 51 of this chapter (Guideline on Air Quality Models).

(2) Where an air quality model specified in appendix W of part 51 of this chapter (Guideline on Air Quality Models) is inappropriate, the model may be modified or another model substituted. Such a modification or substitution of a model may be made on a case-by-case basis or, where appropriate, on a generic basis for a specific state program. Written approval of the Administrator must be obtained for any modification or substitution. In addition, use of a modified or substituted model must be subject to notice and opportunity for public comment under procedures developed in accordance with paragraph (q) of this section.

(m) Air Quality Analysis--

(1) Preapplication analysis.

(i) Any application for a permit under this section shall contain an analysis of ambient air quality in the area that the major stationary source or major modification would affect for each of the following pollutants:

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(a) For the source, each pollutant that it would have the potential to omit in a significant amount;

(b) For the modification, each pollutant for which it would result in a significant net emissions increase.

(ii) With respect to any such pollutant for which no National Ambient Air Quality Standard exists, the analysis shall contain such air quality monitoring data as the Administrator determines is necessary to assess ambient air quality for that pollutant in any area that the emissions of that pollutant would affect.

(iii) With respect to any such pollutant (other than nonmethane hydrocarbons) for which such a standard does exist, the analysis shall contain continuous air quality monitoring data gathered for purposes of determining whether emissions of that pollutant would cause or contribute to a violation of the standard or any maximum allowable increase.

(iv) In general, the continuous air quality monitoring data that is required shall have been gathered over a period of at least one year and shall represent at least the year preceding receipt of the application, except that, if the Administrator determines that a complete and adequate analysis can be accomplished with monitoring data gathered over a period shorter than one year (but not to be less than four months), the data that is required shall have been gathered over at least that shorter period.

(v) For any application which becomes complete, except as to the requirements of paragraph (m)(1)(iii) and (iv) of this section, between June 8, 1981, and February 9, 1982, the data that paragraph (m)(1)(iii) of this section, requires shall have been gathered over at least the period from February 9, 1981, to the date the application becomes otherwise complete, except that:

(a) If the source or modification would have been major for that pollutant under 40 CFR 52.21 as in effect on June 19, 1978, any monitoring data shall have been gathered over at least the period required by those regulations.

(b) If the Administrator determines that a complete and adequate analysis can be accomplished with monitoring data over a shorter period (not to be less than four months), the data that paragraph (m)(1)(iii) of this section, requires shall have been gathered over at least that shorter period.

(c) If the monitoring data would relate exclusively to ozone and would not have been required under 40 CFR 52.21 as in effect on June 19, 1978, the Administrator may waive the otherwise applicable requirements of this paragraph (v) to the extent that the applicant shows that the monitoring data would be unrepresentative of air quality over a full year.

(vi) The owner or operator of a proposed stationary source or modification of volatile organic compounds who satisfies all conditions of 40 CFR Part 51 Appendix S, section IV may provide post-approval monitoring data for ozone in lieu of providing preconstruction data as required under paragraph (m)(1) of this section.

(vii) For any application that becomes complete, except as to the requirements of paragraph (m)(1) (iii) and (iv) pertaining to $PM_{10}$, after December 1, 1988 and no later than August 1, 1989 the data that paragraph (m)(1)(iii) requires shall have been gathered over at least the period from August 1, 1988 to the date the application becomes otherwise complete, except that if the Administrator determines that a complete and adequate analysis can be accomplished with monitoring data over a shorter period (not to be less than 4 months), the data that paragraph (m)(1)(iii) requires shall have been gathered over that shorter period.

(viii) With respect to any requirements for air quality monitoring of $PM_{10}$ under paragraphs (i)(11) (i) and (ii) of this section, the owner or operator of the source or modification shall use a monitoring method approved by the Administrator and shall estimate the ambient concentrations of $PM_{10}$ using the data collected by such approved monitoring method in accordance with estimating procedures approved by the Administrator.

(2) Post-construction monitoring. The owner or operator of a major stationary source or major modification shall, after construction of the stationary source or modification, conduct such ambient monitoring as the Administrator determines is necessary to determine the effect emissions from the stationary source or modification may have, or are having, on air quality in any area.

(3) Operations of monitoring stations. The owner or operator of a major stationary source or major modification shall meet the requirements of Appendix B to Part 58 of this chapter during the operation of monitoring stations for purposes of satisfying paragraph (m) of this section.

(n) Source information. The owner or operator of a proposed source or modification shall submit all information necessary to perform any analysis or make any determination required under this section.

(1) With respect to a source or modification to which paragraphs (j), (l), (n) and (p) of this section apply, such information shall include:

(i) A description of the nature, location, design capacity, and typical operating schedule of the source or modification, including specifications and drawings showing its design and plant layout;

(ii) A detailed schedule for construction of the source or modification;

(iii) A detailed description as to what system of continuous emission reduction is planned for the source or modification, emission estimates, and any other information necessary to determine that best available control technology would be applied.

(2) Upon request of the Administrator, the owner or operator shall also provide information on:

(i) The air quality impact of the source or modification, including meteorological and topographical data necessary to estimate such impact; and

(ii) The air quality impacts, and the nature and extent of any or all general commercial, residential, industrial, and other growth which has occurred since August 7, 1977, in the area the source or modification would affect.

(o) Additional impact analyses.

(1) The owner or operator shall provide an analysis of the impairment to visibility, soils and vegetation that would occur as a result of the source or modification and general commercial, residential, industrial and other growth associated with the source or modification. The owner or operator need not provide an analysis of the impact on vegetation having no significant commercial or recreational value.

(2) The owner or operator shall provide an analysis of the air quality impact projected for the area as a result of general commercial, residential, industrial and other growth associated with the source or modification.

(3) Visibility monitoring. The Administrator may require monitoring of visibility in any Federal class I area near the proposed new stationary source for major modification for such purposes and by such means as the Administrator deems necessary and appropriate.

(p) Sources Impacting Federal Class I Areas--Additional Requirements--

(1) Notice to Federal Land Managers. The Administrator shall provide written notice of any permit application for a proposed major stationary source or major modification, the emissions from which may affect a Class I area, to the Federal land manager and the Federal official charged with direct responsibility for management of any lands within any such area. Such notification shall include a copy of all information relevant to the permit application and shall be given within 30 days of receipt and at least 60 days prior to any public hearing on the application for a permit to construct. Such

notification shall include an analysis of the proposed source's anticipated impacts on visibility in the Federal Class I area. The Administrator shall also provide the Federal land manager and such Federal officials with a copy of the preliminary determination required under paragraph (q) of this section, and shall make available to them any materials used in making that determination, promptly after the Administrator makes such determination. Finally, the Administrator shall also notify all affected Federal land managers within 30 days of receipt of any advance notification of any such permit application.

(2) Federal Land Manager. The Federal Land Manager and the Federal official charged with direct responsibility for management of such lands have an affirmative responsibility to protect the air quality related values (including visibility) of such lands and to consider, in consultation with the Administrator, whether a proposed source or modification will have an adverse impact on such values.

(3) Visibility analysis. The Administrator shall consider any analysis performed by the Federal land manager, provided within 30 days of the notification required by paragraph (p)(1) of this section, that shows that a proposed new major stationary source or major modification may have an adverse impact on visibility in any Federal Class I area. Where the Administrator finds that such an analysis does not demonstrate to the satisfaction of the Administrator that an adverse impact on visibility will result in the Federal Class I area, the Administrator must, in the notice of public hearing on the permit application, either explain his decision or give notice as to where the explanation can be obtained.

(4) Denial--impact on air quality related values. The Federal Land Manager of any such lands may demonstrate to the Administrator that the emissions from a proposed source or modification would have an adverse impact on the air quality-related values (including visibility) of those lands, notwithstanding that the change in air quality resulting from emissions from such source or modification would not cause or contribute to concentrations which would exceed the maximum allowable increases for a Class I area. If the Administrator concurs with such demonstration, then he shall not issue the permit.

(5) Class I variances. The owner or operator of a proposed source or modification may demonstrate to the Federal Land Manager that the emissions from such source or modification would have no adverse impact on the air quality related values of any such lands (including visibility), notwithstanding that the change in air quality resulting from emissions from such source or modification would cause or contribute to concentrations which would exceed the maximum allowable increases for a Class I area. If the Federal land manager concurs with such demonstration and he so certifies, the State may authorize the Administrator: *Provided*, That the applicable requirements of this section are otherwise met, to issue the permit with such emission limitations as may be necessary to assure that emissions of sulfur dioxide, $PM_{2.5}$, $PM_{10}$, and nitrogen oxides would not exceed the following maximum allowable increases over minor source baseline concentration for such pollutants:

| **Pollutant** | **Maximum allowable increase (micrograms per cubic meter)** |
|---|---|
| $PM_{2.5}$: | |
| Annual arithmetic mean....................................................... | 4 |
| 24-hr maximum.................................................................... | 9 |
| $PM_{10}$: | |
| Annual arithmetic mean....................................................... | 17 |
| 24-hr maximum.................................................................... | 30 |
| Sulfur dioxide: | |
| Annual arithmetic mean....................................................... | 20 |
| 24-hr maximum.................................................................... | 91 |
| 3-hr maximum...................................................................... | 325 |
| Nitrogen dioxide: | |
| Annual arithmetic mean....................................................... | 25 |

(6) Sulfur dioxide variance by Governor with Federal Land Manager's concurrence. The owner or operator of a proposed source or modification which cannot be approved under paragraph (q)(4) of this section may demonstrate to the Governor that the source cannot be constructed by reason of any maximum allowable increase for sulfur dioxide for a period of twenty-four hours or less applicable to any Class I area and, in the case of Federal mandatory Class I areas, that a variance under this clause would not adversely affect the air quality related values of the area (including visibility). The Governor, after consideration of the Federal Land Manager's recommendation (if any) and subject to his concurrence, may, after notice and public hearing, grant a variance from such maximum allowable increase. If such variance is granted, the Administrator shall issue a permit to such source or modification pursuant to the requirements of paragraph (q)(7) of this section: *Provided*, That the applicable requirements of this section are otherwise met.

(7) Variance by the Governor with the President's concurrence. In any case where the Governor recommends a variance in which the Federal Land Manager does not concur, the recommendations of the Governor and the Federal Land Manager shall be transmitted to the President. The President may approve the Governor's recommendation if he finds that the variance is in the national interest. If the variance is approved, the Administrator shall issue a permit pursuant to the requirements of paragraph (q)(7) of this section: *Provided*, That the applicable requirements of this section are otherwise met.

(8) Emission limitations for Presidential or gubernatorial variance. In the case of a permit issued pursuant to paragraph (q)(5) or (6) of this section the source or modification shall comply with such emission limitations as may be necessary to assure that emissions of sulfur dioxide from the source or modification would not (during any day on which the otherwise applicable maximum allowable increases are exceeded) cause or contribute to concentrations which would exceed the following maximum allowable increases over the baseline concentration and to assure that such emissions would not cause or contribute to concentrations which exceed the otherwise applicable maximum allowable increases for periods of exposure of 24 hours or less for more than 18 days, not necessarily consecutive, during any annual period:

**MAXIMUM ALLOWABLE INCREASE**
**[Micrograms per cubic meter]**

| Period of exposure | Terrain areas | |
|---|---|---|
| | Low | High |
| 24-hr maximum | 36 | 62 |
| 3-hr maximum | 130 | 221 |

(q) Public Participation. The Administrator shall follow the applicable procedures of 40 CFR Part 124 in processing applications under this section. The Administrator shall follow the procedures at 40 CFR 52.21(r) as in effect on June 19, 1979, to the extent that the procedures of 40 CFR Part 124 do not apply.

(r) Source obligation.

(1) Any owner or operator who constructs or operates a source or modification not in accordance with the application submitted pursuant to this section or with the terms of any approval to construct, or any owner or operator of a source or modification subject to this section who commences construction after the effective date of these regulations without applying for and receiving approval hereunder, shall be subject to appropriate enforcement action.

(2) Approval to construct shall become invalid if construction is not commenced within 18 months after receipt of such approval, if construction is discontinued for a period of 18 months or more, or if construction is not completed within a reasonable time. The Administrator may extend the 18–month period upon a satisfactory showing that an extension is justified. This provision does not apply to the time period between construction of the approved phases of a phased construction project; each phase must commence construction within 18 months of the projected and approved commencement date.

(3) Approval to construct shall not relieve any owner or operator of the responsibility to comply fully with applicable provisions of the State implementation plan and any other requirements under local, State, or Federal law.

(4) At such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in any enforceable limitation which was established after August 7, 1980, on the capacity of the source or modification otherwise to emit a pollutant, such as a restriction on hours of operation, then the requirements or paragraphs (j) through (s) of this section shall apply to the source or modification as though construction had not yet commenced on the source or modification.

(5) [Reserved]

(6) Except as otherwise provided in paragraph (r)(6)(vi)(b) of this section, the provisions of this paragraph (r)(6) apply with respect to any regulated NSR pollutant emitted from projects at existing emissions units at a major stationary source (other than projects at a source with a PAL) in circumstances where there is a reasonable possibility, within the meaning of paragraph (r)(6)(vi) of this section, that a project that is not a part of a major modification may result in a significant emissions increase of such pollutant, and the owner or operator elects to use the method specified in paragraphs (b)(41)(ii)(a) through (c) of this section for calculating projected actual emissions.

(i) Before beginning actual construction of the project, the owner or operator shall document and maintain a record of the following information:

(a) A description of the project;

(b) Identification of the emissions unit(s) whose emissions of a regulated NSR pollutant could be affected by the project; and

(c) A description of the applicability test used to determine that the project is not a major modification for any regulated NSR pollutant, including the baseline actual emissions, the projected actual emissions, the amount of emissions excluded under paragraph (b)(41)(ii)(c) of this section and an explanation for why such amount was excluded, and any netting calculations, if applicable.

(ii) If the emissions unit is an existing electric utility steam generating unit, before beginning actual construction, the owner or operator shall provide a copy of the information set out in paragraph (r)(6)(i) of this section to the Administrator. Nothing in this paragraph (r)(6)(ii) shall be construed to require the owner or operator of such a unit to obtain any determination from the Administrator before beginning actual construction.

(iii) The owner or operator shall monitor the emissions of any regulated NSR pollutant that could increase as a result of the project and that is emitted by any emissions unit identified in paragraph (r)(6)(i)(b) of this section; and calculate and maintain a record of the annual emissions, in tons per year on a calendar year basis, for a period of 5 years following resumption of regular operations after the change, or for a period of 10 years following resumption of regular operations after the change if the project increases the design capacity or potential to emit that regulated NSR pollutant at such emissions unit.

(iv) If the unit is an existing electric utility steam generating unit, the owner or operator shall submit a report to the Administrator within 60 days after the end of each year during which records must be generated under paragraph (r)(6)(iii) of this section setting out the unit's annual emissions during the calendar year that preceded submission of the report.

(v) If the unit is an existing unit other than an electric utility steam generating unit, the owner or operator shall submit a report to the Administrator if the annual emissions, in tons per year, from the project identified in paragraph (r)(6)(i) of this section, exceed the baseline actual emissions (as documented and maintained pursuant to paragraph (r)(6)(i)(c) of this section), by a significant amount (as defined in paragraph (b)(23) of this section) for that regulated NSR pollutant, and if such emissions differ from the preconstruction projection as documented and maintained pursuant to paragraph (r)(6)

(i)(c) of this section. Such report shall be submitted to the Administrator within 60 days after the end of such year. The report shall contain the following:

(a) The name, address and telephone number of the major stationary source;

(b) The annual emissions as calculated pursuant to paragraph (r)(6)(iii) of this section; and

(c) Any other information that the owner or operator wishes to include in the report (e.g., an explanation as to why the emissions differ from the preconstruction projection).

(vi) A "reasonable possibility" under paragraph (r)(6) of this section occurs when the owner or operator calculates the project to result in either:

(a) A projected actual emissions increase of at least 50 percent of the amount that is a "significant emissions increase," as defined under paragraph (b)(40) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant; or

(b) A projected actual emissions increase that, added to the amount of emissions excluded under paragraph (b)(41)(ii)(c) of this section, sums to at least 50 percent of the amount that is a "significant emissions increase," as defined under paragraph (b)(40) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant. For a project for which a reasonable possibility occurs only within the meaning of paragraph (r)(6)(vi)(b) of this section, and not also within the meaning of paragraph (r)(6)(vi)(a) of this section, then provisions (r)(6)(ii) through (v) do not apply to the project.

(7) The owner or operator of the source shall make the information required to be documented and maintained pursuant to paragraph (r)(6) of this section available for review upon a request for inspection by the Administrator or the general public pursuant to the requirements contained in § 70.4(b)(3)(viii) of this chapter.

(s) Environmental impact statements. Whenever any proposed source or modification is subject to action by a Federal Agency which might necessitate preparation of an environmental impact statement pursuant to the National Environmental Policy Act (42 U.S.C. 4321), review by the Administrator conducted pursuant to this section shall be coordinated with the broad environmental reviews under that Act and under Section 309 of the Clean Air Act to the maximum extent feasible and reasonable.

(t) Disputed permits or redesignations. If any State affected by the redesignation of an area by an Indian Governing Body, or any Indian Governing Body of a tribe affected by the redesignation of an area by a State, disagrees with such redesignation, or if a permit is proposed to be issued for any major stationary source or major modification proposed for construction in any State which the Governor of an affected State or Indian Governing Body of an affected tribe determines will cause or contribute to a cumulative change in air quality in excess of that allowed in this part within the affected State or Indian Reservation, the Governor or Indian Governing Body may request the Administrator to enter into negotiations with the parties involved to resolve such dispute. If requested by any State or Indian Governing Body involved, the Administrator shall make a recommendation to resolve the dispute and protect the air quality related values of the lands involved. If the parties involved do not reach agreement, the Administrator shall resolve the dispute and his determination, or the results of agreements reached through other means, shall become part of the applicable State implementation plan and shall be enforceable as part of such plan. In resolving such disputes relating to area redesignation, the Administrator shall consider the extent to which the lands involved are of sufficient size to allow effective air quality management or have air quality related values of such an area.

(u) Delegation of authority.

(1) The Administrator shall have the authority to delegate his responsibility for conducting source review pursuant to this section, in accordance with paragraphs (v)(2) and (3) of this section.

(2) Where the Administrator delegates the responsibility for conducting source review under this section to any agency other than a Regional Office of the Environmental Protection Agency, the following provisions shall apply:

(i) Where the delegate agency is not an air pollution control agency, it shall consult with the appropriate State and local air pollution control agency prior to making any determination under this section. Similarly, where the delegate agency does not have continuing responsibility for managing land use, it shall consult with the appropriate State and local agency primarily responsible for managing land use prior to making any determination under this section.

(ii) The delegate agency shall send a copy of any public comment notice required under paragraph (r) of this section to the Administrator through the appropriate Regional Office.

(3) The Administrator's authority for reviewing a source or modification located on an Indian Reservation shall not be redelegated other than to a Regional Office of the Environmental Protection Agency, except where the State has assumed jurisdiction over such land under other laws. Where the State has assumed such jurisdiction, the Administrator may delegate his authority to the States in accordance with paragraph (v)(2) of this section.

(4) In the case of a source or modification which proposes to construct in a class III area, emissions from which would cause or contribute to air quality exceeding the maximum allowable increase applicable if the area were designated a class II area, and where no standard under section 111 of the act has been promulgated for such source category, the Administrator must approve the determination of best available control technology as set forth in the permit.

(v) Innovative Control Technology.

(1) An owner or operator of a proposed major stationary source or major modification may request the Administrator in writing no later than the close of the comment period under 40 CFR 124.10 to approve a system of innovative control technology.

(2) The Administrator shall, with the consent of the governor(s) of the affected state(s), determine that the source or modification may employ a system of innovative control technology, if:--

(i) The proposed control system would not cause or contribute to an unreasonable risk to public health, welfare, or safety in its operation or function;

(ii) The owner or operator agrees to achieve a level of continuous emissions reduction equivalent to that which would have been required under paragraph (j)(2) of this section, by a date specified by the Administrator. Such date shall not be later than 4 years from the time of startup or 7 years from permit issuance;

(iii) The source or modification would meet the requirements of paragraphs (j) and (k) of this section, based on the emissions rate that the stationary source employing the system of innovative control technology would be required to meet on the date specified by the Administrator;

(iv) The source or modification would not before the date specified by the Administrator:

(a) Cause or contribute to a violation of an applicable national ambient air quality standard; or

(b) Impact any area where an applicable increment is known to be violated; and

(v) All other applicable requirements including those for public participation have been met.

(vi) The provisions of paragraph (p) of this section (relating to Class I areas) have been satisfied with respect to all periods during the life of the source or modification.

(3) The Administrator shall withdraw any approval to employ a system of innovative control technology made under this section, if:

(i) The proposed system fails by the specified date to achieve the required continuous emissions reduction rate; or

(ii) The proposed system fails before the specified date so as to contribute to an unreasonable risk to public health, welfare, or safety; or

(iii) The Administrator decides at any time that the proposed system is unlikely to achieve the required level of control or to protect the public health, welfare, or safety.

(4) If a source or modification fails to meet the required level of continuous emission reduction within the specified time period or the approval is withdrawn in accordance with paragraph (v)(3) of this section, the Administrator may allow the source or modification up to an additional 3 years to meet the requirement for the application of best available control technology through use of a demonstrated system of control.

