ORAL ARGUMENT NOT YET SCHEDULED

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 10-1413

SIERRA CLUB,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent*.

ON PETITION FOR REVIEW OF FINAL ACTIONS BY THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

# BRIEF OF RESPONDENT


IGNACIA S. MORENO
Assistant Attorney General

JESSICA O'DONNELL
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0851

OF COUNSEL:
BRIAN DOSTER
SCOTT JORDAN
U.S. Environmental Protection Agency
Office of General Counsel
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460


Dated: April 6, 2012

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Respondent United States Environmental Protection Agency ("EPA") states the following:

### A. Parties, Intervenors, and Amici

All parties to this case are listed in petitioner's brief.

### B. Rulings Under Review

Petitioner seeks review of the United States Environmental Protection Agency's ("EPA's") final rule, "Prevention of Significant Deterioration (PSD) for Particulate Matter Less Than 2.5 Micrometers (PM2.5)---Increments, Significant Impact Levels (SILs), and Significant Monitoring Concentration (SMC)," 75 Fed. Reg. 64,864 (Oct. 20, 2010) ("Rule") (JAXX-XX).

### C. Related Cases

A petition for review of the rule by the State of Texas and the Texas Commission on Environmental Quality (collectively "Texas"), No. 10-1415, filed Dec. 20, 2010, also is pending before this Court. Texas's petition is currently stayed pending action by EPA in response to Texas's administrative petition for reconsideration, which EPA granted to address Texas's claims that EPA provided inadequate notice and opportunity to comment on three discrete aspects of the Rule. The undersigned counsel is not aware of any additional related cases

involving substantially the same parties and the same or similar issues pending in this or any other court.

Dated: April 6, 2012

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General

/s/ *Jessica O'Donnell*
JESSICA O'DONNELL
United States Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20024
Tel: 202-305-0851
Jessica.O'Donnell@usdoj.gov

Of Counsel:
BRIAN DOSTER
SCOTT JORDAN
United States Environmental Protection Agency
Office of General Counsel
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

*Counsel for Respondents*

# TABLE OF CONTENTS

JURISDICTION....1

STATUTES AND REGULATIONS....2

STATEMENT OF ISSUES....2

STATEMENT OF THE CASE AND FACTS....3

I. STATUTORY BACKGROUND....3

II. REGULATORY BACKGROUND....6

A. PSD Regulations....8

B. EPA's Longstanding Policy of Allowing the Use of Screening Tools to Implement the PSD Review Process....11

C. SILs and SMC under the Challenged Rule....14

1. $PM_{2.5}$ Significant Impact Levels....14

2. $PM_{2.5}$ Significant Monitoring Concentrations....18

STANDARD OF REVIEW....20

SUMMARY OF ARGUMENT....23

ARGUMENT....26

I. THE CAA AFFORDS EPA DISCRETION TO PROMULGATE SILs AS MEANS TO "DEMONSTRATE" THAT A SOURCE WILL NOT "CAUSE, OR CONTRIBUTE TO" A VIOLATION OF THE NAAQS OR INCREMENTS....26

A. EPA Reasonably Interprets CAA Section 165(a)(3) to Allow the Use of SILs to "Demonstrate" that a Source Will Not "Cause, or Contribute to" a Violation of the NAAQS or Increments. ....................26

B. EPA Agrees that SILs Should Not Be Used to Exempt a Source Whose Emissions are Shown to Cause a Violation of the NAAQS or Increment. ....................32

II. EPA's ADOPTION OF SILs IS SUPPORTED BY ITS INHERENT AUTHORITY UNDER *ALABAMA POWER* TO CREATE *DE MINIMIS* EXEMPTIONS. ....................36

A. EPA's Reasonably Interprets Section 165(a)(3) to Allow the Use of SILs as *De minimis* Thresholds. ....................38

B. EPA's Interpretation of Section 165(a)(3) to Allow the Use of SILs to Demonstrate Compliance with NAAQS and Increments Furthers the Legislative Design. ....................42

C. The SILs Identify Levels below which a Source's Impact is Truly *De minimis* and thus Requiring a Cumulative Impact Analysis Would Yield Information of Only Trivial Value. ....................43

III. EPA PROPERLY USED ITS *DE MINIMIS* AUTHORITY TO ADOPT SIGNIFICANT MONITORING CONCENTRATIONS. ....................44

A. Petitioner's Challenge to EPA's Authority to Adopt SMCs is Time-Barred. ....................47

B. EPA's Interpretation of Section 165 (e)(2) is a Permissible Construction of the Statute. ....................49

C. The SMC Implements the Legislative Design By Exempting Data that Is Not Accurate Enough to Serve any Useful Purpose. ....................51

D. The SMC Reflects the Level at Which Regulatory Benefits are Truly *De minimis*. ....................53

CONCLUSION ........................................................................................................ 56

## TABLE OF AUTHORITIES

### CASES

**Alabama Power v. EPA,*
636 F.2d 323 (D.C. Cir. 1980)........................................ 2, 22, 36, 49, 50, 51, 53

*Alaska Dep't of Envtl. Conservation v. EPA,*
540 U.S. 461 (2004)..........................................................................22

*Am. Electric Power Co. v. Connecticut,*
131 S. Ct. 2527 (2011)......................................................................22

*Burlington Truck Lines v. United States,*
371 U.S. 156 (1962)..........................................................................20

**Catawba County, N.C. v. EPA,*
571 F.3d 20 (D.C. Cir. 2009).................................................. 20, 21, 27, 28, 40

*Chevron, U.S.A., Inc. v. NRDC,*
467 U.S. 837 (1984).......................................................................... 21, 22, 27

*City of Waukesha v. EPA,*
320 F.3d 228 (D.C. Cir. 2003)..........................................................20

*Davis County Solid Waste Management v. EPA,*
108 F.3d 1454 (D.C. Cir. 1997)........................................................35

*Envtl. Def. v. Duke Energy Corp.,*
549 U.S. 561 (2007)..........................................................................22

**Envtl. Defense Fund ("EDF") v. EPA,*
82 F.3d 451 (D.C. Cir. 1996), *amended by,*
92 F.3d 1209 (D.C. Cir. 1996)............................................................ 22, 39, 44

*Entergy Corp. v. Riverkeeper, Inc.,*
556 U.S. 208 (2009).......................................................................... 21, 28, 31, 41

*Authorities chiefly relied upon are marked with an asterisk.

*In re N. Mich. Univ. Ripley Heating Plant*,
PSD Appeal No. 08-02, 2009 WL 443976 (EAB Feb. 18, 2009) ......................10

**In re Prarie State Generating Co.*,
13 E.A.D. 1 (EAB 2006)........................................................................ 13, 28

*Kokechick Fishermen's Ass'n v. Sec'y of Commerce*,
839 F.2d 795 (D.C. Cir. 1988)........................................................................41

**Medical Waste Inst. & Energy Recovery Council*,
645 F.3d 420 (D.C. Cir. 2011)................................................................... 47, 48

*Motor & Equip. Mfrs. Ass'n v. Nichols*,
142 F.3d 449 (D.C.Cir.1998)..........................................................................47

*New York v. EPA*,
443 F.3d 880 (D.C. Cir. 2006)............................................................... 39, 40, 50

*NRDC v. EPA*,
571 F.3d 1245 (D.C. Cir. 2009)......................................................................21

*Ober v. Whitman*,
243 F.3d 1190 (9th Cir. 2001) ........................................................................22

*Ohio v. EPA*,
997 F.2d 1520 (D.C. Cir. 1993)......................................................................22

*Public Citizen v. Young*,
831 F.2d 1108 (D.C. Cir. 1987)............................................................. 37, 40, 50

**Sur Contra La Contaminacion ("SURCCO") v. EPA*,
202 F.3d 443 (1st Cir. 2000)................................................................... 31, 32

*United States v. Mead*,
533 U.S. 218 (2001).........................................................................................21

**STATUTES**

5 U.S.C. § 706(2)(A) ....... 20

21 U.S.C. § 376e(b)(5)(B) ....... 40

42 U.S.C. §§ 7401-7671q ....... 3

42 U.S.C. § 7407(a) ....... 4

42 U.S.C. § 7407(d)(ii), d(iii) ....... 5

42 U.S.C. § 7409(b) ....... 3

42 U.S.C. § 7410(a)(1)-(2), (*l*) ....... 4

42 U.S.C. § 7410(a)(2)(C), (D) ....... 4

42 U.S.C. § 7411(a)(4) ....... 5, 39

42 U.S.C. §§ 7470-7479 ....... 5

42 U.S.C. § 7470 ....... 4, 41

42 U.S.C. § 7470(3) ....... 41

42 U.S.C. § 7473 ....... 4, 5

42 U.S.C. § 7475 ....... 44

42 U.S.C. § 7475(a) ....... 5

42 U.S.C. § 7475(a)(3) ....... 2, 4, 5, 8, 26, 27, 29, 37, 38, 40

42 U.S.C. § 7475(a)(7) ....... 44

42 U.S.C. § 7475(e)(1) ....... 6

42 U.S.C. § 7475(e)(2) ........ 1, 6, 9, 25, 44, 51
42 U.S.C. § 7475(e)(3) ........ 29
42 U.S.C. § 7475(e)(3)(D) ........ 6, 9, 29
42 U.S.C. § 7476 ........ 4
42 U.S.C. § 7479(1) ........ 5
42 U.S.C. § 7479(2)(C) ........ 5
42 U.S.C. § 7607(b)(1) ........ 1, 24
42 U.S.C. § 7607(b) ........ 46
42 U.S.C. § 7607(b)(1) ........ 1, 47, 48
42 U.S.C. § 7607(d)(9)(A) ........ 20

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. § 50.13 ........ 3
40 C.F.R. Pt. 51, App. S ........ 35
40 C.F.R. Pt. 51, App. W ........ 9, 10, 11
40 C.F.R. § 51.165(b) ........ 15, 35, 36, 48
40 C.F.R. § 51.165(b)(2) ........ 12, 16, 28, 29, 36
40 C.F.R. § 51.165(b)(3) ........ 29
40 C.F.R. § 51.166 ........ 6

40 C.F.R. § 51.166(i)(5) .......... 13, 14, 46, 48, 55

40 C.F.R. § 51.166(i)(5)(i)(c) .......... 18, 45

40 C.F.R. § 51.166(k) .......... 8

40 C.F.R. § 51.166(k)(2) .......... 15, 34, 35, 36, 42

40 C.F.R. § 51.166(*l*)(1) .......... 9

40 C.F.R. § 51.166(m) .......... 8

40 C.F.R. § 51.166(m)(i) .......... 9

40 C.F.R. §§ 51.166(m)(1)(iii), (iv) .......... 9

40 C.F.R. § 52.21 .......... 6

40 C.F.R. § 52.21(i)(5) .......... 13, 14, 46, 48

40 C.F.R. § 52.21(i)(5)(i)(c) .......... 18, 45

40 C.F.R. § 52.21(k) .......... 8, 34

40 C.F.R. § 52.21(k)(2) .......... 15, 35, 36, 42

40 C.F.R. § 52.21(m) .......... 8

40 C.F.R. § 52.21(m)(1)(i) .......... 9

40 C.F.R. § 52.21(m)(1)(iii), (iv) .......... 9

**FEDERAL REGISTERS**

44 Fed. Reg. 3274, 3283 (Jan. 16, 1989) .......... 12

45 Fed. Reg. 52,676 (Aug. 7, 1980) .......... 1, 13, 45

45 Fed. Reg. at 52,705 ........................................................................45
45 Fed. Reg. at 52,706 ........................................................................45
45 Fed. Reg. at 52,707 ........................................................................16, 17, 45
45 Fed. Reg. at 52,708 ........................................................................16, 17, 45, 48
45 Fed. Reg. at 52,709 ........................................................................45, 48
45 Fed. Reg. at 52,710 ........................................................1, 13, 18, 19, 45, 48, 52
45 Fed. Reg. at 52,733-34 ....................................................................47
52 Fed. Reg. 24,672, 24,713 (July 1, 1987)..........................................12, 15, 28
61 Fed. Reg. 38,250 (July 23,1996)........................................................13
61 Fed. Reg. at 38,291 ........................................................................13
61 Fed. Reg. at 38,292 ........................................................................13
61 Fed. Reg. at 38,293 ........................................................................13
70 Fed. Reg. 68,218, 68,266 (Nov. 9, 2005) ..........................................10
72 Fed. Reg. 54,112 (Sept. 21, 2007) ....................................................5
72 Fed. Reg. at 54,116 ........................................................................5
72 Fed. Reg. at 54,139 ........................................................................14, 15, 28, 30
72 Fed. Reg. at 54,141 ........................................................................10, 18, 45, 54
72 Fed. Reg. at 54,142 ........................................................................18, 54
75 Fed. Reg. 64,864 (Oct. 20, 2010)......................................................1, 6
75 Fed. Reg. at 64,865 ........................................................................7

