**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 10-1413

---

SIERRA CLUB,
Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and
LISA P. JACKSON, Administrator,
Respondents.

---

Petition for Review of Final Administrative Action
of the United States Environmental Protection Agency

---

# PROOF REPLY BRIEF OF SIERRA CLUB

---


David S. Baron
Seth L. Johnson
Emma C. Cheuse
Earthjustice
1625 Massachusetts Ave., NW
Suite 702
Washington, DC 20036
Phone: (202) 667-4500
Fax: (202) 667-2356
dbaron@earthjustice.org
sjohnson@earthjustice.org
echeuse@earthjustice.org

*Counsel for Sierra Club*


Dated: May 29, 2012

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii
GLOSSARY OF ACRONYMS AND ABBREVIATIONS .......... vi
SUMMARY OF ARGUMENT .......... 1
ARGUMENT .......... 3
I. EPA's Adoption of Significant Impact Levels Is Unlawful and Arbitrary. .......... 3
A. The Act Unambiguously Requires Compliance with Clean Air Standards and Increments. .......... 3
1. The Act's Extraordinary Rigidity Forecloses *De Minimis* Exemptions from the Requirement for Showing Compliance with Clean Air Standards and Increments. .......... 3
2. Adoption of SILs Eviscerates the Legislative Design. .......... 10
B. EPA Cannot and Does Not Show That Air Quality Impacts at the Levels of the SILs Are "Trivial." .......... 11
C. EPA's Lawyers' Argument That SILs Are a Reasonable Interpretation of the Act Is Barred and Meritless. .......... 13
II. EPA Acted Unlawfully and Arbitrarily in Establishing the Significant Monitoring Concentration. .......... 18
A. This Challenge Is Timely. .......... 18
B. The SMC Is Unlawful and Arbitrary. .......... 21
1. The Clean Air Act Unambiguously Requires Pre-Construction Air Quality Monitoring. .......... 23
a. The Act Is Extraordinarily Rigid. .......... 23
b. Adoption of the SMC Thwarts the Legislative Design. .......... 24
2. EPA Does Not and Cannot Show That Monitoring Benefits Are "Trivial." .......... 26
III. Vacatur of the Significant Impact Levels and Significant Monitoring Concentration Is the Proper Remedy. .......... 27
CONCLUSION .......... 30
CERTIFICATE REGARDING WORD LIMIT .......... 31
CERTIFICATE OF SERVICE .......... 32

<u>**TABLE OF AUTHORITIES**</u>

**CASES** **PAGE(S)**

* *Alabama Power Co. v. Costle*,
636 F.2d 323 (D.C. Cir. 1979)........................................ 2, 5, 10, 14, 21, 23-26, 28

*Am. Forest & Paper Ass'n v. EPA*,
294 F.3d 113 (D.C. Cir. 2002)........................................................................15

* *Bluewater Network v. EPA*,
370 F.3d 1 (D.C. Cir. 2004)........................................................................8, 14

*Brown v. Gardner*,
513 U.S. 115 (1994)......................................................................................16

*Catawba County v. EPA*,
571 F.3d 20 (D.C. Cir. 2009).......................................................................8, 9

*Chlorine Chemistry Council v. EPA*,
206 F.3d 1286 (D.C. Cir. 2000)....................................................................27

*Christensen v. Harris County*,
529 U.S. 576 (2000)......................................................................................17

*Davis v. Dep't of Justice*,
610 F.3d 750 (D.C. Cir. 2010)......................................................................21

*Entergy Corp. v. Riverkeeper*,
556 U.S. 208 (2009)......................................................................................17

*Envtl. Def. Fund v. Admin'r*
("*EDF II*"), 898 F.2d 183 (D.C. Cir. 1990) ..................................................7

*Envtl. Def. Fund v. EPA*
("*EDF I*"), 636 F.2d 1267 (D.C. Cir. 1980) ..........................................11, 12

*Envtl. Def. Fund v. EPA*
("*EDF III*"), 82 F.3d 451 (D.C. Cir. 1996), *amended by* 92 F.3d 1209
(D.C. Cir. 1996) ....................................................................................4, 6, 13

* Authorities upon which we chiefly rely are marked with an asterisk.

*Envtl. Def. v. EPA*,
509 F.3d 553 (D.C. Cir. 2007)....................................................................20

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)....................................................................................5

*Fox Television Stations v. FCC*,
293 F.3d 537 (D.C. Cir. 2002)....................................................................29

* *Honeywell Int'l v. EPA*,
374 F.3d 1363 (D.C. Cir. 2004), *withdrawn in part on other grounds*, 393 F.3d 1315 (D.C. Cir. 2005)....................................................................13

*In re Sealed Case*,
237 F.3d 657 (D.C. Cir. 2001)....................................................................17

*Kokechik Fishermen's Ass'n v. Sec'y of Commerce*,
839 F.2d 795 (D.C. Cir. 1988)..................................................................6, 7

*Massachusetts v. DOT*,
93 F.3d 890 (D.C. Cir. 1996)..................................................................16, 17

*Medical Waste Institute v. EPA*,
645 F.3d 420 (D.C. Cir. 2011)....................................................................19

*Nat'l Ass'n of Reversionary Property Owners v. Surface Transp. Bd.*,
158 F.3d 135 (D.C. Cir. 1998)....................................................................20

*New Jersey v. EPA*,
517 F.3d 574 (D.C. Cir. 2008)....................................................................16

*New York v. EPA*,
443 F.3d 880 (D.C. Cir. 2006)......................................................................6

*Niagara Mohawk Power Corp. v. FERC*,
452 F.3d 822 (D.C. Cir. 2006)....................................................................19

*North Carolina v. EPA*,
531 F.3d 896 (D.C. Cir. 2008)....................................................................14

*NRDC v. EPA*,
489 F.3d 1364 (D.C. Cir. 2007)..............................................................14, 15

*PanAmSat Corp. v. FCC*,
198 F.3d 890 (D.C. Cir. 1999)....................20

* *Public Citizen v. Young*,
831 F.2d 1108 (D.C. Cir. 1987)....................9, 10, 21

* *S. Coast Air Quality Mgmt. Dist. v. EPA*,
472 F.3d 882 (D.C. Cir. 2006), *amended by* 489 F.3d 1245
(D.C. Cir. 2007)....................18, 28