(w) Permit rescission.

(1) Any permit issued under this section or a prior version of this section shall remain in effect, unless and until it expires under paragraph (s) of this section or is rescinded.

(2) Any owner or operator of a stationary source or modification who holds a permit for the source or modification which was issued under § 52.21 as in effect on July 30, 1987, or any earlier version of this section, may request that the Administrator rescind the permit or a particular portion of the permit.

(3) The Administrator shall grant an application for rescission if the application shows that this section would not apply to the source or modification.

(4) If the Administrator rescinds a permit under this paragraph, the public shall be given adequate notice of the rescission. Publication of an announcement of rescission in a newspaper of general circulation in the affected region within 60 days of the rescission shall be considered adequate notice.

(x) to (z) [Reserved]

(aa) Actuals PALs. The provisions in paragraphs (aa)(1) through (15) of this section govern actuals PALs.

(1) Applicability.

(i) The Administrator may approve the use of an actuals PAL for any existing major stationary source if the PAL meets the requirements in paragraphs (aa)(1) through (15) of this section. The term “PAL” shall mean “actuals PAL” throughout paragraph (aa) of this section.

(ii) Any physical change in or change in the method of operation of a major stationary source that maintains its total source-wide emissions below the PAL level, meets the requirements in paragraphs (aa)(1) through (15) of this section, and complies with the PAL permit:

(a) Is not a major modification for the PAL pollutant;

(b) Does not have to be approved through the PSD program; and

(c) Is not subject to the provisions in paragraph (r)(4) of this section (restrictions on relaxing enforceable emission limitations that the major stationary source used to avoid applicability of the major NSR program).

(iii) Except as provided under paragraph (aa)(1)(ii)(c) of this section, a major stationary source shall continue to comply with all applicable Federal or State requirements, emission limitations, and work practice requirements that were established prior to the effective date of the PAL.

(2) Definitions. For the purposes of this section, the definitions in paragraphs (aa)(2)(i) through (xi) of this section apply. When a term is not defined in these paragraphs, it shall have the meaning given in paragraph (b) of this section or in the Act.

(i) Actuals PAL for a major stationary source means a PAL based on the baseline actual emissions (as defined in paragraph (b)(48) of this section) of all emissions units (as defined in paragraph (b)(7) of this section) at the source, that emit or have the potential to emit the PAL pollutant.

(ii) Allowable emissions means “allowable emissions” as defined in paragraph (b)(16) of this section, except as this definition is modified according to paragraphs (aa)(2)(ii)(a) and (b) of this section.

(a) The allowable emissions for any emissions unit shall be calculated considering any emission limitations that are enforceable as a practical matter on the emissions unit's potential to emit.

(b) An emissions unit's potential to emit shall be determined using the definition in paragraph (b)(4) of this section, except that the words “or enforceable as a practical matter” should be added after “federally enforceable.”

(iii) Small emissions unit means an emissions unit that emits or has the potential to emit the PAL pollutant in an amount less than the significant level for that PAL pollutant, as defined in paragraph (b)(23) of this section or in the Act, whichever is lower.

(iv) Major emissions unit means:

(a) Any emissions unit that emits or has the potential to emit 100 tons per year or more of the PAL pollutant in an attainment area; or

(b) Any emissions unit that emits or has the potential to emit the PAL pollutant in an amount that is equal to or greater than the major source threshold for the PAL pollutant as defined by the Act for nonattainment areas. For example, in accordance with the definition of major stationary source in section 182(c) of the Act, an emissions unit would be a major emissions unit for VOC if the emissions unit is located in a serious ozone nonattainment area and it emits or has the potential to emit 50 or more tons of VOC per year.

(v) Plantwide applicability limitation (PAL) means an emission limitation expressed in tons per year, for a pollutant at a major stationary source, that is enforceable as a practical matter and established source-wide in accordance with paragraphs (aa)(1) through (15) of this section.

(vi) PAL effective date generally means the date of issuance of the PAL permit. However, the PAL effective date for an increased PAL is the date any emissions unit that is part of the PAL major modification becomes operational and begins to emit the PAL pollutant.

(vii) PAL effective period means the period beginning with the PAL effective date and ending 10 years later.

(viii) PAL major modification means, notwithstanding paragraphs (b)(2) and (b)(3) of this section (the definitions for major modification and net emissions increase), any physical change in or change in the method of operation of the PAL source that causes it to emit the PAL pollutant at a level equal to or greater than the PAL.

(ix) PAL permit means the major NSR permit, the minor NSR permit, or the State operating permit under a program that is approved into the State Implementation Plan, or the title V permit issued by the Administrator that establishes a PAL for a major stationary source.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(x) PAL pollutant means the pollutant for which a PAL is established at a major stationary source.

(xi) Significant emissions unit means an emissions unit that emits or has the potential to emit a PAL pollutant in an amount that is equal to or greater than the significant level (as defined in paragraph (b)(23) of this section or in the Act, whichever is lower) for that PAL pollutant, but less than the amount that would qualify the unit as a major emissions unit as defined in paragraph (aa)(2)(iv) of this section.

(3) Permit application requirements. As part of a permit application requesting a PAL, the owner or operator of a major stationary source shall submit the following information to the Administrator for approval:

(i) A list of all emissions units at the source designated as small, significant or major based on their potential to emit. In addition, the owner or operator of the source shall indicate which, if any, Federal or State applicable requirements, emission limitations, or work practices apply to each unit.

(ii) Calculations of the baseline actual emissions (with supporting documentation). Baseline actual emissions are to include emissions associated not only with operation of the unit, but also emissions associated with startup, shutdown, and malfunction.

(iii) The calculation procedures that the major stationary source owner or operator proposes to use to convert the monitoring system data to monthly emissions and annual emissions based on a 12–month rolling total for each month as required by paragraph (aa)(13)(i) of this section.

(4) General requirements for establishing PALs.

(i) The Administrator is allowed to establish a PAL at a major stationary source, provided that at a minimum, the requirements in paragraphs (aa)(4)(i)(a) through (g) of this section are met.

(a) The PAL shall impose an annual emission limitation in tons per year, that is enforceable as a practical matter, for the entire major stationary source. For each month during the PAL effective period after the first 12 months of establishing a PAL, the major stationary source owner or operator shall show that the sum of the monthly emissions from each emissions unit under the PAL for the previous 12 consecutive months is less than the PAL (a 12–month average, rolled monthly). For each month during the first 11 months from the PAL effective date, the major stationary source owner or operator shall show that the sum of the preceding monthly emissions from the PAL effective date for each emissions unit under the PAL is less than the PAL.

(b) The PAL shall be established in a PAL permit that meets the public participation requirements in paragraph (aa)(5) of this section.

(c) The PAL permit shall contain all the requirements of paragraph (aa)(7) of this section.

(d) The PAL shall include fugitive emissions, to the extent quantifiable, from all emissions units that emit or have the potential to emit the PAL pollutant at the major stationary source.

(e) Each PAL shall regulate emissions of only one pollutant.

(f) Each PAL shall have a PAL effective period of 10 years.

(g) The owner or operator of the major stationary source with a PAL shall comply with the monitoring, recordkeeping, and reporting requirements provided in paragraphs (aa)(12) through (14) of this section for each emissions unit under the PAL through the PAL effective period.

(ii) At no time (during or after the PAL effective period) are emissions reductions of a PAL pollutant that occur during the PAL effective period creditable as decreases for purposes of offsets under § 51.165(a)(3)(ii) of this chapter unless the

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

level of the PAL is reduced by the amount of such emissions reductions and such reductions would be creditable in the absence of the PAL.

(5) Public participation requirements for PALs. PALs for existing major stationary sources shall be established, renewed, or increased through a procedure that is consistent with §§ 51.160 and 51.161 of this chapter. This includes the requirement that the Administrator provide the public with notice of the proposed approval of a PAL permit and at least a 30–day period for submittal of public comment. The Administrator must address all material comments before taking final action on the permit.

(6) Setting the 10–year actuals PAL level.

(i) Except as provided in paragraph (aa)(6)(ii) of this section, the plan shall provide that the actuals PAL level for a major stationary source shall be established as the sum of the baseline actual emissions (as defined in paragraph (b)(48) of this section) of the PAL pollutant for each emissions unit at the source; plus an amount equal to the applicable significant level for the PAL pollutant under paragraph (b)(23) of this section or under the Act, whichever is lower. When establishing the actuals PAL level, for a PAL pollutant, only one consecutive 24–month period must be used to determine the baseline actual emissions for all existing emissions units. However, a different consecutive 24–month period may be used for each different PAL pollutant. Emissions associated with units that were permanently shut down after this 24–month period must be subtracted from the PAL level. The reviewing authority shall specify a reduced PAL level(s) (in tons/yr) in the PAL permit to become effective on the future compliance date(s) of any applicable Federal or State regulatory requirement(s) that the reviewing authority is aware of prior to issuance of the PAL permit. For instance, if the source owner or operator will be required to reduce emissions from industrial boilers in half from baseline emissions of 60 ppm $NO_X$ to a new rule limit of 30 ppm, then the permit shall contain a future effective PAL level that is equal to the current PAL level reduced by half of the original baseline emissions of such unit(s).

(ii) For newly constructed units (which do not include modifications to existing units) on which actual construction began after the 24–month period, in lieu of adding the baseline actual emissions as specified in paragraph (aa)(6)(i) of this section, the emissions must be added to the PAL level in an amount equal to the potential to emit of the units.

(7) Contents of the PAL permit. The PAL permit must contain, at a minimum, the information in paragraphs (aa)(7)(i) through (x) of this section.

(i) The PAL pollutant and the applicable source-wide emission limitation in tons per year.

(ii) The PAL permit effective date and the expiration date of the PAL (PAL effective period).

(iii) Specification in the PAL permit that if a major stationary source owner or operator applies to renew a PAL in accordance with paragraph (aa)(10) of this section before the end of the PAL effective period, then the PAL shall not expire at the end of the PAL effective period. It shall remain in effect until a revised PAL permit is issued by a reviewing authority.

(iv) A requirement that emission calculations for compliance purposes must include emissions from startups, shutdowns, and malfunctions.

(v) A requirement that, once the PAL expires, the major stationary source is subject to the requirements of paragraph (aa)(9) of this section.

(vi) The calculation procedures that the major stationary source owner or operator shall use to convert the monitoring system data to monthly emissions and annual emissions based on a 12–month rolling total as required by paragraph (aa)(13)(i) of this section.

(vii) A requirement that the major stationary source owner or operator monitor all emissions units in accordance with the provisions under paragraph (aa)(12) of this section.

(viii) A requirement to retain the records required under paragraph (aa)(13) of this section on site. Such records may be retained in an electronic format.

(ix) A requirement to submit the reports required under paragraph (aa)(14) of this section by the required deadlines.

(x) Any other requirements that the Administrator deems necessary to implement and enforce the PAL.

(8) PAL effective period and reopening of the PAL permit. The requirements in paragraphs (aa)(8)(i) and (ii) of this section apply to actuals PALs.

(i) PAL effective period. The Administrator shall specify a PAL effective period of 10 years.

(ii) Reopening of the PAL permit.

(a) During the PAL effective period, the Administrator must reopen the PAL permit to:

(1) Correct typographical/calculation errors made in setting the PAL or reflect a more accurate determination of emissions used to establish the PAL;

(2) Reduce the PAL if the owner or operator of the major stationary source creates creditable emissions reductions for use as offsets under § 51.165(a)(3)(ii) of this chapter; and

(3) Revise the PAL to reflect an increase in the PAL as provided under paragraph (aa)(11) of this section.

(b) The Administrator shall have discretion to reopen the PAL permit for the following:

(1) Reduce the PAL to reflect newly applicable Federal requirements (for example, NSPS) with compliance dates after the PAL effective date;

(2) Reduce the PAL consistent with any other requirement, that is enforceable as a practical matter, and that the State may impose on the major stationary source under the State Implementation Plan; and

(3) Reduce the PAL if the reviewing authority determines that a reduction is necessary to avoid causing or contributing to a NAAQS or PSD increment violation, or to an adverse impact on an air quality related value that has been identified for a Federal Class I area by a Federal Land Manager and for which information is available to the general public.

(c) Except for the permit reopening in paragraph (aa)(8)(ii)(a)(1) of this section for the correction of typographical/calculation errors that do not increase the PAL level, all other reopenings shall be carried out in accordance with the public participation requirements of paragraph (aa)(5) of this section.

(9) Expiration of a PAL. Any PAL that is not renewed in accordance with the procedures in paragraph (aa)(10) of this section shall expire at the end of the PAL effective period, and the requirements in paragraphs (aa)(9)(i) through (v) of this section shall apply.

(i) Each emissions unit (or each group of emissions units) that existed under the PAL shall comply with an allowable emission limitation under a revised permit established according to the procedures in paragraphs (aa)(9)(i)(a) and (b) of this section.

(a) Within the time frame specified for PAL renewals in paragraph (aa)(10)(ii) of this section, the major stationary source shall submit a proposed allowable emission limitation for each emissions unit (or each group of emissions units, if such a distribution is more appropriate as decided by the Administrator) by distributing the PAL allowable emissions for the major stationary source among each of the emissions units that existed under the PAL. If the PAL

had not yet been adjusted for an applicable requirement that became effective during the PAL effective period, as required under paragraph (aa)(10)(v) of this section, such distribution shall be made as if the PAL had been adjusted.

(b) The Administrator shall decide whether and how the PAL allowable emissions will be distributed and issue a revised permit incorporating allowable limits for each emissions unit, or each group of emissions units, as the Administrator determines is appropriate.

(ii) Each emissions unit(s) shall comply with the allowable emission limitation on a 12–month rolling basis. The Administrator may approve the use of monitoring systems (source testing, emission factors, etc.) other than CEMS, CERMS, PEMS, or CPMS to demonstrate compliance with the allowable emission limitation.

(iii) Until the Administrator issues the revised permit incorporating allowable limits for each emissions unit, or each group of emissions units, as required under paragraph (aa)(9)(i)(b) of this section, the source shall continue to comply with a source-wide, multi-unit emissions cap equivalent to the level of the PAL emission limitation.

(iv) Any physical change or change in the method of operation at the major stationary source will be subject to major NSR requirements if such change meets the definition of major modification in paragraph (b)(2) of this section.

(v) The major stationary source owner or operator shall continue to comply with any State or Federal applicable requirements (BACT, RACT, NSPS, etc.) that may have applied either during the PAL effective period or prior to the PAL effective period except for those emission limitations that had been established pursuant to paragraph (r)(4) of this section, but were eliminated by the PAL in accordance with the provisions in paragraph (aa)(1)(ii)(c) of this section.

(10) Renewal of a PAL.

(i) The Administrator shall follow the procedures specified in paragraph (aa)(5) of this section in approving any request to renew a PAL for a major stationary source, and shall provide both the proposed PAL level and a written rationale for the proposed PAL level to the public for review and comment. During such public review, any person may propose a PAL level for the source for consideration by the Administrator.

(ii) Application deadline. A major stationary source owner or operator shall submit a timely application to the Administrator to request renewal of a PAL. A timely application is one that is submitted at least 6 months prior to, but not earlier than 18 months from, the date of permit expiration. This deadline for application submittal is to ensure that the permit will not expire before the permit is renewed. If the owner or operator of a major stationary source submits a complete application to renew the PAL within this time period, then the PAL shall continue to be effective until the revised permit with the renewed PAL is issued.

(iii) Application requirements. The application to renew a PAL permit shall contain the information required in paragraphs (aa)(10)(iii)(a) through (d) of this section.

(a) The information required in paragraphs (aa)(3)(i) through (iii) of this section.

(b) A proposed PAL level.

(c) The sum of the potential to emit of all emissions units under the PAL (with supporting documentation).

(d) Any other information the owner or operator wishes the Administrator to consider in determining the appropriate level for renewing the PAL.

(iv) PAL adjustment. In determining whether and how to adjust the PAL, the Administrator shall consider the options outlined in paragraphs (aa)(10)(iv)(a) and (b) of this section. However, in no case may any such adjustment fail to comply with paragraph (aa)(10)(iv)(c) of this section.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

(a) If the emissions level calculated in accordance with paragraph (aa)(6) of this section is equal to or greater than 80 percent of the PAL level, the Administrator may renew the PAL at the same level without considering the factors set forth in paragraph (aa)(10)(iv)(b) of this section; or

(b) The Administrator may set the PAL at a level that he or she determines to be more representative of the source's baseline actual emissions, or that he or she determines to be more appropriate considering air quality needs, advances in control technology, anticipated economic growth in the area, desire to reward or encourage the source's voluntary emissions reductions, or other factors as specifically identified by the Administrator in his or her written rationale.

(c) Notwithstanding paragraphs (aa)(10)(iv)(a) and (b) of this section:

(1) If the potential to emit of the major stationary source is less than the PAL, the Administrator shall adjust the PAL to a level no greater than the potential to emit of the source; and

(2) The Administrator shall not approve a renewed PAL level higher than the current PAL, unless the major stationary source has complied with the provisions of paragraph (aa)(11) of this section (increasing a PAL).

(v) If the compliance date for a State or Federal requirement that applies to the PAL source occurs during the PAL effective period, and if the Administrator has not already adjusted for such requirement, the PAL shall be adjusted at the time of PAL permit renewal or title V permit renewal, whichever occurs first.

(11) Increasing a PAL during the PAL effective period.

(i) The Administrator may increase a PAL emission limitation only if the major stationary source complies with the provisions in paragraphs (aa)(11)(i)(a) through (d) of this section.

(a) The owner or operator of the major stationary source shall submit a complete application to request an increase in the PAL limit for a PAL major modification. Such application shall identify the emissions unit(s) contributing to the increase in emissions so as to cause the major stationary source's emissions to equal or exceed its PAL.

(b) As part of this application, the major stationary source owner or operator shall demonstrate that the sum of the baseline actual emissions of the small emissions units, plus the sum of the baseline actual emissions of the significant and major emissions units assuming application of BACT equivalent controls, plus the sum of the allowable emissions of the new or modified emissions unit(s) exceeds the PAL. The level of control that would result from BACT equivalent controls on each significant or major emissions unit shall be determined by conducting a new BACT analysis at the time the application is submitted, unless the emissions unit is currently required to comply with a BACT or LAER requirement that was established within the preceding 10 years. In such a case, the assumed control level for that emissions unit shall be equal to the level of BACT or LAER with which that emissions unit must currently comply.

(c) The owner or operator obtains a major NSR permit for all emissions unit(s) identified in paragraph (aa)(11)(i)(a) of this section, regardless of the magnitude of the emissions increase resulting from them (that is, no significant levels apply). These emissions unit(s) shall comply with any emissions requirements resulting from the major NSR process (for example, BACT), even though they have also become subject to the PAL or continue to be subject to the PAL.

(d) The PAL permit shall require that the increased PAL level shall be effective on the day any emissions unit that is part of the PAL major modification becomes operational and begins to emit the PAL pollutant.

(ii) The Administrator shall calculate the new PAL as the sum of the allowable emissions for each modified or new emissions unit, plus the sum of the baseline actual emissions of the significant and major emissions units (assuming application of BACT equivalent controls as determined in accordance with paragraph (aa)(11)(i)(b)), plus the sum of the baseline actual emissions of the small emissions units.

(iii) The PAL permit shall be revised to reflect the increased PAL level pursuant to the public notice requirements of paragraph (aa)(5) of this section.

(12) Monitoring requirements for PALs.

(i) General requirements.

(a) Each PAL permit must contain enforceable requirements for the monitoring system that accurately determines plantwide emissions of the PAL pollutant in terms of mass per unit of time. Any monitoring system authorized for use in the PAL permit must be based on sound science and meet generally acceptable scientific procedures for data quality and manipulation. Additionally, the information generated by such system must meet minimum legal requirements for admissibility in a judicial proceeding to enforce the PAL permit.

(b) The PAL monitoring system must employ one or more of the four general monitoring approaches meeting the minimum requirements set forth in paragraphs (aa)(12)(ii)(a) through (d) of this section and must be approved by the Administrator.

(c) Notwithstanding paragraph (aa)(12)(i)(b) of this section, you may also employ an alternative monitoring approach that meets paragraph (aa)(12)(i)(a) of this section if approved by the Administrator.

(d) Failure to use a monitoring system that meets the requirements of this section renders the PAL invalid.

(ii) Minimum performance requirements for approved monitoring approaches. The following are acceptable general monitoring approaches when conducted in accordance with the minimum requirements in paragraphs (aa)(12)(iii) through (ix) of this section:

(a) Mass balance calculations for activities using coatings or solvents;

(b) CEMS;

(c) CPMS or PEMS; and

(d) Emission factors.

(iii) Mass balance calculations. An owner or operator using mass balance calculations to monitor PAL pollutant emissions from activities using coating or solvents shall meet the following requirements:

(a) Provide a demonstrated means of validating the published content of the PAL pollutant that is contained in or created by all materials used in or at the emissions unit;

(b) Assume that the emissions unit emits all of the PAL pollutant that is contained in or created by any raw material or fuel used in or at the emissions unit, if it cannot otherwise be accounted for in the process; and

(c) Where the vendor of a material or fuel, which is used in or at the emissions unit, publishes a range of pollutant content from such material, the owner or operator must use the highest value of the range to calculate the PAL pollutant emissions unless the Administrator determines there is site-specific data or a site-specific monitoring program to support another content within the range.