75 Fed. Reg. at 64,866 .......... 7, 8, 9, 12, 15, 18

75 Fed. Reg. at 64,867 .......... 8, 18

75 Fed. Reg. at 64,868 .......... 5

75 Fed. Reg. at 64,890 .......... 13

75 Fed. Reg. at 64,891 .......... 11, 14

75 Fed. Reg. at 64,892 .......... 33

75 Fed. Reg. at 64,893 .......... 16, 43

75 Fed. Reg. at 64,894 .......... 16, 17, 33

75 Fed. Reg. at 64,895 .......... 45

75 Fed. Reg. at 64,896 .......... 19, 45, 53, 54

75 Fed. Reg. at 64,897 .......... 19, 48, 54

75 Fed. Reg. at 64,899 .......... 35

75 Fed. Reg. at 64,900 .......... 35

75 Fed. Reg. at 64,901 .......... 35

75 Fed. Reg. at 64,902 .......... 15

75 Fed. Reg. at 64,904 .......... 15

75 Fed. Reg. at 64,906 .......... 15

75 Fed. Reg. at 64,993 .......... 17

## GLOSSARY

| | |
|---|---|
| CAA | Clean Air Act |
| EDF | Environmental Defense Fund |
| EPA | United States Environmental Protection Agency |
| JA | Joint Appendix |
| NAAQS | National Ambient Air Quality Standards |
| NRDC | Natural Resources Defense Council |
| NSR | New Source Review |
| $PM_{2.5}$ | Fine particulate matter (particulate matter 2.5 micrometers and smaller in diameter) |
| $PM_{10}$ | Coarse particles (particulate matter 10 micrometers and smaller in diameter |
| RTC | Response to Comment |
| PSD | Prevention of Significant Deterioration |
| SILs | Significant impact levels |
| SIPs | State implementation plans |
| SMC | Significant monitoring concentration |
| $\mu g/m^3$ | Micrograms per cubic meter |

## JURISDICTION

This case involves a challenge to the United States Environmental Protection Agency's ("EPA's") final rule, "Prevention of Significant Deterioration (PSD) for Particulate Matter Less Than 2.5 Micrometers (PM2.5)---Increments, Significant Impact Levels (SILs), and Significant Monitoring Concentration (SMC)," 75 Fed. Reg. 64,864 (Oct. 20, 2010) ("Rule") (JAXX-XX). Petitioner invokes this Court's jurisdiction under Clean Air Act section 307(b)(1), 42 U.S.C. § 7607(b)(1), which requires that petitions for review of final action of EPA be filed within 60 days of the date of publication in the Federal Register.

While Petitioner purports to challenge the validity of the above-noted Rule, one of their four claims in fact challenges final action taken by EPA long ago. *See infra* argument III.A. Specifically, Petitioner claims that EPA's *de minimis* waiver of preconstruction monitoring requirements specified in Clean Air Act section 165(e)(2), 42 U.S.C. § 7475(e)(2), is unlawful; at base, this claim challenges regulations EPA issued in 1980, 45 Fed. Reg. 52,676, 52,710 (Aug. 7, 1980) (JAXX-XX). Because Petitioner failed to challenge these regulations within 60 days of their issuance, Petitioner's instant challenge to these regulations is time-barred under section 307(b)(1), 42 U.S.C. § 7607(b)(1), and this Court lacks jurisdiction to hear it.

## STATUTES AND REGULATIONS

The pertinent statutes and regulations are set forth in a separate addendum.

## STATEMENT OF ISSUES

1. Whether EPA has discretion under section 165(a)(3) of the CAA, 42 U.S.C. § 7475(a)(3), to develop methods and tools that a permit applicant may use to "demonstrate" that it does not "cause or contribute to" violations of the NAAQS and PSD increments.

2. Whether EPA reasonably adopted, under the *de minimis* authority recognized in *Alabama Power Co. v. EPA*, 636 F.2d 323, 360-61 (D.C. Cir. 1979), "significant impact levels" as screening techniques that relieve permit applicants of the need to expend resources on modeling of a proposed project combined with the emissions from other existing sources when the permit applicant shows that the air quality impact of the emissions added by its construction is *de minimis* and that additional analysis is not needed to make the demonstration required to obtain a permit.

3. Whether the relevant data and analysis in the record support EPA's finding that the particular significant impact levels promulgated for $PM_{2.5}$ represent the level below which the burdens of requiring a cumulative air quality analysis yield a gain of only trivial value.

4. Whether the Court can hear Petitioner's untimely challenge to EPA's exercise of its *de minimis* authority recognized in *Alabama Power* to establish "significant monitoring concentrations" as a screening tool to exempt proposed sources from pre-construction monitoring requirements.

5. If Petitioner's challenge to EPA's establishment of significant monitoring concentrations is not time-barred, whether EPA properly invoked its *de minimis* authority to establish a significant monitoring concentration for $PM_{2.5}$.

6. Whether the relevant data and analysis in the record support EPA's finding that the particular significant monitoring concentration promulgated for $PM_{2.5}$ represents the level below which the burdens of regulation yield a gain of only trivial value.

## STATEMENT OF THE CASE AND FACTS

### I. STATUTORY BACKGROUND

The Clean Air Act ("CAA" or "Act"), 42 U.S.C. §§ 7401-7671q, requires EPA to set National Ambient Air Quality Standards ("NAAQS") at levels requisite to protect public health and welfare. 42 U.S.C. § 7409(b). EPA has established both an annual and a 24-hour $PM_{2.5}$ NAAQS. The annual $PM_{2.5}$ NAAQS is 15 micrograms per cubic meter ($\mu g/m^3$) and the 24-hour $PM_{2.5}$ NAAQS is 35 $\mu g/m^3$. 40 C.F.R. § 50.13.

Once EPA establishes a new or revised NAAQS, States are required to develop and submit for EPA approval state implementation plans ("SIPs") that contain emission limitations and other control measures to ensure that the relevant NAAQS is achieved and maintained. 42 U.S.C. §§ 7407(a), 7410(a)(1)-(2), (*l*), 7475(a)(3). The CAA's Prevention of Significant Deterioration or "PSD" provisions are among those that must be addressed by SIPs. 42 U.S.C. § 7410(a)(2)(C), (D).

In brief, the purpose of the PSD program is to protect the public health from adverse effects of air pollution notwithstanding attainment and maintenance of air quality standards, including ensuring that construction of new or modified sources in attainment areas does not lead to significant deterioration of air quality, while at the same time ensuring that economic growth will occur in a manner consistent with the preservation of clean air resources. 42 U.S.C. § 7470. Thus, the PSD provisions require EPA to establish "increments" (discussed below) for the various NAAQS pollutants and ensure that aggregate permitted pollution increases in attainment areas do not cause significant deterioration in air quality. 42 U.S.C. §§ 7473, 7476.

The PSD provisions also set forth procedures and requirements for preconstruction review and permitting of new or modified sources of air pollution that plan to locate in areas that are classified as "attainment" or "unclassifiable"

with respect to a particular NAAQS. *See, generally,* 42 U.S.C. §§ 7470-7479.[1] The permitting requirements apply to "major emitting facilities," (hereinafter "facilities"), including new or modified sources that emit 250 tons per year or 100 tons per year for certain source categories of any air pollutants. *Id.* §§ 7475(a), 7479(1), (2)(C), 7411(a)(4).

Under CAA section 165(a)(3), to obtain a construction permit, a proposed facility subject to PSD review must demonstrate that emissions from construction or operation of such facility "will not cause, or contribute to, air pollution in excess of any (A) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which this part applies more than one time per year, [or] (B) national ambient air quality standard in any air quality control region." *Id.* § 7475(a)(3). The "maximum allowable increase" of an air pollutant that may occur above a defined baseline concentration is known as the PSD "increment." 75 Fed. Reg. at 64,868 (JAXX); 72 Fed. Reg. 54,112, 54,116 (Sept. 21, 2007) (JAXX); *see* 42 U.S.C. § 7473.

For purposes of determining whether emissions from a proposed facility will cause or contribute to an exceedance of either any increment or

---

[1] An "attainment" area is one where the air quality meets the NAAQS for a pollutant; an "unclassifiable" area is one that cannot be classified as meeting or not meeting the NAAQS for a pollutant. 42 U.S.C. § 7407(d)(ii), (d)(iii).

NAAQS, section 165(e) requires the permitting authority or the proposed facility to conduct an ambient air quality analysis including:

> continuous air quality monitoring data . . . gathered over a period of one calendar year preceding the date of the application for a permit . . . unless the State, in accordance with regulations promulgated by the [EPA] Administrator, determines that a complete and adequate analysis for such purposes may be accomplished in a shorter period.

42 U.S.C. § 7475(e)(1), (2).

Section 165(e)(3) further authorizes EPA to promulgate regulations regarding the ambient air quality analysis required for PSD review, including rules that "specify with reasonable particularity each air quality model or models to be used under specified sets of conditions for purposes of this part." *Id.* § 7475(e)(3)(D).

## II. REGULATORY BACKGROUND

Over time, EPA has promulgated comprehensive regulations and guidance setting forth detailed requirements for States to implement the PSD program. *See* 40 C.F.R. § 51.166. EPA also has established corresponding regulations for federal implementation of the PSD provisions in States that lack an EPA-approved PSD program in their SIP. 40 C.F.R. § 52.21. The final rule at issue here, "Prevention of Significant Deterioration (PSD) for Particulate Matter Less Than 2.5 Micrometers (PM2.5)---Increments, Significant Impact Levels (SILs), and Significant Monitoring Concentration (SMC)," 75 Fed. Reg. 64,864 (Oct. 20,

2010) ("Rule"), supplements these regulations to implement the PSD provisions as applied to fine particle pollution—also known as "$PM_{2.5}$."[2]

Specifically, the Rule does three things: First, it establishes "increments" for $PM_{2.5}$, which serve to limit aggregate pollution increases in attainment and unclassifiable areas to prevent significant deterioration of air quality in areas that are meeting the NAAQS. *See* 75 Fed. Reg. at 64,865 (JAXX). Second, it establishes "significant impact levels" ("SILs") for $PM_{2.5}$ that may be used in various ways in evaluating the impact that a proposed new source or modification may have on the $PM_{2.5}$ NAAQS and increments. *Id*. at 64,865-66 (JAXX-XX). Generally speaking, the SILs EPA adopted in this Rule are screening tools that may be used to identify *de minimis* circumstances where it may be unnecessary for a PSD permit applicant to conduct a more in-depth cumulative impact analysis of a proposed source's impact. Third, the Rule establishes a "significant monitoring concentration" ("SMC") for $PM_{2.5}$. *Id*. at 64,866 (JAXX). The SMC is a screening tool to identify *de minimis* circumstances where either a proposed source's impact or the existing ambient concentration of $PM_{2.5}$ is *de minimis* and thus the collection of preconstruction monitoring data would not yield meaningful information for the

[2] The "$_{2.5}$" in this acronym refers to the size of fine particulate matter, i.e., 2.5 microns or less. Other EPA regulations implement the PSD provisions as applied to relatively more coarse particulate matter up to 10 microns ("$PM_{10}$").

analysis. *See id.* at 64,866-67 (JAXX-XX). Sierra Club challenges only those provisions of the Rule relating to the $PM_{2.5}$ significant impact levels and significant monitoring concentration.