*SEC v. Chenery*,
332 U.S. 194 (1947)....................13

* *Shays v. FEC*,
414 F.3d 76 (D.C. Cir. 2005)....................11, 25, 26

*Sierra Club v. EPA*,
353 F.3d 976 (D.C. Cir. 2004)....................12

*Sur Contra La Contaminación v. EPA*,
("*SURCCo*"), 202 F.3d 443 (1st Cir. 2000)....................17, 18

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001)....................16

*Zacharias v. SEC*,
569 F.3d 458 (D.C. Cir. 2009)....................29

**STATUTES**

42 U.S.C. §7410(k)(1)-(2)....................29

42 U.S.C. §7470(1)....................7

42 U.S.C. §7470(3)....................7

42 U.S.C. §7471....................25

42 U.S.C. §7473(c)....................6

42 U.S.C. §7475(a)....................28

* 42 U.S.C. §7475(a)(3)....................4, 5, 8, 15

42 U.S.C. §7475(a)(7) .......... 25

42 U.S.C. §7475(a)-(b) .......... 6

42 U.S.C. §7475(d)(2)(C)(iii)-(iv) .......... 6

42 U.S.C. §7475(d)(2)(D) .......... 6

* 42 U.S.C. §7475(e)(2) .......... 23, 24

42 U.S.C. §7479(1) .......... 6

42 U.S.C. §7506(c)(1) .......... 6

42 U.S.C. §7607(d)(3)(C) .......... 17

42 U.S.C. §7607(d)(6) .......... 17

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. §51.165(b)(2) .......... 27

40 C.F.R. §51.166(a)(3) .......... 28

40 C.F.R. §51.166(k)(2) .......... 27

40 C.F.R. §52.21(k)(2) .......... 27

**FEDERAL REGULATIONS**

45 Fed. Reg. 52,676 (1980) .......... 18

65 Fed. Reg. 70,954 (Nov. 28, 2000) .......... 20

72 Fed. Reg. 54,112 (Sept. 21, 2007) .......... 13, 20, 22

75 Fed. Reg. 64,864 (Oct. 20, 2010) .......... 12, 13, 15, 20-22, 26, 29

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| Br. | Opening Brief of Sierra Club |
| CAA, the Act | Clean Air Act |
| the Club | Sierra Club |
| EPA, the agency | Environmental Protection Agency |
| EPA Br. | Brief of Respondent |
| JA | Joint Appendix |
| NAAQS | National Ambient Air Quality Standards |
| $PM_{2.5}$ | Fine particulate matter pollution (particulate matter 2.5 micrometers and smaller in diameter) |
| PSD | Prevention of significant deterioration |
| RTC | EPA-HQ-OAR-2006-0605-0059 |
| SILs | Significant impact levels |
| SIP | State Implementation Plan |
| SMC | Significant monitoring concentration |
| $\mu g/m^3$ | Microgram per cubic meter |

## SUMMARY OF ARGUMENT

EPA concedes that "an impact from an individual source could cause a NAAQS or increment violation *even if* the impact falls below the applicable" significant impact levels ("SILs"), and the agency does not claim that compliance with the SILs shows as a factual matter that the proposed source will not cause or contribute to violations. Brief of Respondent ("EPA Br.") 32-33 (emphasis in original). The agency openly admits that its SILs rule not only allows, but requires the granting of pre-construction "PSD" permits for sources that will in fact cause or contribute to such violations. *Id.* 32-34. Thus, far from providing a "means" within the Clean Air Act ("the Act") for demonstrating actual compliance with National Ambient Air Quality Standards ("NAAQS") and increments, as EPA's lawyers claim, *e.g.*, *id.* 26, the rule allows proposed major sources to **avoid** making such a demonstration, and instead merely show compliance with the SILs. But the Act rigidly forecloses such claimed "*de minimis*" exemptions, and EPA has not met its burden of justifying them: they thwart rather than advance the Act's central clean air goals, and the waivers encompass pollution impacts that EPA itself concedes are nontrivial. Further, EPA's lawyers are barred from defending the rule as a permissible "interpretation" of the Act (a meritless argument itself), for the agency itself made no such claim, but rather justified the SILs solely as a *de minimis* exemption from the statute.

EPA's concession (at 32-36) that its SILs rule should be vacated because it actually requires the permitting of sources that will cause or contribute to violations of NAAQS and increments does not fully resolve Sierra Club's challenge, as the agency maintains (at 34) that the use of SILs is still **allowable** under the same circumstances, and (at 34 n.10) intends to issue guidance providing for continued use of SILs after vacatur of the rule.

Contrary to EPA's claim, Sierra Club is not barred from challenging the agency's authority to adopt a monitoring waiver ("significant monitoring concentration" or "SMC") for fine particulate matter pollution ("$PM_{2.5}$") merely because EPA adopted waivers for a list of pollutants in 1980 that did not include $PM_{2.5}$. The 1980 final action did not contain a legal interpretation as to EPA's authority to adopt SMCs generally, nor did it purport to authorize an SMC for $PM_{2.5}$. On the merits, EPA is unable to overcome the explicit holding in *Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979), that EPA cannot do precisely what it did here: waive monitoring based on claims about the limits of monitoring accuracy. The statute rigidly mandates monitoring as an essential part of the PSD permitting process, leaving no authority for EPA to substitute a different tool. EPA also fails to show that its monitoring waiver applies only where the benefit of monitoring would be trivial: indeed, the agency concedes (at 52) that the waiver applies in situations where it "should not" be used. EPA's lawyers wrongly imply

that the SMC applies only where $PM_{2.5}$ levels are too low to be accurately measured, when they waive monitoring even where actual $PM_{2.5}$ levels are right at, or even over, the level of the standards. In reality, the SMC is nothing more than an impermissible EPA attempt to substitute predictions or estimates of pollution levels for the real-world monitoring of actual pollution levels that Congress mandated.

## ARGUMENT

### I. EPA'S ADOPTION OF SIGNIFICANT IMPACT LEVELS IS UNLAWFUL AND ARBITRARY.

### A. The Act Unambiguously Requires Compliance with Clean Air Standards and Increments.[1]

#### 1. The Act's Extraordinary Rigidity Forecloses *De Minimis* Exemptions from the Requirement for Showing Compliance with Clean Air Standards and Increments.