(iv) CEMS. An owner or operator using CEMS to monitor PAL pollutant emissions shall meet the following requirements:

(a) CEMS must comply with applicable Performance Specifications found in 40 CFR part 60, appendix B; and

(b) CEMS must sample, analyze and record data at least every 15 minutes while the emissions unit is operating.

(v) CPMS or PEMS. An owner or operator using CPMS or PEMS to monitor PAL pollutant emissions shall meet the following requirements:

(a) The CPMS or the PEMS must be based on current site-specific data demonstrating a correlation between the monitored parameter(s) and the PAL pollutant emissions across the range of operation of the emissions unit; and

(b) Each CPMS or PEMS must sample, analyze, and record data at least every 15 minutes, or at another less frequent interval approved by the Administrator, while the emissions unit is operating.

(vi) Emission factors. An owner or operator using emission factors to monitor PAL pollutant emissions shall meet the following requirements:

(a) All emission factors shall be adjusted, if appropriate, to account for the degree of uncertainty or limitations in the factors' development;

(b) The emissions unit shall operate within the designated range of use for the emission factor, if applicable; and

(c) If technically practicable, the owner or operator of a significant emissions unit that relies on an emission factor to calculate PAL pollutant emissions shall conduct validation testing to determine a site-specific emission factor within 6 months of PAL permit issuance, unless the Administrator determines that testing is not required.

(vii) A source owner or operator must record and report maximum potential emissions without considering enforceable emission limitations or operational restrictions for an emissions unit during any period of time that there is no monitoring data, unless another method for determining emissions during such periods is specified in the PAL permit.

(viii) Notwithstanding the requirements in paragraphs (aa)(12)(iii) through (vii) of this section, where an owner or operator of an emissions unit cannot demonstrate a correlation between the monitored parameter(s) and the PAL pollutant emissions rate at all operating points of the emissions unit, the Administrator shall, at the time of permit issuance:

(a) Establish default value(s) for determining compliance with the PAL based on the highest potential emissions reasonably estimated at such operating point(s); or

(b) Determine that operation of the emissions unit during operating conditions when there is no correlation between monitored parameter(s) and the PAL pollutant emissions is a violation of the PAL.

(ix) Re-validation. All data used to establish the PAL pollutant must be re-validated through performance testing or other scientifically valid means approved by the Administrator. Such testing must occur at least once every 5 years after issuance of the PAL.

(13) Recordkeeping requirements.

(i) The PAL permit shall require an owner or operator to retain a copy of all records necessary to determine compliance with any requirement of paragraph (aa) of this section and of the PAL, including a determination of each emissions unit's 12–month rolling total emissions, for 5 years from the date of such record.

(ii) The PAL permit shall require an owner or operator to retain a copy of the following records for the duration of the PAL effective period plus 5 years:

(a) A copy of the PAL permit application and any applications for revisions to the PAL; and

(b) Each annual certification of compliance pursuant to title V and the data relied on in certifying the compliance.

(14) Reporting and notification requirements. The owner or operator shall submit semi-annual monitoring reports and prompt deviation reports to the Administrator in accordance with the applicable title V operating permit program. The reports shall meet the requirements in paragraphs (aa)(14)(i) through (iii) of this section.

(i) Semi-annual report. The semi-annual report shall be submitted to the Administrator within 30 days of the end of each reporting period. This report shall contain the information required in paragraphs (aa)(14)(i)(a) through (g) of this section.

(a) The identification of owner and operator and the permit number.

(b) Total annual emissions (tons/year) based on a 12–month rolling total for each month in the reporting period recorded pursuant to paragraph (aa)(13)(i) of this section.

(c) All data relied upon, including, but not limited to, any Quality Assurance or Quality Control data, in calculating the monthly and annual PAL pollutant emissions.

(d) A list of any emissions units modified or added to the major stationary source during the preceding 6–month period.

(e) The number, duration, and cause of any deviations or monitoring malfunctions (other than the time associated with zero and span calibration checks), and any corrective action taken.

(f) A notification of a shutdown of any monitoring system, whether the shutdown was permanent or temporary, the reason for the shutdown, the anticipated date that the monitoring system will be fully operational or replaced with another monitoring system, and whether the emissions unit monitored by the monitoring system continued to operate, and the calculation of the emissions of the pollutant or the number determined by method included in the permit, as provided by (aa)(12)(vii).

(g) A signed statement by the responsible official (as defined by the applicable title V operating permit program) certifying the truth, accuracy, and completeness of the information provided in the report.

(ii) Deviation report. The major stationary source owner or operator shall promptly submit reports of any deviations or exceedance of the PAL requirements, including periods where no monitoring is available. A report submitted pursuant to § 70.6(a)(3)(iii)(B) of this chapter shall satisfy this reporting requirement. The deviation reports shall be submitted within the time limits prescribed by the applicable program implementing § 70.6(a)(3)(iii)(B) of this chapter. The reports shall contain the following information:

(a) The identification of owner and operator and the permit number;

(b) The PAL requirement that experienced the deviation or that was exceeded;

(c) Emissions resulting from the deviation or the exceedance; and

(d) A signed statement by the responsible official (as defined by the applicable title V operating permit program) certifying the truth, accuracy, and completeness of the information provided in the report.

(iii) Re-validation results. The owner or operator shall submit to the Administrator the results of any re-validation test or method within 3 months after completion of such test or method.

(15) Transition requirements.

(i) The Administrator may not issue a PAL that does not comply with the requirements in paragraphs (aa)(1) through (15) of this section after March 3, 2003.

(ii) The Administrator may supersede any PAL that was established prior to March 3, 2003 with a PAL that complies with the requirements of paragraphs (aa)(1) through (15) of this section.

(bb) If any provision of this section, or the application of such provision to any person or circumstance, is held invalid, the remainder of this section, or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.

(cc) Without regard to other considerations, routine maintenance, repair and replacement includes, but is not limited to, the replacement of any component of a process unit with an identical or functionally equivalent component(s), and maintenance and repair activities that are part of the replacement activity, provided that all of the requirements in paragraphs (cc)(1) through (3) of this section are met.

(1) Capital cost threshold for equipment replacement.

(i) For an electric utility steam generating unit, as defined in § 52.21(b)(31), the fixed capital cost of the replacement component(s) plus the cost of any associated maintenance and repair activities that are part of the replacement shall not exceed 20 percent of the replacement value of the process unit, at the time the equipment is replaced. For a process unit that is not an electric utility steam generating unit the fixed capital cost of the replacement component(s) plus the cost of any associated maintenance and repair activities that are part of the replacement shall not exceed 20 percent of the replacement value of the process unit, at the time the equipment is replaced.

(ii) In determining the replacement value of the process unit; and, except as otherwise allowed under paragraph (cc)(1)(iii) of this section, the owner or operator shall determine the replacement value of the process unit on an estimate of the fixed capital cost of constructing a new process unit, or on the current appraised value of the process unit.

(iii) As an alternative to paragraph (cc)(1)(ii) of this section for determining the replacement value of a process unit, an owner or operator may choose to use insurance value (where the insurance value covers only complete replacement), investment value adjusted for inflation, or another accounting procedure if such procedure is based on Generally Accepted Accounting Principles, provided that the owner or operator sends a notice to the reviewing authority. The first time that an owner or operator submits such a notice for a particular process unit, the notice may be submitted at any time, but any subsequent notice for that process unit may be submitted only at the beginning of the process unit's fiscal year. Unless the owner or operator submits a notice to the reviewing authority, then paragraph (cc)(1)(ii) of this section will be used to establish the replacement value of the process unit. Once the owner or operator submits a notice to use an alternative accounting procedure, the owner or operator must continue to use that procedure for the entire fiscal year for that process unit. In subsequent fiscal years, the owner or operator must continue to use this selected procedure unless and until the owner or operator sends another notice to the reviewing authority selecting another procedure consistent with this paragraph or paragraph (cc)(1)(ii) of this section at the beginning of such fiscal year.

(2) Basic design parameters. The replacement does not change the basic design parameter(s) of the process unit to which the activity pertains.

(i) Except as provided in paragraph (cc)(2)(iii) of this section, for a process unit at a steam electric generating facility, the owner or operator may select as its basic design parameters either maximum hourly heat input and maximum hourly fuel consumption rate or maximum hourly electric output rate and maximum steam flow rate. When establishing fuel consumption specifications in terms of weight or volume, the minimum fuel quality based on British Thermal Units content shall be used for determining the basic design parameter(s) for a coal-fired electric utility steam generating unit.

(ii) Except as provided in paragraph (cc)(2)(iii) of this section, the basic design parameter(s) for any process unit that is not at a steam electric generating facility are maximum rate of fuel or heat input, maximum rate of material input, or maximum rate of product output. Combustion process units will typically use maximum rate of fuel input. For sources

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works. 

having multiple end products and raw materials, the owner or operator should consider the primary product or primary raw material when selecting a basic design parameter.

(iii) If the owner or operator believes the basic design parameter(s) in paragraphs (cc)(2)(i) and (ii) of this section is not appropriate for a specific industry or type of process unit, the owner or operator may propose to the reviewing authority an alternative basic design parameter(s) for the source's process unit(s). If the reviewing authority approves of the use of an alternative basic design parameter(s), the reviewing authority shall issue a permit that is legally enforceable that records such basic design parameter(s) and requires the owner or operator to comply with such parameter(s).

(iv) The owner or operator shall use credible information, such as results of historic maximum capability tests, design information from the manufacturer, or engineering calculations, in establishing the magnitude of the basic design parameter(s) specified in paragraphs (cc)(2)(i) and (ii) of this section.

(v) If design information is not available for a process unit, then the owner or operator shall determine the process unit's basic design parameter(s) using the maximum value achieved by the process unit in the five-year period immediately preceding the planned activity.

(vi) Efficiency of a process unit is not a basic design parameter.

(3) The replacement activity shall not cause the process unit to exceed any emission limitation, or operational limitation that has the effect of constraining emissions, that applies to the process unit and that is legally enforceable.

Note to paragraph (cc): By a court order on December 24, 2003, this paragraph (cc) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

**Credits**

[43 FR 26403, June 19, 1978, as amended at 44 FR 27571, May 10, 1979; 45 FR 52735, Aug. 7, 1980; 47 FR 27561, June 25, 1982; 49 FR 43209, Oct. 26, 1984; 50 FR 28550, July 12, 1985; 51 FR 32179, Sept. 9, 1986; 51 FR 40675, 40677, Nov. 7, 1986; 52 FR 24714, July 1, 1987; 52 FR 26401, July 14, 1987; 53 FR 396, Jan. 6, 1988; 53 FR 40671, Oct. 17, 1988; 54 FR 27285, 27300, June 28, 1989; 56 FR 5506, Feb. 11, 1991; 57 FR 3946, Feb. 3, 1992; 57 FR 32336, July 21, 1992; 58 FR 31637, June 3, 1993; 58 FR 38883, July 20, 1993; 60 FR 40474, Aug. 9, 1995; 61 FR 9918, March 12, 1996; 61 FR 41894, Aug. 12, 1996; 67 FR 80274, Dec. 31, 2002; 68 FR 61279, Oct. 27, 2003; 68 FR 63028, Nov. 7, 2003; 69 FR 40276, July 1, 2004; 70 FR 71704, Nov. 29, 2005; 72 FR 24078, May 1, 2007; 72 FR 32528, June 13, 2007; 72 FR 72617, Dec. 21, 2007; 73 FR 28349, May 16, 2008; 73 FR 77900, Dec. 19, 2008; 74 FR 26099, June 1, 2009; 74 FR 48156, Sept. 22, 2009; 74 FR 50117, Sept. 30, 2009; 74 FR 65695, Dec. 11, 2009; 75 FR 16016, 16017, March 31, 2010; 75 FR 31606, June 3, 2010; 75 FR 64905, Oct. 20, 2010; 76 FR 17555, March 30, 2011; 76 FR 28661, May 18, 2011; 76 FR 43507, July 20, 2011]
SOURCE: 57 FR 27936, 27939, 27942; 37 FR 10846, May 31, 1972; 50 FR 31369, Aug. 2, 1985; 57 FR 32336, July 21, 1992; 57 FR 37104, Aug. 18, 1992; 58 FR 6606, Feb. 1, 1993; 58 FR 38883, July 20, 1993; 59 FR 39859, Aug. 4, 1994; 62 FR 8328, Feb. 24, 1997, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Notes of Decisions (210)

Current through November 3, 2011; 76 FR 68118.

**End of Document** © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# DECLARATIONS

## DECLARATIONS

1. Christopher D. Applegate
2. Glen Besa
3. Ann E. Brodersen
4. Ellen Corrie
5. Randy Cunningham
6. Mary Hodell
7. James Kleissler
8. Karla Land
9. Violet Lehrer
10. Brandt Mannchen
11. Bruce Nilles
12. Kelly Pierce
13. Ruth Reynolds
14. Marti Sinclair
15. Mark Snyder
16. Stephen M. Yaver

**DECLARATION OF CHRISTOPHER D. APPLEGATE**

1. My name is Christopher D. Applegate, and I am of legal age and competent to give this declaration. All information herein is based on my own personal knowledge unless otherwise indicated.

2. I live in Norman, Oklahoma, and have been a resident since August 2008.

3. I am a member of the Sierra Club, and have been a member since February of 2009. In January 2011, I assumed the role of vice chair and outings leader for the Red Earth Group of the Sierra Club's Oklahoma Chapter. As the outings leader of the Red Earth Group, I help organize and lead outings to Oklahoma's great outdoors, including the Wichita Mountains Wilderness Area. I am also working with the Red Earth Group to develop a more robust community outreach program that aims to provide more community members with opportunities to explore the outdoors while educating the public about pertinent environmental issues, such as air and water pollution. I have already led two trips this year to the Wichita Mountains and am planning a third with students from the University of Oklahoma.

4. I also enjoy hiking in my free time, and have returned to the Wichita Mountains with family and friends four or five times this year since my last organized trip. I plan to continue visiting the Wilderness Area each year for the foreseeable future. I go there in the hopes of breathing fresh air and seeing the beautiful views and vistas. During my trips to the Wichita Mountains, I have been troubled by seeing haze pollution, which significantly reduces my enjoyment of the area. Visibility at the Wichita Mountains Wilderness Area is greatly impaired and I am saddened by the lack of visibility. I am aware from public reports (e.g.,http://www.regulations.gov/#!documentDetail;D=EPA-

R06-OAR-2010-0190-0019, pages A-48 to -51) that this haze pollution is due mainly to air pollution from manmade sources, including sources located in other states such as Texas, and am concerned that the haze will worsen if such air pollution is allowed to increase.

5. In April 2011, I spoke at a public hearing on EPA's proposed plan to reduce regional haze. At the hearing, I expressed concerns about the impacts of haze pollution on visibility in beloved wilderness areas, such as the Wichita Mountains. I also expressed concerns about the public health impacts of haze pollution. I understand that haze-causing pollutants, such as sulfur dioxide and fine particulate matter, also pose a serious health threat. I am concerned about the impacts of these pollutants on my health, and the health of my family and friends, and concerned that this health risk will worsen if levels of these pollutants are allowed to increase.

6. Where I live, we also periodically have haze pollution that I believe threatens my health, and that detracts from my enjoyment of the outdoors there. If haze-causing pollution, especially fine particle pollution, is allowed to increase, I am concerned that visibility and air quality will worsen in my community, increasing the risk to my health and further detracting from my enjoyment of the outdoors there.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of October, 2011.

Christopher D. Applegate
Christopher D. Applegate

**Declaration of Glen Besa**

1. I am a life member of Sierra Club and have been a member since 1988.

2. I have been employed with the Sierra Club starting in 1996. Since 2008, my full time job has been as Director of the Virginia Chapter of Sierra Club. I also served in that capacity from 2000 to 2002. Between 2002-2007, I worked as Regional Director for Sierra Club's Appalachian Regional Office, which coordinates activities of the Club's chapters in the District of Columbia, Delaware, Georgia, Maryland, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia. I have also previously worked for the American Lung Association of Maryland (ALAM) as an advocate on clean air issues in Maryland. Much of my work for both organizations has focused on advocacy for strong measures to limit air pollution from major new and expanded factories and power plants. This work has included opposing deficient (in our view) air pollution permits for new power plants such as a coal plant in Wise County, VA now under construction, and one that is currently proposed for Surry County, VA. I have offered and mobilized the public to offer testimony on many federal and state air pollution regulations as well as lobbying on legislation related to air pollution.

3. I work in Richmond, Virginia and live in adjoining Chesterfield County, and have lived in metro Richmond since 1998. I spend substantial amounts of time outdoors at my house and in my community jogging, hiking, biking, and doing yard work. I also travel frequently to other parts of the state on Sierra Club business, and regularly spend time outside on these trips conducting outdoor events including tabling at fairs and festivals that require me to spend hours outside.

4. Through my work with Sierra Club and the Lung Association, I have become very familiar with threats posed by air pollution to human health and the environment. Protecting public health and the environment from air pollution is a priority of both the Club and ALAM, and has been for many years. I am aware that the air in Richmond and other places I visit in Virginia is often polluted with PM2.5 due to emissions from industries, power plants and other sources. I am also aware that PM2.5 pollution is associated with a variety of serious adverse health effects, including aggravation of asthma, decreases in lung function, development of chronic bronchitis, heart problems, and premature death. I am further aware that PM2.5 pollution is a major cause of regional haze and visibility impairment.

5. I am very concerned about the threat posed to my health and welfare by PM2.5 pollution in places where I live, work and recreate. I have had asthma since childhood and take medication daily to control it. I know from published reports and personal experience that my asthma puts me at particularly high risk of adverse health effects from PM2.5 pollution. On days in metro Richmond when air pollution is high, I curtail or adjust my physical activities. Even so, I often experience more intense asthma symptoms and have to increase my medication. I am concerned that the threat to my health will increase if PM2.5 pollution levels are allowed to rise in the

places where I live, work and recreate. I do not want additional air pollution to make it more difficult for me to engage in outdoor activities and exercise that help protect my health and give me personal enjoyment.

6. I visit Shenandoah National Park at least once a year, for recreation and aesthetic enjoyment, and I plan to continue doing so each year in the future. My wife and I spent our honeymoon in Shenandoah National Park and just celebrated our Tenth Anniversary last May by spending the weekend in the park. We go there to hike, breathe fresh air, view the beautiful scenery and vistas, and enjoy the plant and animal life there. Unfortunately, our enjoyment of the Park is diminished by haze pollution, which often obscures the scenic vistas and often exacerbates my asthma symptoms. From my work, I am aware that PM2.5 pollution is a major cause of this haze in the Park. I am very concerned that the haze will worsen and our enjoyment of the park will be further diminished if PM2.5 pollution in and around the Park is allowed to increase. Additionally, Sierra Club throughout its 119 year history has advocated for the protection of our National Parks, and protecting Shenandoah National Park is part of my job as Virginia Chapter Director.

7. Through my work with Sierra Club and the Lung Association, I have become familiar with sources of air pollution in Virginia, Maryland, and the Appalachian region. I am aware that there are numerous large power plants and industrial plants in Virginia that emit large amounts of PM2.5 (including its precursors like NOx and SO2), and also numerous such plants in surrounding and upwind states whose emissions often drift into Virginia. I am also aware that states periodically receive applications from these kinds of major sources for prevention of significant deterioration (PSD) permits for modifications that will increase their pollution emissions.

8. I am further aware that there have been and are proposals in Virginia and nearby states for major new power plants that would emit significant quantities of PM2.5 and its precursors and that require PSD permits. For example, a major new coal-fired power plant – authorized by a PSD permit issued by Virginia (a permit that Sierra Club and I, as the Chapter's Director, objected to for, among other things, failure to adequately address PM2.5) – is now under construction in Wise County, Virginia that will emit substantial amounts of PM2.5. A PSD permit has also been issued for the Wellington power plant in Greene County, Pennsylvania, whose emissions are projected to contribute to degradation of air quality in Shenandoah National Park. A number of other PSD permits have been proposed or recently issued in North Carolina, South Carolina, and Tennessee, states whose emissions can and do drift into Virginia. http://www.epa.gov/region4/air/permits/PSDapplications.htm.

9. Based on the above and my experience, it is reasonable to expect that additional proposals for PSD permits, including permits for plants emitting major amounts of PM2.5, will be submitted in the future in Virginia and other states whose emissions impact Virginia. I am very concerned that increases in PM2.5 emissions authorized by the granting of such permits will worsen PM2.5

pollution where I live, work, and enjoy outdoor recreation, thereby further endangering my health and welfare, and my enjoyment of places like Shenandoah National Park. I believe that there is already too much PM2.5 pollution going into the air in and around Shenandoah National Park. I am also aware that this park is a Class I area under the Clean Air Act which means that it is supposed to receive particular care from the states and the federal government, including the U.S. Environmental Protection Agency (EPA), but I am concerned that EPA is not protecting air quality enough to allow me to continue enjoying it as I wish to do.