**A. PSD Regulations**

As noted above, section 165(a)(3), 42 U.S.C. § 7475(a)(3), requires that a new source or modification proposing to locate in an attainment or unclassifiable area demonstrate that its emissions will not cause or contribute to any violation of the applicable increment or the NAAQS. For this demonstration, EPA's pre-existing PSD regulations generally require sources to submit for review and approval a source impact analysis and an air quality analysis, which consist of an analysis of existing air quality that would be affected by the proposed source and a showing that the proposed source's allowable emissions would not cause or contribute to a violation of any NAAQS or increment. 75 Fed. Reg. at 64,866 (JAXX); 40 C.F.R. § 51.166(k), (m); 40 C.F.R. § 52.21(k), (m).

The source impact analysis is primarily a modeling analysis designed to show that the allowable emissions increase from the proposed source, in conjunction with other emissions increases from existing sources, will not result in a violation of either the NAAQS or the increments. 75 Fed. Reg. at 64,866 (JAXX). EPA has published guidelines for conducting this modeling analysis in a document called the Guideline on Air Quality Models (the "Guideline'), which is

incorporated in the Code of Federal Regulations. 40 C.F.R. Pt. 51, App. W. EPA's PSD regulations require modeling to be based on the Guideline. 40 C.F.R. §§ 51.166(*l*)(1), 52.21(*l*)(1). The Guideline implements CAA section 165(e)(3)(D), 42 U.S.C. § 7475(e)(3)(D),[3] by identifying air quality models and modeling techniques that should be applied in the review of PSD permit applications. 40 C.F.R. Pt. 51, App. W, § 1.0.a.

The air quality analysis must assess the ambient air quality in the area that the proposed project would affect. 75 Fed. Reg. at 64,866 (JAXX); 40 C.F.R. §§ 52.21(m)(1)(i), 51.166(m)(1)(i). Consistent with section 165(e)(2), 42 U.S.C. § 7475(e)(2), this analysis must contain air quality monitoring data that is representative of the air quality in the area affected by the proposed source for the one-year period preceding receipt of the PSD permit application. 75 Fed. Reg. at 64,866 (JAXX); 40 C.F.R. §§ 51.166(m)(1)(iii), (iv), 52.21(m)(1)(iii), (iv). Where data representative of air quality in the area already exists, the applicant may submit that available data; otherwise, the source owner or operator must install and operate monitors to collect the necessary data. 75 Fed. Reg. at 64,866 (JAXX); New Source Review Workshop Manual, Prevention of Significant Deterioration

[3] 40 C.F.R. Pt. 51, App. W, Preface (explaining how the Guideline was published to satisfy requirements of the 1977 amendments with respect to consistency in the application of air quality models).

and Nonattainment Area Permitting, at C.18-C.19 (Draft Oct. 1990) (hereinafter "NSR Workshop Manual") (JAXX-XX);[4] *In re N. Mich. Univ. Ripley Heating Plant*, PSD Appeal No. 08-02, 2009 WL 443976 (EAB Feb. 18, 2009).

EPA's Guideline recommends using monitored data to determine one component of the background concentration used in an air quality modeling exercise. 40 C.F.R. Pt. 51, App. W, Table 8-2 n.9 ("Generally, the ambient impacts from non-nearby (background) sources can be represented by air quality data unless adequate data do not exist."); *id*. § 8.2.3.f. (referencing § 8.2.2[5] of the Guidelines which describes air quality data from monitors); 72 Fed. Reg. at 54,141 (JAXX) (discussing this topic but referencing § 9.2 prior to a revision that moved this content to § 8.2).[6] Another component of the background concentration is established by explicitly modeling the impact of "nearby sources." 40 C.F.R. Pt. 51, App. W, §§ 8.2, 8.2.3.b; 72 Fed. Reg. at 54,141 (JAXX); *see also* 40 C.F.R. Pt.

---

[4] This document is referenced in the Guideline on Air Quality Models. 40 C.F.R. Pt. 51, App. W, Preface n.2. EPA developed the NSR Workshop Manual for use in conjunction with New Source Review workshops and training, as guidance for permitting authorities to be used in implementing the PSD requirements of the New Source Review Program. *See id.* (Preface).

[5] Section 8.2.3.f. of the Guidelines actually references § 89.2.2. This appears to be a scrivener's error, as the Guideline does not have a § 89 or a § 9.2.2.

[6] EPA renumbered the sections of Appendix W in 2005, and moved the content of § 9 to § 8. 70 Fed. Reg. 68,218, 68,266 (Nov. 9, 2005). The proposed rule to establish SILs and SMCs appears to reference the older § 9.2 and § 9.2.3.f, which are presently located at § 8.2 and § 8.2.3.f. respectively.

51, App. W, Table 8-2 (describing three types of source emissions data that are needed to complete a cumulative impacts analysis on a PSD permit application).

### B. EPA's Longstanding Policy of Allowing the Use of Screening Tools to Implement the PSD Review Process

A fundamental principle of the air quality modeling discipline is that a modeling analysis should begin with relatively simple estimating techniques that provide conservative estimates of air quality impact and then progress toward more refined and precise techniques as needed. 40 C.F.R. Pt. 51, App. W, §§ 2.2, 4.2.1, 4.2.2. The Guideline observes that "use of screening techniques followed, as appropriate, by a more refined analysis is always desirable." 40 C.F.R. Pt. 51, App. W, § 2.2.c. With respect to PSD permit review specifically, the Guideline states:

> The purpose of [screening] techniques is to eliminate the need of more detailed modeling for those sources that clearly will not cause or contribute to ambient concentrations in excess of either the National Ambient Air Quality Standards (NAAQS) or the allowable prevention of significant deterioration (PSD) concentration increments. If a screening technique indicates that the concentration contributed by the source exceeds the PSD increment or the increment remaining to just meet the NAAQS, then the second level of more sophisticated models should be applied.

*Id.* § 2.2.a. The use of screening approaches is partly based on the recognition that more complex air quality modeling analysis requires more resources. *Id*. § 2.1.d.; 75 Fed. Reg. at 64,891 (JAXX) ("a screening tool

greatly improves PSD program implementation by streamlining the permit process and reducing the labor hours necessary to submit and review a complete permit application").

Consistent with the Guideline, EPA has historically allowed the use of several types of screening tools to facilitate implementation of the preconstruction review process to reduce the permit applicant's burden and streamline the permitting process for *de minimis* circumstances. 75 Fed. Reg. at 64,866 (JAXX). These tools include the SILs and SMCs, described generally below.

Significant Impact Levels. The SIL, expressed as an ambient pollutant concentration ($\mu g/m^3$), has multiple uses. EPA initially promulgated SILs in 1979 as the "significance levels" under which a source may be exempt from the preconstruction review requirements in Appendix S of Part 51. 44 Fed. Reg. 3274, 3283 (Jan. 16, 1979). In 1987, EPA promulgated these SILs as a tool for showing that a predicted ambient impact resulting from the emissions increase at a proposed major new stationary source or modification would not cause or contribute to a violation of the NAAQS in an area that was not meeting the NAAQS. 52 Fed. Reg. 24,672, 24,713 (July 1, 1987) (promulgating 40 C.F.R. § 51.165(b)(2)). EPA also has interpreted this regulation to support using a SIL to show that an individual proposed source's impact is *de minimis* and thus the source is not "culpable" for a violation of the NAAQS or increment that might be predicted in

an attainment area as a result of cumulative source impact analysis reflecting the impacts of other sources in the area. 75 Fed. Reg. at 64,890 (JAXX); 61 Fed. Reg. 38,250, 38,293 (July 23, 1996); *In re Prairie State Generating Co.*, 13 E.A.D. 1, 103-09 (EAB 2006). Additionally, EPA guidance has provided for the use of the same SIL values to determine: (1) when a proposed source's ambient impacts warrant a comprehensive cumulative source impact analysis that incorporates information on the air quality impact of the emissions of other sources besides the source seeking the permit; and (2) the size of the impact area within which the air quality analysis is completed. 75 Fed. Reg. at 64,890 (JAXX); 61 Fed. Reg. at 38,293; *In re Prairie State Generating Co.*, 13 E.A.D. 1, 103-09 (EAB 2006); *see also* NSR Workshop Manual at C.24-C.31 (JAXX-XX). EPA proposed to codify some of these uses of SILs into the PSD regulations in 1996, 61 Fed. Reg. at 38,291-93, but took no final action on that proposed rule.

Significant Monitoring Concentrations. EPA initially promulgated Significant Monitoring Concentrations in 1980. 45 Fed. Reg. 52,676, 52,710 (Aug. 7, 1980) (JAXX). Using the SMC as a screening tool, sources may be able to demonstrate that it is unnecessary to gather preconstruction monitoring data for a particular pollutant at the discretion of the permitting authority. *See* 40 C.F.R. §§ 51.166(i)(5) and 52.21(i)(5); *see* NSR Workshop Manual C.16-C.18 (JAXX-XX). Such a showing can be made by demonstrating that the modeled air quality

impact of emissions from the new source or modification or the existing air quality level in the area where the source would construct is less than a *de minimis* level, expressed as an ambient pollutant concentration (μg/$m^3$). 40 C.F.R. §§ 51.166(i)(5), 52.21(i)(5); NSR Manual C.16-C.18 (JAXX-XX).

### C. SILs and SMC under the Challenged Rule

#### 1. $PM_{2.5}$ Significant Impact Levels

In the Rule, EPA for the first time adopted express language in regulations intended to authorize the longstanding practice of using "significant impact levels" as a screening tool for evaluating whether a comprehensive cumulative source impact analysis is necessary to demonstrate that a source will not cause or contribute to a violation of the NAAQS or increments. 75 Fed. Reg. at 64,891 (JAXX); 72 Feg. Reg. at 54,139 (JAXX) ("If based on a preliminary impact analysis, a source can show that its emissions alone will not increase ambient concentrations by more than the SILs, EPA considers this to be a sufficient demonstration that a source will not cause or contribute to a violation of the NAAQS or increment."); Response to Comment ("RTC"), EPA-HQ-OAR-2006-0605-0059, at 67 (JAXX) ("The SIL is used largely as a screening tool to determine the level of air quality analysis that a proposed source or modification must undertake to satisfy the requirements for an air quality impact analysis."). Specifically, under the provisions promulgated in this Rule, if the proposed source

shows through modeling that its projected emissions alone have an impact below the SIL, the source is deemed not to cause or contribute to any violation of the NAAQS or increments and is thereby exempt from doing a cumulative source impact analysis. 75 Fed. Reg. at 64,904, 64,906 (JAXX, XX); 40 C.F.R. §§ 51.166(k)(2), 52.21(k)(2). EPA also incorporated the $PM_{2.5}$ SIL values into its preexisting regulation authorizing the use of SILs to determine whether a new or modified source causes or contributes to a NAAQS violation in a nonattainment area, 40 C.F.R. § 51.165(b).[7] 75 Fed. Reg. at 64,866, 64,902 (JAXX, XX).