Contrary to EPA's assertions (at 38-42), the relevant provisions of the Act are far too rigid to allow the sort of *de minimis* exemption EPA adopted here. As

---

[1] EPA erroneously claims (at 15 n.7, 36) that Petitioner did not and could not (on timeliness grounds) challenge EPA's authority to add SILs for $PM_{2.5}$ to 40 C.F.R. §51.165(b) (governing predicted impacts inside nonattainment areas of sources proposed for construction outside such areas). To the contrary, Petitioner argued that the SILs impermissibly allow violations to worsen when pollution spreads into nonattainment areas governed by 40 C.F.R. §51.165. Br. 36 & n.15. Further, Petitioner's challenge to EPA's authority to add §51.165(b) SILs for $PM_{2.5}$ is timely for the reasons given *infra* in Part II.A. The footnote in Petitioner's brief EPA cites did not *limit* Petitioner's challenge to the C.F.R. sections noted therein.

described above, the agency's SILs rule replaces the statutorily mandated "demonstrat[ion]" of compliance with NAAQS and increments, 42 U.S.C. §7475(a)(3), with a demonstration of compliance with EPA-invented SILs. EPA utterly misleads in asserting (at 41) (emphasis removed) that SILs "allow a source to demonstrate through modeling that its impact will not cause or contribute to a NAAQS or increments violation." In reality, the rule allows the source merely to show that its expected impact will be below the SILs, and then automatically claim it has shown compliance with NAAQS and increments, even where the impact would be "in fact" sufficient to trigger or worsen violations. *See* EPA Br. 32 (SILs could be "used to justify issuing permits to sources whose emissions will in fact cause violations of the NAAQS" or increments). EPA cannot and does not refute Petitioner's showing that the statute rigidly requires actual compliance with clean air standards. Opening Brief of Sierra Club ("Br.") 20-37.

EPA's other attempts to evade the statutory language also fall flat. Rather than confront the explicit and expansive mandate in §165 that proposed sources show they "will not" cause or contribute to violations—with carefully prescribed exceptions—EPA (at 39) cites a single case (*Envtl. Def. Fund v. EPA* ("*EDF III*"), 82 F.3d 451, *amended by* 92 F.3d 1209 (D.C. Cir. 1996)) where the Court allowed a *de minimis* exemption from a different statutory provision. The question here, however, is whether the statutory scheme at issue *here* shows a rigid design to

require an actual demonstration of compliance with NAAQS and increments by each permit applicant—rather than allowing sources to avoid such a demonstration and obtain permits when they will in fact cause or contribute to such violations (albeit by an amount less than an EPA-invented threshold). The unambiguous statutory language requiring, *inter alia*, that "no" proposed source can be built without showing that it "will not" cause or contribute to violations of any NAAQS or increments, 42 U.S.C. §7475(a)(3); the careful specification of limited exceptions; Congress' telling omission of any "significance" threshold for the demonstration; and the centrality of NAAQS and increments to the statutory design all show that Congress plainly did not intend to allow a *de minimis* exemption. Br. 20-32; *see also Alabama Power*, 636 F.2d at 350 (proposed major sources "cannot commence construction if their emissions would cause or contribute to a violation") (emphasis added). By focusing only on a few terms in isolation, *see* EPA Br. 38-41, EPA completely misses the cumulative force of the statutory language taken in context, and the close linkage between that language and the central purpose of the PSD program and the statute as a whole. *See, e.g., FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) (court must interpret statute's words "in context" and "'with a view to their place in the overall statutory scheme'") (quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)).

EPA's attempts to draw support from *EDF III* are in any event misplaced. The provision there not only lacked the extensive evidence of rigidity present here, but the Court found a *de minimis* exemption to be fully consistent with the provision's purpose—a finding that would not be possible here, where EPA's SILs directly flout the Act's central purposes of protecting the NAAQS and increments. *EDF III*, 82 F.3d at 466-67; *compare* 42 U.S.C. §7506(c)(1), *with id.* §§7473(c), 7475(a)-(b), (d)(2)(C)(iii)-(iv), (D), 7479(1). EPA also cites *New York v. EPA*, but the *de minimis* discussion there is purely dictum and merely reviews the doctrine in general terms. 443 F.3d 880, 888 (D.C. Cir. 2006) ("EPA appropriately has not attempted to justify the [exemption at issue] as an exercise of *de minimis* discretion").

Equally groundless is EPA's effort (at 41-42) to explain away Congress' careful specification of the only exemptions it intended to allow from the demonstration mandated in §165(a)(3)—exemptions that do not include EPA's "*de minimis*" SILs. Br. 21-23. EPA also has no answer to the point that by limiting application of the PSD program to only "major" facilities, Congress has already exercised its judgment as to which sources have sufficient impact to warrant full regulation, *id.* 24. In *Kokechik Fishermen's Ass'n v. Secretary of Commerce*, 839 F.2d 795, 801-02 (D.C. Cir. 1988), this Court held that an enumeration of specific exceptions in a statute foreclosed inference of a *de minimis* exemption. *See* Br. 23-

24 (discussing *Kokechik* and cases with similar holdings). EPA's only response is to wrongly assert (at 41-42) that the Act is distinguishable because it purportedly allows the agency to "balance" compliance with NAAQS and increments against "encouraging economic growth." In reality, no such balancing is allowed under the plain language of §165: Instead, similar to *Kokechik*, 839 F.2d at 801-02, the Act absolutely bars violations of increments or NAAQS. Br. 29-31. And contrary to EPA's claim, the statutory goal is not to "encourage" economic growth, but, among others, "to protect public health and welfare" from harms that may result from pollution <u>even if</u> the NAAQS are not violated, and to provide that economic growth be "*consistent with* the preservation of existing clean air resources." 42 U.S.C. §7470(1), (3) (emphasis added); *accord, e.g.*, *Envtl. Def. Fund v. Admin'r* ("*EDF II*"), 898 F.2d 183, 184 (D.C. Cir. 1990). By allowing new violations of NAAQS or increments to occur or worsen, EPA's approach contravenes the PSD program's first-listed purpose <u>and</u> impermissibly allows the general goal of economic growth to trump the specific command to prevent violations of air standards.

EPA also fails to reconcile its claim of *de minimis* authority with the absence of any "significance" qualifier in §165(a)(3). The statute requires a showing that the source will "not cause, or contribute to," violations of NAAQS or increments: it does not say "cause, or contribute **significantly** to," violations. EPA cannot and

does not claim the word "cause" is ambiguous, nor can it import a "significance" requirement into the word "contribute." As the Court held in *Bluewater Network v. EPA*, "the term ['contribute'] has no inherent connotation as to the magnitude or importance of the relevant 'share' in the effect; **certainly it does not incorporate any 'significance' requirement**." 370 F.3d 1, 13 (D.C. Cir. 2004) (emphasis added; citations omitted). There, Congress further showed its intent by omitting the word "significant" from the provision at issue, but including it in another related provision. *Id.* at 13-14. So too here. *See* Br. 25-26. The provision at issue in *Bluewater* provided for limits on emissions that "cause, or contribute to," certain types of air pollution, 370 F.3d at 13-14 (quoting 42 U.S.C. §7547(a)(3))—almost identical to §165(a)(3)'s "cause, or contribute to, air pollution in excess" of NAAQS or increments, 42 U.S.C. §7475(a)(3).