10. I was dismayed to learn that EPA has adopted a rule allowing issuance of PSD permits to major sources of PM2.5 pollution even if emissions from those sources will cause or contribute to violations of health standards or increments for PM2.5. As I understand it, the rule allows this result if the source predicts that its impact on ambient PM2.5 levels will fall below certain specified "significant impact levels" ("SILs"). I am aware that the state of Pennsylvania used the same kind of approach to justify issuing a PSD permit for the Wellington Power Plant in Greene County, PA, in 2006, even though emissions from that plant were projected to worsen violation of the SO2 increment for Shenandoah National Park. The state determined that the permit was allowable because the Wellington plant's projected impact on SO2 levels at Shenandoah fell below a SIL that EPA had proposed for SO2.
http://ehb.courtapps.com/efile/documentViewer.php?fileName=2782.2217.pdf. (pages 61-68). I am very concerned that EPA's adoption of SILs for PM2.5 will be used in similar ways to authorize additional degradation of air quality and violation (or worsening of existing violations) of clean air standards or increments in places where I live, work , and recreate, including Shenandoah National Park.

11. I was also dismayed to hear that EPA has adopted a rule allowing some proposed major new and modified power plants and factories to avoid providing a year's worth of PM2.5 ambient air quality monitoring data as part of their PSD permit applications. I believe such monitoring information would be valuable and important to me in determining whether a proposal will cause or contribute to air quality or increment violations, and in determining the degree to which the proposal threatens my health and welfare. Virginia does not have that many PM2.5 ambient monitors, and many counties have no official monitors at all. I am very concerned that waiver of monitoring requirements will mean that more permits will be issued that will cause serious harm to the air in the places I live, work and recreate. I am also concerned these monitoring waivers will make it more difficult for me to do my job on behalf of the Virginia Chapter. We need air monitoring information, in particular, in order to be able to evaluate the potential impacts of a proposed permit when added to existing pollution levels, inform our members about those impacts, and develop informed comments or other action to protect our air from a proposed new source.

12. I support the efforts of Sierra Club to ensure that EPA rules require full compliance with provisions of the Clean Air Act governing prevention of air quality deterioration and requiring

compliance with air quality standards and increments in the places where I live, work, and enjoy outdoor recreation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of November, 2011.

Glen Besa

**DECLARATION OF ANN E. BRODERSEN**

1. My name is Ann E. Brodersen. I am 66 years old and live in Sioux City, Iowa. I have lived at my current address since 1983.
2. I am an active member of the Sierra Club and have been since 2000. Until summer 2010, I served as Public Relations Chair for the Northwest Iowa Group of the Club's Iowa Chapter. I also served on the Executive Committee for the group until summer 2010. I believe in the Club's mission to enjoy, explore and protect the planet, including the quality of its air.
3. I live about 14 and a half miles north of the George Neal North coal-fired power plant. I am aware from the plant's air permit application that the plant plans modifications that will increase its potential emissions of fine particulate matter ("$PM_{2.5}$") pollution by over 300 tons per year. By reviewing the material the state released on this project after it was permitted, I became aware that the permit was issued without full review of its air quality impact. I would have liked the opportunity to review this information and seek help from Sierra Club reviewing it before the permit was issued.
4. From resources available on EPA's website, I am aware that $PM_{2.5}$ pollution is a significant threat to human health and the environment and that it contributes to haze, which impairs visibility.
5. Air quality affects my quality of life. I recently traveled to over 10 national parks in the West. I saw air quality in a lot of different areas. Air quality where there were big industrial facilities and coal was being burned was definitely not as good. There were places where the air was much clearer and much better than in Sioux City. When it was better, it was easier to breathe and it was less hazy. I enjoy being in places with better air quality.
6. I am concerned about air quality in the Sioux City area. I don't think that our air quality is very good. There are meat packing and tanning plants across the river, like the Tyson and BPI plants, and the power plant to my south. A lot of times here, I can smell air pollution and see haze when I get up.
7. I walk two miles every day usually right in my neighborhood, and sometimes in local parks or along the riverfront, all in the area near my home. In particular, I enjoy regularly going to walk in parks in and around Sioux City, including Snyder Bend Park, which is about 3 and a half miles south of the George Neal North plant, Bacon Creek Park, in southern Sioux City, and Crystal Cove, in South Sioux City, Nebraska. I walk in them and enjoy the scenery there. Sometimes I bring a picnic. On days that it is hazy, it is harder to breathe, and I enjoy my walks less and sometimes change what time I go for my walk. I regularly go to Stone State Park. I should be able to see Iowa, Nebraska, and South Dakota from there, but on hazy days, I can't. This diminishes my enjoyment of going to the park.
8. In addition, the Loess Hills are a unique National Natural Landmark containing bluffs, prairie and forest within a few miles of where I live, covering a total of 650,000 natural acres and stretching from Sioux City down to Omaha. The Hills provide habitat for 49 species of wildlife. The President recently named Loess Hills as a landmark within the Great Outdoors Initiative. My local Sierra Club chapter and the Nature Conservancy organize recreational activities, including hiking and an annual workshop on its special ecological values for members. During these events and several other times a year, I visit the Loess Hills to hike, watch birds, and to view plants and other wildlife. When I am visiting the Loess Hills, I regularly see haze. I am concerned that this haze will increase and impair my ongoing ability

to enjoy the views of these unique hills. I am also extremely concerned that the pollution will harm plants and wildlife that I appreciate observing in their natural habitat.

9. I am a Master Gardener and have a small garden at home. I grow tomatoes, herbs, cucumbers, and squash which I eat. I am concerned about the impact of air pollution on my garden and the food I eat. In addition, I am concerned about the impact of air pollution from the George Neal North Plant and other sources on the agricultural crops (corn and soybeans) as well as agricultural animals (cattle and hogs) raised in every direction for miles surrounding Sioux City, which enters the food chain in this area and affects the food I eat regularly.
10. Additional degradation of the air quality here concerns me. When I think about the threat of an increase in the quantity of emissions of fine particulate matter from the George Neal North plant, added to the existing air, I am worried about the additional risk to my health, my environment, and my well-being. I am concerned about the fact that the George Neal plant was able to get a permit without full environmental review.
11. Clean air protections for fine particulate matter pollution are very important to me. I know that at levels violating clean air standards (and even below those levels) this kind of pollution can impair my breathing, endanger my health, and threaten my enjoyment of my neighborhood, where I see deer and foxes, and the parks and Loess Hills that I regularly visit.
12. I am very concerned about other sources in our area using EPA's rule exemptions to increase their air pollution. For example, I am following the Hyperion refinery air permit process with the Sierra Club. This facility proposes to locate only about 30 miles northwest of Sioux City. I would like to be able to participate in other air permit processes and have access to full air quality monitoring information for all sources that seek to increase their air pollution to make sure their full impact is evaluated before they can get a permit.
13. I do not want other sources in my area to be able to use the same exemptions that the George Neal plant used to get a permit to increase its harmful fine particulate matter pollution.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 4, 2011.

Ann E. Brodersen

Ann E. Brodersen

DECLARATION OF ELLEN CORRIE

1. My name is Ellen Corrie. I live with my husband in Tift County, Georgia. I am 56 years old.

2. I am a member of Sierra Club and have been since 2010.

3. We live about 35 miles from the proposed site of the coal-fired Ben Hill plant, in Ben Hill County, Georgia. I learned of plans for the plant after the mayor of Fitzgerald, Georgia announced his support for the proposal. I have relied on Georgians for Smart Energy (www.georgiansforsmartenergy.org) and GreenLaw (www.green-law.org) to keep abreast of developments related to the plant. The proposed plant scares me.

4. The air in Tift County is relatively clean, and I want to make sure it stays that way. I submitted comments during the permitting process for the coal-fired plant proposed in Washington County, Georgia, and I intend to participate in the commenting process for the Ben Hill plant.

5. My husband and I lived in Atlanta for many years, but have recently moved back to Tift County, where I grew up and where my 91-year-old mother lives. We moved back in part because I really like living in an area with clean air. This is where we plan to spend our retirement.

6. We live on my family's 300 acre property. Part is farmland, and part is woodland. It has been in my family for three generations.

7. We have a garden in which we grow a lot of the vegetables we eat. My husband and I do most of the gardening.

8. I am often outdoors. I have been planting fruit trees and native plants, and I walk a lot. I am pretty miserable when I cannot go outside.

9. I buy local farm produce when possible, and am hoping to get more access to local produce.

10. My husband and I are hikers and birders. We periodically bird in Ben Hill County. The Nature Conservancy has some good spots for birding near the proposed plant site. The Ocmulgee River, which the plant proposes to use as a source of water, is especially good for birding. We see pine warblers, chirping sparrows, a variety of woodpeckers, and other birds along the Ocmulgee. I have also seen and enjoyed viewing other birds, like hummingbirds and painted buntings in Ben Hill County.

11. I am aware that burning coal emits large quantities of fine particles ("$PM_{2.5}$") into the air. I am also aware from published reports that $PM_{2.5}$ air pollution presents a substantial threat to human health and the environment and that it contributes to visibility impairment. I am very concerned that $PM_{2.5}$ air pollution from the proposed Ben Hill plant will lower air quality where I live and recreate, threaten my health and that of my family, and impair the views of the sky and countryside that I now enjoy. I am concerned that it will have a negative impact on the birds in the area. Based on reading published reports about the impacts of air pollutants on their surroundings, a subject matter I have gotten more interested in since the

Ben Hill plant was proposed, I am also concerned that fine particle pollution from the proposed Ben Hill plant will be deposited onto the ground and the water in our community and on our property. I am worried that this pollution will harm our plants, and that toxic fine particles could bioaccumulate in local plants and animals, and wind up in my body.

12. If the Ben Hill plant is built, I will be very concerned about the health threat from breathing the particles it emits whenever I am outdoors, and this will very much detract from my enjoyment of being outside, whether walking, gardening, birding, or doing anything else.

13. I am concerned about the impacts of industrial development on our clean rural air. I worry that if this plant or other major $PM_{2.5}$ sources are built in our area, I won't be able to live as long and enjoy as much as my mother has. I am very concerned that EPA's weakening of requirements for limiting fine particle pollution threatens the health and welfare of me and my family, as well as my enjoyment of my surroundings, by making it easier to construct a plant without having to demonstrate that it will not add more pollution to the air than is safe. I am also concerned that weakening air quality monitoring requirements will make it harder for me to assess the health threats I face from fine particle pollution. I rely on fellow Sierra Club members with greater technical expertise to help explain to me information about proposed sources, such as Plant Ben Hill, but they cannot keep me informed without up-to-date data.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on November 7, 2011.

Ellen Corrie

Ellen Corrie

# DECLARATION OF RANDY CUNNINGHAM

1. My name is Randy Cunningham. I am 62 years old and I reside in Cleveland with my wife. I have lived at my present address since 1998.

2. I am a member of Sierra Club and have been a member since 2004. I am the chairperson of the Coal & Energy Committee of the Northeast Ohio group of the Sierra Club. In this position, I attend monthly meetings and head the opposition to a proposed waste-to-energy plant in the Cleveland area. I have also worked on Sierra Club projects to oppose coal-fired power plants.

3. From my work with the Sierra Club, I am aware that fine particulate matter pollution causes harmful effects on human health, including aggravating respiratory symptoms. I am also aware that the health risks from this kind of pollution are even greater to people with existing respiratory ailments and to older adults. Also because of my work with the Club, I am aware of a number of industrial plants in the Cleveland area that emit air pollutants, including fine particles, and that this pollution causes visibility-impairing haze, harms ecosystems, and can travel long distances in the atmosphere.

4. From my work with the Sierra Club, I know that the air quality in the Cleveland area is sub-optimal and I am aware that it is designated as a "non-attainment" area for fine particulate matter air pollution. We have had several medical professionals come to Sierra Club meetings to give presentations on the health effects of fine particulate matter air pollution.

5. I am also aware of the elevated levels of particulate matter air pollution in the Cleveland area because I frequently see a visible haze over Lake Erie as I ride the Rapid Transit train in Cleveland.

6. My wife suffers from sinus infections and respiratory ailments. The elevated level of particulate matter air pollution in the Cleveland area makes it more difficult for her to breathe, which is very distressing to me.

7. I enjoy spending time outdoors in my yard, as well as canoeing. I frequently canoe on the Cuyahoga River east of Cleveland, where there are various city parks and recreation easements. I also periodically travel to the Adirondack Mountains to canoe. I am very concerned about the detrimental effects increased levels of particulate matter air pollution will have on these places I visit regularly. Being outdoors in nature is very important to me, and if the natural setting is harmed, I will enjoy my outdoor activities less.

8. For the above reasons, I am concerned about the threats posed to my health and that of my wife by fine particulate matter air pollution in my community. I am also concerned that these health threats will increase if fine particulate matter is allowed to increase.

9. I have participated in the air permitting process for coal-fired power plants by providing testimony to the Ohio Environmental Protection Agency.

10. I plan to continue participating in the air permitting process for sources of particulate matter air pollution that would cause further deterioration to the air quality in the Cleveland area. I also rely on Sierra Club to help protect me by participating in air permitting processes for sources that are located outside my area but may affect fine particulate matter pollution levels in Cleveland.

11. I am extremely concerned about the EPA's weakened particulate matter regulations that would allow industrial polluters outside the Cleveland area to avoid carrying out monitoring and providing information necessary to assessing how Cleveland will be affected by their emissions. I am concerned that air quality here will get worse. Because the air quality in Cleveland is already poor, we cannot afford to have more polluters adding to the particulate matter air pollution that already undermines the health of the Cleveland community and of me and my wife.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 10, 2011.

Randy Cunningham

**Declaration of Mary Hodell**

1. I am a member of Sierra Club-Dacotah Chapter. I joined Sierra Club in 2009 and intend to continue to be an active member.

2. I am 32 years old and live in a rural area about 10 miles from South Heart, ND. I have lived here for about 5 years, since July 2006. I have lived in this part of the state, western North Dakota, for my whole life.

3. I first got involved in Sierra Club because as a full-time mother I want to look out for the safety of my children and their health, as well as my own health. I also want to protect our ability to enjoy the environment together as my children grow up.

4. I joined Sierra Club after finding out about a proposed coal plant, the South Heart Coal plant which would be 2 miles from our nearby town of South Heart, ND, which is where my children go to school. So, the pollution would be going out into the air only 2 miles from the K-12 school where my older children currently attend, and my youngest will start in just a few short years. The plant would also be about two miles from my family's third generation farm, where my parents currently live, and about 12 miles from my home. The plant would be thirteen miles from Theodore Roosevelt National Park. These are all places where I and my loved ones live and visit and that is why I am so concerned about the South Heart coal plant.

5. I have five children, ages 11, 10 (both sons), 7 (daughter), 5 (son), and 2 (daughter). My three oldest children have asthma, and have been hospitalized because of it, including an ambulance trip from school for my ten year-old, just a year ago. There are no words to describe what it is like to watch your child struggle to breathe, and not be able to do anything to help them. As a mother, I am very concerned with keeping them healthy. We use air purifiers in the house and have been very diligent with monitoring their asthma. My three oldest have to take quick-acting rescue inhalers to school, and I do not want their asthma to get worse or it will affect their lives and long-term health even more. It scares me to think about my children's health getting worse because of the air pollution that they are exposed to in our area. I try to keep a positive outlook on life and do everything I can to help protect their health, because of my love for my children.

6. Enjoying outdoor activities is a real priority for me and my family. We chose to live in our rural area so that we can enjoy nature and have a peaceful home away from pollution and too much noise and city life. I regularly go on nature walks with my children near our home. We also regularly visit pastures near our home and enjoy the grasses, birds, and seeing wildlife when we can. We also like to visit our local creeks and search for frogs, especially in the springtime. Every spring we like to go looking for newborn birds and deer. Our little creek has a variety of fish, and it's a peaceful place to teach the

children how to fish in the summer. We regularly look for new rocks together and search for all kinds of wildflowers in the summer.

7. At home, in our own garden, my family and I grow our own vegetables and flowers. Each of my children has a personal garden plot in our yard, except our 2 year-old daughter who has been sharing my plot this year. I enjoy gardening with my children. We like to eat vegetables grown in our own garden.

8. We also enjoy walking and hiking regularly. I've always enjoyed biking and I continue to bike throughout the warm times of the year when I can. I recently took up running, and there is nothing more relaxing than running through the peaceful prairie. My family and I plan to bike a lot more when my youngest daughter gets old enough to bike with us.

9. One of our favorite places to go at least three times each summer, for quality family time is Theodore Roosevelt National Park. Every year we go in the warm seasons. We are only about 20 miles from the park, and I often look for spur of the moment occasions when we can get away to visit the Park. Most recently this summer, I took my children on short hiking trails in the park, and I plan to continue going in the upcoming years so that the littlest ones can work up to larger trails that we can all enjoy together. Whenever we go, we always look for prairie dogs and buffalo, and other wildlife, and we really enjoy being able to see them. We plan to continue visiting at least as often as we do now. As the children get older, I'd like to take them there more often. Going to the Park is special for me and my family and it is very important to me that we be able to continue being able to visit and build on the wonderful memories we already have of the Park. When we are there, we always enjoy the views of the sky, the prairie, and the badlands.

10. About 4 years ago, when I heard about the new South Heart coal plant project proposed to come to our area, I contacted the North Dakota Department of Health to try to find out more information about potential health impacts due to air pollution it would create. They sent me a children's health study from 2001 showing a higher occurrence of asthma and respiratory illnesses in the central part of our state, where there are a number of major coal-fired power plants and sources of pollution. This made me want to find out more and to get involved and try to stop this plant from coming so close to where my family lives and goes to school, and so close to the natural areas that we cherish. I have been active in my community on the issue of air pollution and helping to inform and organize my friends and neighbors ever since.

11. In 2007, I also helped start a local group in my area called Neighbors United to monitor and engage in advocacy on the South Heart coal plant. We reached out to Sierra Club about this coal plant because of its national work to protect people from the impacts of coal facilities. I also investigated the plant proposal to find out more information. Then, with some friends and neighbors, I started and helped lead an effort for a petition to try to

get an environmental impact statement at the local county level and to push for a zoning change to be denied, to prevent this project from moving in. We managed to get public hearings, but the county did not do a full environmental impact analysis, so that we could gather information that we wanted about the harm this plant would cause. Since then, at every opportunity, I have volunteered my time and submitted comments on the air permit for a smaller sister plant also owned by the same company. I have also submitted comments, including to the Public Service Commission on the proposed mine that the company wants to build near Theodore Roosevelt National Park to fuel the new power plant. In March of this year, I helped provide information on this part of the project to neighbors and friends, and together we sent many – approximately 3000 – comment cards to the state. There have been a number of public hearings. I've attended those hearings and asked questions to try to gain more information. I plan to continue attending future hearings and to take every opportunity to offer comments and explain why I do not think this plant should come to my area.

12. I am currently monitoring the status of the South Heart plant, which I expect will soon submit an application for an air permit to construct a plant that gasifies coal to produce hydrogen. Although the owner withdrew its original construction permit, I was extremely disappointed to learn that earlier this year it announced that it still plans to build the South Heart plant and to use coal in its operation. (See the attached letter from December 2010). Because information available shows that this plant will burn coal through combustion as part of its operation to create hydrogen and then electricity, I understand that it is likely to emit a substantial amount of fine particle matter and other harmful pollutants that contribute to create fine particle matter. I am very concerned about all of this additional pollution.

13. Based on the health effects that I have read about from coal plants and fine particle pollution, I am particularly concerned that this plant will threaten our health, especially my children's health, by adding to the fine particle and other air pollution that we breathe. Because I am aware that fine particle pollution is especially dangerous for children with asthma, I am especially concerned about this additional pollution making my children's asthma worse than it is now.

14. I'm personally concerned about all kinds of air pollution from the South Heart and other similar coal plants, including fine particle pollution and all of the pollutants that contribute to it, because of the health effects that I have read that these pollutants have. I am particularly concerned because I am aware that fine particle pollution is especially dangerous for children with asthma and I do not want my children to be exposed to this type of pollution on a daily basis, or to be personally exposed to this. I am also concerned about the harmful impacts of this pollution on the food that we grow in our own garden.

15. I also am concerned about South Heart adding too much more of this type of pollution into Theodore Roosevelt National Park. I am closely following EPA's haze rules, also. I understand from reviewing materials related to EPA's recent haze rules proposal that it has recognized the need to reduce haze at Theodore Roosevelt. www.epa.gov/region8/air/ND_RegionalalHazePublicHearingFactSheetOct2011.pdf. From reviewing available information on haze, I am aware that fine particles contribute to haze and make it worse. I'm concerned about haze generally and being able to keep our view of the fields and sky in the area where I live, and of the beautiful natural areas of the Theodore Roosevelt National Park that I love to visit with my family. I am concerned about the impact fine particles will have on wildlife both in the Theodore Roosevelt National Park as well as the wildlife that share our countryside.

16. All of these are reasons why I believe it is important not to have any exceptions from air quality review or information requirements in the permit process for South Heart or for other factories or coal plants that will emit fine particle pollution.

17. I have used Sierra Club's website on existing coal plants as a resource. (http://www.sierraclub.org/coal/map). Based on this information, I'm aware of at least 5 other coal plants that already exist within a couple of hours of where we live.

18. I am currently working to gather information and continue to communicate the need to stop the South Heart plant with the Dacotah Chapter and national Sierra Club, with the members of my local Club group and Neighbors United, and with other people concerned in my local area as well as with the local media. I have provided information to the national Sierra Club and also asked for their technical help based on their experience to help us continue monitoring this plant and reviewing its permit proposal. In July of this year, I invited staff from Sierra Club here; they came to talk with people in our community and gather information about the proposed plant and also help us prepare for the new proposed air permit.