EPA established the SILs for $PM_{2.5}$ utilizing methods that would identify levels representing *de minimis* or insignificant impact on ambient air quality. 72 Fed. Reg. at 54,139 (JAXX). The final SILs adopted by EPA were calculated by multiplying the $PM_{10}$ SILs proposed in 1996 by the ratio of the $PM_{2.5}$ NAAQS to the $PM_{10}$ NAAQS, resulting in the following $PM_{2.5}$ SILs:

| **Averaging Period** | **SILs** (µg/m$^3$) | | |
|---|---|---|---|
| | Class I Areas | Class II Areas | Class III Areas |
| Annual | .06 | 0.3 | 0.3 |
| 24 hour | .07 | 1.2 | 1.2 |

75 Fed. Reg. at 64,866 (JAXX).

[7] Petitioner does not and indeed cannot challenge EPA's use of its *de minimis* authority as reflected in 40 C.F.R. § 51.165(b) (*see* Pet. Br. 20 n.8 & 32 n.12), as EPA adopted this regulation in 1987 (52 Fed. Reg. 24,672, 24,713 (July 1, 1987)) and thus the time to challenge it under 42 U.S.C. § 7607(b)(1) has long since passed.

EPA relied on past actions setting threshold *de minimis* values to conclude that the SIL values set here would also be *de minimis*. First, EPA calculated each $PM_{2.5}$ SIL value such that the ratio of the $PM_{2.5}$ SIL to the $PM_{2.5}$ NAAQS was the same as the ratio of the previously established $PM_{10}$ SIL to the $PM_{10}$ NAAQS for each applicable averaging period. 75 Fed. Reg. at 64,893 (JAXX); *see also* 40 C.F.R. § 51.165(b)(2). Using these ratios, the $PM_{2.5}$ SILs are 2% of the NAAQS for the annual figures (annual $PM_{2.5}$ SIL (Class II and III) of 0.3 $\mu g/m^3$ divided by annual $PM_{2.5}$ NAAQS of 15 $\mu g/m^3$) and 3.4% of the 24-hour NAAQS for the 24-hour figures (24-hour $PM_{2.5}$ SIL (Class II and III ) of 1.3 $\mu g/m^3$ divided by 24-hour $PM_{2.5}$ NAAQS of 35 $\mu g/m^3$).

EPA next compared the $PM_{2.5}$ SILs to the $PM_{2.5}$ increments consistent with the applicable averaging period. This comparison showed that the annual SIL was 7.5% of the annual increment and the 24-hour SIL was 13% of the 24-hour increment. EPA then compared these percentages to the corresponding figures for the $PM_{10}$ SILs, which are 5% for the annual and 17% for the 24-hour, and concluded they were comparable. 75 Fed. Reg. at 64,893 (JAXX).

Additionally, EPA looked back at the modeling and analysis done in 1980 to establish those earlier *de minimis* thresholds. This analysis and modeling (which is described in more detail at 75 Fed. Reg. at 64,893-94 (JAXX) and 45 Fed. Reg. at 52,707-08 (JAXX-XX)) concluded that source impacts representing less than 5%

of the NAAQS and less than 35% of the increments were reasonably considered *de minimis*. 75 Fed. Reg. at 64,993 (JAXX); 45 Fed. Reg. at 52,707 (JAXX). The $PM_{2.5}$ SILs established in this Rule compare favorably to that standard. The $PM_{2.5}$ SILs at 2.0% (annual) and 3.4% (24-hour) of the NAAQS are both less than 5%. Similarly, the $PM_{2.5}$ SILs at 7.5% (annual) and 13% (24-hour) of the Class II and Class III increments are both less than 35%.

Further, even in an area where multiple sources with *de minimis* impacts will be located, it cannot be assumed that the individual impacts of each source are additive. For example, four sources each consuming 12% of the increment would not necessarily consume 48% of the increment collectively. 75 Fed. Reg. at 64,894 (JAXX). A given source's greatest impact will be limited to the area nearest to it and during the specific times when the emissions are actually occurring, and the location and timing of a source's impact will be different for different sources. *Id*.; *see* 45 Fed. Reg. at 52,708 (JAXX) ('"[T]he source specific concentration [of the pollutant] occurs in only a limited area (often one point) and the temporal and spatial conditions which lead to maximum consumption [of the increment] by one source are seldom the same for other sources that may be making similar *de minimis* changes.").

Nevertheless, EPA expects permitting agencies to be cautious about using SILs where a number of *de minimis* impacts could collectively create air quality

problems. *See* RTC at 62 (JAXX) ("In short, it is not our intent that the SILs be used as a means of allowing known adverse air quality situations to be ignored just because they are small."). If, for example, the cumulative effect of a number of *de minimis* impacts in an area can be shown to cause air quality problems that are not being addressed simply because no source's impact is "significant" then the permitting authority must address the air quality problems, either by using lower *de minimis* levels, or by temporarily ceasing to use the *de minimis* concept altogether where it is known to allow the adverse conditions to worsen without remedy, or by taking some other step to address the problems. *Id.*

### 2. $PM_{2.5}$ Significant Monitoring Concentrations

The Rule also added a significant monitoring concentration ("SMC") for $PM_{2.5}$ to the long-standing monitoring exemption provision (promulgated in the 1980 PSD regulations at 45 Fed. Reg. at 52,710 (JAXX)). *See* 75 Fed. Reg. at 64,866-67 (JAXX-XX) (40 C.F.R. § 51.166(i)(5)(i)(c); § 52.21(i)(5)(i)(c)). EPA proposed and evaluated three options for determining an appropriate SMC that would identify the degree of ambient impact on $PM_{2.5}$ concentration that is truly *de minimis*. 72 Fed. Reg. at 54,141-42 (JAXX-XX). Ultimately, EPA selected the option that is based on the lowest detectable concentration, adjusted by a multiplication factor to account for errors that may arise from various activities

associated with air quality monitoring, such as sample collection, analytical measurement, calibration, and interferences. *See* 75 Fed. Reg. at 64,896 (JAXX).

EPA followed the same practice it established in 1980, when it first promulgated the SMC provision. At that time, EPA determined the SMCs based on the then-current capability of obtaining a meaningful measure of ambient pollutant concentrations. *Id.* EPA promulgated values that represented five times the lowest detectable concentration in ambient air that could be measured by the instruments available. *Id.* (citing 45 Fed. Reg. at 52,710). This factor of five took into account the measurement errors associated with the monitoring of these low pollutant levels or small incremental changes in concentration. *Id.*

In this Rule, EPA took another look at the minimum detection limit of 2 $\mu g/m^3$ used in 1980, and reaffirmed this value based on recent data. 75 Fed. Reg. at 64,896-97 (JAXX-XX). The minimum detection limit was "reaffirmed by 9 years of field blank data collected by EPA through the $PM_{2.5}$ Performance Evaluation Program." *Id.* Then, based on information collected during this rulemaking, EPA used its assessment of the uncertainties introduced to the measurement of $PM_{2.5}$ due to such factors as mechanical or operational variations in the sampling devices, and the possibility of human error associated with the performance of sampling device calibration and sample analysis. *Id.* at 64,896 (JAXX). As a result of this new information, EPA reduced the uncertainty factor

from 5 to 2, which reduced the SMC value from 10 $\mu g/m^3$ (that is, 5 times the detection limit of 2 $\mu g/m^3$) to the value established in this rule, 4 $\mu g/m^3$. *Id.*[8] EPA concluded that "there is little to be gained from preconstruction monitoring of $PM_{2.5}$ concentrations that cannot be accurately measured." *Id*.

## STANDARD OF REVIEW

The CAA sets forth the appropriate standard of review, which is the same as the standard set forth in the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). *Catawba County, N.C. v. EPA*, 571 F.3d 20, 41 (D.C. Cir. 2009) (citations omitted). The Court considers whether EPA's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A). The Court "must affirm the Rule if the record shows EPA considered all relevant factors and articulated a 'rational connection between the facts found and the choice made."' *Catawba*, 571 F.3d at 41 (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Of particular note here, EPA is entitled to an "extreme degree of deference [] when it is evaluating scientific data within its technical expertise." *City of Waukesha v. EPA*, 320 F.3d 228, 247 (D.C. Cir. 2003) (internal quotation marks omitted). "Such deference is

[8] As part of the grant of the State of Texas's reconsideration petition, EPA has granted reconsideration of the SMC value to address Texas's claim that the reduction of the uncertainty value from 5 to 2 was done without adequate notice and opportunity to comment.

especially appropriate in [the court's] review of EPA's administration of the complicated provisions of the Clean Air Act." *Catawba*, 571 F.3d at 41 (citation omitted).

When reviewing EPA's statutory interpretation, the Court first inquires whether Congress "has directly spoken to the precise question at issue," in which case the Court "must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984). If the statute is "silent or ambiguous with respect to the specific issue," the Court moves to *Chevron's* second step and must defer to the agency's interpretation so long as it is "based on a permissible construction of the statute." *Id*.

Under *Chevron* step two, considerable deference must be accorded to the interpretation of the agency assigned to administer that statute. In applying that deference, the agency's interpretation must be upheld "if it is a reasonable interpretation of the statute – not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc*., 556 U.S. 208, 218 (2009) (emphasis in original). Moreover, heightened deference is to be given to an agency's interpretation of a statute that is complex and within the agency's expertise. *United States v. Mead*, 533 U.S. 218, 227-31 (2001). The CAA is precisely this type of statute. *NRDC v. EPA*, 571 F.3d 1245, 1251 (D.C. Cir. 2009). *See also Am. Electric Power Co. v. Connecticut*, 131

S. Ct. 2527, 2533 n.2 (2011) (describing the "complicated issues related to carbon-dioxide emissions and climate change").

Finally, to the extent that EPA's longstanding interpretation reflected in its PSD regulations authorizing the use of *de minimis* screening levels does not foreclose Petitioners' arguments under 42 U.S.C. § 7607(b), *see infra* argument III.A, EPA's interpretation must at the very least be accorded substantial deference. *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 575 (2007); *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 487 (2004) ("We 'normally accord particular deference to an agency interpretation of longstanding' duration.") (citations omitted).

In reviewing EPA's use of its *de minimis* authority recognized in *Alabama Power Co. v. EPA*, 636 F.2d 323, 360-61 (D.C. Cir. 1979), the Court should apply the same deference that is accorded the agency's "reasonable interpretation of an ambiguous statute." *Envtl. Def. Fund, Inc. ("EDF") v. EPA*, 82 F.3d 451, 467 (D.C. Cir. 1996), *amended by*, 92 F.3d 1209 (D.C. Cir. 1996) (citing *Chevron*, 467 U.S. at 843; *Ohio v. EPA*, 997 F.2d 1520, 1535 (D.C. Cir. 1993)); *see also Ober v. Whitman*, 243 F.3d 1190, 1195 (9th Cir. 2001) ("EPA, in discharging its duty to enforce the Act, is permitted under *Chevron* to exempt *de minimis* sources of PM-10 from pollution controls.").

## SUMMARY OF ARGUMENT

Petitioner Sierra Club attacks only those portions of the Rule promulgating the PM2.5 significant impact levels and significant monitoring concentration, challenging both EPA's legal authority and its record-basis for adopting these provisions of the Rule. But, EPA's use of SILs and SMC is consistent with EPA's legal authority under the CAA, furthers the purposes of the statute, and is amply supported by the record.