EPA mistakenly relies on *Catawba County v. EPA*, 571 F.3d 20 (D.C. Cir. 2009), to justify reading the word "significantly" into §165(a)(3). EPA Br. 40; *see also id.* 27-28. But the provision at issue in *Catawba* addressed a markedly different statutory scheme governing the drawing of nonattainment area boundaries, a scheme the Court found left some discretion to EPA rather than (as here) dictating a precise outcome (namely, compliance with NAAQS and increments). 571 F.3d at 35 (noting that statute allowed EPA to, *inter alia*, alter the boundaries as it "'deems' … 'necessary'") (quoting 42 U.S.C.

§7407(d)(1)(A)(i)). *Catawba* further recognized that the statutory context was key, as "a statute may foreclose an agency's preferred interpretation despite … textual ambiguities if its structure, legislative history, or purpose makes clear what its text leaves opaque." *Id.* Indeed, *Catawba* ultimately *rejected* reading "contribute to" as excluding exacerbation of a violation, holding that "[w]e may not interpret 'contribute' in a way that does such violence to section 107(d)'s very purpose." *Id.* at 39. So too here.

Contrary to EPA's assertion (at 40), the issue here is materially very similar to that in *Public Citizen v. Young*, 831 F.2d 1108 (D.C. Cir. 1987), where the Court found a statutory ban on color additives that "induce cancer" rigidly foreclosed *de minimis* exemptions. Not only is the statutory language ("induce") analogous to that at issue here ("cause or contribute to"), but in finding rigidity, the *Young* Court relied on the statute's lack of the discretionary language that Congress included in provisions governing other agency determinations. 831 F.2d at 1112, 1114 n.6, 1120-22. Likewise here, Congress has explicitly set out the limited situations in which NAAQS or increment exceedances and exceptions to the "cause or contribute" showing are to be allowed. Br. 20-26, 28-32. Indeed, the Act's protective mandate is more stringent than the provision at issue in *Young* because §165(a) puts the burden on the facility to show it will <u>not</u> cause or contribute to violations before receiving a permit.

EPA also repeatedly (*e.g.*, at 36-37) mischaracterizes *Young* as holding there is a "presumption" in favor of *de minimis* authority. As *Young* makes clear, the *de minimis* concept "obviously is not available to thwart a statutory command." 831 F.2d at 1113. Further, it is well-settled that **EPA** bears the burden to demonstrate that an exempted activity truly qualifies for a *de minimis* exemption. *Alabama Power*, 636 F.2d at 360.

### 2. Adoption of SILs Eviscerates the Legislative Design.

EPA does not (and cannot) dispute that protecting NAAQS and increments lies at the Act's core and that the Act requires prevention of significant deterioration of air quality. Br. 29-32. It thus attempts no explanation of how waiving compliance with increments and NAAQS can possibly implement the legislative design. EPA's lawyers' only defense is to assert (at 42-43) that SILs implement the legislative design because they "are a means of demonstrating compliance with the NAAQS and increments." The claim is not only baseless (since, as EPA concedes, a proposed source can comply with SILs but still violate NAAQS and increments) but an impermissible *post hoc* rationale: EPA itself justified SILs solely as *de minimis* **exemptions** from the Act's mandate that proposed sources show actual compliance with clean air standards and increments. *Infra* pp.13-18.

## B. EPA Cannot and Does Not Show That Air Quality Impacts at the Levels of the SILs Are "Trivial."

*De minimis* exemptions "must cover **only** situations where the burdens of regulation yield a gain of trivial or no value." *Shays v. FEC*, 414 F.3d 76, 114 (D.C. Cir. 2005) (emphasis added; internal quotation marks omitted). By EPA's own admission, SILs fail this test because they allow air quality impacts that are in fact non-trivial. *See* EPA Br. 32-33; *see also Envtl. Def. Fund v. EPA* ("*EDF I*"), 636 F.2d 1267, 1283-84 & n.45 (D.C. Cir. 1980) (because EPA found that more stringent regulation would yield benefits, it could not rationally invoke *de minimis* exemption). The problem here is not merely—as EPA suggests (at 34)—that the regulatory text deprives permitting authorities of "the discretion" to disregard the SILs (although that is itself certainly unlawful and arbitrary). Even if such discretion were granted, EPA would still **allow** permitting authorities to use SILs in situations where a source's impacts are plainly not trivial. EPA suggests (at 32-34) that SILs "should not be used" where "there is information" that violations of NAAQS or increments could result, but "should not" is hortatory rather than prohibitory. In any event, such an approach unlawfully abrogates the permit applicant's statutory burden to "demonstrate" that its emissions will <u>not</u> cause or contribute to violations. *Infra* p.15.

Further, EPA has not shown how compliance with a SIL can by itself reflect pollution impacts that are always trivial. Whether a new source will tip an area

into violation of NAAQS or increments or make an existing violation worse depends not just on that source's own contribution (the only factor addressed by the SILs) but also on the contribution of other pollution sources. Thus, EPA has not carried its burden of demonstrating that it can use SILs to "find the concentration at which there are only trivial benefits to be derived from regulation." *EDF I*, 636 F.2d at 1284 n.46. EPA further has no answer to the point that the form of the NAAQS already specifies with precision the amount of leeway allowed for "small" exceedances, foreclosing inference of additional such authority. Br. 32-34. Nor does EPA dispute that its SILs were meant to serve its policy preference for relieving a new source of "the burden of addressing its small contribution to a problem caused primarily by other sources," 75 Fed. Reg. 64,864, 64,892/1 (Oct. 20, 2010) ("$PM_{2.5}$ increments rule"), JA___, a rationale directly at odds with the Act's mandate for new and modified major sources to bear that very burden. Br. 37-38.