19. I am concerned about the review and informational exemptions that I understand EPA has created for important parts of the construction permit review process for fine particle pollution. It is very important to me and my family that South Heart should be prevented from receiving any such exemptions from the Clean Air Act. The same goes for any other plant that proposes to build or expand in a way that will increase pollution where I live and enjoy outdoor activities. We need to make sure these kinds of construction permits go through the full review process and do not violate our national air quality standards.

20. In order to be able to protect myself and my family from the proposed South Heart plant, I believe that we need to have access to all of the information relevant to South Heart's impact, and air quality monitoring information is especially important. I have reviewed

some of this type of information in my experience with Sierra Club and Neighbors United, and I believe it is useful to my local group and Sierra Club as we consider and comment on the proposed permit. I am concerned that South Heart Coal and Great Northern Project Development will try to avoid providing important information and analysis in their air permit application. Because some of the issues related to this project are extremely technical, I plan to seek advice and help from Sierra Club, and I want to make sure that the Club and I have all of the information that will be necessary and valuable to review the proposed permit and participate in the comment process.

21. It is also very important to me that our permitting agency have all of the relevant information because without that we cannot trust them to even have a chance to do their job to protect us. No one should be able to cut corners in the permit process, including in the review of vital information, for such a serious matter as South Heart or any other major coal plant.

22. I'd also like to have air monitoring information generally for my area not just on South Heart but also on other permits when proposed. We do not have much information on air quality that I am aware of. Especially in the summer, because of my children's asthma when the air looks especially hazy, I often change our outdoor plans or have to avoid taking them out on our hikes around our area. I would like to know more about the current status of our air and what types and amounts of air pollution is there, including fine particle pollution, so I can use this to protect my family, especially in my advocacy on the South Heart plant.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4 day of November, 2011.

Mary Hodell

Mary Hodell

SOUTH HEART ENERGY

Rich Southwick
Vice President – Environmental

Phone: 406-266-4360
Mobile: 406-439-6766
Fax: 406-266-4577

rsouthwick@gnplp.com

SOUTH HEART ENERGY DEVELOPMENT, LLC
173 Cottonwood Rd.
Townsend, MT 59644

RECEIVED
DEC 16 2010
PUBLIC SERVICE COMMISSION

December 13, 2010

Mr. Darrell Nitschke
Executive Secretary
North Dakota Public Service Commission
600 East Boulevard, 12th Floor
Bismarck, ND 58505-0480

**Re: Letter of Intent – South Heart Hydrogen Energy Project**

Dear Mr. Nitschke:

South Heart Energy Development, LLC (SHED) is pleased to notify the North Dakota Public Service Commission (PSC) of its intent to construct and operate a 175 MW-net integrated gasification combined cycle (IGCC) electric power generating facility (facility) in southwest North Dakota near the community of South Heart in Stark County. The facility will, via gasification, convert lignite from an adjacent mine into hydrogen, which will fuel a combustion turbine in facility's power block to generate electric power.

That planned facility is a component of the South Heart Project (SHP), which will also include an adjacent surface lignite mine and related linear facilities. A permit application for the adjacent mine was filed with the PSC on March 29, 2010 and is currently undergoing review by PSC staff.

SHED is a subsidiary of Great Northern Project Development L.P. (GNPD) and Allied Syngas Corporation (ASC). GNPD is a privately held natural resource development company affiliated with Great Northern Properties – the nation's largest private coal reserve holder. GNPD, headquartered in Houston, TX, maintains offices in Bismarck, ND, in Townsend, MT and in Miles City, MT. ASC is a privately held company that owns and operates discrete projects utilizing the British Gas Lurgi (BGL) gasification technology, a technology owned by an ASC subsidiary.

In a previous letter to you dated January 23, 2008, GNPD on behalf of South Heart Coal LLC (SHC) notified the PSC that it intended to construct and operate a coal-to-synthetic natural gas production facility on the same site. This letter updates and revises that January 23, 2008 notification to reflect changes to the facility design and its products.

This letter and its attachments are intended to fulfill SHED's obligations under Chapter 69-06-03 of Title 69 of the North Dakota Administrative Code to file a Letter of Intent at least one year prior to filing an application for a certificate of site compatibility.

**Size and Type of Facility**

The planned facility would be a nominal 175 MW-net IGCC facility. The facility will use three BGL gasifiers and associated downstream process units to convert lignite from the adjacent mine into hydrogen. That hydrogen will be used to fuel a combustion turbine (CT) that will drive a generator to produce electricity. The heat energy contained in the turbine exhaust will be recovered in a heat recovery

1 PU-10-668 Filed: 12/16/2010 Pages: 3
Letter of Intent

South Heart Energy Development, LLC

Richard A. Southwiek

steam generator (HRSG) that will produce steam used to drive a steam turbine. That steam turbine will drive a second generator. This configuration is commonly referred to as IGCC.

As currently designed, the process will capture just over 90% of the carbon originally contained in the coal. That carbon, in the form of $CO_2$, will be transported via pipeline to oil fields in the Williston Basin for use for enhanced oil recovery (EOR).

The facility is intended to serve the electric power needs of North Dakota, North Dakota industries, and the people and industries of the Upper Midwest.

**Map of Project Area**

The enclosed Figure 1 is a map showing the planned SHP location in North Dakota (inset), the planned site for the SHED production facility and the location of the adjacent SHC lignite mine.

**Anticipated Construction and Operation Schedule**

SHED does not have a definitive project development schedule at this writing. However, SHED does not anticipate commencement of construction before July 2013. Were construction to begin in July 2013, SHED projects operation to begin approximately 4 years later in July 2017.

**Estimated Cost of Construction**

The current estimated cost for the construction of the facility is $2.2 billion.

SHED looks forward to working with the PSC and its staff to obtain all required approvals for the SHP production facility, its linear facilities and those for the associated lignite mine. Please do not hesitate to contact Rich Voss, V.P. Project Development at 701-223-8783 (rvoss@gnplp.com) or me at 406-266-4360 (rsouthwick@gnplp.com) with any questions.

Sincerely,

Richard A. Southwick
V.P. - Environmental

Enclosure

cc: Chuck Kerr, GNPD
Todd Joyner, SHED
Rich Voss, SHED




**LEGEND**

- ☐ Production Facility Site
- Project Boundary
- Mine Pit

2 1 0 2 MILES

1 INCH = 2 MILES
WHEN PRODUCED AT SIZE 8.5X11IN

N

**REFERENCE**

PLSS: ND HUB.
USGS Topo Quad. 2000 National Geographic Society, Hubbard.
Coordinate System: NAD 1927 StatePlane North Dakota South FIPS 3302

PROJECT

SOUTH HEART ENERGY DEVELOPMENT
SOUTH HEART PROJECT
SOUTH HEART, ND

SOUTH HEART ENERGY

TITLE

**SOUTH HEART PROJECT**
**LOCATION MAP**

Golder Associates
Denver, Colorado

| | | | | |
|---|---|---|---|---|
| PROJECT No. | | 093-2174E | FILE No. | SH_Facility_Public.mxd |
| DESIGN | AJR | 12/10/2010 | SCALE | AS SHOWN |
| GIS | AJR | 12/10/2010 | | |
| CHECK | AM | 12/10/2010 | | |
| REVIEW | RLK | 12/10/2010 | | |

FIGURE 1

DECLARATION OF JAMES KLEISSLER

1. My name is James Kleissler. I am 39 years old. I live in Swissvale, in Allegheny County, Pennsylvania. I have lived in Swissvale for three years.

2. I am a dues paying member of Sierra Club. I initially joined Sierra Club in 2000. I have held volunteer leadership positions within Sierra Club at the group and chapter levels.

3. I enjoy engaging in outdoor activities in Allegheny County, including biking, canoeing, and playing sports. Roughly twice a week I engage in one of these activities. I also enjoy hiking in Allegheny National Forest in northern Pennsylvania. I plan to continue doing so in the future.

4. I suffer from asthma. I was diagnosed in 1999. I can experience shortness of breath, wheezing, tightness of the chest, coughing, and exhaustion due to my asthma. When the air quality is worse, my symptoms are more severe and more frequent. On days when the air is bad, I often feel too exhausted to go out. Having asthma negatively affects my ability to participate in the activities that I enjoy. I also spend money on medication that I need to control my asthma.

5. The air in Allegheny County is pretty bad. I am aware from my work with the Club that Allegheny County is designated "nonattainment" for fine particulate matter ($PM_{2.5}$). I don't want the air quality here to get any worse.

6. I understand that $PM_{2.5}$ pollution is harmful to human health, and has been linked to coughing, difficulty breathing, decreased lung function, and aggravated asthma. I am aware that my asthma causes me to be particularly susceptible to the harmful effects of $PM_{2.5}$ pollution.

7. I know that $PM_{2.5}$ pollution can be transported over long distances, leading to effects far downwind from the sources of the pollution, and that pollution from outside Pennsylvania contributes to the $PM_{2.5}$ pollution problem here.

8. I am concerned that because EPA has relaxed permitting standards for sources in areas with good air quality, pollution from sources benefitting from those weakened standards will further degrade the quality of the air in Allegheny County. I am concerned that the resulting increased levels of $PM_{2.5}$ pollution will make it more difficult for me to breathe, more expensive to treat my asthma, and harder for me to enjoy outdoor activities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 8, 2011.

James Kleissler

DECLARATION OF KARLA LAND

1. My name is Karla Land. I am 65 years old and I reside in Channelview, TX, with my husband. Channelview is a suburb about 20 minutes from the heart of Houston proper and is located in Harris County. I have lived at my present address since 1992. I have lived in the greater Houston area since 1979. I also work in Channelview.
2. I am a member of Sierra Club. I have been a member since approximately 1992 and I regularly attend meetings and am active in the Club. I first joined out of concern surrounding the construction of an incinerator and the air pollution that it would produce in my town.
3. I am aware that fine particulate matter pollution is linked to harmful effects on human health, including chronic bronchitis, worsening asthma symptoms, increasing respiratory problems, and premature death from heart or lung disease. I am also aware that the health risks from this kind of pollution are even greater to people with existing respiratory ailments and to older adults.
4. My daughter has chosen to raise her son outside of the Channelview area in part because of our concerns about the harmful effects of air pollution from industrial sources. My husband and I choose to visit them, rather than having them travel to our home in Channelview, where they would be exposed to the high levels of air pollution in the area.
5. I am aware of numerous major industrial sources of air pollution in close proximity to where I live and work. I am aware that these sources contribute to the particulate matter in the air because I regularly see visible air pollution coming out of many of these sources that causes decreased visibility and the constant haze that ruins our view of the sky in Channelview.

6. The air pollution, including particulate matter, in my community diminishes my enjoyment of and ability to participate in outdoor activities. Air pollution often makes it difficult to breathe and prevents me from going outside. If it were not for the poor air quality in my community, I would spend much more time in my backyard and going for walks in my neighborhood.
7. My husband and I both love to spend time on the water. For example, we both are divers and love fishing. We reside and work three blocks from the San Jacinto River, but we will not touch the water nor eat anything from it because it is too polluted. I have read news articles saying that there is pollution in the water as a result of air and water emissions from nearby industrial facilities. If the river were not so polluted, I would love to boat and fish near my house and eat fish from the San Jacinto.
8. My husband and I purchased land outside of San Antonio, Texas, so that we can regularly travel there to enjoy time outdoors, without the same level of air pollution and haze concerns we face in Channelview. When we travel there, we take part in the outdoor activities that we enjoy, including fishing, hiking, taking nature walks, swimming, among others. I am very interested in ensuring that the air in West Texas stays clean so that we can continue to take part in these activities, which we are unable to do at home due to the high levels of pollution.
9. I suffer from chronic bronchitis and I am concerned that I will develop asthma. Many of my friends and neighbors also suffer from upper respiratory problems, which I believe to be a result of the increased levels of air pollutants, including particulate matter, in the air in Channelview and our surrounding area.

10. I am very concerned about additional air pollution because there is already so much pollution in my area that this community cannot handle any more. My personal experience makes me feel like we already have unacceptable levels of air pollution. For me to feel safer in terms of our air quality, we need to have more information about our air quality from individual sources and stronger permit requirements to make sure that our air gets better, not worse. I am aware that EPA's rules have reduced the amount of information that sources provide on fine particle pollution before they can get a permit. This is especially worrisome to me because our air quality is so bad that I just don't think we can take more harmful pollution and we need more information, not less. I am very concerned that exceptions from construction permit requirements are just going to make our air quality even worse. I am concerned that weakened protections EPA has created for fine particulate matter will allow the air to degrade even more. I cannot and do not want to avoid going outdoors completely and so I am concerned that additional air pollution will harm my health and diminish my quality of life.

11. Because I need my state agency to protect my air quality even though I am concerned about the job it has done in the past, it is very important to me for it to receive and review all of the information that the Clean Air Act requires before any sources can get a permit in my area. I also personally want to be able to review this information for new sources in my area and for Sierra Club to be able to review and analyze it with me. As a member, I rely on Sierra Club to help me evaluate information about air quality in my area and I am concerned that unless sources provide important impact and monitoring data that neither I nor Sierra Club will be able to understand the full impact sources have.

12. I am very interested in air quality data, but I do not currently have access to air quality reports and I am worried about having even less information because of EPA's rules. I would like to have more information about the air that I am breathing so I can take action to protect my health and to help my neighbors and community improve our air.
13. I have participated in the permitting process for a new source of air pollution in the past by attending community meetings and volunteering time with the Sierra Club to prevent an incinerator from coming to this community. I have helped talk with my neighbors and raised public awareness on proposed sources in the past.
14. I plan to participate in the permitting process of new and modified sources of air pollution that will increase the particulate matter pollution and harm our air quality further in Channelview, and I believe that additional information on air quality beyond what EPA's rules require would assist me in doing so.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 8, 2011.

Karla Land

Karla Land

**DECLARATION OF VIOLET LEHRER**

1. I am a Program Assistant for the Sierra Club Environmental Law Program. I have held this position since May 2008 and have been employed with Sierra Club for over three years. As part of its Beyond Coal Campaign, Sierra Club has an ongoing effort to compile information on proposed coal-fired and petroleum coke-fired power plants, coal-to-gas plants, coal-to-liquid plants, and other coal-based plants ("coal plants") in the United States. Sierra Club makes this information available to our members and the public through "Coal Plant Tracker," an online database providing up-to-date, detailed information about newly proposed coal plants across the country. *See* http://www.sierraclub.org/environmentallaw/coal/plantlist.aspx. We also track proposed modifications at existing coal plants in some instances in this database and also in our separate on-line database for existing coal plants (http://www.sierraclub.org/coal/map). I serve as Sierra Club's contact person for the Coal Plant Tracker and am regularly contacted by the general public, other organizations, and governmental officials to provide information about coal permits and plants addressed in the Coal Plant Tracker.

2. As a Program Assistant with Sierra Club, my duties include overall management of the Coal Plant Tracker and supervision of a small team of law program staff who are responsible for maintaining the timeliness, accuracy, and reliability of the Coal Plant Tracker. I am also directly responsible for maintaining the timeliness, accuracy, and reliability of information about a number of the coal plants listed on the Coal Plant Tracker.

3. As part of our duties, I and the other law program staff referenced above collect information on proposed coal plants on a regular and ongoing basis from a number of sources, including draft and final permits, permit applications, environmental impact statements, filings with state regulatory agencies, and proceedings before state public utility and service commissions. We also collect information from media sources, company and developer press releases and financial filings, as well as contacts with local and state non-profit organizations and local, state, and federal agency employees. After information on a given plant is collected and after I or another law program staff member checks this for reliability (such as through personal communication, docket research, and research in other media), we post a summary of that information on the Coal Plant Tracker. I and other law program staff add new information to the Coal Plant Tracker for each plant on an ongoing basis.

4. For the purposes of this declaration, I reviewed our Coal Plant Tracker to verify the following information on coal plants across the nation: coal plant name, developer name, location, and whether the proposed coal plant is in the process of seeking a prevention of significant deterioration permit ("PSD permit") under the Clean Air Act. Some of this information is collected in the tables attached. For purposes of both tables, a proposal remains pending unless the project developer has announced that the proposal has been terminated and has not indicated that the proposal will be renewed.

5. I have reviewed the Coal Plant Tracker and compiled Table 1 (attached), showing 18 pending or expected proposals for major coal plants that have not yet received PSD permits.

6. I have also reviewed the Coal Plant Tracker and compiled Table 2 (attached) showing 4 major coal plant permits that Sierra Club challenged successfully and that resulted in a pending remand to the state agency before it may reissue the permit.

7. I have also reviewed the Coal Plant Tracker and counted 15 additional PSD permits that Sierra Club is currently commenting on or is challenging (such as at the Environmental Appeals Board or in court).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 11, 2011, in San Francisco, CA.

Violet Lehrer

**ATTACHMENT TO VIOLET LEHRER DECLARATION**

**Table 1**

| **State** | **Developer(s)** | **Location or Plant Name** |
|---|---|---|
| AR | LS Power Development | Osceola/ Plum Point II |
| CA | Hydrogen Energy International LLC (joint BP Alternative Energy & Rio Tinto) | Hydrogen Energy California Project |
| GA | Power4Georgians LLC | Plant Ben Hill Fitzgerald |
| GA | Power4Georgians | Sandersville, Washington County Power Station |
| IL | Tenaska & Christian County Generation | Taylorville Energy Center |
| IL | Secure Energy LLC | Decatur Gasification Plant |
| IL | U.S. Department of Energy, Ameren Energy Resources Company, Babcock & Wilcox Company, & Air Liquide | FutureGen 2.0 (Meredosia refit) |
| IN | Leucadia, Indiana Gasification, LLC, & E3 Gasification | Indiana Gasification |
| KY | Fuel Frontiers, Inc. | Muhlenberg County |
| KY | Black Stallion Energy Center | Quicksand, KY |
| MN | Excelsior Energy | Mesaba Energy Project |
| MS | Rentech Development Corp. | Belwood Coal-to-Liquids Plant |
| MT | Australian-American Energy Company & Crow Reservation | Many Stars Coal-to-Liquids Plant, Big Horn County |
| ND | Great Northern Project Development & South Heart Coal | Stark County (Coal to hydrogen) |
| NY | Jamestown Board of Public Utilities | Jamestown / Chautaqua County |
| TN | Freedom Energy Diesel, LLC | East Tennessee Progress Center, Morristown, Hamblen County (Coal to liquids) |
| TX | ConocoPhillips | Sweeney Refinery Gasification Project, Brazoria County |
| VA | Old Dominion Electric Cooperative | Surry County – Cypress Creek Power Station |

**Table 2**

| **State** | **Developer(s)** | **Location or Plant Name** |
|---|---|---|
| GA | LS Power Development/Longleaf Associates | Longleaf |
| IL | Vulcan Construction | Manteno, IL |
| TX | White Stallion Energy Center, LLC | White Stallion Energy Center |
| WV | TransGas Development Systems LLC | Mingo County |

**Declaration of Brandt Mannchen**

1. I am a member of Sierra Club and have been since 1977.

2. I live in Houston, Texas. I am 59 years old and have lived in Houston or Bellaire, a community surrounded entirely by Houston, for my entire life, except for the period 1970-74.

3. I am State Air Quality Issue Chair for the Lone Star (Texas) Chapter of the Sierra Club, and also Chair of the Air Quality Committee of the Club's Houston Regional Group. I have been a volunteer with the Club on clean air issues ever since I joined because of my interest in clean air and my support for Sierra Club's mission of protecting and improving air quality. I have a bachelor's degree in Environmental Science from Sam Houston State University. I also have a master in science degree in Environmental Management from the University of Houston Clear Lake. From 1978 until my retirement in 2004, I was an air quality investigator with the Bureau of Air Quality Control in the Health & Human Services Department of the City of Houston. While there, I worked on a variety of air pollution control programs, including ambient air quality monitoring, inspections of major and minor air pollution sources, annual compliance investigation of the largest sources, and review of source compliance with prevention of significant deterioration (PSD) permits.

4. From my background, experience, and clean air work for Sierra Club, I am familiar with the nature of PM2.5 pollution and the health risks associated with it. I know that such pollution is a mixture of small particles including nitrates, sulfates, metals, and other materials. These particles can be directly emitted from smokestacks or they can form when gases like nitrogen oxides and sulfur dioxide are emitted from power plants and factories and react in the air. I am also aware that PM2.5 pollution is linked to a variety of serious health effects including decreased lung function, aggravated asthma, development of chronic bronchitis, heart problems, and premature death.

5. I spend a lot of time outside in Houston and in surrounding areas. I regularly walk and hike in and around Houston and at local parks for recreation, exercise, and to enjoy being active outdoors. On these walks and hikes I enjoy viewing plants and wildlife, and where the vantage point allows, viewing the downtown skyline. I plan to continue these activities regularly into the future.

6. I am aware that there is substantial PM2.5 pollution in Houston's air, and am very concerned about the threat posed to my health and welfare from this pollution. Based on my familiarity with air pollution sources in Houston and on published data, I know that my community has numerous industrial plants that emit large quantities of PM2.5 pollution and its precursors. For example, according to data on the state's website,[1] the Houston metro

[1] http://www.tceq.texas.gov/airquality/point-source-ei/psei.html, file name 2009statesum.xlsx (268K).

area (including Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller counties) has at least 54 industrial facilities that emit more than 100 tons per year of at least one PM2.5 precursor (NOx or SO2) and/or PM2.5, and 32 of these emit more than 250 tons per year or more of at least one PM2.5 precursor. The same website shows that statewide, there are 411 sources that emit more than 100 tons per year of at least one PM2.5 precursor and/or PM2.5, and 242 of those emit more than 250 tons per year of a PM2.5 precursor. I am also aware that PM2.5 pollution emitted by industries outside the Houston area regularly travels through the air to Houston.