With regard to the significant impact levels, EPA reasonably interprets section 165(a)(3) of the CAA, 42 U.S.C. § 7475(a)(3), to allow the use of significance levels as a means to demonstrate that a source will not cause or contribute to any violation of the NAAQS or increment. The terms "cause, or contribute to" and "demonstrate" are ambiguous, and EPA reasonably interprets the statute to allow sources that do not contribute significantly to ambient air concentrations of $PM_{2.5}$ to demonstrate compliance through modeling of the source's impact measured against the SILs.

However, EPA agrees with Petitioner that the statute should not be interpreted to allow the use of SILs to make the required compliance demonstration under section 165(a)(3) in circumstances where it can be shown that the source causes a NAAQS or increments violation that would not exist but for the emissions from that source. In the course of this litigation, EPA has come to

recognize that the regulatory text it adopted in 40 C.F.R. §§ 51.166(k)(2) and 52.21(k)(2) does not accurately reflect EPA's intent, because it does not afford permitting authorities sufficient discretion to deny sources use of the SILs where their use would lead to a new violation of the NAAQS or increment. Accordingly, EPA asks that the Court vacate and remand these provisions to EPA, so that EPA may initiate a rulemaking to revise them to reflect EPA's intent.

Notwithstanding this error in the regulatory text, EPA submits that SILs generally *are* a valid exercise of EPA's *de minimis* authority, and that the use of SILs generally should be upheld. Section 165(a)(3) requires sources to demonstrate they will not cause or contribute to any NAAQS or increments violation. EPA's use of SILs as a means to demonstrate compliance with the NAAQS or increments thus implements the legislative design. Moreover, EPA rationally concluded that the SILs reflect the level at which a source's impact is truly *de minimis* and thus requiring the source to perform a comprehensive cumulative impact analysis would yield only trivial gain.

Additionally, Petitioner fails to show that EPA's adoption of a significant monitoring concentration for $PM_{2.5}$ is inconsistent with the statute or EPA's *de minimis* authority. First, Petitioner's claim that EPA lacks the statutory authority to use a SMC to exempt a source from submitting a year's worth of monitoring data is time-barred under section 307(b)(1) of the CAA, 42 U.S.C. § 7607(b)(1).

EPA promulgated the SMC provisions challenged here in 1980. EPA's statutory interpretation to permit *de minimis* exemptions of the air quality monitoring requirement has not changed since EPA first adopted SMC for several pollutants in its 1980 PSD regulations. Accordingly, any challenges to that interpretation should have been raised long ago. Because EPA's interpretation of its legal authority to adopt SMC has not changed since 1980, Petitioner cannot challenge it now.

In any event, EPA's use of SMC is firmly grounded in its inherent authority to adopt *de minimis* exemptions. EPA's interpretation of CAA section 165(e)(2), 42 U.S.C. § 7475(e)(2), to permit *de minimis* exemptions of the requirement for a year's worth of preconstruction monitoring data when the source's impact or the ambient air concentrations are below levels at which such concentrations can accurately be measured is reasonable. Further, EPA rationally concluded that the *de minimis* levels it selected as the SMC for $PM_{2.5}$ reflect the levels below which concentrations cannot accurately be measured and thus the requirement to collect monitoring data would yield information of no more than trivial value.

## ARGUMENT

### I. THE CAA AFFORDS EPA DISCRETION TO PROMULGATE SILs AS MEANS TO "DEMONSTRATE" THAT A SOURCE WILL NOT "CAUSE, OR CONTRIBUTE TO" A VIOLATION OF THE NAAQS OR INCREMENTS.

#### A. EPA Reasonably Interprets CAA Section 165(a)(3) to Allow the Use of SILs to "Demonstrate" that a Source Will Not "Cause, or Contribute to" a Violation of the NAAQS or Increments.

EPA reasonably interprets CAA section 165(a)(3), 42 U.S.C. § 7475(a)(3), to give it the discretion to adopt SILs for the purpose of demonstrating that a proposed new source or modification will have *de minimis* impacts on air quality and therefore will not cause or contribute to a violation of any NAAQS or increment. Petitioner's primary argument to the contrary is that SILs are unlawful because they waive compliance with the NAAQS and increments. This argument misunderstands the purposes of the SILs and relies on an overly restrictive reading of the statute. The SILs are not intended to waive section 165(a)(3)'s requirement that a source demonstrate compliance with the NAAQS or increment. Rather, the purpose of SILs is to provide a means by which a source may make this demonstration. EPA's interpretation of section 165(a)(3) to allow the use of SILs to make the required showing is a reasonable interpretation of a statute that is ambiguous as to this issue. Nothing in the CAA precludes EPA's use of SILs in this manner.

Section 165(a)(3) provides that "[n]o major emitting facility . . . may be constructed in any area to which [the PSD program] applies unless" . . . the facility "*demonstrates*" that its emissions "will not *cause, or contribute to*, air pollution in excess of any (A) [increment] for any pollutant . . . [or] (B) national ambient air quality standard for any pollutant." 42 U.S.C. § 7475(a)(3) (emphasis added). While it is clear that such a demonstration must be made to obtain a PSD permit, the statute does not define the phrase "cause, or contribute to," or specify how a facility is to "demonstrate" that it does not cause or contribute to a violation of the NAAQS or increments. Therefore, the statute is ambiguous with respect to the precise questions at issue here, and EPA's permissible interpretation of these terms must be upheld. *Chevron*, 467 U.S. at 843.

As this Court recently observed, dictionary definitions of "contribute" vary as to whether the word implicitly includes a level of significance or is defined without reference to any threshold level of significance. *Catawba*, 571 F.3d at 38-39 (discussing meaning of "contribute" in 42 U.S.C. § 7407(d), and concluding that the provision "is ambiguous as to how EPA should measure contribution and what degree of contribution is sufficient"). In that case, petitioners had argued that EPA was *required* to interpret the word "contribute" in section 107(d) of the CAA to incorporate a significance threshold. *Id.* The *Catawba* court concluded that the fact that the term "contribute" may or may not connote a significance threshold

"alone suggests an ambiguity that fatally undermines petitioners' *Chevron* step one argument" regarding the meaning of "contribute" in section 107(d). 571 F.3d at 39. So it is here. Because Congress did not further define or quantify "contribute" in section 165(a)(3), it is "eminently reasonable to conclude that [Congress's silence] is meant to convey nothing more than a refusal to tie the agency's hands" as to the level of contribution necessary under section 165(a)(3). *Entergy*, 556 U.S. at 222.

EPA has long interpreted the phrase "cause or contribute" to refer to significant or non-*de minimis* emission contributions. 72 Fed. Reg. at 54,139 (JAXX); *In re Prairie State Generating Co.*, 13 E.A.D. at 105-08; *see, e.g.*, NSR Workshop Manual at C.52 (JAXX) ("The source will not be considered to cause or contribute to the violation if its own impact is not significant at any violating receptor at the time of each predicted violation."). EPA's New Source Review regulations, at 40 C.F.R. § 51.165(b)(2), promulgated in 1987, 52 Fed. Reg. at 24,713, provide that a new source or modification proposing to locate in an attainment area will be considered to "cause or contribute to" a violation of the NAAQS in a nonattainment area if its emissions would exceed specific "significance levels" identified in the regulations. If the emissions from the proposed source or modification would have an ambient impact in a nonattainment area that exceeds the SILs, i.e., a significant impact, the source is considered to

"cause, or contribute to" the NAAQS violation and may not receive a PSD permit unless it obtains emissions reductions to compensate for its impact. 40 C.F.R. § 51.165(b)(2)-(3).

Additionally, section 165(a)(3) does not specify the *method* a source must use to "demonstrate" that it will not "cause, or contribute to" a NAAQS or increment violation. *See* 42 U.S.C. § 7475(a)(3). By its silence, Congress left it to EPA to determine how best to implement Congress's intent that new or modified sources "demonstrate" compliance with the increment and NAAQS before obtaining a PSD permit. Nothing in the statute precludes EPA from using a modeling analysis that relies on significance levels as a means to demonstrate whether a source will "cause, or contribute" to a violation of the NAAQS or increments.

In fact, Congress expressed in explicit terms its intent that EPA determine precisely how section 165(a)(3)'s core requirements should be implemented. CAA section 165(e)(3), 42 U.S.C. § 7475(e)(3), expressly directs EPA to promulgate regulations regarding the appropriate ambient air quality analyses to be performed in implementing section 165. Additionally, section 165(e)(3)(D), 42 U.S.C. § 7475(e)(3)(D), directs EPA to specify each model to be used under specified sets of conditions. Thus, while the statute clearly gives EPA the discretion to require a cumulative impact analysis, it does not preclude EPA generally from promulgating

regulations that allow a source to "demonstrate" that its emissions alone are *de minimis* and therefore do not "cause or contribute to" a NAAQS or increment violation. Because the SILs are a reasonable method for demonstrating compliance with the NAAQS and increments, Petitioner's argument that EPA's use of SILs waives section 165(a)(3)'s core requirement is unavailing.

Although EPA has not previously incorporated every application of the SILs into the PSD regulations at issue here, 40 C.F.R. §§ 51.166 and 52.21, EPA historically has supported using SILs to determine whether a new or modified source wishing to locate in an attainment area must conduct a more extensive cumulative impact analysis to demonstrate that it will not "cause or contribute to" a violation of the NAAQS or PSD increment. *See* 72 Fed. Reg. at 54,139 (JAXX). Thus, EPA stated in its NSR Workshop Manual, drafted in 1990, that "EPA does not require a full impact analysis for a particular pollutant when emissions of that pollutant from a proposed source or modification would not increase ambient concentrations by more than prescribed significant ambient impact levels." NSR Workshop Manual at C.24 (JAXX).

Numerous other guidance documents also recognize the use of SILs as an appropriate screening tool to determine whether a proposed source's ambient impact is significant "so as to warrant a comprehensive, cumulative air quality analysis to demonstrate compliance with the NAAQS." *E.g.*, Memorandum, from

Stephen D. Page, Director, Office of Air Quality Planning and Standards, to Regional Air Division Directors, "Guidance Concerning the Implementation of the 1-hour SO2 NAAQS for the Prevention of Significant Deterioration Program at 4, Aug. 23, 2010 (JAXX).[9] EPA's longstanding policy and practice of interpreting the "cause or contribute" demonstration in section 165(a)(3) to include a significance inquiry "tends to show that the EPA's current practice is a reasonable and hence legitimate exercise of its discretion." *Entergy Corp.*, 556 U.S. at 224.

Indeed, in *Sur Contra La Contaminacion ("SURCCO") v. EPA*, 202 F.3d 443, 448 (1st Cir. 2000), the First Circuit upheld EPA's use of SILs to grant a PSD permit. In that case, *SURCCO* had argued that it was improper for EPA to issue the permit without requiring a full impact analysis of the proposed source's sulfur

---

[9] *See also* Memorandum from Stephen D. Page, Director, Office of Air Quality Planning and Standards, to Regional Air Division Directors, "Guidance Concerning the Implementation of the 1-hour NO2 NAAQS for the Prevention of Significant Deterioration Program at 11, June 29, 2010 (JAXX); Memorandum from Gerald A. Emison, Director, EPA Office of Air Quality Planning and Standards, to Thomas J. Maslany, Director, Air Management Division, "Air Quality Analysis for Prevention of Significant Deterioration (PSD)" at 1 (July 5, 1988) (JAXX) ("Historically, the [EPA's] position has been that a PSD source will not be considered to cause or contribute to a predicted NAAQS or increment violation if the source's estimated air quality impact is insignificant (i.e., at or below defined *de minimis* levels."); Memorandum from Richard G. Rhodes, Director, Control Programs Development Division, EPA, to Alexandra Smith, Director, Air and Hazardous Materials Division, EPA Region 10, "Interpretation of 'Significant Contribution,'" (Dec. 16, 1980) (JAXX-XX) (a source will not be viewed as causing or contributing to a violation if the source's impact is lower than the SILs at the time and location of the violation).

dioxide emissions. *Id*. The Court held that "[i]t was rational for the Agency to prefer its own model, to reject SURCCO's proposed alternative modeling that allegedly showed sulfur dioxide emissions above the threshold levels, and to accept, instead, [the applicant's] modeling." *Id.* The Court thus found that EPA was "within its discretion, under the regulations, to exempt [the applicant] from conducting a full impact analysis." *Id.* The First Circuit's acceptance of EPA's reliance on a SIL in the context of a specific permit challenge as a sufficient demonstration of compliance with the NAAQS and increments further shows the reasonableness of EPA's interpretation of the statute.