Finally, EPA does not render the SILs lawful or rational by claiming (at 43-44) that the values are "comparable" to those derived for another purpose for other pollutants in 1980. Reflexively tethering the SILs' values to those set for different purposes hardly justifies abrogating the statute, nor does it rationally show that the impacts allowed by these SILs are trivial. *See Sierra Club v. EPA*, 353 F.3d 976, 986 (D.C. Cir. 2004) ("the adequacy of the underlying justification offered by the

agency is the pertinent factor—not what the agency did on a different record concerning a different industry."); *see also EDF III*, 82 F.3d at 467 ("When the EPA chose to deviate from these standards by prescribing a lower tonnage threshold for lead, it explained that this adjustment was required because even relatively small increases in lead emissions, as compared to other pollutants, may threaten a state's ability to attain the national standards for lead.").

### C. EPA's Lawyers' Argument That SILs Are a Reasonable Interpretation of the Act Is Barred and Meritless.

Perhaps lacking faith in the *de minimis* rationale the agency propounded below, EPA's lawyers make the new claim that SILs are lawful interpretations of purportedly ambiguous language in §165(a)(3). EPA Br. 23, 26-32. The Court should not entertain this impermissible *post hoc* rationale, which is entitled to no deference. *E.g., SEC v. Chenery*, 332 U.S. 194, 196 (1947); *Honeywell Int'l v. EPA*, 374 F.3d 1363, 1373 (D.C. Cir. 2004), *withdrawn in part on other grounds*, 393 F.3d 1315 (D.C. Cir. 2005) (refusing to entertain statutory interpretation raised by EPA's lawyers because "[w]ithout knowing the agency's interpretation of the statute, we simply have no way of evaluating whether its interpretation is reasonable"). EPA itself—as opposed to its lawyers—relied solely on *Alabama Power*'s dicta on *de minimis* exemptions, not on any purported ambiguity in §165(a)(3). 75 Fed. Reg. at 64,891/2-3, JA____; 72 Fed. Reg. 54,112, 54,139/2-3

(Sept. 21, 2007), JA____; EPA-HQ-OAR-2006-0605-0059 ("RTC") 59-60, JA____-__; *see also Alabama Power*, 636 F.2d at 360-61 (*de minimis* concept allows "[c]ategorical exemptions" from "a statutory command").

Even if cognizable, the attorneys' claim is meritless, as the statutory scheme shows an unambiguous intent to require a showing of actual compliance with the NAAQS and increments. *See supra* pp.3-10; Br. 20-32. Contrary to the lawyers' claim (at 27-28), Congress' failure to explicitly "define or quantify" the word "contribute" does not leave EPA free to insert the word "significantly" before it. *NRDC v. EPA*, 489 F.3d 1364, 1373 (D.C. Cir. 2007) ("the absence of a statutory definition does not render a word ambiguous"). As noted above, this Court has ruled in a very similar context that the plain meaning of the term "contribute" "does not incorporate any 'significance' requirement." *Bluewater Network*, 370 F.3d at 13-14. And even EPA's lawyers do not argue that "cause" should be read to include a significance component, explaining that they "agree[] that SILs should not be used to justify issuing permits to sources whose emissions will in fact cause violations of the NAAQS" or increments. EPA Br. 32-34.

Moreover, by using the phrase "cause, ***or*** contribute to," Congress comprehensively covered any triggering or worsening of a violation. *See North Carolina v. EPA*, 531 F.3d 896, 910 (D.C. Cir. 2008) ("EPA must give effect to both provisions in … statute" "written in the disjunctive"). EPA itself recognized

that the phrase sweeps broadly. *See* 75 Fed. Reg. at 64,892/1 ("notwithstanding the existence of a SIL, permitting authorities should determine when it may be appropriate to conclude that even a *de minimis* impact will 'cause or contribute' to an air quality problem"), JA____. Yet, by reading each word in isolation, EPA's lawyers miss the breadth of Congress' intent. *See NRDC*, 489 F.3d at 1373 ("The words of the statute should be read in context … and the problem Congress sought to solve should be taken into account to determine whether Congress has foreclosed the agency's interpretation.") (internal quotation marks omitted).

Further, the Act places the burden squarely on a permit proponent to "demonstrate[] … that emissions from … such facility will not cause, or contribute to," violations of clean air standards. 42 U.S.C. §7475(a)(3) (emphasis added). The lawyers unlawfully abrogate the statutory burden of proof by allowing the use of SILs unless some unidentified party provides "information … demonstrating that a proposed source's impact would cause" a violation. EPA Br. 34 (emphasis added); *see Am. Forest & Paper Ass'n v. EPA*, 294 F.3d 113, 119 (D.C. Cir. 2002) (rejecting attempt to reverse statutory burden of proof under Act).

Even if the Act were ambiguous as EPA's attorneys claim, construing it to allow the use of SILs would not be permissible. Given EPA's concession that use of SILs can in fact authorize violations of NAAQS and increments, interpreting the Act to allow their use would be so contrary to the language, structure, and central

purpose of the statute as to be patently unreasonable. *Supra* pp.3-10; *e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485 (2001) ("The EPA may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion."). Likewise, assuming *arguendo* EPA has some discretion to set the parameters of the "demonstrat[ion]" §165(a)(3) requires, that discretion cannot plausibly go so far as to allow a methodology that the agency itself admits is not in fact an accurate predictor of the compliance the statute requires. *See Massachusetts v. DOT*, 93 F.3d 890, 893 (D.C. Cir. 1996) ("Because the range of permissible interpretations of a statute is limited by the extent of its ambiguity, an agency cannot exploit some minor unclarity to put forth a reading that diverges from any realistic meaning of the statute lest the agency's action be held unreasonable."); *see also, e.g.*, EPA Br. 32 (conceding SILs may be "used to justify issuing permits to sources whose emissions will <u>in fact</u> cause violations of the NAAQS" or increments) (emphasis added).

EPA's claim (at 28-31) that it has long allowed the use of SILs is unavailing, given their inconsistency with the Act. *Brown v. Gardner*, 513 U.S. 115, 122 (1994) ("A regulation's age is no antidote to clear inconsistency with a statute"); *New Jersey v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008) ("[W]e do not see how merely applying an unreasonable statutory interpretation for several years can transform it into a reasonable interpretation.") (alteration in original; internal

quotation marks omitted). *Entergy Corp. v. Riverkeeper*, 556 U.S. 208, 224 (2009) (quoted in EPA Br. 31), found the longstanding nature of an EPA interpretation was relevant in the context of an interpretation that was consistent with the statutory text and purpose. *Id.* at 218-22 & n.4, 226. Here, by contrast, as shown above, the SILs are plainly an impermissible interpretation of the Act. *See, e.g.*, *In re Sealed Case*, 237 F.3d 657, 669 (D.C. Cir. 2001) ("We only defer to an agency interpretation if a statute … is unclear."); *Massachusetts*, 93 F.3d at 893 (agency interpretation of ambiguous statute may not "diverge[]" completely from text). Moreover, the agency's lawyers impermissibly rely (at 30-31) on memoranda that are not in the docket, were not cited by the agency itself in the rulemaking, and, in any event, do not purport to be anything other than non-binding material. 42 U.S.C. §7607(d)(3)(C), (6) (limiting record on judicial review to material in docket at time of final rulemaking). Likewise, the "NSR Workshop Manual" they cite (at 30) is labeled "draft" on almost every page. JA____. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law[,] do not warrant *Chevron*-style deference").