7. Based on my knowledge of air pollution, I know that PM2.5 pollution is a major cause of haze and visibility impairment in my community. This haze impairs and detracts from my views of the city skyline and diminishes my enjoyment of those views.

8 I am very concerned that PM2.5 pollution will increase in my community, presenting a greater threat to my health and welfare. I know from my work experience and from my Sierra Club activities that the state frequently receives and grants applications from industrial sources in the Houston area and elsewhere in the state for PSD permits to allow these sources to significantly increase their emissions of PM2.5 pollution and/or its precursors, and from applicants seeking to build entirely new sources of these pollutants. According to the state's website, there are currently 13 PSD permit applications pending in the Houston area (Region 12) alone: www5.tceq.state.tx.us/airperm/index.cfm. The same website shows that statewide, 46 PSD permit applications are pending. These include power plants and other fuel burning sources that ordinarily emit PM2.5 and/or precursors like NOx and SO2. Based on my experience, I would expect the number of applications each year to be similar in the future.

9. Based on my work experience and Sierra Club activities, I am familiar with the PSD permit program. One of the most important requirements for obtaining a PSD permit is a showing by the source that it will not cause or contribute to violation of any national ambient air quality standard (NAAQS) or any increment. I am concerned for my health and welfare because EPA has adopted a rule that allows sources to avoid making this showing if they predict their impact on ambient PM2.5 levels will fall below fixed "significant impact" levels which (in a Class II area like Houston) are 0.3 micrograms per cubic meter (ug/m$^3$) as an annual average, and 1.2 ug/m$^3$ as a 24-hour average. I am very concerned that this approach will lead to violations of the PM2.5 NAAQS and of increments for PM2.5 in my area. According to EPA data (epa.gov/airtrends/values.html), the current (2008-10) PM2.5 "design value" in Harris County (which consists almost entirely of Houston) is 13.0 ug/m$^3$, which is only 2 micrograms below the current annual health standard (15 ug/m3). The same EPA website shows that Harris County exceeded the annual PM2.5 health standard in the 2006-08 period. Because of the large number of major sources in the Houston area and in the state generally, I am very concerned that multiple PSD permits could be issued allowing "de minimis" increases that individually or collectively will cause or contribute to violation of

PM2.5 health standards and/or increments in my community, thereby substantially endangering my health and detracting from my quality of life here..

10. From my work I am very familiar with the importance of having a reliable baseline of ambient air quality monitoring to ensure that new and expanded major air pollution sources do not cause or contribute to violations of NAAQS or increments. I am concerned that EPA has adopted a rule allowing applicants for PSD permits to avoid providing any such monitoring if they estimate that the impact of their emissions on ambient PM2.5 levels will fall below 4 $ug/m^3$ as a 24-hour average. I am very concerned that this exemption will endanger my health and welfare by allowing increases in PM2.5 pollution in my community without reliable data on existing pollution levels at the site of the proposed source and in impacted areas – levels that monitoring could well show are already within 4 ug/m3 of the standard. Given the large number of PSD permits issued in Texas and in the Houston area, I am also concerned that multiple new or modified sources will be allowed to cause or contribute to violations that we who live here are not even aware of because monitoring has been waived.

11. For all the foregoing reasons, I am very concerned that the exemptions described above create a significant threat to my health and welfare from degradation of air quality in my community due to increased PM2.5 pollution. It is important to me that air pollution not increase in my area because I want to keep my good health and continue to be able to enjoy the outdoor activities that contribute to my personal well-being.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31 day of October, 2011.

Brandt Mannchen

Brandt Mannchen

**DECLARATION OF BRUCE NILLES**

1. I am Deputy Conservation Director of Sierra Club and Senior Director of the Club's Beyond Coal Campaign. I have worked for Sierra Club since 2002, including in past roles as Director of the Midwest Clean Energy Campaign and Director of the Illinois Clean Air Campaign. I obtained a B.S. and J.D. degree from the University of Wisconsin, and am admitted to the bars of California, Illinois, and Wisconsin.

2. My responsibilities at Sierra Club include coordinating and planning the organization's conservation and clean air advocacy, including leading Sierra Club's campaign to curtail coal-based air pollution; developing and articulating Sierra Club's positions on national clean air policy issues; directing and participating in the drafting of comments on (and in some cases, challenges to) national, regional, and local actions including proposed permits for coal plants under the Clean Air Act ("the Act" or "CAA"); working with members and outside legal counsel to assist in current advocacy and litigation to advance our mission; and generally advocating for greater protection of public health and the environment from air pollution nationwide and in local communities where Sierra Club members live. My position requires me to be familiar with Sierra Club's purposes, its activities on clean air issues, and the nature and scope of its membership. I also regularly speak with and provide information to local members concerned about air pollution from coal plants and other industrial factories, including fine particle ("PM2.5") pollution.

3. Sierra Club is a nonprofit, membership organization founded in 1892 to promote a clean and healthy environment for its members (including air quality), conservation of natural resources, and the enjoyment and protection of the natural environment. Since the passage of the Clean Air Act, Sierra Club has worked to strengthen and fully implement our mission, including by engaging in public education, advocacy, and litigation for full and effective implementation of the Clean Air Act's protections. Among other things, Sierra Club has successfully opposed past attempts by EPA to weaken or waive Clean Air Act protections. *See, e.g.*, *Sierra Club v. EPA*, 536 F.3d 673, 677-78 (D.C. Cir. 2008) (vacating EPA rule preventing state and local authorities from supplementing inadequate Title V monitoring requirements); *Sierra Club v. EPA*, 551 F.3d 1019, 1028 (D.C. Cir. 2008) (holding that the requirement under CAA § 302(k) that emission standards apply at all times required vacatur of EPA's start-up, shut-down, and malfunction exemption from air toxics standards); *Sierra Club v. EPA*, 129 F.3d 137, 143 (D.C. Cir. 1997) (holding that EPA's exemption for nonattainment areas from transportation conformity review requirement violated the CAA).

4. In 2007, Sierra Club created the Beyond Coal Campaign, which aims to protect Sierra Club's members and the environment from increased air pollution created by coal plants and other industrial sources through public education, advocacy, and litigation. From the start, I have served as director of the Campaign and continue to direct this program. As part of the Beyond Coal Campaign, Sierra Club tracks, researches, submits comments on, and, if necessary, challenges permits for construction and expansion of coal-fired or coal-based power plants and other industrial sources that would generate increased air pollution, including PM2.5 and its precursors (such as nitrogen oxides, NOx, and sulfur dioxide, SO2). Among other things, the goal of such advocacy is to promote protection of the health and welfare of our members by ensuring that increased pollution from these industrial sources is limited to the full extent required by the Act. As part of our mission, it is also important to Sierra Club to protect the air in national parks, many of which are Class I areas under the Clean Air Act, from PM2.5 pollution in order to safeguard our members' ability to continue engaging in hiking, camping, biking, bird watching, wildlife and plant observation, and other recreational activities there, in a healthy and enjoyable way.

5. Sierra Club also works to educate our members and the public on the health and environmental impacts of air pollution and on proposed permits for coal plants and other major emitters of PM2.5 and its precursors, including construction permits for new and modified major sources located in attainment and unclassifiable areas under the Prevention of Significant Deterioration ("PSD") Program. Among other things, we have created a website on proposed coal plants, publish articles in *SIERRA* magazine, and use a variety of social media to communicate with our members and supporters. This includes an online database where our members can find information about significant proposed coal plants in their local area and nationwide. *See* Coal Plant Tracker Website, http://www.sierraclub.org/environmentallaw/coal/plantlist.aspx. Our website also provides information on approximately 491 existing coal plants around the United States that may seek to modify or expand their operations. *See* http://www.sierraclub.org/coal/map. In addition, the Club regularly educates and informs concerned members of the public by raising awareness through public statements about air pollution, proposals for construction and expansion of air pollution sources, and threats to public health and welfare from such proposals.

6. As part of the Campaign and its clean air advocacy, Sierra Club regularly reviews, comments on, and challenges proposed PSD permits on behalf of its members. I am aware that in the past few years the Club has commented on more than fifty PSD permit proposals for coal plants alone. The Club has also

commented on numerous PSD permit applications for non-coal sources, such as oil refineries, cement plants, and natural gas fired facilities. All of the foregoing proposals involve combustion sources that generate PM2.5 and its precursors. The Club plans to continue regularly commenting on and, where appropriate, challenging the foregoing types of PSD permits for the foreseeable future in order to prevent violations of the national ambient air quality standards ("NAAQS") and PSD increments. The Club is also actively monitoring and participating in the comment process, the remand process, or investigating or involved in an appeal or litigation on 15 pending or recently issued permits. Based on my experience, I expect that Sierra Club will comment on and if necessary challenge at least 5 and as many as 10 new PSD permits for coal plants each year for the foreseeable future. I expect that the Club will also continue to comment on and challenge PSD permits for other types of sources that emit or have the potential to emit large increases in PM2.5 and its precursors.

7. I am aware that PM2.5 pollution presents serious risks to human health, ranging from impairment of breathing and difficulty engaging in outdoor activities, work, and school, to aggravated asthma, cardiovascular disease, lung failure, lung cancer, and premature death. 72 Fed. Reg. 54,112, 54,127-28 (Sept. 21, 2007). I am also familiar with scientific information indicating that the current NAAQS for PM2.5 are not strong enough to prevent adverse health effects from PM2.5. EPA, Policy Assessment for the Review of the Particulate Matter National Ambient Air Quality Standards, EPA 452/R-11-003 (Apr. 2011), http://www.epa.gov/ttnnaaqs/standards/pm/data/20110419pmpafinal.pdf. I am also aware of the welfare impacts of PM2.5, which can harm plants, wildlife, and natural resources. 72 Fed. Reg. at 54,128-33. I am also aware of the science showing that PM2.5 is a major cause of haze that impairs visibility and makes it more difficult for people to enjoy scenic vistas in natural areas and to enjoy the skyline in urban areas. *Id.* at 51,128-29.

8. I am aware that EPA has adopted rules that authorize major sources to receive PSD permits without demonstrating that they will not cause or contribute to a violation of the NAAQS or PSD increments, if they simply provide modeling that purports to show that their impact will be below a certain "significant impact level" ("SIL"). For most areas (Class II), this is 0.3 micrograms per cubic meter ($\mu g/m^3$) as an annual average, and 1.2 $\mu g/m^3$ as a 24-hour average. 75 Fed. Reg. 64,864, 64,890 (Oct. 20, 2010). For Class I areas, this is 0.06 $\mu g/m^3$ as an annual average, and 0.07 $\mu g/m^3$ as a 24-hour average. *Id.* The SIL rule allows these sources not to provide the cumulative impact analysis mandated by the Clean Air Act. In addition, EPA's new rule on the "significant monitoring concentration"

("SMC") exempts sources with a modeled impact below the specified amount (*i.e.*, 4 $\mu g/m^3$, 24-hour average) from providing any pre-construction air monitoring information, as the Act requires. 75 Fed. Reg. at 64,895. As further explained below, these exemptions endanger the health and welfare of Sierra Club members, impair the Club's ability to provide effective comment and advocacy on proposed PSD permits, and deprive the Club and its members of vital information about the potential air quality impact of new major pollution sources.

9. The declaration of Stephen Yaver and the other declarations submitted by Sierra Club in this case (collectively, "Sierra Club declarations") show that Sierra Club members live in many of the communities that are designated attainment or unclassifiable for the 1997 and 2006 PM2.5 NAAQS, and where PSD permitting rules therefore apply. *Compare* Sierra Club declarations, *with* 40 C.F.R. Pt. 81, Subpt. C (identifying PM2.5 designations). Some of these communities have PM2.5 levels that are already close to violating the PM2.5 NAAQS, as shown by EPA's current "design value" metric of air quality. http://epa.gov/airtrends/values.html (2008-10 PM2.5 design values – table 4 county summary). For example, Harris County, Texas, where Houston is located and where Sierra Club has members, has an annual PM2.5 design value of 13.0 $\mu g/m^3$ – only 2 micrograms below the annual standard of 15.0 $\mu g/m^3$. *Id.*; *see* Mannchen Decl.; Land Decl.; Yaver Decl. Houston also violated the annual standard as recently as 2008 (the 2006-08 annual design value was 15.2 $\mu g/m^3$).

10. Other currently attainment/unclassifiable areas where Sierra Club members live are similarly close to violating the annual standard, such as Muscogee County, GA (13.1 $\mu g/m^3$ in 2010 and 14.4 $\mu g/m^3$ in 2009). http://epa.gov/airtrends/values.html (2008-10 PM2.5 design values – table 4 county summary); Yaver Decl. Other similar areas where Sierra Club members live are on the edge of violating the national 24-hour standard, which is 35 $\mu g/m^3$, *e.g.*, Dona Ana County, NM (35 $\mu g/m^3$), Mesa County, CO (35 $\mu g/m^3$), and Outagamie County, WI (34 $\mu g/m^3$). http://epa.gov/airtrends/values.html (2008-10 PM2.5 design values – table 4 county summary); Yaver Decl.

11. In addition, Sierra Club has members who live or work in communities that, although designated attainment or unclassifiable for PM2.5, actually violate the standard. For example, Ramsey County, Minnesota, where St. Paul is located and where member Mark Snyder works, has a 24-hour PM2.5 value of 37 $\mu g/m^3$ – well over the 35 $\mu g/m^3$ standard. http://epa.gov/airtrends/values.html (2008-10 PM2.5 design values – table 4 county summary); *see* Snyder Decl.; Yaver Decl. For major source permitting purposes, however, St. Paul is an "attainment" area and therefore PSD rules apply there

unless and until the area is formally redesignated by EPA as nonattainment (which, based on my experience, EPA rarely does in a timely manner, if at all). Under EPA's SIL rule, a new major pollution source projected to worsen the existing PM2.5 violation in Ramsey County by an amount up to the SIL – *i.e.*, 1.2 $\mu g/m^3$ – will still be granted a PSD permit. In fact, the rule allows an unlimited number of such permits to be issued.

12. Sierra Club also has thousands of members who live in areas designated nonattainment for PM2.5 where additional PM2.5 pollution would worsen violations of the NAAQS or make it more difficult for these areas to improve their air quality in order to reach attainment status, such as in Fairbanks North Star Borough, AK; San Francisco Bay Area, CA; San Joaquin Valley area, CA; Yuba City-Marysville, CA; Los Angeles-South Coast Air Basin, CA: Sacramento area, CA; Butte County, CA; New York City area, NY; Cuyahoga Co., OH; Klamath and Lane Co., OR; Allegheny and Philadelphia Counties, PA; Knoxville-Sevierville-LaFollette, TN; Cache and Utah Cos., Salt Lake City area (Box Elder, Davis, Salt Lake Co., Tooele, and Weber Cos.), UT; and Pierce County, WA. Yaver Decl.; *see also* http://www.epa.gov/oaqps001/greenbk/rnca.html (2006 PM2.5 nonattainment list); http://www.epa.gov/oaqps001/greenbk/qnca.html (1997 PM2.5 nonattainment list); 40 C.F.R. Pt. 81, Subpt. C (2010). EPA's rules are required to protect these members from sources located in nearby areas that would violate or exacerbate a violation of the NAAQS in their nonattainment area.

13. For example, Sierra Club members James Kleissler and Randy Cunningham (among other members) live in and enjoy recreation in Allegheny County, PA, and Cleveland, OH, respectively, which are each currently designated nonattainment due to their history of violating the NAAQS. 40 C.F.R. § 81.339 (PA designations); *id.* § 81.336 (OH designations); Kleissler Decl.; Cunningham Decl.; Yaver Decl. All permits issued right outside these nonattainment areas, or within hundreds of miles of these areas that are upwind from and send PM2.5 and its precursors into these areas, will exacerbate their nonattainment status, and only make it more difficult for these communities to improve their air quality to achieve attainment status. The current 24-hour design value for the Allegheny County area of Pittsburgh-Beaver Valley, where James Kleissler and other Sierra Club members live, is 35 $\mu g/m^3$, right on the edge of violating the 24-hour standard, and the annual design value is 13.4 $\mu g/m^3$, also close to the annual standard. http://epa.gov/airtrends/values.html (2008-10 PM2.5 design values – tables 1a, 1b Ann. Std. and 24-hr std. NAA status); *see* Kleissler Decl.; Yaver Decl. In the other part of Allegheny County (Liberty-Clairton, also designated as nonattainment),

where Sierra Club also has members, the 24-hour design value is 48 $\mu g/m^3$, and the annual design value is 16 $\mu g/m^3$ (both above the level of the standards). http://epa.gov/airtrends/values.html (2008-10 PM2.5 design values – tables 1a, 1b Ann. Std. and 24-hr std. NAA status); Yaver Decl. As another example, the current 24-hour design value for Cuyahoga County, where Cleveland is located and where Sierra Club member Randy Cunningham lives, is 33 $\mu g/m^3$ – close to the 24-hour PM2.5 standard. http://epa.gov/airtrends/values.html (2008-10 PM2.5 design values – table 4 county summary); *see* Cunningham Decl. Under EPA's SIL rule, a new major source could be granted a permit to construct just outside these nonattainment areas, even though Allegheny County is already in violation of the NAAQS, and even though such a source would cause PM2.5 levels in Cleveland to degrade to levels higher than 35 $\mu g/m^3$ and back into violation. In fact, this pollution may come from other states entirely, for, as EPA has recognized, a significant amount of the PM2.5 air pollution in these nonattainment areas comes from out-of-state. *E.g.*, Air Quality Modeling Technical Support Document for the Final Transport Rule, EPA-HQ-OAR-2009-0491-4140 at app.D at D-7 to -8; *id.* at app.F at F-4, tbl.F-2a. In fact, the rule would allow an unlimited number of such permits to be issued.

14. As a further example, Cincinnati is in the process of being redesignated from nonattainment to attainment status for PM2.5 and has an annual PM2.5 design value of 14.4 $\mu g/m^3$ – only 0.6 below the standard. http://epa.gov/airtrends/values.html (2008-10 PM2.5 design values – table 4 county summary); Direct Final Rule, 76 Fed. Reg. 64,825, 64,826 (Oct. 19, 2011); Proposed Rule, 76 Fed. Reg. 64,880 (Oct. 19, 2011). But EPA's SIL rule would allow major new sources to construct just outside the nonattainment area and worsen PM2.5 levels inside the nonattainment area by up to 0.3 $\mu g/m^3$ each. Just three such sources could place the area back in violation of the standard. And if EPA finalizes its redesignation of the area to attainment, the same thing could happen due to new sources permitted inside the metro area. Sierra Club's members in Chicago, including Kelly Pierce, are in a similar position because, although still designated nonattainment, Cook County has recently moved from violating to meeting the standards, with a current design value of 12.7 $\mu g/m^3$ for the annual standard and 33 $\mu g/m^3$ for the 24-hour standard. http://epa.gov/airtrends/values.html (2008-10 PM2.5 design values – table 4 county summary); 74 Fed. Reg. 62,243 (Nov. 27, 2009); Pierce Decl.

15. Based on my past experience, I expect that the SIL and SMC exemptions will lead to the permitting of more major sources that alone and together will create substantial increases in PM2.5 and its precursors in each of

these areas, and likely cause or contribute to violations of the NAAQS and increments. I am aware from reviewing the final rule that EPA expects the PSD program to issue about 274 permits each year. 75 Fed. Reg. at 64,892. I am also aware from publicly available information that many states have already begun implementing the SIL and/or SMC rules.[1]

16. I know from my experience in participating in permit proceedings and from review of public data that emissions from a single new power plant or industrial plant can cause substantial increases in ambient PM2.5 levels. For example, Illinois predicted that the Mississippi Lime Plant would by itself increase 24-hour levels of PM2.5 by 6.12 $\mu g/m^3$ (more than 2/3 of what is now the Class II increment) and annual levels by 1.49 $\mu g/m^3$. http://www.epa.state.il.us/public-notices/2010/mississippi-lime-pdr/project-summary.pdf. The PSD permit application for the George Neal North plant near Sioux City, Iowa predicted that the plant's modifications would produce a maximum ambient increase of 0.98 $\mu g/m^3$ on a 24-hour average. George Neal PSD Permit Application at 77 tbl. 2, https://aqbweb.iowadnr.gov/psd/9704010/PSD_PN_11-160/application.pdf. The state's project summary for the proposed Tenaska coal-fired power plant in Christian County, Illinois predicts that the project will cause a maximum ambient PM2.5 increase of 5.79 $\mu g/m^3$ 24-hour (more than half the Class II increment) and 0.82 $\mu g/m^3$ annual. http://www.epa.state.il.us/public-notices/2011/christian-county-generation/project-summary.pdf at 11-12.

17. Sierra Club's members are concerned about specific sources in these areas due to the threat they pose to their health and welfare. For example, Sierra Club's members in Manteno, IL, including declarant Ruth Reynolds, are concerned about sources like Vulcan taking advantage of EPA's new rules. Reynolds Decl.