### B. EPA Agrees that SILs Should Not Be Used to Exempt a Source Whose Emissions are Shown to Cause a Violation of the NAAQS or Increment.

EPA does not dispute Petitioner's contention that section 165(a)(3) unambiguously requires all permit applicants to demonstrate that proposed construction will not cause or contribute to a violation of air quality standards. Likewise, EPA agrees that SILs should not be used to justify issuing permits to sources whose emissions will in fact cause violations of the NAAQS. Thus, EPA acknowledged in the preamble to the Rule that there may be circumstances in which an impact from an individual source could cause a NAAQS or increment violation *even if* the impact falls below the applicable SILs. For example, EPA specifically cautioned against the use of SILs in circumstances where the ambient

air quality in an area is close to the NAAQS or close to consuming the increment. *See* 75 Fed. Reg. at 64,894 (JAXX) ("[W]e have historically cautioned states that the use of a SIL may not be appropriate when a substantial portion of any NAAQS or increment is known to be consumed."). Similarly, EPA stated that SILs *should not* be used where a number of *de minimis* impacts could collectively cause a violation. *See* RTC at 62 (JAXX) ("If, for example, the cumulative effect of a number of *de minimis* impacts in an area can be shown to cause air quality problems that are not being addressed simply because no source's impact is "significant" then the permitting authority must address the air quality problems, whether by using lower *de minimis* levels or temporarily cease using the *de minimis* concept altogether where it is known to allow the adverse conditions to worsen without remedy, or taking some other step to address the problems.").

In short, EPA did not and does not intend for SILs "to be used as a means for allowing known adverse air quality situations to be ignored just because they are small." RTC at 62 (JAXX). Thus, in the preamble to the final Rule, EPA stated: "[N]otwithstanding the existence of a SIL, permitting authorities should determine when it may be appropriate to conclude that even a *de minimis* impact will 'cause or contribute' to an air quality problem and to seek remedial action from the proposed new source or modification." 75 Fed. Reg. at 64,892 (JAXX).

In the course of this litigation, however, EPA has come to the conclusion that the regulatory text it promulgated in 40 C.F.R. §§ 51.166(k)(2) and 52.21(k)(2) does not correctly implement EPA's intent in this regard. In particular, where information exists demonstrating that a proposed source's impact would cause a NAAQS or increments violation, which violation would not exist *but for* the source's impact at any particular location, then EPA agrees it *would not* be appropriate to use the SILs. EPA believes that the regulatory text it adopted does not allow permitting authorities the discretion to require a cumulative impact analysis, notwithstanding that the source's impact is below the SIL, where there is information that shows the proposed source would lead to a violation of the NAAQS or increments. This was not EPA's intent in promulgating this rule. Therefore, EPA seeks vacatur and remand of the regulatory text promulgated in this Rule at 40 C.F.R. § 51.166(k)(2) and 52.21(k)(2) so that the Agency may consider how to revise those provisions to ensure that SILs are not used in circumstances where a source's impact may lead to a NAAQS or increment violation.[10]

[10] EPA plans to issue guidance in the near future on how the PM2.5 SIL values that remain in 40 C.F.R. § 51.165(b) may be properly applied as part of a demonstration to show that a source's impact will not cause or contribute to a violation of the NAAQS or increments. This guidance would apply until revised regulations can be finalized.

Vacating and remanding these discrete provisions (40 C.F.R. §§ 51.166(k)(2) and 52.21(k)(2)) does not require that the Court vacate the entire Rule. The test for assessing whether portions of a challenged regulation are severable is to determine whether or not the agency would have adopted the severed portion on its own. *See Davis County Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1458-59 (D.C. Cir. 1997). The record here demonstrates that EPA intended the other portions of the Rule to operate with or without the SIL provisions that EPA now concedes are improperly written. As EPA explained in the final Rule preamble, SILs are not mandatory or required elements of an approvable PSD state implementation plan, even though they are considered to be useful components for implementing the PSD program. 75 Fed. Reg. at 64,899-901 (JAXX-XX. In other words, the absence of the SILs in the regulation would not have any meaningful effect on the implementation of the PSD increments and SMC for $PM_{2.5}$ that EPA adopted in this Rule. Thus, even though EPA is conceding that the Court should invalidate the SIL provisions of the Rule, the Court need not invalidate the portions of the Rule establishing $PM_{2.5}$ increments or SMC.

Additionally, we note that the regulatory text in 40 C.F.R. § 51.165(b) (which established SILs as a tool for showing that a source will cause or contribute to a NAAQS violation) and 40 C.F.R. Pt. 51, App. S (which uses SILs as a threshold for the applicability of certain Appendix S requirements) do not contain

the same language as EPA promulgated in this Rule in 40 C.F.R. §§ 51.166(k)(2) and 52.21(k)(2) that leads EPA to seek the remand of those provisions. We also note that Petitioner does not in this petition challenge the SILs contained in 40 C.F.R. § 51.165(b) on the grounds that they are outside of EPA's statutory authority under the CAA (*see* Pet. Br. 20 n.8 and 32 n.12). Although Petitioner does challenge the reasonableness of the $PM_{2.5}$ SIL values incorporated into EPA's existing regulation at 40 C.F.R. § 51.165(b)(2) (Pet. Br. 37 n.17), for the reasons discussed below, EPA submits that these values are fully supported by the administrative record and therefore should be upheld.

## II. EPA's ADOPTION OF SILs IS SUPPORTED BY ITS INHERENT AUTHORITY UNDER *ALABAMA POWER* TO CREATE *DE MINIMIS* EXEMPTIONS.

In *Alabama Power*, the D.C. Circuit recognized that EPA has the inherent authority under the CAA to exempt emissions increases from new or modified sources from some or all of the PSD requirements where such emissions would be *de minimis* and thus their regulation would yield only trivial or no value. *Ala. Power Co.*, 636 F.2d at 360-61. The authority to exempt *de minimis* activity from regulation where such regulation would result in trivial or no benefit is part of an agency's usual responsibility to carry out a statutory scheme, like the CAA. In

fact, there is "virtually a presumption in its favor." *Public Citizen v. Young*, 831 F.2d 1108, 1113 (D.C. Cir. 1987).

As applied here, EPA is using SILs to identify a level of impact on ambient air quality that EPA regards as truly *de minimis*, in that requiring more detailed air quality analysis would have virtually no benefit. A source that demonstrates its impact does not exceed a SIL is not required to conduct more extensive air quality analysis or modeling to demonstrate that those emissions "will not cause, or contribute to" a violation of the NAAQS or increment. 42 U.S.C. § 7475(a)(3). Because in such circumstances the source's impacts alone are *de miminis*, i.e., insignificant, a cumulative impact analysis and modeling by that source would yield information of trivial value. It thus makes little economic or environmental sense to require that work to be done.

As discussed more fully below, EPA's interpretation of section 165(a)(3) to allow sources with *de minimis* impacts to demonstrate compliance with NAAQs and increments without a comprehensive cumulative impact analysis is firmly grounded in EPA's *de minimis* authority under *Alabama Power* and reflects a permissible construction of the statute under *Chevron*. Petitioner's arguments against EPA's use of its *de minimis* authority should be rejected. The statute is not so rigid as to foreclose EPA's use of SILs as a means for making the demonstration required by section 165(a)(3) of compliance with the NAAQS and increments.

Contrary to Petitioner's argument, SILs are not intended to waive the central requirements of section 165(a)(3) but, rather, are a tool to implement Congress's intent. Moreover, the SILs in the Rule are based on EPA's reasonable assessment of the level at which a source's impact is truly *de minimis*.

### A. EPA Reasonably Interprets Section 165(a)(3) to Allow the Use of SILs as *De Minimis* Thresholds.

As discussed above, section 165(a)(3), 42 U.S.C. § 7475(a)(3), does not specify how the required demonstration of whether a source will "cause, or contribute to" a NAAQS or increment violation is to be made, and EPA's interpretation of that provision to allow the use of SILs as a means to demonstrate compliance is reasonable. Petitioner's argument that the statute is extraordinarily rigid, foreclosing the use of SILs, is based on its misunderstanding of how SILs operate. The use of SILs does not waive the mandatory requirement in section 165(a)(3) that a source "demonstrate" that it "will not cause, or contribute to," a violation of the NAAQS or increments. Rather, SILs are a means of demonstrating through modeling that the source's impact will be sufficiently low relative to the NAAQS or increments that such impact will not cause or contribute to a NAAQS or increments violation.

Petitioner's contention that Congress's use of the terms "no" and "any" in section 165(a)(3) reflects the sort of rigid language that forecloses EPA's *de*

*minimis* authority (Pet. Br. 21) ignores that this Court has approved *de minimis* exemptions from similarly broad and sweeping language. In *EDF v. EPA*, 82 F.3d at 465, for instance, the Court considered EPA's use of its *de minimis* authority in the context of section 176(c) of the CAA, which provides that "*[n]o* department, agency, or instrumentality of the Federal Government shall . . . support *in any way* . . . *any* activity which does not conform to an implementation plan." 42 U.S.C. § 7506(c) (emphasis added). The Court in *EDF* concluded this language was not so rigid as to foreclose *de minimis* exceptions, notwithstanding the words "no" and "any." *EDF*, 82 F.3d at 466. The language in section 165(a)(3) is no more rigid than the language in section 176(c). If the Court found the language of the conformity provision in *EDF* to admit of *de minimis* exceptions, so too should this Court conclude that section 165(a)(3) authorizes EPA to use SILs as *de minimis* thresholds for demonstrating that a source does not cause or contribute to NAAQS or increments violations.

This Court's decision in *New York v. EPA*, 443 F.3d 880, 888 (D.C. Cir. 2006), also is instructive. In that case, the Court vacated an EPA rule that interpreted "any physical change" in the definition of "modification" in 42 U.S.C. § 7411(a)(4) to exempt physical changes that do not exceed 20% of the replacement value and do not change the source's basic design parameters. The Court reasoned that the plain language of the statute said "any" and there is "no

reason why 'any' should not mean 'any.'" *Id.* However, the court in that case discussed the *de minimis* principle as a separate question, noting that the *Alabama Power* court acknowledged that EPA could apply the *de minimis* principle in applying the statutory definition of "modification." *Id.* at 888.

The one *de minimis* case Petitioners cite, *Public Citizen v. Young*, 831 F.2d at 1111-13, involves statutory language that does not parallel the usage of the terms "no" or "any" in section 165(a)(3). *Compare* 21 U.S.C. § 376e(b)(5)(B) ("a color additive . . . shall be deemed unsafe . . . if . . . [it] is found . . . to induce cancer" in man or animal), *with* 42 U.S.C. § 7475(a)(3) ("no major emitting facility . . . may be constructed in any area to which [the PSD program] applies unless," *inter alia*, the facility "demonstrates . . . that [its] emissions . . . will not cause, or contribute to" any violation of the NAAQS or increment). Accordingly, *Public Citizen* does not support Petitioner's reading of the statute as "extraordinarily rigid."