Finally, *Sur Contra La Contaminación v. EPA* ("*SURCCo*"), 202 F.3d 443 (1st Cir. 2000) (cited in EPA Br. 31-32), says nothing about the demerits of EPA's statutory interpretation, which is the issue here. The petitioner did not challenge

EPA's regulations or guidance, just EPA's permitting decision. *SURCCo,* 202 F.3d at 448 ("SURCCo's petition focuses on purported technical errors … and on assertions that the EPA should have applied its discretion differently. SURCCo does not directly challenge the PSD permit regulations ….").

## II. EPA ACTED UNLAWFULLY AND ARBITRARILY IN ESTABLISHING THE SIGNIFICANT MONITORING CONCENTRATION.

### A. This Challenge Is Timely.

Contrary to EPA's assertion (at 47-48), the Club's challenge to EPA's authority to adopt an SMC for $PM_{2.5}$ is not time-barred merely because the agency adopted SMCs in 1980 for a list of pollutants that did not include $PM_{2.5}$. The 1980 action did not purport to establish a general rule that monitoring waivers were legally authorized for any and all pollutants. Indeed, the preamble to the 1980 final rule itself did not even articulate a statutory interpretation justifying monitoring waivers at all, asserting merely that the SMCs reflected "*de minimis*" levels for the pollutants then listed. 45 Fed. Reg. 52,676, 52,705/3-10/2 (1980), JA____-__; *see also* EPA Br. 18, 45 (acknowledging agency had never before established an SMC for $PM_{2.5}$). Thus, this challenge to EPA's authority to grant a new monitoring exemption is not time-barred. *See S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 898 (D.C. Cir. 2006), *amended on other grounds by* 489 F.3d 1245 (D.C. Cir. 2007) (challenge to new application of alleged authority

to revoke clean air standard not time-barred even though EPA first exercised such authority seven years before); *Niagara Mohawk Power Corp. v. FERC*, 452 F.3d 822, 827 (D.C. Cir. 2006) (agency's prior application of claimed legal authority "does not foreclose [a person's] ability to challenge the principle as beyond the agency's statutory authority when the agency later utilizes it to cause substantial injury"). EPA cites *Medical Waste Institute v. EPA*, 645 F.3d 420 (D.C. Cir. 2011), but there this Court rejected as time-barred a challenge to an approach EPA had taken in an earlier iteration of standard-setting for <u>the same</u> category of sources under §129 of the Clean Air Act, and (unlike here) the earlier iteration contained a detailed legal rationale for the challenged approach.[2] *Id.* at 427 (citing 62 Fed. Reg. 48,348, 48,363-64 (1997)).

Moreover, even if EPA had somehow made a decision in 1980 about a pollutant it only started specifically regulating in 1997, EPA reopened the issue of its authority to establish an SMC by proposing and inviting comment on different approaches for setting an SMC for $PM_{2.5}$ and asserting authority not on grounds that the matter was already settled, but on the basis of the *de minimis* concept and

[2] EPA's speculation (at 48 n.12) as to the Club's arguments about the SILs' addition to 40 C.F.R. §51.165(b) is incorrect, for the Club does not concede it is barred from challenging their addition. *See also supra* p.3 n.1.

*Alabama Power*, 75 Fed. Reg. at 64,896/1, JA____; 72 Fed. Reg. at 54,141/2-42/1, JA____-__; RTC 91-93, JA____-__. *See, e.g., Envtl. Def. v. EPA,* 509 F.3d 553, 558 (D.C. Cir. 2007) (challenge to new application of alleged authority first invoked in 1993 not time-barred because rulemaking "create[d] the opportunity for renewed comment [on] and objection" to authority) (alterations in original; internal quotation marks omitted); *PanAmSat Corp. v. FCC*, 198 F.3d 890, 897 (D.C. Cir. 1999) (agency reopened issue where it discussed continuing justification of its decision without also relying on its prior resolution of the matter). EPA knows how to notify commenters that it has previously decided—and is not reopening—an issue. *See, e.g.*, 65 Fed. Reg. 70,954, 70,959/1 n.2 (Nov. 28, 2000) ("EPA is not accepting comment on these past determinations; or otherwise reopening these issues."). The agency did not do so here.

Further, even if the issue of whether EPA has authority to create an SMC for $PM_{2.5}$ were time-barred, EPA's decision to set it as a multiple of the lowest level at which monitors can register $PM_{2.5}$ is open to challenge. Because EPA proposed and requested comment on three methodologies, 72 Fed. Reg. at 54,141/2-42/1, JA____-__, two of which were not presented in the 1980 rulemaking, it opened the issue of the legality of those options. *See Nat'l Ass'n of Reversionary Property Owners v. Surface Transp. Bd.*, 158 F.3d 135, 142 (D.C. Cir. 1998) ("An explicit invitation to comment … is usually sufficient to affect [*sic*] a reopening.").

## B. The SMC Is Unlawful and Arbitrary.

Contrary to EPA's arguments (at 49-50), *Alabama Power* has already read the Act as foreclosing the very sort of monitoring exemption adopted here. EPA justified the SMC as a level reflecting the "ability to accurately measure ambient $PM_{2.5}$ concentrations." 75 Fed. Reg. at 64,896/3, JA____. In *Alabama Power*, EPA likewise claimed that it could waive monitoring because "current monitoring techniques are at best of questionable accuracy" for certain measurements. 636 F.2d at 372. This Court held with respect to §165(e)(2), the very provision at issue here, that EPA "does not have authority to dispense with monitoring as at least one element of the overall enforcement effort," notwithstanding the limits on monitoring accuracy. *Id.* at 372 (emphasis added). This categorical, directly applicable holding refutes EPA's argument that it somehow has "*de minimis* authority" to waive the pre-application monitoring requirement for virtually identical reasons. *See Public Citizen v. Young*, 831 F.2d at 1113 (*de minimis* concept "obviously is not available to thwart a statutory command"); *see also Davis v. Dep't of Justice*, 610 F.3d 750, 753 (D.C. Cir. 2010) ("law of the circuit" binds panel).