---

[1] *See* Oregon: New Source Review/Prevention of Significant Deterioration Rule Revisions, Proposed Rule, 76 Fed. Reg. 59,090 (Sept. 23, 2011) (proposing a change to Oregon SIP to incorporate the SIL and SMC); ALA. ADMIN. CODE r. 335-3-14.03(1)(g) (2011) (SIL); *id.* r.335-3-14.04(h)(1) (SMC); Colo. Air Quality Control Comm'n, Oct. 20, 2011 Mtg., http://www.cdphe.state.co.us/op/aqcc/meetingmaterials/meetingsmaterials-102011.html (proposing SIL at 5 COLO. CODE REGS. § 1001-5(VI)(A)(2)(c) (2011) and proposing SMC at *id.* § 1001-5(VI)(B)(3)(a)(iii)); 7-1100-1125 DEL. CODE REGS. § 3.9.2 (2011) (proposing SIL); *id.* § 3.7.7.1 (proposing SMC); IDAHO ADMIN. CODE r. 58.01.01.107(3)(q) (2011) (incorporating EPA rule by reference); N.M. CODE R. § 20.2.74.303 (2011) (SIL); *id.* § 20.2.74.503 (SMC); N.Y. COMP. CODES R. & REGS. tit. 6, § 231-12.6 (2011) (SIL); *id.* § 231-12.4 (SMC); OKLA. ADMIN. CODE § 252:100-8-33(c)(1)(c) (2011) (SMC); *id.* § 252:100-8-35(a)(2) (SIL); 9 VA. ADMIN. CODE § 5-80-1695(E)(1) (2011) (SMC); *id.* § 5-80-1715(A)(2) (SIL).

Manteno, IL is in Kankakee County, which is currently designated as attainment/unclassifiable. Vulcan is a PSD permit where Sierra Club recently won a remand at the Environmental Appeals Board, requiring the state agency to redo its cumulative impact air quality analysis and review of monitoring data before it can issue a new permit decision. *In re: Vulcan Const. Materials*, 15 E.A.D. __ , Slip Op. at 18, 27-28 (Mar. 2, 2011) http://yosemite.epa.gov/oa/EAB_Web_Docket.nsf/Published%20and%20Unpublished%20Decisions/E63D7354499383FD85257847006CE8CF/$File/Remand%20Order....pdf.

18. As another example, member Glen Besa is concerned about the potential application of EPA's rules to Old Dominion's proposed Cypress Creek plant in Surry County, Virginia (which is an attainment/unclassifiable area) and other similar proposals, because additional PM2.5 pollution would threaten his enjoyment of Shenandoah National Park (a Class I area) and the health and welfare of the members in the Virginia Sierra Club chapter he directs. Besa Decl. The Beyond Coal Campaign is tracking this plant on behalf of our local members because the company previously applied for a PSD permit and has announced its plan to reapply. http://www.sierraclub.org/environmentallaw/coal/plantlist.aspx.

19. In addition, Sierra Club's members who live and enjoy recreational activities in and around Ben Hill County, Georgia, including declarant Ellen Corrie, are also concerned about increases in PM2.5 pollution due to the proposed coal plant there. Corrie Decl. Sierra Club members who live near and regularly enjoy Theodore Roosevelt National Park, which is a Class I area, 40 C.F.R. § 81.423, including Mary Hodell, are concerned that the planned South Heart coal plant will seek to use EPA's new rules as a way to get a permit and thus to impair visibility and enjoyment of the park, as well as harm their health and welfare. Hodell Decl. I am aware that South Heart Coal originally applied for a PSD air permit to build the South Heart plant near Theodore Roosevelt in North Dakota in 2005. Although it withdrew that application in the face of significant community opposition, in December 2010, South Heart announced new plans to build a new coal to hydrogen plant that will require a PSD permit.

20. In addition to Mary Hodell and Glen Besa, other Sierra Club members, such as Christopher Applegate, are also concerned about their ability to continue to enjoy Class I areas, including the Wichita Mountains Wilderness Area in Oklahoma, without increased haze and harm to their welfare interests. Applegate Decl.; 40 C.F.R. § 81.424; *see also* 40 C.F.R. Pt. 81, Subpt. D.

21. There are many major sources of PM2.5 and PM2.5 precursors within attainment and unclassifiable areas where Sierra Club members live, in adjacent and nearby areas, and in upwind areas whose emissions are often transported into the areas where Club members live. *See* http://iaspub.epa.gov/airsdata/adnet.ranking?geotype=us&geocode=usa&geoinfo=us%7Eusa%7EUnited+States&pol=NOX+SO2+PM25&year=2002&fld=percent&fld=plt_name&fld=addr&fld=county&fld=state&fld=sic&rpp=25 (EPA emissions database); http://www.sierraclub.org/coal/map. EPA's SIL and SMC rules substantially weaken the Act's protections against increased pollution from modifications and expansions of these sources, thereby threatening the health and welfare of Club members in these areas.

22. I am aware from my work and from published EPA findings that PM2.5 pollution and its precursors can travel hundreds of miles through the air from the emission points to downwind areas where it can cause or contribute to violations of PM2.5 NAAQS and increments. *See, e.g.*, 76 Fed. Reg. 48,208 (Aug. 8, 2011). Accordingly, the health and welfare of Sierra Club members are threatened not only by increases in emissions of PM2.5 and its precursors in their own communities, but also by increases in other areas both near and far.

23. I am aware of cases where major sources have invoked SIL and SMC exemptions in connection with other pollutants as a way to evade providing a cumulative impact analysis to demonstrate compliance with NAAQS and/or increments, and to avoid air monitoring requirements, even though these sources predicted extremely high levels of emissions. As to the SIL exemption, recently Sierra Club challenged Illinois EPA's use of the SIL for SO2 in a PSD permit for a coal-burning lime manufacturing plant, and the Environmental Appeals Board ("EAB") stated that a SIL could be used but remanded the permit due to the agency's failure to support the level chosen. *In re: Mississippi Lime Co.*, 2011 WL 3557194 (Aug. 9, 2011) (remanding but stating: "Although it was not improper for IEPA to use a SIL in the culpability analysis for the one-hour SO2 NAAQS, it is unclear from the administrative record what SIL value IEPA used in the culpability analysis."). In another case brought by Sierra Club, the EAB upheld Illinois EPA's grant of a PSD permit to a coal plant whose emissions were predicted to worsen violations of the SO2 NAAQS, where the state agency found that the proposed facility would not exceed the SIL (that was proposed) for SO2 or PM10. *In re: Prairie State Generating Co.*, 13 E.A.D. 1, 100-05, 2006 WL 2847225 (2006). In yet another example case, Sierra Club, challenged a Michigan permit where the state waived the increment compliance demonstration on the grounds that expected impacts fell below SILs for CO, PM10, and NOx. *In re: Northern Michigan*

*University Ripley Heating Plant*, 2009 WL 443976, 14 E.A.D. __ (Feb. 18, 2009), Slip Op. at 35 http://yosemite.epa.gov/oa/EAB_Web_Docket.nsf/PSD%20Permit%20Appeals%20(CAA)/06DBEC31EBFD8C3E85257562005231 8B/$File/Denying%20and%20Remanding...79.pdf (remanding the permit). In another case of which I am aware, a PSD permit was issued for the Wellington Power Plant in Greene County, PA, even though emissions from that plant were projected to contribute to violation of the SO2 increment for Shenandoah National Park. The state determined that the permit was allowable because the Wellington plant's projected impact on SO2 levels at Shenandoah fell below a SIL that EPA had proposed for SO2. Groce, 2005-246-R at 61-68 (Nov. 22, 2006), http://ehb.courtapps.com/efile/documentViewer.php?fileName=2782.2217.pdf. Other examples are *Sur Contra La Contaminacion v. EPA*, 202 F.3d 443, 448 (1st Cir. 2000) (affirming U.S. EPA's application of a SIL exemption for SO2 to a PSD permit without addressing EPA's authority to issue the rule in the AES Puerto Rico permit, 8 E.A.D. 324 (May 27, 1999)) and *In re Tondu Energy Co.*, 9 E.A.D. 710, 2001 WL 312458 (Mar. 28, 2001) (allowing use of SIL for PM10 and stating that "MDEQ addressed this issue by stating . . . that . . . it did not consider the contribution of other industries in the area of the Facility because the air quality impact analysis submitted by Tondu predicted that the ambient impact of the Facility's PM10 emissions would be below the significant ambient impact levels"). Additional examples of cases that I am aware of where SILs were applied to waive compliance with increments are cited in Sierra Club's comments on the proposed version of the EPA rule at issue here. EPA-HQ-OAR-2006-0605-0040 at 17.

24. In regard to the SMC, I am aware of cases where permit authorities also applied an SMC to waive preconstruction monitoring for PSD permit applicants. For example, this occurred for multiple pollutants (CO, NO2, SO2, and PM10) in *In re EcoEléctrica, LP*, 7 E.A.D. 56, 61-65, 1997 WL 160751 (1997) (also applying "significant ambient impact levels"), and for CO, PM10, and NOx in *Northern Michigan University*, 2009 WL 443976, 14 E.A.D. (Slip Op. at 57). These examples heighten my concern that the SILs and SMC for PM2.5 will be invoked to allow new or worsened violations of the PM2.5 NAAQS and increments, and to allow PSD permit applicants to evade providing a year's worth of ambient monitoring as required by the Act.

25. In addition, I am aware that a source has already invoked the SIL and SMC exemptions in Iowa for the George Neal plant. https://aqbweb.iowadnr.gov/psd/9704010/PSD_PN_11-160/application.pdf. The SIL and SMC have already undermined the permit review process and reduced the

air quality information available to Sierra Club members in Sioux City, by allowing a source to submit an application that did not contain the impact analysis and air monitoring data that is required. There is no current design value on record for Sioux City, or for many other areas of the United States. http://epa.gov/airtrends/values.html (2008-10 PM2.5 design values – table 4 county summary). For the two most recent reporting periods, EPA has called the PM2.5 air quality data "incomplete" for Woodbury County (where Sioux City is located). *Id.* Under EPA's SMC rule, major sources of PM2.5 or its precursors that predict their impact will be less than the SMC will be allowed to worsen PM2.5 pollution in Sioux City without Sierra Club members there even knowing whether the area is already violating, or close to violating, PM2.5 health standards. Thus, the lack of adequate ambient monitoring data has impaired and will impair the ability of Sierra Club and its members to determine whether pollution from proposed PSD sources will flip the area into violation of the NAAQS or an increment, or even worsen an existing violation.

26. Based on my experience with the permitting of major pollution sources, I am concerned that EPA's exemptions will soon lead to additional similar permits that use the SIL and SMC to evade Clean Air Act requirements.

27. If EPA had not issued the new SIL and SMC rules, Sierra Club and our members would have a right to review the source impact analysis and air quality monitoring data under 42 U.S.C. § 7475(a)(3), (e)(2), and EPA's rules for all major sources that apply for PSD permits. I am familiar with both types of information. Sierra Club staff regularly review and analyze these pieces of information in connection with proposed PSD permits. I have reviewed these reports in connection with dozens of permit applications in recent years. Based on my personal experience working on coal plant comments, advocacy, and litigation over the years, I consider the impact analysis and monitoring required by the Act to be central to Sierra Club's ability to evaluate whether or not a proposed permit will cause a violation of the NAAQS or of an increment. Waiving these informational requirements for certain sources makes it significantly harder for Sierra Club and its members to meaningfully consider and comment on a proposed PSD permit. For the same reasons, these waivers will substantially impair the ability of Sierra Club and its members to exercise our procedural rights to advocate for stronger limits on PM2.5 and precursor emissions as necessary to avoid violating (or worsening existing violations of) the PM2.5 NAAQS and increments and where such violations cannot or will not be avoided, to urge denial of a permit.

28. Based on my experience, a cumulative impact analysis is essential to determining whether emissions from a proposed source will cause or contribute to

violation of NAAQS and increments. Only by adding the proposed source's projected emissions impact to the impact already caused by other pollution sources and by expected emissions increases from other sources can the predicted impact on actual air quality and increment consumption be reasonably determined. I have reviewed or supervised the review of dozens of proposed PSD permits, and have never seen a case in which a prediction of the source's expected impact on air quality standing alone, without considering existing pollution levels and increment consumption, was sufficient to determine whether that source would cause or contribute to violations of the applicable NAAQS and increments. I do not believe that it is possible to assess a source's full impact on air quality by only modeling its impact in a vacuum, without consideration of how its impact will interact with other sources and emissions, to create the overall cumulative impact.

29. Based on my experience, actual ambient air monitoring data is fundamental to determining whether a proposed PSD source will or will not cause or contribute to violation of the NAAQS or increments. Sierra Club uses such monitoring data to determine whether air quality in areas likely to be impacted by the source's emissions is close to violating (or already violating) clean air standards, and whether emissions from the proposed source are therefore likely to cause or contribute to a violation. We often hire experts to assist in evaluating whether a proposed source will cause or contribute to violations of the NAAQS, and the year's worth of monitoring required by the Act is very important to inform their analysis. Without this information, our ability to offer informed comment on proposed permits is significantly diminished – as is the permitting authority's ability to determine whether the proposed source will in fact cause or contribute NAAQS violations. The fact that a proposed source predicts that its own emissions will not increase ambient PM2.5 levels more than the SMC simply does not tell us whether the increase – alone or in combination with other increases in the area – will result in a violation of the NAAQS or increments. For these reasons, EPA's SMC waiver of pre-application monitoring for PM2.5 will seriously hinder our ability to offer informed comment on proposed PSD permits, impair our ability to protect our members from air quality violations due to emissions increases, and increase the likelihood that PSD permits will be issued that in fact lead to violations of the PM2.5 NAAQS and increments. I am aware of PSD permit cases that have turned on the data provided in the cumulative impact analysis and air monitoring report. The recent remand Sierra Club won in our challenge to the Vulcan permit provides one such example. *Vulcan Construction Materials*, Slip Op. at 18, 27-28 (remanding due to failure to publish air quality impact analysis for comment and due to failure to justify use of regional instead of on-site air monitoring data).

30. Because many of our members rely on Sierra Club to protect them and their families from harmful new and modified power plants and other industrial sources, by undermining Sierra Club's ability to comment, participate in the permit review process, and then litigate effectively if needed, the exemptions also harm Sierra Club's ability to fulfill its mission and commitment to our members. I expect that for some permits, waiver of the requirements for a cumulative impact assessment and for monitoring by the PSD permit applicant will require Sierra Club to expend resources and staff time that would not otherwise have been necessary (*e.g.*, to hire our own experts to conduct cumulative impact analyses, and to use our own resources to collect data in support of such analyses) in order to provide robust advocacy on behalf of our members. Based on my past experience, I anticipate that hiring a modeling expert would likely cost Sierra Club about $5,000 to $10,000 per case.

31. The information at stake, particularly the ambient air monitoring data, is also valuable to Sierra Club and its members to assess the need to take other types of action to protect their interests and find other ways to improve local air quality. For example, in the past, Sierra Club has disseminated information gathered on air quality in connection with an individual permit challenge to our local Chicago group and allies to inform them of potential air quality problems with the proposed Indeck-Elwood permit for a coal-fired power plant. This plant was proposed next to the Midewin National Tallgrass Prairie, our nation's first such protected area, and an area Sierra Club had worked for more than a decade to protect. Our members and allies were particularly concerned about the impacts of air pollution and deposition on this area, as well as the health of the nearly 7 million people who live in the Greater Chicago area. We plan to do similar informational dissemination in the future for similar permits, but we will not be able to do so where sources invoke the SIL and SMC exemptions and therefore do not produce the otherwise-required section 165 assessments and air quality data.

32. Vacating the SIL and SMC rules would both restore protection for Sierra Club members' health and welfare and would allow Sierra Club to see all important pieces of information, as the Act requires, and to evaluate this information as part of each individual permit process, in order to submit informed, meaningful comments and engage in advocacy and litigation. If the rules are vacated, a permitting authority will not be able to ignore any source's PM2.5 emissions impact or air concentration impact as "de minimis." It also will not be able to issue a permit without full review of both a cumulative impact analysis and air monitoring report and without satisfying section 165 of the Act.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11 day of November, 2011

Bruce Nilles

DECLARATION OF KELLY PIERCE

1. My name is Kelly Pierce. I am 46 years old and I reside in Chicago with my partner. I have lived at my present address since 1991.

2. I am a member of the Sierra Club and have been a member for approximately one year. I attend monthly meetings as a member of the Air & Energy Committee of the Club's Chicago group, which is currently focusing on, among other things, passing an ordinance that would improve pollution controls on Chicago's two coal-fired power plants, fisk and Crawford. I joined Sierra Club so that I could work to improve air quality in the Chicago area.

3. From my work with the Sierra Club and independent research, I am aware that fine particulate matter pollution is linked to harmful effects on human health, including increasing respiratory problems, aggravating asthma symptoms, and premature death from heart or lung disease. I am also aware that the health risks from this kind of pollution are even greater to people with existing respiratory ailments and to older adults. Also because of that work and research, I am aware of the typical sources of fine particulate matter pollution and that this pollution can travel long distances in the air.

4. I suffer from weak adrenals and a low thyroid, which cause underactive lung and heart function. I am aware that particulate matter air pollution is especially dangerous for people who, like me, have heart or lung conditions. Particulate matter air pollution makes it more difficult for me to breathe.

5. I enjoy spending time outdoors and try to do so as much as possible. I enjoy biking, walking, and exercising at the track across the street from my home. I frequently bike on the trail in Lincoln Park.

6. Particulate matter air pollution diminishes my ability to take part in the outdoor activities that I enjoy. On days where there is a high temperature, little wind and elevated levels of humidity, I have difficulty breathing due to stagnant air pollution, including particulate matter, so I avoid taking part in outdoor activities. On these days, I have increased difficulty breathing and tire easily. Particulate matter air pollution diminishes my ability to enjoy the outdoors.

7. I know that particulate matter air pollution levels in Chicago are already elevated because I subscribe to a service that gives me air quality alerts and I have increased difficulty breathing. When I travel to visit family in Freeport, IL, approximately 115 miles away from Chicago, I find it much easier to breathe.

8. I am aware of several sources of particulate matter air pollution near my home, including Finkl & Sons, a steel plant, and Fisk and Crawford, coal-fired power plants.

9. I feel that I do not have access to enough information on air quality in Chicago. I want access to the actual numbers and real time data that come from air monitors in Chicago. Because of my health issues, this is very important to me. Before factories and power plants are allowed to increase fine particle pollution in areas where I live, work, and enjoy the outdoors, I believe I'm entitled to know, and the responsible government officials should know, whether existing air quality already violates (or is close to violating) clean air health standards in those areas.

10. I am extremely concerned because the EPA has created a rule that allows industrial polluters, in the Chicago area and outside it, who seek to increase the amount of particulate matter air pollution they dump into the atmosphere to avoid fully and accurately assessing the impacts of this pollution on the air I breathe. Without this information, I don't understand how I can trust that the government is doing its job to protect me from air pollution that sources in and around Chicago emit and that affects me here. Also, I rely on the Sierra Club to help me understand air pollution issues and to advocate on my behalf to help protect me from expansions and new sources of air pollution affecting my local area. I am very concerned about EPA's waiver rules for particulate matter air pollution because I feel that their weakened protections could cause a detrimental increase in particulate matter air pollution in the Chicago area that will threaten my health.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on November 7, 2011.

Kelly Pierce

DECLARATION OF RUTH REYNOLDS

1. My name is Ruth Reynolds. I am a member of the Sierra Club and have been since 2010. I joined Sierra Club because I'm concerned about the impacts of air pollution and other types of pollution on our world, including the places I live and regularly visit.

2. I am 57 years old and live in Manteno, Illinois. I have lived at my current address for two years.

3. I live with my son, who is a senior in college. One of my other sons, who has asthma, lives overseas and every year brings my grandchildren, who are 3 years old and 10 months old, to visit over the summer, staying for a period of one or two months.

4. I live about two miles from the Vulcan quarry, where I am aware that Vulcan is proposing to reconstruct a lime kiln that is expected to emit fine particulate pollution. I have concerns about the Vulcan plant, including the effects of gravel removal, increased truck traffic, and an increase in particulate matter air pollution.

5. I am aware that particulate matter air pollution threatens human health and the environment and that it contributes to haze in the air, which impairs views and visibility. I am aware of the increased vulnerability of certain populations in my community, especially children and people with asthma, to air pollution. I am concerned about the threat posed to my health and that of my family members from increased particulate matter emissions from the proposed Vulcan lime kiln reconstruction.

6. I enjoy the outdoors and try to spend as much time as possible outside. I regularly engage in outdoor activities, including taking my dog for frequent walks in my neighborhood, spending time near the Kankakee River and nearby parks, walking, and growing flowers and vegetables, like peppers, in my outdoor garden. I frequently visit Heritage Park in Manteno, which is approximately 1.5 miles from the Vulcan plant and is widely used by the community for outdoor recreation. I want to protect these areas from receiving more harmful air pollution from industrial sources.

7. I enjoy eating local food. I enjoy tending my garden and eating food from it, and I take advantage of the farmer's markets in Manteno and Kankakee as much as possible.

8. My family travels to Door County, Wisconsin, every year to visit state parks in the area, including Potawatomi and Peninsula State Parks. We do this every year and plan to continue doing so. I enjoy walking in the natural setting and enjoying the scenic views of the natural environment.