Petitioner's argument that the absence of the word "significant" from section 165(a)(3) forecloses EPA from applying a *de minimis* exemption also is unavailing. As discussed above, the term "contribute to" may or may not connote a significance threshold and therefore is ambiguous. *Catawba*, 571 F.3d at 39. Thus, nothing in the statute precludes EPA from interpreting the phrase to mean a contribution that is significant. Indeed, "it is eminently reasonable to conclude that

[Congress's silence] is meant to convey nothing more than a refusal to tie the agency's hands" as to the level of contribution necessary under section 165(a)(3). *Entergy*, 556 U.S. at 222. EPA's interpretation of "contribute" in section 165(a)(3) to mean "significantly contribute" furthers the legislative intent that EPA ensure that economic growth occur consistent with preserving air quality, as provided in 42 U.S.C. § 7470(3).

Finally, that section 165 provides several express waivers from the requirement in section 165(a)(3) does not show that Congress intended to foreclose EPA's use of its *de minimis* authority in this Rule. *See* Pet. Br. at 21-22. EPA is not waiving the requirement in section 165(a)(3); EPA is establishing *de minimis* levels that allow a source to *demonstrate* through modeling that its impact will not cause or contribute to a NAAQS or increments violation. In any event, Petitioner's reliance on *Kokechick Fishermen's Ass'n v. Sec'y of Commerce*, 839 F.2d 795, 801-02 (D.C. Cir. 1988), is misplaced, as that case is clearly distinguishable. In that case, the court's analysis of the relevant statute turned on its conclusion that the text does not allow balancing of marine mammal protection against fishing interests. *Id.* at 801-02. In contrast, in CAA section 160, 42 U.S.C. § 7470, Congress has identified various purposes of the PSD program, seemingly at some tension with one another, including encouraging economic growth *and* preventing significant deterioration of air quality, and it has required EPA to balance these

competing interests. EPA's use of SILs as a means of demonstrating compliance with NAAQS and increments is one reasonable approach to balancing these competing purposes of the statute.

**B. EPA's Interpretation of Section 165(a)(3) to Allow the Use of SILs to Demonstrate Compliance with NAAQS and Increments Furthers the Legislative Design.**

Because SILs are a means of demonstrating compliance with the NAAQS and increments, they also implement the legislative design. Petitioner's argument that SILs thwart the legislative design is based on their assumption that SILs waive the requirement in section 165(a)(3) that permit applicants "demonstrate" that they will not "cause, or contribute to" a violation of the NAAQS and or the increments. Pet. Br. 29. As discussed in argument I.B., *supra*, EPA agrees with Petitioner that SILs should not be used to justify permitting a source without a cumulative analysis in circumstances where there is information to suggest that use of the SIL in this manner would lead to a violation of the NAAQS or increment. Because EPA recognizes that the regulatory language it adopted in 40 C.F.R. §§ 51.166(k)(2) and 52.21(k)(2) does not provide permitting authorities discretion not to apply SILs for the particular purpose covered by these provisions, EPA agrees that §§ 51.166(k)(2) and 52.21(k)(2) should be vacated and remanded. With appropriate safeguards addressing circumstances when SILs should not be used, however, SILs remain a reasonable mechanism to meet section 165(a)(3)'s

requirements that sources demonstrate compliance with the NAAQS and increments.

### C. The SILs Identify Levels below which a Source's Impact is Truly *De minimis*, and thus Requiring a Cumulative Impact Analysis Would Yield Information of Only Trivial Value.

EPA has provided a reasoned explanation that shows air quality impacts below the SILs are truly *de minimis*. Petitioner's arguments do not so much challenge the particular values EPA determined are appropriate *de minimis* levels as they rehash their arguments, addressed above, that the use of SILs is foreclosed by the statute and thus that EPA could identify no appropriate *de minimis* level. The most direct attack Petitioner makes on the numeric values of the SILs is to argue that EPA did not provide any evidence to support the SILs it set. *See* Pet. Br. 38-39. Contrary to Petitioner's assertions, the rationale for the SILs adopted is fully explained and supported by evidence in the record.

EPA calculated the SILs by multiplying the ratio of the $PM_{2.5}$ NAAQS to the $PM_{10}$ NAAQS by the existing $PM_{10}$ SILs, which are set forth in 40 C.F.R. 51.165(b)(2). 75 Fed. Reg. at 64,893 (JAXX). To determine that these levels reflect truly *de minimis* impacts, EPA analyzed them in comparison to the impact EPA deems insignificant for purposes of determining whether a source is a major emitting facility. *Id.* EPA determined that the ambient impact resulting from the application of the SIL is comparable to the range of ambient concentrations

deemed *de minimis* under EPA's 1980 regulations establishing significance rates for purposes of the major source determination. *Id.*; *see supra* background section II.C.1. (comparing these SILs as a percentage of the $PM_{2.5}$ NAAQs and increments to the significance levels for $PM_{10}$). EPA reasonably relied on significance levels established in analogous contexts as a basis for its determination that the SILs here reflect the levels below which any further regulation would yield, at most, only trivial benefits. *See EDF*, 82 F.3d at 467 (upholding EPA's finding of *de minimis* impacts based on previously adopted *de minimis* levels); *Ober*, 243 F.3d at 1196 (same).

## III. EPA PROPERLY USED ITS *DE MINIMIS* AUTHORITY TO ADOPT SIGNIFICANT MONITORING CONCENTRATIONS.

As part of the required PSD review of new or modified sources of air pollution, CAA section 165, 42 U.S.C. § 7475, and EPA's implementing regulations require a source to collect preconstruction monitoring data. Specifically, section 165(a)(7), 42 U.S.C. § 7475(a)(7), requires "such monitoring as may be necessary to determine the effect which emissions from any [covered] facility may have, or is having, on air quality in any areas which may be affected by emissions from such source." Additionally, section 165(e)(2), 42 U.S.C. § 7475(e)(2), calls for collecting one year's worth of preconstruction monitoring

data, unless the permitting authority determines a complete and adequate analysis may be accomplished in a shorter period.

Under EPA's longstanding interpretation of the Act, as reflected in regulations first adopted in 1980, EPA may use its *de minimis* authority to exempt sources from providing such monitoring data if the source can demonstrate that either its ambient impact or the ambient concentration with regard to a pollutant is less than a value known as the significant monitoring concentration, or SMC. *See* 72 Fed. Reg. at 54,141 (JAXX); 45 Fed. Reg. 52,676, 52,707 (JAXX, XX); 40 C.F.R. §§ 51.166(m), 52.21(m). EPA first adopted this interpretation in its 1980 PSD implementation regulations, 45 Fed. Reg. at 52,705-710 (JAXX-XX), when it promulgated a number of SMCs to be used as screening tools for sources to use to determine whether they should conduct site-specific preconstruction monitoring.

In the present Rule, EPA amended its PSD implementing regulations by adopting an SMC for $PM_{2.5}$. 75 Fed. Reg. at 64,895 (JAXX) (40 C.F.R. §§ 51.166(i)(5)(i)(c), 52.21(i)(5)(i)(c)). As it did in the 1980 Rule, EPA based the SMC on its *de minimis* authority recognized in *Alabama Power*. 75 Fed. Reg. at 64,895-96 (JAXX-XX). Like the other pollutants for which EPA has promulgated SMCs, EPA concluded that there is little to be gained from requiring the collection of preconstruction monitoring data for $PM_{2.5}$ concentrations that are at levels so low that they cannot be accurately measured. *Id.*

Petitioner's arguments against the SMC must be rejected. As an initial matter, this Court does not have jurisdiction to consider Petitioner's claim that EPA lacks the authority to implement SMCs. EPA adopted the provisions of the PSD regulations at issue here, 40 C.F.R. §§ 51.166(i)(5) and 52.21(i)(5), in 1980. At that time, EPA set forth its interpretation of the CAA to allow the use of *de minimis* thresholds for determining whether a source must collect a year's worth of monitoring data. If Petitioner wished to challenge that interpretation, it was required to do so within 60 days of publication of the regulation in the Federal Register. Section 307(b), 42 U.S.C. § 7607(b), precludes Petitioner from raising the issue now.

To the extent the Court reaches Petitioner's argument that the statute does not authorize SMCs, Petitioner fails to show that the statute is so rigid as to rebut the "virtual presumption" of inherent agency authority to create *de minimis* exemptions from regulatory burdens that will have little or no benefit. Second, Petitioner misconstrues the basis for the exemption to be that all monitoring is "pointless." Pet. Br. 43. To the contrary, EPA reasonably determined that monitoring that would not provide accurate data would not serve the purposes of the Act. Third, Petitioner's argument that the SMC is arbitrary ignores EPA's explanation in the record, which shows that the SMC reflects a narrowly tailored

exemption applicable only where the value of the monitoring data is likely to be trivial.

### A. Petitioner's Challenge to EPA's Authority to Adopt SMCs is Time-Barred.

CAA section 307(b)(1), 42 U.S.C. § 7607(b)(1), directs that any petition for review must be filed within sixty days from the date that notice of the challenged action appears in the Federal Register. The filing period in the Clean Air Act "is jurisdictional in nature." *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 460 (D.C. Cir. 1998) (citation and internal quotation marks omitted). Thus, if the petitioner has failed to comply with it, the Court is "powerless to address their claim." *Medical Waste Inst. & Energy Recovery Council v. EPA*, 645 F.3d 420, 427 (D.C. Cir. 2011). Here, Petitioner failed to comply with this requirement with regard to its claim that EPA lacks the authority to adopt SMCs.

As noted, EPA first promulgated SMCs in its 1980 regulations implementing the PSD provisions of the CAA. 45 Fed. Reg. at 52,733-34 (JAXX-XX). At that time, EPA asserted its interpretation of section 165(e)(2) of the CAA to permit a permitting authority to exempt a source from submitting a year's worth of preconstruction monitoring data if the source could show either that the source's proposed impact or the ambient air quality concentrations were below *de minimis* levels promulgated as "significant monitoring concentrations." 45 Fed. Reg. at

52,708-710 (JAXX-XX). EPA relied on the same interpretation of the Act in promulgating the $PM_{2.5}$ SMC here. Indeed, EPA did not substantively modify the regulatory text Petitioner challenges, except to add a new SMC for $PM_{2.5}$.[11]

Pursuant to section 307(b)(1), challenges to EPA's interpretation of the CAA as reflected in the SMC were required to have been raised within 60 days of when the regulation was first published in the Federal Register. 42 U.S.C. § 7607(b)(1). As the Court recently held in the context of another CAA regulation: "The sixty-day window provided by statute has long since closed, and we may not reopen it and entertain a belated challenge to the EPA's [SMC] approach now." *Medical Waste Inst.*, 645 F.3d at 427. This is true even though Petitioner lodged objections to EPA's SMC approach during the rulemaking. *See id.* Petitioner's objection to EPA's authority to adopt SMCs is time-barred.[12]

---

[11] In this Rule, EPA made minor technical corrections to the language in 40 C.F.R. §§ 51.166(i)(5) and 52.21(i)(5) to address an erroneous cross-reference to a subparagraph (i)(8), which EPA inadvertently failed to change when the paragraphs were renumbered in an earlier rulemaking. 75 Fed. Reg. at 64,897 (JAXX).

[12] Notably, Petitioner recognizes that they cannot challenge here EPA's authority to adopt the SILs at 40 C.F.R. § 51.165(b) (*compare* Pet. Br. 20 n.8 and 32 n.12, *with* Pet. Br. 37 n.17), which were first promulgated in 1987. Petitioner fails to explain, however, why the same does not hold true for Petitioner's belated attempt to challenge EPA's longstanding regulations adopting SMC.