Unable to refute the extraordinary rigidity of the Act's monitoring mandate, EPA resorts to grossly mischaracterizing the SMC exemption as applying only where ambient $PM_{2.5}$ levels are "so low that they cannot be accurately measured."

EPA Br. 45. The claim is false. EPA's rule waives pre-application monitoring **regardless** of real-world ambient $PM_{2.5}$ levels. The SMC is primarily used to waive monitoring where a proposed source predicts (through computer modeling) that it will cause less than an SMC's-worth of **increase** in pollution levels. 72 Fed. Reg. 54,141/2, JA____; Br. 11. For example, if the source predicts it will cause $PM_{2.5}$ levels to rise by 3 micrograms per cubic meter ("$\mu g/m^3$") (24-hour average) in the affected area, the rule allows waiver of monitoring, because that predicted level of increase (3 $\mu g/m^3$) is below the SMC of 4 $\mu g/m^3$. This waiver applies <u>even if</u> pre-existing ambient $PM_{2.5}$ levels are not only measurable, but already so high (e.g., at 33 $\mu g/m^3$), that a 3 $\mu g/m^3$ increase will tip the area into violation of the 24-hour NAAQS of 35 $\mu g/m^3$. Thus, far from saving the permit applicant from having to monitor for undetectable levels of $PM_{2.5}$, the rule allows the applicant to avoid monitoring that would reveal levels close to violating the standard.

A secondary and far less common use of SMCs is to waive monitoring where the source estimates that **ambient** pollution levels themselves are lower than the SMC. 75 Fed. Reg. at 64,866/3-67/1, JA____-__; Br. 11 n.5. But even there, a mere estimate of pollution levels hardly renders monitoring superfluous. Monitoring can reveal, for example, that <u>actual</u> pollution levels are higher than an estimate could or would predict. EPA's claim (*e.g.*, at 49) that the SMC exempts collection of data "that is not useful to carrying out the purposes of the statute"

thus not only illegally second-guesses Congress' judgment as to how to gather necessary data, but is also simply false. Indeed, EPA makes no response to the point that Congress required pre-application monitoring "for purposes of determining whether emissions from [a proposed] facility will exceed" increments or NAAQS. 42 U.S.C. §7475(e)(2); *see also Alabama Power*, 636 F.2d at 376 & n.17 (monitoring is "essential" to determining baseline pollution levels); *e.g.*, Br. 43-45.

### 1. The Clean Air Act Unambiguously Requires Pre-Construction Air Quality Monitoring.

#### a. The Act Is Extraordinarily Rigid.

EPA strains (at 50-51) to discount Congress' specification of only a single limited exception to the monitoring requirement, but ignores precedent that refutes the availability of *de minimis* exemptions where the statute sets out such carefully proscribed exceptions to a blanket command. *See supra* pp.6-7 (discussing *Kokechik*). EPA's lawyers suggest (at 51) that the exception in §165(e)(2) should be read to allow total waiver of monitoring in favor of alternatives that provide a "complete and adequate analysis," but this farfetched rationale was never offered by the agency itself, and in any event the plain language of the exception (which is limited to allowing monitoring for "a shorter period") forecloses such a reading. Moreover, the lawyers' notion that waiving the monitoring that "Congress has

mandated," *Alabama Power*, 636 F.2d at 372 (emphasis added), somehow "furthers Congress's intent" relies on the baseless presumption that if the SMC is not exceeded, monitoring data will be "inaccurate or could lead to uncertainty," EPA Br. 51. As explained above, the SMC for increases provides no basis whatsoever for supposing that monitoring data in the impacted area will be inaccurate. *Supra* pp.21-22. Nor is there any finding or rational basis for presuming that a mere estimate that ambient levels are within the SMC will truly be more accurate or certain than the actual, real-world monitoring that Congress mandated.

#### b. Adoption of the SMC Thwarts the Legislative Design.

EPA's arguments (at 51-56) that the SMC is somehow justified by the limitations of monitoring accuracy are fully refuted above. *See supra* pp.21-24. EPA asserts that a modeled prediction of impact below the SMC justifies waiver of actual pre-application monitoring because "any attempt to quantify the impact of a source based on preconstruction and post-construction monitoring in the area would be inconclusive." EPA Br. 55-56 (quoting RTC 92, JA____). As discussed above, a presumption that pre-application monitoring will be useless is both unsupportable and contrary to Congress' explicit decision to require such monitoring "for purposes of determining whether emissions from such facility will exceed" the increment or NAAQS, 42 U.S.C. §7475(e)(2) (emphasis added). And

the potential utility of "post-construction" monitoring is utterly irrelevant to the utility and legal imperative of requiring the pre-application monitoring at issue here. Indeed, the Act addresses (discretionary) post-construction monitoring separately. 42 U.S.C. §7475(a)(7); *Alabama Power*, 636 F.2d at 372-73. EPA's claim further ignores that monitoring can show that <u>any</u> addition of pollution would violate NAAQS or increments (by revealing that actual pollution levels are already right at the maximum allowable level). Br. 39-40, 43-46, 48-49.[3] In addition, EPA ignores the vital role of monitoring in facilitating informed public participation in the permitting process and establishing the baseline for measuring increment consumption. *Id.* 47-48, 50-51 n.21.

In summary, instead of implementing the legislative design, EPA is pressing its own preference for modeling and other estimation methods in lieu of the monitoring that Congress explicitly mandated. *See* Br. 45-48, 53. EPA cannot substitute its own policy for the unambiguous policy judgment Congress made. *See, e.g.*, *Shays*, 414 F.3d at 114.

---

[3] Contrary to Intervenor's assertion (at 2), the PSD permit requirement applies not only in areas that meet the NAAQS, but also in "unclassifiable" areas, where air quality may not be known. 42 U.S.C. §7471.