9. Air quality where I live and regularly visit matters to me. I think anything that would increase air pollution in the places that I live and where I enjoy outdoor recreation, including gardening and walking, should be carefully evaluated and subjected to strong pollution limits to protect my health and quality of life. In my opinion, air regulations in the past have been effective at limiting pollution, but I am concerned that sources of pollution like Vulcan and

others can now take advantage of exemptions to these regulations. I understand that these regulations would allow air pollution levels in Manteno and in places I visit to rise to unhealthy levels or to levels that diminish my enjoyment of spending time and engaging in various activities there. I am also concerned that weakened protections against air quality deterioration will be applied to the Vulcan facility and will allow more particulate matter air pollution to settle on the ground and water in the area and on my garden. I am worried that this pollution can harm my plants and the local vegetables I enjoy and that toxic fine particles could contaminate the local foods I eat, and then wind up in my body.

10. Whenever Vulcan and other facilities like it seek permission to emit significant additional quantities of air pollution into my area, I want to have important information on the air quality here to help me better understand the threats to my health and personal well-being of allowing increased pollution and to help me and the Sierra Club try to mitigate them.

11. I plan to continue relying on Sierra Club to protect my interests in not having more air pollution come to Manteno as a result of the Vulcan plant and any other industrial sources.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 8, 2011.

Ruth Reynolds, Ed.D.

Ruth Reynolds, Ed.D.

**Declaration of Marti Sinclair**

1. I am a member of Sierra Club and have been since 1992.

2. I am the co-chair of Sierra Club's national clean air team, which is a volunteer position responsible for oversight of the Club's work to protect and improve air quality. I have served as the chair (2005-2011) or co-chair (2011-present) of this committee since 2005.

3. I live in Cincinnati, Ohio, which is in the Miami River Valley area. I am 58 years old. I have two adult children, ages 22 and 25. The 25 year old lives at home and the 22 year old lives at home during breaks from college. Both of my children have asthma and I have a history of asthma. As a result, we have a greater sensitivity and are more vulnerable to health impacts from air pollution than the population in general. Because of my concern about my children's health and my love for the outdoors, I have volunteered with Sierra Club for many years to try to reduce air pollution. I am also a cancer survivor and I am concerned about the impacts of poor air quality on my health, my quality of life, and my enjoyment of the outdoors.

4. I have a master's degree in zoology from Colorado State University and worked for many years as a bench scientist. I have extensively reviewed scientific information on air pollution during my years of volunteering with the Club and leading the national air team.

5. Almost every day, I spend significant amounts of time outside. Weather permitting, I work in my flower gardens for about twenty minutes a day; some years we raise vegetables as well. On weekends my family and I spend significant time walking in public parks near our house and in and around greater Cincinnati, as well as visiting the zoo, and attending local outdoor festivals including several Octoberfest gatherings, the Cincinnati *panegyri* Greek festival, and the Celtic festival.

6. Whenever I am outside in my area, I breathe the air. Outside air also circulates into my home. Our family keeps our windows open day and night in the warm seasons to enjoy the breezes.

7. I commute 4 days a week to my office in downtown Cincinnati and work from my home office one day a week. At both offices and during my commute, I breathe the polluted air in the Miami Valley.

8. For years I have smelled air pollution from industrial sources during the course of my daily life. Many people notice the air pollution in Cincinnati and quite a few even file formal complaints; when I reviewed county records a few years ago, I found that there had been over 600 odor complaints registered with Hamilton County Department of Environmental Services in 2005-2006. Even when there is no odor, I am concerned

about the haze that I see and about the fine particulate matter pollution that I know is a constituent of that haze.

9. We resided in Oklahoma from 1988 until 1997. I joined the Sierra Club in 1994, after my son was hospitalized with life-threatening asthma. Throughout his childhood, he was rushed to the emergency room dozens of times for asthma attacks. I could see deposits of particulate matter from a local polluter coating our vehicle so my concern for my son's life was tied directly to my concern about the unrelenting heavy particulate air pollution in my neighborhood. However, my concern over the health impacts of air pollution extended to other members of my community who were also suffering from asthma or other health problems making them more vulnerable to air pollution. I worked with the Sierra Club on national and state air issues and I received the 2004 Oklahoma Wildlife Federation Air Conservationist of the Year.

10. Since moving to Ohio in 1997, my son's asthma has continued to be aggravated. He was hospitalized once again while in middle school, and now, as an adult, he keeps a rescue inhaler and a battery-operated breathing machine with him at all times. I have continued my national work to protect air quality and have continued working at the state level for reduced air pollution emissions. I commented extensively on EPA's proposed national rules for municipal waste combustors, and engaged in air permit advocacy on the Formica and Moellering plants in Cincinnati, Ohio, with the Sierra Club. I also have helped to inform and organize members of the Club and concerned citizens to submit comments and to attend hearings on a draft permit for the installation of boilers at the Cognis chemical manufacturing facility in Cincinnati. The Sierra Club, local residents of the immediate neighborhood, and union representatives all attended the public hearings.

11. From my years of experience engaging in clean air work with Sierra Club, I am familiar with the nature of fine particulate matter pollution, or PM2.5, and the health threats that it creates. I am aware that this comes from a number of major sources like power plants and chemical plants. I am also aware that nitrogen oxides (or NOx) and sulfur dioxide (SO2) are precursors that form PM2.5 in the air. I am aware of the serious health and welfare impacts associated with fine particulate matter, including aggravation of lung and respiratory problems like asthma and long-term bronchitis and cardiac function. I understand that these illnesses which are aggravated by particulate matter can cause early death and particulate matter has been linked to early mortality. In addition, I am familiar with the science showing that fine particulate matter and its precursors are major contributors to haze and visibility impairment in both urban and rural areas. I am concerned about the fact that PM2.5 can travel hundreds of miles in the air from the source to my area.

12. I am aware from my Sierra Club volunteer work, from published reports, and the dismal haze that hangs over the city during the summer months that the Cincinnati area has a

significant amount of air pollution, including fine particulate matter and its precursors. I am very concerned about the threat that this air pollution poses to my health and well-being, and the health and quality of life for my children. I am also concerned that additional fine particle pollution will increase these threats to my health and well-being, and that of my children. I am further concerned that additional fine particle pollution will increase the level of haze that we have in our air and make it harder for me to enjoy walking, visiting parks, and going to outdoor events in our area with my family for fun and shared time together.

13. Based on my work as a Sierra Club volunteer in Ohio, I am aware that many major sources of fine particulate matter – and its precursors – are located in Ohio and in surrounding states and that these sources contribute to air pollution into our area. EPA's website indicates that the most recent data showed that in my home county (Hamilton) and adjacent Ohio counties (Butler, Clermont and Warren) there are 25 sources that emit more than 100 tons per year of at least one PM2.5 precursor and/or PM2.5, and 18 of these emit more than 250 tons per year. http://iaspub.epa.gov/airsdata/adnet.ranking?geotype=co&geocode=39017+39025+39061+39165&geoinfo=co%7E39017+39025+39061+39165%7EButler+Co%2C+Clermont+Co%2C+Hamilton+Co%2C+Warren+Co%2C+Ohio&pol=NOX+SO2+PM25&year=2002&fld=percent&fld=plt_name&fld=addr&fld=county&fld=state&fld=sic&rpp=25. I am also aware that there are a number of other major polluting sources in Ohio and in other states that send their emissions downwind or empty emissions from Ohio, Indiana, and Kentucky into the Miami River Valley where it turns into haze.

14. Because our area already has so many major sources of fine particulate matter pollution, I am concerned that these and other sources will increase their emissions to even higher levels and increase the assault on our health and quality of life. I know from my volunteer experience in Ohio that the state regularly receives permit applications from sources to modify, expand, or build, and that without proper safeguards in place these sources will increase emissions impacting air quality and human health. For example, I am aware that the Sierra Club (http://www.sierraclub.org/environmentallaw/coal/plantlist.aspx) has been tracking, commenting on, and in some instances challenging many new coal power plants proposed for Ohio in just the last few years.

15. From my advocacy with Sierra Club nationally and locally over the years, I am aware of the pre-construction review permit process, or "Prevention of Significant Deterioration" (PSD) program for areas in attainment of the national ambient air quality standards. I am aware that EPA's new rules would allow certain sources to be permitted despite the fact that they cause or contribute to violations of the national PM2.5 standards. I am also aware that these rules remove the requirements to submit an analysis of a source's cumulative impact and local air monitoring information for certain sources of PM2.5 and

its precursors. From the commenting and advocacy that I have done on various sources over the years, I believe that full information about a source's impact and local air quality are both necessary for me and our local members here in Ohio to be able to investigate and file comments on that source. I have worked closely with Sierra Club to analyze proposed permits and I believe this information is important to be able to comment in a useful and informed way.

16. The loss of permit information is extremely concerning to me. I want to make sure that Ohio is required to review and analyze information that is relevant and important to determining whether a proposed source will cause or contribute to a violation of standards for PM2.5 before it issues a PSD permit. Without this information, I do not trust that the permitting agency will have what it needs to make sure a source will not cause air quality degradation that will threaten my health and my children's health. Full access to information relevant to air quality impacts of all proposed PSD sources is also important to enable Sierra Club to inform our members and affected community members about sources and their emissions' impact, as well as the quality of the air based on actual monitoring or tests, and not just estimates or modeling.

17. I have been involved in advocacy on a number of air permits (including PSD) in Ohio and have seen the state and industry take advantage of exceptions and waivers available to allow pollution, whatever the cost to public health and safety. For example, for one permit for a plant in Scioto County, Ohio, which I reviewed and wrote comments on for Sierra Club, where the state and industry found leeway, they made the permitting requirements meaningless. Process rates were redacted, production capacity was redacted, whole sections were illegible, and, due to the redacted information, Ohio EPA's calculations were unintelligible because the values of the variables were redacted; no one could check the math. In my experience here in Ohio, I expect that the Ohio EPA and Ohio industry will similarly take full advantage of all exemptions EPA has issued for particulate emissions to limit permit review and our access to information. I am concerned that air quality is likely to plummet as a consequence.

18. I am extremely concerned that new and modified major sources of fine particulate matter or its precursor pollutants will cause violations of the national PM2.5 standards here in Cincinnati, endangering my health and life, and the health and welfare of my children. I regularly attended the Hamilton County Air Quality Policy Advisory Group meetings at the Hamilton County Department of Environmental Quality from 2007 through 2009. I am aware that the design value or measure of our air in Hamilton County, where Cincinnati is located, is very close to violating the national ambient air quality standards for fine particulate matter. The current annual value for 2008-10 is 14.4 micrograms per cubic meter ($\mu g/m^3$). http://www.epa.gov/airtrends/values.html (Design Values 2008-10 for PM2.5). The current 24-hour value for 2008-10 is 31 $\mu g/m^3$. The national standards, which are supposed to protect me and my family in Cincinnati from an unsafe level of

fine particulate matter pollution, are set at 15 $\mu g/m^3$ for the annual average and 35 $\mu g/m^3$ for the 24-hour standard. Cincinnati is very close to both of those levels.

19. I am aware that in the past Cincinnati was in an area listed as nonattainment for fine particulate matter because our county could not meet the required standard and that our state has asked EPA to redesignate the area to be in attainment status. I am aware that EPA is in the process of changing our status to attainment. Because we are so close to the level of the standards, I believe that we should not allow proposed modifications, expansions, and new sources to cut corners. I am concerned about EPA's new waiver rules because I understand that they authorize new major sources to be permitted in some cases without providing sufficient monitoring information to ensure that they will not worsen our air quality. Without this ounce of prevention, a pound of cure will be required for resulting human health consequences and the inevitable deterioration of Ohio's air quality.

20. I do not believe that permitting can be done safely by granting exemptions for areas like mine that teeter on the brink of violation of current health standards for PM2.5. All additional fine particulate matter pollution that EPA's rules will allow without a full permit review process makes me concerned about my health, my children's health, and our ability to continue to enjoy the outdoor activities we love to do together. For all of these reasons, I am concerned that current and new sources will use EPA's rules as an excuse to increase harmful pollution in our area, and that I and Sierra Club will not have any recourse to have the information or opportunity we need to prevent this.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of November, 2011.

M J Sinclair

Marti Sinclair

DECLARATION OF MARK SNYDER

1. My name is Mark Snyder. I am 39 years old and live in Minneapolis, MN. I have lived at my current address since 1998.

2. I work as a pollution prevention specialist in St. Paul and focus on helping manufacturers reduce their use of toxic chemicals. I earned a B.S. in chemistry from the University of Minnesota-Twin Cities in 1997. I also have work experience on environmental compliance, including air permitting compliance, Toxic Release Inventory reporting, and hazardous waste inspections.

3. I am a member of the Sierra Club and have been since 2001. From November 2008 until last month, I served as a co-chair of the Sierra Club's North Star Chapter's Clean Air and Renewable Energy ("CARE") committee. I got involved with this committee because of my personal and professional interest in pollution prevention and because I enjoy volunteering with like-minded people, including a former professor of mine, to try to strengthen our local air quality.

4. I am familiar with fine particulate matter "$PM_{2.5}$" and its negative impacts on human health and the environment from my volunteer work with Sierra Club and my own reading on the topic. I am aware that $PM_{2.5}$ pollution is linked to breathing impairment, asthma aggravation, heart problems, and premature deaths. My committee has done some educational outreach about links between asthma and fine particulate pollution. I also am aware that $PM_{2.5}$ pollution is a major contributor to haze and visibility impairment.

5. Based in part on information available at http://www.sierraclub.org/coal/map/, I am aware that there are several large sources of $PM_{2.5}$ pollution in the area of Minneapolis/St. Paul.

6. I am a regular runner and biker. I mostly run and bike along trails in Minneapolis and sometimes in St. Paul near my office. For exercise, I run outside at least weekly during warm weather and as much as I can when the weather gets cold. I commute to work by bike on occasion during warmer months both for exercise and to avoid driving.
7. I am subscribed to receive air quality notifications by email, so I get alerts and forecasts that way. I won't run outside if I'm aware of an air quality alert. I also follow recommendations about avoiding activities that can contribute to poor air quality during alerts. It is disappointing to me when the air quality is too bad for me to be able to bike or run outside.
8. In August, I visited the St. Croix River in western Wisconsin, which is a nationally designated Wild and Scenic River, and enjoyed walking the trails there. I plan to continue to visit it regularly, at least once a year. The clean air and beautiful views of the river and the plant-life there are definitely part of the appeal of this area for me and I want to be able to enjoy them next time I visit.
9. I am very concerned about the additional risk to my health and quality of life from more permit proposals for large facilities that would increase fine particle pollution levels in Minneapolis/St. Paul or in the places like the St. Croix River that I intend to visit regularly and want to protect from air pollution.
10. I have participated in air permitting processes with our CARE committee in the past, and I plan to continue doing so in the future as proposals for sources seek permits. We have also participated in hearings on integrated resource plans for utilities and will continue to do both. For example, there is a proposal to expand operations at a garbage incinerator operated by Hennepin County in downtown Minneapolis. The proposal would increase the amount of waste burned from 1000 tons per day to 1200 tons per day. We anticipate being involved in

the permitting process if the proposal reaches that point. Having more, reliable information about existing air pollution would be extremely helpful in our participation in this and other proposals for air pollution permits in the Minneapolis/St. Paul metro area. We cannot make informed recommendations without it.

11. I am always interested in having more information about air quality for my area, both for my own personal interest and as a Sierra Club volunteer. It's helpful for deciding when and where I spend my recreational time, when and how to advocate for stronger pollution limits to protect my health and welfare, and for helping others to make informed decisions on steps needed to protect the air I breathe.

12. I am aware that EPA has issued new waivers in the permit process for sources of particulate matter. Because of these rules I am very concerned that more harmful sources will get permits than should in my area, and I am especially concerned that I and the Sierra Club will not be able to have access to the necessary information about permits. Unless we have information on each source's combined impact with other sources and on air monitoring in our area, it is extremely difficult if not impossible for us to offer informed views on proposed permits and pollution controls that are needed.

13. Without strong protection for air and full information on proposed permits, I am concerned my local air quality is going to get worse and I may not be able to do anything about it. The committee I serve on for our local Sierra Club Chapter especially needs information about proposed permits and local air quality so we can do our best to serve our local members in the Twin Cities, and so I am also very concerned that EPA's rules are going to make our job harder.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 3, 2011.

Mark Snyder

**DECLARATION OF STEPHEN M. YAVER**

1. I am the Director of Member Services and Development Operations for the Sierra Club, a non-profit corporation organized under the laws of the State of California. I work in Sierra Club's national office in San Francisco, California. I have been working at Sierra Club in that capacity since June 2007. In that capacity, I am responsible for planning, developing and directing the programs, operations and Club staff responsible for: providing information services to members, the operational and user aspects of the Club's member/donor database, the delivery of member/donor acknowledgments, the membership renewal and the door-to-door membership acquisition and conservation outreach program. My work requires that I be familiar with the Club's purpose, organization, structure and activities, and with environmental interests and concerns of Club members. My work also requires me to be familiar with the nature and scope of the Club's membership programs, its membership records, and the manner in which information on members can be retrieved.
2. The Sierra Club is a nonprofit corporation existing under the laws of California, with its principal place of business in San Francisco, CA. The Club is a membership organization dedicated to exploring, enjoying, and protecting the wild places of the earth, and to protecting and restoring the quality of the natural and human environment. The Club's actions to protect and enhance the environment include advocacy and litigation to strengthen and enforce environmental laws and regulations. Club members are greatly concerned about air quality, and the Club has a long history of activities at both the local and national levels to protect air quality, often working closely with our members to provide them with services and information that are helpful to them locally.
3. The Club regularly maintains membership records that include the address of each member. These records are regularly updated each business day to add new members, reflect address changes, and change membership status for those who are no longer active members. The records are maintained on a computer database, from which I obtained the information provided below.
4. Sierra Club currently has more than 615,000 individual members, residing in all 50 states.
5. Sierra Club has the following number of members residing in each of the following counties:
   i. Ben Hill County, GA: 10;
   ii. Woodbury County, including Sioux City, IA: 123;
   iii. Kankakee County, including Manteno, IL: 98;
   iv. Cook County, including Chicago, IL: 10,172;
   v. Hennepin County, including Minneapolis, MN: 5,512;
   vi. Ramsey County, including St. Paul, MN: 2,410;
   vii. Stark County, including South Heart, ND: 21;

viii. Hamilton County, including Cincinnati, OH: 2,222;

ix. Cuyahoga County, including Cleveland, OH: 2,673;

x. Cleveland County, including Norman, OK: 477;

xi. Allegheny County, including Pittsburgh and Swissvale, PA: 3,186 (also including Port Vue Borough: 26; Lincoln Borough: 20; Clairton City: 14; Glassport Borough: 3; Liberty: 4);

xii. Harris County, including Houston and Channelview, TX: 3,581;

xiii. Chesterfield County, including Richmond, VA: 356.

6. Sierra Club also has the following number of members residing in each of the following counties:

   a. Fairbanks North Star Borough, AK: 206;

   b. San Francisco Bay Area, CA – Alameda Co.: 11,754; Contra Costa Co.: 6,459; Marin Co.: 4,771; Napa Co.: 1,063; San Francisco Co.: 7,159; San Mateo Co.: 6,012; Santa Clara Co.: 10,759; Solano Co.: 1,084; Sonoma Co.: 4,711;

   c. San Joaquin Valley area, CA – Fresno Co.: 1,238; Kern Co.: 928; Kings Co.: 46; Madera Co. 244; Merced Co.: 257; San Joaquin Co.: 1,011; Stanislaus Co.: 810; Tulare Co.: 407;

   d. Yuba City-Marysville, CA – Sutter Co.: 99; Yuba Co.: 94;

   e. Los Angeles-South Coast Air Basin - Los Angeles Co.: 30,902; Orange Co.: 9,261; Riverside Co.: 2,952; San Bernardino Co.: 2,485;

   f. Sacramento area, CA – El Dorado Co.: 1,067; Placer Co.: 1,818; Sacramento Co.: 5,014; Solano Co.: 1,084; Yolo Co.: 1,573;

   g. Butte County, CA: 1,134;

   h. Mesa County, CO: 245;

   i. Muscogee County, GA: 105;

   j. Dona Ana County, NM: 344;

   k. New York City area, NY – Bronx Co.: 691; Kings Co.: 2,376; Nassau Co.: 2,749; New York Co.: 6,036; Orange Co.: 690; Queens Co.: 2037; Richmond Co.: 455; Rockland Co.: 720; Suffolk Co.: 3,082; Westchester Co.: 3,098;

   l. Klamath Co.: 99; Lane Co.: 1,827 (OR);

   m. Philadelphia County, including Philadelphia, PA: 2,020;

   n. Knoxville-Sevierville-LaFollette, TN - Blount Co.: 175; Knox Co.: 734; Loudon Co.: 84; Roane Co.: 7;

o. Cache Co.: 116; Utah Co.: 195; Salt Lake City area - Box Elder Co.: 26; Davis Co.: 191; Salt Lake Co.: 1,961; Tooele Co.: 46; Weber Co.: 312 (UT);

p. Pierce County, WA: 1,459;

q. Outagamie County, WI: 318.

7. These are just some examples. Sierra Club members also live in many other cities, towns, and counties throughout the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of November, 2011.

Stephen M. Yaver

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of November, 2011, I have served the foregoing **Proof Opening Brief of Sierra Club** on all registered counsel through the court's electronic filing system (ECF).

/s/David S. Baron
David S. Baron