### B. EPA's Interpretation of Section 165 (e)(2) is a Permissible Construction of the Statute.

To the extent the Court reaches Petitioner's statutory challenge to the SMC, EPA reasonably interprets the statute to allow an exemption from the preconstruction monitoring requirement based on *de minimis* levels reflecting current capabilities to accurately measure ambient air concentrations. The purpose of the statute's monitoring requirement is to provide data for purposes of performing an air quality analysis. It is reasonable for EPA to conclude that the statute permits an exemption for collection of data that is not useful to carrying out the purposes of the statute.

Petitioner's argument that CAA section 165(e)(2) forecloses any *de minimis* exemptions because it sets forth a plain requirement for monitoring data (Pet. Br. at 41(citing *Alabama Power*)), proves too much. By definition, an agency's authority to adopt *de minimis* exemptions as recognized in *Alabama Power* is inherent—that is, not express in the statute. 636 F.2d at 360 ("Courts should be reluctant to apply the literal terms of a statute to mandate pointless expenditures of effort."). Thus, while it is true that the court in *Alabama Power*, 636 F.2d at 372, interpreted section 165(e)(2) as a "plain requirement" for monitoring data that could not be categorically waived on the ground of technological infeasibility, that does not mean EPA is foreclosed from exercising its *de minimis* authority to craft a more

narrowly tailored exemption, as it did here. Further, this Court has recognized that an agency's inherent authority to adopt *de minimis* exemptions is "virtually a presumption." *Public Citizen*, 831 F.2d at 1113. To argue, as Petitioner does, that the statute sets forth a plain requirement is not sufficient to rebut that presumption. Petitioner must show that the statute is "extraordinarily rigid" before an agency will be precluded from adopting a *de minimis* exemption. *Alabama Power*, 636 F.2d at 360-61.

Moreover, Petitioner cannot buttress its interpretation of the statute as "extraordinarily rigid" by arguing that Congress's inclusion of an express exemption in section 165(e)(2), forecloses EPA from adopting *de minimis* exemptions. *Alabama Power* recognizes an agency's inherent authority to adopt exemptions for *de minimis* exemptions that are not otherwise explicitly authorized by the statute. Whether a statute may be read to implicitly authorize non-*de minimis* exceptions in the face of exemptions expressly authorized by Congress is a separate question. *See, e.g., New York*, 443 F.3d at 887-88 (distinguishing the issue in that case, i.e., whether the agency may create implicit exemptions in the face of explicit exemptions, from an agency's inherent *Alabama Power* authority to create *de minimis* exemptions). Thus, the principle of statutory construction Petitioner relies upon is inapposite in the context of an agency's implied authority to create *de minimis* exemptions.

To the extent the exemption in section 165(e)(2) is relevant at all, the language of the exemption supports EPA's interpretation of the statute. Section 165(e)(2) authorizes EPA to establish regulations allowing a permitting authority to require less than one year's data if "a *complete and adequate analysis* for such purposes may be accomplished in a shorter period." 42 U.S.C. § 7475(e)(2) (emphasis added). This language further demonstrates that the purpose of the preconstruction monitoring requirement is to provide data that is sufficient to conduct a "complete and adequate analysis." If the monitoring data is inaccurate or could lead to uncertainty, then requiring its collection does not serve the purposes of the statute. EPA's decision to create a *de minimis* exemption based on the levels below which ambient pollutant concentrations can accurately be measured furthers Congress's intent and therefore is an appropriate exercise of EPA's *de minimis* authority.

### C. The SMC Implements the Legislative Design By Exempting Data that Is Not Accurate Enough to Serve any Useful Purpose.

The purpose of *de minimis* exemptions is to inject a limited degree of flexibility into the statute, where an otherwise rigid application would thwart the legislative purposes. *See Alabama Power*, 636 F.2d at 360. The SMC for a pollutant reflects levels below which concentrations of that pollutant in ambient air cannot accurately be measured. There is no purpose in requiring collection of data

that cannot be relied upon in an analysis of ambient air quality under the statute. EPA's decision to create a *de minimis* exemption based on the levels below which pollutant concentrations can accurately be measured furthers Congress's intent and therefore is an appropriate exercise of EPA's *de minimis* authority.

Petitioner's assertion that the SMC thwarts the legislative purposes (because it allows NAAQS violations) ignores that EPA has long stated that permitting authorities should not apply the exemption in circumstances where an area's ambient concentration is close to the NAAQS or the consumption of the increment. 45 Fed. Reg. at 52,710 (JAXX) (SMCs "should not be used when (1) there is an apparent threat to an applicable PSD increment or NAAQS based on modeling alone or (2) when there is a question of adverse impact on a Class I area."). Moreover, Petitioner fails to explain how the collection of possibly inaccurate data or uncertain data would enable permitting authorities to determine whether a proposed new source will violate the NAAQS or increments. In fact, EPA concluded the opposite. EPA found that preconstruction monitoring of ambient concentrations that are below the SMC "could not be used for any quantitative purposes because [the results] would not provide the desired confidence of accuracy and precision." RTC at 92 (JAXX). EPA reasonably concluded that, in these circumstances, "the time and expense of a year of preconstruction monitoring data would be wasted." *Id.* EPA's use of its *de minimis* authority to avoid such

"pointless expenditures of effort" furthers the legislative design and should be upheld. *Alabama Power*, 636 F.2d at 360.

### D. The SMC Reflects the Level at Which Regulatory Benefits are Truly *De minimis*.

Petitioner's argument that EPA cannot show monitoring benefits are trivial (Pet. Br. 47-54) misunderstands or mischaracterizes the purpose and scope of the SMC exemption and ignores the analysis in the record supporting the values EPA selected as the SMC for $PM_{2.5}$. As already discussed, the purpose of the exemption is to exempt permit applicants from having to collect monitoring data when the source's impact or the ambient concentrations are below the level at which the concentrations may accurately be measured. EPA does not deem all monitoring to be trivial, as Petitioner suggests. Pet. Br. 47. Rather, EPA believes there is little value to requiring additional monitoring data to be collected when the source's impact or the ambient concentrations in the area are below the levels at which the concentrations can accurately be measured. 75 Fed. Reg. at 64,896 (JAXX). As noted above, representative data may already be available. Thus, the exemption is narrowly targeted to exempt only those instances where the collection of monitoring data is not likely to be useful in any ambient air quality analysis. *Id.* *See* RTC at 91-92 (JAXX-XX). As such, it is an appropriate *de minimis* exemption under *Alabama Power*. 636 F.2d at 361 (valid *de minimis* exemption is one that is

"narrow in reach and tightly bounded by the need to show that the situation is genuinely *de minimis*").

Further, EPA fully explained its choice of the SMC value in the record. EPA proposed and evaluated three options for determining an appropriate SMC that would identify the degree of ambient impact on $PM_{2.5}$ concentration that is truly *de minimis*. 72 Fed. Reg. at 54,141-42 (JAXX-XX). EPA selected the option that is based on the lowest detectable concentration—or minimum detection limit—adjusted by a multiplication factor to account for errors that may arise in monitoring from various sources, such as sample collection, analytical measurement, calibration, and interferences. *See* 75 Fed. Reg. at 64,896 (JAXX). EPA's reasoning reflects a rational connection between the SMC values selected and EPA's goal of exempting monitoring that would be of little value. Accordingly, EPA's judgment is entitled to deference.

Moreover, EPA in this rulemaking took another look at the detection limit originally used in 1980, and reaffirmed this value based on recent data. 75 Fed. Reg. at 64,896-97 (JAXX-XX) (minimum detection limit was "reaffirmed by 9 years of field blank data collected by EPA through the $PM_{2.5}$ Performance Evaluation Program.") Then, based on information collected during this rulemaking, EPA used its assessment of the uncertainties introduced to the measurement of $PM_{2.5}$ due to mechanical or operational variations of the sampling

devices, and human error associated with the performance of sampling device calibration and sample analyses. *Id.* As a result of this new information, EPA reduced the uncertainty factor from 5 to 2, which reduced the SMC value from 10 $\mu g/m^3$ (that is, 5 times the detection limit of 2 $\mu g/m^3$) to the value established in this rule, 4 $\mu g/m^3$. *Id.* EPA's thorough examination of these technical issues further supports the reasonableness of its decision.

However, that EPA gave permitting authorities the discretion to consider whether monitoring might provide more than trivial benefits, notwithstanding the SMC, shows that EPA properly limited the exemption to those situations that are truly *de minimis*.[13] Thus, contrary to Petitioner's argument, EPA's limitation of the use of the SMC supports rather than undermines its use of its *de minimis* authority.

Finally, EPA considered and rejected Petitioner's argument that there is no rational relationship between basing the SMC on monitoring accuracy and applying it based on a measurement of a source's predicted increase in emissions based on modeling. In that argument, Petitioner does not dispute that the predicted

---

[13] In contrast to the language in §§ 51.166(k)(2) and 52.21(k)(2) that EPA concedes is erroneous, the language in §§ 51.166(i)(5) and 52.21(i)(5) of EPA's regulations leaves more room for permitting authority discretion. *See e.g.*, 40 C.F.R. § 51.166(i)(5) ("may exempt … from the requirements of paragraph (m) of this section, with respect to monitoring").

impact of a source might be below levels that could be accurately measured, but argued that there was still value to preconstruction monitoring. Pet. Br. 51. As EPA explained in response to comments, "any difference in the ambient concentration due to such a source [with impacts below the SMC] would be too small to be measured accurately, so any attempt to quantify the impact of a source based on preconstruction and post-construction monitoring in the area would be inconclusive." RTC at 92 (JAXX). Similarly, EPA concluded that a source trying to measure ambient concentrations below the SMC "would be trying to measure concentrations that are in the range where uncertainties exist, and the results of the monitoring could not be used for any quantitative purposes." RTC at 92 (JAXX). In such circumstances, there would be no benefit to be gained from the time and expense of collecting a year's worth of data and a *de minimis* exception is appropriate. *Id.*

## CONCLUSION

For all of the foregoing reasons, the Court should uphold EPA's use of its *de minimis* authority to promulgate SILs and SMC in general, but vacate and remand to EPA those portions of the SIL regulations codified at 40 C.F.R. §§ 51.166(k)(2) and 52.21(k)(2), so that EPA may revise the text to properly reflect EPA's intent that the SILs not be used in circumstances where their use may lead to a new violation of the NAAQS or increments. Further, the Court should find that

Petitioner's challenge to EPA's authority to adopt the SMC is time-barred and dismiss that portion of their challenge for lack of jurisdiction. The Court should otherwise deny the remainder of the issues raised by the petition.

Dated: April 6, 2012

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General

/s/ *Jessica O'Donnell*
JESSICA O'DONNELL
United States Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20024
Tel: 202-305-0851
Jessica.O'Donnell@usdoj.gov

Of Counsel:
BRIAN DOSTER
SCOTT JORDAN
United States Environmental Protection Agency
Office of General Counsel
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

*Counsel for Respondents*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing proof Brief for Respondent was served, this 6th day of April, 2012, on all registered counsel, through the Court's CM/ECF system.

/s/ *Jessica O'Donnell*
Jessica O'Donnell
United States Department of Justice
Environment & Natural Resources Div.
Counsel for Respondent EPA

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify that the foregoing proof Brief of Respondent EPA contains 12,636 words as counted by the Microsoft Office Word 2007 word processing system, and thus complies with the applicable word limitation.

/s/ *Jessica O'Donnell*
Jessica O'Donnell
United States Department of Justice
Environment & Natural Resources Div.
Counsel for Respondent EPA