### 2. EPA Does Not and Cannot Show That Monitoring Benefits Are "Trivial."[4]

Inverting the proper burden of proof for a *de minimis* exemption, EPA claims the SMC is lawful because its regulations afford discretion whether to allow a source to take advantage of the SMC, and EPA hopes that permitting agencies will not allow it to be used in certain circumstances. EPA Br. 52, 55. To the contrary, the agency bears the burden of showing that a *de minimis* exemption "cover[s] only situations where the burdens of regulation yield a gain of trivial or no value." *Shays*, 414 F.3d at 114 (internal quotation marks omitted; emphasis added); *Alabama Power*, 636 F.2d at 360. Far from meeting that burden, EPA concedes the contrary—that its SMC exempts sources from monitoring in situations where monitoring "can be useful" in determining background concentration for purposes of a NAAQS analysis. RTC 92, JA____. Regardless of EPA's hortatory statement (at 52) (internal quotation mark omitted) that the SMC "should not be used" in certain circumstances, the rule's plain language allows the SMC's use in those very situations, rendering it illegal and arbitrary. *See, e.g.*, 75 Fed. Reg. at 64,900/2 ("when either the modeled $PM_{2.5}$ impact of, or the existing ambient air quality within the area of, the proposed new major source or major

---

[4] The arguments in Part II.B.1.b apply here.

modification is less than the $PM_{2.5}$ SMC, the reviewing authority may exempt the source or modification from the monitoring data requirements for $PM_{2.5}$"), JA____.

## III. VACATUR OF THE SIGNIFICANT IMPACT LEVELS AND SIGNIFICANT MONITORING CONCENTRATION IS THE PROPER REMEDY.

EPA's concession that the Court should vacate its SILs rule, while warranted, does not fully resolve Sierra Club's challenge.

EPA's stated intent to continue allowing the use of SILs, and to issue guidance facilitating continued SIL waivers, EPA Br. 34 n.10, shows the need for a ruling on the merits invalidating the entirety of EPA's final action pertaining to SILs (including its legal rationale for authorizing them). *See Chlorine Chemistry Council v. EPA*, 206 F.3d 1286, 1290 (D.C. Cir. 2000) ("we have no reason to believe that mere vacatur [without a ruling] provides an adequate remedy if, as we ultimately conclude, EPA's action was unlawful."). Indeed, the guidance EPA intends would actually broaden the availability of SIL waivers by incorporating only the SIL values in 40 C.F.R. §51.165(b)(2), values that are significantly weaker than those EPA set for Class I areas in the rule here. *Compare* 40 C.F.R. §51.165(b)(2) (annual value of 0.3 $\mu g/m^3$ and 24-hour average value of 1.2 $\mu g/m^3$), *with id.* §§51.166(k)(2), 52.21(k)(2) (same values for Class II and III areas; annual value of 0.06 $\mu g/m^3$ and 24-hour value of 0.07 $\mu g/m^3$ in Class I areas). Thus, EPA apparently intends to use vacatur of the regulatory text as a pretext for

implementing a waiver that departs even further from the Act's mandates (and from limits on *de minimis* exemptions). A ruling by the Court on the merits is therefore warranted to stop the continuing unlawful use of SILs to waive the Act's mandates. *See S. Coast Air Quality Mgmt. Dist.*, 472 F.3d at 905, *amended in relevant part by* 489 F.3d at 1248.

Intervenor's contention (at 12-14, 16-17) that vacatur is not needed because the state implementation plan ("SIP") revision process can repair the damage SILs allow is meritless. Intervenor would replace the Act's plain mandate for prevention, 42 U.S.C. §7475(a) (prohibiting new source permits "unless" source shows it "will not" cause or contribute to violations), with an unwieldy process of allowing violations and hoping someone fixes them later. Br. 31-32. Moreover, the revision process Intervenor cites only starts "[i]f" EPA or the state finds the SIP is "substantially inadequate" or an increment is being exceeded, 40 C.F.R. §51.166(a)(3),[5] and the rule does not require them to make either finding.

---

[5] Further, the revision process is designed to address exceedances coming to light *ex post* "due to allocation through administrative error of too many permits" or sources the Act exempts from regulation. *Alabama Power*, 636 F.2d at 362. The process thus in no way justifies permitting authorities to flout §165(a)(3) *ex ante* by issuing permits that authorize new or modified major sources to violate the NAAQS or increments.

Further, the SILs allow new violations of clean air standards and worsening of existing violations, both of which can cause premature death and sickness, as well as impair visibility—and Intervenor would allow these violations to persist until after the lengthy SIP revision process ends. *See* 42 U.S.C. §7410(k)(1)-(2) (giving EPA 18 months to determine adequacy of SIP). By contrast, there is no inequity in denying exemptions that are contrary to the language and purpose of the Act.[6] *See also Zacharias v. SEC*, 569 F.3d 458, 462 (D.C. Cir. 2009) (vacating action at agency request); *Fox Television Stations v. FCC*, 293 F.3d 537, 541 (D.C. Cir. 2002) (vacating action over intervenor's objection when agency did not join objection).

Petitioner agrees with EPA that the portions of its final action pertaining to SILs are severable from the establishment of the increments themselves. EPA Br. 35. Similarly, the SMC should be vacated and is severable from the establishment of the increments. *See id.*; 75 Fed. Reg. at 64,895-97 (SMC is not mandatory and does not depend on increments), JA____-__.

---

[6] Although irrelevant for the reasons stated above, Intervenor's claim (at 17) that the demonstration required absent SILs would take at least a year is not supported by the record: EPA found it would take about 105 hours per applicant—2.5 work weeks. *See* 75 Fed. Reg. at 64,892/2 (estimating, per year, 274 PSD permit applications and additional burden of $PM_{2.5}$ analyses of 29,000 hours), JA____.

## CONCLUSION

For the reasons given above, Petitioner respectfully requests that this Court vacate and rule invalid on the merits the portions of the $PM_{2.5}$ increments rule that establish and authorize SILs and an SMC for $PM_{2.5}$.

DATED: May 29, 2012

Respectfully submitted,

/s/David S. Baron
David S. Baron
Seth L. Johnson
Emma C. Cheuse
Earthjustice
1625 Massachusetts Ave., NW
Suite 702
Washington, DC 20036-2212
(202) 667-4500
dbaron@earthjustice.org
sjohnson@earthjustice.org
echeuse@earthjustice.org

*Counsel for Sierra Club*

## CERTIFICATE REGARDING WORD LIMITATION

Counsel hereby certifies that, in accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), the foregoing Proof Reply Brief of Sierra Club contains 6,971 words, as counted by counsel's word processing system.

DATED: May 29, 2012

/s/David S. Baron
David S. Baron

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of May, 2012, I have served the foregoing **Proof Reply Brief of Sierra Club** on all registered counsel through the court's electronic filing system (ECF).

/s/David S. Baron
David S. Baron